UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

S1 15 Cr. 867 (RMB)

---

UNITED STATES OF AMERICA

- against –

REZA ZARRAB

Defendant.

---

BAIL APPLICATION ON
<u>BEHALF OF REZA ZARRAB</u>

BRAFMAN & ASSOCIATES, P.C.

By:   Benjamin Brafman, Esq.
Marc Agnifilo, Esq.
Joshua D. Kirshner, Esq.
*Attorneys for Reza Zarrab*
767 3rd Avenue, 26th FL
New York, NY 10017
Tel: (212) 750-7800
Fax: (212) 750-3906

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**S1 15 Cr. 867 (RMB)**

---

**UNITED STATES OF AMERICA**

-against-

**REZA ZARRAB,**

                                      **Defendant.**

---

**Preliminary Statement**

We write on behalf of our client, **REZA ZARRAB**, in the above-referenced case, to request a hearing before this Court at Your Honor's earliest convenience to determine the conditions of Bail necessary to assure Mr. Zarrab's appearance in court.[1]

**Introduction and Proposed Conditions of Release**

As this Court noted at the arraignment in this matter, Mr. Zarrab is presumed to be innocent. The law is clear that prior to a conviction, "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755 (1987). Moreover, in deciding a Bail issue pursuant to 18 U.S.C. § 3142, the "court should bear in mind that it is only a limited group of offenders who should be denied Bail pending trial." United States v. Shakur, 817 F.2d 189, 195

---

[1] There is no reason to suggest that Mr. Zarrab is a danger to the community in any way. Mr. Zarrab does not have a criminal record and is only charged with assisting in money transmissions that allegedly constitute criminal violations, therefore, this letter focuses on the conditions necessary to assure Mr. Zarrab's appearance in this Court when required.

(2d Cir. 1987).   Indeed, the Bail Reform Act requires that the Court impose "the least restrictive…condition, or combination of conditions, that… will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(c)(1)(B).  Nor do the facts of this case trigger either of the rebuttable presumptions of detention.[2]   Therefore, the burden of establishing that there are no appropriate conditions of release falls squarely on the Government based on the factors set forth in the Bail Reform Act that we review below.  With those legal principles in mind, counsel is prepared to offer the following conditions[3] that, we respectfully submit, are more than sufficient to reasonably assure Mr. Zarrab's appearance during the pendency of this case:

- A $50 million personal recognizance bond secured by $10 million in cash;
- Travel restricted to the Southern District of New York;
- Surrender of all travel documents[4] with no new applications;
- Strict Pretrial Services Supervision;
- Home detention with GPS monitoring at Mr. Zarrab's residence in Manhattan (Mr. Zarrab may only leave his residence for medical treatment, counsel meetings, religious services, and court appearances– all with prior notification to Pretrial Services); and
- Mr. Zarrab's presence at his residence[5] is to be secured by the Guidepost Solutions LLC[6] security company ("Guidepost") with the following provisions:
  - 24-hour armed former or off-duty law enforcement officers;
  - Two officers per shift;

---

[2] As this Court is aware, the Bail Reform Act provides for a rebuttable presumption of detention for cases fitting only two categories – one where the defendant is charged with certain firearms or drug offenses; and a second where the defendant has certain prior convictions.  As noted, neither applies here.

[3] These conditions were provided to the government in an effort to reach an agreement as to Bail, but, ultimately, the government indicated that there are no conditions to which it would agree.

[4] In addition to his Turkish and Iranian travel documents, Mr. Zarrab has also voluntarily surrendered his Macedonian passport.

[5] In the event that bail is granted, Mr. Zarrab has entered into a lease for an apartment that has already been inspected and approved by Guidepost.  Also, Guidepost has already started installing security cameras throughout the residence.

[6] Guidepost is run by Bart Schwartz, the former Chief of the Criminal Division of the United States Attorney's Office for the Southern District of New York.  It is widely recognized as the preeminent provider of pretrial security solutions.

- o One supervisory security professional overseeing and scheduling the security detail;
- o Security both at the residence and whenever Mr. Zarrab leaves the building pursuant to Bail conditions;
- o Guidepost will also provide, as needed, a security vehicle with driver, when Mr. Zarrab must travel to counsel's office, court, religious services, or medical treatment; and
- o Guidepost agrees to communicate with Pretrial Services, the Court, and/or the U.S. Attorney's Office, as required by the Court.

## Background

Reza Zarrab is 33 years old and a citizen of Turkey. He lives in Istanbul with his wife, Ebru Gündeş Sarraf, who is a famous singer and television personality, and their five-year-old daughter. In Turkey, he is a respected businessman who is devoted to his family and philanthropic causes.   Many of the important charitable causes that he supports are detailed in this application.

On December 15, 2015, an indictment was filed under seal charging him and his co-defendants with non-violent financial crimes.  Mr. Zarrab was arrested on March 21, 2016 at Miami International Airport as he voluntarily entered the United States with his wife and daughter to visit Miami and subsequently Disney World.  Mr. Zarrab was detained immediately and spent 22 days in the Federal Detention Center in Miami, Florida. He was then transported to Tallahassee, Atlanta and Oklahoma City before arriving in this District on April 26, 2016.  No prior application for Bail has been made.

## The Indictment

Reza Zarrab is one of three defendants charged in a four-count indictment alleging violations of U.S. Sanctions against Iran, Bank Fraud, Conspiracy, and Money

Laundering. For purposes of this application, Mr. Zarrab concedes that the Indictment includes serious felony charges – a fact which, however, does not distinguish it from almost all of the federal felony indictments brought in this District. Notably, however, the Indictment includes only allegations of financial crimes. There are no allegations of violence or potential violence in the indictment and, as noted, none of the charges creates any presumptions of detention under the Bail Reform Act, <u>see</u> 18 U.S.C. 3142(f)(1), or is otherwise identified in the Act as the sort of crime for which bail should be denied, see 18 U.S.C. 3142(g)(1).

## The Legal Standards and Authority

### A. The Bail Reform Act

The Eighth Amendment to the Constitution provides: "Excessive bail shall not be required." U.S. Const. amend VIII. "Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." <u>Stack v. Boyle</u>, 342 U.S. 1, 4 (1951). Consistent with these fundamental principles, the Bail Reform Act of 1984 "requires a court to order the pre-trial release of a defendant on a personal recognizance bond 'unless the [court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.'" <u>United States v. Sabhnani</u>, 493 F.3d 63, 75 (2d Cir. 2007) (quoting 18 U.S.C. § 3142(b)). Even "[i]f the court determines that a defendant's release on an unsecured bond presents a risk of flight, … the law still favors pre-trial release 'subject to the least restrictive further condition, or combination of conditions, that [the court] determines will reasonably assure the

appearance of the person as required.'" Id. (quoting 18 U.S.C. § 3142(c)(1)(B)). Thus, a court may not order pretrial detention unless it finds "that no condition or combination of conditions will reasonably assure the appearance of the person" at trial. 18 U.S.C. § 3142(e). As the Second Circuit has repeatedly recognized, "[u]nder this statutory scheme, 'it is only a limited group of offenders who should be denied bail pending trial.'" Sabhnani, 493 F.3d at 75 (quoting Shakur, 817 F.2d at 195) (quotation marks omitted).

"Because the law thus generally favors bail release, the government carries a dual burden in seeking pre-trial detention." Id. First, it must establish by a preponderance of evidence that the defendant would present an actual risk of flight. Id. If the government satisfies this burden, it "must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court." Id. (citing Shakur, 817 F.2d at 195). The Bail Reform Act lists thirteen categories of conditions that may be imposed to minimize the risk of flight, plus a catch-all category of "any other condition that is reasonably necessary" to satisfy the aforementioned joint objectives of bail. 18 U.S.C. § 3142(c)(1)(B)(xiv).

**B. Bail Condition of Home Detention with 24-Hour Armed Security**

The Second Circuit and other judges in this District and in the Eastern District of New York have repeatedly agreed that a defendant's willingness to submit to home detention policed by 24-hour armed security guards will substantially mitigate any risk of flight. See, e.g., Sabhnani, 493 F.3d at 77. In the hope of reaching an agreement with the government, we informed the prosecutors assigned to this case that our Bail proposal would include the conditions that Mr. Zarrab be subject to home detention with

electronic GPS monitoring by Pretrial Services and 24-hour physical surveillance by armed security guards.   The government rejected our proposal as inadequate, a position that is inexplicably at odds with the government's accession to similar conditions in the Bernard Madoff matter.  See United States v. Madoff, 586 F. Supp. 2d 240, 244 & n.3 (S.D.N.Y. 2009) (noting that the Government "submitted the jointly proposed Bail condition modifications," which included that the condition that Madoff employ a security firm, at his wife's expense, to provide 24-hour monitoring of Madoff's building and video monitoring of his apartment doors).

In seeking detention, the government may argue that releasing Mr. Zarrab on these conditions would be inappropriate because it would allow a wealthy defendant to be released on the condition that he pay for a private jail.   This argument should not fare any better here than in the other courts that have rejected it.   Judge Jed Rakoff of this District specifically rejected the government's argument that private security guards impermissibly favored the wealthy:

> It cannot be gainsaid that many kinds of bail conditions favor the rich, and, conversely, that there are many defendants who are too poor to afford even the most modest of bail bonds or financial conditions of release. This is a serious flaw in our system. But it is not a reason to deny a constitutional right to someone who, for whatever reason, can provide reasonable assurances against flight.

United States v. Dreier, 596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009).  Tellingly, the same Bail conditions we offer were also approved by other federal judges in New York, including Judge Seybert in the David H. Brooks case (E.D.N.Y. Case # 06 Cr. 550) and recently by Judge Scanlon in the FIFA bribery case for the defendant Jeffrey Webb (E.D.N.Y. Case # 15 Cr. 252), a non-United States citizen, and, as we more fully

discuss infra, by both District Judge Vernon Broderick and Magistrate Judge Fox in the U.N. Bribery case, where the defendant Ng Lap Seng, also a non-United States citizen, was granted Bail with similar conditions.

Although not specifically resolving the issue, the Second Circuit has aptly pointed out that the government's argument fails to consider that some wealthy defendants would have been initially granted Bail if they were not as wealthy. See United States v. Sabhnani, 493 F.3d 63, 78 n.18 (2d Cir. 2007) ("The government has not argued and, therefore, we have no occasion to consider whether it would be 'contrary to principles of detention and release on Bail' to allow wealthy defendants 'to buy their way out by constructing a private jail.'"). The government cannot logically argue that wealth increases the risk of flight at the same time that wealth should not be used to justify bail conditions; the government cannot have it both ways.

Even in United States v. Cilins, No. 13 Cr. 315 (WHP), 2013 WL 3802012 (S.D.N.Y. July 19, 2013), where the District Court rejected the armed guard condition, Judge William H. Pauley III acknowledged that "other judges in this district have found that an armed security guard may be sufficient to assure a defendant's appearance, even when he is a serious risk of flight." Id.

In all events, Cilins is readily distinguishable. First, the charged conduct there involved obstruction of investigative and criminal processes. The defendant there, a French citizen, was charged with three counts of witness tampering, one count of obstructing a criminal investigation, and one count of destroying, altering, falsifying records in a federal investigation. Id. at *2. "According to the Government, each offense obstructed a federal investigation into the conduct of Cilins and his associates."

*Id.* at *2. Second, the alleged misconduct was ongoing: "when Cilins was arrested after his last meeting with the cooperating witness, he had $20,000 in cash on his person." *Id.* Here, in contrast, the government does not contend that Mr. Zarrab's alleged misconduct is ongoing. Third, the <u>Cilins</u> court relied on the fact that "France refuses to extradite its citizens," which meant that "Cilins can avoid prosecution on this Indictment if he can reach French soil." *Id.* Turkey, by contrast, has an extradition treaty with the United States and recently complied with a U.S. request for extradition of a high-profile hacking suspect. *See* DOJ Press Release, Man Pleads Guilty to Facilitating Computer Hacking of Vermont Company (Dec. 2, 2015).[7] Finally, the <u>Cilins</u> court emphasized that Cilins had repeatedly evaded the government's attempts to accurately assess the scope of his assets, leading the court to conclude that Cilins's "lack of candor … adds to the risk of flight and buttresses this Court's conclusion that nothing short of detention can reasonably assure Cilins's appearance at trial." 2013 WL 3802012, at *3. Mr. Zarrab, in contrast, has been forthright with this Court throughout these proceedings.[8]

### C. Recent Precedent in This District Supports Bail With 24-Hour Home Detention and 24-Hour Armed Security

Directly supporting defendants' application for granting Bail with the condition, amongst others, of home detention with 24-hour armed security, is Judge Vernon Broderick's (affirming Magistrate Judge Fox) recent decision in <u>United States v. Ng Lap</u>

---

[7] *See* https://www.justice.gov/opa/pr/man-pleads-guilty-facilitating-computer-hacking-vermont-company.
[8] Similarly, any reliance on <u>United States v. Valerio</u>, 9 F. Supp. 3d 283 (E.D.N.Y. 2014) would also be unjustified. In <u>Valerio</u>, the defendant was charged with producing child pornography involving three-year-old and six-year-old victims. <u>Id.</u> at 285. After an extensive discussion addressing the defendant's danger to the community, Judge Bianco concluded that the defendant's "attempt to replicate a jail in his home is insufficient to adequately address the issues of dangerousness raised by his release." <u>Id.</u> at 296. In addressing the defendant's risk of flight, Judge Bianco noted that the case involved a fifteen-year minimum sentence. <u>Id.</u> at 298. These concerns are not present in Mr. Zarrab's case, as there is no legitimate argument that Mr. Zarrab poses a threat to the community and there is no mandatory minimum sentence in his case.

Seng, No. 15 Cr. 706 (S.D.N.Y).  Exhibit 1 (Transcript of Bail Hearing). The Ng case is particularly instructive because it involved similar circumstances to those present here – a foreign defendant with limited ties to the United States, significant personal wealth and a potentially high guideline sentence for non-violent, economic offenses if convicted.

Ng Lap Seng, a citizen of China, was arrested on a Complaint on September 19, 2015 while attempting to board his private plane.  Mr. Ng, who the government alleged is worth approximately $1.8 billion, is not a United States Citizen and has no ties to the United States.

Significantly, unlike Mr. Zarrab, Mr. Ng owned or had access to several private planes in the United States and was intending to leave the United States when arrested. On the other hand, Mr. Zarrab was arrested entering the country on a commercial airline on what was to be a visit to Disney World with his family. Furthermore, while Mr. Zarrab does have significant personal and family wealth, he does not have anywhere near the $1.8 billion dollars in net worth the government alleged of Mr. Ng.  Thus, any argument that the proposed conditions would somehow not be meaningful to Mr. Zarrab would be specious.

Finally, in the Ng case, despite vigorous objection from the government at both the Magistrate and District Court level, Magistrate Judge Fox and District Judge Broderick ordered Mr. Ng's release with nearly identical conditions to those we propose for Mr. Zarrab, including the use of Guidepost to provide 24-hour armed security. Notably, to date, Mr. Ng has been compliant with all of the conditions of Bail since his release in October, 2015. There simply is no fact present here that would lead the Court

to believe that Mr. Zarrab would not be similarly compliant with these stringent conditions should the Court grant Bail as requested.[9]

## Argument

The proposed conditions of release, specifically home detention with 24-hour armed security, obviates any perceived risk of flight due to Mr. Zarrab's lack of ties to the United States. The significant bond and other proposed conditions of Mr. Zarrab's pre-trial release are more than sufficient to accomplish the aims of the Bail Reform Act.

As noted above, the Bail Reform Act requires the release of a defendant on the **"least restrictive"** conditions necessary to "reasonably assure the appearance of the person as required and the safety of any other person and the community." See 18 U.S.C. § 3142(c)(1)(B) (emphasis added).  To determine the least restrictive conditions of release necessary to achieve the aims of the Bail Reform Act, the Court must consider the following factors:  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g); See also U.S. v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007); United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993).  An analysis of these factors compels the conclusion that the proposed conditions of Mr. Zarrab's  release are more than sufficient to accomplish the aims of the Bail Reform Act.

---

[9] We also note that no person has ever absconded or failed to appear in Court when required in any of the numerous cases in which Guidepost has provided private security.

## A. Nature and Circumstances of the Crimes Charged

In evaluating the "least restrictive" Bail conditions that will "reasonably assure the appearance of the person as required and the safety of any other person and the community," the Court must take into account:  "the nature of the circumstances of the offense charged, including whether the offense is a crime of violence, a Federal crime of terrorism, or involves a minor victim or controlled substance, firearm, explosive, or destructive device." See 18 U.S.C. § 3142(g)(1).  It is clear from the statutory language that the primary consideration for the Court, is whether the charged crime involved violence, narcotics, sex crimes, terrorism, or weapons. The fact that the statute mentions these crimes in particular, is an indication that Congress viewed these specific offenses as more deserving of detention or strenuous Bail conditions than other offenses, all else being equal.

Critical here to the Court's analysis of the "nature and circumstances of the crime charged," is that Mr. Zarrab has not been charged with any crime involving violence, sex trafficking, terrorism, minor children, narcotics, or weapons. Accordingly, there is nothing about the nature and circumstance of the charged offenses to suggest that pre-trial detention is necessary to achieve the purposes of the Bail Reform Act.

## B. Weight of the Evidence

The government will argue that its case against Mr. Zarrab is strong. The allegations, however, against Mr. Zarrab will be sharply contested at trial.  The work done by Mr. Zarrab's counsel thus far provides ample basis for belief that the charges are ill-founded and that the government will not prevail at trial. In any event, the strength of the government case is generally considered the "least important" of the 18 U.S.C. §

12

3142(g) factors for the court to consider when determining the conditions necessary to satisfy the aim of the Bail Reform Act.  See U.S. v. Jones, 566 F. Supp.2d 288, 292 (S.D.N.Y. 2008).

### C. History and Characteristics of Mr. Zarrab

Despite his lack of ties to the United States, the facts here concerning Mr. Zarrab's history and characteristics underscore that he is not a risk of flight.  Mr. Zarrab is a husband and a father who is committed to his family and would not countenance life as a fugitive.

Mr. Zarrab belongs to a close-knit family, his parents having been married 45 years.  He is uncle to his two siblings' four children.  He is a member of the Muslim faith, as is his wife, and they are raising their daughter in that same faith.

Mr. Zarrab was born in Tehran, Iran on September 12, 1983.  The youngest of three siblings, he moved to Istanbul, Turkey with his family as a one-year-old child.  He holds Iranian, Turkish and Macedonian passports, but has always considered himself Turkish at heart, having lived in Turkey most of his life.

Mr. Zarrab attended elementary school and high school in Istanbul.  After his family moved to Dubai in 1999, he established his first successful business enterprise, a tea brokerage, trading in Sri Lankan tea destined for Turkey.  That company employed three people in Dubai for approximately three years.

In 2002, Mr. Zarrab returned to Turkey, without his family, where he established a Turkish gold brokerage and currency exchange.  Shortly thereafter, he purchased a majority partnership in a Turkish currency exchange house, which he operated for

approximately two years, employing five people.  He sold his interest in that company in 2009.

In 2008, Mr. Zarrab established a shipbuilding company in Istanbul named Royal Shipping.  In 2009, Royal Shipping received an order from the Royal Radisson Hotel in Moscow for construction of five river-cruise ships.  On the strength of that order, Mr. Zarrab assembled a team of naval architects and engineers, leased a shipyard in Istanbul, and commenced construction.  Royal Shipping completed the project on schedule, and delivered the five vessels to the Royal Radisson Hotel in 2010.  During the height of construction, Royal Shipping directly employed more than 100 people.

In 2009, Royal Shipping also contracted to manufacture all heavy machinery for a start-up steel manufacturing company in Iran established by Mr. Zarrab's father.  That project had a value to Royal Shipping of approximately $30 million, and was performed over the course of approximately two years.

Building on the success of Royal Shipping, Mr. Zarrab also acquired a share in a real estate construction company in Istanbul in 2010.  Over the course of approximately two years, that company built two separate apartment buildings in Istanbul with a total of more than 60 apartment units.  Mr. Zarrab began working in the gold and commodities trading business in 2012.

### 1. Mr. Zarrab Meets and Marries Ebru Gündeş

In 2005, Ebru Gündeş, a popular Turkish singer, performed at the wedding of Mr. Zarrab's brother.  Mr. Zarrab, who had long been a follower of Ms. Gündeş, was inspired by her performance, and he composed two songs in her honor. Mr. Zarrab then delivered those songs, through mutual friends, to Ms. Gündeş, who was so impressed

that she asked to meet Mr. Zarrab. They fell in love and married in 2010. In 2011, Ms. Gündeş gave birth to a daughter, their only child to date. Eventually, Ms. Gündeş released professional recordings of both of Mr. Zarrab's compositions. Their marriage is a partnership, and Mr. Zarrab would not sacrifice that marriage and her career by becoming an international fugitive.

### 2. Mr. Zarrab is a Prominent and Well-Respected Philanthropist

In addition to being successful at many different business ventures, Mr. Zarrab is also deeply committed to improving social conditions in Turkey. Mr. Zarrab has made numerous charitable contributions totaling in excess of $5 million (equivalent), including the payment of medical care for the needy, assistance to mentally disabled children, and providing access to quality schooling for residents in low-income communities. He also owns businesses in the non-financial sector, employing more than 80 full-time workers.

Mr. Zarrab's philanthropic activities had their genesis at a conference he attended in Istanbul in 2012, sponsored by *Togem-Der*, a Turkish non-profit organization focusing on early detection and education for the mentally disabled, tuition support for low-income families, vocational training programs, and general assistance to the poor. As the young father of a one-year-old daughter, Mr. Zarrab was touched by the organization's work, and driven by his general concern for the underprivileged. Mindful of his own success, he implemented a personal assistance program that has included not only monetary support to *Togem-Der* and other organizations, but also his personal involvement in identifying and assisting needy individuals.

After attending the *Togem-Der* conference, Mr. Zarrab also pledged to provide financial assistance to that organization on a monthly basis. *Togem-Der* also supplied Mr. Zarrab with a list of children from low-income families who were enrolled in various schools, but whose parents were having difficulty paying their monthly tuition bills. Mr. Zarrab personally tasked his staff with the job of interviewing the families of each of the children, for due diligence purposes, after which he assumed the responsibility of paying the monthly tuition bill for each student identified by *Togem-Der*, without exception. That practice continues to the present. Documentation of those payments is attached hereto as Exhibit 2.

Mr. Zarrab has also contributed a total of approximately $2,300,000 (equivalent) to *Togem-Der* for construction of 11 new schools, primarily in the northern regions of Turkey, where winter conditions are often severe. New schools were greatly needed in those areas owing to an increasing number of students in need of education, the general lack of heating, and the poor physical condition of many of the existing school buildings. Photographs of those school construction projects, together with documentation verifying Mr. Zarrab's payments, are attached hereto as Exhibit 3. He has also established a food kitchen for 5,000 Syrian refugees in Turkey at a personal cost of approximately $350,000 (equivalent) and has paid approximately $1,000,000 (equivalent) for the construction of a multi-story facility in Istanbul dedicated to early identification and education of mentally disabled children. A photograph of that facility, together with documentation verifying Mr. Zarrab's payment, are attached hereto as Exhibit 4.

Finally, Mr. Zarrab has also supplied medical care for numerous financially-challenged individuals in Turkey. Mr. Zarrab has tasked his staff with the job of meeting the administrators of various government hospitals in Turkey to request lists of individuals under the hospitals' care who require treatment, but are unable to pay. Mr. Zarrab's staff has met individually with each patient identified by those hospitals and performed independent research into the financial means of those patients and their families. In more than 100 separate cases, where genuine financial need was verified, Mr. Zarrab paid the medical bills of those patients in full. In 2010, Mr. Zarrab also provided hundreds of new medical beds for use in a government-run retirement home named *Darulaceze.*

Additionally, in six separate cases, Mr. Zarrab purchased motorized wheelchairs for patients who were not ambulatory, and he caused electric charging stations to be installed to power those devices, all at a cost to Mr. Zarrab of approximately $300,000 (equivalent). Documentation of those purchases is attached hereto as Exhibit 5.

Mr. Zarrab's charitable work in Turkey has been continuous and ongoing since 2008, interrupted only by recent his arrest and detention in the United States. His financial contributions to *Togem-Der* alone totaled approximately $850,000 (equivalent) in 2013, approximately $1,500,000 (equivalent) in 2014, and approximately $2,300,000 (equivalent) to date in 2016.

### 3. A Well Respected Employer and Business Owner

In addition to his philanthropic activities, Mr. Zarrab is also a productive business owner. Mr. Zarrab, through his businesses, employs more than 250 people in Turkey and, in 2015, he was listed as the 56th largest taxpayer in Turkey. Notably, Mr. Zarrab

is also a productive business owner in the non-financial sector in Turkey.  Since 2012, he has owned and operated a profitable furniture manufacturing operation in Istanbul named Royal Mobilya, which employs between 80 and 90 full-time workers. Attached hereto as Exhibit 6 is a brochure containing detailed information about Royal Mobilya.

In sum, Reza Zarrab's history and personal characteristics establish that he is a man of character, someone who has taken his civic responsibilities seriously and, accordingly, is not a risk of flight.  What is also clear is that Mr. Zarrab has shown that he is deeply committed to defending himself against these allegations in order to clear his name and so that he may one day be re-united with his family.

Finally, as we have said, any perceived risk of flight for Mr. Zarrab is, as a practical matter, eliminated by the stringent proposed conditions of release, specifically including home detention with 24-hour armed security.

### D. Nature and Seriousness of Danger to the Community

The Second Circuit has not endorsed the position that "economic harm" should be considered in evaluating whether someone is a "danger to the community" under the Bail Reform Act.  While courts have considered the concern about non-physical harm to the community where the charges fall under the enumerated felonies articulated in 18 U.S.C. § 3142(f)(1), such as child pornography or drug trafficking offenses, see e.g. United States v. Zaragoza, 2008 WL 686825, at *3 (N.D. Cal. Mar. 11, 2008), United States v. Schenberger, 498 F. Supp.2d 738, 742 (D.N.J. 2007), there is very little authority supporting the argument that a court should consider a defendant's propensity to commit further economic crimes as "danger to the community" contemplated by the Bail Reform Act.  In any event, this case certainly does not give the Court reason to take

such an expansive view of this clause in the Act.  See e.g., United States v. Madoff, 586 F. Supp.2d at 254 ("[I]t is far too great an extension to reach from the cases presented by the Government that narrowly recognize the possibility of economic harm (and rarely conclude the economic harm presented rises to the level of a danger to the community for which someone should be detained) to such a conclusion based on the minimal evidence presented here by the Government.")

The charges in this case do not support a threat to the community of continued economic harm.  Furthermore, as a practical matter, Mr. Zarrab could not engage in the conduct alleged in the indictment if he is under house arrest in the United States.  For these reasons, the issue of "danger to the community" is not an appropriate concern when determining the "least restrictive" conditions of Bail for this defendant.

### Mr. Zarrab's Lack of Ties to the Community

Mr. Zarrab is not a U.S. citizen and only came to the United States because he wanted to take his wife and five-year-old daughter to Disney World.  The Government will argue that his lack of ties and his personal wealth make detention appropriate. However, there are several serious flaws in the Government's anticipated argument in this regard.

First, the proposed conditions make it virtually impossible for Mr. Zarrab to flee. With a perfect record for ensuring clients always appear in court when required, Guidepost has proven to be at least as effective as traditional incarceration.

Second, when the Bail Reform Act identified certain classes of cases and defendants that deserved special consideration for detention, it created only two

presumptions of detention.  Neither involved defendants from other countries, non-U.S. citizens, or more generally defendants with thin or no community ties.  While these are factors among the many other factors listed in the Bail Reform Act, they are far from dispositive.

Third, there is nothing in the Bail Reform Act to suggest that a wealthy defendant is more of a flight risk than a non-wealthy defendant.  While the statute does indicate that financial resources are a factor the court may consider, those considerations go in both directions.  Thus, it is clear that Mr. Zarrab has much to lose under the proposed Bail package should he fail to return to court, an eventuality counsel views as practically impossible, as noted.  His family would lose the $10 million cash Bail; he would be responsible for the remainder of the $50 million on the bond and he would live the rest of his life as a fugitive instead of a successful, well-respected businessman and philanthropist.

Furthermore, the defendant's wife is, modesty aside, an international music star throughout the Middle East and elsewhere.   It would mark the end of her very successful and public career if she was to be married to a fugitive. One of the considerations this Court often has in difficult Bail matters is how the defendant's potential flight would impact loved ones. Here, there is an added impact that simply is not present in the vast majority of cases – that if the defendant fails to live up to his Bail obligations, he ruins the career of his wife.

Even if it were possible for the defendant to flee under the proposed conditions, which we contend it is not, he would nonetheless not do so for fear of the terrible impact such a decision would visit on his family.  For these reasons, we believe the Bail

proposal contained in this Application is more than sufficient to ensure that Mr. Zarrab returns to court when required to do so.

## Difficulty Preparing for Trial If Detained and Mr. Zarrab's Personal Medical Issues

Although not dispositive under the Bail Reform Act, we also note that Mr. Zarrab speaks limited English and, based on information and belief, a significant portion of the discovery is in Turkish or Farsi. Accordingly, for counsel to confer with Mr. Zarrab there must always be a third-party interpreter present who is fluent in Turkish and Farsi. In addition, we have been informed by the government that this case will involve voluminous discovery and, based on counsel's preliminary investigation, it is clear that counsel will need to review years of additional documents and interview dozens of fact witnesses as the charges against Mr. Zarrab relate to a fundamentally legal series of overseas projects. To provide effective assistance, counsel would need to review these documents and interview these witnesses in Mr. Zarrab's presence and with the benefit of technological assistance not available at the MCC. Were Mr. Zarrab to be detained, it would be difficult for counsel to defend this case properly.

Finally, we note that Mr. Zarrab suffers from a series of medical issues. He suffers from intestinal polyps, a stomach ulcer, and tumor located near his kidney, all of which require periodic monitoring by physicians. He requires a special diet and medical supervision properly to maintain his health in the many months before trial, and while on Bail, those issues will be much easier to address.

## Conclusion

Because Mr. Zarrab is not charged with a violent crime, is not facing any mandatory minimum prison sentence and is otherwise eligible for Bail, we urge this Court not to detain him simply because he is wealthy and lacks ties to the United States.  Our bail proposal removes any possible concern of flight

We look forward to further addressing these issues at a hearing before this Court.

Respectfully submitted,

Benjamin Brafman
Marc Agnifilo, Of Counsel
Joshua D. Kirshner
*Attorneys for Reza Zarrab*
Brafman & Associates, P.C.
767 3rd Avenue, 26th FL
New York, NY 10017
Tel: (212) 750-7800
Fax: (212) 750-3906

cc:   AUSA Sidhardha Kamaraju (via email)
      AUSA Michael Lockard (via email)
      All counsel (via ECF)