UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

REZA ZARRAB,
     a/k/a "Riza Sarraf,"

               *Defendant*.

ECF CASE

**S1 15 Cr. 867 (RMB)**

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT REZA ZARRAB'S MOTION FOR BAIL**

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Michael Lockard
Sidhardha Kamaraju
Assistant United States Attorneys
    *Of Counsel*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ........................................................................................................................ 2

   I. The Indictment......................................................................................................................... 2

     A. Statutory Background ........................................................................................................ 2

     B. Offense Conduct................................................................................................................. 5

     C. The Defendant's Arrest in Miami and Misrepresentations to Pre-Trial Services ............. 7

     D. The Defendant's Assets, Businesses, and Corrupt Political Connections ........................ 8

DISCUSSION ........................................................................................................................... 14

   I. Applicable Law ..................................................................................................................... 15

   II. Risk of Flight....................................................................................................................... 15

     A. Nature and Seriousness of the Charges Against the Defendant....................................... 16

     B. Weight of the Evidence Against the Defendant ............................................................... 19

     C. History and Characteristics of the Defendant .................................................................. 20

     D. The Defendant's Proposed Bail Package Is Insufficient to Address These Concerns ..... 22

CONCLUSION.......................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*United States* v. *Banki,*
369 F. App'x 152, 154 (2d Cir. 2010)……………………………………………...…23

*United States* v. *Paul Ceglia,*
12 Cr. 876 (VSB)(S.D.N.Y. 2015) ......................................................................23

*United States* v. *Cilins,*
No. 13 Cr. 315 (WHP), 2013 WL 3802012, at *3 (S.D.N.Y. July 19, 2013)...................23, 24, 25

*United States* v. *Colorado-Cebado,*
No. A-13-CR-458 (DEW), 2013 WL 5852621, at *7 (W.D. Tex. Oct. 30, 2013) ........................23

*United States* v. *Dreier,*
596 F. Supp. 2d 831, 834 (S.D.N.Y. 2009)..…………………………………………24

*United States* v. *Hassanshahi,*
989 F. Supp. 2d 110, 112 (D.D.C. 2013)…………………………………………………15, 16

*United States* v. *Karni,*
298 F. Supp. 2d 129, 129 (D.D.C. 2004)…………………………………………………15, 16

*United States* v. *Ng Lap Seng,*
15 Cr. 706 (VSB) (S.D.N.Y. Oct. 22, 2015)..........................................................24, 25

*United States* v. *Townsend,*
897 F.2d 989, 994-95 (9th Cir. 1990)……………...…………………………………...15

*United States* v. *Valerio,*
9 F. Supp. 3d 283, 293-94 (E.D.N.Y. 2014)………………………………...……………...23

## STATUTES AND RULES

18 U.S.C. § 1701……………………………………………………………………..2

18 U.S.C § 1702……………………………………………………………………...2

18 U.S.C. § 1705……………………………………………………………………….2

18 U.S.C. § 3142.........................................................................................14, 15, 18

**SECONDARY SOURCES**

Dept. of State, 2013 Country Reports on Terrorism, *available at*
http://www.state.gov/j/ct/rls/crt/2013/224826.htm (May 3, 2016) .................................................3


Testimony of Robert J. Einhorn to House Comm. on
Oversight and Govt. Reform (July 29,
2010)……………………………………………………………………………………………..17

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the defendant's application for bail in the above-referenced matter. There are no conditions that can reasonably assure the defendant's appearance. Accordingly, the defendant's application for bail should be denied, and the defendant should remain detained pending trial.

Reza Zarrab is a sophisticated, well-connected, international businessman with immense wealth and influence, who is alleged to have aided the Government of Iran's deception of the United States and international banking system for years. More recently, following his arrest, he misled an arm of the Court by making material misrepresentations about the vast scope of his assets and income and the extent of his international travel. In addition to his history of duplicity, Zarrab has significant incentive and ability to flee from the United States and this case. He has no ties to the United States, substantial family and business ties abroad, access to enormous resources, at least three passports, and the ability easily to travel to and remain in countries from where he cannot be extradited. He faces prosecution for serious offenses that carry a statutory maximum term of imprisonment of 75 years and a likely sentencing range under the United States Sentencing Guidelines of decades. Moreover, the evidence of Zarrab's participation in the charged offenses is overwhelming: his culpability is captured in voluminous and unimpeachable email communications among Zarrab and his subordinates and co-conspirators, business records, and financial evidence that document his orchestration of the charged schemes. As a dual citizen of Iran and Turkey, who is alleged by Turkish authorities to have used his wealth and influence to secure his recent release from Turkish prison, the defendant poses an extraordinary risk of flight and there are no bail conditions that will assure his presence in Court.

Zarrab's proposed bail conditions are an attempt to use his tremendous wealth to obscure the flight risk through a façade of security that is beyond the reach of all but a small subset of fabulously wealthy defendants. Putting aside the inequity of permitting a wealthy defendant to construct his own perceived prison staffed by a firm on his payroll, these conditions do not mitigate the risk of flight created by the nature of the charges, weight of the evidence, Zarrab's personal background, and his duplicity to date. For these reasons, and those set forth more fully below, the defendant's application for bail should be denied.

## BACKGROUND

### I. The Indictment

Zarrab is charged in a four-count superseding indictment, S1 15 Cr. 867 (RMB) (the "Indictment"), attached hereto as Exhibit A, with conspiring from at least in or about 2010, up to and including in or about 2015, to: (1) defraud the United States and to impede the lawful functions of the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"), in violation of Title 18, United States Code, Section 371 (Count One); (2) violate the International Emergency Economic Powers Act, Sections 1701 to 1706 of Title 50 of the United States Code ("IEEPA"), and the Iranian Transactions and Sanctions Regulations, Part 560 of Title 31, Code of Federal Regulations ("ITSR") (Count Two); (3) commit bank fraud, in violation of Title 18, United States Code, Section 1349 (Count Three); and (4) commit money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957 (Count Four).

### A. Statutory Background

The IEEPA authorizes the President to deal with "unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats, 50 U.S.C. § 1701(a), and to take steps to address such threats, 50 U.S.C. § 1702. Section 1705 provides, in part, that "[i]t shall be

unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a).

The President has repeatedly declared such a national emergency with respect to the Government of Iran: beginning with Executive Order No. 12170, issued on November 14, 1979, President Jimmy Carter found in response to the Islamic Revolution in Iran and the takeover of the American Embassy in Tehran, that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat." Exec. Order 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979). A few years later, in 1987, President Ronald Reagan issued an Executive Order finding "that Government of Iran is actively supporting terrorism as an instrument of state policy" and "has conducted aggressive and unlawful military action against U.S.-flag vessels and merchant vessels of other non-belligerent nations engaged in lawful and peaceful commerce in international waters of the Persian Gulf and territorial waters of non-belligerent nations of that region." Exec. Order 12613, 52 Fed. Reg. 41940 (Oct. 30, 1987)

On March 15, 1995, President William Jefferson Clinton again found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States[.]" Exec. Order No. 12957, 60 Fed. Reg. 14615 (Mar. 17, 1995). On two other occasions in 1995 and 1997, President Clinton again found that the actions and policies of the Government of Iran constituted a threat to the national security, foreign policy, and economy of the United States. *See* Exec. Orders 12959 (May 6, 1995) and 13059 (Aug. 19, 1997). These orders, among other things, prohibited the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person and

authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.

Every President since President Clinton has continued the national emergency with respect to Iran and Executive Orders 13059, 12959, and 12957, given that the actions and policies of Iran continue to threaten the national security, foreign policy, and economy of the United States. The most recent continuation of this national emergency was on March 9, 2016. *See* 81 Fed. Reg. 12793 (Mar. 9, 2016). In this most recent continuation, President Barack Obama noted that, despite the Joint Comprehensive Plan of Action ("JCPOA") entered into among the United States and others, and Iran concerning Iran's nuclear program, "certain actions and policies of the Government of Iran continue to pose an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *Id.*

Pursuant to this authority, the Secretary of the Treasury promulgated the ITSR, implementing the sanctions imposed by the Executive Orders. Section 560.204 prohibits, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. Person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from OFAC. The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR. 31 C.F.R. § 560.203.

Appendix A to the ITSR contained a list of persons determined to be the Government of Iran. At all times relevant to the charged conduct, Bank Mellat an Iranian state-owned bank; the National Iranian Oil Company ("NIOC"), an Iranian oil company; Naftiran

Intertrade Company Ltd. ("NICO"), an Iranian company located in the United Kingdom; and

Naftiran Intertrade Company Sarl ("NICO Sarl"), an Iranian company located in Switzerland,

were on the list in Appendix A.  At all times relevant to the charges in the Indictment, NIOC was

also identified by OFAC as an agent or affiliate of Iran's Islamic Revolutionary Guard Corp

("IRGC") pursuant to Executive Order 1359.  In addition, at all times relevant to the charges in

the Indictment, Bank Mellat, and all of its branches and subsidiaries, including Mellat Exchange,

were designated as Specially Designated Nationals ("SDNs").[1]

### B.  Offense Conduct

Zarrab facilitated millions of dollars-worth of transactions on behalf of Iran and

sanctioned entities that were designed to evade the U.S. sanctions.  The goals of the conspiracy

were made clear in a December 3, 2011 draft letter addressed to the General Manager of the

Central Bank of Iran, prepared for Zarrab's signature, and found in Zarrab's email account[2]:

> The role that the Supreme Leader [the Ayatollah Khamenei] and the esteemed
> officials and employees of Markazi Bank [the Central Bank of Iran] play against
> the sanctions, wisely neutralizes the sanctions and even turns them into
> opportunities by using specialized methods.  It is no secret that the trend is
> moving towards intensifying and increasing the sanctions, and since the wise
> leader of the Islamic Revolution of Iran has announced this to be the year of the
> Economic Jihad, the Zarrab family, which has had half a century of experience
> in foreign exchange, while establishing branches in Turkey, United Arab

---

[1] On January 16, 2016, the International Atomic Energy Administration certified that Iran had met its obligations under the JCPOA to dismantle its nuclear program.  On that date, known as "Implementation Day," the JCPOA formally went into effect.  As part of the United States' obligations under the JCPOA, OFAC removed NIOC, Nico Sarl, and Bank Mellat from the SDN List.  The practical effect of their removal was that non-U.S. persons and companies no longer risked U.S. sanctions for doing business with these entities that did not involve U.S. goods or services.  However, it remains unlawful for U.S. persons to engage in transactions with any of these entities, and they remain barred from engaging in U.S. dollar transactions.  Zarrab's conduct is just as illegal today as it was when he repeatedly evaded U.S. sanctions.

[2] The draft letter was written in Farsi.  Similarly, other communications and documents described herein are also written in Farsi or in Turkish.  These communications and documents have been translated into English as part of the investigation.  These translations are preliminary, and may be revised based on further investigation.

> Emirates, Russia, and Azerbaijan, considers it to be our national and moral duty to declare our willingness to participate in any kind of cooperation in order to implement monetary and foreign exchange anti-sanction policies . . . .
>
> Hoping that the efforts and cooperation of the zealous children of Islamic Iran will result in an upward increase in the progress of our dear nation in all international and financial arenas.

(*See id*. ¶ 14(i)).

Zarrab and his co-conspirators orchestrated the scheme through a global network of companies located in Turkey and the United Arab Emirates ("UAE"), including a group of companies under Royal Holding A.S. ("Royal Holding"), a holding company in Turkey, Durak Doviz Exchange ("Durak"), a money services business in Turkey, and Al Nafees Exchange LLC ("Al Nafees"), a money services business in the United Arab Emirates. The Royal Holding group of entities includes Royal Emerald Investments, among others. (*See id*. ¶ 9).

The defendant used this web of businesses to evade U.S. sanctions by making it appear as if certain financial transactions were on behalf of Turkish or Emirati companies when in fact, they were for the benefit of Iran, its agents, and agents or affiliates of the IRGC, including Bank Mellat, Mellat Exchange, NIOC, and others. (*See id*. ¶ 12). For example, in or about January 2011, Al Nafees and Royal Emerald Investments, two businesses operated by Zarrab and his co-conspirators, arranged, at the direction of Mellat Exchange, to make a U.S. dollar payment of more than $950,000 to a Canadian company on behalf of MAPNA Group, and Iranian construction and power plant company. (*See id*. ¶ 14(a)). A U.S. bank processed a leg of this transaction, which was described to that bank as a payment related to fire equipment, with no mention made of MAPNA Group. (*See id*. ¶ 14(b)). Zarrab actively participated in the criminal scheme, personally directing illicit transactions involving hundreds of thousands of dollars, and using false documentation and front companies to do so. (*See id*. ¶ 14(j-l)).

*C. The Defendant's Arrest in Miami and Misrepresentations to Pre-Trial Services*

On or about March 19, 2016, Zarrab flew from Istanbul to Miami, Florida, with his family and some of his employees. During his interview with Customs, Zarrab declared that he was carrying approximately $103,000 in cash. The FBI subsequently arrested Zarrab, and searched him, finding, among other things, an Apple iPhone (the "Zarrab Phone").

Two days later, on or about March 21, 2016, Zarrab was presented in the United States Magistrate's Court for the Southern District of Florida. In preparation for that appearance, Zarrab was interviewed by Pre-Trial Services in English (the "Pre-Trial Services Interview"). Zarrab ultimately waived a removal hearing and bail hearing in Miami.

During the Pre-Trial Services Interview, Zarrab made several significant misrepresentations regarding his international travel and his assets, apparently seeking to minimize both. Zarrab's misrepresentations about his financial assets will be discussed in the next section. With respect to his foreign travel, Zarrab misrepresented both his ability to travel and the places to which he had traveled. Specifically, although Zarrab holds three passports, from Iran, Turkey, and Macedonia, which he now offers to surrender, during the Pre-Trial Services Interview, he only acknowledged having a Turkish passport. Moreover**,** Zarrab claimed during that Pre-Trial Services Interview that he had traveled to London, Europe, China, Singapore, and Thailand over the past 10 years for vacation. Notably, however, the defendant omitted that, in addition to this already extensive travel, during that time period, his Turkish passport indicates that he also traveled, among other places, to Russia in 2007 and 2010, Azerbaijan in 2009, the Kingdom of Saudi Arabia in 2013 and 2015, Egypt in 2014, and Lebanon in 2015. This, of course, does not include the locations to which Zarrab presumably traveled using his Macedonian and Iranian passports, which the Government does not have.

*The Defendant's Assets, Businesses, and Corrupt Political Connections*

**(1) The Defendant's Businesses**

During the Pre-Trial Services Interview, the defendant claimed that he earned an annual income of approximately $720,000 from a gold export business, a furniture business, and a shop that he leases out in Turkey. These assertions are false, in that they dramatically understate the defendant's income and his extensive holdings.

Perhaps the best evidence of the defendant's wealth is his own public statements. For example, on or about April 19, 2014, Zarrab gave a television interview (the "April 19 Interview") in Turkey that was made available online, a draft translation of which is attached hereto as Exhibit B. During the interview, Zarrab made statements that demonstrate that his income is greatly in excess of the approximately $720,000. Zarrab claimed, that at one point, which he described as before the imposition of the American embargo, he was exporting a ton of gold a day. (*See* Ex. B at p. 7). Even using a price of $300 per ounce of gold, an amount below the lowest price per ounce of gold in the past 15 years, Zarrab's daily export of one ton of gold a day would be valued at $9,600,000, or approximately $3.5 billion in gold exports per year. Furthermore, according to Zarrab, $3.5 billion in exports was less than 40% of the value of his annual exports. Specifically, during the April 19 Interview, Zarrab asserted that he is responsible for approximately 25 billion Turkish lira in exports, or more than $11 billion. (*See id*. p. 21-22).

Moreover, the defendant's gold export business is just one of his numerous commercial ventures, only a few of which the defendant has disclosed to the Court, and the majority of which are used as part of his criminal scheme. Under the umbrella of his family's holding company, Royal Holdings, the defendant also operates, among others, money exchange businesses, shipping ventures, a furniture company, and a construction business. Through these businesses, the defendant not only generates sizeable income for himself, but also furthers the

sanctions avoidance scheme with which he is charged. For instance, the defendant operates Al Nafees, a money exchange house that, based on ledgers email amongst the co-conspirators, sold and bought $3,452,919,870 and $3,452,928,229, respectively, in 2011. Al Nafees also engaged in financial transactions on behalf of sanctioned entities, including the Mellat Exchange. (*See* Indictment ¶ 14(a)). Similarly, the defendant operates Atlantis Capital Trading Ltd. ("Atlantis") and Durak, which were used, among other things, to make bulk cash movements of approximately $1,002,900,000 and €412,000,000 in paper currency to Mellat Exchange in Tehran, Iran using bulk cash couriers in or about late 2011. Not surprisingly, the defendant did not disclose Al Nafees, Durak, or Atlantis during the Pre-Trial Services Interview.

Zarrab also failed to disclose his shipping business, Royal Shipping, during the Pre-Trial Services Interview, but now touts it as an example of his business acumen. But while the defendant discusses projects undertaken by Royal Shipping on behalf of the Radisson hotel chain and his father's steel manufacturing company, he omits how he used his shipping ventures to help NIOC, which, at the time, was designated as an arm of the IRGC, a principal supporter of terrorist activity around the world. The illegal business relationship with NIOC is captured in voluminous documentary evidence. For example, in an email dated on or about January 5, 2013, attached hereto as Exhibit C, the sender of the email describes an anticipated visit to NIOC's facilities that was agreed to by Zarrab. In another email, dated on or about January 22, 2013, which was sent to an email account for "Royal Denizcilik Ve," one of the businesses used by Zarrab and his co-conspirators, the sender writes on behalf of "Petroiran Company, one of the subsidiaries of the National Iranian Oil Company (NIOC)," and, based on "your official letter to Mr. Ahmad Ghalebany (the managing director of the NIOC)," offers to enter into a business relationship. A copy of this email is attached hereto as Exhibit D.

### (2) The Defendant's Assets

Through his various businesses, Zarrab has amassed a considerable fortune, which is perhaps best demonstrated through the lifestyle that he leads. Zarrab's true lifestyle stands in stark contrast to the picture of his assets that he attempted to paint during the Pre-Trial Services Interview. At that time, Zarrab claimed that he owned a home that he purchased for $8 million, an office building, and a shop in a bazaar in Turkey. Again, these claims are false.

For example, in or about May 2014, Zarrab was emailed a spreadsheet that appears to detail his assets (the "Assets Spreadsheet"). The Assets Spreadsheet appears to show that, as of that time, Zarrab owned, at least, (i) approximately 20 properties alone in his name (more than six times the number he admitted during the Pre-Trial Services Interview), and another three in the name of his business, his wife, or his daughter; (ii) approximately 24 firearms used by individuals who appear to be part of Zarrab's security detail, including firearms valued at in excess of €40,000; (iii) approximately six horses owned by Zarrab, his wife, or one of the Royal entities, at least three of which are valued at more than €100,000; (iv) approximately seven sea vessels, which are registered to "Rza Yachting" or "Royal Turk LLC;" (v) a private airplane named "TC-RZA;" (vi) approximately 17 luxury automobiles in the name of Zarrab or one of the Royal entities; and (vii) artwork valued at more than $10 million. A translation of Asset Spreadsheet showing these assets is attached hereto as Exhibit E. [3] Moreover, in addition to the property described in the Assets Spreadsheet, the defendant owns other significant assets. For example, one of the employees traveling with Zarrab at the time of his arrest claimed, in substance and in part, to be overseeing the construction for Zarrab of a

---

[3] Because the Asset Spreadsheet includes personal financial information about the defendant and his family, the Government is providing unredacted versions to the Court and the defendant, rather than filing the document electronically.

yacht longer than a football field, with three personal submersibles. Zarrab also rents an luxury apartment in Dubai. Furthermore, the defendant plainly has access to a large amount of liquid assets, given that entered the United States with more than $100,000 in cash.

The information found on the Asset Spreadsheet and located through the FBI's investigation is further corroborated by images and videos of assets found on the Zarrab Phone, including large amounts of currency and gold, Zarrab's plane, some of Zarrab's firearms, one of Zarrab's yachts, and one of Zarrab's horses. These images are attached hereto as Exhibit F.[4]

### (3) The Defendant's Corrupt Political Connections

The defendant has used his tremendous wealth not only to purchase several homes, yachts, and other assets, but also to buy access to corrupt politicians in Turkey. In or about 2013, Zarrab was arrested in Turkey, and that charged with bribing high-level Turkish officials to facilitate his criminal conduct. He was released after 72 days in custody, when the charges were dismissed after the Turkish prosecutors and police officers responsible for the investigation were either re-assigned, fired, or arrested and prosecuted themselves.

The details of the investigation that led to Zarrab's arrest are summarized in a December 18, 2013 Turkish prosecutor's report (the "Report") that was leaked to the Turkish press and then posted online. Relevant portions of a draft translation of the Report is attached hereto as Exhibit G.[5] The evidence discussed in the Report includes descriptions of telephone conversations between Zarrab and others intercepted by Turkish law enforcement (including partial transcripts of telephone conversations), physical surveillance of Zarrab and others (including photographs of surveillance), and emails between Zarrab and others. The Turkish

---

[4] With respect to videos, the Government includes screenshots of portions of the video. If the Court wishes, the Government will submit full versions of the videos.

[5] Evidence from the Report is described in this letter in sum and substance. Any interpretation of such evidence is preliminary and based on the investigation to date.

investigation revealed that Zarrab and others orchestrated a criminal scheme that included:

<u>Bribery of Foreign Public and Bank Officials</u>: The Report describes a massive bribery scheme executed by Zarrab and others, paying cabinet-level governmental officials and high-level bank officers tens of millions of Euro and U.S. dollars, among other currencies, to facilitate Zarrab's network's transactions for the benefit of Iran and to protect Zarrab's network from potential competitors. The Report details evidence, including physical surveillance and intercepted telephone conversations and electronic communications between Zarrab, his co-conspirators, and others, concerning (i) bribe payments from Zarrab to Mehmet Zafer Caglayan, then the Turkish minister of economic affairs, between March 2012 and August 2013 totaling at least approximately € 32 million in Euro, $10 million in U.S. dollars, and 300,000 in Swiss francs (including cash, precious gems, luxury watches, and a piano) (*see, e.g.*, Ex. G pp. 89-96, 204-10); (ii) bribe payments from Zarrab to Muammer Guler, then the Turkish minister of the interior (with responsibility for Turkish law enforcement), between April and October 2013 totaling at least approximately $5.8 million in U.S. dollars (*see, e.g.*, *id.* pp. 260-64); (iii) bribe payments from Zarrab to Egemin Bagis, then the Turkish minister of E.U. Affairs (*see, e.g.*, *id.* pp. 173-91); (iv) bribe payments to Suleyman Aslan, then the General Manager of the Turkish bank Türkiye Halk Bankasi S.A. ("Halkbank"), totaling at least approximately €2.5 million and $1.4 million (*see, e.g.*, *id.* pp. 101-02). The Report's conclusions are corroborated by emails obtained through the FBI's investigation, including emails attaching images of the wire transfer to Caglyan's brother financial data confirming the wire payment, spreadsheets that appears to track the bribes paid to Caglyan and Aslan, and other documents referenced in the Report.

<u>Use of Fraudulent Documents to Disguise Transactions for Iranian Entities</u>: The Report further describes a scheme by Zarrab to disguise money transfers using front companies

and false invoices for food and medicine. The Report details recorded telephone conversations in which Zarrab spoke with a Halkbank employee, who questioned why Dubai would ship sugar to Iran. In response, Zarrab explained that at Caglayan's request, he (Zarrab) was an intermediary for Iran's food transactions, including shipments of rice from Pakistan, sugar from Dubai, and other transactions; Zarrab would transfer money to the selling location at Iran's request to pay the invoice, as well as the veracity of bills of lading that showed wheat being shipped from Dubai. The Report describes another recorded call in which one of Zarrab's co-conspirators noted that "I mean, it's impossible for wheat to be originating from Dubai." In another intercepted call, according to the Report, Zarrab's co-conspirator worried "the documents we submit are the wrong documents . . . in the end they're fictitious documents, forgery is a crime that has a prison sentence, this is something beyond money." The Report describes another intercepted call in which Zarrab counseled pushing forward with the fraudulent documents, stating "…I don't know long live Photoshop, keep them printing." Zarrab's use of false documents is corroborated by the fact that, during a search of his home by Turkish law enforcement, the officers found blank U.A.E. customs forms. (*See, e.g.*, *id*. pp. 58, 133-64).

Interference With The Turkish Investigation: The Report also describes how Zarrab and high-ranking Turkish officials conspired to obstruct the Turkish investigation. For example, the Report describes one call in which Zarrab spoke with Muammer Guler, the then Turkish Minister of the Interior. In the call, Zarrab and Guler discuss, in substance and in part, dealing with Orhan Ince, a Turkish police chief handling the investigation into the bribery scandal. Guler assured Zarrab that he would deal with Ince: "About Orhan, I'm already following up on that. Don't worry about that matter." Zarrab emphasized the importance of dealing with Ince: "Mr. Minister, that's the most important thing. It's more important than

anything else."  Guler assured Zarrab that he would handle Ince: "Okay daddy, that's my problem, that is your brother's job, don't worry yourself… DON'T WORRY. I WILL MAKE THAT PIMP PAY FOR WHAT HE MADE YOU SUFFER TEN FOLD. I WILL MAKE HIM SUFFER. THAT'S A SON OF A BITCH. DON'T WORRY YOURSELF ABOUT HIM."  (*See*, *e.g.*, *id*. pp. 13-14, 279-82).

According to press reports, in the aftermath of the high-profile arrests of Zarrab and several members of the Turkish government, numerous Turkish law enforcement officers and prosecutors involved in the investigation and prosecution were fired or re-assigned from the case, reportedly as a result of political pressure from the office of the then-Turkish Prime Minister and current President, Recep Tayyip Erdogan.  Apparently as a result in part of these actions, the charges against Zarrab and his co-defendants were dismissed in November 2014.

In addition to the Report, the close ties between Zarrab and high-ranking Turkish officials, including Erdogan, are highlighted by the defendant's work with the Turkish charity Togem-Der, which the defendant touts in his bail application.  (*See* Def. Mem. at 15-16).  According to press reports (attached hereto as Exhibit H), Togem-Der was founded by Emine Erdogan, wife of President Erdogan.  Furthermore, the Togem-Der website, a screenshot of a March 16, 2016 cached version[6] of which is attached hereto as Exhibit I, identifies Beyhan Nilser Bagis on the page listing the Board of Directors ("Yonetim Kurulu").  Bagis is the wife of Egeman Bagis, the one-time Turkish Minister of European Union Affairs who was dismissed as part of the 2013 corruption scandal caused by Zarrab's arrest.

### DISCUSSION

The Government respectfully submits that, in light of the foregoing, the defendant

---

[6] The website for Togem-Der appears to have been disabled after Zarrab filed his bail application.

presents a significant flight risk, and that, as a result, there are no appropriate bail conditions.

## I. Applicable Law

The question of bail is governed by the factors set forth in Title 18, United States Code, Section 3142. Those factors include: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including, among other things, the defendant's ties to the community, past conduct, and financial resources; and (4) whether the defendant poses a danger to the community if released. *See* 18 U.S.C. § 3142(g)(1)-(4). If, after weighing these factors, the Court concludes that "no condition or combination of conditions will reasonably assure the appearance of the person as required…" then bail should be denied.. *See* 18 U.S.C. § 3142(e).

## II. The Defendant Presents an Incurable Risk of Flight

Zarrab presents a substantial risk of flight that cannot be addressed through bail conditions, due to the serious nature of the charged conduct, the weight of the evidence, and his personal characteristics, including his wealth, foreign ties, lack of any connection to the United States, and duplicity during the Pre-Trial Services Interview. *See United States* v. *Townsend*, 897 F.2d 989, 994-95 (9th Cir. 1990) (denying bail to defendants alleged charged with export violations where defendants faced substantial sentences, had no domestic ties, extensive foreign ties, and had access to large quantities of cash).[7]

---

[7] In three cases, the United States District Court for the District of Columbia concluded that bail conditions could be set for violators of IEEPA and the Export Administration Act (the "EAA"). *See United States* v. *Hassanshahi*, 989 F. Supp. 2d 110, 112 (D.D.C. 2013) (defendant charged with violating the EAA and IEEPA by transporting electrical relays to Iran); *United States* v. *Hanson*, 613 F. Supp. 2d 85, 86 (D.D.C. 2009) (defendant charged with violating the EAA and IEEPA by transporting unmanned aerial vehicle components to China); *United States* v. *Karni*,

## A. *Nature and Seriousness of the Charges Against the Defendant*

In 1979, the President determined that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat." Executive No. 12170. To address that national emergency, Presidents have adopted, among other things, a coordinated regime of economic sanctions, including the ITSR, the IFSR, and the WMD Sanctions, against the Government of Iran and other Iranian entities. For almost 40 years, the sanctions regime has been one of the key ways in which the United States has sought to curb the Iranian threat.

At the time of the charged conduct, one of the purposes of the sanctions regime was to place pressure on various industries in Iran, thus limiting Iran's ability to engage in the

---

298 F. Supp. 2d 129, 129 (D.D.C. 2004) (defendant charged with violating the EAA and IEEPA by transporting devices capable of triggering nuclear weapons to Pakistan via South Africa). The Government respectfully submits that these cases are distinguishable from Zarrab's case. Initially, while the Government believes that the nature of the crimes charged in *Karni*, *Hanson*, and *Hassanshahi* support detention, the conduct here is of a different nature. Zarrab is charged with enabling Iran and other sanctioned entities to participate in prohibited financial transactions, thus allowing them to alleviate the economic pressure that was intended by the sanctions to alter Iran's behavior, including its pursuit of nuclear weapons and sponsorship of terrorism. The entities aided by Zarrab include entities that, at the time, were arms of the IRGC, which is notorious for its facilitation of terrorism. In other words, Zarrab's conduct, unlike that in *Karni*, *Hanson*, and *Hassanshahi*, was not limited to any specific banned set of products, but rather, enabled Iran to engage in the full course of conduct that threatens the United States. Furthermore, in *Hanson* and *Hassanshahi*, the court found that the defendants had ties to the United States, unlike Zarrab. *See Hasssanshahi*, 989 F. Supp. 2d at 116 (defendant had "very strong" ties to the United States, including multiple family members); *see Hanson*, 613 F. Supp. 2d at 89 (although the defendant primarily lived abroad, she was a naturalized U.S. citizen, and had a rented home in Maryland where she lived with her husband and adopted son). In *Karni*, the defendant was required to remain in the custody of a local rabbi, who was obligated to arrange for twenty-hour supervision of the defendant. *See* 298 F. Supp. 2d at 133 ("Defendant will be released into the custody of Rabbi Herzel Kranz….Rabbi Kranz must commit to have someone with Defendant on a twenty-four hour basis, seven days of week."). Furthermore, none of the opinions in *Hassanshahi*, *Hanson*, or *Karni*, suggest that those defendants have the financial wherewithal, global business network, or connections to foreign officials that Zarrab does, all of which further his ability to flee, or that those defendants made the same kinds of serious misrepresentations that Zarrab did, which demonstrates his intent to flee.

type of conduct that threatens U.S. interests. As Robert J. Einhorn, Special Advisor for Arms Control and International Security, testified to the House Committee on Oversight and Government Reform, sanctions on the Iranian financial sector, among other efforts, were causing Iran to have "great difficulty in obtaining access to financial services that are the lifeblood of international commerce and Iranian proliferation," and had "raised the cost of doing business for Iranian procurement agents as they are forced to find alternative financial arrangements and engage in more complex deceptive practices, sacrificing time and resources to do so." *See* Testimony of Robert J. Einhorn to House Comm. on Oversight and Govt. Reform (July 29, 2010). Sanctions on Iran's shipping and petroleum industries similarly limited Iranian entities operating in those sectors from accessing international markets, including U.S. markets, thus encouraging Iran to cease its nuclear program and hostility against the United States. *See id.*

During the time period of the charged conduct, of particular importance was decimating the IRGC's ability to continue its support of terrorism and unrest in the Middle East. As the State Department has stated, through its participation in various economic sectors in Iran, the IRGC controls significant business interests in Iran, and "[t]he profits from these activities are available to support the full range of the IRGC's illicit activities, including WMD proliferation and support for terrorism." U.S. Dep't of State, Media Note: Treasury Targets Iran's Islamic Revolutionary Guard Corps (February 10, 2010). Indeed, the IRGC continues to threaten global stability by sending IRGC officers to Syria to aid Bashar Al-Assad. *See* Dept. of State, 2013 Country Reports on Terrorism, *available at* http://www.state.gov/j/ct/rls/crt/2013/224826.htm (May 3, 2016).

For years, the defendant has been a key operative in the effort to undermine that sanctions scheme through full-scale "economic jihad." He has aided sanctioned Iranian financial

institutions, such as Bank Mellat, the Mellat Exchange, and Bank Karafarin, by giving them access to the very financial markets that the sanctions scheme was designed to cut them off from. He has helped the IRGC earn millions of dollars that could be used to finance its weapons proliferation and support for terrorism by facilitating shipping and petroleum transactions for IRGC-controlled entities, like NIOC. In doing so, the defendant eased the pressure on Iran and the IRGC created by the sanctions, and worked to diminish their deterrent effect. Zarrab's actions, in a very real sense, compromised the well-being and security of the United States.

The seriousness of the Zarrab's criminal conduct is demonstrated by the potential sentence that he faces should he be convicted. The statutory maximum term of imprisonment for the four charges in the Indictment is 75 years. Moreover, while the Government's investigation is ongoing, even a preliminary Guidelines analysis shows that Zarrab is facing a decades in prison. Specifically, after accounting for the volume of illegal transactions in which he engaged, offense-level enhancements that are likely to apply, such as the 4-point increase for his role in the offense and the 4-point increase for operating a money laundering business, and the grouping of the offenses, the applicable offense level would be at least a 42. Even at a Criminal History Category I, this offense level results in a Guidelines range of 360 months to life imprisonment.

Zarrab argues, in essence, that because he has not been charged with a crime enumerated in Section 3142, the nature of the charges here do not support pre-trial detention. While the Bail Reform Act certainly specifies certain crimes as being particularly worthy of detention, there is nothing in its language that suggests that these are the only crimes that could ever warrant detention. If it did, then the statute would not direct the Court to consider the nature of the charged offense, "including" whether it is one of the enumerated offenses, but rather, would instruct the Court to consider *only* whether the charged offense was one of the enumerated

offenses. In this case, it is completely appropriate for the Court to consider that the defendant's criminal conduct threatened the U.S.'s national security, and, as a serious offense, carries a significant potential penalty that would cause the defendant to want to abscond.

B. *Weight of the Evidence Against the Defendant*

The possibility of more than 30 years in prison is certainly sufficient to motivate the defendant to flee. That incentive, however, is only increased when the strength of the evidence against the defendant – and thus the likelihood of conviction – is factored into the equation. Here, the case against the defendant is powerful and overwhelming.

The evidence against Zarrab consists, in large part, of unimpeachable documentary evidence, including emails obtained from, among others, Zarrab's own email accounts, and those used by his co-conspirators, and bank records showing the illegal transactions. That evidence establishes conclusively Zarrab's knowing participation in the sanctions avoidance scheme detailed in the Indictment. For instance, the draft December 3, 2011 letter, which was addressed to the Central Bank of Iran, prepared for Zarrab's signature, and found in his email, outlines his commitment to undermining the sanctions as part of the "Economic Jihad" being waged by his "dear nation," Iran. (*See* Indictment ¶ 14(i)). Moreover, other emails show that Zarrab was warned explicitly that financial transactions in which he engaged were banned by U.S. banks because they ran afoul of OFAC regulations. (*See id*. ¶¶ 14(g)-(h)). Furthermore, emails also show Zarrab himself directing transactions that were not for the benefit of the company in whose name they were executed, but rather, for NIOC, which was, at the time, designated as an arm of the IRGC. (*See id*. ¶¶ 14(j)-(k)). This transaction is also reflected in bank records. (*See id*. ¶ 14(l)). These are but a few examples of the paper trail that shows Zarrab engaging in millions of dollars-worth of sanctioned financial transactions.

Moreover, other evidence found during the investigation further bolsters the case against the defendant. For example, during the search of Zarrab's home in Turkey in 2013, Turkish authorities found blank U.A.E. customs forms, which not only demonstrate aspects of the charged scheme, but also show the defendant's access to fraudulent documentation that would help him flee. Furthermore, the Zarrab Phone contains additional evidence of continuing communications with co-conspirators, ongoing business relationships, and consciousness of guilt, including an image of an FAQ relating to sanctions under the Iran Freedom and Counter-Proliferation Act of 2012, which demonstrates Zarrab's knowledge of the sanctions regime that he was working to undermine. Similarly, the Zarrab Phone also contains multiple images of banking confirmation records showing continuing transactions with Iranian banks.

### C. History and Characteristics of the Defendant

Finally, the history and characteristics of the defendant, including his wealth, lack of U.S. ties, and extensive foreign connections, exacerbate the risk of flight created by the seriousness of the criminal conduct alleged and the strength of the Government's case.

Despite his attempt to downplay his assets, it is indisputable – especially in light of the defendant's own statements and the evidence found by the FBI – that the defendant is a man with access to a rare amount of wealth. He has millions of dollars-worth of different currency at his disposal – indeed, as noted above, he traveled to Miami with more than $100,000 in cash. His assets include various modes of transportation, including yachts, submersibles, and at least one airplane. He has multiple homes in at least two foreign countries. He uses, owns, or controls dozens of holding and shell companies, and has used this network of corporate entities to move large sums of currency around the world. With this financial wherewithal, the defendant has the means to travel whenever he wants and wherever he wants, and do so covertly.

Furthermore, that wealth is particularly conducive to flight in this case when

combined with the defendant's access to foreign countries that would not extradite him back to the United States to face the pending charges. Having a safe place to which to escape only increases the motivation to flee. Zarrab currently holds Iranian, Turkish, and Macedonian passports. Iran and Macedonia do not have extradition treaties with the United States, and thus, if Zarrab were able to travel to those countries, he would be beyond the reach of the Government and the Court. Moreover, Zarrab regularly travels to other countries without extradition treaties with the United States, including Lebanon, Russia, and Saudi Arabia, some within the last year.

Turkey does have an extradition treaty with the United States, but does not extradite its citizens. Indeed, even if Turkey were to allow extradition of its citizens, it is highly unlikely that Zarrab would be returned to the United States. As alleged in the Report, when charged with serious crimes in Turkey, the defendant simply paid off high-ranking Turkish officials to squash the investigation, even to the point of having law enforcement officials involved in that investigation arrested, terminated, reassigned, or criminally charged. The Report makes very clear that if the defendant were able to reach Turkish soil, he could cause the highest levels of Turkish government to block his return to the United States. Zarrab's access to powerful members of Turkish society is further underscored by his relationship with Togem-Der.

Zarrab implicitly acknowledged the flight risk that his wealth and foreign connections create by lying about both during the Pre-Trial Services Interview. When asked to truthfully quantify his wealth, Zarrab minimized his business income from several billion dollars to less than a million dollars, and omitted millions of dollars-worth of assets. Similarly, when asked about his travel over the past decade, Zarrab chose to mention a few countries that he visited purportedly for vacation, but failed to disclose his travel to countries like Lebanon, Russia, and Saudi Arabia. The reason for these misrepresentations is obvious. Zarrab knew that

if he had been honest about the extent of his resources or the breadth of his travel that would lead to the inescapable conclusion that he is a flight risk, and so he chose to lie instead. Zarrab's dishonesty should give the Court no confidence in his pledge to return for court proceedings.

   D.   *The Defendant's Proposed Bail Package Is Insufficient to Address These Concerns*

Based on the foregoing, the Government respectfully submits that there are no conditions that could reasonably assure the defendant's appearance. The defendant, nevertheless, has proposed that he be bailed principally on the following conditions: (i) a 50 million dollar bond, secured by $10 million in cash and signed by his wife; and (ii) home confinement with electronic monitoring and private guards paid for by the defendant. The fact of the matter is, however, that, while the defendant touts the security this package purportedly provides, it fundamentally amounts to the defendant's potentially sacrificing a sum of money that he can easily do without, or even recoup in short order, and an offer to build a personal jail for himself in an apartment in Manhattan, none of which would impede his flight.

First, although the defendant argues that the $50 million bond secured by $10 million in cash will, in essence, cripple he and his wife's ability to live their lives if he absconds, the bond provides no security against flight. The defendant's commercial ventures generate a tremendous amount of revenue – more than $11 billion annually – in foreign countries, and have allowed the defendant to amass a sizeable fortune. Trading ten million dollars – approximately a quarter of the amount of cash that the defendant had delivered to Iran during late 2011 and a third of the amount of bribes he paid in 2013 – for his freedom is an exchange the defendant could, and almost assuredly would, make without any concern about his financial future. Furthermore, both the defendant and his wife's assets are located exclusively abroad, beyond the reach of the Government, and the $50 million bond would only be enforceable in the United States, a country that the defendant and his family almost never visit, and could certainly avoid

in the future. Thus, incurring a bond obligation would not turn Zarrab and his wife into "fugitives," and would have no impact on their lives going forward. Accordingly, the defendant's proposed bond, even secured by $10 million, provides no disincentive to him to flee.

Second, the defendant's proposal that he be subject to home detention, on electronic monitoring, and supervised by private guards paid by him, does not mitigate the risk of flight. The inadequacies of electronic monitoring are well-documented: as of 2012, more than 140 federal and state defendants on electronic monitoring have absconded. Indeed, just last year, the defendant in *United States* v. *Paul Ceglia*, (VSB) 12 Cr. 876 (S.D.N.Y.) fled while on electronic monitoring, and remains at large. Electronic monitoring is no bar to flight here.

The heart of the defendant's proposal is that he will be supervised at a leased apartment in New York by private security guards on his payroll. In a summary order, the Second Circuit held that it is not legal error "for a district court to decline to accept," as "a substitute for detention," a defendant hiring private security guards to monitor him. *United States* v. *Banki*, 369 F. App'x 152, 154 (2d Cir. 2010). In the same decision, the Second Circuit noted that it was "troubled" by the possibility of "allow[ing] wealthy defendants to buy their way out by constructing a private jail." *See id.* (internal quotation marks omitted)). *Accord, e.g.*, *United States* v. *Cilins*, No. 13 Cr. 315 (WHP), 2013 WL 3802012, at *3 (S.D.N.Y. July 19, 2013) ("'it is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out by constructing a private jail, policed by security guards not trained or ultimately accountable to the Government, even if carefully selected'" (quoting *Borodin* v. *Ashcroft*, 136 F. Supp. 2d 125, 134 (E.D.N.Y. 2001))); *United States* v. *Valerio*, 9 F. Supp. 3d 283, 293-94 (E.D.N.Y. 2014) ("There is nothing in the Bail Reform Act that would suggest that a defendant (or even, hypothetically, a group of

defendants with private funding) has a statutory right to replicate or construct a private jail in a home or some other location."); *United States* v. *Colorado-Cebado*, No. A-13-CR-458 (DEW), 2013 WL 5852621, at *7 (W.D. Tex. Oct. 30, 2013) ("When an armed guard with license to use that firearm is needed to ensure that a defendant does not flee, then conditions of release are simply not appropriate, regardless of how elaborate a release proposal a wealthy defendant might construct."); *but see United States* v. *Ng Lap Seng*, 15 Cr. 706 (VSB) (S.D.N.Y. Oct. 22, 2015) (approving arrangement, but adding conditions about, among other things, visitors and methods of communication); *United States* v. *Dreier*, 596 F. Supp. 2d 831, 834 (S.D.N.Y. 2009) (same).

At bottom, Zarrab's proposed private security arrangement does not mitigate the risk of flight. While the defendant touts in his submission Guidepost's track record with respect to escapes, which is obviously based on a much smaller sample size than the Bureau of Prisons, it is self-evident that the majority of prison escapes occur while a prisoner is outside of a correctional facility, particularly at hospital visits. That is because a private security firm simply cannot replicate the controlled environment of a federal correctional facility, in which, typically, all of the needs to the prisoner can be attended to without placing the prisoner in the community at large. Zarrab's proposed security arrangement would have the effect of permanently placing him in this high-flight-risk circumstance. Moreover, a public escape attempt, in New York City, involving armed private guards attempting to stop the defendant, potentially by force, greatly magnifies the danger of the defendant's flight to the public.

Furthermore, in this specific case, the risk of flight is greater than that found in *Ng Lap Seng*, the case upon which the defendant principally bases his argument, and more akin to the risk in *Cilins*, which rejected the defendant's application to be released under the supervision of private guards. To be sure, in *Ng Lap Seng* (China), *Cilins* (France), and this case (Iran and

Turkey), the defendants had strong ties to nations that would not extradite them back to the United States if they fled. *See* Def. Ex. 1 at 11; *Cilins*, 2013 WL 3802012, at *2. But unlike in *Ng Lap Seng*, and like in *Cilins*, Zarrab's willingness to disregard the directives of the judicial system has already been demonstrated through his misrepresentations during the Pre-Trial Services Interview about information that is material to the determination of the risk of flight that he poses. *Compare* Def. Ex. 1 at 29 (noting that the defendant had been honest with Pre-Trial Services) *with Cilins*, 2013 WL 3802012, at *3 (denying bail, in part, because the defendant had misled Pre-Trial Services concerning his assets). This lack of candor on the defendant's part should already show the Court that he cannot be trusted to abide by the extremely unusual bail conditions he proposes. Furthermore, unlike in *Ng Lap Seng*, the lengths to which the defendant will go to free himself are not hypothetical. Rather, here, there appear to be credible allegations that Zarrab has already secured his release from Turkish prison by causing the wholesale reorganization of the Turkish prosecutor's office and police department through bribery. Certainly, a defendant who can impact an entire judicial system could evade the bail conditions proposed by the defendant, including few paid-for private security guards.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that the defendant's motion for bail should be denied.

Dated: New York, New York
       May 25, 2016

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____/s/_____
    Michael Lockard/Sidhardha Kamaraju
    Assistant United States Attorneys
