UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

S1 15 Cr. 867 (RMB)

UNITED STATES OF AMERICA

- against –

REZA ZARRAB

Defendant.

## DEFENDANT REZA ZARRAB'S REPLY MEMORANDUM IN SUPPORT OF HIS APPLICATION FOR BAIL

BRAFMAN & ASSOCIATES, P.C.
*By:*   Benjamin Brafman, Esq.
Marc Agnifilo, Esq.
Joshua D. Kirshner, Esq.
*Attorneys for Reza Zarrab*
767 3rd Avenue, 26th FL
New York, NY 10017
Tel: (212) 750-7800
Fax: (212) 750-3906

## INTRODUCTION

Defendant Reza Zarrab respectfully submits this Reply Memorandum of Law to correct several significant misstatements of fact and law in the Government's Memorandum of Law in Opposition to Defendant Reza Zarrab's Motion for Bail (Government's Opposition).

First, the Government's statements of the applicable law concerning the Bail Reform Act are one-sided, not complete, and do not fairly reflect Second Circuit law.

Second, the Government's claim that Mr. Zarrab intentionally lied to Pretrial Services in Florida where the report itself makes clear that "the interview was conducted in English, the defendant is in need of a Turkish interpreter," (emphasis added) is baseless and unfair.

Third, while the Government has repeatedly noted in its memo that the evidence against Mr. Zarrab is overwhelming, and that he will be convicted and sentenced to "decades" in prison, they fail to advise this Court that the charges against Mr. Zarrab represent an unprecedented reach to prosecute a non-U.S. person under the facts alleged.

Fourth, the Government's claim that the criminal case against Mr. Zarrab in Turkey was dismissed because Mr. Zarrab bribed Government Officials is as errant and unsupported as it is offensive.  Furthermore, the Government's claim on this issue is inconsistent with principles of Comity that must be afforded the legal systems of other nations.

Fifth, the Government's suggestion that private, armed guards generally, or even those provided by Guidepost Solutions LLC, are unreliable, is plainly inconsistent with the facts in this case, with prior holdings of Courts in this District and, as argued in its submission, plainly or implicitly offensive.

For the reasons set forth below, and as further argued in defendant's principal Memorandum of Law in support of his bail proposal, the bail under the conditions proposed by the Defendant should be approved by this Court.

## POINT ONE

### THE GOVERNMENT HAS UTTERLY FAILED TO MEET THE "DUAL BURDEN" IT MUST CARRY WHEN SEEKING DETENTION IN A CASE THAT DOES NOT CHARGE A CRIME OF VIOLENCE AND WHERE THE DEFENDANT IS NOT ALLEGED TO BE A DANGER TO THE COMMUNITY

The Government failed to adequately and properly set forth the law concerning the release of Mr. Zarrab, specifically in regard to its own "dual burden" to prove risk of flight.[1]

The Second Circuit has long held that the Government has a "dual burden of proof" in order to seek detention. United States v. Sabhnani, 493 F.3d 63 (2d Cir. 2007). First, the Government "must establish by a preponderance of the evidence that the defendant, if released, presents an actual risk of flight." Id. at 75. If the Government fails to prove actual risk of flight, the inquiry goes no further, and the defendant is released. If the Government satisfies this first burden, the Government must then meet a **second** burden, and must then, "demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court." Id.

Accordingly, in this case, the Government must prove by a preponderance of the evidence that despite the severe and very strict conditions specifically proffered by the defense, there is  no reasonable assurance that Mr. Zarrab will appear in court.  The Government simply

---

[1] The Government does not allege that Mr. Zarrab is a danger to the community.  Accordingly, the hearing as to his release on conditions is confined to **risk of flight**.

cannot meet their second burden and, accordingly, release under the conditions proffered by the defense is appropriate.

## I. ELECTRONIC MONITORING WITHOUT PRIVATE SECURITY HAS NOT BEEN PROPOSED BY THE DEFENSE

In an attempt to cast doubt on the efficacy of the defendant's proposed bail package, the Government cites to United States v. Paul Ceglia, (VSB) 12 Cr. 876 (S.D.N.Y.), where the defendant fled while on electronic monitoring.  The Government tries to equate  defendant Ceglia's bail conditions with those proposed in this case.  The Government, however, ignores one important distinction – armed guards.  In the Ceglia case, the Defendant was **not** monitored 24/7 by Guidepost Solutions or any other investigation company.  As the Honorable Jed Rakoff noted in United States v. Dreier, 596 F.Supp.2d 831, 833 (SDNY 2009), "the most potentially efficacious, and controversial (bail condition) is Dreier's proposal to have armed guards staying at his apartment at all times."

The salient question for this Court, therefore, is not whether Mr. Zarrab could flee if secured only by electronic monitoring, or whether he would seek to flee and forfeit his bail money.  The question for this Court, we submit, is whether Mr. Zarrab would, or could flee given proposed conditions that include armed guards from Guidepost Solutions in his presence at all times.  The Government simply cannot prove that Mr. Zarrab is a flight risk under these proposed conditions, and, therefore, the Government has not satisfied the burden placed upon it by the law of this Circuit.

## II. THE FACTS IN U.S. v CILINS ARE DISTINGUISHABLE

The Government also relies on United States v. Cilins, 2013 WL 3802012, and argues that the Cilins case, where Judge Pauley denied bail, is akin to the facts in the present case

because defendant Cilins was not forthcoming with pretrial services and – the Government

claims - neither was Mr. Zarrab.. <u>Cilins</u>, however, is distinguishable for three reasons.

First, as will be shown in POINT TWO below, Mr. Zarrab did **not** intentionally mislead

pretrial services.

Second, Judge Pauley in <u>Cilins</u> was very concerned that defendant Cilins failed "to

disclose an account worth more than $1 million until his **third** detention hearing," whereas Mr.

Zarrab has candidly placed his financial condition in his initial filing for bail, well before the

Government ever raised the issue.

Third, the clear focus of Judge Pauley's decision in <u>Cilins</u> was the nature of the charges,

specifically that Cilins was charged with three counts of Witness Tampering, one count of

Obstructing a Criminal Investigation, and one count of Destroying, Altering or Falsifying

Records in a Federal Investigation.  <u>Id.</u> at 2.  In fact, Judge Pauley began his discussion with a

detailed review of the charged conduct, stating as follows:

> In substance, the Government alleges that Cilins obstructed its investigation by
> offering millions of dollars in bribes to a cooperating witness to induce the
> cooperating witness to: (1) destroy subpoenaed documents; (2) give perjured
> grand jury testimony; (3) make false statements to federal law enforcement
> officers and (4) sign a false attestation  The Government proffers that multiple
> recorded conversations between Cilins and the cooperating witness discuss the
> bribery and obstruction scheme.

<u>Id.</u> at 2.  Judge Pauley then went on to observe that given the substance of the indictment, Cilins

"demonstrates a willingness to interfere in the grand jury process."  <u>Id.</u>  The particular charges in

<u>Cilins</u> and his continuing intentional deception clearly distinguish it from the present case.

In this case, the Government simply has not met the "dual burden" squarely placed upon

it by the Second Circuit.  Aside from trying to disparage Guidepost Solutions as a "façade" and

as part of  Zarrab's "payroll," <u>see</u> Government's Opposition, p. 2, which, as demonstrated in

POINT FIVE below, are baseless and irresponsible allegations, the Government has said

nothing to undermine the reasonableness and efficacy of the proposed package.  Simply put, the bail conditions proposed by Mr. Zarrab will ensure that he returns to court when required and nothing in the Government's written submission proves otherwise.

**POINT TWO**

**REZA ZARRAB DID NOT LIE TO THE PRE-TRIAL SERVICES OFFICER IN MIAMI WHEN INTERVIEWED AFTER HIS ARREST**

The Government bases its argument that Mr. Zarrab is a "risk of flight" on the Pre-Trial Service Interview (the "Interview") conducted in Miami, Florida on March 21, 2016 and the Pre-Trial Service Report[2] (the "Report") of the same date.   (Gov. Opp. pp. 7-11.)   While the government acknowledged, as it must, that the Interview was conducted in English, it has ignored the fact that the Pretrial Services Officer stated plainly that Mr. Zarrab required  a Turkish interpreter.  On this point, the report states, "(a)lthough the interview was conducted in English, the defendant *is in need of a Turkish interpreter*." (emphasis added).

Thus, the first paragraph of the Pretrial Services Report reads as follows:

> On March 21, 2016, the Notice to the Defendant was read and explained in English, and he exercised his rights to proceed with the Pretrial Services interview without the presence of an attorney. **Although the interview was conducted in English, the defendant is in need of a Turkish interpreter.** His background information was not verified because the defendant advised he has no family ties to the United States.  (emphasis added)

By stating plainly in the first and second sentences of the Report that Mr. Zarrab "is in need of a Turkish interpreter," and that his rights were explained to him in English, with the Interview also conducted in English, the pretrial officer has placed us on notice that the Report has  fundamental limitations.   In a desperate attempt to keep the Defendant detained, the

---

[2] The Report is not an exhibit to this memorandum due to the confidentiality requirements pursuant to 18 U.S.C. § 3153(c).

Government has ignored these important limitations plainly disclosed at the very outset of the Report, and instead tries to suggest that the Florida Pretrial Services Report should prompt this Court to conclude that Mr. Zarrab be detained because he was not completely honest in that interview.

By way of background, Mr. Zarrab was arrested at the airport in Miami on March 19, 2016. He, his wife and their young child were on their way to Disney World. He brought approximately $100,000 in cash with him and as part of his customs disclosure, and prior to his arrest, he truthfully disclosed every dollar in his possession, which is hardly the conduct of a person intent on deception. Instead of going with his family to Disney World, he was summarily arrested. After more than 36 sleepless hours in federal custody, without having spoken to a single person in his native language, Mr. Zarrab was brought to the Southern District of Florida courthouse and interviewed by a Pretrial Officer in English, through a screen in the holding facility, and without a lawyer or Turkish interpreter present.[3]

Upon information and belief, prior to the commencement of the Interview, Mr. Zarrab informed the Officer that he required an interpreter. In response, the Pretrial Officer indicated that she would see if one was available for the court proceedings, but that she could not get one for the Interview. She advised, in substance that this (the Interview) would be quick, or that she would do this quickly, words to that effect. During the Interview, the questions began to confuse Mr. Zarrab and he again stated that he needed an interpreter. He recalls saying multiple times that he did not understand a question and/or that he needed an interpreter. Rather than delaying the Interview and waiting for an interpreter, the Officer continued to ask him questions

---

[3] While the Report states that Mr. Zarrab "exercised his rights to proceed with the Pretrial Services interview without the presence of an attorney," any notice of rights was necessarily given to him in English and, thus, any subsequent waiver of his rights is as unreliable as the contents of the Report itself.

presumably in order to meet her deadline to complete the Report before Mr. Zarrab was brought to court.   Ultimately, there was no bail application in Florida, so none of the issues in the report were further examined, and no Court ever relied on the information in the Report.   Further,   it was Mr. Zarrab who clarified any confusion created by the incomplete Report, addressing all of the issues the Government now highlights, **before** the Government raised any of them.

The government's wholesale reliance on this report to argue that Mr. Zarrab is not trustworthy is badly misplaced.   Indeed, the Report could not be more clear that Mr. Zarrab did not fully understand what was being discussed.   There is no indication that he  understood the purpose of the Interview, or the role played by Pretrial Services in the court process, or that the Interview would be reduced to a Report and that this Report may one day determine whether or not he would remain in jail.   Moreover, there is no indication that Mr. Zarrab understood that he could have a lawyer present, or that he possibly could wait until the court secured a Turkish interpreter for him **before** having the interview.   Implicit in the first two sentences of the report is the fact that Mr. Zarrab understood none of these things because they were explained to him in English and he needs a Turkish interpreter.   For the Government to now engage in a "Talmudic" parsing of a document reflecting an interview between two people who speak primarily different languages is, we submit, not useful to the court, and should be disregarded for this reason alone.

Because the Government spends so much time in its memorandum on this Interview, we are compelled to address some of its contentions.   As an initial matter, we do not know precisely what questions were  asked of Mr. Zarrab during the Interview.   For example, the Government argues that Mr. Zarrab holds three passports, but that "during the Pre-Trial Services Interview, he only acknowledged having a Turkish Passport." (Gov. Opp. p. 7)   The Report, however, merely states that Mr. Zarrab "possessed a Turkish passport, which he advised was seized by arresting

officers." Putting aside whether he understood the questions that were being asked, it is entirely unclear whether Mr. Zarrab was even asked if he held additional passports, and most notably, it was Mr. Zarrab and his counsel who disclosed the existence of both his Iranian and Macedonian passports to the Government, and to this Court in his initial filing for bail, and all three passports will be deposited with Pre-Trial Services as a condition of Bail.

The Government also focuses on the statement in the Report that Mr. Zarrab "sells gold, and he owns a furniture business" and that he "earns approximately $60,000 monthly."  The Government claims "these assertions are false, in that they dramatically understate the defendant's income and his extensive holdings."  (Gov. Opp. p. 8).  To the contrary, any argument that Mr. Zarrab was intentionally deceptive as to his personal wealth is belied by the further statement by him in the Report that he "purchased his residence in Turkey for $8,000,000" and "an office building for approximately $1,000,000 **and** the properties are "paid in full."  Thus, Mr. Zarrab not only disclosed that he has significant wealth in the Interview, but also did so in significant detail in our opening Memorandum in Support of Bail, submitted well **before** these false claims of deception were made by the government.

Similarly, the Government argues that Mr. Zarrab was duplicitous when he indicated that "[i]n the past ten years, [he] has traveled to London, Europe, China, Singapore, and Thailand,, for ***vacation***" (emphasis added)  ostensibly because he omitted other countries to which he has also traveled.  The Government's position fails to take into account -  aside from the language barrier and the fact that we cannot determine what questions were asked -  that Mr. Zarrab's other travel may well have been for business or religious reasons, and not for vacation.

We respectfully ask that the Court view the Miami Pretrial Services Report in two ways: first, as a minimally probative document given the language barrier, and second, as a minor part

of what has been a full, thorough examination and disclosure of defendant's assets and overall wealth.   The Court is respectfully reminded that Mr. Zarrab truthfully declared his cash upon entering the country, and has since  provided detailed financial information to the Court as part of his bail application before any claim of falsity by the Government. We also ask your Honor to consider that Mr. Zarrab was placed in an untenable position during the Pretrial Interview because he was **not** provided with an interpreter. Nonetheless, he endeavored to answer the questions as best he could under  the difficult circumstances in which he found himself  at that time.

It is fundamentally unfair for the Government to fail to provide an interpreter to a criminal defendant who clearly needs one, and who requested one, and then seeking to detain him based on confusion the Government itself created.


## POINT THREE

### IN ITS RESPONSE, THE GOVERNMENT HAS VIRTUALLY ASSURED THIS COURT THAT MR. ZARRAB WILL BE CONVICTED AND THEN SENTENCED TO "DECADES" IN PRISON.  THE GOVERNMENT HAS CONVENIENTLY NEGLECTED TO EXPLAIN THAT IT HAS NEVER CHARGED A NON-US PERSON UNDER THESE CIRCUMSTANCES AND THAT THIS CASE REPRESENTS A RADICAL EXTENSION OF EXISTING LAW

It is not generally the province of a bail motion to discuss the applicability of the charged statutes to the alleged conduct at issue.   However, the degree of confidence argued by the Government that this defendant faces "decades" in prison, and as a result, the Court should keep him in jail now, requires the defendant to demonstrate the legal novelty of this case and its very defensible posture. Simply put, this case is an **outlier**. The Government has **never** charged anything like it, and while we do not look to try the case in our bail motion, we do believe the Court must be aware at this stage of the proceedings of the complex and novel legal issues

9

surrounding these charges so that your Honor can look behind the Government's unfailing confidence and appreciate how very difficult it may well be for this case to even survive motion practice.

## I.   THE SANCTIONS CHARGE (COUNT TWO)

While the Government has charged Bank Fraud and Money Laundering in a clear attempt to have those guidelines eclipse the guidelines applicable to a sanctions violation, this case is, at its heart, a sanctions case.

Specifically, the International Emergency Economic Powers Act ("IEEPA"), 50 U.S. C. § 1702, allows the President to impose sanctions that prohibit transactions "by any person, or with respect to any property <u>subject to the jurisdiction of the United States.</u>" (emphasis added).  Here, the Government has indicted Mr. Zarrab for violations of IEEPA and the Iranian Transaction and Sanctions Regulations ("ITSR") issued pursuant to IEEPA.  But the alleged violations in this case are based on actions that occurred beyond U.S. jurisdiction.

Thus, the indictment alleges that Mr. Zarrab, a **non**-U.S. citizen, violated U.S. sanctions by his use, while in a **foreign country**, of **non-U.S. companies** to instruct **non-U.S. banks** to send U.S. dollar payments to other **non-U.S. banks** for the benefit of **other non-U.S. persons**.[4]

---

[4] The Government has charged numerous foreign financial institutions (although notably ***not a single employee of the financial institutions***) for ITSR violations under 50 U.S.C. § 1705(a) relating to the stripping of U.S. dollar payments that ***these institutions sent*** directly through their own correspondent bank accounts held in New York.  See, e.g., Statement of Facts, *United States v. BNP Paribas*, S.A., No. 1:14-cr-00460 (S.D.N.Y. June 30, 2014), ECF No. 13-2, ¶ 16 ("BNPP intentionally used a non-transparent method of payment messages, known as cover payments, to conceal the involvement of Sanctioned Entities in U.S. dollar transactions processed through BNPP New York and other financial institutions in the United States."); Statement of Facts, *United States v. Commerzbank*, Crim No. 1:15-cr-00031 (D.D.C. Mar. 12, 2015), ECF No. 1-2 ¶2 ("Commerz sent payments involving sanctioned entities or entities affiliated with sanctioned countries through the U.S. financial system.  Commerz knowingly and willfully concealed from U.S. financial institutions and regulators the sanctioned entities' connection to these transactions and intentionally falsified the business records of these institutions.")  In each of these and other similar settlements by non-U.S. banks (none of which were contested) the non-U.S. bank had involved its own bank accounts in New York in the subject transactions.

In short, the only basis upon which the alleged conduct in this case could be subject to the jurisdiction of the United States is that the non-U.S. banks that Mr. Zarrab used to send the U.S. dollar payments to the non-U.S. recipients elected to do so by involving U.S. banks in the payment chain. Thus, simply because Mr. Zarrab or some other party denominated payments in U.S. Dollars the Government asserts that IEEPA and the ITSR apply to Mr. Zarrab just as if he were a U.S. person or had acted within the United States. This is an extraordinary assertion of jurisdiction over an individual **non**-U.S. businessperson which, to our knowledge, has **never** been tested in the courts let alone accepted by the agency that administers the sanctions, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC").[5] Furthermore, IEEPA does not prohibit a foreign businessperson from doing business with a sanctioned entity.

### A. AFTER MR. ZARRAB WAS INDICTED, A U.S. TREASURY OFFICIAL TESTIFIED BEFORE CONGRESS LAST WEEK THAT THE VERY CONDUCT CHARGED BY THE GOVERNMENT HERE LIKELY DOES NOT VIOLATE THE SANCTIONS

The interpretation of the scope of the sanctions law advanced by the U.S. Attorney in this case is flatly contradicted by the very agency, OFAC, responsible for determining the scope of these sanctions. Only last week, on May 25, 2016, Adam Szubin, the Acting Undersecretary of Treasury and former Director of OFAC testified before the U.S. House of Representatives Committee on Foreign Affairs. His testimony makes clear that Mr. Zarrab should never have been charged and that the assertion of jurisdiction in this matter is entirely inappropriate. In pertinent part, Mr. Szubin stated:

> Thank you Chairman for the question and I welcome the opportunity to clarify an area that has been the subject of a lot of confusion and concern. Our sanctions,

---

[5] In addition to being factually not guilty of a sanctions violation, Mr. Zarrab has significant Fifth Amendment Due Process and Fair Notice defenses if his conduct was openly condoned by OFAC and only "deemed" illegal by the United States Attorney for the Southern District of New York.

our primary sanctions in the U.S. control what U.S. actors can do and what they cannot do. That governs the conduct of U.S. actors anywhere they reside in the world. So for example, a branch of U.S. bank in Europe or in East Asia has to behave like a U.S. person here in Washington or here in New York. ***Our sanctions on the other hand do not control the actions of non-U.S. persons— whether or not the currency they are using is the dollar, the Euro, the Pound or the Yen.*** So to be very specific, every foreign bank in the world has U.S. dollars in their possession. It is, thankfully, the international currency of choice for international trade. That means that banks in Europe, Japan, and China all hold dollars in their vaults. ***Our sanctions don't extend to those dollar bills, and foreign actors aren't under our jurisdiction if they choose to give those to any actor, including an Iranian actor.*** And so, I just want to be clear as to the contours of our jurisdiction on offshore dollar clearing. [Emphasis Added.]

The United States Department of Justice may object to foreign businesspersons transacting with Iran, but that does not make it illegal, even when the transactions involve U.S. dollars. The conduct of Mr. Zarrab is precisely what Mr. Szubin this week described to the Congress as *not violating U.S. sanctions*.

## B. CONFUSION IN THE SANCTION ARENA CREATES SERIOUS ISSUES OF DUE PROCESS AND FAIR NOTICE, ESPECIALLY TO NON-U.S. PERSONS

As early as 1996, OFAC has consistently asserted in its public guidance, published on Treasury Department's public website, www.treasury.gov, that the ITSR only imposes compliance obligations on U.S. persons and U.S.-owned or controlled non-U.S. companies. Perhaps the consistency and constancy of the guidance explains why no foreign transactor has ever been charged, let alone convicted, for engaging in the type of conduct alleged in the indictment. We submit, with great respect for the independence and integrity of this Court, that the conduct alleged in this case does not violate U.S. sanctions.

In an article that OFAC authored and published in the ABA Bank Compliance 1996 March/April journal, entitled "Specially Designated Who?' A Primer on Compliance," which OFAC still currently posts on the guidance section of its website, OFAC states:

*You still haven't convinced upper management that OFAC compliance is in the bank's best interest? Make sure they understand the **full range** of OFAC's enforcement authority. All U.S. citizens and permanent resident aliens, companies located in the United States, overseas branches of U.S. companies, and in some case, overseas subsidiaries of U.S. companies come under OFAC jurisdiction. This means that all U.S. banks and U.S. Citizens and permanent resident aliens in their employ need to be aware that they may be held accountable for sanctions violations.*

OFAC's subsequent guidance to the public has continued to express this limitation on the reach of the ITSR, including Sections 203 and 204. In October 2012, OFAC published a document entitled "OFAC regulations for the Financial Community," also currently available in the guidance section of OFAC's website. Section V, entitled, Terminology discusses a number of key phrases which consistently reappear in Treasury sanctions:

*G--------Person Subject to the Jurisdiction of the United States*
*The universe which must comply with OFAC regulations. It includes American citizens and permanent resident aliens wherever they are located; individuals and entities located in the United States (including all foreign branches, agencies, rep offices, etc,); corporation organized under U.S. law, including foreign branches; and (under TWEA based sanctions) entities owned or controlled by any of the above, the most important being foreign-organized subsidiaries of U.S corporations.* [Emphasis Added.]

Notably, OFAC's "universe" does **not** include foreign nationals transacting in U.S. dollars outside the United States. Even more visibly, in the Frequently Asked Questions (FAQs) section of its website, OFAC has for many years and to this day maintained this limitation on the reach of its sanctions. OFAC FAQ 11, last updated on January 1, 2015, published under the sub-heading "Basic Information on OFAC and Sanctions" reads as follows:

*11. Who must comply with OFAC regulations?*
*U.S. persons must comply with OFAC regulations, including all U.S. citizens and permanent resident aliens regardless of where they are located, all persons and entities within the United States, all U.S. incorporated entities and their foreign branches. In the cases of certain programs, foreign subsidiaries owned or*

*controlled by U.S. companies also must comply. Certain programs also require foreign persons in possession of U.S.-origin goods to comply. [01-15-15]*[6]

In contrast, OFAC has not published any guidance on its website alerting the public to the possibility that the Government might disregard the above-stated guidance, disregard the express jurisdictional limits of the IEEPA, and seek to hold **non**-U.S. business persons criminally liable under IEEPA for payment transactions by their banks that begin and end outside the United States.

### C. THE ITSR PROHIBITIONS UNDERLYING THE INDICTMENT DO NOT APPLY TO NON-US PERSON OPERATING COMPLETELY OUTSIDE THE UNITED STATES

Acting Undersecretary Szubin's comments underscore the gross misapplication of both 31 CFR §560.204 ("Section 204") and 31 CFR §560.203 ("Section 203") to Mr. Zarrab.

First, Section 204 expressly applies only to exports "from the United States, or by a United States person, wherever located."[7]   Mr. Zarrab never acted "from the United States" – he

---

[6] The ITSR only has one prohibition requiring foreign persons ("persons other than United States persons") to comply, involving the re-export to Iran of goods or technology subject to US export controls. *See* 31 CFR. 560.205. The Defendant, however, was not charged with violating this regulation. Further, criminal convictions against non-U.S. persons under the ITSR uniformly have involved illegal shipments to or for Iran of export controlled US-origin goods and technology.  There are no criminal convictions of non-U.S. persons under the ITSR or IEEPA for the type of actions attributed to the Defendant in this indictment.

[7] Section 204 states in full:

Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

was at all relevant times physically located outside the United States - and he is not a "United States person" because he is neither a U.S. citizen nor a resident of the United States. *See United States v. All Funds on Deposit in United Bank of Switzerland*, 2003 WL 56999, at *2 (S.D.N.Y. Jan. 7, 2003) (Section 204 reaches "domestic activities" and "foreign activities when conducted by a 'U.S. person.'").

Indeed, even if the regulations were somehow construed to apply to Mr. Zarrab – which they cannot be based on OFAC's own published guidance, defendant could not have known that the regulations would apply to him and thus could not have acted "willfully" in violating them. Second, Mr. Zarrab did not himself export anything from the United States under the regulation. Section 204 prohibits the U.S. "export" of "goods, technology, or services." The funds remitted by defendant are not goods, technology, or services. *See United States v. Banki*, 685 F.3d 99, 108 (2d Cir. 2011) ("there is no general bar to the remissions of funds"). At a minimum, the regulations are ambiguous as to whether fund transfers by a non-U.S. person, acting through a non-U.S. bank, constitute an export of "services" from the United States (by that person) for purposes of Section 204. *Id.* at 109. To the extent that there is any ambiguity as to whether the remission of funds by a non-U.S. person from outside of the United States constitutes the U.S. export of "goods, technology, or services," the ambiguity must be interpreted in favor of

---

(a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

(b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

defendant. *Id.* ("[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.")

There was also no violation of Section 203 by Mr. Zarrab, which has the same jurisdictional reach as its authorizing legislation, the IEEPA, and therefore applies only to persons "subject to the jurisdiction of the United States." Moreover, this section prohibits conduct that evades some other ITSR prohibition, causes a violation, or constitutes an attempt to violate some other section of the ITSR.[8] Thus, even if the Government can overcome the jurisdictional limits on Section 203 under IEEPA, the Government cannot prove a violation of Section 203 unless it can prove an underlying violation of Section 204 by the U.S. financial institutions, which it cannot do. Section 204 expressly provides that, in the case of an indirect transfer to Iran, a violation can only occur if a U.S. exporter has "*knowledge or reason to know*" that its "goods, technology, or services" will go to Iran. Mr. Zarrab had no contact with these U.S. banks in connection with these transactions. No U.S. person received or relied upon any information provided by Mr. Zarrab prior to processing the payment messages sent to the U.S. bank from the non-U.S. banks involved in these transactions. The U.S. banks that indirectly participated in these transactions, therefore, could not have known or had reason to know that the funds would go to Iran and thus could not have violated Section 204. Absent an underlying

---

[8] Section 203 states in full:

(a) Any transaction on or after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this part is prohibited.

violation, defendant could not have caused a violation of the regulations or otherwise violated Section 203.

We respectfully acknowledge that it is unusual for counsel in a bail argument to argue the merit or lack of merit of the case at hand as the "only" issue for a district court to decide in a case like this is whether the Government has met its burden of proving that there are no combination of conditions that will ensure the defendant's appearance at all court proceedings.  In this case, however, pointing out that the flawed theory of this unprecedented prosecution is important, as the Government, has argued the "certainty" of conviction and the eternity of imprisonment faced by Mr. Zarrab as incentive for him to flee.  We respectfully submit that this case is very defensible and even now, hanging by a jurisdictional thread.  There is no incentive to flee a case that is defensible and Mr. Zarrab is intent on remaining in the Southern District of New York to fight these charges and clear his name.

## D. MR. ZARRAB IS NOT A TERRORIST AND THE SUBJECT TRANSACTIONS DID NOT INVOLVE TERRORIST ORGANIZATIONS

In an unfortunate and shameless attempt to prevail in a bail application by resorting to the most prejudicial information imaginable, the Government has suggested links between Mr. Zarrab and the support of terrorism.

Simply put, Mr. Zarrab is **not** a terrorist, and has **not** engaged in business with the Islamic Revolutionary Guard Corps (IRGC), a Specially Designated Global Terrorist (SDGT) under the OFAC sanctions.  Moreover, Mr. Zarrab has never appeared on the OFAC Specially Designated Nationals list. The Government has attempted to misleadingly conflate the National Iranian Oil Company (NIOC), Iran's state-owned petroleum monopoly, with the IRGC, as if Mr. Zarrab had engaged in business with the IRGC (which he has not) or that OFAC had designated NIOC as a SDGT (which it has not).  Nor has OFAC ever accused NIOC of engaging in

terrorism, labeled NIOC as a terrorist organization or asserted that business with NIOC equates to terrorist financing. The Court should reject the Government's disingenuous argument on the issue out of hand.

In September 2012, OFAC issued a determination that the IRGC exercised influence over NIOC and therefore NIOC constituted an agent or affiliate of IRGC for purposes of the OFAC's "secondary sanctions" against Iran, as discussed below. Consequently, as explained in the determination, US secondary sanctions would apply to certain dealings with NIOC if those dealings provided material support to or involved significant transactions with NIOC. President Obama and the US Congress introduced these secondary sanctions to deter **non**-US persons from transacting with NIOC and other Iranian sanctions targets to help persuade Iran to negotiate a nuclear non-proliferation agreement.

Unlike OFAC's ITSR, which the Government enforces through the US legal and judicial system, the secondary sanctions operated through an extra-territorial designation mechanism. By designating a non-US person under the secondary sanctions, OFAC could prohibit US persons from transacting with them and require US banks to freeze their assets. Essentially, this US secondary boycott against NIOC and other Iranian sanctions targets exposed non-US persons to the risk of losing access to the US market (through a designation) if they continued to engage in sanctionable business with, for example, NIOC, in any currency anywhere in the world. Under the secondary sanctions regime, OFAC left this choice to the non-US persons; rather than asserting that the sanctions prohibited non-US business with NIOC, OFAC threatened to cut off US market access in response to any such business. OFAC did, in fact, designate a number of non-US persons under these secondary sanctions, but Mr. Zarrab was **never** among those designated. This is yet another example of how the United States Attorney for the Southern

District of New York is at odds with OFAC, the agency responsible for setting policy regarding the sanctions.

Furthermore, in January 2016, a full five months before the prosecutors in this District tried to implicate Mr. Zarrab in supporting terrorism through his purported association with NIOC, the Obama Administration ended the secondary sanctions against NIOC and hundreds of other Iranian sanctions targets, and declared that it would no longer designate non-US persons that previously or subsequently transacted with such sanctions targets. Apparently, the U.S. Attorney's Office did not fully grasp the import of the President's decision. Specifically, the Obama Administration made this change because Iran had by that point satisfied its nuclear non-proliferation commitments under the Joint Comprehensive Plan of Action. Thus, OFAC no longer classifies NIOC as an agent or affiliate of the IRGC and no longer has authority to designate Mr. Zarrab for transacting with or on behalf of NIOC, even if those transactions occurred prior to January 2016. In summary, the Government's efforts to associate Mr. Zarrab with terrorism by referencing his dealings with NIOC completely misstate the actual record, which confirms that NIOC was **never** designated as a terrorist organization and is no longer even considered an agent or affiliate of the IRGC.

### E.   THE CENTRAL BANK OF IRAN EMAIL PUBLISHED IN THE INDICTMENT IS NOT RELEVANT TO THIS COURT'S DECISION ON BAIL AND WOULD NEVER BE ADMISSIBLE AT TRIAL

In another attempt to tarnish Mr. Zarrab's reputation by falsely associating him with people seeking to undermine the influence of the United States in Iran, the government, in the indictment, and now in their opposition paper, recklessly quote from a draft letter pledging allegiance to the "Supreme Leader (the Ayatolla Khamenei)" Indictment ¶ 14(i); Gov. Opp. p. 5-6.

The Government, however, conveniently omits the following essential facts.  First, the draft letter was sent to Mr. Zarrab as an attachment to an email. Second, the draft letter was unsigned.  Third, there is no evidence that Mr. Zarrab  read the email attachment which was written in Farsi, a language Mr. Zarrab does not read.

To understand why Mr. Zarrab can speak conversational Farsi but cannot read it, some background must be explained.  Mr. Zarrab left Iran with his family when he was one year old. He was educated in Turkey.   The language Farsi utilizes distinct and unique letters and characters, and has an entirely different alphabet than the Turkish language.   While Mr. Zarrab has  learned to speak conversational  Farsi, he cannot write or read it because he is unfamiliar with the Farsi characters.  This lack of knowledge, however, is not an impediment to him being able to speak Farsi at a conversational level

Therefore, to the extent that the Government suggests anti-American animus to Mr. Zarrab because of a letter sent to him in a language he does not read, this suggestion should be readily disregarded.   It is also undisputed that the email ostensibly addressed to Mr. Zarrab and sent for his signature, was **never** signed by him, which makes sense insofar as he could not read the attachment in Farsi.  In sum, the court should respectfully attach no importance to this email in the context of this bail application.

## II. THE CONSPIRACY TO DEFRAUD OFAC (COUNT ONE)

The Government has charged Mr. Zarrab not only with conspiracy to violate U.S. sanctions (Count Two), but a separate count of conspiracy to "defraud" the U.S. agency that administers the sanctions program (Count One).  Super. Indict. ¶ 13 (citing 18 U.S.C. § 371). Section 371, however, is a statute aimed at protecting the Federal Government alone," *McNally v. United States*, 483 U.S. 350, 359 n.8 (1987), and the indictment does not allege the U.S.

Government has suffered any harm.  The count should also be dismissed because none of Mr. Zarrab's alleged actions constitute fraud.  At most (even viewing the evidence in the light most favorable to the Government), he allegedly structured financial transactions to avoid detection by OFAC, but "[t]he offense of structuring financial transactions to avoid currency reports … does not involve the use of false statements or counterfeit documents."  *Goldeshtein v. I.N.S.*, 8 F.3d 645, 649 (9th Cir. 1993); *see also Williams v. United States*, 458 U.S. 279, 284-85 (1982) (no false statement is made as part of check-kiting scheme because "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false'").  Finally, the Government's decision to charge Mr. Zarrab with both (1) conspiracy to violate U.S. sanctions and (2) conspiracy to defraud the government by violating U.S. sanctions raises obvious double jeopardy concerns.

### III. CONSPIRACY TO COMMIT BANK FRAUD (COUNT THREE)

The government's bank fraud charge is equally suspect.  Specifically, none of the alleged conduct in the superseding indictment constitutes a conspiracy to "defraud a financial institution," 18 U.S.C. § 1344(1), because none of the alleged conduct is fraudulent or indicates any intent to defraud a bank.

As the Second Circuit has made clear, "the bank fraud statute … is a specific intent crime requiring proof of an intent to victimize a bank by fraud."  *United States v. Nkansah*, 699 F.3d 743, 748 (2d Cir. 2012).  Those allegations are missing here, which should compel dismissal of this count.  We point this out, not to argue dismissal at this time, prior to formal motion practice, but so that the court has a better understanding of why the Government claims about the strength of their case is significantly overblown.

Likewise, the Government's allegations are insufficient to establish that Mr. Zarrab was part of a conspiracy "to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, by means of false and fraudulent pretenses, representations, and promises." Super. Indict. ¶ 20 (citing 18 U.S.C. § 1344(2)). The superseding indictment fails to allege that Mr. Zarrab or any of his alleged conspirators used any "false or fraudulent pretenses" or "obtained" any property from any U.S. bank.

Indeed, the Second Circuit has rejected the Government's theory of bank fraud in the majority side of a 9-3 circuit split—an issue that is under current review by the U.S. Supreme Court. *Shaw v. United States*, No. 15-5991 (U.S. cert. granted Apr. 25, 2016). Simply put, the Government's Bank Fraud theory is inconsistent with the state of the law in this Circuit and eight other Circuits.

## IV. CONSPIRACY TO COMMIT MONEY LAUNDERING (COUNT FOUR)

Finally, the Government's allegation of a conspiracy to commit money laundering hangs by a thread. The Superseding Indictment alleges that Mr. Zarrab conspired to transport funds with the intent to promote violation of U.S. sanctions and bank fraud. But as explained above, both of these predicate offenses rest on shaky legal grounds. Moreover, this count also creates clear double jeopardy issues, as Mr. Zarrab is charged with (1) conspiracy to violate sanctions for allegedly arranging financial transactions and (2) conspiracy to launder money for allegedly arranging *the same* transactions. As courts have repeatedly recognized, "allegations of money laundering that are inseparable from the underlying crime, such as certain financial fraud transactions, have not withstood scrutiny." *United States v. Awada*, 425 F.3d 522, 524 (8th Cir. 2005) (citing *United States v. Christo*, 129 F.3d 578 (11th Cir. 1997)).

### V. BECAUSE EACH OF THE FOUR COUNTS IS LEGALLY TENUOUS, THE COURT SHOULD DISREGARD THE GOVERNMENT'S STATEMENTS THAT A CONVICTION AND LENGTHY SENTENCE ARE ALL BUT ASSURED

The import of the legal analysis we have provided suggests that each of the four charges is legally suspect and will be sharply challenged at the appropriate time in the proceedings. For now, however, we ask that the Court view the Government's professed confidence in these charges with a critical eye. The outcome of this case, perhaps more than most federal cases, is far from certain and accordingly, Mr. Zarrab, a 32-year-old father and very successful businessman has every incentive to stay and clear his name rather than spending his entire life as a fugitive.

### POINT FOUR

### THE GOVERNMENT'S ALLEGATIONS OF BRIBERY AND CORRUPTION IN TURKEY ARE ERRONEOUS AND IRRESPONSIBLE, AND SHOULD NOT BE CONSIDERED AS FACTORS IN THIS COURT'S DECISION ON BAIL

The Government argues that Mr. Zarrab presents a risk of flight because he has purportedly bribed Turkish public officials in exchange for various business and political favors, and that his "corrupt political connections" would lead him to "cause the highest levels of Turkish government to block his return to the United States." (Opp., at 21.) The Government's primary support for that inflammatory claim is an unsigned Turkish police report, pursuant to which Mr. Zarrab and dozens of other individuals were arrested in Istanbul in December 2013. (Opp., Exhibit G.) The Government's argument is baseless and irresponsible.

### I. THE POLICE REPORT LACKS PROBATIVE VALUE, IS INHERENTLY UNRELIABLE AND SHOULD BE GIVEN NO WEIGHT

As detailed above, all four counts charged against Mr. Zarrab in this case hang upon a novel and, the defense contends, inappropriate, application of the IEEPA statute, by which the Government purports to exercise criminal jurisdiction over financial services allegedly provided

by non-U.S. persons abroad, in the form of U.S. dollar-denominated banking transactions that, somewhere along the chain, cleared through financial institutions in this District. The Superseding Indictment does not contain a bribery count, nor do the Government's charges include any allegation of improper payments to officials. Instead of pointing to documents that are relevant to the charges in this case, the Government has instead reached overseas and introduced a rejected Turkish police report as "evidence" that Mr. Zarrab presents a flight risk.

The Police Report has not been authenticated. It is unsigned and, therefore, even if its author could be cross-examined, he cannot be identified. It contains hearsay. It is a questionable translation. Unlike the documents the Government argues demonstrate a "powerful and overwhelming" case in this District (Opp., at 19), all of which will eventually be scrutinized within the context of the Federal Rules of Evidence, the Police Report is a free-floating document without mooring. While it is understood that the Government often goes outside the four corners of an indictment for evidence demonstrating a risk of flight, the presumption of innocence and Constitutional protections against excessive Bail mandate that such evidence carry some degree of reliability, and the Police Report does not.

## II. THE POLICE REPORT WAS OFFICIALLY REJECTED IN TURKEY

Aside from the inherent problems with importing an unsigned document from overseas into these proceedings, we note that the Police Report was rejected in Turkey in multiple official legal proceedings. Thus, initially, the allegations were scrutinized by the Chief Public Prosecutor's Office of Istanbul, which issued a Decision of Non-Prosecution signed by Ekrem Aydiner (Public Prosecutor No. 25994) on October 16, 2014 (the "Decision of Non-Prosecution") (available upon request). The Decision of Non-Prosecution contains a thorough

discussion of the allegations in the Police Report and the elements of the offense of bribery under

Article 252 of the Turkish Penal Code, and it concludes in pertinent part:

> [T]here are no evidences proving existence of an agreement between Riza
> Sarraf and the public officials to whom he allegedly provides interest, under
> which agreement he allegedly provides interest against their performances or
> non-performances of certain acts in connection with their duties. (This
> lengthy decision is available to the Court upon request)
>
> \* \* \*
>
> On the grounds explained in detail it has been decided, in accordance with
> Article 172 of the Law of Criminal Procedure, that **THERE ARE NO
> GROUNDS FOR PROSECUTION** against any of the suspects for the
> offenses. (This decision is available upon request)[9]

Further, after the Decision of Non-Prosecution was issued, the 6th Criminal Court of

Peace of Istanbul upheld and finalized that decision. Moreover, certain public officials

denounced in the Police Report who enjoyed prosecutorial immunity were subsequently cleared

of any wrongdoing following an investigation by a Parliamentary Commission of Inquiry and a

full vote in the Turkish General Assembly. (Exhibit 1)

While some in the Turkish political opposition may decry the fact that Mr. Zarrab was

not prosecuted in Turkey, fundamental principles of comity and due process call for this Court to

respect the official Turkish process. "International comity is 'the recognition which one nation

allows within its territory to the legislative, executive or judicial acts of another nation.'" *Pravin*

*Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997) (quoting

*Hilton v. Guyot,* 159 U.S. 113, 164 (1895)).   Under this principle, "United States courts

---

[9] Although the Chief Public Prosecutor's Office made its conclusions based on all of the evidence in the Police Report, it is also noteworthy that much of that evidence was gathered illegally: "In the assessment made in respect of the investigation made in light of all of the above explanations; the opinion has been reached that it is not possible to accept the lawfulness of the evidences obtained basing on the communication detection and technical surveillance decisions made—without explaining what kind of strong suspicion existed—on the grounds of electronic mail denunciations with unknown authors and senders, the truthfulness of which have never been investigated and being so, which may actually have never been put in process (emphasis added)

ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries, allowing those acts and proceedings to have extraterritorial effect in the United States." *Id.* As the Second Circuit put it, "It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation. Such an assumption would directly conflict with the principle of comity...." *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir. 1991).

The Government may be willing to declare – based on a "leaked" report "posted online" (Opp., at 11) – that Mr. Zarrab can corrupt Turkey's "entire judicial system" (*id.*, at 25), but this Court "should be wary of branding other nations' judicial forums as deficient in the substance or procedures that their laws contain." *Corporacion Tim, S.A. v. Schumacher*, 418 F. Supp. 2d 529, 532-33 (S.D.N.Y. 2006), *aff'd sub nom. Corp. Tim, S.A. v. Schumacher*, 223 F. App'x 37 (2d Cir. 2007). Additionally, Turkey is a signatory to the European Convention on Human Rights and therefore falls under the auspices of the European Court of Human Rights, further bolstering the credibility of its official processes. For all of these reasons, the Court should give effect to the official action of the Chief Public Prosecutor's Office of Istanbul, the 6th Criminal Court of Peace of Istanbul and the Turkish General Assembly, all of which concluded that Mr. Zarrab had not engaged in bribery or other illegal conduct.

### III. MR. ZARRAB DID NOT USE "CORRUPT POLITICAL CONNECTIONS" TO OBSTRUCT JUSTICE

Contrary to what the Government asserts, Mr. Zarrab and the former Turkish Minister of the Interior did not "obstruct the Turkish investigation." (*See* Opp., at 13-14.) The Government cites a telephone conversation referenced in the Police Report as evidence of the purported "conspiracy," but the Government is confused and mistaken about the facts. Orhan Ince – who the Government believes the Minister agreed to "handle" for Mr. Zarrab – was not "handling the

investigation into the bribery scandal." (*Id.,* at 13.)  Rather, the conversation was about an unrelated attempt by police officer Orhan Ince to blackmail Mr. Zarrab.   Mr. Zarrab filed a complaint with the Istanbul Chief Public Prosecutor's Office in connection with the effort of Officer Ince to blackmail him.

The Government also claims that Mr. Zarrab "simply paid off high-ranking Turkish officials to squash the investigation, even to the point of having law enforcement officials involved in that investigation arrested, terminated, reassigned, or criminally charged." (Opp., at 21.)  That claim is absurd and lacks any evidentiary support.  The Government apparently takes its view from inferences gleaned through unidentified "press reports" attributing the arrest of police officers involved in the illegal evidence gathering described in the Decision of Non-Prosecution to political pressure from President Erdoğan.  (*See* Opp., at 14.)  However, other press articles – written from elsewhere along the Turkish political spectrum – suggest that the investigations themselves "were politically motivated, aiming to box the government in and even bring it down." (Exhibit 2, at 2; *see also* Exhibit 3 (discussing political dynamics in Turkey, and linking December 2013 arrests to same political forces believed responsible for infamous Ergenekon cases); Exhibit 4 (describing December 2013 arrests as "power bid using judicial tools and a smear campaign").)  The disparity in these views reflects a complex political dynamic in Turkey, and the Court should meticulously avoid the Government's invitation to weigh in on the debate.

Similarly, the Government asserts that Mr. Zarrab presents a flight risk because some of his philanthropic activities – which were voluntarily disclosed and fully documented in his Bail Application – purportedly give him "access to powerful members of Turkish society" and create "close ties" to high-ranking Turkish officials, including President Erdoğan.  (*See* Opp., at 14,

21.)  The Government's argument on that point is supported by no evidence, but trades instead on the presumption that Mr. Zarrab is guilty of the allegations in the unsigned, leaked, online Police Report and therefore, by extension, must be guilty of secretly buying political influence through the *Togem-Der* charity.  The Government's implication is unfounded, offensive and has no place in a United States District Court.

<u>**POINT FIVE**</u>

<u>**THE GOVERNMENT'S SUGGESTION THAT ARMED GUARD'S PROVIDED BY GUIDEPOST SOLUTIONS LLC ARE INSUFFICIENT OR WILL BE INEFFECTIVE BECAUSE PAID FOR BY THE DEFENDANT IS INCORRECT AND SHOULD BE DISREGARDED**</u>

The Government repeatedly assails the efficacy of armed guards provided by Guidepost Solutions LLC ("Guidepost Solutions") as a "façade" of security because paid for by the defendant.  As indicated by the Affirmation of Joseph Jaffe (filed under seal), the Chief Compliance Officer and Deputy General Counsel of Guidepost, Mr. Jaffe is the former Chief of the Official Corruption Unit of the U.S. Attorney's Office for the SDNY and held a number of high level law enforcement posts.  Mr. Jaffe explains that Guidepost is a global organization comprised of experienced investigators, security and technology consultants and compliance and monitoring experts.  He set forth Guidepost's experience with providing pretrial release services to defendants in the EDNY and SDNY.  Mr. Jaffe further states that Guidepost reviewed the premises where the defendant would reside if released, and that they then designed and oversaw the implementation of appropriate electronic and physical surveillance measures to ensure that the defendant would be secure during the pendency of the pretrial release conditions. Appropriate physical restraints and electronic and visual monitoring equipment have already been installed and will be monitored on a continuous basis.  Mr. Jaffe stated that he would provide an appropriate number of experienced, armed (if so required by the court) security

oversight professionals, all of whom are former or off-duty law enforcement officers or agents). These persons would serve 24 hours per day, seven days per week in the oversight of the defendant, and will ensure that whatever the court orders in regard to the security details concerning the defendant, will be done.   Mr. Jaffe also stated that Guidepost will communicate with Pretrial Services, other law enforcement authorities and the U.S. Attorney's Office, as required by the Court.

Given the unblemished professional reputation of Guidepost and the well-developed plan already instituted to meticulously ensure complete security for Mr. Zarrab, the Government has no right nor basis to imply that this is all a "façade."  Rather, these are very real measures to be carried out by highly responsible men and women with impeccable professional credentials and they will ensure Mr. Zarrab's return to court whenever required.

## CONCLUSION

Mr. Zarrab is entitled to bail as a matter of law.  The Government has woefully failed to meet its dual burden of proving by a preponderance of the evidence that the defendant is a risk of flight and that the conditions proposed by him will not ensure his appearance when required. The conditions proposed are severe and the added conditions of house arrest with electronic monitoring and the premises secured by Guidepost will ensure the defendant's appearance when required.  Furthermore, the unique and virtually unprecedented nature of the charges makes the case very defensible indeed, further incentivizing the Mr. Zarrab's already-firm intention to remain in the Southern District and help his experienced and committed lawyer clear his name.

Respectfully submitted,

Benjamin Brafman
Marc Agnifilo, Of Counsel
Joshua D. Kirshner
*Attorneys for Reza Zarrab*
Brafman & Associates, P.C.
767 3rd Avenue, 26th FL
New York, NY 10017
Tel: (212) 750-7800
Fax: (212) 750-3906

cc:     AUSA Sidhardha Kamaraju (via email)
        AUSA Michael Lockard (via email)
        All counsel (via ECF)

30

# EXHIBIT 1

**TURKISH GRAND NATIONAL ASSEMBLY**

**LEGISLATION PERIOD**
24

**LEGISLATION YEAR**
5

# SEQUENCE NUMBER: 681

PARLIAMENT INVESTIGATION COMMISSION

REPORT ON

FORMER MINISTER OF ECONOMY MEHMET ZAFER ÇAĞLAYAN,

FORMER MINISTER OF INTERIOR MUAMMER GÜLER, FORMER

MINISTER OF EUROPEAN UNION EGEMEN BAĞIŞ, AND FORMER

MINISTER OF ENVIRONMENT AND URBAN PLANNING ERDOĞAN

BAYRAKTAR

JANUARY 2015

-184-

### 2.4. General Evaluation and Conclusion

The mindset that "any methods that are in accordance with the law / against the law can be used when fighting people suspected of committing crime, and if necessary laws of third parties can also be breached" must have been abandoned a very long time ago, and maximum efforts should be shown for allowing enjoyment of individual rights and freedoms as desired by law-makers, in particular the judicial officers and law enforcement officers should be ensured according to legislations as any acts to the contrary will disrepute their works, tarnish their reputation in the eye of society, and cripple the social peace.

A great importance has been given to the right to privacy which is secured under the Turkish Constitution of 1982, Section IV "Privacy and Protection of Private Life", Sub-section A: "Privacy of Private Life", Article 20, and strict conditions have been imposed for interception, listening and recording of communications under Article 135 of Code of Criminal Procedures No. 5271, technical surveillance under Article 140 of Code of Criminal Procedures. It is evident that anybody who acts to the contrary will face criminal charges as defined under Turkish Criminal Law No. 5237.

Given Article 6 of the Constitution and the Circular No. 100 published on 20.01.2006 by Ministry of Justice General Directorate of Sanctions, the report which was issued about 4 ex-Ministers and the findings obtained as a result of interception, listening and recording of communications and technical surveillance by Istanbul Chief Public Prosecutor's Office's Terror and Organized Crimes Investigation Bureau, and the Organized Crimes Brach of Police, which is at the disposal of said Bureau, through fraudulent ways for evading the law, are null and void.

In their punitive strategy expanded into complete body of our criminal law, the law-makers required to ensure that all procedures under an investigation-prosecution process are entirely in accordance with the law.  Leaving the door slightly open for illegal – corrupt actions will appeal new illegal – corrupt actions.  Therefore, those who use the powers of law should act consciously in accordance with the intention of law-makers.

Turkish Grand National Assembly          (Investigation No: 681)

-185-

Both investigation documents referred to our commission have the nature of denunciation for 4 ex-Ministers, and given that fact, the evidences were reinvestigated through new investigations and inspections carried out in a duly manner.

When monitoring and listening to communications of a person pursuant to a court order, if any evidence which involves possibility of a criminal activity is found during communication with another person, then such evidence is considered as coincidental evidence, and the person who carries out the monitoring should file such evidence to Public Prosecutor who in turn will make a decision whether to initiate any action on the basis of such evidence pursuant to Article 138 of Turkish Criminal Law. However, it must be accepted that after finding such evidence, if the monitoring continues for obtaining new evidences about the same person, then any subsequent evidences will not be considered as coincidental evidences, and any evidences which will be obtained about that person without a valid court order will be entirely against the law and invalid. After obtaining coincidental evidences, if no investigation is initiated on the basis of such evidence, the initially obtained coincidental evidence will be nothing but a denunciation. In addition, as the Public Prosecutor has no authority to initiate an investigation against minister on the basis of coincidental evidence, then such evidence cannot be taken into account in the ongoing investigation.

Of the offenses which the Ministers were charged, for committing a bribery offense, there should be an agreement between the parties for performance or nonperformance of a certain action. Indeed, the relevant conduct should also be within the jurisdiction of relevant minister. In the investigation, considering each of the conducts which the 4 Ministers were charged, no illegal aspect was found in such conducts. Therefore, though there is nothing which would require giving or receiving bribe, even if we disregard all of these for a moment, there is still no sufficient suspicion which would require initiating an action regarding exchange of monies under bribery. Actually, there is no evidence which shows that conducts such as embezzlement and bribery which are considered as corruption offenses. Actually, there is no such claim, either.

Turkish Grand National Assembly          (Investigation No: 681)

-186-

**IN THE LIGHT OF ALL FACTS DETAILED ABOVE:**

**A) Regarding Former Minister of Economy Mehmet Zafer ÇAĞLAYAN**

An investigation was decided to be carried out against Former Minister of Economy Mehmet Zafer Çağlayan who was charged with forgery, smuggling and bribery offenses, claiming that he facilitated operations of Rıza SARRAF in exporting gold to Iran, hindered judicial and administrative investigations regarding 1,5 tons gold which was purported to be illegally brought into the country from Ghana, and tried to send that gold out to Dubai in return for some material benefits provided by Rıza SARRAF, the amount and value of which could not be determined.

In his plea detailed here above, the Former Minister in question made the following statements as a summary:

"All investigations carried out by the Public Prosecutor and law enforcement are claimed to be void, I have never been engaged in any unlawful transactions involving gold, and the claims that I facilitated transactions are completely untrue.  Actually, I neither attempted to nor have any authority to hinder judicial and administrative investigations regarding 1,5 tons of gold purported to be illegally brought into the country from Ghana,

Furthermore, in spite of forgery charges, I have certainly not forged any documents,

I have not been engaged in any conducts in Halk Bank that would be to the detriment of Bank and favor of clients, nor have I any relationship, either direct or indirect, with hindering of transactions and procedures of some clients. Actually, these facts are established under investigators' reports. All charges are completely untrue.

As the Public Prosecutor established that there has been no smuggling offense, then it is groundless that I was involved in such an offense.

For the watch and piano which were asserted to be given as a gift, I made payment in cash, and that claim is not true:"

Turkish Grand National Assembly          (Investigation No: 681)

-187-

In the investigation carried out by our Commission, we evaluated statements of witnesses heard regarding the mentioned cases, property investigations, and expert person reports:

As a result of the investigation carried out by Bakırköy Public Prosecutor's Office regarding the foregoing case, the conduct was not found to constitute a smuggling offense, on which grounds, a decision not to prosecute, with details, date and number given above, was made, which has become final and absolute following objections thereto, so there is no smuggling offense,

Regarding other charges, an investigation was carried out by Istanbul Chief Public Prosecutor's Office against involved people, and such charges were decided to be void and null as they were based on evidences which were illegally obtained by law enforcement and public prosecutors who initiated the investigation, and as the other issues did not constitute any offense, the abovementioned "Decision not to prosecute" was made, which decision has become  final and absolute following objections thereto, and no unusual situation was noticed as defined in the expert's report prepared as a result of property investigation,

In the expert's report, it is stated that the sum of TRL 2.465.000 which was transferred from by Mehmet Şenol ÇAĞLAYAN to Mehmet Zafer ÇAĞLAYAN's account was made a as result of transfer of shares, and as a part of the sum of TRL 4.736.810 which had previously been declared as receivables in the declaration of property, and it was also declared TRL 660.000, the cost of watch paid to Rıza SARRAF, was covered from the remaining portion of said receivable,

A letter signed by Rıza SARRAF where he declared to be paid for and receive the price of the watch which he brought from Switzerland; also regarding EUR 40.000 paid for the piano which he took from the same person, he declared to have paid said EUR 40.000 from the EUR 47.000 of his wife which had been previously declared in the statement of property; and we have come to the opinion that there is no evidence which would lead to sufficient suspicion for referring him to the Supreme Court, and accordingly he should not be referred to the Supreme Court.

Turkish Grand National Assembly          (Investigation No: 681)

**B) Regarding Former Minister of Interior Muammer GÜLER:**

An investigation was decided to be carried out against Former Minister of Interior Muammer Güler who was charged with forgery of official documents (Article 204 of Turkish Criminal Law), influence peddling (Article 255 of Turkish Criminal Law), bribery (Article 252 of Turkish Criminal Law), breach of secrecy of investigation (Article 285 of Turkish Criminal Law) offenses, claiming that he give Rıza SARRAF's vehicles the privilege of using emergency lane, and assigned guards for said person, assisted naturalization of said person and some detained suspects and his relatives into Turkish citizenship by illegal and exceptional ways, instructed to check whether there were any judicial or intelligence investigations regarding said person, attempted to prevent media's publishing or broadcasting of any news regarding said person in return for some material benefits provided by Rıza SARRAF, the amount and value of which could not be determined.

In his plea regarding the conducts defined in the investigation motion, the Former Minister in question made following statements as a summary:

"The authority to allow use of emergency lanes and assigning guards belongs to the governors in provinces, and he did not contribute to decision of assigning guards, nor is there any illegality regarding allocation of license plate,

The application for exceptional naturalization was process which was initiated before he came to the office, and the procedures were performed in accordance with legislations, and naturalization was granted by a Cabinet decree,

Regarding the claim that he instructed to check whether there were any judicial or intelligence investigations regarding said person, he said that said person informed him that some civilians were following him upon which he instructed investigation of that case for security purposes, and he was not aware of the judicial investigation."

Moreover, regarding the investigation on his property, he declared that he contributed to property of his daughter Burcu GÜLER, and there is no unusual aspects regarding his own properties, which was proved by expert's report; and regarding his son Barış GÜLER's properties, he declared that his son gained his property while he had been engaged in real estate business and other miscellaneous businesses for a long time, most of which was before he became a Minister, and that he only partially contributed to his properties.

Turkish Grand National Assembly          (Investigation No: 681)

-189-

Regarding his attempts to prevent media's publishing or broadcasting of any news, he said that said person informed him that an unfair article would be punished about him whereupon he called Chief Editor of Bugün Newspaper and CEO of the Group which owns Yeni Şafak Newspaper and informed them about it, and other than that, there was certainly no attempt to prevent any news or place pressure.

Upon evaluation of other evidences, witness testimonies, and experts' reports available in the file, we have come to the opinion that there is sufficient suspicion that he committed the charged offenses, and accordingly he should not be referred to the Supreme Court.

**C) Regarding Former Minister of European Union Egemen BAĞIŞ:**

An investigation was decided to be carried out against Former Minister of European Union Egemen BAĞIŞ who was claimed to have intermediated attempts of Rıza SARRAF to lease a hotel with tourism certificate, and obtain visa for his relatives, caused relevant authorities and bodies to conduct inquiries to detect whether there were any investigations involving said person, attempted to prevent media's publishing and broadcasting of any news about activities of that person in return for some material benefits provided by Rıza SARRAF, the amount and value of which could not be determined.

In hi his plea detailed here above, the person in question made following statements as a summary:

"Rıza SARRAF attempted to open a hotel, and he learnt that he bought a building from a person whom he was also acquainted with, and he just wished him for the best in that attempt and had no other involvement and engagement in it, and as far as he knew, said project failed to be fulfilled, and indeed, the it is no him but the Ministry of Culture and Tourism that had the authority to authorize openings of hotels, and such claims were unfounded, and nonsense,

The claims that he caused relevant authorities and bodies to conduct inquiries to detect whether there were any investigations involving said person were also completely untrue,

Turkish Grand National Assembly          (Investigation No: 681)

-190-

He had no attempt to prevent media's publishing and broadcasting of any news about activities of that person, and he only informed Hüseyin ÇELİK about it."

Other than that plea, the witnesses heard made no statement that he benefited in any way as a result of those claims or otherwise.

Istanbul Chief Public Prosecutor's Office carried out an investigation regarding the bribery offense against Rıza SARRAF and others in connection with these cases, and concluded that the conducts of investigated suspects did not constitute any bribery offense, and made a decision not to prosecute on grounds that the technical surveillance and listening records were performed unlawfully and against the laws, and said decision not to prosecute has become final and absolute upon dismissal of objections thereto. Our Commission was not content with that, and continued investigation. As a result of inspection of property, as defined in the expert's report, of the three significant real properties, one was inherited from his mother, the second was bought using the monies obtained from sale of a previously purchased real property, and the third was bought from a construction company under with payment in installment; documents relating thereof were filed, and we concluded that there was no sufficient suspicion that would lead to prosecution, in other words, no sufficient suspicion that would require referring him to the Supreme Court.

**D)   Regarding   Former   Minister   of   Environment   and   Urban   Planning   Erdoğan BAYRAKTAR:**

In the investigation and inspection regarding the claims that a criminal organization's leaders and members facilitated approval of individual development plans, ignored unlawful aspects of some projects which were against development plans, and ensured trouble-free completion of any inspections thereof, in return for some material benefits provided the amount and value of which could not be determined; and some of such conducts were performed within knowledge of Erdoğan BAYRAKTAR, who was then the Minister of Environment and Urban Planning, and he mediated for ensuring that companies which were awarded contracts by the Ministry outsource catering services from companies in which his relatives had shares.

Turkish Grand National Assembly          (Investigation No: 681)

-191-

As defined above, Istanbul Chief Public Prosecutor's Office carried out an investigation against the people involved in case in question charged with the offenses: altering, destroying or hiding official documents, receiving or giving bribe, causing construction pollution, establishing an organization for committing crime, being a member to an organization established for committing crime, and malfeasance, upon which investigation, Istanbul Chief Public Prosecutor's Office decided not to prosecute due to lack of evidence, and said decision has become final and absolute. Moreover, as a result of the investigation carried out by our Commission, we failed to find any evidences which prove committal of offenses defined in the investigation motion. Therefore, we do not think that Former Minister of Environment and Urban Planning Erdoğan BAYRAKTAR should be referred to the Supreme Court.

## CONCLUSION AND DECISION

On the basis of whole file content and grounds as detailed here above, in the Commission meeting dated 05.01.2015, it was decided by majority of votes (9 votes against 5 votes) that Former Minister of Economy Mehmet Zafer ÇAĞLAYAN, Former Minister of Interior Muammer GÜLER, Former Minister of European Union Egemen BAĞIŞ, and Former Minister of Environment and Urban Planning Erdoğan BAYRAKTAR would not be referred to the Supreme Court.

05.01.2015

| | | |
|---|---|---|
| Chairman<br>*Hakkı Köylü*<br>Kastamonu | Vice-chairman<br>*Yılmaz Tunç*<br>Bartın | Spokesman<br>*Mustafa Kemal Şerbetçioğlu*<br>Bursa |
| Clerk<br>İlknur İnceöz<br>Aksaray | Member<br>*İsmet Su*<br>Bursa | Member<br>*Bilal Uçar*<br>Denizli |
| Member<br>*Osman Taney Korutürk*<br>Istanbul<br>(Opposition Note) | Member<br>*Rıza Mahmut Türmen*<br>Izmir<br>(Opposition Note) | Member<br>*Erdal Aksünger*<br>Izmir<br>(Opposition Note) |
| Member<br>Mesut Dedeoğlu<br>*Kahramanmaraş*<br>(Opposition Note) | Member<br>*Ayşe Türkmenoğlu*<br>Konya | Member<br>*Mustafa Akış*<br>Konya |
| Member<br>*Emre Köprülü*<br>Tekirdağ<br>(Opposition Note) | Member<br>*Yusuf Başer*<br>Yozgat | |

Turkish Grand National Assembly        (Investigation No: 681)

# EXHIBIT 2

# Former police chief speaks out about Turkey's 'parallel state'

Author: Mustafa Akyol Posted November 25, 2014

Turkey's acquaintance with Hanefi Avci dates back to the so-called Feb. 28 Process in the late 1990s when he emerged as a brave police chief standing up to the secularist putchists and exposing their violations on the TV screen. Years later, in 2010, he was back in the headlines with a book claiming that the repressive state machine, controlled by secularist generals in the past, was now the tool of the Fethullah Gulen community. Gulenist police, he wrote, had taken control of police intelligence, purging rival colleagues along the way, and were now using their power to lay traps for political rivals.

After reading his book, it was obvious to me that Avci was not one of those hard-core secularists averse to the Gulen community because of its religious values. The concrete incidents he recounted and the sociological analyses he made on closed, tight-knit ideological communities sounded convincing to me. I became even more convinced when Avci was soon put behind bars by the same police and prosecutors he accused in the book. He was indicted for membership in an obscure Communist organization, a charge that was not only thin but actually backed up Avci's charges that Gulenist police made things up to carry out political arrests.

Following Avci's arrest I wrote a number of articles in his defense, which led some colleagues, who advocated a relentless onslaught on the "putchists," to chastise me, including in a column titled "What are you doing Mustafa?"

Then, in a couple of years the atmosphere in Turkey changed. The ruling Justice and Development Party (AKP) and the Gulen community fell out, and Avci's claims became the No. 1 topic in the pro-government media. The new political climate resulted in a sound Constitutional Court ruling that led to Avci's release from jail in June.

Last week, I met with him in a cafe in Istanbul. I saw that his stance on the "parallel state" is more objective, prudent and realistic than the vengeful writers in pro-government circles.

## Closed mind-set

I asked Avci first about how he ended up in jail. He explained that an underground Communist group by the name Revolutionary Headquarters did exist, but that he was implicated by an extremely strained link. This method, after all, was the hallmark of the "parallel structure": drawing far-fetched associations between targeted individuals and existing criminal groups and, if need be, fabricating evidence.

But what was the underlying logic?

"The logic here goes like this: First, you decide someone is guilty and then fabricate the necessary evidence," he said. "The people on top decide that someone is guilty and should be arrested, and those in lower positions carry out those orders without any questioning."

When I asked him what all this had to do with Islam, Avci said, "In fact, this mentality has nothing to do with religion directly. All illegal ideological organizations have the same mentality. The world is split into black and white according to the group's ideology, and wrongdoings in the name of a grand ideal become increasingly legitimate over time."

### Foreign forces?

And what if the actions of the "parallel state" are not the result of closed-group-idealism-turned-fanaticism but of serving the interests of "foreign powers"? What if the United States or Israel is behind all this? I knew Avci did not embrace this conspiracy theory, a fixture in the pro-government media, for he had lately shared the following post on Twitter: "The crimes of the parallel structure are obvious: forging documents, setting up individuals and institutions … Arguments that go beyond this are mere speculation."

He stuck to his position during our conversation, stressing there was no evidence to back up government claims of "espionage on behalf of foreign powers."

He further said, "Given that Fethullah Gulen is based in the United States, reliant on it, and that the community has some important activities there, it is understandable that they use a rhetoric sympathetic to the United States and Israel. But this doesn't mean that the community supplies information to the United States and Israel or that it works for them. Based on existing evidence, one could say that the community obtained and exploited secret state documents — and those are very grave accusations — but there is no evidence to suggest they passed those documents to another country. Espionage means obtaining secret information with the purpose of passing it to a foreign country. In fact, I believe the community members' view of foreign powers and the outside world is no different from the view of the average Anatolian person."

Next, I asked Avci about the Dec. 17 and Dec. 25 corruption probes. His comments suggested he didn't downplay the evidence the probes had produced. Yet, he stressed the investigations were politically motivated, aiming to box the government in and even bring it down.

### Dink murder and missionaries' massacre

Another critical topic I brought up was how almost all crimes the pro-government media used to blame the "deep state" — in collaboration with pro-Gulen media — were now blamed on the "parallel state" by the same media.

"How do you view the fact that crimes previously attributed to the Ergenekon network and the 'deep state' — like Hrant Dink's assassination, the missionaries' massacre in Malatya in 2006 and the bombing of a bookstore in Semdinli in 2005 — are now attributed to the 'parallel state'?" I asked.

Starting with an overview of the past, Avci offered the following explanation: "The Gulen community tried to use every bad incident in Turkey's recent history as a cover for operations against certain quarters, regardless of whether evidence existed or not. The death of [former President] Turgut Ozal, [politician] Muhsin Yazicioglu's death in a helicopter crash, Hrant Dink's murder, the massacre of the missionaries in Malatya are some of the examples. To implicate the quarters it targeted, the community distorted the facts and even impeded efforts to solve those cases. Had it not acted in such a subjective and conspiratorial manner, had it not manipulated and exploited those cases, they could have been analyzed and solved."

Avci, however, was equally opposed to the use of the same conspiratorial mentality and prejudices against the community today.

He said, "The community exaggerated its propaganda so much that some journalists came to believe that those murders were committed or masterminded by community members."

Then he added, "I think that blaming those incidents on the Gulen community without any tangible evidence and investigation is as wrong as the probes that Gulenist police and prosecutors led without any evidence and real investigation and the propaganda campaigns the community waged to implicate certain quarters. I believe those cases can be solved with an objective investigation. Some of them will be confirmed as accidents (such as Yazicioglu's case) and others as natural deaths (such as Ozal's)."

**No to witch hunts**

And how should the state counter this "parallel structure"? I reminded Avci that a witch hunt is underway, with the government seeking to undermine all entities and institutions of the Gulen community. Is it OK to target schools, private tutoring halls, charities or Bank Asya?

"The community took a political stance and entered into alliances against the government and the AKP, acting as a political organization rather than a religious community," Avci said. "So, the government and the AKP saw the community as a political opponent and used political rhetoric to denounce it. The AKP or the government may act politically against a group waging political opposition against them, but the state should abide by the law."

He further said, "Targeting the community's civic entities cannot be justified as long as they have not been involved in a crime, collaborated with a criminal formation or facilitated a criminal activity. The state should not engage in political rows."

In Avci's view, what needs to be done is simple: uncover and probe the wrongdoings of the "parallel structure" through legal means. This includes exposing and prosecuting the injustices in the Ergenekon and Sledgehammer coup probes, the illegal wiretapping, the seizure of secret state documents, the fabrication of evidence, the unlawful purges in the police and the nepotistic entrenchment in the bureaucracy. "The exposure of all those misconducts, I believe, will lead also to soul-searching within the community itself," he added.

Avci seemed upset that the community had come to this point. "I wish they never gotten involved in those affairs and instead carried on with their schools and charities. They would have set an example both in Turkey and in the world," he said.

Those feelings are not surprising for someone who identifies himself as a conservative, shares common values with the Gulen community and appreciates its educational institutions.

I said goodbye to Avci, filled with similar feelings. The Gulen community, I thought, should have never succumbed to ambitions to entrench itself in the bureaucracy and all those power struggles. I wish we still knew it only as the devoted teachers trotting the globe from Kenya to Mongolia to open schools, the gentle "dialogue" volunteers, the faith services and charities. Had its leaders not yearned for power this much, they would not have become so vulnerable to its corrupting effect.

Yet, one should keep in mind that the "power corrupts" rule is valid for everyone, including the AKP government, which has turned from the Gulen community's best partner to its archenemy. It's also time for the AKP to face up to its obvious corruption, and elevate its take on the Gulen community from the primitive level of political revenge and witch hunt to the level of justice. One of the safest ways to do this is perhaps to lend an ear to Avci, a man who has kept an honest stance on the issue from the beginning.

Read More: http://www.al-monitor.com/pulse/originals/2014/11/turkey-parallel-state-police-chief.html

Former police chief speaks out about Turkey's 'parallel state' - Al-Monitor: the Pulse of the Middle East



©2016 Al-Monitor. All rights reserved.

Close

X



The Pulse of the Middle East
Al-Monitor brings together top journalists from across the Middle East. Including Egypt, Iran, Iraq, Israel, Lebanon, Palestine, Syria and Turkey. Plus, we have daily translations from 20 major news organizations in the region.
Stay connected. Sign up for our daily newsletter.

Newsletter Signup   Type email address here      Subscribe

# Nedim Sener focuses on Cemaat role in Turkey scandal

Author: Tulin Daloglu Posted December 26, 2013

ISTANBUL — Since the massive corruption scandal broke out on Dec. 17, Turkish Prime Minister Recep Tayyip Erdogan has been covertly blaming the Fethullah Gulen religious movement — better known as the Cemaat — painting it as a subcontractor of the United States and Israel, accusing it of engaging in a conspiracy to remove him from power. He even accused the Cemaat — without openly stating its name — of establishing a "state within the state," and vowed not to allow it to supersede government authority. In short, there is an undeclared but open war between the Erdogan camp and the Cemaat.

Therefore, *Al-Monitor* decided to interview investigative journalist Nedim Sener. He argues that he has been targeted by the Cemaat and fell victim to a plot by its members in the police and the judiciary, who have tied him to the infamous Ergenekon case, where military officers, intellectuals and other civilians have been convicted of establishing a terrorist organization to bring down the Erdogan government. During those days, the Erdogan camp and the Cemaat were in a relationship of convenience to finish off the military's tutelage, and Erdogan certainly did not experience discomfort with the Cemaat's establishment in state institutions. In fact, the Cemaat lived its best years in state institutions since the Erdogan government came to power.

In that light, Sener draws attention to the very fact that the prime minister's camp knows very well in which occupations and state institutions these Gulen movement members are. "They're not searching for them with a torch in the darkness and trying to figure out who is from the Cemaat or not. They know very well who is who. They brought them into power in these occupations. And it is easy for the government now to dismiss them. That is why Fethullah Gulen lost control in his latest address to his followers and literally cursed on the Erdogan government," he told *Al-Monitor*.

"I certainly don't believe in the Cemaat's sincerity in the fight against corruption. Since the day the Erdogan government came into power, there has been corruption. I personally reported them. ... There was, for example, the Deniz Feneri charity [where part of 41 million euros ($56 million) collected for charity from Turks living abroad was used outside its purpose]. The government dismissed those judges who tried to unearth this corruption, and the Cemaat did not express a thing about it then. Why have they become sensitive on corruption today but they were not yesterday! Turkey is not facing corruption charges for the first time. Therefore, we also need to question the Cemaat's motivation in this setting, as well."

On Dec. 25, when *Al-Monitor* sat down for an interview with Sener, Erdogan's government was facing its first seriously difficult day in power since it took charge over a decade ago. Three cabinet ministers, whose sons were accused in the graft probe, had announced their resignations, and, as we were speaking, news broke that a second wave of the operation was stopped by the government before arrests were made. Erdogan's sons' names, Burak and Bilal, were also publicly spelled out for the first time in connection with the corruption ring.

"The government can't stay in charge after such a scandal. It is best that it resign, but the corruption issue is now secondary. One really needs to see that the Cemaat is actually directly aiming at Erdogan. It simply showcases that it has grown so strong that it can even bring down the country's prime minister when it wants to." Sener told *Al-Monitor*.

when it wants to," Sener told *Al-Monitor*.

"If we are for correcting our state system, for growing stronger in our democracy and for strengthening our judiciary, where individuals are all treated equally before a judge, and where people believe they can find justice when they need it, we also need to stand against this Cemaat establishment in the state institutions. There is a reason why it is grouped in intelligence units and the judiciary. There are video recordings that show Gulen asking his followers, at the least 20 to 30 years ago, to start finding employment in police, judiciary or military. ... He tells them they should stay quiet and not reveal their identities until the time comes. This is scary."

He added, "When the West looks at them, it sees their movement as an interfaith dialogue group, like a nongovernmental organization. We, however, practice a different reality here. And that gap is the problem in trying to explain to outsiders as to why this movement is not what it seems. There are many more religious movements in this country, and people don't have an issue with them. But the Cemaat is a different story. It has grouped in intelligence departments of the police, in the judiciary and elsewhere. And it shapes our political life with that power. This rises as a direct challenge to our individual liberties. ... The Gulenists are not trying to establish an Islamic republic or impose Sharia. This is an outright fight for power — it does not have anything to do with God or spirituality. This is all a very earthly matter."

An award-winning, internationally recognized investigative journalist, Sener documented in his 2009 book *The Dink Murder and Intelligence Lies* that police officers who conducted the Ergenekon investigation should also be put on trial in the Hrant Dink case. The book put him under a dangerous spotlight, and he believes that the Cemaat set a plot for him, tying him to the Ergenekon case. He was jailed for over a year in pretrial detention and released in March 2012 pending a trial that seeks a 15-year imprisonment. Now, hear Sener as he describes why the 2007 murder of Dink, a beloved Armenian Turkish journalist, is linked to this case, and that to see the big picture we need to factor this part of the puzzle into the equation:

"When we talk about the Ergenekon operation, Ali Fuat Yilmazer — who was head of the police intelligence department, later assigned as the deputy security director [in Istanbul police] — had an exceptional, close relationship with Erdogan. Whenever the prime minister was in town, they used to get together while the ministers had to wait sometimes for two weeks to get an appointment with Erdogan. He was one of the key members of the Cemaat [in the police]. And he was also the man who led the Ergenekon operation. He was known as the brain of the operation. So, who was he? Along with Ramazan Akyurek, head of the Trabzon Security Directorate, who was also a member of the Cemaat, he was a man who carried responsibility in the Dink murder.

"What happened to Yilmazer? Two days after we were arrested [in March 2011], he was dismissed. Since I was arrested, I have been saying that there is a conspiracy against me, and I continue to say the same thing. Yilmazer tried to take his revenge on me, because I documented in my book that he committed professional misconduct and therefore [was] indirectly responsible for Dink's murder. The prime minister signed a report on Dec. 12, 2008, stating that very fact.

"Twenty days after we were arrested, they also dismissed [Ergenekon special prosecutor] Zekeriya Oz. These are — Yilmazer and Oz — really critical names. There is no need to doubt that they are both members of the Cemaat. And they did not forget what happened to them, and started to prepare for [this] operation aiming at the prime minister and those others within the police and the judiciary. They took the first strike on Feb. 7, when they invited Hakan Fidan [head of National Intelligence Organization and a close confidant of Erdogan] to answer some questions [regarding the Oslo talks with the Kurdistan Workers Party (PKK)].

"The day when these people stand trial before a judge, we will only then start to understand what kind of

a power there was behind Dink's murder. We did not even start to discuss this issue with all sincerity. The

public may not yet be ready to face the truth. But I documented the misconduct. ... Father Andrea Santoro was killed in his church in Trabzon when Ramazan Akyurek was the security director there. These murders were essential to set the stage for the Ergenekon operation. They needed some provocative actions to create public uproar.

"Once you look at the big picture, you start sensing the big network behind Dink's murder. The issue is that this intelligence head and security director had access to critical knowledge from both sides — the victims and their murderers. Once you put all these facts on the table, and still do not do a thing to prevent these murders, you then need to question as to why they did not do a thing about it.

"Zekeriya Oz linked the murder at the Council of State to the Ergenekon trial [alleging that those Ergenekon members were trying to set the ground for military intervention with such actions], but he refrains from linking Dink's murder to the Ergenekon trial. But they argue that that murder was also a work of the Ergenekon establishment. So, why not link these cases? The Ergenekon dossier consists of multiple cases, and adding one more would not make it less or more complicated. The point is that the moment they link the Dink murder to the Ergenekon trial, their men [members of the Cemaat] who played a role in this murder will also eventually end up appearing before the judge for trial. Put simply, those police officers [Yilmazer and Akyurek] will also be put on trial for Dink's murder.

"They put me into a trap because I proved this scenario with documents — all based on facts. I am not talking about a scenario that does not have a solid ground. I documented this in my book, and that is why they threw me in jail. My case is still pending, and I may be imprisoned for 15 years — for being a member of Ergenekon.

"People need to acknowledge the two wrongdoings here: Corruption is wrong, and what the Cemaat is doing is also wrong."

Read More: http://www.al-monitor.com/pulse/originals/2013/12/turkey-corruptian-cemaat-role-scandal-police-hrant-dink.html



©2016 Al-Monitor. All rights reserved.

# EXHIBIT 3



# FINANCIAL TIMES

January 15, 2014 4:41 pm

# Turkey must defend its democracy against the Gulenists

By Osman Can

 Share  Author alerts   Print  ✂ Clip                     Comments

## The Gulenists pose a greater threat than the politico-military elites, writes Osman Can



Turkey is in crisis because of actions taken by the country's judiciary. It is a crisis that will determine the fate of democracy there. It also owes much to the past – rather than conduct politics in the open, many have sought control by infiltrating state institutions.

In December, a wave of arrests of prominent people following a secret investigation, together with leaks about the allegations, encouraged the impression that the crisis is about corruption. But the investigation is dishonest. The police officers and prosecutors who conducted it have ties to the Gulenists, a secretive religious movement based on absolute obedience, whose final goal no one knows. The leaks, to media that belong to the movement, amount to political defamation. The real target is the 11-year-old Justice and Development (AK) party government. There is no doubt that this is a power bid using judicial tools and a smear campaign.

The nature and history of the judiciary lend themselves to such a campaign. It is a hierarchical system influenced by the Turkish ethnocentrism of the 1930s and by coups d'état in 1960 and 1980. It is independent of parliament. By turns, the country's Kurds, Alawites, non-Muslims and conservatives have all been terrorised in the name of justice. In 100 years, more than 100 parties have been closed down. Indeed, even the AK party, supported by 50 per cent of the population, was barely able to save itself from closure as recently as 2008.

There have been efforts to democratise the judiciary in line with the democratisation of society as a whole. As part of constitutional changes approved by referendum in 2010, the constitutional court and the high council of judges and prosecutors (HYSK) were transformed with the support of the EU. The plan was to make them more pluralistic. But crucial changes were annulled by court order, paving the way for the Gulenists, who occupy central posts in state institutions, mainly the army and judiciary, to infiltrate them.

Before the 2010 referendum Fethullah Gulen, the movement's leader, called for people to vote for the constitutional changes "even if it means taking the corpses of your loved ones from their graves". At the time, the government saw the call as well-intentioned. But during elections among the judiciary to the HYSK, the Gulenists won support from pro-democracy groups by highlighting fears that anti-democratic forces would otherwise take control.

So the Gulenists, who have only 15 per cent support in the judiciary as a whole and only 2-3 per cent backing across society, took control of the supreme court of appeal and the state council and, hence, the whole judiciary. Since those bodies choose the presidency of the supreme election council, the Gulenists acquired powers able to influence the fate of upcoming elections – local, parliamentary and presidential. They have become an asymmetric power.

This anti-secular movement, based on conservative nationalism, has always had problems with democratic politics, since it aims to dominate the country by occupying the state from within. It differs with previous authoritarian elites in the values it endorses and symbols it uses – but not in its methods. When democrats were struggling with the country's old military-dominated system, the movement gave its support to the AK party and won its trust. When military tutelage was brought to an end, they filled the vacuum. Unfortunately, the government failed to take the necessary prevention measures.

As a result, we face a new version of an old struggle: between powers trying to shape politics through an unconstitutional order and pro-democracy forces trying to change the system. Turkey was once dominated by politico-military elites; today, with the religion card in their hands, the Gulenists pose a greater threat still. In democratic politics, it is decisions of parliament and the approval of voters that count. After a century of domination by undemocratic elites, Turkish society knows that and approves of the struggle with the Gulen movement.

The AK party must use this support well by reconciling with other democratic actors. Turkey's need for a fully democratic constitutional system in line with pluralistic and participatory politics can be delayed no longer.

*The writer is professor of constitutional law at Marmara University and a member of the Central Committee of the AK party*

-----------------------------------------------

**Letters in response to this opinion:**

*Turkey's checks and balances need to be protected / From Mr Robert Ellis*

*Rule of law being f louted by Turkey's authoritarian regime*

 Share ∨     Author alerts        Print    ✂ Clip                     Comments



Bruce Springsteen: still got it?



Week Ahead - VW results, US job numbers



North Korea's mystery unmasked

**Printed from:** http://www.ft.com/cms/s/0/9e8c4212-7dd7-11e3-95dd-00144feabdc0.html

Print a single copy of this article for personal use. Contact us if you wish to print more to distribute to others.

© THE FINANCIAL TIMES LTD 2016 FT and 'Financial Times' are trademarks of The Financial Times Ltd.

# EXHIBIT 4

# U.S. Fight Over Zarrab's Release Rekindles Turkey Bribe Plot

Patricia Hurtado      Benjamin Harvey      Isobel Finkel
                      BenjaminHarvey       is_fink
May 25, 2016 — 7:09 PM EDT
Updated on May 26, 2016 — 3:49 PM EDT

The U.S. government's efforts to deny bail to a 33-year-old gold trader has rekindled allegations of a multi-million dollar bribery scheme involving Turkey's former EU minister, a charity close to President Recep Tayyip Erdogan and the chief executive officer of a **major state bank**.

The trader, Reza Zarrab, was arrested in March in Florida and accused of laundering hundreds of millions of dollars in a conspiracy to evade American sanctions against Iran. His lawyer said he was on a family trip to Disney World. In arguing to keep Zarrab in prison, U.S. officials told a New York judge Wednesday they had corroborated Turkish allegations that Zarrab had paid bribes to Turkish ministers and former Turkiye Halk Bankasi AS Executive Officer Suleyman Aslan, whose bank, according to the police reports, was used to process the trader's Iranian transactions.

Prosecutors argued that Zarrab was a flight risk, in part because he has three passports but only admitted to one of them. In urging the court to deny his request to be released on a $50 million bond, prosecutors said the security Zarrab would pay amounts to a third of what he allegedly gave in bribes in just one year.

It's not only Zarrab's wealth that Manhattan U.S. Attorney Preet Bharara wants the court to consider. The prosecutor alleged that the Iranian-born Zarrab managed to evade prosecution on bribery claims in Turkey, where he enjoys the benefits of nationality, a network of businesses and high-level connections.

"When charged with serious crimes in Turkey, the defendant simply paid off high-ranking Turkish officials to **squash the investigation**, even to the point of having law enforcement officials involved in that investigation arrested, terminated, reassigned or criminally charged,"' the U.S. said. "If the defendant were able to reach Turkish soil, he could cause the highest levels of Turkish government to block his return to the United States."

In a court filing Thursday, Zarrab's attorney, Benjamin Brafman, called the government's allegations "inaccurate and fundamentally flawed." Brafman said he would file a reply by Tuesday at noon.

## Halkbank Bribe

The U.S. has collected evidence, including e-mails, that corroborate that 2013 report by Turkish authorities accusing Zarrab and others of participating in a "massive bribery scheme" in Turkey, federal prosecutors said. The report says Zarrab paid $10 million in bribes to Mehmet Zafer Caglayan, then the Turkish minister of economic affairs, $5.8 million to Muammer Guler, then minister of the interior, and an unspecified amount of bribes to Egemen Bagis, then minister of European Union affairs, prosecutors said.

Zarrab allegedly paid at least $1.4 million to Halkbank's Aslan. Turkey's largest publicly traded state lender, Halkbank has denied wrongdoing. Nevertheless, its shares fell as much as 3.5 percent in Istanbul trading, extending their losses since Zarrab's March arrest to 22 percent.

**For a story on how the allegations have roiled Turkish markets today, click here.**

According to the findings of Turkish police, Zarrab was allegedly funneling more money through Halkbank than the bank is valued at today. The investigation found that two of Zarrab's companies transferred 16.9 billion liras ($5.8 billion) through the bank, whose market capitalization has plummeted to about $3.8 billion, less than a quarter of the $14.7 billion valuation it had three years ago.

"The report's conclusions are corroborated by e-mails obtained through the FBI's investigation," prosecutors wrote in their filing. Zarrab and high-ranking Turkish officials "conspired to obstruct the Turkish investigation," they said.

## Political Crisis

Erdogan's administration had dismissed the allegations by Turkish police, spawning a political crisis that shaved about quarter off the value of Turkey's main equity index. The former ministers in Turkey, Aslan and Erdogan's representatives didn't respond to requests for comment.

U.S. prosecutors said Zarrab's close ties with high-ranking Turkish officials were reinforced by his work for a Turkish charity, Togem-Der, which provides education to poor children. The charity was founded by Emine Erdogan, the president's wife, and Bagis's wife serves on the board of directors. Zarrab has contributed more than $2 million to the charity so far this year, his lawyer said in a bail application.

"Mr. Zarrab was touched by the organization's work, and driven by his general concern for the underprivileged," Brafman said in a request that Zarrab be freed on bail.

## Tremendous Revenue

Zarrab told U.S. authorities his annual income was $720,000 and came from a gold export business, a furniture firm and a shop he leases in Turkey, a figure prosecutors said was "dramatically understated." His assets include more than 20 properties, 17 luxury automobiles, a private plane and a yacht longer than a football field, prosecutors allege. He established a gold brokerage business with his family in 2002.

He's also the owner and operator of Royal Holding AS, a manufacturer of river-cruise ships, according to his lawyer. His businesses generate "a tremendous amount of revenue -- more than $11 billion annually -- in foreign countries, and have allowed the defendant to amass a sizable fortune," according to Wednesday's court filing.

In the U.S., Zarrab is accused along with two others of using a web of companies to induce American banks to unwittingly launder money that violated international sanctions against Iran, according to the indictment.

"As a dual citizen of Iran and Turkey, who is alleged by Turkish authorities to have used his wealth and influence to secure his recent release from Turkish prison, the defendant poses an extraordinary risk of flight and there are no bail conditions that will assure his presence in court," U.S. prosecutors wrote.

The case is U.S. v. Reza Zarrab, 15-cr-867, U.S. District Court, Southern District of New York (Manhattan).

5/29/2016                    U.S. Fight Over Zarrab's Release Rekindles Turkey Bribe Plot - Bloomberg

Terms of Service Trademarks Privacy Policy

©2016 Bloomberg L.P. All Rights Reserved

ade in NYC Advertise Ad Choices Website Feedback Help