# BRAFMAN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

767 THIRD AVENUE, 26TH FLOOR

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: BBRAFMAN@BRAFLAW.COM

BENJAMIN BRAFMAN
———
ANDREA ZELLAN
JOSHUA D. KIRSHNER
JACOB KAPLAN
ALEX SPIRO

MARK M. BAKER
OF COUNSEL

MARC AGNIFILO
OF COUNSEL
ADMITTED IN N.Y. AND N.J.

June 7, 2016

**VIA ECF**
The Honorable Richard M. Berman
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

Re:     United States v. Reza Zarrab, 15 Cr. 867 (RMB)

Dear Judge Berman:

    We write on behalf of our client, Reza Zarrab, in the above-referenced case in response to the Government's letter of June 3, 2016 (the "letter"). For the following four reasons, the Government has failed to meet either of its dual burdens: (1) to establish that the defendant presents an actual risk of flight; and (2) that "no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court." United States v. Sabhnani, 493 F.3d 63, 75 (2d Cir. 2007) (quoting 18 U.S.C. § 3142(b)).

    First, the Government asserts that Mr. Zarrab was deceptive during the initial Pretrial Services interview. However, Mr. Zarrab was entitled under applicable law to an interpreter during that interview, pursuant to Title 28, United States Code, Section 1827 (Section 1827). By asking this Court to deny Bail on the basis of inferences from the Pretrial Services interview, which was conducted without an interpreter, the Government violates Section 1827. As a result, we respectfully submit that this Court should refuse to consider any aspect of the Pretrial Services interview in determining the issue of detention or release. Rather, the Court should rely

on the full presentation of defendant's background as it has been developed by the papers and arguments of counsel.

Second, during an FBI interview, the Agents continued to question Mr. Zarrab after he invoked his right to counsel, in violation of his Sixth Amendment rights. Nevertheless, during this improper interview, which was conducted **with** a Turkish interpreter, Mr. Zarrab provided an accounting of his assets and businesses, demonstrating that – when he understood what he was being asked – he was candid and forthright, which further supports our position that he never intentionally withheld information from Pretrial Services in Florida.

Third, the Government has not shown that Mr. Zarrab speaks sufficiently proficient English to readily understand legal terms, concepts and jargon.

Fourth, the Government has not shown that Mr. Zarrab reads or writes the Farsi language.

For these, and all the other reasons we have submitted previously in writing and in oral argument, the Government has failed to meet the dual burden imposed upon it by the Bail Reform Act, and the defendant should be released on the conditions discussed at the last court conference.

1. <u>Mr. Zarrab Requested, Required And Had A Legal Right To An Interpreter At His Pretrial Services Interview</u>

Title 28, United States Code, Section 1827 requires the Court to utilize an interpreter in judicial proceedings when the defendant "speaks only or primarily a language other than the English language…so as to inhibit such party's comprehension of the proceedings or communication with counsel." 28 U.S.C. Sec. 1827(d)(1)(A). There is no doubt that Mr. Zarrab's primary language is not English, and there is similarly no doubt that he is entitled by Section 1827 to an interpreter in connection with all aspects of these judicial proceedings.

By arguing for Mr. Zarrab's detention pretrial based on a cursory, rushed Pretrial Services interview, where Mr. Zarrab was legally entitled to and, indeed, requested a Turkish interpreter, the Government violates the spirit if not the letter of Section 1827. Section 1827 mandates that an interpreter be available for every defendant who does not speak English as their primary language in every federal criminal case. <u>See</u> Section 1827(d)(1)(A). Moreover, a defendant may not waive their right to an interpreter unless the Court first approves and the waiver is made expressly by the defendant after the opportunity to consult with counsel. <u>See</u> Section 1827(f)(1).

The Government here has stated repeatedly, both orally and in writing that Mr. Zarrab lied to the Court or an arm of the Court in connection with the Pretrial Services interview. Additionally, the Government is using that interview as the cornerstone of its arguments to this Court that it detain Mr. Zarrab pretrial. Where, as here, the Pretrial Services interview is treated by the Government as integral to the court proceedings, such interview should be subject to the requirements of Section 1827 because the matter the Government seeks to prove (*i.e.,* Mr. Zarrab's purported intent to deceive) rests on the assumption that the defendant understood the

questions posed to him. Put differently, the Government should not be permitted to ask the Court to make inferences from an interview, conducted by a court representative that falls so far below the statutory requirements of Section 1827.

Plainly, Congress passed Section 1827 to ensure that criminal defendants participate in criminal proceedings in the language with which they are most familiar. Mr. Zarrab was denied this crucial right. The Government now seeks to exacerbate the transgression by using the defective Pretrial Services interview to incarcerate him. Therefore, the Court should disregard the Government's argument that Mr. Zarrab be detained based on inferences from that interview.

2. Mr. Zarrab Provided the FBI With A List Of His Real Property Holdings Before The Pretrial Services Interview

When Mr. Zarrab was arrested at Miami International Airport, FBI Agents took him into a separate room and subjected him to a videotaped interview. The Agents covered various topics with Mr. Zarrab, all in the presence of a Turkish interpreter. At one point during the interview, Mr. Zarrab stated that he wished to speak to an attorney. Although one of the Agents made the point on videotape that the interrogation would stop because Mr. Zarrab had requested a lawyer, the Agents continued to question Mr. Zarrab – without an attorney present – after the video recorder was turned off. [1] They asked him questions about his assets, his real estate holdings, and his bank accounts, among other things. Because the FBI asked specific questions, Mr. Zarrab provided specific answers, listing (by memory) a total of seven different real estate holdings as well as three Turkish bank accounts. It is noteworthy that in all submissions, the Government never provided the Court with the document attached as Exhibit 1 – a handwritten list proposed from memory by Mr. Zarrab on the night of his arrest in response to question of the FBI Agents after Mr. Zarrab invoked his right to counsel, and after the video was turned off. While not necessarily an exhaustive list, it demonstrates that Mr. Zarrab did his best to provide the Government with a list of his real estate holdings, contrary to the Government's argument that Mr. Zarrab has tried to conceal his assets.

Thus, although the Government emphasizes the fact that Mr. Zarrab failed to disclose certain assets during the Pretrial Services interview, there is no evidence that the Pretrial Services Officer asked him to disclose all of his assets. Indeed, we submit that she did not. Although the FBI violated Mr. Zarrab's Constitutional right to have counsel present during its interrogation, when the Agents asked more detailed questions – and in the presence of a Turkish interpreter – Mr. Zarrab's answers were forthright and complete. Mr. Zarrab was open and candid about his assets, bank accounts and real estate holdings. Likewise, as mentioned previously, he told the FBI Agents in full candor that he travels all over the world. He plainly hid nothing about his assets, real estate holdings and travel, or any other thing.

3. Exhibits A through M Do Not Demonstrate Mr. Zarrab's Fluency With English

At the very first court appearance, the undersigned said to this Court, "(w)e are able to communicate with our client in English." It is undisputed that Mr. Zarrab can understand and speak basic English but requires an interpreter for complex conversation involving legal or

[1] A motion to dismiss will be made at the appropriate time.

3

technical terms, phrases or words. The Government's recent submission, including Exhibits A–M, sheds no new light on this issue.

In regard to Exhibits A – H, the Government here cites to a series of images of documents found on Mr. Zarrab's phone. First, Mr. Zarrab did not write nor did he dictate any of the English language in these documents. Second, while counsel has no reason to suggest that these images were not found on his phone, there is no evidence to suggest that Mr. Zarrab ever looked at the images, and certainly no suggestion anywhere that he understood them.

In regard to Exhibit I, this is a lengthy text exchange between Mr. Zarrab and "Adem Turkey", a native English speaker. This exhibit also proves nothing more than the fact that Mr. Zarrab can converse in basic English. Though the document is lengthy, the vast majority of the writing is from Adem Turkey. Additionally, despite the fact that the exchange is on the "Whatsapp" text application, which has a spell check and grammar check functions built in, Mr. Zarrab's communications are rife with misspellings and incomplete (and sometimes incomprehensible) sentences. Finally, the majority of Zarrab's texts are brief, one-line sentences consisting of between one and ten words.

Exhibit J is an email that attaches a letter, purportedly written by Mr. Zarrab, which the Government asserts is evidence that he can converse in complex English. Mr. Zarrab's email reads, "Please be advised as <u>bellow</u> letter" (emphasis added). The attached letter is written in English, and the Government suggests that Mr. Zarrab wrote it. However, it is clear from the signature at the bottom of Government's Exhibit J that Mr. Zarrab did not sign the letter. Comparing the signatures from the bottom of Government's Exhibit J (attached hereto as Exhibit 2), and a known signature of Mr. Zarrab from Exhibit 3, it is patently obvious that the signatures are completely different. (To make the signature contrast as clear as possible, we juxtaposed the signatures and placed them in the attached Exhibit 4, with the signature from the Government's Exhibit J above and Defense Exhibit 3 below.)

Referring to Exhibit K, the government writes that Mr. Zarrab "exchanges emails", however, Exhibit K shows only that Mr. Zarrab received the subject email, not that he sent anything in English in response. Also, the Government neglects to consider that Mr. Zarrab has English-speaking employees who might assist him in drafting English-language communications.

The Government's Exhibit L is a Certificate of Completion of an "E-Commerce" class in Dubai, sponsored by the Carnegie Bosch Institute. This exhibit may say something about Mr. Zarrab's technological abilities, but it has no probative value concerning the depth and breadth of his English language skills.

Government's Exhibit L (at pages 7 and 8 of 34) also includes copies of school report cards of Mr. Zarrab, presumably to demonstrate that he studied English. The Government, however, redacted Mr. Zarrab's scores, and therefore neglected to include the fact that his English scores were well below average. (Exhibit 5)

In Exhibit M, the Government attaches Mr. Zarrab's application for a passport to St. Kitts in which he identified English as one of the languages that he speaks. Once again, the Government has failed to prove anything more than what we have repeatedly stated: Mr. Zarrab speaks basic English.

4. <u>Mr. Zarrab Does Not Read Or Write Farsi, And The Government's Submission Does Not Prove Otherwise</u>

The Government's Exhibits N through Q, most respectfully, show nothing of value. For instance, in Exhibit O, someone referred to as Mojtaba 2 writes a message in Farsi on November 2nd. The Government states in its recent letter that the message indicates a desire to meet. According to the Government's Exhibit O, Mr. Zarrab sends Mojtaba 2 a message in Turkish on January 17th, saying only that Mojtaba 2 should change his screen photo. Given the fact that Mr. Zarrab "responded" to this message a full two and a half months later and did not address the subject matter of the Farsi message asking for a meeting, the conclusion is inescapable that Mr. Zarrab did not read this Farsi message at all. Rather, Mr. Zarrab, apparently looking at Mojtaba 2's photograph on top of the page, opined only that he should change his screen shot.

The Government's Exhibit Q also contains a handwritten contract dated July 24, 2014 in Farsi script, which the Government claims was "signed by Zarrab and by co-defendant Hossein Najafzadeh . . .", presumably to support the Government's claim that Mr. Zarrab is able to read Farsi characters. Once again, the Government is mistaken. First, the document was not written by Mr. Zarrab. Second, Mr. Zarrab signed the document based on an official translation prepared for him on July 22, 2014, two days before he signed the Farsi document. (Exhibit 6)

Also, as a general matter, Mr. Zarrab works with people who do in fact speak Farsi and who can assist him when necessary. This fact is made abundantly clear in a document provided by the Government in discovery showing text messages between Mr. Zarrab and another person. Mr. Zarrab wrote "I can't read Farsi letters." Mr. Zarrab then explained, "I asked an Iranian to read it for me." (Exhibit 7)

Obviously, Mr. Zarrab had no idea when he wrote these messages that he would one day be asked to demonstrate to a U.S. District Court that he did not read or write Farsi. But, he wrote them, and he wrote these messages because they are true – he does not read or write Farsi characters, but he can have Farsi-readers assist him when necessary.

### Conclusion

Counsel for Mr. Zarrab appreciates the time and attention the Court has devoted to this matter. However, after all of the briefing and argument, the government has failed to meet its dual burden. The Government cannot prove that Mr. Zarrab is a flight risk and that there are no conditions that can reasonably assure his presence in court. The Guidepost Solutions armed guards and the other conditions of his release will assure his appearance in court when required. The Government has failed to meet its burden of proof to the contrary. Accordingly, we ask this Court to grant Bail for Mr. Zarrab under the conditions originally proposed.

Respectfully submitted,

Benjamin Brafman

cc:  AUSA Sidhardha Kamaraju (via email)
     AUSA Michael Lockard (via email)
     All counsel (via ECF)

**EXHIBIT 1**

1. KANLICA    HOME    TURKEY
2. METROPORT  BUSSINES    OFFICE    TURKEY
3. FURNITURE  FACTORY    LAND    TURKEY
4. GIRAN BAZAR    SHOP    TURKEY
5. BEYLIKIDUZU    8    ⊕ SMALL    APT.    TURKEY
6. FATHER    HOME .    NOUUS.    TURKEY
7. BUSTANE Z  PASTÄRAN    TEHRAN – FAMILY    HOME    FROM  MY
                                                        DAD

TURKEY

HALK    BANK
GARANTI    BANK
DENIZ   BANK



**EXHIBIT 2**

# CAMERON

## DENİZCİLİK VE KIYMETLİ MADENLER SAN. VE TİC LTD. ŞTİ

**Dear Mr. Karim Zamani,**

Referring to your good company's letter No. S.P-104 dated 28.04.2015, herewith we would like to state the following:

1. This company does not have any contract with your good company. Therefore, there is no contractual obligation, liability, responsibility etc. regarding the matter at hand.

2. The mentioned partnership has been merely based on an agreement in which both parties were bound to some obligations ;however with regret your good company has not pursued putting this agreement in force or action at all.

   Any actions taken were within the scope of this agreement and our company's capacity; all the profits generated were the result of our sole actions.

3. It seems that due to not paying any amount as your share to the expected partnership and no other particular action taken by your good company, there is no record of any account at the company and we are to emphasize that effecting the said payment has been only an ethical act or manner from our side and thus does not fall into any sort of legislative act or any kind of binding contract.

4. Although the agreement has been realized between our company and the esteemed company Sama Petrol, all the mutual understandings were obtained through direct negotiations with NICO and henceforth any correspondence with our company regarding the subject of this agreement will be realized, only if it is issued by NICO.

5. Paying any sum as share, generated from our ethical act will be effected only upon the official confirmation of NICO and consequently transferred to the accounts that belong to NICO.

   Eventually, we most kindly urge you to consider these two fundamentally important factors (mentioned in No.4 and No.5 above) in the future.

**Sincerely,**

**Managing director,**

CAMERON DENİZCİLİK VE KIYMETLİ
MADENLER SAN. TİC. LTD. ŞTİ.
Mollafenari Mah. Nuruosmaniye Cad. Orient Bazaar
Tic. Merkezi No:45/401 Cağaloğlu/İSTANBUL
Hocapaşa V.D. 1960 074 0936

**Molla Fenari Mah. Nuruosmanlye Cad. Orient Bazaar Tic.Merkezi No:45/401 Cağaloğlu/İSTANBUL**
**Hocapaşa V.D 1960740936   Tel:0212 514 91 00 Fax :0212 514 91 28**

EXHIBIT 3

**T.C.**
**İSTANBUL**
**22.NOTERLİĞİ**

İSTANBUL 22.
NOTERİ

AYŞEGÜL
GÜNDÜZ

İMÇ 5.BLOK NO.
5516 UNKAPANI
İSTANBUL
Tel : 0212 528 10 88

# İMZA SİRKÜLERİ

ŞİRKETİN UNVANI : CAMERON DENİZCİLİK VE KIYMETLİ MADENLER
SANAYİ TİCARET LİMİTED ŞİRKETİ

ŞİRKETİN ADRESİ : İSTANBUL BAHÇELİEVLER METROPORT
BUSİDENCE PLAZA B BLOK K. 8 NO. 152

YETKİLİLER : RIZA SARRAF

YETKİNİN DAYANAĞI : 04,05,2012 tarihinde tescil ve ilan edilen İstanbul 22.
noterliğinden 5195 yevmiye sayı ve 4,5,2012 tarih ile tanzim ve tastikli şirket ana
sözleşmesi.

İSTANBUL    Ticaret Sicil Memurluğunun 818105 Ticaret Sicil Numarasında kayıtlı olup
şirket ana sözleşmesinde belirtilen işlerle iştigal etmek üzere kurulmuş bulunan yukarıda ticaret ünvanı ve
adresi yazılı şirketimizi temsil ve ilzama yetkili ilgili 8 ve 9.maddesinde "Şirketin işleri ve muameleleri
ortaklar kurulu tarafından seçilecek bir veya birkaç müdür tarafından yürütülür. İLK 3 YIL süre
için T.C.Uyruklu 61246507012 kimlik numaralı İSTANBUL ili, BAKIRKÖY ilçesi, ATAKÖY
7-8-9-10 Kısım Mahallesi Yüzücü Talat Yüzmen Sokak 4L/9 adresinde ikamet eden RIZA
SARRAF ' ın şirket müdürü seçilmişlerdir. Şirketi müdürler temsil ve ilzam ederler. Şirketi temsil
ve ilzam edecek imzalar ortaklar kurulu tarafından tesbit, tescil ve ilan ettirilir. İLK 3 YIL için
müdür seçilen RIZA SARRAF ' ın MÜNFERİT imzası ile temsil ve ilzama yetkili kılınmıştır.
"denilmekte olduğundan aşağıdaki imzanın tastikini    talep ederim."

RIZA SARRAF

1. 2. 3.

Bu imza sirküleri altındaki imzanın gösterdiği BEŞİKTAŞ Nüfus Müdürlüğü'nden verilmiş
24.2.2012 tarih, 1700 kayıt, C13 seri ve 247609 numaralı fotoğraflı Nüfus Cüzdanına göre
İSTANBUL ili BAKIRKÖY ilçesi ATAKÖY 7.8.9.10 KISIM mahallesi / köyü 76 cilt, 312 aile sıra, 1
sıra numaralarında nüfusa kayıtlı olup, baba adı HOSSEIN, ana adı SHAHEN, doğum tarihi
12.9.1983, doğum yeri TAHRAN/IRAN olan ve halen KANLICA MAH. HALİDE EDİP ADIVAR
CAD. 11/1 BEYKOZ/İSTANBUL adresinde oturduğunu, okur yazar olduğunu söyleyen,
61246507012* T.C. kimlik numaralı RIZA SARRAF adlı kişiye ait olduğunu işlerinin yoğunluğu
nedeni ile noterliğimize gelemediklerinden gidilen mahallinde ve ve huzurumda imzalandığını
onaylarım. FK
DAYANAK: 04,05,2012 tarihinde tescil ve ilan edilen İstanbul 22. noterliğinden 5195 yevmiye
sayı ve 4,5,2012 tarih ile tanzim ve tastikli şirket ana sözleşmesi ile geçen şirketi ilk üç yıl
süre ile münferit temsile RIZA SARRAF ' ın yetkili ve mezun olduğu görülerek eklendi.

İSTANBUL 22. NOTERİ
AYŞEGÜL GÜNDÜZ

KDV, Harç, Damga Vergisi ve Değerli Kağıt bedeli makbuz karşılığı tahsil edilmiştir.
(TNB) A/S Ka=1355/0, A/S YAZI=2/0, A/S DeK.=1/0, DYNK.Sf,Ka.=,44.4

A-3/1



**EXHIBIT 4**

CAMERON DENİZCİLİK VE KIYMETLİ
MADENLER SAN. TİC. LTD. ŞTİ.
Mollafenari Mah. Nuruosmaniye Cad. Orient Bazaar
Tic. Merkez No: 5/40 LC 24 Floor İSTANBUL
Hocapaşa V.D. 196 074 0936

**RIZA SARRAF**

1.

**EXHIBIT 5**

# GURSOI PRIVATE HIGH SCHOOL

## STUDENT'S SCHOOL REPORT

NAME AND SURNAME : REZA ZARRAB

CLASS NO : 8-B 685

**GENERAL STANDING**

| LESSONS | WEEKLY LESSON HOURS | 1. SEMESTER POINT | 2. SEMESTER POINT | GENERAL POINT | CUMULATIVE GENERAL AVERAGE POINT FIGURE | SAY | GENERAL RESULT |
|---|---|---|---|---|---|---|---|
| TURKISH | 6 | 2 | 2 | 2 | | | |
| MATHS | 4 | 2 | 1 | 2 | | | |
| SCIENCE | 4 | 2 | 1 | 2 | | | |
| CITIZENSHIP INF. | 3 | 4 | 3 | 4 | 12 | | |
| HIS. OF TURKISH REPUBLIC AND | | 1 | 1 | 1 | By Dec. of Board of Class Teachers | | |
| PRINCIPLES OF ATA | 2 | 2 | 3 | 3 | 21 | | |
| ENGLISH | 7 | 1 | 1 | 1 | By Dec. of Board of Class Teachers | | |
| RELIGION & ETHICS | 2 | 4 | 2 | 3 | 3 | | |
| DRAWING | 1 | 4 | 2 | 5 | 5 | | |
| MUSIC | 1 | 5 | 4 | 5 | 10 | | |
| PHYSICAL TRAINING | 2 | 5 | 5 | 5 | 4 | | |
| OPTIONAL GERMAN | 2 | 1 | 2 | 2 | 4 | | |
| POINT OF BEHAVIOR | | 1. SEMESTER COMPLETE | 2. SEMESTER COMPLETE | | | | |
| DAYS UNDISTENDED | 9.0 | | | | | | |





ISTANBUL SEMZINCI NOTERLIGI

Bu Tercüme Oren Turizm Tercümanlik
LTD. STI. Mütercimlerinden [...] asına uygun
Tarafından [...] Çevrilmiştir.
olarak [...]
Babıâli Cad. Rızıhan No:29/2 Cağaloğlu-IST.
Tel.: 522 20 78 Fax.: 526 99 98

VEKILI NOTER
SEVIL PEREK...

# ZARRAB

| DERSLER | Haftalık Ders Saati | I.Dönem Notu | II.Dönem Notu | Yıl Sonu Notu | Ağırlıklı Yıl Sonu | Yıl Sonu Başarı Durumu Rakamla | Yazı ile |
|---|---|---|---|---|---|---|---|
| TÜRKÇE | 5 | 2 | 2 | 2 | 12 | | |
| MATEMATİK | 4 | 2 | 1 | 2 | 8 | | |
| FEN BİLGİSİ | 4 | 1 | 1 | 2 | 8 | | |
| VATANDAŞLIK BİL. | 3 | 4 | 2 | 4 | 12 | | |
| T.C. INK. TAR. VE ATA. | 2 | 1 | 1 | S.Ö.K.K. | S.Ö.K.K | | |
| İNGİLİZCE | 2 | 2 | 3 | 3 | 21 | | |
| DİN KÜL. VE AH.AK BİL. | 2 | 1 | 3 | 3 | 5 S.Ö.K.K. | | |
| RESİM-İŞ | 1 | 4 | 4 | 4 | 4 | | |
| MÜZİK | 1 | 5 | 2 | 3 | | | |
| BEDEN EĞİTİMİ | 2 | 5 | 5 | 5 | 10 | | |
| SEÇ. R.MÜZİĞİ | 2 | 5 | 2 | 2 | 4 | | |

## DAVRANIŞLAR

| | DÖNEM I. | II. |
|---|---|---|
| Çevre koruma ve temizlik alışkanlığı | Pekiyi | Pekiyi |
| Bağımsız olarak iş yapabilmesi | Pekiyi | Pekiyi |
| Planlı ve düzenli çalışması | İyi | İyi |
| Eşya, araç ve gereçleri dikkatli kullanması ve koruması | İyi | Pekiyi |
| Başkalarıyla birlikte çalışabilmesi | İyi | İyi |
| Grup içinde çalışma ve sorumluluk alma istek ve alışkanlığı | Pekiyi | Pekiyi |
| Aldığı görevi yerine getirme başarısı | İyi | Pekiyi |
| Serbest zamanlarını değerlendirme alışkanlığı | İyi | İyi |

SONUÇ: S.Ö.K.K. ile geçti.

Sınıf Geçme Derecesi:

| | Birinci Dönem | İkinci Dönem |
|---|---|---|
| Devam Etmediği Günler | TBM | TBM |
| | I. Dönem | II. Dönem |
| Davranış Notu | 9.0 | |
| | I. Dönem | II. Dönem |
| Aldığı Disiplin Cezaları | TBM | TBM |

### İMZALAR

| | I. Dönem | II. Dönem |
|---|---|---|
| Okul Müdürü | Tayyip SAYGILI | Tayyip SAYGILI |
| Müdür Yardımcısı | Galip ÇBARTAY | Galip ÇBARTAY |
| Öğrenci Velisi | | |

ÖĞRETMENLER YENİ NESİL SİZİN ESERİNİZ OLACAKTIR.
K. ATATÜRK

0001 6 0 2 3

**EXHIBIT 6**

YÜCE ALLAHIN ADI İLE

MADDE 1 : iş bu anlaşmanın Türkiye, birleşik Arap emirlikleri (Dubai) ve İran devletlerinin kanunları çerçevesinde aşağıdaki taraflar arasında 24-07-2014 tarihinde (İran takvimine göre bin üç yüz doksan üç yılı mordad ayının ikinci günü) yazılmış ve imzalanmış olup, taraflardan her biri anlaşma dahilinde yazılı olan maddelere uymak zorundadırlar.

Anlaşmanın tarafları

.................................. tarihinde .......................................kayıt numarası ile                                        adresi birleşik Arap emirlikleri ................................................................................................ olan .................................................................................... Şirketi

ile

.................................. tarihinde .......................................kayıt numarası ile                                        adresi İran .................................................................................... olan .................................................................................... Parsin Kish Şirketidir.

baba adı Ayatollah, kimlik numarası 282 kimliğin verildiği yer Tebriz, doğum tarihi 1950 ve .................................................................................... adresinde olan Sayın Ali NAJAFZADEH anlaşmada "İŞVEREN" olarak adlandırılacaktır.

27/10/2010 tarihinde 758342 kayıt numarası ile kayıt edilen, adresi Trump Tower otuz beşinci kat Mecidiye Köy İstanbul Türkiye ve Rıza Sarraf müdüriyetinde olan ve Royal Holding (aslı ile aynıdır fotokopi belge bu anlaşmanın ekinde yer almaktadır) bu anlaşmada "TEMSİLCİ" olarak adlandırılacaktır.

Açıklama: tarafların yukarıda yazılı olan adresi aynı zamanda anlaşmadaki resmi adresleri olarak kabul edilmektedir. Bu çerçevede, taraflardan her biri adresinde meydana gelecek olan bir değişikliği (ister kısmı bir değişiklik olsun ister genel bir değişiklik olsun) anında diğer tarafa yazılı olarak bildirmesi gereklidir; zira yapılacak olan tebligatlarda en son bildirilen adres geçerli sayılacaktır.

MADDE 2 : ANLAŞMANIN KONUSU

Anlaşmanın konusu; İŞVERENİN isteğine binaen anlaşmanın maddeleri çerçevesinde, Halk Bankasında tanıtmış olan hesaplardan veya Türkiye'nin diğer bankalarından Euro veya Türk lirası cinsinden paranın TEMSİLCİNİN tarafından çekilmesidir.

MADDE 3 : ANLAŞMANIN TUTARI

Anlaşmanın tutarı, TEMSİLCİNİN Euro ya da Türk lirası muadili olarak TEMSİLCİLİK işlemini gerçekleştirebilmesi için banka hesabına/hesaplarına yatan tutar olarak belirlenmiştir.

MADDE 4 : ANLAŞMANIN SÜRESİ

Bu Anlaşmanın süresi, anlaşmanın imzalandığı tarihten itibaren bir yıldır(miladi takvime göre). Aynı zamanda anlaşmanın bir yıl daha uzatılması mümkündür.

MADDE 5 : ANLAŞMANIN ŞARTLARI

5-1 TEMSİLCİ, İŞVERENİN yazılı bildiriminden hemen sonra bildirilen toplam tutarın %50 sini Euro ya da Türk lirası ya da anlaşmaya varılan rutin kur üzerinden dirhem muadili olarak İŞVERENİN hesabına (İŞVEREN tarafından bildirilen hesaplara) yatırması gereklidir. İŞVERENSE toplam tutarın %50 sinin yatırılması üzerine aynı gün toplam tutarın yüzde yüzü üzerinde swift miktarını TEMSİLCİNİN banka hesabına (TEMSİLCİ tarafından belirtilmiş hesaba) yatırmalıdır.

5-2 TEMSİLCİ, Euro ya da Türk lirası ya da anlaşmaya varılan rutin kur üzerinden dirhem muadili olarak yatırılan swift miktarını aldıktan sonra, tutarın geri kalan %50 sini İŞVERENİN Türkiye, Birleşik Arap emirlikleri veya diğer ülkelerdeki hesaplarına yatırmalıdır.

5-3 TEMSİLCİ, İŞVEREN tarafından yatırılan swifti aldıktan 3 gün sonra , döviz (Euro-Türk lirası) veya dirhem muadilini İŞVEREN tarafından belirtilen hesaplara yatırması gereklidir, swiftin İŞVEREN tarafından verilmesi

İşbu tercüme Farsça'dan aslına/fotokopisine uygun olarak tarafımdan 22.07.2014 tarihinde Türkçe diline çevrilmiştir.
Yeminli Tercüman: KAMİL KÜÇÜKTAY

Belgenin Noterliğimiz Yeminli Tercümanı KAMİL KÜÇÜKTAY tarafından..................
Aslına/fotokopisine uygun olarak.................
Çevirildiğini onaylarım.



(Halk Bank) ve tutarın diğer banka hesaplarına nihai olarak aktarılması ile ilgili tüm sorumluluk TEMSİLCİYE aittir.

5-4 TEMSİLCİNİN anlaşmanın konusu olan işlemleri yerine getirmesinden dolayı alacağı ücret %4,9 olarak belirlenmiştir ki bu oran tarafların karşılıklı anlaşması ile değiştirilebilir olup, göndericinin halk bankası ve tüm bankalardaki ücretinin kapsamaktadır.

5-5 TEMSİLCİNİN anlaşmanın konusunda belirtilen işlemleri gerçekleştirmesinden dolayı oluşacak olan tüm masraflar kendisine aittir.

5-6 TEMSİLCİ, İŞVEREN tarafından yapılacak olan bilgi edinme taleplerine 24 saat içinde yazılı olarak cevap vermek ile mükelleftir.

5-7 döviz kurlarındaki dalgalanmaların, anlaşmada yer alan taahhütler ve ödemeler, özellikle karşılıklı olarak belirlenmiş olan ücret oranında bir etkisi yoktur.

5-8 İŞVERENİN TEMSİLCİNİN hesaplarına gerçekleştirmiş olduğu para havaleleri dolayısı ile oluşan havale ücreti mukabilinde, TEMSİLCİ binde 1/5 lik bir tutarı alarak tüm havaleleri belirtilen hesaplara geçekleştirip 24 saat içinde swiftlerin sunmak zorundadır. Belirtilen hesaplara ödeme yapılmadan önceki tüm sorumluluk TEMSİLCİYE ait olup ödeme yapıldıktan sonra İŞVERENE ait olacaktır ve eğer havale işlemi gerçekleşmez ve tutar geri dönerse İŞVERENİN alacağı olarak mahsup edilecektir.

5-9 TEMSİLCİ İŞVEREN ile hesap tesviyesini gerçekleştirdikten bir gün sonra, tüm banka makbuzlarını ve dekontlarını İŞVERENE vermek zorundadır.

MADDE 6 : ANLAŞMANIN FESİH SEBEPLERİ

6-1 anlaşmanın taraflarından her biri, anlaşmada yer alan şartların diğer tarafça çiğnenmesi halinde, anlaşmayı fesih etme hakkında sahiptir.

6-2 anlaşmanın fesih edilmesinden sonra, işlemin şartlarını ve hacmini dikkate alarak, TEMSİLCİ en fazla bir hafta içinde tesviyeyi gerçekleştirmek zorundadır. Belirtilen bu süre tarafların karşılıklı anlaşması doğrultusunda uzatılabilir.

MADDE 7 : SORUMLULUKLAR

7-1 TEMSİLCİNİN banka hesaplarına yapılmış olan ödemelerin TEMSİLCİ nezdinde emaneten bulunduğu dikkate alınarak, bu emanet TEMSİLCİ tarafından muhafaza etmelidir.

7-2 İŞVERENİN bildirdiği banka hesapların doğruluğunu tespit etme görevi TEMSİLCİ ait olup; İŞVEREN, belirtilen hesaplara anlaşma çerçevesinde TEMSİLCİ tarafından yapılacak olan ödemelerden dolayı herhangi bir sorumluluk taşımamaktadır.

7-3 TEMSİLCİ, analaşma çerçevesinde gerçekleştireceği tüm taahhütlerin garantisi olarak aşağıdaki teminatları sunmalıdır.

Parsin Kish firmasının tüm belgelerinin aslı ile aynıdır fotokopileri, Ayrıca Royal firmasına ait 2 adet mühürlü ve imzalı beyaz çeki : çek no 0014876 garanti bankası hesap numarası 6298866-2 (print fotokopi) çek no.......................... garanti bankası hesap numarası ...................................... (print fotokopi) İŞVERENe emaneten teminat olarak vermelidir.

İşbu tercüme Farsça'dan aslına/fotokopisine uygun olarak tarafımdan 22.07.2014 tarihinde Türkçe diline çevrilmiştir.
Yeminli Tercüman: KAMİL KÜÇÜKTAY

Belgenin Noterliğimiz Yeminli Tercümanı KAMİL KÜÇÜKTAY tarafından.................
Aslına/fotokopisine uygun olarak.................
Çevirildiğini onaylarım.

MADDE 8 : GEÇERLİ VE HÂKİM KANUNLAR

İş bu sözleşme yorum, geçerlilik, etki ve uygulama açısında uluslararası yasalara ve aynı zamanda Türkiye ve Birleşik Arap Emirliklerinin medeni hukuk ve kanunları ve onların ticaret odaları yönetmeliklerine dayanmaktadır.

MADDE 9 : İHTİLAFLARIN ÇÖZÜMÜ

Taraflar arasında iş bu sözleşmenin yorumu, geçerliliği, etki ve uygulaması ile ilgili oluşacak her hangi bir ihtilaf halinde örneğin sözleşme bitiş tarihi veya nüshalarının geçerliliği gibi durumlar söz konusu ise, ilk önce bu ihtilaf tarafların samimi ve iyi niyetli müzakereleri sonucunda çözülmeğe çalışılmalıdır. Aksi takdirde ve uzlaşmaya varılmaması halinde, ihtilaf tarihinden en fazla 2 gün içinde 3 kişilik jüri heyetine hakemlik için sunulacaktır. Hakemlerin birincisi İŞVEREN tarafından, ikincisi TEMSİLCİ tarafından, üçüncü kişi ise BAŞHAKEM olarak bu iki hakem tarafından seçilecektir. Bu heyetin kararı kesin karar olup itiraz edilemez karar sayılacaktır. Bu heyetin kararı ana sözleşmeden müstakil bir sözleşme olarak ele alınıp hemen yürürlüğe alınmalıdır.

Madde 10: VERGİ VE DİĞER YASAL ÖDEMELER

Türkiye'deki herhangi bir vergi ve yasal ödemeler TEMSİLCİ tarafından karşılanacaktır.

Madde 11: SÖZLEŞME İÇERİĞİNDE DEĞİŞİKLİK VE ISLAH

Sözleşme içeriğinde herhangi bir değişiklik ve ıslahın yapılması ancak tarafların anlaşması halinde gerçekleşebilir.

Madde 12: İKAMETGÂH VE ADRES

Tarafların ikamet adresleri bu sözleşmenin giriş bölümünde belirlenmiş olan adresler olup taraflarca yapılacak yazışmalar, ilanlar ve ikazlar bu adreslere gönderilecektir. Adres değişikliği durumunda taraflar en fazla 5 gün içinde durumu karşı tarafa bir yazılı almak bildirmesi gerekmektedir. Bildirilmediği takdirde tüm irsaliyeler gönderilmiş sayılıp bu taraf (adres değişikliği yapan) için bilgilendirilmemesi durumuna itiraz etme hakkı kazandırmaz.

Madde 13: TEMSİLCİNİN İŞVEREVE MUNHASIR OLMASI

TEMSİLCİNİN en az beş yüz milyon Avro (500.000.000 Avro) veya onun muadilini Türk Lirasını Halk Banka'sı nezdinde olan TEMSİLCİ hesabına ödemesi hazırlığını ilan etmesi ve aynı zamanda İŞVERENİN bu parayı o hesaba aktarmayı taahhüt etmesi durumunda, TEMSİLCİ Halk Bankasındaki o hesabından farklı özel veya tüzel kişilere yazılı veya sözlü olarak TEMSİLCİLİK taahhüdü altına girmemekle yükümlüdür. Sadece G.M.N, SHAHR ve SARMAYEH Bankalarıyla olan ve değeri azami sekiz yüz milyon Avroluk sözleşmeler bu taahhüdün istisnasıdır.

Madde 14: SÖZLEŞME TARİHİ VE YERİ

İş bu sözleşme 14 madde ve iki nüsha olarak 24-07-2014 tarihinde (İran takvimine göre bin üç yüz doksan üçü yılı mordad ayının ikinci günü) Trump Tower otuz beşinci kat Mecidiye Köy İstanbul Türkiye adresinde düzenlenmiş ve taraflarca imzalanmıştır. Bu iki nüsha geçerlilik ve uygulama açısından aynı değere sahipler.

İşbu tercüme Farsça'dan aslına/fotokopisine uygun olarak tarafımdan 22.07.2014 tarihinde Türkçe diline çevrilmiştir.
Yeminli Tercüman: KAMİL KÜÇÜKTAY

Belgenin Noterliğimiz Yeminli Tercümanı KAMİL KÜÇÜKTAY tarafından................. Aslına/fotokopisine uygun olarak................. Çevrildiğini onaylarım.

**EXHIBIT 7**

Source App: iMessage: +905322066666
Body:

OK! I will bring cash.

From: From: +905322066666 Rz Ist
Timestamp: 11/3/2015 12:21:40 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

I can't read Farsi letters ☺

From: From: +905302345605
Timestamp: 11/3/2015 12:22:52 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

Better for me too. I thought that might be difficult for you and that's why I wrote in Farsi alphabet.

From: From: +905322066666 Rz Ist
Timestamp: 11/3/2015 12:23:17 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

I asked an Iranian to read it for me.

From: From: +905302345605
Timestamp: 11/3/2015 12:23:37 PM(UTC+0)
Source App: iMessage: +905322066666
file://rY/PHONES/2016-04-08.15-23-16/AppleDevice_AdvancedLogical_2/chats/iMessage +905322066666/chat-195.txt[4/15/2016 3:21:36 PM]
Body:

Tomorrow or today? What time will you arrive?

From: From: +905302345605
Timestamp: 11/3/2015 12:23:45 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

Really.

From: From: +905322066666 Rz Ist
Timestamp: 11/3/2015 12:23:53 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

If you have time, I will come by today.

From: From: +905302345605
Timestamp: 11/3/2015 12:24:30 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

I will be home until 7 but I am invited to a dinner. What time?

From: From: +905322066666 Rz Ist
Timestamp: 11/3/2015 12:24:50 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

Will be there before 7.

From: From: +905302345605
Timestamp: 11/3/2015 12:25:01 PM(UTC+0)

Source App: iMessage: +905322066666
Body:
Ok
-------------------------------
From: From: +905302345605
Timestamp: 11/3/2015 12:35:10 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

Please text me half an hour before you arrive.

From: From: +905322066666 Rz İst
Timestamp: 11/3/2015 12:35:33 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

Sure!

From: From: +905322066666 Rz İst
Timestamp: 11/3/2015 12:59:59 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

Half an hour.

From: From: +905302345605
Timestamp: 11/3/2015 1:00:24 PM(UTC+0)
Source App: iMessage: +905322066666
Body:
Ok
-------------------------------
From: From: +905302345605
Timestamp: 11/3/2015 1:57:00 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

I received the money. Congratulations, enjoy!

From: From: +905302345605
Timestamp: 11/4/2015 9:10:01 AM(UTC+0)
Source App: iMessage: +905322066666
Body:

Hi, are you ok for 1:30?

[TN: Next three pages are in Farsi; written with Roman alphabet]

Last Activity: 11/4/2015 9:10:01 AM(UTC+0)
Participants: +905322066666 Rz Ist, +905302345605
From: From: +905302345605
Timestamp: 11/3/2015 12:14:32 PM(UTC+0)
Source App: iMessage: +905322066666
Body:
------------------------------
From: From: +905322066666 Rz Ist
Timestamp: 11/3/2015 12:16:05 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

Hi, yes please send your account number.

From: From: +905302345605
Timestamp: 11/3/2015 12:16:46 PM(UTC+0)
Source App: iMessage: +905322066666
Attachments:
#1: chats\iMessage +905322066666\attachments195\IMG_5526.jpeg
Body:
------------------------------
From: From: +905322066666 Rz Ist
Timestamp: 11/3/2015 12:18:22 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

How much in total should I deposit into your account?

From: From: +905302345605
Timestamp: 11/3/2015 12:18:38 PM(UTC+0)
Source App: iMessage: +905322066666
Body:
14000 $
------------------------------
From: From: +905322066666 Rz Ist
Timestamp: 11/3/2015 12:19:14 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

OK! I can pay cash too. Which one do you prefer?

From: From: +905302345605
Timestamp: 11/3/2015 12:20:13 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

Either of those are fine for me. You can pick the one which is better for you.

From: From: +905302345605
Timestamp: 11/3/2015 12:20:41 PM(UTC+0)
Source App: iMessage: +905322066666
Body:

Cash is better.

From: From: +905322066666 Rz Ist
Timestamp: 11/3/2015 12:20:59 PM(UTC+0)