UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                          S1 15 Cr. 867 (RMB)

REZA ZARRAB, *et al.*,

                    Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT REZA ZARRAB'S
MOTION TO DISMISS THE SUPERSEDING INDICTMENT**

BANCROFT PLLC                    QUINN EMANUEL URQUHART &
Viet D. Dinh                     SULLIVAN, LLP
Paul D. Clement                  Christine H. Chung
Jeffrey M. Harris                Adam M. Abensohn
Edmund G. LaCour Jr.             William A. Burck
500 New Jersey Avenue, NW        Daniel R. Koffmann
7th Floor                        51 Madison Avenue
Washington, DC 20001             22nd Floor
                                 New York, NY 10010

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................1

STATUTORY AND FACTUAL BACKGROUND ....................................5

    A.    Statutory Background Of U.S. Sanctions Law ..............................5

    B.    Zarrab's Arrest And The Superseding Indictment .......................6

ARGUMENT ...............................................................................................8

I.    The Charge Against A Foreign National For Conspiring To Violate IEEPA Based On Funds Transfers Between Foreign Banks Should Be Dismissed ...........9

    A.    IEEPA And The Related Regulations Do Not Apply To The Facts Alleged ...........................................................................10

        1.    The Indictment Does Not Allege A Prohibited Export "From The United States" Under Section 204 ..............................10

        2.    It Is Irrelevant Whether The Alleged Co-Conspirators Expected That Transfers Between Foreign Entities Would Be Processed By U.S. Banks .........................................16

        3.    The Indictment Alleges No Violation of Section 203 ...................17

    B.    Any Ambiguities Must Be Resolved In Zarrab's Favor ............................19

        1.    Sections 204 And 203 Must Be Presumed Not To Apply Extraterritorially ..................................................19

        2.    The Rule Of Lenity And Due Process Principles Also Require That The Sanctions Charge Be Dismissed ......................22

II.    The Indictment Fails To Allege Conspiracy To Commit Bank Fraud ..................25

    A.    The Indictment Fails To Allege A Conspiracy To Defraud A U.S. Bank ...........................................................................25

        1.    The Indictment Fails To Allege Material Misrepresentations To A U.S. Bank ...........................................................26

        2.    The Indictment Fails To Allege A Scheme To Harm A U.S. Bank ...........................................................27

    B.    The Indictment Fails To Allege A Conspiracy To Use False Or Fraudulent Pretenses To Obtain Money Or Property From A U.S. Bank ...........................................................30

        1.    The Indictment Fails To Allege Use Of "False Or Fraudulent Pretenses" ..................................................30

        2.    The Indictment Fails To Allege A Scheme To Obtain Money From A U.S. Bank ..............................................31

      C.      The Bank Fraud Statute Does Not Apply Extraterritorially.......................32

III.     The Indictment's Duplicative Money Laundering Charge Merges With The IEEPA Charge And Should Thus Be Dismissed ......................................................33

IV.     The Indictment's Allegations Of A Conspiracy To Defraud The United States Fail On Both Statutory And Constitutional Grounds ..................................34

CONCLUSION...................................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*The Circassian*,
  69 U.S. 135 (1864) ........................................................................................5

*Cleveland v. United States*,
  531 U.S. 12 (2000) ........................................................................................31

*In re French*,
  440 F.3d 145 (4th Cir. 2006) ........................................................................20

*Goldeshtein v. I.N.S.*,
  8 F.3d 645 (9th Cir. 1993) .......................................................................27, 30

*Grain Traders, Inc. v. Citibank, N.A.*,
  960 F. Supp. 784 (S.D.N.Y. 1997), *aff'd*, 160 F.3d 97 (2d Cir. 1998) ................31

*Johnson v. United States*,
  135 S. Ct. 2551 (2015) ..................................................................................23

*Keene Corp. v. United States*,
  508 U.S. 200 (1993) ......................................................................................18

*Kiobel v. Royal Dutch Petroleum Co.*,
  133 S. Ct. 1659 (2013) ......................................................................19, 21, 35

*Liparota v. United States*,
  471 U.S. 419 (1985) ......................................................................................22

*Loughrin v. United States*,
  134 S. Ct. 2384 (2014) ......................................................................28, 30, 31

*Microsoft Corp. v. United States*,
  No. 14-2985 (2d Cir. July 14, 2016) ..............................................................19

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010) ..........................................................................2, 19, 20, 21

*Norex Petroleum v. Access Indus.*,
  631 F.3d 29 (2d Cir. 2010) ............................................................................32

*Petroleos Mexicanos v. SK Engineering*,
  572 F. App'x 60 (2d Cir. 2014) ..........................................................12, 20, 21

*RJR Nabisco, Inc. v. European Cmty.*,
  136 S. Ct. 2090 (2016) ..................................................................................20

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
  513 B.R. 222 (S.D.N.Y. 2014) ......................................................................21

*Skilling v. United States,*
  561 U.S. 358 (2010) .................................................................................... 32

*United States v. Aleynikov,*
  676 F.3d 71 (2d Cir. 2012) ............................................................................ 8

*United States v. All Funds on Deposit in United Bank of Switz.,*
  No. 01-cv-2091 (JSR), 2003 WL 56999 (S.D.N.Y. Jan. 7, 2003) ................ 14

*United States v. Amen,*
  831 F.2d 373 (2d Cir. 1987) ......................................................................... 18

*United States v. Awada,*
  425 F.3d 522 (8th Cir. 2005) ........................................................................ 34

*United States v. Aydin,*
  No. 12-cr-221 (ODE) (N.D. Ga. July 10, 2012) ........................................... 15

*United States v. Ballistrea,*
  101 F.3d 827 (2d Cir. 1996) ......................................................................... 35

*United States v. Banki,*
  685 F.3d 99 (2d Cir. 2012) ............................................................... 3, 22, 23

*United States v. Briggs,*
  939 F.2d 222 (5th Cir. 1991) ................................................................. 26, 30

*United States v. Coplan,*
  703 F.3d 46 (2d Cir. 2012) ............................................................................. 9

*United States v. Delano,*
  55 F.3d 720 (2d Cir. 1995) ........................................................................... 31

*United States v. Ehsan,*
  163 F.3d 855 (4th Cir. 1998) ........................................................................ 15

*United States v. Foote,*
  413 F.3d 1240 (10th Cir. 2005) ...................................................................... 9

*United States v. Gholikhan,*
  No. 05-cr-60238 (JIC) (S.D. Fla Sept. 13, 2005) ........................................ 15

*United States v. Ghorashi Sarvestani,*
  No. 13-cr-214 (PGG) (S.D.N.Y. Mar. 20, 2013) .......................................... 15

*United States v. Johnson,*
  971 F.2d 562 (10th Cir. 1992) ...................................................................... 34

*United States v. Laljie,*
  184 F.3d 180 (2d Cir. 1999) ......................................................................... 29

*United States v. Morgenstern,*
  933 F.2d 1108 (2d Cir. 1991) ....................................................................... 29

*United States v. Nkansah*,
  699 F.3d 743 (2d Cir. 2012)........................................3, 26, 27, 28, 30

*United States v. Perlmutter*,
  636 F. Supp. 219 (S.D.N.Y. 1986) .................................................26

*United States v. Pirro*,
  212 F.3d 86 (2d Cir. 2000).........................................................8, 9

*United States v. Plaza Health Labs*,
  3 F.3d 643 (2d Cir. 1993)............................................................25

*United States v. Prevezon Holdings*,
  122 F. Supp. 3d 57 (S.D.N.Y. 2015)................................12, 20, 33

*United States v. Rigas*,
  490 F.3d 208 (2d Cir. 2007).........................................................25

*United States v. Roberts*,
  363 F.3d 118 (2d Cir. 2004).........................................................23

*United States v. Rodriguez*,
  140 F.3d 163 (2d Cir. 1998).....................................................28, 29

*United States v. Santos*,
  553 U.S. 507 (2008).....................................................................34

*United States v. Starr*,
  816 F.2d 94 (2d Cir. 1987)............................................................28

*United States v. Stavroulakis*,
  952 F.2d 686 (2d Cir. 1992).....................................................28, 29

*United States v. Torres*,
  604 F.3d 58 (2d Cir. 2010)............................................................16

*United States v. Trejo*,
  610 F.3d 308 (5th Cir. 2010) .......................................................34

*United States v. Tyson*,
  653 F.3d 192 (3d Cir. 2011)...........................................................9

*United States v. Vilar*,
  729 F.3d 62 (2d Cir. 2013)............................................................32

*United States v. Williams*,
  553 U.S. 285 (2008).....................................................................23

*W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*,
  No. 03-cv-8606 (RWS), 2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004) .................33

*Williams v. United States*,
  458 U.S. 279 (1982)......................................................................27

*Worldwide Directories, S.A. v. Yahoo, Inc.*,
   No. 14-cv-7349 (AJN), 2016 WL 1298987 (S.D.N.Y. March 31, 2016) ...............................21

## Statutes and Regulations

18 U.S.C. §371 ....................................................................................................................7, 35

18 U.S.C. §1341 ........................................................................................................................31

18 U.S.C. §1344 ...........................................................................................................8, 29, 32

18 U.S.C. §1344(1) ...............................................................................................................25, 28

18 U.S.C. §1344(2) .........................................................................................................28, 30, 31, 32

18 U.S.C. §1956 ...........................................................................................................8, 33, 34

22 U.S.C. §8711 ........................................................................................................................24

31 C.F.R. §560 ............................................................................................................................5

31 C.F.R. §560.203 ............................................................................................................ *passim*

31 C.F.R. §560.204 ............................................................................................................ *passim*

31 C.F.R. §560.205 ...............................................................................................................6, 21

31 C.F.R. §560.314 ....................................................................................................................10

31 C.F.R. §560.406 ....................................................................................................................14

31 C.F.R. §560.516 ....................................................................................................................22

50 U.S.C. §1702 ..........................................................................................................................5

50 U.S.C. §1705 ...................................................................................................................8, 20

62 Fed. Reg. 44,531 (Aug. 19, 1997) ......................................................................................18

77 Fed. Reg. 64,664 (Oct. 22, 2012) ........................................................................................18

Iran Freedom and Counter-Proliferation Act of 2012, Pub. L. No. 112-239, 126 Stat. 1632 .......24

Iran Threat Reduction and Syria Human Rights Act of 2012 ......................................................24

## Other Authorities

Appendix D – Fundamentals of the Funds Transfer Process, U.S. Treasury Dep't, October
   2006, *available at* https://www.fincen.gov/news_room/rp/files/Appendix_D.pdf .................11

*Black's Law Dictionary* (10th ed. 2014) .......................................................................................32

*Hearing on Iran Nuclear Deal*,
   --- Cong. Rec. ----, 2016 WL 3015315 (May 25, 2016) ....................................................17, 24

Howard N. Fenton III, *United States Antiboycott Laws: An Assessment of Their Impact Ten Years After Adoption*, 10 Hastings Int'l & Comp. L. Rev. 211 (1987) .....................................5

*OFAC FAQ 11: General Questions*, U.S. Dep't of Treasury (Jan. 15, 2015), https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx ...............22

OFAC Guidance (July 22, 2002), *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/iranship.pdf..................................................................13

Regulations for the Financial Community, 4 (2012), *available at* https://www.treasury.gov/resource-center/sanctions/Documents/facbk.pdf ..........................22

Joanne Scott, *Extraterritoriality and Territorial Extension in EU Law*, 62 Am. J. Comp. L. 87 (2014)......................................................................................................................................23

*Merriam-Webster.com* ..............................................................................................................12

Restatement (Third) of Foreign Relations Law IV, 1A Intro. Note (Am. Law Inst. 1987)............5

U.S. Dep't of Treasury, Resource Center, Specially Designated Nationals List, https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx (last visited July 15, 2016)...............................................................................................24

## PRELIMINARY STATEMENT

Reza Zarrab is a Turkish businessman and citizen of Turkey and Iran. As such, he is free to engage in transactions with Iranian businesses without running afoul of U.S. laws that criminalize U.S. sanctions against Iran. Like most of the rest of the world, as long as he does not engage in such transactions in or from the U.S., he is unencumbered by restrictions placed on U.S. citizens as a function of U.S. foreign policy. Despite that obvious limit on U.S. sanctions laws, not to mention the presumption against extraterritoriality and the rule of lenity, Zarrab stands accused of violating U.S. law for agreeing with *foreign* persons in *foreign* countries to direct *foreign* banks to send funds transfers from *foreign* companies to other *foreign* banks for *foreign* companies. This is a prosecutorial overreach of the first order. It is as unprecedented as it is problematic. These transactions are fundamentally foreign, and they are entirely legal under the foreign law that directly governs foreign persons and foreign transactions.

It is not the role of the United States to set parameters by which foreign persons and entities can transact with one another. There are thousands of transactions occurring every day involving Iranian businesses, many involving citizens of our closest allies. While the United States can prohibit U.S. citizens and businesses based in the U.S. from trading with the Iranian government, when it comes to foreign businesses and foreign transactions, it cannot charge the traders. The sanctions laws of the United States reflect this foundational limit. With the exception of one targeted provision that the government has pointedly not charged, the sanctions laws are limited to U.S. persons and exports from the U.S. The prosecutors' effort to extend those laws (and twist others beyond recognition) to prosecute a Turkish businessman for arranging funds transfers from outside the U.S. between foreign entities is not only unjustified and a due process violation; it is a dangerous extension of U.S. law that should not be allowed.

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). That presumption reflects foundational principles of international law that recognize that a sovereign's authority to legislate is at its zenith when it comes to its own territory and citizens. The presumption against extraterritoriality ensures that the difficult constitutional and international law questions posed by legislation implicating foreign citizens outside the U.S. need not be confronted unless Congress makes clear its intent to reach beyond its borders to foreign transactions and citizens. These concerns apply with particular force to sanctions laws in which a nation makes it unlawful for its citizens and its territory to be used to engage in otherwise lawful transactions with a disfavored foreign nation. Such a cessation of lawful commerce is a classic tool of foreign policy, but it is classically exercised with respect to the citizens and territory of the nation imposing the sanction. Extending sanctions to criminalize transactions by foreign nationals outside the U.S. would raise grave constitutional and international law questions, which should not be entertained absent clear congressional intent.

Nothing in the Iranian Transactions and Sanctions Regulations ("ITSR") suggests an intent to confront such novel and difficult questions. To the contrary, Section 204 of the ITSR, the linchpin of the sanctions conspiracy charge, clearly states that it does *not* apply to foreign conduct by foreign actors, but instead is limited to the exporting or re-exporting of goods or services to Iran "from the United States, or by a United States person." There is no dispute that Zarrab is not a "U.S. person." And the government cannot manufacture an export "from the United States" out of the incidental involvement of a U.S. bank at some mid-point in the payment chain of a transaction that originated *from a foreign country and occurred between two*

*foreign entities*. No U.S. court has ever accepted that convoluted theory and there is no indication that Congress expressed any intent, let alone a clear intent, to criminalize the countless foreign transactions that might incidentally involve a U.S. bank.

Even if there were some ambiguity about whether the ITSR regime reaches Zarrab's extraterritorial conduct, the presumption against extraterritoriality dictates that Section 204, since it gives no clear indication that it applies to foreign activities by foreign actors, reaches only domestic crimes. Numerous cases make clear that the government cannot transform a fundamentally foreign scheme into a domestic one based on the limited involvement of a U.S. bank. Moreover, like the last prosecution in this District in which conspiracy to violate the ITSR was charged in connection with funds transfers, it is at the very least "ambiguous" and "uncertain" whether Zarrab's alleged conduct falls within the scope of those regulations. He thus cannot be compelled to face criminal prosecution consistent with due process and the rule of lenity. *See United States v. Banki*, 685 F.3d 99, 109 (2d Cir. 2012) ("[T]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.").

The government's other charges fare no better. The Indictment fails to allege a conspiracy to defraud a U.S. bank at every turn. It does not allege that Zarrab made a misrepresentation to a U.S. bank, or that he intended to harm a U.S. bank by taking its money or exposing it to clear risk of loss, as this Circuit's law requires. *See United States v. Nkansah*, 699 F.3d 743, 748 (2d Cir. 2012). A U.S. bank would never be at risk of losing its own money by innocently clearing dollars, which is all the Indictment alleges. The portion of the bank fraud charge that alleges that Zarrab conspired to obtain money or property from a bank by means of a misrepresentation likewise fails. At most, a foreign bank of which Zarrab was a customer obtained a service from a U.S. bank, which was never at risk of a loss of property.

Conspiracy to commit money laundering is an improper duplicative charge that merges with the trade sanction and bank fraud violations also alleged as the predicate specific unlawful activities. The Indictment cannot simultaneously charge Zarrab with (1) conspiracy to commit sanctions violations and bank fraud for arranging international financial transactions, and (2) conspiracy to launder money for arranging *the very same* transactions, as it does here.

Finally, the Indictment alleges that Zarrab's effort amounted to a conspiracy to defraud the U.S. of its efforts to enforce its trade sanctions. The notion that Zarrab defrauded a U.S. agency (the Office of Foreign Assets Control ("OFAC")) by purportedly evading its regulations is as nonsensical as arguing that obscuring a license plate "defrauds" the department of motor vehicles. The government certainly can prohibit actions that make enforcement of its laws more difficult, but in the absence of such prohibitions, labeling an effort to avoid detection a "fraud on the United States" is an affront to language.

*       *       *

The government's displeasure that Zarrab was fully exonerated of bribery charges brought in Turkey three years ago are a matter of the public record of the bail proceedings. But a Turkish businessman's exoneration of charges by Turkish authorities for transactions centered in Turkey is not an invitation for the United States to file baseless charges based on non-existent connections with the United States. Even that understates the overreach. Basic principles of constitutional and international law limit a nation's ability to impose sanctions on another sovereign. Barring U.S. citizens and transactions is one thing; purporting to assert global criminal jurisdiction based on nothing more than the incidental clearing of a transaction by a U.S. bank is another matter entirely. If Congress ever decides to enact such a controversial regime there will be time enough for the courts to consider its constitutionality and for the rest of

the world to consider its implications. But taking such a momentous step is the prerogative of Congress, not prosecutors. The Indictment should be dismissed in its entirety.

## STATUTORY AND FACTUAL BACKGROUND

### A.     Statutory Background Of U.S. Sanctions Law

"International law has long recognized limitations on the authority of states to exercise jurisdiction to prescribe in circumstances affecting the interests of other states." Restatement (Third) of Foreign Relations Law IV, 1A Intro. Note (Am. Law Inst. 1987). "Territoriality and nationality remain the principal bases of jurisdiction to prescribe," and any attempt to expand or transcend these concepts of jurisdiction has sparked intense international controversy. *Id*.

While a typical economic sanctions regime is used to effect change outside a nation's borders, it respects traditional principles of jurisdiction by requiring only the implementing country's nationals and residents to participate in the economic boycott of the targeted nation. *See* Howard N. Fenton III, *United States Antiboycott Laws: An Assessment of Their Impact Ten Years After Adoption*, 10 Hastings Int'l & Comp. L. Rev. 211, 214–15 (1987). This jurisdictional limitation is crucial, for if the implementing nation goes further, prohibiting wholly foreign persons from trading with a targeted nation, its policy becomes a blockade, which has long been considered "an act of war." *The Circassian*, 69 U.S. 135, 156 (1864).

In accordance with these principles, Congress enacted the International Emergency Economic Powers Act ("IEEPA"), which gave the President limited authority to "investigate, regulate, or prohibit" certain transactions under economic sanctions that are expressly limited in application to "any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. §1702(a)(1)(A). Pursuant to this authority, the President has implemented the ITSR to prohibit the exportation of certain goods and services to Iran. 31 C.F.R. pt. 560. Relevant here, Section 204 applies to anyone acting within the U.S. or any

"United States person, wherever located," to prohibit the "exportation, reexportation, sale, or supply … from the United States … of any goods, technology, or services to Iran …." *Id.* §560.204. Section 203 prohibits any conspiracy to violate ITSR prohibitions and any transaction "that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions" in ITSR. *Id.* §560.203. The only ITSR provision that expressly applies to conduct by a foreign person (not U.S.-owned or controlled) taken in a foreign country is Section 205, *id.* §560.205, which was not charged here.

### B. Zarrab's Arrest And The Superseding Indictment

Zarrab was arrested upon arriving in Miami, Florida, from Istanbul with his wife and daughter, on March 19, 2016, en route to Disney World for a family vacation. Events relating to his arrest are further described in Zarrab's motion to suppress evidence obtained from his iPhone 6. *See* Dkt. No. 62. Zarrab was presented in the Southern District of Florida on March 21, 2016. *See* Dkt. No. 3, No. 16-mj-2352 (JJO) (S.D. Fla. Mar. 21, 2016).

The Superseding Indictment ("Indictment") was returned on March 30, 2016. The Indictment refers almost exclusively to foreign persons and entities, and none of the named or unnamed co-conspirators are alleged to have performed any act in the U.S., or to have communicated with any person or entity based in the U.S. Zarrab is introduced as the owner and operator of a "network of companies located in Turkey and in the United Arab Emirates." Indict. ¶9. The Indictment alleges that Zarrab and his co-defendants and others, "assisted Iranian individuals and companies," to "evade U.S. sanctions."[1] *Id.* ¶12. Zarrab and his co-defendants purportedly engaged in that evasion by "conducting international financial transactions using Turkish and Emirati companies" on behalf of "Iranian individuals and entities," to "conceal from

---

[1] Co-defendants Camelia Jamshidy and Hossein Najafzadheh are also alleged to be from Iran, Turkey, or the United Arab Emirates. *Id.* ¶¶10–11. They have not been arrested.

U.S. banks and others" that services were being provided to Iran in violation of sanctions regulations. *Id.*

The "overt acts" are alleged to be the common basis for all four of the conspiracy charges. *Id.* ¶¶13–14, 18, 21, 24. Those acts describe a hodgepodge of less than a dozen transactions, dating from 2011 to 2013. *Id.* ¶14. The common factors, as alleged, are that a company owned or controlled by Zarrab, in Turkey or the United Arab Emirates, was asked by another foreign company to transfer funds electronically to yet another foreign company, in either dollars or Euro. *Id.* As alleged, some of the transfers, in dollars or Euro, were blocked by U.S. banks, and correspondence was addressed to Zarrab or someone alleged to be an associate of Zarrab, about the blocking. *See, e.g., id.* ¶14.f., h.

The last and much-touted overt act is the receipt in Zarrab's email in-box on December 3, 2011, of a draft letter, in Farsi, and prepared for Zarrab's signature by an unidentified person. *Id.* ¶14.i. The drafter praises the "role" of Ayatollah Khamenei and the Central Bank of Iran in "play[ing] against the sanctions" and the step taken by the Ayatollah which the drafter characterizes as an "announce[ment of] this to be the year of the Economic Jihad." *Id.* The draft letter purports to state that Zarrab considers it his family's "national and moral duty" to cooperate in "foreign exchange anti-sanction policies." *Id.* The Indictment does not allege that Zarrab ever acknowledged the email, much less that he signed it. *Id.*

The Indictment alleges four charges based on these overt acts. Count One alleges that Zarrab conspired, from 2010 to 2015, to defraud the United States, in violation of 18 U.S.C. §371, by "obstruct[ing] the lawful and legitimate governmental functions and operations of [OFAC] in the enforcement of economic sanctions laws and regulations administered by that agency." *Id.* ¶¶13–14. Count Two alleges that Zarrab conspired, from 2010 to 2015, to violate

IEEPA, 50 U.S.C. §1705, which criminalizes willful violations of the ITSR, by conspiring with others to violate Sections 204 and 203 of 31 C.F.R. §560. *Id.* ¶¶15–18. Count Three alleges that Zarrab conspired to commit bank fraud, in violation of 18 U.S.C. §1344, by agreeing with others to execute a scheme or artifice to defraud a financial institution, and to obtain money or property from a financial institution by means of false and fraudulent pretenses. *Id.* ¶¶19–21. And, finally, Count Four alleges that Zarrab conspired to commit money laundering, in violation of 18 U.S.C. §1956(a)(2)(A), by agreeing with others to transmit funds to places in the U.S., from and through places outside the U.S., with the intent to promote unlawful activity (namely, the trade sanction and bank fraud violations alleged in Counts Two and Three). *Id.* ¶¶22–24.

## ARGUMENT

An indictment must be dismissed if "it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012). The indictment must "contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000). While "the language of the statute may be used in the general description of an offense, … it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Id.* at 93. If the statute "includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,-it must descend to particulars." *Id.*

Because each of the offenses charged in this case includes "generic terms," the government was bound to "descend to the particulars," *id.*, by alleging specific agreements, acts, and attempted acts purportedly undertaken by Zarrab and his alleged co-conspirators. And because the government must allege these "essential facts," the Indictment is subject to challenge

"as it was actually drawn, not as it might have been drawn." *Id.* at 92. Moreover, because Zarrab has "object[ed] to the indictment before trial," he "is entitled to a more exacting review of the indictment than [a defendant] who waits until after trial to object." *Id.* The Court, therefore, is obligated to carefully "evaluate whether [the] facts alleged could support conviction" under any of the Indictment's four counts. *Id.*

Each of the Indictment's four counts involves an alleged conspiracy. While an indictment for a criminal conspiracy "need not [allege] commission of the substantive offense," it must allege "that the intended future conduct the conspirators agreed upon includes all the elements of the substantive crime." *United States v. Coplan*, 703 F.3d 46, 66 (2d Cir. 2012); *see United States v. Tyson*, 653 F.3d 192, 206 (3d Cir. 2011) (conspiracy's "common goal or purpose must be illegal"). If the indictment alleges an agreement to undertake actions that, if accomplished, would not constitute a substantive crime, the indictment fails to allege a conspiracy. *See United States v. Foote*, 413 F.3d 1240, 1250 (10th Cir. 2005). Each of the government's overreaching charges against Zarrab fails to allege actionable criminal conduct and should be dismissed.

## I.    The Charge Against A Foreign National For Conspiring To Violate IEEPA Based On Funds Transfers Between Foreign Banks Should Be Dismissed

The heart of the government's case against Zarrab is an IEEPA conspiracy charge (Count Two) that is as unprecedented as it is wrong. The text of the IEEPA, the associated Executive Orders, and OFAC's related regulations, particularly in light of the presumption against extraterritoriality and rule of lenity, demonstrate that prosecutors cannot impose compliance obligations on non-U.S. persons operating abroad solely based on their use of the U.S. dollar as a transaction currency where they have no contacts in the U.S. or with any U.S. persons. The fact that a U.S. bank incidentally may be involved at some point down the payment chain in processing the payment is insufficient to sustain these charges. The government's sweeping

reading of IEEPA disregards the statute's jurisdictional limits and transforms it from a classic prohibition on U.S. nationals and territory in service of U.S. foreign policy into a highly controversial effort to prosecute anyone in the world who engages in dollar-denominated transactions with Iran. It also runs afoul of the presumption against extraterritorial application of U.S. law, the rule of lenity, and constitutional principles of due process and fair notice. Zarrab surely did not have fair notice that his alleged agreement with other foreigners, who then undertook exclusively foreign activity, could subject him to prosecution within the U.S.

A.      **IEEPA And The Related Regulations Do Not Apply To The Facts Alleged**

The linchpin of this prosecution is the purported conspiracy to violate Section 204, which expressly applies only to exports "from the United States, or by a United States person, wherever located." 31 C.F.R. §560.204. Here, there is no allegation that Zarrab, or the other alleged conspirators, are either U.S. citizens or permanent residents, nor that they were physically located within U.S. territory at the time of the alleged overt acts. *See id.* §560.314 (defining "United States person"). The government does not dispute that the conspirators cannot be prosecuted under the "U.S. person" prohibition in Section 204. Zarrab likewise did not conspire to "export" a "service" "from the United States" to Iran, within the meaning of Section 204. *Id.* §560.204. As set forth below, an export "from the United States" must begin in the U.S. and involve "domestic activity" by Zarrab.

1.      **The Indictment Does Not Allege A Prohibited Export "From The United States" Under Section 204**

The Indictment identifies electronic funds transfers on behalf of Iranian companies in which Zarrab received foreign currency from those companies and arranged funds transfers through foreign banks to the foreign banks of the intended foreign recipient companies. Indict. ¶14. Because some of these transfers involved U.S. dollars, his action purportedly caused the

foreign banks to involve U.S. banks in correspondent banking transactions to "clear" those payments (*i.e.*, to debit and credit the accounts of the foreign banks on the books of the U.S. banks).[2]   *Id.*   According to the Indictment, foreign entities including in China and Canada thereby received payment in U.S. dollars for their exports of goods and services from third countries to Iran.  *Id.*

Even if the allegations are accepted as true, none of these executed or contemplated transactions triggers criminal liability because Zarrab did not export or conspire to export anything "from the United States."  31 C.F.R. §560.204.  It is undisputed that the funds Zarrab and his alleged co-conspirators sent to third countries, purportedly for the benefit of Iran, all came "from" accounts held outside of the U.S. by foreign persons at foreign banks.  It would be an unnatural reading of Section 204 to conclude that funds sent from Turkey, for instance, to China, nevertheless came "from the United States," merely because a U.S. correspondent bank played a processing role mid-way through the course of the transaction.

That is the unnatural reading the government has adopted here, by focusing not on the funds transfer between foreign countries that was the purpose of the alleged conspiracy, but on the sub-step taken by the U.S. correspondent bank to engage in the "clearing" described above by debiting and crediting the accounts of other banks in the payment chain.  This single component does not change the fundamentally foreign nature of the transactions and cannot

---

[2]   A bank does not ship physical cash or take dollars out of its vault to effect such a funds transfer.  Instead, the sending bank will construct a chain of debits and credits to connect its books with those of the receiving bank.  A U.S. dollar-denominated funds transfer between two foreign banks need not involve a U.S. bank.  If the foreign banks do not have U.S. dollar correspondent accounts outside of the U.S., they may "clear" the funds transfer through the U.S.  In such cases, the foreign sending bank will involve a U.S. correspondent bank at which it holds a U.S. dollar balance.  The sending bank will direct its U.S. correspondent bank to debit its account and to credit the account of the receiving bank at its U.S. correspondent bank.  Any service thus involves making book-keeping entries in correspondent bank accounts, not any physical transfer.  *See* Appendix D – Fundamentals of the Funds Transfer Process, U.S. Treasury Dep't, October 2006, *available at* https://www.fincen.gov/news_room/rp/files/Appendix_D.pdf.

overcome the extraterritorial nature of the conspiracy. *See Petroleos Mexicanos v. SK Engineering*, 572 F. App'x 60, 61 (2d Cir. 2014) (affirming dismissal of RICO claims where predicate wire fraud involved only "minimal contacts" with the U.S. including a bank payment, and no "allegations that the scheme was directed from (or to) the United States"); *United States v. Prevezon Holdings*, 122 F. Supp. 3d 57, 70–72 (S.D.N.Y. 2015) (wire transfer through New York could not serve as predicate for money laundering because it was not "sufficiently central to the overall fraud scheme to convert this foreign scheme into a domestic one.").

All actions by Zarrab and the alleged co-conspirators took place abroad. None of the conspirators had U.S. bank accounts of their own, nor did they have the authority to determine whether or how their foreign banks would involve U.S. banks in these funds transfers. The mere fact that a U.S. bank cleared a payment originating and terminating at foreign banks without any involvement of Zarrab or his purported conspirators in that clearing transaction does not somehow transform the payment into a "U.S. export" by Zarrab. *See Petroleos Mexicanos*, 572 F. App'x at 61; *Prevezon*, 122 F. Supp. 3d at 70–72. That a U.S. bank had a processing role mid-way through the transactions directed by Zarrab does not change the fact that those transactions involved the transfer of funds *from* one foreign customer of a foreign bank to another foreign customer of another foreign bank. How the "clearing" occurred was of no moment to Zarrab, his purported co-conspirators, or the intended recipient.

The government's boundless reading of the phrase "from the United States"—applying it to money transfers that neither began nor ended in the U.S.—is further undercut by the plain meaning of "from," OFAC's own guidance, and prior case precedents. *First*, "from" is "a function word to indicate the starting point of a physical movement or action." *From*, *Merriam-Webster.com*, http://www.merriam-webster.com/dictionary/from (last visited July 15, 2016). The

plain meaning of an export "from the United States" is a transfer that *begins* in the U.S., not one that transits *through* the U.S. The money transfers here plainly began abroad. The government itself, in its original Indictment, recognized that the charged conspiracy was "begun and committed outside" of the U.S. Dkt. No. 2 ¶¶13, 15, 19, 22. The government's deletion of that language in the Superseding Indictment does not undo this defect, because it cannot change that Zarrab and his purported co-conspirators are charged with sending funds to foreign entities that were drawn *from* accounts held by foreign entities outside the U.S. Indeed, the government's interpretation of "from" would be akin to saying that a car that arrives in Florida, after a trip that began in New York, came "from" Georgia, South Carolina, North Carolina, Virginia, Maryland, Delaware, New Jersey, and New York. But any ordinary user of English would plainly say that the car came "from" New York.[3] Likewise, a transfer of funds held at a bank in Turkey comes "from" Turkey, even if that transfer is processed in part in one or more other countries en route to its ultimate destination.

*Second*, OFAC's own guidance on Section 204 makes clear that it applies to only U.S. exporters in the U.S. OFAC has confirmed that: "violation[s] involving indirect sales to Iran may be based upon the actual knowledge of the U.S. supplier at the time of its sale, or upon determination that the U.S. supplier had reason to know at the time of sale that the goods were specifically intended for Iran." OFAC Guidance (July 22, 2002), *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/iranship.pdf. Here, there is no "U.S. supplier," and certainly no U.S. supplier alleged to have been aware of anything destined for Iran. Zarrab was not acting from the U.S., and supplied nothing from the U.S.

---

[3] Nor would one say that, because the car passed through a tollbooth in North Carolina, the transit authority for that state provided a "service" that was exported to Florida.

*Third*, the surrounding ITSR provisions confirm that, for a transaction to be "from the United States," it must *originate* in the U.S. Indeed, there is a separate regulation addressing the scenario at issue here—*i.e.*, a transaction that does not originate in the U.S., but instead touches the U.S. or involves a U.S. entity while in "transit." 31 C.F.R. §560.406. There would be no need for Section 406 if Section 204 already covered transactions that "transit[ed]" through the U.S., rather than being limited to transactions originating "from" the U.S. Even more importantly, Section 406 specifically describes the extent to which Section 204 applies in the "transit" context—*i.e.*, in a scenario, like this one, where a U.S. entity plays a mid-way role in a transaction that starts and ends elsewhere. And Section 406 provides that the only prohibition under Section 204 that applies in the transit context is the prohibition on the shipment of "goods," not services. *Id.* §560.406. The Indictment alleges, at most, that the U.S. banks were called upon to provide a "service" in the form of processing funds transfers. Indict. ¶16.

*Fourth*, the high-water mark of court precedents, *United States v. All Funds on Deposit in United Bank of Switz.*, reinforces that Section 204, as applied to a non-U.S. person, requires a funds transfer that begins in the U.S. and is directed by the non-U.S. person. No. 01-cv-2091 (JSR), 2003 WL 56999 (S.D.N.Y. Jan. 7, 2003) (Rakoff, J.). There, the government sought to forfeit funds of a non-U.S. entity, Sawan Exchange Company, on the basis that Sawan had violated Section 204 by exporting money transmitting services to Iran by delivering funds to individuals in Iran. *Id.* at *2. The Court held that Section 204 "reaches domestic activities by anyone, whether or not a 'U.S. person,'" in addition to "foreign activities when conducted by a 'U.S. person,'" but did not reach foreign activities conducted by foreign persons—even if the foreign person is doing business with Iran. *Id.* In *All Funds*, sufficient "domestic activities" were deemed to exist by virtue of Sawan's maintenance of funds in its *own bank account* in New

York, which enabled Sawan itself to transfer funds "from the United States" to Iran. Here, there are no such domestic activities: Zarrab is not alleged to have taken any action other than to originate funds transfers from bank accounts held outside the U.S.; those transfers therefore were not "from the United States."

*Fifth*, until this prosecution, the government had never before used Section 204 to prosecute foreign customers of foreign banks for payment-related conduct as remote from the U.S. as here. As the table annexed as Appendix A demonstrates, prosecutions under Section 204 are rare; there are only 20 such prosecutions in the reported case law. *See* Appendix A.[4] Of those 20, 16 involved U.S. persons. *See id.* And in the four prosecutions in which a non-U.S. person was charged, the export of the good or service began in the U.S. and the defendant himself arranged the export by, for example, soliciting price quotes, negotiating prices, or directing payments to U.S. accounts for goods exported from the U.S.[5] As these cases demonstrate, Section 204 is designed to govern the actions of U.S. persons, or to restrict exports originating from the U.S. None of that has occurred here. In no prior case has the government claimed export "from the United States," based on involvement by a U.S. bank at the mid-point of a transaction, by foreign persons with no U.S. contacts, that originated and concluded elsewhere, to reach transactions that were entirely legal in the countries in which they actually occurred.

---

[4] Appendix A includes all cases found through Westlaw and Lexis searches in which the alleged crime was a violation of Section 204 or Section 203 or in which the government sought civil forfeiture based on violation of those same prohibitions.

[5] *See United States v. Ehsan*, 163 F.3d 855, 857 (4th Cir. 1998); Indictment, *United States v. Gholikhan*, No. 05-cr-60238 (JIC) (S.D. Fla Sept. 13, 2005), Dkt. No. 3; Indictment, *United States v. Aydin*, No. 12-cr-221 (ODE) (N.D. Ga. July 10, 2012), Dkt. No. 1; Information, *United States v. Ghorashi Sarvestani*, No. 13-cr-214 (PGG) (S.D.N.Y. Mar. 20, 2013), Dkt. No. 13; *see also* Sentencing Tr. 22–24, *Ghorashi Sarvestani*, No. 13-cr-214 (PGG) (S.D.N.Y. Sept. 12, 2014), Dkt. No. 45.

## 2. It Is Irrelevant Whether The Alleged Co-Conspirators Expected That Transfers Between Foreign Entities Would Be Processed By U.S. Banks

The government cannot backfill the fatal void in "domestic activity" by alleging that Zarrab "knew that these dollar transactions on behalf of and for the benefit of Iranian entities *would be processed* by U.S. financial institutions." Dkt. No. 28, at 8 (emphasis added). Even if Zarrab were aware that a U.S. bank might have a processing role mid-way through one of the funds transfers, it would not change the fact that the subject funds came "from" outside the U.S. and were sent by foreign businesses to other foreign businesses, none of which had U.S. bank accounts. And neither Zarrab nor his purported co-conspirators had any contact with, or involvement in, any U.S. bank's activity in making book-keeping entries to "clear" the payments. As such, there is no violation of Section 204, regardless of Zarrab's purported knowledge as to the mechanics of the transaction. *See United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010) ("In order to convict a defendant of the crime of conspiracy, the government must show that two or more persons entered into a joint enterprise for an unlawful purpose ….").

The government's suggestion that the mere knowledge that an international payment would touch the books of a U.S. bank brings a foreign-to-foreign transaction within the scope of Section 204 invites the sort of expansive extraterritorial application of U.S. law that courts have repeatedly cautioned against. There is no question that Zarrab's conduct was *entirely* legal in Turkey, as it would be in many other countries. Thus, if the government's theory were correct— that directing a foreign transfer in U.S. dollars is tantamount to criminally "orchestrating" a "scheme to allow sanctioned entities" to access "the United States financial networks," Bail Hr'g Tr. at 44:17–20, Dkt. No. 38—it would fundamentally alter the reach of U.S. law and capture innumerable transactions permissible in the countries in which they occur. As Adam J. Szubin, the Acting Undersecretary of the Treasury and former Director of OFAC, recently acknowledged

in testimony before Congress regarding Iran, the U.S. dollar is *the* currency of choice in international trade (over the Euro, the Pound, etc.), and millions of people daily engage in billions of dollars in transactions with no connection to the U.S. other than being denominated in U.S. dollars. *Hearing on Iran Nuclear Deal*, --- Cong. Rec. ----, 2016 WL 3015315 (May 25, 2016) (statement of Adam J. Szubin). Based on the government's theory, then, a countless number of foreign nationals engaging in trade using U.S. dollars, in transactions entirely legal in their home countries, can now be prosecuted by the U.S. Department of Justice for money laundering, bank fraud, and sanctions violations. That would be an astonishing expansion of U.S. law.

*       *       *

In sum, neither Zarrab nor any of the other foreign persons with whom he allegedly worked was an exporter of U.S. services who engaged in U.S. activity. And an incidental U.S. dollar clearing in the midst of a foreign-country to foreign-country funds transfer is not an export "from" the U.S. To accept the government's reading of Section 204 would improperly expand U.S. criminal jurisdiction to defendants like Zarrab, whom the government itself has maintained has "no ties to the United States whatsoever." *See* Bail Hr'g Tr. at 55:2–3, Dkt. No. 38.

### 3.    The Indictment Alleges No Violation of Section 203

Because the Indictment fails to describe a violation of Section 204, the alleged Section 203 violation also fails. Section 203, by its terms, requires that the defendant caused or attempted to cause a violation of some *other* ITSR prohibition. 31 C.F.R. §560.203 (prohibiting any transaction that "evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part"). But Section 204 does not apply to the purported facts, *see supra* at 10–17, as Zarrab and his alleged co-conspirators are foreign persons who acted abroad, and any actions taken by U.S. banks involved transactions

that originated from foreign countries. With no predicate violation of Section 204, no violation of Section 203 can have occurred.

Moreover, because Zarrab cannot be held criminally liable for substantive offenses under Section 204, he likewise cannot be liable under Section 203 for the ancillary offenses of evading, avoiding, attempting, or otherwise conspiring to violate the ITSR. As described above, IEEPA, through Section 204, criminalizes only the "exportation, reexportation, sale, or supply" of U.S. goods or services, and only when carried out by U.S. persons or others acting from within the U.S. *Id.* §560.204. Courts have repeatedly recognized that "[w]hen Congress assigns guilt to only one type of participant in a transaction, it intends to leave the others unpunished for the offense." *United States v. Amen*, 831 F.2d 373, 381 (2d Cir. 1987).

Section 203 is relevant, however, insofar as an amendment to that provision reinforces that Section 204's prohibition on the export of services to Iran is limited to exports "by U.S. persons" and "from the United States." *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another …, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). Before October 22, 2012—when almost all the overt acts alleged in the Indictment occurred—Section 203 prohibited only "any transaction by a *United States person or within the United States* that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions" set forth in ITSR. *See* Exec. Order 13059, 62 Fed. Reg. 44,531, 44,532 (Aug. 19, 1997) (emphasis added). Post-amendment, Section 203 applied to "[a]ny transaction on or after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited." 77 Fed. Reg. 64,664, 64,667 (Oct. 22, 2012).

OFAC did not similarly broaden Section 204, which continues to apply only to exports "from the United States, or by a United States person," thereby confirming that Section 204 does not apply to non-U.S. activity of non-U.S. persons, wherever located.

**B.      Any Ambiguities Must Be Resolved In Zarrab's Favor**

Even if there were some ambiguity in the text of Section 204, several powerful interpretive canons would require construing the statute and regulations in Zarrab's favor.

**1.      Sections 204 And 203 Must Be Presumed Not To Apply Extraterritorially**

The Second Circuit emphasized just last week that the presumption against extraterritoriality "is strong and binding." *Microsoft Corp. v. United States*, No. 14-2985, slip op. at 21 (2d Cir. July 14, 2016).  Indeed, "[i]t is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison*, 561 U.S. at 255.  This presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013).  This principle applies with particular force in the context of sanctions statutes, which express a nation's foreign policy judgment that its nationals and territory will not engage in otherwise lawful transactions with a disfavored nation.  But IEEPA-authorized sanctions do not purport to limit the entire world.  They necessarily assume that absent comparable action from other nations restraining its citizens, the rest of the world is free to engage in the subject transactions without placing those foreign citizens at risk of being imprisoned upon entering the U.S.  Thus, IEEPA self-evidently does not apply, for example, to a Turkish citizen's decision to work for an Iranian bank or a Chinese company's purchase of Iranian oil.  Nor does IEEPA apply to fundamentally foreign actions "where the possibilities of international discord are so evident and retaliative action so certain." *Id.* at 1664.

19

Far from containing a "clear indication of an extraterritorial application," *Morrison*, 561 U.S. at 255, both Section 204 and the pre-2012 version of Section 203 make abundantly clear that they do *not* apply to foreign conduct by foreign persons. *See id.* at 265 ("when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms").[6] Even the current version of Section 203 is contingent on violations of Section 204, and Section 204 expresses a limit on its application to U.S. persons "wherever located" and anyone else exporting from the U.S. If it applied to foreign persons "wherever located," or transactions that transit "through" the U.S., Congress or the Treasury Secretary would have said so, but they did not.

When there is no clear indication that a statute or regulation applies extraterritorially, the "focus" of the charged crime must be *domestic* in order to support jurisdiction. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). But where the "participants, acts, targets, and effects involved in the transaction at issue are primarily foreign," *In re French*, 440 F.3d 145, 150 (4th Cir. 2006), the extraterritorial nature of the charged conduct cannot be altered by an incidental funds transfer that transits through the U.S. *See Prevezon*, 122 F. Supp. 3d at 70–72 (single wire transfer routed through New York could not "convert [a foreign wire fraud] scheme into a domestic one."); *Petroleos Mexicanos*, 572 F. App'x at 60 (affirming dismissal of RICO claims where predicate wire fraud involved "minimal contacts" with the U.S., including but not limited to a bank payment, but there were no allegations that the scheme was "directed from (or to) the United States"). Thus, the government cannot seize on the allegation that U.S. banks played a processing role, incidental to the alleged funds transfers between foreign actors, to transform the fundamentally foreign activity described in the Indictment into an actionable

---

[6] Section 1705(c)—the criminal prohibition in IEEPA—assumes an independent substantive violation, here of Sections 204 or 203. 50 U.S.C. §1705(c). Its extraterritorial application is thus coterminous with that of the underlying regulations. *See RJR Nabisco*, 136 S. Ct. at 2103.

domestic conspiracy. *Id.*; *see also Worldwide Directories, S.A. v. Yahoo, Inc.*, No. 14-cv-7349 (AJN), 2016 WL 1298987, at *10 (S.D.N.Y. March 31, 2016) ("[I]f the domestic conduct alleged is peripheral to the overall scheme, and the scheme is not directed to or from the United States, it does not matter that the defendant intentionally used U.S. wires in furtherance of a fraudulent scheme."); *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 513 B.R. 222, 228 n.1 (S.D.N.Y. 2014) ("Nor is the fact that some of the defendants here allegedly used correspondent banks in the United States to process dollar-denominated transfers sufficient to make these foreign transfers domestic.").

It is also telling that another provision of the ITSR, which was not charged here, expressly applies to non-U.S. persons. *See* 31 C.F.R. §560.205(a). That provision (Section 205(a)) prohibits re-exports by foreign persons of export-controlled U.S. goods and technology, and it expressly applies to certain actions "from a third country … by a person *other than a United States person*." *Id.* (emphasis added). Because the ITSR, at Section 205, "provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Kiobel*, 133 S. Ct. at 1667. This "explicit provision for a specific extraterritorial application would be quite superfluous if the rest of the [ITSR] already applied to transactions" covered under, for instance, Section 204. *Morrison*, 561 U.S. at 265.

OFAC's own historic guidance further undermines the government's attempt to expand its sanctions jurisdiction under IEEPA. In 2012, OFAC made clear that "[t]he universe which must comply with OFAC regulations" was broad, but not limitless, including:

> American citizens and permanent resident aliens wherever they are located; individuals and entities located in the United States (including all foreign branches, agencies, rep offices, etc.); corporations organized under U.S. law, including foreign branches; and (under TWEA based sanctions) entities owned or controlled by any of the above, the most important being foreign-organized subsidiaries of U.S. corporations.

OFAC Regulations for the Financial Community, 4 (2012), *available at* https://www.treasury.gov/resource-center/sanctions/Documents/facbk.pdf.[7]  Notably absent from this list were foreign nationals who transact in U.S. dollars outside the U.S.

### 2. The Rule Of Lenity And Due Process Principles Also Require That The Sanctions Charge Be Dismissed

The rule of lenity independently requires that Section 204 and 203 be interpreted in Zarrab's favor.  If "textual arguments can be made both ways" about whether Sections 204 and 203 apply to the allegations in the Indictment, then the regulation must be interpreted in Zarrab's favor.  *Banki*, 685 F.3d at 109–11 (reversing ITSR convictions).  This rule "ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Liparota v. United States*, 471 U.S. 419, 427 (1985).

*Banki* makes clear that the rule of lenity is far from a formalism.  In that case, the Circuit held that because Sections 204 and 516 of the ITSR were "at a minimum" ambiguous in exempting a person from aiding and abetting the exporting of non-commercial family remittances to Iran, the Section must be interpreted in the defendant's favor and convictions based on a stricter interpretation reversed.  685 F.3d at 109.  Likewise, if Section 204 were ambiguous such that a bar on exports from the U.S. could be understood to encompass transactions by foreign persons that originate elsewhere but pass through the U.S., the rule of lenity would require the narrower, at least equally plausible, reading advanced here.

Even more fundamentally, Zarrab's lack of a connection to the U.S., the text of IEEPA and Sections 204 and 203, and OFAC's historic public guidance render the Indictment violative

---

[7]    Similarly, on its website, in response to the question "Who must comply with OFAC regulations?," OFAC responds that, with limited exceptions not applicable here, OFAC regulations do not apply to actions foreign persons undertake abroad.   *OFAC FAQ 11: General Questions*, U.S. Dep't of Treasury (Jan. 15, 2015), https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx.

of the Due Process Clause. "The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due process.'" *Johnson v. United States*, 135 S. Ct. 2551, 2556–57 (2015); *see also Banki*, 685 F.3d at 109 ("[N]o citizen should be held accountable for a violation of a statute whose commands are uncertain."); *United States v. Williams*, 553 U.S. 285, 304 (2008) (criminal statute must not be "so standardless that it authorizes or encourages seriously discriminatory enforcement"). To determine whether a criminal statute provides fair notice of the prohibited conduct, "a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *United States v. Roberts*, 363 F.3d 118, 122 (2d Cir. 2004).

Zarrab plainly did not have fair warning that an alleged conspiracy comprised of foreign actors taking actions abroad on behalf of other foreign actors could trigger criminal penalties in the U.S. He could not have known that he was risking criminal prosecution at all, much less in the U.S., a country with which he had no contact. The alleged acts are not illegal in Turkey, the United Arab Emirates, or anywhere else the defendants resided or were alleged to have acted. Nor did they run afoul of the European Union's Iran sanctions, which "applie[d] only within the territory of the EU and to natural and legal persons who enjoy the nationality of an EU Member State." Joanne Scott, *Extraterritoriality and Territorial Extension in EU Law*, 62 Am. J. Comp. L. 87, 94–95 (2014). And the notion that he would have regarded himself as having exported a service "from the United States" to Iran merely because he or the foreign recipient of the funds denominated some transfers in U.S. dollars is nonsensical.[8] *See supra* at 10–15 & App'x A.

---

[8] It is particularly unreasonable for the government to argue that Zarrab had fair warning that foreign transactions in U.S. dollars could lead to U.S. criminal liability given that a U.S.

The existence of secondary sanctions further underscores that Zarrab lacked fair notice of exposure to U.S. criminal penalties. Precisely because IEEPA applies territorially to U.S. persons and foreign persons acting from or within the U.S., the United States adopted secondary sanctions to target specific foreign persons for foreign conduct. *See, e.g.*, Iran Freedom and Counter-Proliferation Act of 2012, Pub. L. No. 112-239, 126 Stat. 1632; Iran Threat Reduction and Syria Human Rights Act of 2012, 22 U.S.C. §8711. Secondary sanctions, however, do *not* involve criminal liability, and authorize designating as Specially Designated Nationals ("SDNs") foreign actors whose conduct is perceived to be detrimental to U.S. foreign policy interests. The consequences for SDNs also recognize territorial limits, as their property in the U.S. or under the control of a "U.S. person" is blocked, and "U.S. persons" are prohibited from dealing with them. *See generally* U.S. Dep't of Treasury, Resource Center, Specially Designated Nationals List, https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx (last visited July 15, 2016).

Zarrab is indeed the paradigm of the defendant subjected to arbitrary enforcement via an elastic statutory interpretation that failed to give fair notice. Individuals and companies abroad that request Iran-related U.S. dollar payments through foreign banks are countless. Yet the government has never before sought to imprison a foreign national operating entirely outside the U.S. and without any dealings or contacts in the U.S. for violating the prohibition against exports by U.S. persons or from the U.S. Prosecution on such a novel and attenuated theory cannot comport with due process. If OFAC deemed Zarrab's extraterritorial conduct to be a threat to the sanctions regime, it could have put him on the SDN list, as it did the entities listed in Paragraphs

---

dollar exchange can be carried out without a U.S. correspondent banking transaction. *See Hearing on Iran Nuclear Deal,* --- Cong. Rec. ----, 2016 WL 3015315 (Adam J. Szubin) (all foreign banks "hold dollars in their vaults" that they can "give … to any actor, including an Iranian actor").

7 and 8 of the Indictment. Instead, the government debuted its unprecedented theory of jurisdiction and arrested Zarrab as he and his family were arriving in Miami on a trip to Disney World (a trip he surely never would have taken if he had been on notice that his involvement in non-U.S. transactions could expose him to possible U.S. criminal sanction and imprisonment). Because the government's actions, "did not accord [Zarrab] fair warning of the sanctions the law placed on [his] conduct," Count Two should be dismissed. *United States v. Plaza Health Labs*, 3 F.3d 643, 649 (2d Cir. 1993).

## II. The Indictment Fails To Allege Conspiracy To Commit Bank Fraud

Count Three of the Indictment attempts to repackage the faulty sanctions charge as a bank fraud, alleging that Zarrab conspired to "knowingly execute and attempt to execute a scheme or artifice [1] to defraud a financial institution, and [2] to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, by means of false and fraudulent pretenses, representations, and promises." Indict. ¶20 (citing 18 U.S.C. §1344). That count, too, must be dismissed. Among other basic defects, there is no allegation that Zarrab conspired to make a material misrepresentation to a U.S. bank, harm a U.S. bank, or obtain money or property from a U.S. bank.

### A. The Indictment Fails To Allege A Conspiracy To Defraud A U.S. Bank

The government invokes Section 1344(1), which prohibits defendants from "knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice (1) to defraud a financial institution." 18 U.S.C. §1344(1). The government must "prove that the defendant engaged in a deceptive course of conduct by making material misrepresentations," and also that "the defendant, through the scheme, intended to victimize the bank by exposing it to loss." *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007). Nothing close to that is alleged here.

**1. The Indictment Fails To Allege Material Misrepresentations To A U.S. Bank**

In a bank fraud case, the government must allege a "material misrepresentation" directed to a U.S. bank. *See Nkansah*, 699 F.3d at 747 (bank fraud requires a "course of conduct designed to deceive a federally chartered or insured financial institution into releasing property"). There is no allegation in the Indictment that Zarrab conspired to make any representation of any kind to a U.S. bank. Rather, the Indictment alleges that Zarrab and others caused foreign banks to make funds transfers to other foreign entities, which, in certain instances, were processed by U.S. banks. *See, e.g.*, Indict. ¶¶14.b., l. There can be no "material misrepresentation" to a U.S. bank in the absence of *any* representation to a U.S. bank. The closest the Indictment comes to alleging any representation is its allegation that one funds transfer contained information that "purported that the payment was related to fire equipment, but made no mention of MAPNA Group." *Id.* ¶14.b. This language is most revealing, however, in what it does not say. There is no allegation that the payment did not, in fact, relate to fire equipment, or that there was any representation that was rendered false or incomplete on account of any purported failure to identify MAPNA. *See United States v. Perlmutter*, 636 F. Supp. 219, 224 (S.D.N.Y. 1986) ("[I]n prosecuting a … concealment violation, it is incumbent upon the government to prove that the defendant has a *legal duty* to disclose the material facts at the time he was alleged to have concealed them"). Whatever the Indictment alleges, it is not a material misrepresentation.

Instead of identifying even a single purported misstatement or omission, the government relies on the repeated refrain that various unnamed co-conspirators "caused" funds transfers to occur. *See*, *e.g.*, Indict. ¶¶14.b., l. But the "bare act" of causing a funds transfer is not in itself a misrepresentation, and therefore does not constitute a fraud. *See United States v. Briggs*, 939 F.2d 222, 226 (5th Cir. 1991) ("The bare act of instructing a bank to transfer funds is not a factual representation; thus, it cannot be a *mis*representation, a *false* representation, or *any kind*

of representation."); *Williams v. United States*, 458 U.S. 279, 284–85 (1982) (no false statement made as part of check-kiting scheme, which involves obtaining false credit by passing bad checks between banks, because "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false'").

In essence, the government is attempting to convert allegations that Zarrab participated in a scheme to structure certain transactions for the purpose of evading sanctions, by wiring funds to or from non-restricted entities, into a separate conspiracy to mislead financial institutions that happened to have a role in effecting those transactions. *See, e.g.*, Indict. ¶¶14, 21. While such a plan might violate OFAC regulations—if Zarrab were a U.S. person or a person exporting goods, technology, or services from the U.S. to Iran, which he is not—there is no indication that the alleged plan involved a material misrepresentation or fraud upon a U.S. bank. *See Goldeshtein v. I.N.S.*, 8 F.3d 645, 649 (9th Cir. 1993) ("[S]tructuring financial transactions to avoid currency reports … does not involve the use of false statements or counterfeit documents"). Indeed, even as alleged, all the information on each funds transfer may have been true, as the government never alleges that the foreign company that ordered the funds transfer (1) did not actually receive the goods for which it sent the money or (2) purported to describe the final destination for any goods ordered. Because the Indictment fails to allege that Zarrab or any alleged co-conspirator intended to make, or in fact made, a material misrepresentation to a U.S. bank (or to any entity at all), the bank fraud charge should be dismissed.

### 2. The Indictment Fails To Allege A Scheme To Harm A U.S. Bank

There was no bank fraud for the added reason that there was no bank victim. The Second Circuit has made clear that "the bank fraud statute is not an open-ended, catch-all statute encompassing every fraud involving a transaction with a financial institution.… [I]t is a specific intent crime requiring proof of an intent to victimize a bank by fraud." *Nkansah*, 699 F.3d at

749.[9]  The government alleges only that Zarrab or his co-conspirators caused funds transfers between foreign companies that were processed in part by U.S. banks at some point in the payment chain.  But the Indictment does not allege that the conspiracy's object was "to victimize the bank by exposing it to an actual or potential loss."  *United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1998).  Thus, even if the government has alleged an agreement to "lie to [a] bank," it has failed to allege "[t]he further element of a lie intending harm to the institution."  *Nkansah*, 699 F.3d at 748 n.1; *see also United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("[T]he deceit must be coupled with a contemplated harm to the victim.").

It is binding law that, even where a bank is deceived, a jury cannot infer the defendant attempted to victimize the bank if "the actual exposure of a bank to losses is unclear, remote, or non-existent."  *Nkansah*, 699 F.3d at 750; *see also United States v. Stavroulakis*, 952 F.2d 686, 695 (2d Cir. 1992) (cannot infer an attempt to harm unless the bank's potential loss is "[i]nherent in" the defendant's conduct).  There is simply no indication in the Indictment, or in any relevant case law, that a bank would face a real threat of loss on account of processing a transaction that, unbeknownst to the bank, was meant to evade OFAC sanctions.  That possibility is not only remote, it is illogical.  Indeed, the government alleges that the conspirators' overarching goal was to ensure that the U.S. banks would have *no reason to know* that the funds transfers were ultimately intended for Iran or other restricted entities.  Indict. ¶12.  Thus, the banks would not have had the "knowledge or reason to know" that their actions facilitated sanctions violations, as would be necessary for the imposition of penalties.  31 C.F.R. §560.204.  That is likely the reason that, prior to this case, it does not appear that the government has ever attempted to charge

---

[9]  While *Loughrin v. United States*, 134 S. Ct. 2384 (2014), abrogated *Nkansah*'s application to the second prong of the bank fraud statute, *see* 18 U.S.C. §1344(2), *Nkansah* still applies with full force when the government alleges (as here) that a defendant schemed to "defraud a financial institution," *id*. §1344(1).

alleged OFAC violations in the form of a bank fraud.

The Indictment also makes no suggestion that any actual or proposed funds transfer would "expos[e] the bank to the real threat of civil liability." *United States v. Morgenstern*, 933 F.2d 1108, 1114 (2d Cir. 1991). Here again, the allegations suggest just the opposite. According to the Indictment, the funds transfers were of funds that actually belonged to restricted entities. Thus, unlike in a typical bank fraud case such as *Morgenstern*, where the defendant presented a bank with a false instrument designed to cause the release of funds from another account holder (and where the bank was subsequently sued by that account holder, *id.* at 1114 n.1), there is no third party account holder here that would stand as a victim. With no aggrieved account holder deprived of funds, there is no "real threat of civil liability." *Id.* at 1114.

Courts have long rejected bank fraud claims where a bank, rather than standing as a victim subject to potential losses, was—as alleged here—an "unwitting instrumentality of the fraud." *United States v. Laljie*, 184 F.3d 180 (2d Cir. 1999). For instance, the Second Circuit has concluded that, "neither 'a scheme to pass bad checks,' nor a 'pigeon drop' scheme, in which the victim is induced to withdraw money from a bank and entrust it to the defendant, constitutes bank fraud under §1344." *Id.* Likewise, in *United States v. Rodriguez*, the court rejected a claim of bank fraud where the defendant participated in a scheme to fraudulently obtain checks from her friend's employer, and deposit them at her bank. 140 F.3d 163, 165 (2d Cir. 1998). As the court explained, the defendant had not exposed the bank to losses because the bank "took the checks as a holder in due course, free of any claims or defenses had [the employer] decided to institute an action against [it]." *Id.* at 169.[10] In all of these cases, as here, the defendants were

---

[10] By contrast, the defendant in *Stavroulakis* was convicted of bank fraud for selling blank checks, because, "[i]nherent in a sale of stolen checks is that they will eventually be presented to the drawee bank for payment," thereby exposing the bank to a real risk of loss. 952 F.2d at 695.

charged in connection with transactions that involved banks, but did not expose those banks to a substantial threat of loss. And in all of those cases, the charges were rejected.

In sum, the Indictment fails to allege that Zarrab or anyone else conspired "to expose the banks to losses," *Nkansah*, 699 F.3d at 749, which is fatal to the bank fraud charge.

### B. The Indictment Fails To Allege A Conspiracy To Use False Or Fraudulent Pretenses To Obtain Money Or Property From A U.S. Bank

The government's allegations are also insufficient to establish that Zarrab was part of a conspiracy "to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, by means of false and fraudulent pretenses, representations, and promises." Indict. ¶20 (citing 18 U.S.C. §1344(2)).

### 1. The Indictment Fails To Allege Use Of "False Or Fraudulent Pretenses"

Section 1344(2) requires the government to prove a "false statement" that serves as "the mechanism naturally inducing a bank … to part with its money." *Loughrin*, 134 S. Ct. at 2394. As discussed above, however, the Indictment does not describe a conspiracy that used "false or fraudulent pretenses, representations, or promises" in dealing with any U.S. bank. The government instead relies on the "bare act" of Zarrab and his purported co-conspirators allegedly "caus[ing]" certain funds transfers. *See, e.g.*, Indict. ¶14.b. Because the government does not allege that Zarrab or any alleged co-conspirator made false representations to cause the transactions set forth in the Indictment, *see, e.g.*, *Briggs*, 939 F.2d at 226 ("[t]he bare act of instructing a bank to transfer funds is not a factual representation"); *Goldeshtein*, 8 F.3d at 649 ("structuring financial transactions to avoid currency reports … does not involve the use of false statements"), the bank fraud charge under Section 1344(2) fails.

## 2. The Indictment Fails To Allege A Scheme To Obtain Money From A U.S. Bank

The bank fraud charge also fails for the independent reason that neither Zarrab nor any of his purported co-conspirators attempted to obtain money or property "owned by, or under the custody and control of" a U.S. bank. 18 U.S.C. §1344(2); *see also Loughrin*, 134 S. Ct. at 2389 ("We refer to that element … as intent 'to obtain bank property.'").

According to the Indictment, the only function performed by any U.S. bank was to participate in "process[ing]" the funds transfers that Zarrab or his purported co-conspirators directed between foreign entities. Indict. ¶14.b., l. Thus, there was no conspiracy to secure "moneys" or "other property" from those U.S. banks, §1344(2); rather, those banks were called upon only to provide "services," Indict. ¶16, *i.e.*, to process transfers of funds held by other institutions. "[S]ervices are not property," *United States v. Delano*, 55 F.3d 720, 727 (2d Cir. 1995), and cannot serve as the basis for prosecution under Section 1344(2); *see also Cleveland v. United States*, 531 U.S. 12, 25 (2000) ("[T]o the extent that the word 'property' is ambiguous …, ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.").

In the words of the relevant statute, the U.S. banks simply did not "own," or have "custody or control," over any of the funds or property at issue in this case. 18 U.S.C. §1344(2); *cf. Cleveland*, 531 U.S. at 26 (holding that Section 1341 "requires the object of the fraud to be 'property' in the victim's hands"). An intermediary bank that processes an electronic funds transfer does not actually send out or "receive any funds." *Grain Traders, Inc. v. Citibank, N.A.*, 960 F. Supp. 784, 793 (S.D.N.Y. 1997) (Chin, J.), *aff'd*, 160 F.3d 97 (2d Cir. 1998). For example, as described above at 10–11 & n.2, the Indictment describes a funds transfer in dollars between customers whose banks do not have correspondent accounts with each other, resulting in the construction by the sending bank of a correspondent banking chain that could involve U.S.

clearing banks.  In this scenario, the U.S. clearing bank debits and credits the accounts of other banks above and below it in the payment chain without any reduction in or outlay of its own funds.  Thus, the sort of electronic "transfers" alleged in the Indictment do not cause a U.S. bank to part with its money or property.

The bank fraud count also fails because, even if this case did involve funds owned by, or under the custody or control of, a U.S. bank, there is no allegation that any conspirator sought to "obtain" those funds.  18 U.S.C. §1344(2).  A conspiracy to "obtain" funds must entail an effort "[t]o bring" those funds "into one's own possession; to procure, esp. through effort."  *Obtain*, *Black's Law Dictionary* (10th ed. 2014); *see also Skilling v. United States*, 561 U.S. 358, 400 (2010) (fraud occurs only when "the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other").  The allegation here is that Zarrab "conduct[ed] international financial transactions" in a way that "conceal[ed] from U.S. banks and others that services were being provided to Iran," Indict. ¶12.  There is no allegation that any conspirator attempted to "obtain" any funds, and thus no basis for prosecution under Section 1344(2).

### C.    The Bank Fraud Statute Does Not Apply Extraterritorially

The bank fraud charge also fails for the independent reason that Section 1344 does not apply to the fundamentally foreign conduct alleged in the Indictment. *See supra* at 19–20. Because the statute lacks any "clear indication of an extraterritorial application, it has none." *United States v. Vilar*, 729 F.3d 62, 72 (2d Cir. 2013).  And the Indictment definitively confirms that "the relevant conduct occurred in the territory of a foreign sovereign."  *Id.* at 74.  While the government may point to some funds transfers that happened to be processed by U.S. banks, "simply alleging that some domestic conduct occurred cannot support a claim of domestic application."  *Norex Petroleum v. Access Indus.*, 631 F.3d 29, 33 (2d Cir. 2010).  And these momentary and incidental U.S. contacts are particularly shaky ground upon which to justify the

application of the statute, given that a U.S. dollar-denominated funds transfer can be carried out without a U.S. correspondent banking transaction. *See supra* nn.2, 8. The government thus fails to "convert this foreign scheme into a domestic one." *Prevezon*, 122 F. Supp. 3d at 72.

## III. The Indictment's Duplicative Money Laundering Charge Merges With The IEEPA Charge And Should Thus Be Dismissed

The government's allegation that Zarrab conspired to commit money laundering should likewise be dismissed. The Indictment alleges that Zarrab conspired to "transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds to places in the United States from and through places outside the United States … with the intent to promote the carrying on of … the illegal export of services to Iran … and bank fraud …." Indict. ¶23 (citing 18 U.S.C. §1956(a)(2)(A)). But, as explained above, both of these predicate offenses should be dismissed, and with them the money laundering charge.

Even if the predicate counts survive, the money laundering charge cannot, as it merges with the IEEPA charge. The Indictment alleges that Zarrab conspired to commit money laundering when he agreed to "transfer" money internationally "with the intent to promote the carrying on of specified unlawful activity." Indict. ¶23 (quoting 18 U.S.C §1956(a)(2)(A)). But the "specified unlawful activity" that Zarrab allegedly intended to promote was the identical activity of providing "international financial transactions … to Iran." *Id*. ¶¶16, 18. The plain text of the money laundering statute requires that the "transfer" differ from the "specified unlawful activity" it is intended to promote, as it would be nonsensical to read the statute to prohibit a "transfer" intended to promote that very "transfer." It is well settled that the specified unlawful activity "must be distinct from the money laundering allegation itself." *W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch*, No. 03-cv-8606 (RWS), 2004 WL 2187069, at *9 (S.D.N.Y. Sept. 29, 2004) (citing authority). This requirement "helps ensure that the money

laundering statute … will not simply provide overzealous prosecutors with a means of imposing additional criminal liability" for a single underlying offense. *United States v. Trejo*, 610 F.3d 308, 314 (5th Cir. 2010); *see United States v. Johnson*, 971 F.2d 562, 569 (10th Cir. 1992).

Yet that is precisely how the government employs the money laundering statute here. The government simultaneously charges Zarrab with (1) conspiracy to violate sanctions for arranging international financial transactions, and (2) conspiracy to launder money for arranging *the exact same transactions*. But "allegations of money laundering that are inseparable from the underlying crime, such as certain financial fraud transactions, have not withstood scrutiny." *United States v. Awada*, 425 F.3d 522, 524 (8th Cir. 2005). Here, the agreement to send international funds transfers cannot constitute conspiracy to commit money laundering because the agreement was not made "to promote the carrying on of" the IEEPA conspiracy. 18 U.S.C. §1956(a)(2)(A). Rather, the agreement to send funds transfers was itself the alleged IEEPA conspiracy. The government offers "no explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the sentence for that crime." *United States v. Santos*, 553 U.S. 507, 517 (2008) (plurality op.).

## IV. The Indictment's Allegations Of A Conspiracy To Defraud The United States Fail On Both Statutory And Constitutional Grounds

Finally, the government has charged Zarrab with conspiracy to "defraud" the U.S. agency that administers the sanctions program. Indict. ¶13. According to the Indictment, conspiracy to violate OFAC sanctions also constitutes conspiracy to "defraud" OFAC by "impair[ing], imped[ing], and obstruct[ing]" its attempts to enforce the sanctions laws. *Id.* But as discussed above, the Indictment fails to describe a conspiracy to violate OFAC regulations, and Count One, which relies on that purported conspiracy as its predicate, therefore fails. *See supra* at 10–22.

Count One also fails under the text of Section 371, which applies where "two or more persons conspire either" (1) "to commit any offense against the United States," or (2) "to defraud the United States, or any agency thereof," and at least one conspirator undertakes an overt act to further the conspiracy. 18 U.S.C. §371. The fraud prong "reaches schemes which deprive the government of money or property," or attack "the integrity of the United States and its agencies." *United States v. Ballistrea*, 101 F.3d 827, 831 (2d Cir. 1996).

While courts have applied Section 371 to include actions that merely conceal information in a manner that obstructs an agency's attempts to enforce its regulations, *see, e.g.*, *Ballistrea*, 101 F.3d at 833, the government goes even further here, contending that nearly any violation of an agency regulation is an attempt to "defraud" that agency. In reality, a conspiracy to violate OFAC sanctions is no more a conspiracy to defraud OFAC than a conspiracy to obscure a license plate is a conspiracy to defraud the department of motor vehicles.

In all events, Count One must also be dismissed because Section 371 does not apply to foreign conduct. The statute gives no "clear indication of an extraterritorial application," which means it has none. *Kiobel*, 133 S. Ct. at 1664. Section 371 is a tool of domestic criminal law, not impromptu foreign policy. Nor can there be any doubt that the government is seeking to apply Section 371 extraterritorially. The alleged conspiracy to defraud OFAC occurred entirely abroad, with Zarrab and his co-conspirators acting overseas to arrange transactions between foreign banks on behalf of foreign companies. The conspiracy only touched the U.S. twice, when foreign banks directed funds transfers through U.S. banks en route to other foreign banks. Because the alleged conduct is overwhelmingly (if not entirely) foreign, with effects felt almost entirely abroad, the government has impermissibly sought to apply Section 371 extraterritorially.

## CONCLUSION

This Court should dismiss the Indictment in its entirety.

Dated:  New York, New York
       July 18, 2016

BANCROFT PLLC

_/s/ Viet D. Dinh_
Viet D. Dinh
Paul D. Clement
Jeffrey M. Harris
Edmund G. LaCour Jr.
500 New Jersey Avenue, NW
7th Floor
Washington, DC 20001
Tel: (202) 234-0900
Fax: (202) 234-2806


George D. Kleinfeld
CLIFFORD CHANCE US LLP
2001 K Street, N.W.
Washington, DC 20006


Jonathan C. Poling *(pro hac vice to be filed)*
AKIN GUMP STRAUSS HAUER & FELD
LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036

*Attorneys for Defendant Reza Zarrab*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

_/s/ Christine H. Chung_
Christine H. Chung
Adam M. Abensohn
William A. Burck
Daniel R. Koffmann
51 Madison Avenue
22nd Floor
New York, NY 10010
Tel: (212) 849-7000
Fax: (212) 849-7100


Benjamin Brafman
Marc A. Agnifilo
Joshua D. Kirshner
BRAFMAN & ASSOCIATES, P.C.
767 3rd Avenue, 26th Fl
New York, NY 10017


Aaron T. Wolfson
Tara J. Plochocki *(pro hac vice to be filed)*
LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC
405 Lexington Avenue
62nd Floor
New York, NY 10174

# APPENDIX
# A

# APPENDIX A

Cases identified in legal database searches in which 31 C.F.R. §§ 560.203–560.204 were charged criminally or alleged in connection with a civil forfeiture action.[*]

| | Case Name | Charged Provision(s) | Goods/Services at issue | Cases Involving Section 204 | | | | Conduct Alleged |
|---|---|---|---|---|---|---|---|---|
| | | | | U.S. Person | Non-U.S. Person | Export Began in the United States | Defendant(s) Contacted U.S. or Conducted Activity There | |
| 1. | United States v. Ehsan, 97-cr-45 (WMN) (D. Md. 1997) | 31 C.F.R. §§ 560.203–560.204 | Transformer Oil Gas Analysis Systems | | X[**] | X | X | Non-U.S. person contacted a U.S.-based entity seeking to purchase Transformer Oil Gas Analysis Systems (TOGAS) and asked the manufacturer to ship the merchandise to the defendant's agent in New Jersey, from which he would ship it to Dubai and then on to Iran. |
| 2. | United States v. Reyes, 98-cr-189 (CNC) (E.D. Wis. 1998) | 31 C.F.R. §§ 560.203–560.204 | Military Aircraft Parts | X | | X | X | Employee of Wisconsin-based broker of commercial and military aviation component parts, sold military components to a Switzerland-based customer whom the defendant knew intended to ship the parts to Iran. |

---

[*]  Because this chart relies on reported decisions available in Westlaw and Lexis, it does not include information about unreported cases or settlements.

[**]  At issue in *Ehsan* was whether the defendant's planned shipment from Dubai on to Iran was a permissible "reexport," or if the defendant's conduct rendered the goods' stopover merely "transshipment" and thus an impermissible export from the United States to Iran. *See* 163 F.3d 855, 857 (4th Cir. 1998). This distinction would be irrelevant if the defendant were a U.S. person, as Section 204 would prohibit him from exporting to Iran from anywhere, including Dubai. As a result, although we could find no explicit statement of the defendant's citizenship or residence, we treat *Ehsan* as a case in which the defendant was not a U.S. person.

| | Cases Involving Section 204 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Person | Non-U.S. Person | Export Began in the United States | Defendant(s) Contacted U.S. or Conducted Activity There | Conduct Alleged |
| 3. | United States v. All Funds on Deposit in United Bank of Switz., 01-cv-2091 (JSR) (S.D.N.Y. 2001) | 31 C.F.R. § 560.204 | Money Transfers | X | | X | X | Money remitters based in the United States facilitated funds transfers to Iran by collecting their customers' payments and making group deposits of U.S. dollars into a New York-based bank account and sent faxes from the U.S. to Dubai with instructions designating the bank accounts in Iran that the New York-based deposits should benefit. |
| 4. | United States v. Homa International Trading Corp., 01-cr-417 (TPG) (S.D.N.Y. 2001) | 31 C.F.R. §§ 560.203–560.204 | Money Transfers | X | | X | X | Manhattan-based money services business facilitated money transfers to bank accounts in Iran via Dubai, which amounted to a "service" from the U.S. in violation of the regulations. |
| 5. | United States v. Sevilla, 04-cr-171 (N.D. Ill. 2004) | 31 C.F.R. §§ 560.203–560.204 | Hydraulic Testing Machine with nuclear applications | X | | X | X | Sales director of California-based company attempted to export from the U.S. to Iran machinery and software used to measure the tensile strength of steel, a component on the Nuclear Suppliers' Group "Watch List" because of its potential use in nuclear applications. |
| 6. | United States v. Gholikhan, 05-cr-60238 (JIC) (S.D. Fla. 2005) | 31 C.F.R. § 560.204 | Military Night Vision Goggles to Iranian Military | | X | X | X | Iranian nationals solicited and arranged purchases of military night vision goggles from the United States for shipment to Iran's military and police forces through Austria. Defendants personally directed communications and money transfers to the U.S. in furtherance of the scheme. |

## Cases Involving Section 204

| Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Person | Non-U.S. Person | Export Began in the United States | Defendant(s) Contacted U.S. or Conducted Activity There | Conduct Alleged |
|---|---|---|---|---|---|---|---|
| 7. United States v. Quinn, 05-cr-18 (JDB) (D.D.C. 2005) | 31 C.F.R. §§ 560.203–560.204 | Forklift Parts | X | | X | X | Vice president and sales representative of Kentucky-based company shipped forklift parts from the U.S. to Iran via the UAE. |
| 8. United States v. Groos, 06-cr-420 (N.D. Ill. 2006) | 31 C.F.R. §§ 560.203–560.204 | Firefighting Equipment | X | | X | X | U.S. citizen and director of Luxembourg-based subsidiary of U.S. corporation transshipped U.S.-origin firefighting equipment to Iran. |
| 9. United States v. Mousavi, 07-cr-513 (C.D. Cal. 2008) | 31 C.F.R. § 560.204 | Consulting services for wireless company | X | | X | X | Naturalized U.S. citizen of Iranian origin and U.S. resident entered into consulting contracts to support a Kuwaiti company's efforts to bid for a mobile communication license and to establish a bank and leasing company in Iran. |
| 10. United States v. Amirnazmi, 08-cr-429 (CMR) (E.D. Pa. 2008) | 31 C.F.R. § 560.204 | Software for Pricing Chemicals | X | | X | X | A dual U.S. and Iranian citizen and owner of Pennsylvania-based company developed and provided to Iranian government officials a proprietary database and software system that helped buyers locate the best prices in the world for various chemicals. |
| 11. In re 650 Fifth Ave., 08-cv-10934 (KBF) (S.D.N.Y. 2008) | 31 C.F.R. §§ 560.203–560.204 | Rental income from tenants | X | | X | X | 36-story office building located at 650 Fifth Avenue was jointly owned by a U.S.-based Iranian charitable foundation and an entity indirectly by an Iranian bank identified with the Government of Iran. The Iranian bank gave instructions on the financing and management of the property and received rental income generated from tenants. |

| | Cases Involving Section 204 | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Case Name** | **Charged Provision(s)** | **Goods/Services at issue** | **U.S. Person** | **Non-U.S. Person** | **Export Began in the United States** | **Defendant(s) Contacted U.S. or Conducted Activity There** | **Conduct Alleged** |
| 12. | United States v. Sairafi, 09-cr-01344 (VBF) (C.D. Cal. 2009) | 31 C.F.R. §§ 560.203–560.204 | Vacuum Pumps with nuclear applications | X | | X | X | Iranian-born U.S. citizen and owner and operator of a California company arranged with an Iran-based co-conspirator to export high-dollar vacuum pumps and pump-related equipment to Iran via the UAE. The U.S.-based defendant arranged for the shipment from the U.S. to the UAE, including by falsifying air waybills, where the Iran-based defendant then arranged for shipment to Iran. |
| 13. | United States v. Seifi, et al., 10-cr-58 (M.D. Ga. 2010)  United States v. Tabibi, et al., 11-cr-33 (M.D. Ga. 2011) | 31 C.F.R. §§ 560.203–560.204 | Military Aircraft Parts | X | | X | X | Three defendants—an Iranian national, an Iranian-born U.S. citizen, and a U.S. citizen—contacted U.S.-based suppliers and arranged to export parts for F-4 and F-5 fighter jets and AH-1 and UH-1 Huey attack helicopters from the U.S. to Iran via the UAE. |
| 14. | United States v. Banki, 10-cr-8 (PAE) (S.D.N.Y. 2010) | 31 C.F.R. § 560.204 | $3.4 million in money transfers to the U.S. from Iran | X | | X | X | Naturalized U.S. citizen of Iranian origin who received $3.4 million in funds from his family in Iran convicted of aiding and abetting sending by other U.S. residents of corresponding amount of funds from the U.S. to Iran, through money transmitting system called a hawala, in violation of the Iran sanctions. |

| | | | | Cases Involving Section 204 | | | | |
|---|---|---|---|---|---|---|---|---|
| | Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Person | Non-U.S. Person | Export Began in the United States | Defendant(s) Contacted U.S. or Conducted Activity There | Conduct Alleged |
| 15. | United States v. Nazemzadeh, 11-cr-5726 (S.D. Cal. 2011) | 31 C.F.R. §§ 560.203–560.204 | Medical Equipment | X | | X | X | Iranian national living in Michigan on an H1B employment visa sought to purchase medical equipment from U.S.-based suppliers for subsequent shipment to Iran. When one shipper refused to ship to Iran, the defendant suggested making the shipment to a Dutch company as an intermediary. |
| 16. | United States v. Alexander, 11-cr-36 (N.D. Ga. 2011) | 31 C.F.R. §§ 560.203–560.204 | Industrial Metal Cutting Machines | X | | X | X | U.S. resident and owner-manager of U.S.-based manufacturer of water-jet cutting systems negotiated the sale of two cutting systems to Iran-based companies and arranged for them to be shipped to Iran via the UAE. |
| 17. | United States v. Aydin, 12-cr-221 (ODE) (N.D. Ga. 2012) | 31 C.F.R. §§ 560.203–560.204 | F-14 Fighter Jet parts | | X | X | X | Iranian and Turkish nationals sent emails and wired money to the U.S. in order to export military aircraft parts from the United States to Iran via Turkey. |
| 18. | United States v. Saboonchi, 13-cr-100 (PWG) (D. Md. 2013) | 31 C.F.R. §§ 560.203–560.204 | Industrial parts and components | X | | X | X | U.S. citizen and Maryland resident placed orders for industrial parts and components such as cyclone separators, thermocouples, and stainless steel filter elements on behalf of Iranian-based co-conspirator and then shipped goods from the U.S. to co-conspirator in Iran via the UAE and China. |

| | | | | Cases Involving Section 204 | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Case Name** | **Charged Provision(s)** | **Goods/Services at issue** | **U.S. Person** | **Non-U.S. Person** | **Export Began in the United States** | **Defendant(s) Contacted U.S. or Conducted Activity There** | **Conduct Alleged** |
| 19. | United States v. Ghorashi Sarvestani, 13-cr-214 (PGG) (S.D.N.Y. 2013) | 31 C.F.R. §§ 560.203– 560.204 | Satellite Technology | | X | X | X | Iranian national solicited and negotiated purchases of satellite technology and hardware from U.S.-based suppliers for shipment to Iran via Dubai, Malaysia, and Hong Kong and directed payments to the suppliers in the U.S. |
| 20. | United States v. Hassanshahi, 13-cr-274 (RC) (D.D.C. 2013) | 31 C.F.R. §§ 560.203– 560.204 | Power Plant Components | X | | X | X | California resident purchased power plant components in the United States and shipped them ultimately to Iran, often with intermediate stops in non-embargoed countries. |

| | | Cases Involving Section 203 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Person | Non-U.S. Person | Export Began in the United States | Defendant(s) Contacted U.S. or Conducted Activity There | Conduct Alleged |
| 1. | United States v. Ehsan, 97-cr-45 (WMN) (D. Md. 1997) | 31 C.F.R. §§ 560.203–560.204 | Transformer Oil Gas Analysis Systems | | X*** | X | X | Non-U.S. person contacted a U.S.-based entity seeking to purchase Transformer Oil Gas Analysis Systems (TOGAS) and asked the manufacturer to ship the merchandise to the defendant's agent in New Jersey, from which he would ship it to Dubai and then on to Iran. |
| 2. | United States v. Reyes, 98-cr-189 (CNC) (E.D. Wis. 1998) | 31 C.F.R. §§ 560.203–560.204 | Military Aircraft Parts | X | | X | X | Employee of Wisconsin-based broker of commercial and military aviation component parts, sold military components to a Switzerland-based customer whom the defendant knew intended to ship the parts to Iran. |
| 3. | United States v. Homa International Trading Corp., 01-cr-417 (TPG) (S.D.N.Y. 2001) | 31 C.F.R. §§ 560.203–560.204 | Money Transfers | X | | X | X | Manhattan-based money services business facilitated money transfers to bank accounts in Iran via Dubai, which amounted to a "service" from the U.S. in violation of the regulations. |
| 4. | United States v. Sevilla, 04-cr-171 (N.D. Ill. 2004) | 31 C.F.R. §§ 560.203–560.204 | Hydraulic Testing Machine with nuclear applications | X | | X | X | Sales director of California-based company attempted to export from the U.S. to Iran machinery and software used to measure the tensile strength of steel, a component on the Nuclear Suppliers' Group "Watch List" because of its potential use in nuclear applications. |

---

*** *See supra* n.**.

| | | | Cases Involving Section 203 | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Case Name** | **Charged Provision(s)** | **Goods/Services at issue** | **U.S. Person** | **Non-U.S. Person** | **Export Began in the United States** | **Defendant(s) Contacted U.S. or Conducted Activity There** | **Conduct Alleged** |
| 5. | United States v. Quinn, 05-cr-18 (JDB) (D.D.C. 2005) | 31 C.F.R. §§ 560.203–560.204 | Forklift Parts | X | | X | X | Vice president and sales representative of Kentucky-based company shipped forklift parts from the U.S. to Iran via the UAE. |
| 6. | United States v. Groos, 06-cr-420 (N.D. Ill. 2006) | 31 C.F.R. §§ 560.203–560.204 | Firefighting Equipment | X | | X | X | U.S. citizen and director of Luxembourg-based subsidiary of U.S. corporation transshipped U.S.-origin firefighting equipment to Iran. |
| 7. | In re 650 Fifth Ave., 08-cv-10934 (KBF) (S.D.N.Y. 2008) | 31 C.F.R. §§ 560.203–560.204 | Rental income from tenants | X | | | X | 36-story office building located at 650 Fifth Avenue was jointly owned by a U.S.-based Iranian charitable foundation and an entity indirectly by an Iranian bank identified with the Government of Iran. The Iranian bank gave instructions on the financing and management of the property and received rental income generated from tenants. |
| 8. | United States v. Sairafi, 09-cr-01344 (VBF) (C.D. Cal. 2009) | 31 C.F.R. §§ 560.203–560.204 | Vacuum Pumps with nuclear applications | X | | X | X | Iranian-born U.S. citizen and owner and operator of a California company arranged with an Iran-based co-conspirator to export high-dollar vacuum pumps and pump-related equipment to Iran via the UAE. The U.S.-based defendant arranged for the shipment from the U.S. to the UAE, including by falsifying air waybills, where the Iran-based defendant then arranged for shipment to Iran. |

| | Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Person | Non-U.S. Person | Export Began in the United States | Defendant(s) Contacted U.S. or Conducted Activity There | Conduct Alleged |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | **Cases Involving Section 203** |
| 9. | United States v. Seifi, et al., 10-cr-58 (M.D. Ga. 2010) / United States v. Tabibi, et al., 11-cr-33 (M.D. Ga. 2011) | 31 C.F.R. §§ 560.203–560.204 | Military Aircraft Parts | X | | X | X | Three defendants—an Iranian national, an Iranian-born U.S. citizen, and a U.S. citizen—contacted U.S.-based suppliers and arranged to export parts for F-4 and F-5 fighter jets and AH-1 and UH-1 Huey attack helicopters from the U.S. to Iran via the UAE. |
| 10. | United States v. Nazemzadeh, 11-cr-5726 (S.D. Cal. 2011) | 31 C.F.R. §§ 560.203–560.204 | Medical Equipment | X | | X | X | Iranian national living in Michigan on an H1B employment visa sought to purchase medical equipment from U.S.-based suppliers for subsequent shipment to Iran. When one shipper refused to ship to Iran, the defendant suggested making the shipment to a Dutch company as an intermediary. |
| 11. | United States v. Alexander, 11-cr-36 (N.D. Ga. 2011) | 31 C.F.R. §§ 560.203–560.204 | Industrial Metal Cutting Machines | X | | X | X | U.S. resident and owner-manager of U.S.-based manufacturer of water-jet cutting systems negotiated the sale of two cutting systems to Iran-based companies and arranged for them to be shipped to Iran via the UAE. |
| 12. | United States v. Aydin, 12-cr-221 (ODE) (N.D. Ga. 2012) | 31 C.F.R. §§ 560.203–560.204 | F-14 Fighter Jet parts | | X | X | X | Iranian and Turkish nationals sent emails and wired money to the U.S. in order to export military aircraft parts from the United States to Iran via Turkey. |

| | | | | Cases Involving Section 203 | | | |
|---|---|---|---|---|---|---|---|
| | **Case Name** | **Charged Provision(s)** | **Goods/Services at issue** | **U.S. Person** | **Non-U.S. Person** | **Export Began in the United States** | **Defendant(s) Contacted U.S. or Conducted Activity There** | **Conduct Alleged** |
| 13. | United States v. Saboonchi, 13-cr-100 (PWG) (D. Md. 2013) | 31 C.F.R. §§ 560.203–560.204 | Industrial parts and components | X | | X | X | U.S. citizen and Maryland resident placed orders for industrial parts and components such as cyclone separators, thermocouples, and stainless steel filter elements on behalf of Iranian-based co-conspirator and then shipped goods from the U.S. to co-conspirator in Iran via the UAE and China. |
| 14. | United States v. Ghorashi Sarvestani, 13-cr-214 (PGG) (S.D.N.Y. 2013) | 31 C.F.R. §§ 560.203–560.204 | Satellite Technology | | X | X | X | Iranian national solicited and negotiated purchases of satellite technology and hardware from U.S.-based suppliers for shipment to Iran via Dubai, Malaysia, and Hong Kong and directed payments to the suppliers in the U.S. |
| 15. | United States v. Hassanshahi, 13-cr-274 (RC) (D.D.C. 2013) | 31 C.F.R. §§ 560.203–560.204 | Power Plant Components | X | | X | X | California resident purchased power plant components in the United States and shipped them ultimately to Iran, often with intermediate stops in non-embargoed countries. |
| 16. | United States v. Fokker Serv. B.V., 14-cr-121 (RJL) (D.D.C. 2014) | 31 C.F.R. § 560.203 | Aircraft Components and Services | | X | X | X | Dutch company charged with causing exportation of goods and services from the United States to sanctioned countries, including Iran, based on export of U.S.-origin aircraft components and U.S.-based repair shop services. |