UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                            :

UNITED STATES OF AMERICA

                                            :

                   - v. -                            S1 15 Cr. 867 (RMB)

                                            :

REZA ZARRAB,
  a/k/a "Riza Sarraf,"                        :

                    Defendant.           :

                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT REZA ZARRAB'S MOTIONS TO DISMISS THE INDICTMENT AND TO SUPPRESS EVIDENCE

 

 

                                         PREET BHARARA
                                         United States Attorney for the
                                         Southern District of New York
                                         Attorney for the United States of America

Michael D. Lockard
Sidhardha Kamaraju
David W. Denton, Jr.
Assistant United States Attorneys
      *Of Counsel*

# TABLE OF CONTENTS

Page

Background ................................................................................................................. 5

    A.    The Indictment ............................................................................................ 5

    B.    Zarrab's Arrest ............................................................................................ 6

Discussion .................................................................................................................. 7

I.    The Motion to Dismiss Should be Denied ......................................................... 7

    A.    The Motion to Dismiss the IEEPA Conspiracy Charge (Count Two) Should Be
        Denied .......................................................................................................... 8

    B.    The Defendant's Motion to Dismiss the Bank Fraud Conspiracy Charge (Count
        Three) Should Be Denied................................................................................ 25

    C.    The Defendant's Motion to Dismiss the Money Laundering Conspiracy Charge
        (Count Four) Should Be Denied ..................................................................... 39

    D.    The Defendant's Motion to Dismiss the Conspiracy to Defraud the United States
        Charge (Count One) Should Be Denied.......................................................... 42

II.    Zarrab's Motion to Suppress Should Be Denied in its Entirety Without a Hearing......... 45

    A.    The Defendant's Providing His Passcode to CBP Officers Was Not the Product of
        a Custodial Interrogation............................................................................... 46

    B.    The Contents of the Defendant's iPhone Were Lawfully Obtained Pursuant to a
        Search Warrant and Cannot Be Suppressed Based on Purported *Miranda*
        Violations ....................................................................................................... 50

    C.    The Defendant's Responses to Pedigree Questions After His Request for a
        Lawyer Need Not Be Suppressed ................................................................... 53

Conclusion ................................................................................................................. 55

## **TABLE OF AUTHORITIES**

**Cases**

*Barber* v. *Thomas,* 560 U.S. 474 (2010) ....................................................23

*Berkemer* v. *McCarty*, 468 U.S. 420 (1984) ..............................................46

*Boyce Motor Lines* v. *United States,* 342 U.S. 337 (1952) ..........................8

*Chua Han Mow* v. *United States*, 730 F.2d 1308 (9th Cir. 1984) ...............22

*Dennis* v. *United States*, 384 U.S. 855 (1966) ......................................42, 44

*DiPierre* v. *United States*, 564 U.S. 70 (2011) ..........................................23

*EEOC* v. *Arabian Am. Oil Co.*, 499 U.S. 244 (1991) ..................................19

*Environmental Defense Fund, Inc.* v. *Massey*, 986 F.2d 528 (D.C. Cir. 1993)...........................19

*Grain Traders, Inc.* v. *Citibank, N.A.*, 960 F. Supp. 784 (S.D.N.Y. 1997) ..................36

*Goldeshtein* v. *I.N.S.*, 8 F.3d 645 (9th Cir. 1993) ......................................31

*Hamling* v. *United States*, 418 U.S. 87 (1974) ............................................7

*Jones* v. *United States*, 526 U.S. 227 (1999) ...............................................7

*Kenemore* v. *Roy*, 536 F. App'x 391 (5th Cir. 2013)..................................40

*Kiobel* v. *Royal Dutch Petroleum Company*, 133 S.Ct. 1659 (2013) ..........20

*Maracich* v. *Spears*, 133 S.Ct. 2191 (2013) ..............................................23

*Miranda* v. *Arizona*, 384 U.S. 436 (1966) ....................................... *passim*

*Morrison* v. *National Australian Bank Limited*, 561 U.S. 247 (2010) ........20

*Moskal* v. *United States*, 498 U.S. 103 (1990)............................................23

*Murray* v. *United States*, 487 U.S. 533 (1988) ..........................................50

*Neder* v. *United States*, 527 U.S. 1 (1999).................................................26

*Oliver* v. *United States*, 466 U.S. 170 (1984) ............................................50

*Pasquantino* v. *United States*, 544 U.S. 349 (2005) ........................18, 20, 38

*Pennsylvania* v. *Muniz*, 496 U.S. 582 (1990) ............................................53

*Riley* v. *California*, 134 S. Ct. 2473 (2014) ..............................................50

*RJR Nabisco* v. *European Community*, 136 S. Ct. 2090 (2016)...............19, 20

*Sale* v. *Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993) ...........................21

*Screws* v. *United States*, 325 U.S. 91 (1945) ..............................................23

*Siu* v. *United States*, No. C08-1407-JCC, 2009 WL 2032028 (W.D. Wash. July 7, 2009)...........40

*Smith* v. *United States*, 508 U.S. 223 (1993) ..............................................23

**Cases (cont'd)**

*Stansbury* v. *California*, 511 U.S. 318 (1994) ............................................................47

*Torrico* v. *Int'l Bus. Machines Corp.*, 213 F. Supp. 2d 390 (S.D.N.Y. 2002)............................19

*United States* v. *$1,879,991.64 Previously Contained in Sberbank of Russia's Interbank*, No. 2:15-6442 (WJM), 2016 WL 2651424 (D.N.J. May 10, 2016) ........................................33

*United States* v. *Adegbite*, 846 F.2d 834 (2d Cir. 1988).............................................53

*United States* v. *Al Kassar*, 660 F. 3d 108 (2d Cir. 2011) ...........................................22

*United States* v. *Alfonso*, 143 F.3d 772 (2d Cir.1998)...................................................8

*United States* v. *All Funds on Deposit in United Bank of Switzerland*, No. 01 Civ. 2091 (JSR), 2003 WL 56999 (S.D.N.Y. Jan. 7, 2003) ......................................11, 16, 17, 24

*United States* v. *Arnold*, 533 F.3d 1003 (9th Cir. 2008)..............................................49

*United States* v. *Awada*, 425 F.3d 522 (8th Cir. 2005)................................................41

*United States* v. *Ballistrea*, 101 F.3d 827 (2d Cir.1996) ..............................................42

*United States* v. *Banki*, 685 F.3d 99 (2d Cir. 2012).....................................11, 16, 17, 20

*United States* v. *Barrett*, 178 F.3d 643 (2d Cir. 1999)................................................34

*United States* v. *Bengivenga,* 845 F.2d 593 (5th Cir. 1988) .........................................51

*United States* v. *bin Laden*, 92 F. Supp. 2d 189 (S.D.N.Y. 2000) ..................................21

*United States* v. *Binday*, 804 F.3d 558 (2d Cir. 2015)................................................31

*United States* v. *BNP Paribas*, No. 14 Cr. 460 (LGS) (S.D.N.Y.) ...............................24

*United States* v. *Bouchard*, No. 14-4156-CR, 2016 WL 3632591 (2d Cir. July 7, 2016).............25

*United States* v. *Bowman*, 260 U.S. 94 (1922) ..................................................19, 44

*United States* v. *Briggs*, 939 F.2d 222 (5th Cir. 1991) ................................................30

*United States* v. *Briggs*, 965 F.2d 10 (5th Cir. 1992) .................................................31

*United States* v. *Burnett*, 10 F.3d 74 (2d Cir. 1993) ..................................................30

*United States* v. *Caldwell*, 989 F.2d 1056 (9th Cir. 1993)...........................................42

*United States* v. *Carmona*, 873 F.2d 569 (2d Cir. 1989)............................................54

*United States* v. *Coplan*, 703 F.3d 46 (2d Cir. 2012) ................................................42

*United States* v. *Coscia*, No. 14-20-DLB-EBA-5, 2016 WL 2990511 (E.D.Ky. May 10, 2016) .40

*United States* v. *Crisci*, 273 F.3d 235 (2d Cir. 2001) ............................................25, 36

*United States* v. *Culotta*, 413 F.2d 1343 (2d Cir.1969) ..............................................45

*United States* v. *Curcio*, 712 F.2d 1532 (2d Cir. 1983)..............................................23

*United States* v. *Dayan*, No. 03 Cr. 1471, 2005 WL 757250 (S.D.N.Y. Apr. 4, 2005)................30

**Cases (cont'd)**

*United States* v. *DeSumma*, 272 F.3d 176 (3d Cir. 2001)...............................................................51

*United States* v. *DiNome*, 86 F.3d 277 (2d Cir. 1996)....................................................................31

*United States* v. *Djibo*, 151 F. Supp. 3d 297 (E.D.N.Y. 2015)...........................................49, 52, 53

*United States* v. *Elie*, 111 F.3d 1135 (4th Cir. 1997)......................................................................51

*United States* v. *Epskamp*, No. 15-2028-CR (2d Cir. Aug. 5, 2016).......................................20, 21

*United States* v. *FNU LNU*, 653 F.3d 144 (2d Cir. 2011) ...........................................................46, 47

*United States* v. *Garcia*, No. 96 CR. 115 (RPP), 1996 WL 544233 (S.D.N.Y. Sept. 25, 1996)...54

*United States* v. *Gaston*, 357 F.3d 77 (D.C. Cir. 2004) .................................................................54

*United States* v. *Gatlin,* 216 F.3d 207 (2d Cir. 2000)....................................................................44

*United States* v. *Gotchis*, 803 F.2d 74 (2d Cir. 1986)....................................................................54

*United States* v. *Goudarzi*, No. 12 Cr. 830 (PKC) (S.D.N.Y.) .....................................................24

*United States* v. *Harder,* No. CR 15-1, 2016 WL 807942 (E.D. Pa. Mar. 2, 2016)....................40

*United States* v. *Henry*, 325 F.3d 93 (2d Cir. 2003) ......................................................................37

*United States* v. *Homa Int'l Tr. Corp.*, 387 F.3d 144 (2d Cir. 2004) ...............................11, 16, 20

*United States* v. *Irving*, 452 F.3d 110 (2d Cir. 2006) .....................................................................47

*United States* v. *Irving*, No. S3 03 Cr. 633 (LAK), 2003 WL 22127913
(S.D.N.Y. Sept. 15, 2003).............................................................................................................48

*United States* v. *Isiofia*, No. 02 CR. 520 (HB), 2003 WL 21018853 (S.D.N.Y. May 5, 2003) ....54

*United States* v. *Johnson*, 971 F.2d 562 (10th Cir. 1992)..............................................................41

*United States* v. *Klein*, 247 F.2d 908 (2d Cir. 1957) ......................................................................42

*United States* v. *Krasinski*, 545 F.3d 546 (7th Cir. 2008)..............................................................40

*United States* v. *Laljie*, 184 F.3d 180 (2d Cir. 1999).....................................................................34

*United States* v. *LaSpina*, 299 F.3d 165 (2d Cir. 2002)...................................................................8

*United States* v. *Linarez-Delgado*, 259 Fed. App'x 506 (3d Cir. 2007)........................................49

*United States* v. *Londono-Villa*, 930 F.2d 994 (2d Cir. 1991)........................................................22

*United States* v. *Mancuso*, 428 F. App'x 73 (2d Cir. 2011) ...........................................................43

*United States* v. *Martinez-Fuerte*, 428 U.S. 543 (1976)................................................................46

*United States* v. *McCarthy,* 271 F.3d 387 (2d Cir. 2001)...............................................................41

*United States* v. *Miller*, 70 F.3d 1353 (D.C. Cir. 1995)............................................................30, 36

*United States* v. *Montoya de Hernandez,* 473 U.S. 531 (1985).....................................................46

*United States* v. *Moreland*, 622 F.3d 1147 (9th Cir. 2010) ...........................................................40

**Cases (cont'd)**

*United States* v. *Morgenstern*, 933 F.2d 1108 (2d Cir. 1991) ...........................................28, 29, 35

*United States* v. *Moya*, 74 F.3d 1117 (11th Cir. 1996)....................................................................48

*United States* v. *Nazemzadeh*, No. 11 CR 5726 L, 2014 WL 310460 (S.D. Cal. Jan. 28, 2014) ..40

*United States* v. *Nersesian*, 824 F.2d 1294 (2d Cir. 1987) .......................................................42, 43

*United States v. Nkansah*, 699 F.3d 743 (2d Cir. 2012) ...............................................................31

*United States* v. *O'Connor*, 158 F. Supp. 2d 697 (E.D. Va. 2001)................................................40

*United States* v. *Orozco-Prada*, 732 F.2d 1076 (2d Cir. 1984)....................................................22

*United States* v. *Parsa*, 14 Cr. 710 (RA) (S.D.N.Y).....................................................................24

*United States* v. *Patane*, 542 U.S. 630 (2004) ...............................................................................51

*United States* v. *Payton*, 159 F. 3d 49 (2d Cir. 1999)....................................................................38

*United States* v. *Piervinanzi*, 23 F.3d 670 (2d Cir. 1994)........................................................39, 40

*United States* v. *Pirro*, 212 F.3d 86 (2d Cir. 2000) .........................................................................7

*United States* v. *Post*, No. 08 Cr. 243 (KMK), 2013 WL 2934229 (S.D.N.Y. June 3, 2013).........7

*United States* v. *Ragosta*, 970 F.2d 1085 (2d Cir. 1992)..............................................................38

*United States* v. *Rossomando*, 144 F.3d 197 (2d Cir. 1998)....................................................31, 32

*United States* v. *Roy*, 783 F.3d 418 (2d Cir. 2015)26

*United States* v. *Rudaj*, No. 04 Cr. 1110 (DLC), 2006 WL 1876664 (S.D.N.Y. July 5, 2006).....26

*United States* v. *Salemo*, 499 F. App'x 110 (2d Cir. 2012) ..........................................................26

*United States* v. *Santos*, 553 U.S. 507 (2008).............................................................................39

*United States* v. *Sarvestani*, No. 13 Cr. 214 (PGG) (S.D.N.Y.) ..................................................24

*United States* v. *Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015)8, 13

*United States* v. *Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ....................................................26, 35

*United States* v. *Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489 (S.D.N.Y. Dec. 3, 2013) .7

*United States* v. *Trejo*, 610 F.3d 308 (5th Cir. 2010) ...................................................................41

*United States* v. *Velastegui*, 199 F.3d 590 (2d Cir. 1999) ..........................................................27

*United States* v. *Vilar*, 729 F.3d 62 (2d Cir. 2013).......................................................................20

*United States* v. *Villanueva*, 32 F. Supp. 2d 635 (S.D.N.Y. 1998)...............................................53

*United States* v. *Washington*, No. 12 Cr. 146 (JPO), 2012 WL 5438909
    (S.D.N.Y. Nov. 7, 2012) ........................................................................................................45

*United States* v. *Wilson*, 100 F. Supp. 3d 268 (E.D.N.Y. 2015)...................................................48

*United States* v. *Young*, 952 F.2d 1252 (10th Cir. 1991)........................................................30, 36

**Cases (cont'd)**

*United States* v. *Young*, No. 12 Cr. 210 (RJA-JJM), 2013 WL 885288 (W.D.N.Y. Jan. 16, 2013) ........................................................................49

*United States* v. *Yousef*, 327 F.3d 56 (2d Cir. 2003) ................................19, 20

*W. 79th St. Corp.* v. *Congregation Kahl Minchas Chinuch*, No. 03 Civ. 8606 (RWS), 2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004) ........................................................40

*Williams* v. *United States*, 458 U.S. 279 (1972) ........................................31

**Statutes**

18 U.S.C. § 371 ................................................................................ *passim*

18 U.S.C. § 922 ........................................................................................38

18 U.S.C. § 981 ........................................................................................34

18 U.S.C. § 1114 ......................................................................................22

18 U.S.C. § 1344 ............................................................................. *passim*

18 U.S.C. § 1349 ............................................................................. *passim*

18 U.S.C. § 1956 ............................................................................. *passim*

21 U.S.C. § 841 ........................................................................................22

21 U.S.C. § 846 ........................................................................................22

21 U.S.C. § 952 ........................................................................................22

21 U.S.C. § 959 ........................................................................................21

21 U.S.C. § 963 ........................................................................................22

50 U.S.C. § 1701 .........................................................................8, 20, 44

50 U.S.C. § 1702 ...............................................................................8, 20

50 U.S.C. § 1705 ............................................................................. *passim*

**Regulations**

31 C.F.R. § 560.202 ..................................................................................6

31 C.F.R. § 560.203 .......................................................................6, 11, 33

31 C.F.R. § 560.204 .........................................................................6, 9, 11

31 C.F.R. § 560.205 ..................................................................................6

31 C.F.R. § 561.205 ..................................................................................6

31 C.F.R. § 560.314 ............................................................................9, 10

31 C.F.R. § 560.410(a) ............................................................................10

31 C.F.R. § 560.516 ................................................................................10

**Rules**

Fed. R. Crim. P. 7(c) ........................................................................................7

**Other Sources**

*Dollar Dominance Intact as U.S. Fines on Banks Raise Ire*, July 16, 2014, *available at* http://www.bloomberg.com/news/articles/2014-07-15/dollar-dominance-intact-as-u-s-fines-on-banks-raise-ire. .........................................................................13

44 Fed. Reg. 65729 (Nov. 14, 1979) ...........................................................9

52 Fed. Reg. 41940 (Oct. 30, 1987) ............................................................9

60 Fed. Reg. 14615 (Mar. 17, 1995) ...........................................................8

60 Fed. Reg. 47069 (Sept. 11, 1995) ...................................................10, 16

73 Fed. Reg. 66541 (Nov. 10, 2008) .................................................. *passim*

81 Fed. Reg. 12793 (Mar. 9, 2016) ..............................................................9

https://www.justice.gov/opa/pr/bnp-paribas-agrees-plead-guilty-and-pay-89-billion-illegally-processing-financial ...............................................................32

https://www.justice.gov/opa/pr/hsbc-holdings-plc-and-hsbc-bank-usa-na-admit-anti-money-laundering-and-sanctions-violations .............................................32

https://www.treasury.gov/resource-center/sanctions/CivPen/Documents/20160802_humana_fov.pdf. ........................................................................33

https://www.treasury.gov/resource-center/sanctions/CivPen/Documents/20160316_MasterCard.pdf ...........................................................................33

OFAC, *Frequently Asked Questions Relating to the Lifting of Certain U.S. Sanctions Under the Joint Comprehensive Plan of Action (JCPOA) on Implementation Day*, at 4 (last updated June 8, 2016) (*available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/jcpoa_faqs.pdf) ......................................................12

OFAC, *The Use of Exchange Houses and Trading Companies to Evade U.S. Economic Sanctions Against Iran* (Jan. 10, 2013) (*available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/20130110_iran_advisory_exchange_house.pdf) ............24

U.S. DEPT. OF THE TREASURY, *Testimony of Acting Under Secretary for Terrorism and Financial Intelligence Adam J. Szubin before the House Committee on Foreign Affairs* (May 25, 2016) (*available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0466.aspx) ...................................................................12

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Reza Zarrab's motions (1) to dismiss the superseding indictment, S1 15 Cr. 867 (RMB) (the "Indictment" or "Ind.") ("Mot. Dismiss"), and (2) to suppress the results of a search of his cellular telephone pursuant to a search warrant and certain statements Zarrab made during his arrest processing ("Mot. Suppress").

Zarrab's motion to dismiss the Indictment reflects a fundamental mischaracterization of both the Indictment and the law. Zarrab is charged with criminal offenses arising from his scheme to cause United States banks unwittingly to conduct financial transfers on behalf of and for the benefit of Iranian entities, including Iranian government-owned companies. The Indictment alleges, and the trial evidence will prove, that Zarrab engaged in this scheme knowingly and willfully—that is, aware that his conduct violated the requirements of the law. Indeed, one of the overt acts alleged in the Indictment is a draft letter emailed to Zarrab and prepared for his signature, which amply shows Zarrab's awareness of U.S. national security controls on trade with Iran, and his eagerness to assist the Government of Iran in violating them—or, as Zarrab put it, combating "the sanctions" in support of "Economic Jihad":

> The role that the Supreme Leader [the Ayatollah Khamenei] and the esteemed officials and employees of Markazi Bank [the Central Bank of Iran] play against the sanctions, wisely neutralizes the sanctions and even turns them into opportunities by using specialized methods.  It is no secret that the trend is moving towards intensifying and increasing the sanctions, and since the wise leader of the Islamic Revolution of Iran has announced this to be the year of the Economic Jihad, the Zarrab family, which has had half a century of experience in foreign exchange, while establishing branches in Turkey, United Arab Emirates, Russia, and Azerbaijan, considers it to be our national and moral duty to declare our willingness to participate in any kind of cooperation in order to implement monetary and foreign exchange anti-sanction policies . . . .

> Hoping that the efforts and cooperation of the zealous children of Islamic Iran will result in an upward increase in the progress of our dear nation in all international and financial arenas.

(Ind. ¶ 14(i)).

Zarrab is not charged with offenses arising out of "incidental" use of the United States banking system in connection with legitimate foreign business, as his motion wrongly contends (*see, e.g.*, Mot. Dismiss at 2, 3). To the contrary, Zarrab's and his co-conspirators' use of the U.S. financial system to process U.S.-dollar transactions for Iranian banks and entities, including companies and entities owned by the Government of Iran and listed on the U.S. Department of the Treasury's Office of Foreign Assets Control's ("OFAC") list of Specially Designated Nationals ("SDNs"), was knowing and intentional. Zarrab was aware that U.S. banks would not knowingly and voluntarily process his U.S.-dollar financial transfers if they learned that the transactions were for the benefit of blocked Iranian entities. Indeed, the Indictment alleges that on at least two occasions, Zarrab was alerted that U.S. banks blocked his transactions when the banks discovered that the transfers violated OFAC regulations (Ind. ¶ 14(f), (h)), and after the banks blocked these transactions, Zarrab continued to engage in similar unlawful transactions (Ind. ¶ 14(j)-(m)). Evading these regulations, and inducing U.S. banks to unwittingly process the transactions in violation of the national security controls, was the very purpose of the scheme. Put simply, without Zarrab and his network of exchange houses and front companies to secretly conduct sanctions-evading international financial transfers, Zarrab's Iranian co-conspirators would have been excluded from access to the U.S. financial system and the ability to engage in U.S. dollar transactions through U.S. correspondent banks. Zarrab's charged conduct goes to the heart of what U.S. sanctions laws are intended to prohibit.

Accordingly, Zarrab's contention that the Indictment represents an unwarranted "extraterritorial" application of United States laws is wrong for at least two reasons. First, the charges in the Indictment are not being applied extraterritorially—Zarrab and his co-conspirators, though themselves physically located outside the United States, intentionally caused effects inside U.S. borders in violation of the criminal statutes. Second, even if the fact that Zarrab's and his co-conspirators' decision to target the U.S. banking system was hatched overseas were enough to make the application of the law to them "extraterritorial," the International Emergency Economic Powers Act ("IEEPA") falls clearly within a class of criminal statutes that have long been held exempt from any presumption against extraterritoriality. And, in fact, the IEEPA—a law enacted to combat foreign threats—is a statute that clearly contemplates extraterritorial application to protect the national security of the United States.  Similarly, the other violations of federal law that the defendant challenges on this ground—namely conspiracy to commit bank fraud (Count Three) and conspiracy to defraud the United States (Count One)—specifically allege that the criminal conduct was directed toward, and directly harmed, U.S.-based victims.

Nor is there anything unprecedented or problematic about the Indictment. Not only is it well settled that there is no presumption against the extraterritorial enforcement of criminal statutes that protect the Government, but foreign nationals have been charged in this District and others with criminal violations of national security controls. What arguably is unprecedented about this case is the scope, complexity, and reach of the defendant's own unlawful scheme, and his level of access to both Iranian and Turkish government officials and to banks to arrange and facilitate that scheme. And what certainly is unprecedented is Zarrab's novel proposition that the United States is not entitled to prosecute those who willfully seek to exploit the American

3

financial system to help a nation that, through its sponsorship of terrorism and fomenting of global unrest, presents a significant threat to this country's national security.

Zarrab's assertion that the bank fraud conspiracy alleged in Count Three of the Indictment should be dismissed is similarly meritless. Contrary to Zarrab's claim, the Indictment properly alleges the elements of the offense, which should be the end of the inquiry at the motion to dismiss stage. The Indictment spells out that Zarrab and his co-conspirators made misrepresentations to U.S. banks by concealing the true beneficiaries of these transactions, which is the type of implicit misrepresentation that courts have held sufficiently supports a bank fraud prosecution. Moreover, by withholding this information from the banks, Zarrab and his co-conspirators robbed the banks of critical information that they needed to make economic decisions that could have dire consequences, a harm cognizable under the bank fraud statute. Finally, Zarrab's contention that he and his cohorts did not conspire to "obtain" property is defeated by the black letter law of conspiracy, the facts, and common sense.

With respect to Zarrab's challenges to the money laundering conspiracy charged in Count Four and the conspiracy to defraud the United States charged in Count One, those arguments can also be summarily dismissed based on settled law. Zarrab argues that the money laundering count should be dismissed because it impermissibly "merges" with the predicate offenses, specifically the IEEPA and bank fraud conspiracies. But, as courts have repeatedly held, a so-called "merger" problem only exists when the Government charges a different provision of the money laundering statute that involves the "proceeds" of specified unlawful activity; not when, as here, the defendant is charged with the part of the statute that prohibits international financial transfers intended to promote criminal activity. As for Count One, that count charges a straightforward conspiracy to defraud the United States (*i.e.*, OFAC) and impede its function by

deceptively withholding critical information, criminal conduct that has long been cognizable in the Second Circuit under Title 18, United States Code, Section 371.

Zarrab's motion to suppress similarly fails as a matter of law. While Zarrab claims that his *Miranda* rights were violated when he was asked for the passcode for his cellphone by Customs and Border Patrol ("CBP") officers, that inquiry did not come in the context of a custodial interrogation, rendering *Miranda* and its progeny inapplicable. Moreover, the search of the phone was conducted pursuant to a search warrant based on independent probable cause and is not, as a matter of law, fruits of the purported *Miranda* violation. Similarly, Zarrab's claim that he was improperly asked certain questions after invoking his right to an attorney is without merit because, as has long been recognized, routine booking questions associated with processing a defendant are not subject to *Miranda*. Zarrab's motion to suppress thus should be denied in its entirety without a hearing.

## **BACKGROUND**

### A.      The Indictment

On or about March 30, 2016, a grand jury sitting in this District returned the Indictment, which charges Zarrab, along with co-defendants Hossein Najafzadeh and Camelia Jamshidy, who remain at large, with: (i) conspiring to defraud the United States, in violation of Title 18, United States Code, Section 371; (ii) conspiring to violate the IEEPA and the Iranian Transactions and Sanctions Regulations ("ITSR"), in violation of Title 50, United States Code, Section 1705 and Title 31, Code of Federal Regulations, Sections 560.202, 560.203, 560.204, 560.205, and 561.205; (iii) conspiring to commit bank fraud, in violation of Title 18, United

States Code, Section 1349; and (iv) conspiring to commit money laundering, in violation of Title

18, United States Code, Section 1956.[1]

As alleged in the Indictment, Zarrab owned and operated a network of companies located

in Turkey and in the United Arab Emirates, including a group of companies under Royal Holding

A.S. ("Royal Holding"), a holding company in Turkey; Durak Doviz Exchange, a money

services business in Turkey; and Al Nafees Exchange LLC ("Al Nafees Exchange"), a money

services business in the United Arab Emirates. (Ind. ¶ 9). Zarrab used this network of companies,

along with other entities and banks located in Turkey and the United Arab Emirates, to conduct

international financial transactions, including U.S.-dollar denominated transactions, on behalf of

or for the benefit of Iranian entities, including entities owned or controlled by the Government of

Iran and entities affiliated with the Islamic Revolutionary Guard Corps ("IRGC"), such as Bank

Mellat (a Government-owned Iranian bank), the National Iranian Oil Company ("NIOC")

(identified at the time by OFAC as an affiliate of the IRGC), and various entities owned or

controlled by NIOC. (Ind. ¶¶ 6-8, 12).

**B.      Zarrab's Arrest**

On March 19, 2016, Zarrab flew into Miami, Florida from Turkey. After landing, he

entered Customs, where he declared that he was carrying more than $100,000 in U.S. currency.

Zarrab was then directed by CBP officers to secondary processing and was briefly interviewed

by CBP officers. During the interview, Zarrab was asked, among other things, for the passcode

for his Apple iPhone, which he was carrying, and Zarrab provided the passcode without

objection. Zarrab was then taken into another room, where he was met by two agents of the

---

[1] An underlying indictment, charging the same offenses but containing different venue
allegations, was filed under seal on December 15, 2015. The Indictment alleges venue based on
acts occurring or caused in the Southern District of New York.

6

Federal Bureau of Investigation (the "FBI") and placed under arrest. The arresting agents then took Zarrab to another CBP room, where two other FBI agents advised Zarrab of his *Miranda* rights. After making several voluntary statements, Zarrab ultimately invoked his right to an attorney, and the interview was terminated.

After Zarrab invoked his *Miranda* rights, the FBI transported him to a processing facility. While there, FBI agents asked him routine processing questions, including questions about his family, his residences, and his assets.

## DISCUSSION

### I.      The Motion to Dismiss Should be Denied

"A criminal defendant is entitled to an indictment that states the essential elements of the charge against him." *United States* v. *Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) (citing *Jones* v. *United States*, 526 U.S. 227, 232 (1999); *Hamling* v. *United States*, 418 U.S. 87, 117 (1974); Fed. R. Crim. P. 7(c)). "A defendant faces a 'high standard' in seeking to dismiss an indictment." *United States* v. *Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489, at *6 (S.D.N.Y. Dec. 3, 2013) (quoting *United States* v. *Post*, No. 08 Cr. 243 (KMK), 2013 WL 2934229, at *5 (S.D.N.Y. June 3, 2013)). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117. "An indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States* v. *LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (internal quotation marks omitted).

"[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States* v. *Alfonso*, 143 F.3d 772, 777 (2d Cir.1998).  Accordingly,

"[i]n reviewing a motion to dismiss an indictment, the Court must take the allegations of the indictment as true." *United States* v. *Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, at *2 (S.D.N.Y. Oct. 20, 2015) (citing *Boyce Motor Lines* v. *United States*, 342 U.S. 337, 343 n.16 (1952)).

**A.      The Motion to Dismiss the IEEPA Conspiracy Charge (Count Two) Should Be Denied**

The IEEPA authorizes the president to deal with "unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats, 50 U.S.C. § 1701(a), and to take steps to address such threats, including the authority (among other things) to investigate, regulate, or prohibit "any transactions in foreign exchange," "transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof," and "the importing or exporting of currency or securities" "by any person, or with respect to any property, subject to the jurisdiction of the United States," 50 U.S.C. § 1702(a)(1)(A).

**1.  Background and Statutory Framework**

On March 15, 1995, President Clinton found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States[.]"  Exec. Order No. 12957, 60 Fed. Reg. 14615 (Mar. 17, 1995).[2] On two other occasions in 1995 and 1997, President Clinton again

---

[2] The president has repeatedly declared such a national emergency with respect to the Government of Iran, beginning with Executive Order No. 12170, issued on November 14, 1979. President Carter found, in response to the Islamic Revolution in Iran and the takeover of the American Embassy in Tehran, that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat." Exec. Order 12170, 44 Fed. Reg. 65729 (Nov. 14,

found that the actions and policies of the Government of Iran constituted a threat to the national security, foreign policy, and economy of the United States. *See* Exec. Orders 12959 (May 6, 1995) and 13059 (Aug. 19, 1997).[3] Every president since President Clinton has continued the national emergency with respect to Iran and Executive Orders 13059, 12959, and 12957, given that the actions and policies of Iran continue to threaten the national security, foreign policy, and economy of the United States. The most recent continuation of this national emergency was on March 9, 2016, by President Obama. *See* 81 Fed. Reg. 12793 (Mar. 9, 2016).

Pursuant to these authorities, the Secretary of the Treasury promulgated the ITSR, Title 31, Code of Federal Regulations, Part 560, implementing the sanctions imposed by the Executive Orders. Section 560.204 prohibits, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. person,[4] of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from OFAC. A "service" performed in the United States or by a U.S. person is

---

1979). In 1987, President Reagan found "that the Government of Iran is actively supporting terrorism as an instrument of state policy" and "has conducted aggressive and unlawful military action against U.S.-flag vessels and merchant vessels of other non-belligerent nations engaged in lawful and peaceful commerce in international waters of the Persian Gulf and territorial waters of non-belligerent nations of that region." Exec. Order 12613, 52 Fed. Reg. 41940 (Oct. 30, 1987).

[3] In this continuation, President Obama noted that, despite the Joint Comprehensive Plan of Action ("JCPOA") entered into amongst the United States, other nations, and Iran concerning Iran's nuclear program, "certain actions and policies of the Government of Iran continue to pose an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." 81 Fed. Reg. 12793 (Mar. 9, 2016).

[4] A U.S. person is "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States." 31 C.F.R. § 560.314.

9

exported or supplied to Iran if the services are performed on behalf of a person in Iran or the Government of Iran, or where the benefit of such services is received in Iran. 31 C.F.R. § 560.410(a). The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR. 31 C.F.R. § 560.203. The IEEPA makes it a crime for any person to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation or prohibition issued under that Act, including the ITSR. 50 U.S.C. § 1705(a), (c).

In 1995, OFAC adopted a general license for U.S. banks—which are "U.S. persons" under the ITSR, *see* 31 C.F.R. § 560.314—to conduct certain correspondent account transactions that were for the direct or indirect benefit of persons in Iran or the Government of Iran, so long as neither the originating bank nor the beneficiary bank was Iranian. *See* 60 Fed. Reg. 47069 (Sept. 11, 1995) (previously codified at 31 C.F.R. § 560.516). This license was commonly known as the "U-turn license" because it authorized U.S. banks to participate in certain funds transfers between foreign originators and foreign beneficiaries that would otherwise have violated the ITSR. OFAC revoked the U-turn license in 2008 because of "the need to further protect the U.S. financial system from the threat of illicit finance posed by Iran and its banks." 73 Fed. Reg. 66541 (Nov. 10, 2008). The effect of terminating the license was "precluding transfers designed to dollarize transactions through the U.S. financial system for the direct or indirect benefit of Iranian banks or other persons in Iran or the Government of Iran." *Id.* In other words, revocation of the U-turn license was intended to sanction the very conduct in which Zarrab and his co-conspirators are alleged to have engaged.

### 2. The Indictment Sufficiently Alleges a Conspiracy to Violate the IEEPA.

Count Two of the Indictment charges Zarrab with participating in a conspiracy to violate the IEEPA and the ITSR by exporting, re-exporting, selling, and supplying international financial transactional services from the United States directly or indirectly to Iran and the Government of Iran in violation of Section 204 of the ITSR, and by engaging in transactions that evaded or avoided, had the purpose of evading or avoiding, caused violations of, and attempted to violate the ITSR in violation of Section 203. Zarrab and his co-conspirators criminally violated the IEEPA under Title 50, United States Code, Section 1705 because they willfully conspired to violate and to cause a violation of these ITSR provisions. The Indictment properly alleges the essential elements of these offenses, and the IEEPA and the ITSR apply by their plain language to the alleged offenses.

The execution of bank transactions is a "service" under the ITSR. *See United States* v. *Banki*, 685 F.3d 99, 108 (2d Cir. 2012) ("[T]he execution of money transfers from the United States to Iran on behalf of another, whether or not performed for a fee, constitutes the exportation of a service."); *United States* v. *Homa Int'l Tr. Corp.*, 387 F.3d 144, 145-46 (2d Cir. 2004) (executing financial transfers from the U.S. to Iran constitutes an exportation of a service); *United States* v. *All Funds on Deposit in United Bank of Switzerland*, No. 01 Civ. 2091 (JSR), 2003 WL 56999, at *2 (S.D.N.Y. Jan. 7, 2003) ("*UBS*") ("[O]ffering to exchange a customer's money and deliver it (by whatever method) to a foreign country for a fee is well within the ordinary meaning of supplying a 'service.'"). Because the Indictment alleges that this service involved conduct by U.S. banks in the United States, including correspondent account transactions, it is both a service being supplied by U.S. persons (the banks) and from the United States (the U.S. correspondent account activity). And these transactions are alleged to have been

11

on behalf of, and for the benefit of, Iranian entities and the Government of Iran, and thus were exported or supplied, directly or indirectly, to Iran or the Government of Iran. As such these transactions are prohibited by Section 204 unless authorized by a license from OFAC. Since the "U-turn" license was revoked in 2008, all correspondent account transactions of this type have been banned and continue to be banned. *See* 73 Fed. Reg. 66541; *see also* OFAC, *Frequently Asked Questions Relating to the Lifting of Certain U.S. Sanctions Under the Joint Comprehensive Plan of Action (JCPOA) on Implementation Day*, at 4 (last updated June 8, 2016) (*available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/ jcpoa_faqs.pdf) ("[N]on-U.S. persons continue to be prohibited from knowingly engaging in conduct that seeks to evade U.S. restrictions on transactions or dealings with Iran or that causes the export of goods or services from the United States to Iran."); *id.* at 14 ("The so-called 'U-turn general license'… was not reinstated . . . and U.S. financial institutions continue to be prohibited from clearing transactions involving Iran [except as authorized by OFAC]."); U.S. DEPT. OF THE TREASURY, *Testimony of Acting Under Secretary for Terrorism and Financial Intelligence Adam J. Szubin before the House Committee on Foreign Affairs* (May 25, 2016) (*available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0466.aspx) ("[W]e have not promised, nor do we have any plans, to give Iran access to the U.S. financial system, or to reinstate what's called the 'U-turn' authorization.").

Zarrab and his co-conspirators thus are alleged to have conspired to export and supply these U.S.-dollar-transfer services from the United States directly and indirectly to Iran. (Ind. ¶¶ 15-16). Zarrab and his co-conspirators are also alleged to have conspired to cause U.S. persons—the banks—to supply and export these services directly and indirectly to Iran. (Ind. ¶ 17). Zarrab and his co-conspirators are alleged to have acted willfully—that is, with an intent to

do something the law forbids, either to disobey or disregard the law. (Ind. ¶ 15). The evidence at trial will show that they intentionally caused U.S. banks unwittingly to conduct U.S.-dollar transactions on behalf of and for the benefit of Iranian entities and the Government of Iran, without a license from OFAC.[5] Thus, the Indictment properly alleges a violation of the IEEPA and the ITSR and should not be dismissed.

### 3. Zarrab's Challenges to the Charged IEEPA Conspiracy Are Without Merit

Although the Indictment properly alleges the essential elements of the IEEPA violation charged in Count Two, and the plain language of the statute and regulations apply to Zarrab and his conduct, Zarrab argues that: (i) international financial transactions conducted through U.S. correspondent bank accounts are not exported from the U.S. and do not violate the ITSR (Mot. Dismiss at 10-19); (ii) the IEEPA does not apply extraterritorially (Mot. Dismiss at 20-22); and (iii) the rule of lenity and purported due process concerns compel the Court to interpret the IEEPA in the manner he advances (Mot. Dismiss at 22-25). As discussed more fully below, each of these contentions is without merit because they rely on mischaracterizations of the alleged offense conduct and selective citations to case law and regulatory materials, and are flatly refuted by the plain language of the IEEPA and the ITSR, longstanding regulatory guidance and materials, and binding precedent.

---

[5] The significance of being able to conduct U.S. dollar transactions is clear. The U.S. dollar is the preeminent transactional currency in the global market. "Companies, consumers and central banks around the world prefer the dollar to other currencies . . . because they trust the Federal Reserve and the U.S. government to back it." *Dollar Dominance Intact as U.S. Fines on Banks Raise Ire*, July 16, 2014, *available at* http://www.bloomberg.com/news/articles/2014-07-15/dollar-dominance-intact-as-u-s-fines-on-banks-raise-ire. Almost 90% of foreign exchange transactions, and more than 80% of trade finance transactions, are conducted in U.S. dollars. *Id.*

At bottom, Zarrab's argument is a dogged effort to paint his scheme as the mere conduct of legitimate foreign business, with only "incidental" (or "mere," or "sub-step") involvement of the U.S. financial system. (*See, e.g.*, Mot. Dismiss at 2, 3, 4, 9, 11, 12, 17, 20). But on a motion to dismiss, where the Court "must take the allegations of the indictment as true," *Skelos*, 2015 WL 6159326, at *2, Zarrab's efforts to alter the nature of the charges against him must fail. Zarrab is not charged with conducting foreign business transactions with merely incidental involvement of the U.S. financial system, he is charged with knowingly and willfully conspiring to export and supply services from the United States, and to cause U.S. banks to export and supply services from the United States, directly and indirectly to Iran and the Government of Iran, without a license from OFAC. The use of the U.S. financial system was not "incidental" to Zarrab's business; rather, allowing Iran secretly to access the U.S. financial system, in violation of sanctions, was the very purpose of the scheme.

This is made clear in the Indictment. As alleged, Zarrab and his co-conspirators designed layered transactions using intermediary shell companies in third countries and stripping Iran-revealing information from payment instructions that would be provided to the U.S. banks. (*See, e.g.*, Ind. ¶¶ 12, 14(a)-(b) (omitting information from transfer instructions that payment was made for the benefit of an Iranian company), (c)-(h),  (j)-(m)). As alleged, Zarrab worked with Iranian banks and Iranian government-owned agencies identified at the time as SDNs because of their ownership by the Government of Iran, connections to weapons of mass destruction proliferation, and support for the IRGC. (*See, e.g.*, Ind. ¶¶ 8-10, 12, 14). As alleged, Zarrab knew that U.S. banks would block his transactions if the Iranian nexus were revealed and, in fact, sometimes the banks did block his transactions. (*See, e.g.*, Ind. ¶ 14(f), (h)). And, as alleged, Zarrab continued to engage in similar unlawful transactions after the U.S. banks had blocked

14

others. (*See, e.g.*, Ind. ¶¶ 14(j)-(m)). As also alleged, Zarrab received a draft letter via email for

his signature offering his assistance to the Government of Iran in the year of "Economic Jihad"

to "neutraliz[e] the sanctions." (Ind. ¶ 14(i)). Zarrab's contention that the United States sanctions

laws are impotent to proscribe and punish this conduct is utterly inconsistent with the purpose of

the IEEPA and the ITSR to protect and defend the United States' national security, foreign

policy, and economy from threats from a foreign power and is thoroughly defeated by the plain

terms of the statute and regulations. Far from it, this is exactly the type of conduct that the

IEEPA and the ITSR intended to prohibit, and conduct that would make U.S. sanctions laws

largely meaningless if they could not reach it.

### a.   The Indictment Alleges the Export and Supply of Services by U.S. Persons and from the United States

Zarrab's first contention is that Count Two does not allege that Zarrab exported money

from the United States, but rather alleges that he exported money from one foreign country to

another. (Mot. Dismiss at 11-15). Zarrab likens his international financial transfers to a motorist

driving a car from New York to Florida, arguing that the car is "exported" from New York but is

not exported from any intervening state along the highway. (Mot. Dismiss at 13). Zarrab further

argues that he did not have direct contact with the United States or the U.S. banks, but only

indirect involvement through his overseas banks. (Mot. Dismiss at 12, 16). Again, Zarrab's

contentions are premised on an inaccurate description of the charges, the alleged offense

conduct, and case law in this Circuit.

Simply put, Zarrab's motion poses the wrong question. The question is not from where

the funds originated, nor even whether funds can be considered "exported" from more than one

country if they are transferred from bank to bank as part of a multi-jurisdictional international

transfer. The question is whether services were exported or supplied (whether directly or

indirectly) from the United States, or by a U.S. person, to Iran.[6] And, as discussed above, there is no doubt that a financial transaction in which a U.S. bank sends funds overseas is a "service" that is exported or supplied from the United States or by a U.S. person. *Banki*, 685 F.3d at 108; *Homa*, 387 F.3d at 146; *UBS*, 2003 WL 56999, at *2. This is true regardless of whether the request to send the funds overseas arose from outside the United States or as part of a larger financial transaction. In *Banki*, for example, the financial transfers at issue were initiated in Iran by requests to transfer funds; an Iranian hawaladar then arranged for a U.S.-based individual to transfer dollars to the defendant's U.S. account while also arranging an offsetting transfer of funds outside the United States. *See Banki*, 685 F.3d at 103-04. While the Second Circuit found that the district court's jury instructions about the general license for family remittances were incorrect, the court held that the transfers at issue constituted the export of a service within the scope of the ITSR. *Id.* In *UBS*, a foreign currency exchange company directed a U.S. bank, where the exchange company held an account, to conduct financial transfers on the exchange company's behalf as part of a currency exchange transaction overseas. 2003 WL 56999, at *1, *2. Judge Rakoff held that this conduct violated the ITSR. *See id.* Both cases involved international financial transactions, parts of which occurred in the United States and parts of which occurred abroad, and in both cases the court held that the transactions were the export or supply of services from the United States.

---

[6] Zarrab's analogy of international financial transfers being akin to driving money along a banking superhighway from Point A to Point B is not only legally irrelevant, but also factually inapt. Money does not move like a car along a highway. International financial transfers are accomplished by a chain of communications and account transactions between multiple actors, each of which must engage in affirmative conduct to receive, complete, and confirm a portion of the transaction. Without each of those steps, the transaction fails. This is particularly true with regard to transactions such as those alleged in the Indictment, a principal object of which is to complete the transaction with U.S. dollars held in a correspondent account.

Indeed, as described *supra*, for more than a decade OFAC adopted a general license explicitly for the purpose of allowing banking services to be exported or supplied from the United States and by U.S. banks as part of U-turn transactions, where the financial transfers were both initiated and completed abroad. 60 Fed. Reg. 47069 (Sept. 11, 1995) (previously codified at 31 C.F.R. § 560.516). However, in 2008 (*i.e.*, prior to the commencement of the conspiracy in which Zarrab is charged), that general license was unambiguously revoked, and OFAC publicly made clear that these very transactions were once again unlawful. *See* 73 Fed. Reg. 66541.

Zarrab and his co-conspirators conspired to cause the export or supply of these financial services from the United States, and thus are properly charged under Section 1705(b) with a conspiracy to violate or cause a violation of Section 204. Zarrab argues that he cannot have "exported" money (*viz.*, services)[7] from the United States because he did not have direct communication with the U.S. or the U.S. banks (Mot. Dismiss at 14), but points to no case law or statutory language that requires such direct communication. Zarrab concedes, as he must, that a foreign person can export or supply services from the United States, as the foreign currency exchange in *UBS* did when it exported financial services from the United States as part of its international currency exchange transactions. (*Id.*); *accord UBS*, 2003 WL 56999, at *2. But Zarrab pushes *UBS* too far by attempting to read into that opinion a limitation that direct communication with the U.S. bank by the defendant, or a bank account held in the United States

---

[7] In moving to dismiss the bank fraud count, however, Zarrab argues that charge should be dismissed because the U.S. banks "were called upon only to provide services, *i.e.* to process transfers of funds held by other institutions," and did not part with any property. (Mot. Dismiss at 31 (internal citation and quotation marks omitted)). Thus, Zarrab concedes that the Indictment alleges that U.S. banks were providing a service when they processed these transfers. Because that service was provided to entities overseas, those services were "exported," *see Banki*, 685 F.3d at 103-04, and because those services were for the benefit of sanctioned Iranian entities, they were prohibited by the IEEPA and the ITSR.

in the defendant's name, is a prerequisite to the defendant's export or supply of services from the United States. The case does not so hold, and that court's reasoning extends equally from a currency exchange house that holds its own account in the United States to an exchange house owner (like Zarrab) who uses a bank with its own correspondent account in the United States to accomplish the same purpose. If it were otherwise, U.S. sanctions law could readily be circumvented—without consequence—just by adding a single intermediary to an otherwise prohibited transaction. That is not—and cannot be—the law.

Moreover, even if, *arguendo*, Zarrab were not considered to have personally exported or supplied banking services from the United States, he nonetheless is criminally liable under Section 1705(b) for willfully causing the banks to supply or export those services and under Section 203 for conspiring to cause transactions that evaded or avoided, had the purpose of evading or avoiding, caused a violation of, or attempted to violate the ITSR.

Accordingly, Zarrab's contention that the Indictment does not allege a conspiracy to violate Sections 203 and 204 of the ITSR should be rejected.

> **b.    The Indictment Does Not Violate Any Prohibition Against Extraterritoriality or the Rule of Lenity**

In an effort to escape liability for intentionally orchestrating a scheme to violate and to evade U.S. economic sanctions through international financial transactions conducted through the U.S. financial system on behalf of and for the benefit of Iranian entities and the Government of Iran, Zarrab seeks to paint the Indictment as an unprecedented and unwarranted extraterritorial expansion of U.S. law with dire international implications. (Mot. Dismiss at 16-17, 20-24). Zarrab's arguments here are, again, meritless.

First, the Indictment is not an extraterritorial application of the IEEPA and the ITSR. The fact that Zarrab lived and operated overseas does not mean that applying the IEEPA and the

ITSR to his conduct is "extraterritorial." As discussed above, Zarrab is charged in connection

with his scheme to intentionally export and supply financial services from the United States and

to cause U.S. banks to export and supply financial services—in other words, with causing

conduct and effects in the United States. *See Pasquantino* v. *United States*, 544 U.S. 349, 371

(2005) (The "domestic element of petitioners' conduct is what the Government is punishing in

this prosecution, no less than when it prosecutes a scheme to defraud a foreign individual or

corporation, or a foreign government acting as a market participant."); *see also Torrico* v. *Int'l*

*Bus. Machines Corp.*, 213 F. Supp. 2d 390, 397 (S.D.N.Y. 2002) ("[T]he presumption against

extraterritoriality does not ordinarily apply where 'the failure to extend the scope of the statute to

a foreign setting will result in adverse effects within the United States' or where 'the conduct

regulated by the government occurs within the United States.'" (quoting *Environmental Defense*

*Fund, Inc.* v. *Massey*, 986 F.2d 528, 531 (D.C. Cir. 1993))).

Second, even if the Indictment were considered an extraterritorial application of the

IEEPA and the ITSR, there is no presumption against extraterritoriality here. It is well settled

that "Congress has the authority to 'enforce its laws beyond the territorial boundaries of the

United States.'" *United States* v. *Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) (quoting *EEOC* v.

*Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). Although there is generally a presumption

(subject to rebuttal) that statutes do not apply extraterritorially—both to avoid unnecessary

international discord and because Congress typically is presumed to legislate with domestic

concerns in mind, *see RJR Nabisco* v. *European Community*, 136 S. Ct. 2090, 2100 (2016)—this

presumption "does not apply to those 'criminal statutes which are, as a class, not logically

dependent on their locality for the Government's jurisdiction.'" *Yousef*, 327 F.3d at 86 (quoting

*United States* v. *Bowman*, 260 U.S. 94, 98 (1922)); *see also Bowman*, 260 U.S. at 98 ("[T]o limit

19

their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense."); *see also United States* v. *Vilar*, 729 F.3d 62, 72 (2d Cir. 2013) (The presumption against extraterritoriality does not apply where the law at issue is aimed at "protecting 'the right of the government to defend itself.'").[8] The IEEPA and the ITSR are an exercise of the government's right to defend itself and fall within the class of criminal statutes that are not logically dependent on their locality for the government's jurisdiction. Moreover, the IEEPA and the ITSR are part of Congress's delegation of authority to the president to deal with foreign threats; Congress was not acting, as the presumption against extraterritoriality assumes, with solely domestic concerns in mind, and clearly was concerned principally with U.S. national security rather than international comity. *Cf. United States* v. *Epskamp*, No. 15-2028-CR, slip op. at 22 (2d Cir. Aug. 5, 2016) (holding that a similar jurisdictional provision in 21 U.S.C. § 959(b) "appears calibrated for broad extraterritorial application," even without express words to that effect). Accordingly, the presumption against extraterritoriality applied to the RICO statute, wire fraud statute, and securities statutes is inapplicable here. *RJR Nabisco*, 136 S. Ct. at 2100; *Pasquantino*, 544 U.S. at 371; *Morrison* v. *National Australian Bank Limited*, 561 U.S. 247, 266 (2010).

  Third, even if the presumption against extraterritoriality applied, it would be roundly rebutted here. Where the presumption against extraterritoriality applies, "that presumption can be

---

[8] The Second Circuit's decision in *Vilar* came after the Supreme Court's decisions in *Morrison* and *Kiobel* v. *Royal Dutch Petroleum Company*, 133 S.Ct. 1659 (2013), upon which the defendant relies heavily.

overcome when Congress clearly expresses its intent to do so." *Yousef*, 327 F.3d at 86. To determine whether Congress has "clearly manifested" its intent that a statute apply to extraterritorial conduct, courts should consider not only the language of the statute itself, but "all available evidence about the meaning" of the statute, including its text, structure, and legislative history. *United States* v. *bin Laden*, 92 F. Supp. 2d 189, 193 (S.D.N.Y. 2000) (quoting *Sale* v. *Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 177 (1993)); *see also Epskamp*, slip op. at 25 ("Even assuming for the sake of argument that the text of § 959(b) itself is insufficiently plain to overcome the presumption against extraterritoriality, we conclude that the statutory scheme and the context of the statute overcome the presumption against extraterritoriality."). The extraterritorial focus of the IEEPA is apparent even from the title of the act: Zarrab is charged with violating the *International* Emergency Economic Powers Act. The IEEPA was adopted for the express purpose of allowing the United States to respond to threats—having their source in whole or substantial part *outside* the United States—to its national security, foreign policy, and economy. 50 U.S.C. § 1701(a).  *Cf. Epskamp*, slip op. at 26 (holding that 21 U.S.C. § 959(b)(2) applies extraterritorially even without an explicit extraterritoriality provision because, among other things, reading the statute not to apply globally would "have the peculiar effect of establishing a purely domestic crime within a statute aimed at combatting narcotics smuggling and importation where every other provision applies extraterritorially"). Among the authorities the IEEPA gives to the president are the power to investigate, regulate, or prohibit any transactions in *foreign* exchange and transfers of credit or payments that involve any interest of any *foreign* country or a national thereof. 50 U.S.C. § 1702(a). The ITSR, adopted pursuant to the IEEPA and relevant Executive Orders, is "primarily concerned with a few key actions and policies at the heart of the threat posed by the Iranian government—namely, the proliferation of

21

weapons of mass destruction, state-sponsored terrorist activity, and efforts to frustrate Middle East diplomacy." *Banki*, 685 F.3d at 108 (citing *Homa*, 387 F.3d at 146). "[T]o reform the actions of the government of Iran, Executive Order 12,959 and the ITR adopt a blunt instrument: broad economic sanctions intended to isolate Iran." *Id.*

The extraterritorial intent of the IEEPA and the ITSR is similar to anti-narcotics laws, which contain several provisions with extraterritorial reach, most of which contain no express language to that effect. Title 21, United States Code, Sections 841 and 846, for example, contain no language specifying their extraterritorial application; nevertheless, they prohibit, among other conduct, conspiring to distribute controlled substances in the United States even where no conduct in furtherance of the conspiracy takes place within United States territory. *See*, *e.g.*, *United States* v. *Orozco-Prada*, 732 F.2d 1076, 1087-1088 (2d Cir. 1984) (upholding a conviction under 21 U.S.C. §§ 841(a)(1) and 846 where a vessel loaded with marijuana intended for distribution in the United States was intercepted in Colombian territorial waters). Likewise, 21 U.S.C. §§ 952 and 963, which prohibit importing and conspiring to import a controlled substance into the United States, contain no express extraterritoriality provision, but also apply to conduct outside the United States. *See*, *e.g.*, *United States* v. *Londono-Villa*, 930 F.2d 994 999-1000 (2d Cir. 1991) (recognizing Section 952's extraterritorial reach and interpreting the provision to require that the defendant knew or intended that the narcotics would be imported into the United States); *Chua Han Mow* v. *United States*, 730 F.2d 1308, 1311-12 (9th Cir. 1984) (applying Title 21, United States Code, Sections 846 and 963 to conduct by a Malaysian citizen in Malaysia). Similar to the provisions of the Controlled Substances Act, the IEEPA and the ITSR are properly applied to persons who, though outside the United States, intend to cause prohibited conduct within it. *See also United States* v. *Al Kassar*, 660 F. 3d 108, 118-19 (2d Cir.

2011) (holding that Title 18, United States Code, Section 1114, which prohibits conspiring to kill U.S. officers or employees, applies extraterritorially even though the statute does not contain an express extraterritoriality provision).

Similarly, Zarrab's invocation of the rule of lenity is of no aid. (Mot. Dismiss at 23). The rule of lenity is an interpretive tool of last resort: it is "reserved for cases where, 'after seizing everything from which aid can be derived, the Court is left with an ambiguous statute.'" *DiPierre* v. *United States*, 564 U.S. 70, 88 (2011) (quoting *Smith* v. *United States*, 508 U.S. 223, 239 (1993)). The rule is not a thumb on the scales in favor of the defendant. Indeed, the Supreme Court has repeatedly emphasized that "the mere possibility of articulating a narrower construction . . . does not by itself make the rule of lenity applicable." *Smith*, 508 U.S. at 239; *see also Moskal* v. *United States*, 498 U.S. 103, 108 (1990) ("[W]e have declined to deem a statute 'ambiguous' for purposes of lenity merely because it was *possible* to articulate a construction more narrow than that urged by the Government." (emphasis in original)). The canon applies only if, "after considering text, structure, history and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich* v. *Spears*, 133 S.Ct. 2191, 2209 (2013) (quoting *Barber* v. *Thomas,* 560 U.S. 474, 488 (2010)). There is no ambiguity or uncertainty about the application of the IEEPA and the ITSR and the rule of lenity has no application here.

Finally, Zarrab's attempt to invoke due process to limit the IEEPA and the ITSR fails for similar reasons. Willfulness is an element of the offense, precluding any "fair warning" problem. "The requirement that the act must be willful or purposeful . . . relieve[s] the statute of the objection that it punishes without warning an offense of which the accused was unaware." *Screws* v. *United States*, 325 U.S. 91, 102 (1945); *see also United States* v. *Curcio*, 712 F.2d

23

1532, 1543 (2d Cir. 1983) (noting established doctrine that "scienter argument may save a statute which might otherwise have to be condemned for vagueness"). Moreover, the statutes and regulations are not ambiguous, and their application to international financial transactions through the U.S financial system has long been clear. The U-turn license was in effect for over a decade prior to its revocation in 2008; when OFAC revoked the license, two years before Zarrab's charged conspiracy, OFAC publicly and unambiguously noted that the effect was to "preclud[e] transfers designed to dollarize transactions through the U.S. financial system for the direct or indirect benefit of Iranian banks or other persons in Iran or the Government of Iran." 73 Fed. Reg. 66541 (Nov. 10, 2008). The *UBS* court affirmed the application of the ITSR to foreign currency exchange houses causing U.S. bank account transactions for the benefit of Iran in 2003, seven years before Zarrab's conspiracy. *UBS*, 2003 WL 56999 at *2. A year later, in 2004, the Second Circuit decided *Homa*, establishing conclusively that when a U.S. financial institution transfers funds overseas, that constitutes an export of a service under Section 204, *see* 387 F.3d at 146, and then reiterated that holding in *Banki* in 2012, *see* 685 F.3d at 108, during the heart of Zarrab's conspiracy. Then, in 2013, the middle of Zarrab's conspiracy, OFAC warned of "third-country exchange houses or trading companies that are acting as money transmitters to process funds transfers through the United States in support of business with Iran that is not exempt or otherwise authorized by OFAC"—in other words, Zarrab's business.[9] *See* OFAC, *The Use of*

---

[9] Indeed, other foreign nationals have certainly been prosecuted in this District and elsewhere for willful violations of U.S. sanctions.  *See*, *e.g.*, *United States* v. *Parsa*, No. 14 Cr. 710 (RA) (S.D.N.Y) (foreign national prosecuted for violating the IEEPA and the ITSR; defendant pled guilty and has been sentenced); *United States* v. *Sarvestani*, No. 13 Cr. 214 (PGG) (S.D.N.Y.) (foreign national prosecuted for IEEPA violations; defendant pled guilty and has been sentenced); *United States* v. *BNP Paribas*, No. 14 Cr. 460 (LGS) (S.D.N.Y.) (foreign financial institution convicted of IEEPA conspiracy for conducting U.S. dollar transactions using the U.S. financial system on behalf of banks and other entities located in the Sudan, Iran, and Cuba).

*Exchange Houses and Trading Companies to Evade U.S. Economic Sanctions Against Iran* (Jan. 10, 2013) (*available at* https://www.treasury.gov/resource-center/sanctions/Programs/ Documents/20130110_iran_advisory_exchange_house.pdf).  And of course, the Indictment alleges that, even after being warned twice in 2011 that his transactions were being blocked for non-compliance with U.S. sanctions (*see* Ind. ¶ 14(f), (h)), Zarrab continued to engage in these illegal transactions (*see* Ind. ¶ 14(j)-(m)). In short, Zarrab's fair-warning argument is as meritless as his other objections to the Indictment. Accordingly, Zarrab's motion to dismiss Count Two of the Indictment should be denied.

> **B.      The Defendant's Motion to Dismiss the Bank Fraud Conspiracy Charge (Count Three) Should Be Denied**

Zarrab's arguments to dismiss Count Three of the Indictment, which charges him with participating in a conspiracy to commit bank fraud, are similarly meritless. He contends that the bank fraud count is deficient in that it fails to allege: (i) a false statement to a U.S. bank; (ii) a scheme to harm a U.S. bank; and (iii) the use of false or fraudulent pretenses. Zarrab further contends that the bank fraud statute does not apply extraterritorially. (Mot. Dismiss at 25-33). As with his arguments to dismiss the IEEPA charge, Zarrab's arguments are based on a fundamental misconstruction of the law and the conduct charged in the Indictment.

The Indictment properly alleges that Zarrab conspired with others to commit bank fraud. (*See* Ind. ¶ 19). The bank fraud statute, Title 18, United States Code, Section 1344, has two prongs under which a defendant may commit the crime of bank fraud. The first prong, Section 1344(1), requires the Government to prove that the defendant engaged in a deceptive course of conduct and that the defendant intended to victimize the bank by exposing it to loss.  *See United States* v. *Crisci*, 273 F.3d 235, 240 (2d Cir. 2001). The second prong, Section 1344(2), requires the Government to prove "that the defendant intend[ed] to obtain any of the moneys . . . or other

25

property owned by, or under the custody or control of, a financial institution" through false or fraudulent pretenses.  *See United States* v. *Bouchard*, No. 14-4156-CR, 2016 WL 3632591, at *6 (2d Cir. July 7, 2016).

The Indictment specifies the time period of the conspiracy as between in or about 2010 and in or about 2015. (*See* Ind. ¶ 19).  It goes on to allege that an object of that conspiracy was "to execute a scheme or artifice to defraud a financial institution, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody of and control of a financial institution, by means of false and fraudulent pretenses, representations, and promises." (*See* Ind. ¶ 20). These allegations track the language of Title 18, United States Code, Sections 1344 and 1349, and the Indictment provides several examples of fraudulent transactions in which Zarrab and his co-conspirators engaged.[10]  Accordingly, Zarrab's motion to dismiss Count Three should be denied for this reason alone. *See United States* v. *Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) ("We have often stated that an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." (internal citation and quotation omitted)).

What Zarrab's motion does raise are factual issues that cannot be resolved on a motion to dismiss, but only through a trial. Thus, he claims that the representations made to the U.S. banks were neither false nor material (Mot. Dismiss at 26-27, 30), which are issues of fact, *see Neder* v. *United States*, 527 U.S. 1, 8 (1999); that the banks were not exposed to harm as a result of these transactions (Mot. Dismiss at 27-30), which is another issue of fact, *see United States* v. *Rudaj*,

---

[10] The Government is under no obligation to allege and prove overt acts for a conspiracy charged under Title 18, United States Code, Section 1349.  *See United States* v. *Roy*, 783 F.3d 418, 420 (2d Cir. 2015) ("We agree with these courts and conclude that a conspiracy conviction under § 1349 does not require proof of an overt act.").

No. 04 Cr. 1110 (DLC), 2006 WL 1876664, at *7 (S.D.N.Y. July 5, 2006); and that Zarrab did

not intend to actually "obtain" any funds as a result of these transactions (Mot. Dismiss at 31-

32), which is yet another issue of fact, *cf. United States* v. *Salemo*, 499 F. App'x 110, 112 (2d

Cir. 2012). None of these questions is appropriately decided by the Court as a matter of law

based on contentions in a brief, but rather only by the jury based on the evidence presented at

trial. And, as the evidence at trial will prove beyond a reasonable doubt, none of Zarrab's

contentions have any merit.

### 1.  The Indictment Alleges False Statements in Connection with the Scheme to Defraud

Zarrab and his co-conspirators orchestrated the processing of millions of dollars of

financial transactions through U.S. banks on behalf of sanctioned entities that are barred from

using those financial institutions. Because these financial institutions would not have processed

these transactions had they known the true beneficiaries, Zarrab and his conspirators conspired to

conceal that fact from the bank by, among other things, layering these transactions through

multiple front companies and stripping information from wire instructions that revealed the

connections to sanctioned entities. Through these transactions, Zarrab and his co-conspirators

defrauded several U.S. financial institutions.

Zarrab argues that he cannot be guilty of a bank fraud conspiracy because such a charge

requires misrepresentations to financial institutions, and here, the wire transfer instructions did

not constitute representations in the first instance, and, furthermore, have not been demonstrated

to be false. (Mot. Dismiss at 26-27). The transactions in which Zarrab and his co-conspirators

engaged are themselves misrepresentations, however—these transactions are designed to deceive

the bank that their true participants are sanctioned entities and that, as a result, these transactions

are illegal. That is a straightforward application of the bank fraud statute. Moreover, to the extent

Zarrab wishes to contest the falsity or materiality of any of those misrepresentations, he must wait until trial—the Indictment properly alleges that these misrepresentations were material, and no more is required at this stage. *See United States* v. *Velastegui*, 199 F.3d 590, 593, n.2 (2d Cir. 1999) (court must assume the truth of the allegations in the Indictment on a motion to dismiss).

To the extent Zarrab inappropriately seeks to look beyond the Indictment at this stage, his argument is based on the fundamentally flawed premise that instructions to transfer funds can never carry with them misrepresentations. Zarrab is wrong. In the Second Circuit, there is no blanket rule that instructions to transfer funds cannot carry with them misrepresentations. Indeed, the Second Circuit has recognized that checks—which are themselves instructions to transfer funds—submitted with implicit misrepresentations as to legality of the transaction can constitute fraud on a bank.

For example, in *United States* v. *Morgenstern*, 933 F.2d 1108 (2d Cir. 1991), the Second Circuit considered the prosecution under the bank fraud statute of an accountant who had defrauded clients whom he helped with their taxes. *See id*. at 1110. After the accountant advised the clients of their tax liability, the clients would write a check made out to Chemical Bank. *See id*. Chemical Bank would then forward the deposited amount to the Internal Revenue Service in satisfaction of the client's tax liability. *See id*. As part of the scheme, the accountant began inflating the amount of taxes owed by the client, and then having the client execute checks in the inflated amounts. *See id*. The accountant then would deposit those checks at Chemical Bank not into the client's account, but instead in a corporate account that he controlled. [11] *See id. The*

---

[11] The accountant ultimately began to change the payee on checks made out by his client to the tax authorities. *See Morgenstern*, 933 F.2d at 1110.

accountant furthermore continued to deposit legitimate checks made out to Chemical Bank on his client's behalf. *See id*.

The Government charged the accountant with violating the second prong of Section 1344, which prohibits using false and fraudulent pretenses to obtain money or property in the custody of a financial institution. *See id*. at 1113. In challenging the prosecution, the accountant argued that he did not make any misrepresentations to the banks because a check did not constitute an assertion of fact. *See id*. The Second Circuit, however, rejected this argument and found that there was a sufficient misrepresentation implicit in the defendant's conduct of "mixing negotiation of legitimate checks with unauthorized deposits of fraudulently procured checks, [which] sought to convey the misleading impression that he was acting within the scope of his legitimate authority and that there was nothing extraordinary about these transactions." *Id*. The Second Circuit concluded that "[t]his deceptive course of conduct toward Chemical Bank extended well beyond the silent presentation of individual checks and deposit tickets. It amounted to a false representation that he was properly authorized to deposit the Grosses' checks payable to Chemical Bank into the [accountant's] account." *Id*. at 1114.

*Morgenstern* demonstrates the flaw in Zarrab's argument. In both cases, the defendant's interaction with the bank involved instructions to transfer funds—in *Morgenstern* it was checks, and in Zarrab's case, wires. In both cases, the defendants claimed that the payment instructions could not constitute misrepresentations to the bank because the instructions did not contain factual assertions. In both cases, the defendants knew that the banks would not execute those instructions if they were fully informed of the nature of the transactions—in *Morgenstern*, because the accountant did not have authority to deposit checks into his own account, and in Zarrab's case, because the transactions were for the benefit or on behalf of sanctioned entities.

And so, in both cases, to trick the banks into participating in those transactions, both defendants presented those transactions in a misleading manner to the financial institutions—in *Morgenstern*, by commingling fraudulently procured checks with legitimate checks to conceal the lack of authority, and in Zarrab's case, by layering the transactions through front companies and stripping away information that disclosed the connections to sanctioned entities. (*Compare* Ind. ¶ 14(a) (describing payment instructions referring to MAPNA, an Iranian company, sent to Al Nafees Exchange by Mellat Exchange); *with* Ind. ¶ 14(b) (alleging how wire transfer information for the transaction that was processed by the U.S. bank omitted reference to MAPNA). Thus, in both cases, the defendants' conduct "amounted to a false representation." *Morgenstern*, 933 F.2d at 1114; *see also United States* v. *Burnett*, 10 F.3d 74, 78 (2d Cir. 1993) (when a defendant knowingly cashes a check for purposes of falsely boosting the balance in a bank account so that he can later withdraw the artificially inflated balance, the defendant has made a misrepresentation under the first prong of the bank fraud statute); *United States* v. *Dayan*, No. 03 Cr. 1471, 2005 WL 757250, at *3 (S.D.N.Y. Apr. 4, 2005) (denying Rule 29 motion in check-kiting case where defendant claimed that the Government had failed to prove a misrepresentation); *United States* v. *Miller*, 70 F.3d 1353, 1355 (D.C. Cir. 1995) (material misrepresentation "[e]ach time Miller inserted Rolark's card into an ATM and entered her personal four-digit code"); *United States* v. *Young*, 952 F.2d 1252, 1257 (10th Cir. 1991) (implicit misrepresentation of defendant's authority to negotiate checks submitted for payment).

Indeed, one of the cases upon which the defendant principally relies further demonstrates this point. The defendant cites to *United States* v. *Briggs*, 939 F.2d 222 (5th Cir. 1991) (Mot. Dismiss at 30), which, like *Morgenstern*, involved a prosecution under the second prong of the bank fraud statute. There, while the Fifth Circuit held that the mere act of sending a wire does

not involve a misrepresentation, it made clear that its opinion was not "suggest[ing] that there can never be an implied misrepresentation of authority in such circumstances" capable of supporting bank fraud. *Briggs*, 939 F.2d at 226. Indeed, after remand, the Fifth Circuit affirmed the defendant's conviction of bank fraud based on an "an *implicit misrepresentation* by Briggs that she was acting under her employer's authority." *United States* v. *Briggs*, 965 F.2d 10, 12 (5th Cir. 1992) (emphasis added).[12]

Accordingly, the Court should reject Zarrab's argument and find that the Indictment properly alleges a misrepresentation.

### 2. The Scheme Exposed U.S. Banks to Loss

While Zarrab claims that his conduct did not expose the U.S. banks to any meaningful risk of loss (Mot. Dismiss at 27-29 (citing *United States v. Nkansah*, 699 F.3d 743, 748 (2d Cir. 2012)),[13] the fact is that his scheme robbed the U.S. banks of critical information with respect to these fund transfer instructions, and thus, the "concrete harm contemplated by [Zarrab] is to deny the victim [banks] the right to control [their] assets by depriving [them] of information necessary to make discretionary economic decisions." *United States* v. *Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998); *see United States* v. *Binday*, 804 F.3d 558, 574 (2d Cir. 2015) (finding sufficient

---

[12] The other cases upon which the defendant relies do not support Zarrab's position either. *Williams* v. *United States*, 458 U.S. 279, 284-85 (1972) stands only for the limited proposition that the implicit representation of a funds transfer order that the funds are in fact available for transfer does not "make any representation as to the state of petitioner's bank balance" that would constitute a violation of Title 18, United States Code, Section 1344. Similarly, Zarrab cites *Goldeshtein* v. *I.N.S.*, 8 F.3d 645 (9th Cir. 1993), for the proposition that structuring statements does not involve the use of false statements. *Goldeshtein* is irrelevant to the question before the Court, because that case does not involve bank fraud at all, but rather involved determining whether structuring currency transactions to avoid reporting requirements is a crime of moral turpitude for purposes of immigration proceedings. *See id*. at 646-48.

[13] In *Shaw* v. *United States*, 15-5991 (set for argument Oct. 4, 2016), the Supreme Court will address the question of whether any intent to victimize a bank at all is necessary under § 1344(1).

for insurance fraud charge proof that defendants "exposed the insurers to an unbargained-for economic loss" based on the features of the insurance policies the defendants obtained through their fraud). *United States* v. *DiNome*, 86 F.3d 277, 283-84 (2d Cir. 1996) (affirming wire fraud conviction where fraudulent intent was proven by showing that withheld information substantially diminished value of the mortgage transaction). As the court in *Rossomando* stated, when a defendant "deliberately supplies false information to obtain a bank loan . . . he intended to inflict a genuine harm upon the bank—*i.e.*, to deprive the bank of the ability to determine the actual level of credit risk and to determine for itself on the basis of accurate information whether, and at what price, to extend credit to the defendant." 144 F.3d at 201.

Here, by concealing the true beneficiaries of these transactions from the U.S. banks, Zarrab and his co-conspirators robbed them of the ability to properly assess the risk from engaging in these transactions. Indeed, the very reason for OFAC's revocation of the "U-Turn license" in 2008 was "the need to further protect the U.S. financial system from the threat of illicit finance posed by Iran and its banks." 73 Fed. Reg. 66541 (Nov. 10, 2008). Thus, the ability to evaluate the risks of any particular overseas transaction is critical because the potential consequences for the bank from executing barred transactions is tremendous.

First, the bank runs the risk that a regulator at some point may determine that the bank knowingly facilitated sanctions avoidance, which could expose the bank to massive fines and forfeiture. For example, BNP Paribas SA was ordered to forfeit more than $8 billion and to pay a $140 million fine for, among other things, knowingly facilitating sanctions violations. Similarly,

HSBC Bank N.A. was ordered to forfeit more than $1.2 billion, and to pay hundreds of millions of dollars in civil penalties for similar conduct.[14]

Second, while Zarrab glibly attempts to dismiss the potential for harm to the banks claiming "the U.S. banks would have *no reason to know* that the funds transfers were ultimately intended for Iran or other restricted entities," and thus would be "unwitting instrumentalities" of criminal activity (Mot. Dismiss at 28 (emphasis in original)), the fact is that even if the scheme had worked perfectly, and the banks had been completely fooled, that still may not have saved them from regulatory scrutiny. For instance, while a criminal violation of the IEEPA and the ITSR requires knowledge of the violation, a civil breach does not. The ITSR prohibits "[a]ny transaction . . . that evades or avoids . . . any of the prohibitions set forth in this part," 31 CFR § 560.203, and IEEPA imposes civil penalties "on any person who commits an unlawful act" under the promulgated regulations, 50 U.S.C. § 1705(b). OFAC may determine that an entity violated its sanctions even if there was no actual knowledge of the violation, but merely that the entity had reason to know. For example, just this year, OFAC determined that Humana, an insurance company, had violated OFAC's Kingpin sanctions because it had "reason to know" it was providing services to barred entities.[15] Similarly, also this year, OFAC concluded that Mastercard had violated U.S. sanctions with respect to Iran, even though none of the company's employees had actual knowledge of the improper conduct, because Mastercard is a "large and commercially sophisticated company that deals primarily with banks and other financial

---

[14]*See* https://www.justice.gov/opa/pr/bnp-paribas-agrees-plead-guilty-and-pay-89-billion-illegally-processing-financial; https://www.justice.gov/opa/pr/hsbc-holdings-plc-and-hsbc-bank-usa-na-admit-anti-money-laundering-and-sanctions-violations.

[15] *See* https://www.treasury.gov/resource-center/sanctions/CivPen/Documents/20160802_humana_fov.pdf.

institutions," and so had "reason to know" of the violations.[16] In addition to potential civil

penalties, if a U.S. bank unwittingly aids a foreign bank that is engaged in sanctions avoidance

through correspondent banking services, that could lead to the foreign bank's correspondent

bank account *held at the U.S. bank* to be seized by federal authorities. *See*, *e.g.*, *United States* v.

*$1,879,991.64 Previously Contained in Sberbank of Russia's Interbank*, No. 2:15-6442 (WJM),

2016 WL 2651424, at *1 (D.N.J. May 10, 2016) (foreign bank's correspondent bank account

held at U.S. bank seized pursuant to Title 18, United States Code, Section 981(k)). While, in

such a situation, the U.S. bank may have recourse against the foreign bank to recoup certain

assets or may have the opportunity to contest or secure the removal of the seizure, these avenues

would likely lead to the U.S. bank incurring substantial legal fees and costs and exposing itself to

risk of loss that it had not otherwise considered, and come with no absolute certainty of success.

Third, as alleged in the Indictment, there were instances in which the scheme was

recognized by financial institutions, which then blocked the transactions. (*See* Ind. ¶¶ 14(f), (g)).

This presents yet another risk to U.S. banks engaged in such transactions, even if they

themselves have been successfully tricked into participating. The transactions at issue here are a

coordinated series of financial transactions between various financial institutions. If one of the

steps in the chain gets stopped because a bank blocks the transaction, then that creates the

possibility that the prior banks in the chain will suffer a loss, because they would have already

transmitted the funds that they were requested to send without receiving a corresponding

reimbursement. Thus, the bank risks going uncompensated for a time, unless and until the bank

can cure the situation, likely through costly legal action.  Accordingly, the Court should reject

---

[16] *See* https://www.treasury.gov/resource-center/sanctions/CivPen/Documents/20160316_
MasterCard.pdf

Zarrab's argument that the scheme did not expose the banks to loss, and find that the Indictment adequately alleges this element as well.

Finally and most significantly for the purpose of this motion, exposure to potential loss is an element of the offense that must be proven at trial. While the Government need not prove actual loss, *see United States* v. *Barrett*, 178 F.3d 643, 647-48 (2d Cir. 1999) (Government can prove "actual or potential loss" to the bank), the question of whether and how the alleged scheme did (or would have) harmed the financial institution is a question of fact, which should necessarily be reserved for the jury. *See*, *e.g*, *United States* v. *Laljie*, 184 F.3d 180, 191 (2d Cir. 1999) (examining the potential for loss created by each alleged misrepresentation on a case-by-case basis, after trial).

### 3. The Indictment Alleges a Conspiracy to Obtain Money or Property from a U.S. Bank

The Indictment further alleges that an object of the conspiracy was to "obtain" money or property from a U.S. bank through the use of "false and fraudulent pretenses, representations, and promises," which would violate the second prong of Title 18, United States Code, Section 1344. The defendant claims that he neither employed "false and fraudulent pretenses, representations, and promises," nor attempted to obtain anything "under the custody and control of a financial institution." (Mot. Dismiss at 30-32). In light of the Indictment's allegations, Zarrab's arguments cannot succeed. *See Stavroulakis*, 952 F.2d at 693 ("We have often stated that an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.") (internal citation and quotation omitted). But, even if the Court were to consider them, Zarrab's arguments here rely on the same mischaracterizations of fact and law as his other arguments with respect to other counts.

Zarrab's first argument—that there was no false and fraudulent pretense, representation, or promise—is simply a rehash of his contention that his conduct does not constitute a misrepresentation as that term has been applied to the bank fraud statute, and is roundly rejected by *Morgenstern* and similar cases, which have held that implicit misrepresentations can support a prosecution under the second prong of the bank fraud statute. *See supra* pp. 27-30.  Further, Zarrab himself concedes that, as alleged, these transactions were structured in such a manner as to deceive the banks to ensure that they did not know that the transactions were for the benefit of Iranian entities.  (*See* Mot. Dismiss at 28).

Nevertheless, the defendant asserts that the U.S. banks at issue here are merely "process[ing] an electronic funds transfer," and therefore that the scheme was not designed to "obtain" money or property owned by or under the custody or control of a U.S. bank.  (Mot. Dismiss at 31). First, it is well-settled law that processing a transfer of funds based on false and fraudulent pretenses constitutes bank fraud, even if the funds belong to someone other than the banks. *See*, *e.g.*, *Crisci*, 273 F.3d at 240 (upholding bank fraud conviction where defendant cashed forged checks that were drawn on another's account); *Miller*, 70 F.3d at 1355 (material misrepresentation "[e]ach time Miller inserted Rolark's card into an ATM and entered her personal four-digit code"); *Young*, 952 F.2d at 1257 (implicit misrepresentation of defendant's authority to negotiate checks submitted for payment). But in any event, the defendant's description of the transactions here is fatally flawed. The defendant implies that such a transfer is like the electronic equivalent of handing an envelope of cash through a series of hands until it reaches its destination. This contention is based on the same fallacy that underlies Zarrab's untenable claim that no service was exported by a U.S. bank when it processed the transactions at issue here. Try as he might, Zarrab simply cannot write the U.S. bank's involvement out of the

36

equation—he cannot avoid the fact that U.S. banks parted with U.S. dollars, which were in their possession and/or control, as a result of his and his co-conspirator's duplicity.[17]

For example, the Indictment alleges that a U.S. bank processed a wire transaction that originated in the United Arab Emirates for more than $900,000 on behalf of Royal Emerald Investments, one of Zarrab's network of companies, to a Canadian company. (*See* Ind. ¶ 14(b)). Contrary to Zarrab's misleading analogy, in this transaction, U.S. dollars were not being sent to the U.S. bank from the United Arab Emirates so that they could be delivered to the Canadian company. Indeed, if a foreign bank had its own store of U.S. dollars that it wished to send to the Canadian company, then it could simply have done so, without involving the U.S. bank. There would be no need for the foreign bank to use (and thus pay for) the services of the U.S. bank. The entire purpose behind the banking relationship that Zarrab exploited was to get access to the dollars in the custody of the U.S. bank.

### 4. Zarrab's Remaining Challenges to the Bank Fraud Conspiracy Charge Should Be Rejected

Zarrab's remaining contentions are even more spurious. First, he claims that, in processing these transactions, the banks are providing a "service" (which they are and which they are then exporting under the ITSR), and not providing "money or property."[18] (Mot. Dismiss at 31). Zarrab's claim flies in the face of common sense. Of course, the "service" these

---

[17] This distinguishes this case from *Grain Traders, Inc.* v. *Citibank, N.A.*, 960 F. Supp. 784, 793 (S.D.N.Y. 1997), in which Citibank accepted an incoming wire transfer and then used those funds to satisfy a debt owed to Citibank. In that case, there was no outflow of money. Here, there is.

[18] Zarrab's argument again makes a significant concession with respect to the Government's IEEPA claim, in that Zarrab, in challenging the bank fraud charge, concedes that the Indictment alleges that the banks are providing a "service" in processing these transactions. Given, as the Indictment alleges, that these transactions were for the benefit or on behalf of sanctioned entities, Zarrab thoroughly undercuts his challenge to the IEEPA charge through this argument.

banks provide is sending U.S. dollars, *i.e.* "money," where they are directed to send it, just as when Amazon provides a "service" by shipping a purchased product to wherever the purchaser wants. In both cases, these transactions involve both a "service" and "property." Second, Zarrab claims that he did not "obtain" anything because he did not come into possession of the funds. (Mot. Dismiss at 31-32). But, Zarrab is charged with a *conspiracy* to fraudulently obtain money or property from a U.S. bank, which means that his actual receipt of any such money or property is irrelevant. *See United States* v. *Henry*, 325 F.3d 93, 104 (2d Cir. 2003) (each co-conspirator does not have to have a stake in the success of the conspiracy) (internal quotation and citation omitted). Furthermore, to the extent Zarrab argues that the phrase "obtain" implies a possessory interest (Mot. Dismiss at 32), it is well-established that possession can mean either physical possession or ownership and dominion. *See*, *e.g.*, *United States* v. *Payton*, 159 F. 3d 49, 56 (2d Cir. 1999) (defining constructive possession under Title 18, United States Code, Section 922(g) as including ownership and dominion).

The defendant's final gasp is to assert that this constitutes an extraterritorial application of the bank fraud statute. This argument is meritless. The misrepresentations at issue may have originated outside the United States, but they were transmitted to U.S. banks for purposes of obtaining funds in the custody or control of those banks in the United States. The fact that the scheme may have been hatched elsewhere does not render this fundamentally foreign conduct. Indeed, because the bank fraud statute requires that the scheme or fraud be targeted at a financial institution chartered or insured by the U.S. government, the victim of any bank fraud conspiracy under Title 18, United States Code, Sections 1344 and 1349, must by definition be in the United States or an entity linked to the U.S. government. *See United States* v. *Ragosta*, 970 F.2d 1085, 1089 (2d Cir. 1992) ("[T]he government was required to prove beyond a reasonable doubt that

the defendant engage[d] in or attempt[ed] to engage in a pattern or course of conduct designed to deceive a *federally chartered or insured financial institution* into releasing property, with the intent to victimize the institution by exposing it to actual or potential loss." (emphasis added)). As such, there is no extraterritorial application of this statute. *See Pasquantino*, 544 U.S. at 371 (The "domestic element of petitioners' conduct is what the Government is punishing in this prosecution, no less than when it prosecutes a scheme to defraud a foreign individual or corporation, or a foreign government acting as a market participant.").

### C. The Defendant's Motion to Dismiss the Money Laundering Conspiracy Charge (Count Four) Should Be Denied

Zarrab's challenge that the money laundering conspiracy charged in Count Four merges with the IEEPA and bank fraud conspiracies fails as a matter of law. Zarrab relies on case law concerning a different provision of the money laundering statute than is at issue here. It is well settled that there is no so-called "merger" concern with respect to Title 18, United States Code, Section 1956(a)(2)(A), which is the provision that Zarrab is charged with conspiring to violate.

Count Four charges the defendant with a conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 1956(h). Section 1956(a)(2)(A) provides penalties for:

> Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity.

This section differs in critical respects from the preceding provision, Section 1956(a)(1), which requires that the transaction at issue "involves the proceeds of specified unlawful activity." So-called "proceeds" transactions can present a "merger" problem, if a "violation of

the [underlying] statute would also be a violation of the money-laundering statute." *United States*
v. *Santos*, 553 U.S. 507, 515 (2008).

  Courts—including the Second Circuit—that have examined the issue have universally
held, however, that Section 1956(a)(2)(A) does not present the sort of merger problem at issue in
*Santos* because this section does not involve "proceeds." Thus, in *United States* v. *Piervinanzi*,
23 F.3d 670 (2d Cir. 1994), the Second Circuit rejected the defendant's argument that
Section 1956(a)(2)(A) "proscribes only 'laundering' activity that is analytically distinct from the
underlying criminal activity that it promotes." In so holding, the Court of Appeals noted that
unlike § 1956(a)(1), which "requires first that the proceeds of specified unlawful activity be
generated . . . ," "§ 1956(a)(2) contains no requirement that 'proceeds' first be generated by
unlawful activity, followed by a financial transaction with those proceeds, for criminal liability
to attach. Instead, it penalizes an overseas transfer 'with the intent to promote the carrying on of
the specified unlawful activity.'" *Id*. at 679-80*; United States* v. *Coscia*, No. 14-20-DLB-EBA-
5, 2016 WL 2990511 at *2 (E.D.Ky. May 10, 2016) ("Section 1956(a)(2)(A) differs from §
1956(a)(1)(A)(I) in two important ways, both of which help alleviate any potential merger
problems. First, § 1956(a)(2)(A) does not require proof of proceeds. . . . Second, § 1956(a)(2)(A)
requires an international element."); *United States* v. *Moreland*, 622 F.3d 1147, 1168 (9th Cir.
2010); *United States* v. *Krasinski*, 545 F.3d 546, 550 (7th Cir. 2008) ("The absence of a
'proceeds' requirement in section 1956(a)(2)(A) reflects that Congress decided to prohibit any
funds transfer out of the country that promotes the carrying on of certain unlawful activity.");
*Kenemore* v. *Roy*, 536 F. App'x 391, 392 (5th Cir. 2013); *United States* v. *Harder,* No. CR 15-1,
2016 WL 807942, at *9 (E.D. Pa. Mar. 2, 2016); *United States* v. *Nazemzadeh*, No. 11 CR 5726
L, 2014 WL 310460, at *12 (S.D. Cal. Jan. 28, 2014); *Siu* v. *United States*, No. C08-1407-JCC,

2009 WL 2032028, at *1 (W.D. Wash. July 7, 2009); *United States* v. *O'Connor*, 158 F. Supp. 2d 697, 726 n.52 (E.D. Va. 2001).

Zarrab simply ignores this distinction, relying exclusively on inapposite case law addressing different statutory provisions, *i.e.*, Section 1956(a)(1), and different interpretive questions. For example, the defendant selectively quotes from *W. 79th St. Corp.* v. *Congregation Kahl Minchas Chinuch*, No. 03 Civ. 8606 (RWS), 2004 WL 2187069, at *9 (S.D.N.Y. Sept. 29, 2004), to suggest that the underlying unlawful activity must always be separate from a money laundering crime, while ignoring the clear limitation of that holding to "distinguish[ing] between the crime that produces proceeds and the subsequent crime of laundering those proceeds." *Id.* (quoting *United States* v. *McCarthy,* 271 F.3d 387, 395 (2d Cir. 2001)). This question of "proceeds" is precisely the distinction drawn between Sections 1956(a)(1) and (a)(2)(A). The defendant's reliance on *United States* v. *Johnson*, 971 F.2d 562, 569 (10th Cir. 1992), and *United States* v. *Awada*, 425 F.3d 522, 524 (8th Cir. 2005), similarly attempts to invite the Court to misapply case law construing Section 1956(a)(1) to this case, which charges a violation of Section 1956(a)(2)(A).

Perhaps most misleading is the defendant's reliance on *United States* v. *Trejo*, 610 F.3d 308 (5th Cir. 2010), to suggest that the rule against merger is a necessary check against "overzealous prosecutors." (Mot. Dismiss at 34). *Trejo* does concern Section 1956(a)(2)(A), but nowhere does it mention the possibility of merger. Rather, it notes that the strict *mens rea* requirement that "the defendant's conduct not only promoted a specified unlawful activity but that he engaged in it *with the intent* to further the progress of that activity," is what ensures that a defendant is not subject to liability for "mak[ing] benign expenditures with funds derived from unlawful acts." *Id.* at 314-315 (internal quotation marks omitted).

41

Accordingly, as is clear from the face of the Indictment, Count Four alleges that the defendant engaged in those transactions with the intent to further that activity. As such, under clear precedent interpretating Section 1956(a)(2), the operative statutory provision here, Count Four properly alleges a violation of federal law and does not run afoul of the "merger" prohibitions that governs violations of Section 1956(a)(1). Zarrab's application to dismiss Count Four should be denied.

**D.     The Defendant's Motion to Dismiss the Conspiracy to Defraud the United States Charge (Count One) Should Be Denied**

Finally, the defendant contends that Count One should be dismissed on both statutory and constitutional grounds, claiming that Title 18, United States Code, Section 371 does not cover the defendant's conduct both because it does not "defraud" OFAC to willfully violate sanctions regulations and because the defendant's conduct took place outside the United States. (Mot. Dismiss at 34-35). Both arguments are meritless.

First, with respect to the defendant's statutory argument "it is now well established that § 371 'is not confined to fraud as that term has been defined in the common law,' but reaches 'any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government.'" *United States* v. *Coplan*, 703 F.3d 46, 61 (2d Cir. 2012) (quoting *Dennis* v. *United States*, 384 U.S. 855, 861 (1966)). The elements of this type of Section 371 offense—commonly called a "*Klein* conspiracy" after its progenitor *United States* v. *Klein*, 247 F.2d 908 (2d Cir. 1957)—are clear: "(1) [that the defendant] entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy." *United States* v. *Ballistrea*, 101 F.3d 827, 832 (2d Cir.1996) (quoting *United States* v. *Caldwell*, 989 F.2d 1056, 1059 (9th Cir. 1993)).

42

The Second Circuit has routinely upheld *Klein* conspiracy convictions premised on similar conduct. For example, in *United States* v. *Nersesian*, 824 F.2d 1294, 1313 (2d Cir. 1987), the Court upheld a conviction under Section 371 based on the defendants' structuring of transactions of over $10,000 into smaller $1,000 increments in order to evade currency transaction reporting ("CTR") requirements. Even though an "individual bank customer had no duty to report transactions over $10,000," the Court concluded that "[t]he IRS has an interest in receiving CTRs from financial institutions when customers arrange transactions in excess of $10,000. In order for this lawful governmental function to operate, it is imperative that reports be submitted by financial institutions. If [the defendant] and his associates agreed to interfere with and to obstruct this lawful function of the IRS, they could properly be charged with a violation of the 'defraud prong' of § 371." *Id.* at 1313. More recently, in *United States* v. *Mancuso*, 428 F. App'x 73 (2d Cir. 2011), the Second Circuit affirmed a defendant's conviction for preparing a power of attorney that enabled a co-defendant—who, due to prior conviction, was not allowed to work in the asbestos business—to continue in that industry by allowing him to "impersonat[e]" a sham owner who was not banned. *Id.* at 80. The Court concluded that "the power of attorney impaired government functions by hiding [the co-defendant]'s involvement in illegal asbestos practices from regulators scrutinizing him after his federal conviction." *Id.*

In this case, the Indictment makes clear that the defendant is alleged to have deceitfully obstructed OFAC's administration of the sanctions regulations. As set forth in the Indictment, he did so by concealing payments involving Iran behind a network of exchanges and companies, preventing both U.S. banks and the United States government from identifying the fact that he was transmitting prohibited payments on behalf of Iran through U.S. banks. As the Indictment makes plain, the defendant willfully concealed information knowing that screening functions

implemented by banks seeking to comply with OFAC regulations would block the transactions
in which he was engaging, and thereby explicitly obstructed the lawful function of OFAC
regulations by deceitfully processing transactions with incomplete information. (*See* Ind. ¶ 14).
Just as in *Nersesian* and *Mancuso*, Zarrab conspired to conceal material information from U.S.
regulators, in this case OFAC, and thus, is properly charged with a *Klein* conspiracy under
Section 371.

Second, Zarrab reiterates his claims of extraterritoriality, asserting that Section 371
cannot be applied to his case because he directed the scheme from overseas. (Mot. Dismiss at
35). The simple answer to Zarrab's motion is first, because the object of the obstruction was in
the United States, the statute is not being applied extraterritorially. *See Pasquantino*, 544 U.S. at
371 (The "domestic element of petitioners' conduct is what the Government is punishing in this
prosecution, no less than when it prosecutes a scheme to defraud a foreign individual or
corporation, or a foreign government acting as a market participant."). Second, a conspiracy to
defraud the United States by "obstructing or defeating the lawful function of any department of
Government," *Dennis*, 384 U.S. at 861, is by definition a crime that afflicts "the right of the
Government to defend itself against obstruction, or fraud wherever perpetrated," *Bowman,* 260
U.S. at 98, and therefore is "not logically dependent on [its] locality for the Government's
jurisdiction," *id. See also United States* v. *Gatlin,* 216 F.3d 207 (2d Cir. 2000) ("Statutes
prohibiting crimes against the United States government may be applied extraterritorially even in
the absence of 'clear evidence' that Congress so intended."). Indeed, this case proves the validity
and significance of the *Bowman* rule. Zarrab is charged with obstructing the administration of
global sanctions regulations promulgated under the IEEPA. It simply turns the notion of
jurisdiction on its head to say that Congress has expressly authorized government action to

address conduct based in "whole or in substantial part outside the United States," 50 U.S.C.

§ 1701(a), but that Congress has failed to authorize the Government to prosecute those like

Zarrab who conspire with others to obstruct that lawful action through their deceit and fraud.

Accordingly, no presumption against extraterritoriality ought to be applied, and Zarrab's motion

to dismiss should be denied.

## II.    Zarrab's Motion to Suppress Should Be Denied in its Entirety Without a Hearing

Zarrab moves to suppress (a) the results of a search, conducted pursuant to a search

warrant, of the contents of the cellphone that he was carrying with him at the time of his arrest,

based on the fact that CBP officers asked him for the passcode for his phone during a secondary

inspection before Mirandizing him; and (b) his response to questions asked by law enforcement

agents as part of the booking process, because he had previously invoked his *Miranda* rights.

Zarrab's motion fails as a matter of law. With respect to the search of his cellphone, judged

objectively, as the case law requires, the CBP officers were not required to inform Zarrab of his

*Miranda* rights because, at that time, he was not subject to custodial interrogation. Furthermore,

the cellphone was searched by the FBI only after the Government obtained a search warrant. As

for Zarrab's statements, there is no basis to suppress his statements because they came in

response to routine processing questions, which have regularly been held not to offend *Miranda*.

Zarrab's motion to suppress fails as a matter of law, and should be denied in its entirety without

a hearing.[19]

---

[19] The Government does not concede the validity of the factual assertions made in the
defendant's motion to suppress. However, even if the defendant's factual allegations are assumed
to be true for purposes of this motion, his motion fails as a matter of law and no hearing need be
held. *See United States* v. *Washington*, No. 12 Cr. 146 (JPO), 2012 WL 5438909, at *9
(S.D.N.Y. Nov. 7, 2012) ("District courts are 'not required as a matter of law to hold an
evidentiary hearing if [defendant']s moving papers did not state sufficient facts which, if proven,
would have required the granting of the relief requested by [defendant].'" (quoting *United States*

### A.    The Defendant's Providing His Passcode to CBP Officers Was Not the Product of a Custodial Interrogation

There was no requirement for the CBP officers to Mirandize Zarrab before asking for his passcode because he was not subject to custodial interrogation, which is what triggers the *Miranda* obligation. *See Berkemer* v. *McCarty*, 468 U.S. 420, 436 (1984). It is well established that the need of our nation to secure its borders allows law enforcement officers to detain individuals entering the United States for a brief period of time in order to complete a routine customs inquiry. *See United States* v. *Montoya de Hernandez,* 473 U.S. 531, 538 (1985) ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant . . . ."); *United States* v. *Martinez-Fuerte,* 428 U.S. 543, 566 (1976) (authorizing warrantless, suspicionless stops for "brief questioning routinely conducted at permanent checkpoints" near the border). Because questioning from law enforcement officers and the searching of personal belongings is an inherent part of the process of seeking to enter the United States, "the traveler has voluntarily submitted to some degree of confinement and restraint by approaching the border, [and] a reasonable traveler will expect some constraints as well as questions and follow-up." *United States* v. *FNU LNU*, 653 F.3d 144, 153-54 (2d Cir. 2011). The obligation to inform individuals of their rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436 (1966) attaches only when an individual is being questioned in a "custodial interrogation." It therefore is generally the case that *Miranda* warnings are not required for questioning pursuant to crossing the border. *See FNU LNU*, 653 F.3d at 154.

---

v. *Culotta*, 413 F.2d 1343, 1345 (2d Cir.1969) (alterations in original)). If the Court determines that a factual hearing is necessary, the Government expects to introduce evidence contradicting the defendant's claims and also establishing other factual bases for rejecting his motion to suppress, including the inevitable discovery of the disputed evidence.

The defendant protests that the questions which he was asked here "were a central and critical part of a criminal investigation," and that "the conclusion is inescapable that the FBI directed the Customs official to seize and then open" the defendant's phone. (Mot. Suppress at 10-11). This argument has no basis whatsoever in the law. On the contrary, the Second Circuit has been explicit that "the officer's subjective motives for the interrogation (including the uncommunicated existence of probable cause or intent to arrest)" are irrelevant to "determining whether the interaction qualifies as custodial." *FNU LNU*, 653 F.3d at 151; *see also Stansbury* v. *California*, 511 U.S. 318, 324 (1994) ("It is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda.*"); *cf. United States* v. *Irving*, 452 F.3d 110, 123 (2d Cir. 2006) ("[T]he validity of a border search does not depend on whether it is prompted by a criminal investigative motive."). While Zarrab relies heavily on the existence of the arrest warrant and the presence of FBI agents in the vicinity, he was not aware of either the warrant or the agents, and thus, those facts could not have, objectively, transformed the CBP interview into a custodial interrogation.

Furthermore, the questioning here was certainly no more intrusive than that explicitly approved by the Second Circuit in *FNU LNU*. There, the defendant had been stopped at the border and subjected to an interrogation in a closed room, out of public view, with an armed guard escort, lasting for 90 minutes. *Id.* The Second Circuit found that even under these circumstances, which are far more severe than even the defendant's own account of his CBP examination, a reasonable defendant could not find what occurred to be "the equivalent of a formal arrest." *Id.* at 155. The court explained that a reasonable person would consider such an examination "par for the course" when entering the country from abroad. *Id.*

The only issue therefore is whether the questions about the defendant's iPhone somehow transformed this routine inquiry into an objectively "custodial interrogation" requiring the administration of *Miranda* warnings. In focusing on this question, the defendant ignores the purpose of inquiring into the "the nature and context of the questions asked." *Id.* at 154. The issue is not whether the question is somehow unusual—the virtually infinite vagaries of the circumstances presented by individual travelers entering the United States means that what questions are routine will vary with every instance that warrants some follow-up inquiry. Rather, the issue is whether "the question itself . . . suggest[s] to Defendant that he was already under arrest." *United States* v. *Wilson*, 100 F. Supp. 3d 268, 280 (E.D.N.Y. 2015). In *Wilson*, the district court found that there was no custodial interrogation when officer asked if defendant had smuggled drugs before, because:

> Even if Officer Ramos did ask Defendant how he could afford so many trips and suggested . . . that Defendant must have 'done this' before, that single question and accompanying implication alone is not sufficient to transform this situation into a custodial one. While not necessarily the type of question a reasonable traveler might expect at the border, the nature of this question, in these circumstances, does not tip the scales toward a finding that a reasonable person in Defendant's shoes would have felt restraint to the same degree associated with formal arrest.

*Id.*

In fact, "questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest." *United States* v. *Moya*, 74 F.3d 1117, 1120 (11th Cir. 1996) (internal quotation marks omitted). The defendant makes no such allegation here. The sole fact on which the defendant relies is that the question was purportedly unusual, and, even if true, the law makes clear that much more is required to transform the permissible border inquiry into a custodial interrogation.

Moreover, a request for the defendant's passcode is hardly unusual in the context of CBP's authority to search electronic devices at the border. It is well-established that electronic devices, such as the defendant's iPhone, are subject to search at the border in addition to items like luggage or personal property. *See Irving*, 452 F.3d at 123-24 ("Searches of a person's luggage or personal belongings are routine searches."), *aff'g United States* v. *Irving*, No. S3 03 Cr. 633 (LAK), 2003 WL 22127913, at *5 (S.D.N.Y. Sept. 15, 2003) (border search exception authorizes officers to "inspect the contents of [computer] diskettes"). Searches of computers and other electronic devices such as cellular telephones "are likewise considered routine searches that may be conducted in the absence of reasonable suspicion." *United States* v. *Young*, No. 12 Cr. 210 (RJA-JJM), 2013 WL 885288, at *5 (W.D.N.Y. Jan. 16, 2013) (citing *United States* v. *Arnold*, 533 F.3d 1003, 1008 (9th Cir. 2008)); *United States* v. *Linarez-Delgado*, 259 Fed. App'x 506, 508 (3d Cir. 2007) ("Data storage media and electronic equipment, such as films, computer devices, and videotapes, may be inspected and viewed during a reasonable border search").

A request for an iPhone password is a question entirely consistent with a normal, routine border inquiry. Given that law enforcement officers could have searched the iPhone as part of a routine border inquiry, a simple question designed to aid that routine process could not possibly have communicated the defendant that he was "in custody." The defendant relies on only a single case to establish the contrary, *United States* v. *Djibo*, 151 F. Supp. 3d 297 (E.D.N.Y. 2015). *Djibo* is distinguishable in material respects. In particular, *Djibo* relied heavily on the fact that the defendant there was an outbound passenger, such that questions more typically pertaining to inbound customs declarations would have caused the defendant to believe that he was in custody. *Id.* at 306 (noting that "the function of the questioning of an inbound passenger to establish her identity is fundamentally different from the function of the questioning of an outbound passenger

about currency" and that defendant being "asked to execute an inbound passenger customs declaration form" was "an aberration"). Here, the defendant was entering the United States, was properly subject to search as an inbound passenger, and was questioned in a manner that was consistent with a normal entering passenger's secondary inspection, including the permissible search of his electronic devices. In short, *Djibo* provides no support for the defendant's motion.

### B.   The Contents of the Defendant's iPhone Were Lawfully Obtained Pursuant to a Search Warrant and Cannot Be Suppressed Based on Purported *Miranda* Violations

Even if the defendant's statements regarding the iPhone passcode were to be suppressed as self-incriminating statements made without the benefit of *Miranda* warnings while in custody, that does not warrant the suppression of the contents of the iPhone. The law enforcement officers in this case scrupulously adhered to the command of *Riley* v. *California*, 134 S. Ct. 2473, 2495 (2014) ("[T]he question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant."), and obtained a search warrant authorizing them to obtain the contents of the defendant's iPhone. Nor does the defendant contend that the defendant's statement of his passcode was relevant either to the probable cause set forth in the affidavit in support of the search warrant or to the decision to seek a warrant at all. The information supporting probable cause derived from wholly independent sources unconnected to the defendant's statements to the CBP officers. Accordingly, any error in the CBP interview cannot infect the ensuing warrant. *See Murray* v. *United States*, 487 U.S. 533, 542 n.3 (1988) ("[W]hat counts is whether the actual illegal search had any effect in producing the warrant, not whether some hypothetical illegal search would have aborted the warrant. Only that much is needed to assure that what comes before the court is not the product of illegality; to go further than that would be to expand our existing exclusionary rule."). And once that warrant was issued,

the defendant no longer had a reasonable expectation of privacy in his phone's contents that the Fourth Amendment would protect. *See generally Oliver* v. *United States*, 466 U.S. 170, 177 (1984) ("[T]he touchstone of [Fourth Amendment] analysis has been the question of whether a person has a constitutionally protected reasonable expectation of privacy."). The defendant does not contend that the search warrant authorizing the search of that phone was in any way invalid—in short, there is no dispute whatsoever that law enforcement officers had probable cause completely independent of the purported infraction, as verified by the United States Magistrate Judge who signed the search warrant to obtain the contents of the defendant's phone.

Because there can be no dispute that the search warrant for the defendant's phone satisfied the requirements of the Fourth Amendment, the defendant falls back on the suggestion that the contents of the phone must be suppressed as the "fruit of the poisonous tree," stemming from a purported Fifth Amendment violation: his un-Mirandized admission of the passcode to his phone. This argument flies in the face of black-letter law, which is clear that the Fifth Amendment requires the suppression only of unwarned self-inculpatory *statements* by the defendant, not physical evidence, the constitutional protection of which is properly analyzed under the Fourth Amendment. "[T]he *Miranda* rule protects against violations of the Self–Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence resulting from voluntary statements." *United States* v. *Patane*, 542 U.S. 630, 634 (2004); *see also United States* v. *DeSumma*, 272 F.3d 176, 180 (3d Cir. 2001) ("[T]he fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued."); *United States* v. *Elie*, 111 F.3d 1135, 1142 (4th Cir. 1997) ("[D]erivative evidence obtained as a result of an unwarned statement that was voluntary under the Fifth Amendment is never 'fruit of the poisonous tree.'"); *United States*

v. *Bengivenga,* 845 F.2d 593, 600 (5th Cir. 1988)("A violation of *Miranda* rules, rules fashioned to secure the Fifth Amendment's privilege during custodial interrogation, necessitates only the exclusion of testimonial evidence from the prosecution's case in chief. The . . . nontestimonial physical evidence . . . would not be excludable even if they had been obtained in violation of *Miranda.*").

Here, there is no claim of coercion, but only that *Miranda* warnings were not administered. Accordingly, the fruit of the poisonous tree doctrine is squarely inapplicable. Moreover, in this case, the evidence from the defendant's iPhone did not "result" from his admissions regarding his passcode. Law enforcement was entitled to search the phone, and would have been able to do so in any event. It may have been more laborious to do so without the passcode, but there can be no doubt that law enforcement was entitled to search the phone. The fact that the defendant made it easier to execute the warrant does not somehow transform the results of that warrant into fruits of a poisoned tree.

Again, the defendant relies solely on the entirely unpersuasive reasoning of *United States* v. *Djibo*, as his sole support for his motion to suppress. *Djibo* is the only case to have applied the fruits of the poisonous tree doctrine to physical evidence such as that at issue here, and its reasoning is wrong. First, *Djibo* attempted to distinguish the Supreme Court's holding in *Patane* by claiming that the case "implicated only the Fifth Amendment's privilege against self-incrimination," whereas the search of Djibo's iPhone "invokes the Fourth Amendment's freedom from unreasonable searches and seizures." 151 F. Supp. 3d. at 308. But *Djibo* ignores the fact that *Riley* clearly set out how an individual's Fourth Amendment interest in the security of his phone is to be protected: through the warrant requirement. There is simply no doubt that law enforcement officers in this case who obtained the valid search warrant were entitled to the

contents of the defendant's phone entirely independently of the defendant's statements about his passcode.

Second, *Djibo* is materially distinguishable from this case. There, the customs officer conducted an extensive search of the defendant's phone prior to obtaining a warrant, resulting in over 900 pages of information. The Court found that "[t]he government's claim that it did not rely on the initial 'peek'—despite the wording of the search warrant—is simply unsupported by the often contradictory evidence." *Id.* at 309. Here, there is no claim that law enforcement officers executed any search of the defendant's phone other than entering the passcode to verify that it was correct,[20] and there is nothing whatsoever in the warrant application premised on any purportedly illegal search.

### C.   The Defendant's Responses to Pedigree Questions After His Request for a Lawyer Need Not Be Suppressed

The defendant's final argument is that his responses to questions regarding "bank accounts, residences, and businesses" after he invoked his right to counsel must be suppressed. (Mot. Suppress at 15). But this argument too simply ignores black-letter law approving the "routine booking question exception which exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services." *Pennsylvania* v. *Muniz*, 496 U.S. 582, 601 (1990) (internal quotation marks omitted).

Consistent with the Supreme Court's instruction, the Second Circuit has long held that "the solicitation of information concerning a person's identity and background does not amount

---

[20] The defendant's claim that "there may have been countless more intrusions in the interim between this illegal search and the search warrant being granted" (Mot. Suppress at 13 n.3) is pure speculation that need not be credited. *See, e.g., United States* v. *Villanueva*, 32 F. Supp. 2d 635, 639 (S.D.N.Y. 1998). A border search of the phone would not, moreover, have been illegal. *See supra* pp. 48-49.

to custodial interrogation prohibited by *Miranda* v. *Arizona,* 384 U.S. 436 (1966), whether that

solicitation occurs before or after *Miranda* warnings are given." *United States* v. *Adegbite*, 846

F.2d 834, 838 (2d Cir. 1988) (internal citations omitted). The exception for so-called "pedigree

questions" applies even if the defendant has invoked his right to counsel. *United States* v.

*Carmona*, 873 F.2d 569, 573 (2d Cir. 1989) ("gather[ing] ordinary information for administrative

purposes" did not amount to "reinterrogation after appellant had invoked his right to counsel").

 Under that exception, courts have approved questioning designed to elicit a defendant's

"employment data," *United States* v. *Gotchis*, 803 F.2d 74, 79 (2d Cir. 1986); a defendant's

"address and ownership interest in [a] house," *United States* v. *Gaston*, 357 F.3d 77, 82 (D.C.

Cir. 2004); and a defendant's "current assets," *United States* v. *Allen*, 13 F.3d 105, 110 (4th Cir.

1993).

 This is consistent with the practice of courts in this District, which have approved

pedigree inquiries that have addressed a defendant's "employment, bank account, and living

arrangement," *United States* v. *Garcia*, No. 96 CR. 115 (RPP), 1996 WL 544233, at *4

(S.D.N.Y. Sept. 25, 1996); or "the ages and dates of births of his children, the telephone numbers

of most of his relatives, and bank account information," *United States* v. *Isiofia*, No. 02 CR. 520

(HB), 2003 WL 21018853, at *2 (S.D.N.Y. May 5, 2003), *aff'd*, 370 F.3d 226 (2d Cir. 2004).

The defendant's bald assertion that he should not have been asked these questions is thus flatly

contradicted by the applicable case law.

 Accordingly, the Court should deny as baseless Zarrab's motion to suppress statements

he made in response to "pedigree questions" during routine arrest processing.

## **CONCLUSION**

Accordingly, the Government respectfully requests that the Court deny the defendant's

motions to dismiss the Indictment and to suppress evidence, without a hearing.


Dated: New York, New York
       August 8, 2016

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney


                        by:     _____/s/_____
                                Michael D. Lockard
                                Sidhardha Kamaraju
                                David W. Denton, Jr.
                                Assistant United States Attorneys
                                (212) 637-2193/6523/2744


cc:     Defense counsel of record (by ECF)