UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

REZA ZARRAB, *et al.*,

             *Defendants*.

S1 15 Cr. 867 (RMB)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT REZA ZARRAB'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT AND MOTION TO SUPPRESS**

BANCROFT PLLC
Viet D. Dinh
Paul D. Clement
Jeffrey M. Harris
Edmund G. LaCour Jr.
500 New Jersey Avenue, NW
7th Floor
Washington, DC 20001

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Christine H. Chung
Adam M. Abensohn
William A. Burck
Daniel R. Koffmann
51 Madison Avenue
22nd Floor
New York, NY 10010

BRAFMAN & ASSOCIATES, P.C.
Benjamin Brafman
Marc Agnifilo
Joshua D. Kirshner
767 3rd Avenue, 26th Floor
New York, NY 10017

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ............................................................................................................................2

I.     THE INDICTMENT SHOULD BE DISMISSED IN ITS ENTIRETY ..............................2

     A.    There Is No Jurisdiction Under IEEPA To Prosecute Zarrab ...................................3

          1.    Zarrab Is Not "Subject To The Jurisdiction Of The United States" ............3

          2.    The Indictment Also Fails To Allege That Zarrab Conspired To Export Any Service From The U.S. Or To Cause Any Such Export...........7

          3.    The Rule Of Lenity And Due Process Require Dismissal........................10

     B.    The Indictment Fails To Allege Conspiracy To Commit Bank Fraud..................12

          1.    The Indictment Fails To Allege A Scheme To Harm A U.S. Bank Or To Obtain Money Under Bank Custody............................................13

          2.    The Indictment Fails To Allege Misrepresentations To A Bank ..............15

          3.    The Government Impermissibly Applies The Bank Fraud Statute Extraterritorially.................................................................................17

     C.    The Money Laundering And IEEPA Charges Impermissibly Merge..................18

     D.    The Indictment Does Not Describe A Conspiracy To Defraud The U.S.............18

II.    THE COURT SHOULD GRANT THE MOTION TO SUPPRESS, OR CONVENE A HEARING.............................................................................................19

     A.    The Search Of A Traveler's iPhone Is Not Routine ...........................................19

     B.    All Phone Data Should Be Suppressed...............................................................20

     C.    The Government's Continued Questioning Of Zarrab After He Requested Counsel Cannot Be Justified As Arrest Processing ............................................20

CONCLUSION.......................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Arbaugh v. Y&H Corp.*,
  546 U.S. 500 (2006)................................................................................11

*City of Arlington, Tex. v. F.C.C.*,
  133 S. Ct. 1863 (2013)..............................................................................7

*Gebardi v. United States*,
  287 U.S. 112 (1932)..................................................................................6

*Kiobel v. Royal Dutch Petroleum Co.*,
  133 S. Ct. 1659 (2013).............................................................................19

*Pasquantino v. United States*,
  544 U.S. 349 (2005)................................................................................17

*RJR Nabisco, Inc. v European Cmty.*,
  136 S. Ct. 2090 (2016)........................................................................12, 17

*Regan v. Wald*,
  468 U.S. 222 (1984)..................................................................................4

*Riley v California*,
  134 S. Ct. 2473 (2014)............................................................................20

*Trainmen v. Baltimore & Ohio R. Co.*,
  331 U.S. 519 (1947)................................................................................11

*United States v. Aleynikov*,
  737 F. Supp. 2d 173 (S.D.N.Y. 2010)....................................................3, 13

*United States v. All Funds on Deposit in United Bank of Switz.*,
  No. 01 Civ. 2091 (JSR), 2003 WL 56999 (S.D.N.Y. Jan. 7, 2003).....................8

*United States v. Amirnazmi*,
  645 F.3d 564 (3d Cir. 2011)......................................................................4

*United States v. Autuori*,
  212 F.3d 105 (2d Cir. 2000).....................................................................16

*United States v. Banki*,
  685 F.3d 99 (2d Cir. 2012).........................................................1, 8, 10, 11

*United States v. Binday*,
  804 F.3d 558 (2d Cir. 2015)....................................................................13

*United States v. Blackmon*,
  839 F.2d 900 (2d Cir. 1988)....................................................................13

*United States v. Bodmer*,
   342 F. Supp. 2d 176 (S.D.N.Y. 2004) ................................................................6, 11

*United States v. Briggs*,
   965 F.2d 10 (5th Cir. 1992) .........................................................................17

*United States v. Burnett*,
   10 F.3d 74 (2d Cir. 1993) ...........................................................................17

*United States v. Chalmers*,
   474 F. Supp. 2d 555 (S.D.N.Y. 2007) ................................................................5, 11

*United States v. Crisci*,
   273 F.3d 235 (2d Cir. 2001) ........................................................................15

*United States v. Dayan*,
   No. 03 Cr. 1471, 2005 WL 757250 (S.D.N.Y. Apr. 4, 2005) ...............................................17

*United States v. DiNome*,
   86 F.3d 277 (2d Cir. 1996) .........................................................................14

*United States v. Djibo*,
   151 F. Supp. 3d 297 (E.D.N.Y. 2015) .................................................................19

*United States v. Homa Int'l Tr. Corp.*,
   387 F.3d 144 (2d Cir. 2004) ........................................................................8

*United States v. Miller*,
   70 F.3d 1353 (D.C. Cir. 1995) ..................................................................15, 17

*United States v. Morgenstern*,
   933 F.2d 1108 (2d Cir. 1991) ...............................................................15, 16, 17

*United States v. Nkansah*,
   699 F.3d 743 (2d Cir. 2012) ..................................................................13, 14

*United States v. Peoni*,
   100 F.2d 401 (2d Cir. 1938) ........................................................................10

*United States v. Perlmutter*,
   636 F. Supp. 219 (S.D.N.Y. 1986) ...................................................................16

*United States v. Piervinanzi*,
   23 F.3d 670 (2d Cir. 1994) .........................................................................18

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000) ..................................................................3, 13, 16

*United States v. Prevezon Holdings LTD.*,
   122 F. Supp. 3d 57 (S.D.N.Y. 2015) ..............................................................17, 18

*United States v. Reff*,
   479 F.3d 396 (5th Cir. 2007) ........................................................................3

*United States v. Rossomando*,
  144 F.3d 197 (2d Cir. 1998)................................................................13

*United States v. Wallace*,
  85 F.3d 1063 (2d Cir. 1996)................................................................8

*United States v. Yakou*,
  428 F.3d 241 (D.C. Cir. 2004).....................................................5, 6, 11, 12

*United States v. Young*,
  952 F.2d 1252 (10th Cir. 1991) ..........................................................15, 17

## **Statutes, Rules, and Regulations**

18 U.S.C. § 371................................................................................18, 19

18 U.S.C. § 1343...............................................................................17

18 U.S.C. § 1344...............................................................................13, 17

18 U.S.C. § 1956...............................................................................18

46 U.S.C. § 1903...............................................................................11

50 U.S.C. § 1702.......................................................................1, 3, 4, 5, 6, 11

50 U.S.C. § 1705...............................................................................5, 6

Fed. R. Crim. P. 12 ...........................................................................2, 3

19 Fed. Reg. 5481 (Aug. 27, 1954)...........................................................4

44 Fed. Reg. 65,956 (Nov. 15, 1979).........................................................4

60 Fed. Reg. 47,062 (Sept. 11, 1995) .......................................................10

77 Fed. Reg. 6659 (Feb. 8, 2012) ............................................................6

77 Fed. Reg. 64,664 (Oct. 22, 2012).........................................................10

## **Other Authorities**

Appendix D – Fundamentals of the Funds Transfer Process, U.S. Treasury Dep't, October 2006,
  *available at* https://www.fincen.gov/news_room/rp/files/Appendix_D.pdf. ..........................9

*Hearing on Iran Nuclear Deal*,
  --- Cong. Rec. ----, 2016 WL 3015315 (May 25, 2016) ...................................9, 10

L. Sand, *et al.*, Modern Federal Jury Instructions—Criminal § 44-4 (2016) ...............16

*OFAC FAQ 11: General Questions* (Jan. 15, 2015),
  https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx#11...........5

*OFAC FAQ 116: Sanctions Compliance* (Jan. 15, 2015),
  https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_compliance.aspx#116. 14

OFAC Regulations for the Financial Community, 4 (2012), *available at*
  https://www.treasury.gov/resource-center/sanctions/Documents/facbk.pdf ...........................5

## PRELIMINARY STATEMENT

The government signals the frailty of its position by urging the Court, repeatedly, not to scrutinize the Indictment defects identified by Zarrab, but to put off his arguments as "fact questions" not suitable to resolve on a motion to dismiss. That is wrong. The Indictment defects are legal, not factual, and they are fundamental. As such, Zarrab, who has been in custody on defective charges for over five months already, is entitled to have the Indictment dismissed.

*First*, the government misconstrues IEEPA, which only permits prosecution in the case of "any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1). The part of that phrase at issue here—"person subject to the jurisdiction of the United States"—has a well settled meaning in the sanctions context; it applies to U.S. citizens anywhere in the world, or foreign nationals in the U.S. It does not apply to Zarrab—a non-U.S. person, acting in a foreign country. In fact, contrary to the government's insistence (without citation) that Zarrab's actions go "to the heart" of IEEPA violations (Opp. 2), there has *never before* been an IEEPA prosecution for exporting services to Iran, or causing the export of services to Iran, against a foreign defendant for conduct abroad.

*Second*, the government virtually ignores the rule of lenity, but the Second Circuit has already invoked it to reject a prosecution under the exact statute and regulation at issue here. *United States v. Banki*, 685 F.3d 99 (2d Cir. 2012). The rule is dispositive in this case too. The government relies on a construction of IEEPA's jurisdictional provision that courts have rejected or found unclear and that prosecutors have never previously adopted. As a non-U.S. person with no ties to this country, Zarrab was not on notice that he could be prosecuted under a statute that applies only to persons "subject to the jurisdiction of the United States."

*Third*, the Opposition demonstrates that the bank fraud count simply does not fit the allegations in the Indictment. The government's theory that Zarrab conspired to send funds from

his own accounts to foreign entities to benefit Iran is fundamentally different from intending to steal from a U.S. bank, which is what bank fraud would entail. Indeed, the Indictment is missing the two most basic elements of that crime. There is no alleged misrepresentation and no claim that Zarrab intended to take any bank's money. The government's arguments for excusing these defects, if accepted, would require rewriting the law on bank fraud.

*Fourth*, the remaining charges of money laundering and conspiracy fail, among other reasons, because they depend on the defective sanctions and bank fraud counts.

*Fifth*, Zarrab's motion to suppress should be granted, or, if the Indictment survives, a hearing should be convened. It is not a "normal" part of border inspection for travelers to be isolated in interview rooms and compelled to provide passwords for their personal devices. The government also fails to distinguish a case that squarely rejects its position.

The troubling nature of the government's prosecution is fully revealed by its focus—on the first page of its 51-page brief—on a "draft letter" offered for no apparent reason other than to inflame hostility towards Zarrab. One sentence after acknowledging that Zarrab neither drafted nor signed this letter, the government treats its words as if they were his own ("as Zarrab put it …."). Opp. 1. This tactic of distorting the record to impugn a defendant should be beneath the government and exemplifies its overreach in this case. More fundamentally, the government's focus on Zarrab's purported desire to undermine U.S. sanctions—which the letter supposedly demonstrates—does not change that, *as a matter of law*, Zarrab is not subject to IEEPA jurisdiction. He is a foreign citizen who, while in a foreign country, initiated a transfer between foreign entities. That is not, and has never been, a crime under U.S. law.

## ARGUMENT

## I. THE INDICTMENT SHOULD BE DISMISSED IN ITS ENTIRETY

Rule 12(b) permits a defendant to raise by pre-trial motion any defense "that the court

2

can determine without a trial on the merits."  Fed. R. Crim. P. 12(b).  It is settled, moreover, that dismissal is warranted where the government's factual allegations, taken as true, are legally insufficient to state an offense.  *See United States v. Pirro*, 212 F.3d 86, 92, 94-95 (2d Cir. 2000) (upholding dismissal of indictment charging false statement in a tax return); *United States v. Aleynikov*, 737 F. Supp. 2d 173, 190-94 (S.D.N.Y. 2010) (dismissing computer fraud charge).  It is clear from the Opposition that the key fact here—that Zarrab and his co-conspirators were "themselves physically located outside the United States" (Opp. 3)—is not in dispute.  As set forth below, the government misconstrues a series of statutes and regulations in its labored effort to justify this impermissible prosecution of a non-U.S. defendant.

## A.  There Is No Jurisdiction Under IEEPA To Prosecute Zarrab

The government argues the defense "poses the wrong question" by focusing on the undisputed fact that Zarrab and his co-conspirators were not present, and never acted, inside the U.S.  Opp. 15-16.  According to the government, the question is not what Zarrab did or where he did it; rather it is "whether the services were exported … from the United States."  *Id*.  But the government cannot remove Zarrab from the analysis of whether it can prosecute Zarrab.  "As it always should be, establishing jurisdiction [over the defendant is] the Government's first order of business …." *United States v. Reff*, 479 F.3d 396, 401 (5th Cir. 2007).  Thus, the key question is not whether "services were exported" from the U.S.; it is whether Zarrab—a foreign citizen in a foreign country who directed a foreign bank to transfer funds between foreign entities—can be prosecuted for conspiring to export services from the U.S.  The answer is he cannot.

### 1.  Zarrab Is Not "Subject To The Jurisdiction Of The United States"

The government begins its statutory analysis by quoting Section 1702(a)(1) (Opp. 8), which sets IEEPA's outer limit of jurisdiction.  That provision authorizes the President to prohibit certain actions undertaken "by any person, or with respect to any property, subject to the

jurisdiction of the United States."  50 U.S.C. § 1702(a)(1).  By its plain terms, IEEPA only authorizes prosecution of persons who commit prohibited acts while subject to U.S. jurisdiction.

The phrase "subject to the jurisdiction of the United States" has long had a specific definition in the sanctions context.  The identical language appeared first in the Trading with the Enemy Act of 1917 (TWEA), the predecessor statute to IEEPA, enacted in 1977.  *See Regan v. Wald*, 468 U.S. 222, 228 (1984) ("The authorities granted to the President by § 203 of IEEPA are essentially the same as those in § 5(b) of TWEA"); *United States v. Amirnazmi*, 645 F.3d 564, 572 (3d Cir. 2011) ("the powers conferred in IEEPA closely mirror those granted in its progenitor [TWEA]").  The regulations promulgated under TWEA defined "person subject to the jurisdiction of the United States" as limited to:  i) U.S. citizens, ii) persons "actually within the United States," iii) corporations organized under U.S. law, and iv) organizations owned by any of the foregoing.  Foreign Assets Control Regulations, 19 Fed. Reg. 5481, 5482 (Aug. 27, 1954); *see also* Iranian Asset Control Regulations (IACR), 44 Fed. Reg. 65,956, 65,957 (Nov. 15, 1979) (adopting substantially same definition of "person subject to the jurisdiction of the United States").  Those limitations are central to a sanctions regime, which by its nature prevents those under U.S. jurisdiction from engaging in transactions that remain lawful in the rest of the world. It is undisputed that Zarrab, for the entire period of the charged conspiracy, did not fall within these categories.

The government ignores OFAC's repeated guidance, cited in Zarrab's opening brief (Br. 21-22), acknowledging this long-standing jurisdictional limit.  Indeed, OFAC has described "the universe" of "persons subject to the jurisdiction of the United States" as follows:

> American citizens and permanent resident aliens wherever they are located; individuals and entities located in the United States (including foreign branches, agencies, rep offices, etc.); corporations organized under U.S. law, including foreign branches; and (under TWEA based sanctions) entities owned or controlled

by any of the above, the most important being foreign-organized subsidiaries of U.S. corporations.

OFAC Regulations for the Financial Community, 4 (2012), *available at* https://www.treasury.gov/resource-center/sanctions/Documents/facbk.pdf.   OFAC has used substantially the same definition in separate public guidance on who must "comply" with its regulations.   *See OFAC FAQ 11: General Questions* (Jan. 15, 2015), https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx#11.

The Indictment here should be dismissed for similar reasons that the D.C. Circuit affirmed dismissal in *United States v. Yakou*, 428 F.3d 241, 252-54 (D.C. Cir. 2004), where the court examined the same jurisdictional language at issue here.   That case involved the prosecution of a British and Iraqi national accused of violating the Arms Export Control Act by negotiating, from outside the U.S., the manufacture and sale of munitions with the government of Iraq.   *Id.* at 244-45.   The court held that to permit the prosecution would impermissibly expand the regulation authorized by Congress—*i.e.*, of persons "subject to the jurisdiction of the United States"—to "non-U.S. persons located and acting outside the United States."   *Id.* at 253; *see also United States v. Chalmers*, 474 F. Supp. 2d 555, 565-66 (S.D.N.Y. 2007) (Chin, J.) (relying on *Yakou* to dismiss counts alleging that a Bahamian company had violated IEEPA and the Export Administration Act and also aided and abetted violations by a U.S. person).   *Yakou* involved a statute at least equally important to national security as IEEPA.   Yet the court refused to extend the statute beyond its plain terms to reach a defendant situated identically to Zarrab.

The government cannot escape the jurisdictional limits of Section 1702 by relying on Section 1705, which authorizes imposing "penalties" on those who conspire to violate, or to cause a violation, of the regulations enacted under IEEPA.   50 U.S.C. § 1705(a).   First, on a plain reading, Section 1705 does not purport to set IEEPA's jurisdiction; it specifies penalties for those

5

within the jurisdiction set by Section 1702.  Second, the *Yakou* court rejected the same logic, when it held that charging a form of secondary liability (aiding and abetting), did not expand the categories of defendants subject to prosecution.  428 F.3d at 252 ("Congress legislates against the backdrop of the presumption against extraterritoriality," and the aiding and abetting statute "is not so broad to expand the extraterritorial reach of the underlying statute.").  If Congress had intended for Section 1705, which is silent as to its territorial reach, to extend IEEPA beyond the limits stated in Section 1702, it would have said so, but did not.  *Id.*  Lastly, nearly a century of precedent teaches that the government cannot use a conspiracy count to ensnare a defendant not otherwise subject to prosecution as a principal under IEEPA.  *See Gebardi v. United States*, 287 U.S. 112, 118-19 (1932) (when Congress assigns guilt to only one type of participant in a transaction, it intends to leave others unpunished); *United States v. Bodmer*, 342 F. Supp. 2d 176, 181 (S.D.N.Y. 2004) (government conceded that under *Gebardi*, if FCPA did not apply to foreign company acting abroad, it could not be charged with conspiring with U.S. person).

Finally, the dire warnings that Zarrab's construction of IEEPA "would make U.S. sanctions laws largely meaningless" (Opp. 15) are belied by the fact that, until this prosecution, the government has enforced IEEPA within the limits described here.[1]  Indeed, the government's insistence that this prosecution is not "novel" is exposed as empty rhetoric by its failure to address, much less refute, Zarrab's showing—in Appendix A to his opening brief—that every past IEEPA prosecution, consistent with Section 1702, has been with respect to U.S.-origin goods or defendants falling within one of the categories of persons that sanctions law deems

---

[1]   The government's warnings also ignore OFAC's frequent use of secondary sanctions (*see* Br. 24) to reach the types of conduct alleged in the Indictment without exceeding IEEPA jurisdiction.  For instance, OFAC could have designated the conspirators as "Specially Designated National(s)," thereby blocking their assets and prohibiting U.S. persons from dealing with them.  Exec. Order No. 13599, 77 Fed. Reg. 6659 (Feb. 8, 2012).  Rather than use this option by exercising its authority over U.S. persons, the government chose to break new ground with this improper prosecution.

"subject to the jurisdiction of the United States." *See* Appendix A annexed hereto (revised chart). It is undisputed that Zarrab and his co-conspirators are not U.S. citizens or residents and were not within the U.S. during the alleged conspiracy; and there is no claim that they possessed U.S. property. The Indictment thus alleges a conspiracy in which *no* participant is a "person subject to the jurisdiction of the United States," and Count Two must be dismissed.

> **2. The Indictment Also Fails To Allege That Zarrab Conspired To Export Any Service From The U.S. Or To Cause Any Such Export**

The government's application of ITSR Sections 203 and 204 is similarly misguided. No regulation can apply more broadly than the statute pursuant to which it is enacted. *City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1870 (2013). Because IEEPA does not grant jurisdiction over Zarrab (*see* Section IA, *supra*), no violation of ITSR can save the Indictment. *Id.* In any event, consistent with IEEPA's limits, ITSR also do not reach Zarrab.

As demonstrated in Zarrab's opening brief, (Br. 14-15), Section 204 requires Zarrab to have engaged in domestic activity in exporting services from the U.S. According to the Indictment, Zarrab did not do this. Instead, he allegedly endeavored while outside of the U.S. to transfer funds from one foreign nation to another, for the benefit of Iran. The government bristles at the notion that a U.S. bank's act of clearing dollars is "incidental" to such a funds transfer (Opp. 2), but that follows from the very nature of the transaction. The government acknowledges that the dollar clearing process does not physically move money; rather it provides a link in the "chain" of "communications" and "account transactions" facilitating a transfer between two other banks. Opp. 16 n.6. This underscores that it was not the "object" of any conspiracy to cause U.S. clearing; rather, those accounting entries were, at most, a step along the way (a link in the "chain") towards accomplishing what the alleged conspirators specifically intended—which, akin to the car driving from New York to Florida, was to move funds from one

location (for example, Turkey) to another (China, for example), with a U.S. bank only incidentally touching the transaction midway to its destination.  *See United States v. Wallace*, 85 F.3d 1063, 1068 (2d Cir. 1996) (conspiracy requires "specific intent" to achieve an unlawful objective).  The Indictment describes a legal agreement to move funds from one foreign country to another—not a scheme to export services from the U.S. in violation of Section 204.  Br. 6-8.

The trio of cases the government cites in claiming that a "service" was performed in the U.S. does nothing to establish that Zarrab can be charged with exporting that service.  None involves the prosecution of a foreign person.  In *United States v. Banki*, 685 F.3d 99 (2d Cir. 2012), the defendant was a U.S. citizen who requested transfers while in the U.S., *id.* at 103. Indeed, the government *conceded* that only transfers *from the U.S.* to Iran could be the basis for conviction.  Govt.'s Proposed Requests to Charge, at 8-9, 30, 36, *United States v. Banki*, (No. S1 10 Cr. 08) (JFK) (S.D.N.Y. May 5, 2010), ECF No. 63; *see also Banki*, 685 F.3d at 116 (noting that jury was instructed that it was only "Banki's role in the transfer of funds to Iran," not receipt of funds from Iran, that "potentially subjected him to criminal liability.").

The government concedes (Opp. 16), as it must, that *United States v. All Funds on Deposit in United Bank of Switz.*, No. 01 Civ. 2091 (JSR), 2003 WL 56999 (S.D.N.Y. Jan. 7, 2003), involved a civil forfeiture of funds held by a foreign company in its own U.S. bank account.  *Id.* at *1.  Tellingly, the government did not seek to prosecute the non-U.S. company, and instead sued its U.S. bank account.  *Id.*  In *United States v. Homa Int'l Tr. Corp.*, 387 F.3d 144 (2d Cir. 2004), the defendant company and its owner were U.S. citizens and residents convicted of wiring funds originating in the U.S. to Iran, "indirectly" via Dubai.  *Id.* at 145.  The government treats it as mere happenstance that these cases did not reach conduct by foreign nationals that occurred abroad, accusing the defense of "attempting to read in" that limit.  Opp.

17.   In reality, the defendants in those cases fall squarely within the accepted definition of "persons subject to the jurisdiction of the United States," and therefore subject to IEEPA jurisdiction.  Zarrab does not.

The government similarly misses the mark with its multiple references to OFAC's revocation of the "U-turn" license.  *E.g.*, *id.* 10, 12, 17.  The authorization to process Iran-related U.S. dollar payments, and the later revocation, applied to U.S. banks—again, "persons subject to the jurisdiction of the United States."  If anything, then, the U-turn exception and its revocation confirms that the ITSR were never meant to extend to foreign individuals acting abroad, because the license only applied to entities falling within IEEPA's express jurisdictional limit.

Nor does resort to Section 203 save Count Two.  The government falls back to the theory that even if Zarrab himself cannot violate Section 204, the Indictment validly charges him with causing a violation by "intentionally caus[ing] U.S. banks unwittingly to conduct U.S. dollar transactions" for the benefit of Iran.  Opp. 13; *see also id.* at 1, 14-15, 17-18.  As argued above, this theory fails first because no regulation can expand the jurisdictional limitation in IEEPA, and no secondary form of liability can expand the class of persons subject to prosecution. Separately, the government's "causer" theory fails because the Indictment does not allege, and would have no basis to allege, that Zarrab had the power to cause a U.S. bank to clear dollars. The Treasury Department has explained that it is not the Originator—here, Zarrab—but the "Originator's Financial Institution" who makes "the required book entries in its accounting system" to "complete" the requested transfer.[2]  In fact, the bank may choose not to involve a U.S. correspondent at all, as was explained by the Acting Under-Secretary for Terrorism and Financial Intelligence, in testimony cited by the government.  *Hearing on Iran Nuclear Deal,* ---

---

[2]   *See* Introduction to Appendix D – Fundamentals of the Funds Transfer Process, U.S. Treasury Dep't, October 2006, *available at* https://www.fincen.gov/news_room/rp/files/Appendix_D.pdf.

Cong. Rec. ----, 2016 WL 3015315 (Adam J. Szubin) (May 25, 2016) (all foreign banks "hold dollars in their vaults" that they can "give ... to any actor, including an Iranian actor").

Thus, Zarrab could not dictate whether his Turkish bank would enlist a U.S. correspondent bank to participate in a dollar transfer, and he certainly had no authority to cause any U.S. bank—where he held no accounts—to act in any particular way.  It is irrelevant whether Zarrab could have anticipated that his Turkish bank would enlist a U.S. correspondent to facilitate the transfers, since it is axiomatic that criminal causer liability cannot be premised on knowledge of even "probab[le]" consequences.  *See United States v. Peoni*, 100 F.2d 401, 402-03 (2d Cir. 1938) ("causal chain" between defendant who passed counterfeit money to someone who in turn passed money to third person does not make defendant liable for causing third person's possession, because even knowledge of a likely consequence is not a "purposive attitude" to make that possession succeed).

The Indictment also wholly disregards that "causer" liability was not added to Section 203 until October 22, 2012.  *Compare* 60 Fed. Reg. 47,062, 47,063 (Sept. 11, 1995), *with* 77 Fed. Reg. 64,664, 64,668 (Oct. 22, 2012).  Thus, even setting aside the Indictment's failure to state that Zarrab could have caused a U.S. clearing, Section 203 fails to provide a hook to charge any pre-October 2012 conduct, including the Overt Acts in paragraph 14(a) through (i).

### 3.     The Rule Of Lenity And Due Process Require Dismissal

The government dismisses the rule of lenity in a single-paragraph.  Opp. 23.  But the Second Circuit has applied the doctrine to reject a prosecution under the very statute and regulations at issue here.  *Banki*, 685 F.3d at 109-12.  The same result is warranted here.

As discussed *supra*, the IEEPA language limiting prosecution to persons "subject to the jurisdiction of the United States" has long been understood in the sanctions context and by prosecutors to reach only U.S. citizens, foreign nationals located in the U.S., and U.S. companies

and their foreign affiliates.  *See* Section I.A.1, *supra*.  And courts that have assessed statutes with identical jurisdictional language have ordered or affirmed dismissals of indictments charging non U.S. defendants who acted abroad.  *Yakou*, 428 F.3d at 253-54; *Chalmers*, 474 F. Supp. 2d at 565-66.  This statutory, regulatory, and precedential backdrop left Zarrab without fair notice that he had done anything that could subject him to prosecution in the U.S.

Even if the government's contrary construction of IEEPA were plausible, this is a situation in which, at the very least, "textual arguments can be made both ways."  *See Banki*, 685 F.3d at 110.  Another court in this District, in dismissing an indictment pre-trial on rule of lenity grounds, observed that the identical statutory phrase, "subject to the jurisdiction of the U.S.," is susceptible to multiple interpretations and has "no ordinary, common sense meaning." *Bodmer*, 342 F. Supp. at 183 (S.D.N.Y. 2004) (Scheindlin, J.) (dismissing indictment alleging that a Swiss national arrested in South Korea conspired to violate the FCPA).  The Supreme Court has expressed that "jurisdiction" is "a word of many, too many, meanings."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006).  This multiplicity of meanings goes to the heart of the lenity doctrine, as well as Due Process notice requirements, and requires dismissal.

Finally, the government's insistence that IEEPA is of a "class" of statutes that can be applied extraterritorially ignores the plain language of Section 1702.[3]  Opp. 18-23.  Like any statute, IEEPA can be applied extraterritorially *only to the extent Congress has authorized such*

---

[3]    Failing to account for Section 1702 causes the government falsely to equate IEEPA to anti-narcotics laws.  Opp. 22.  Drug laws either include jurisdictional language expressly "reach[ing] acts of manufacturing or distribution committed outside the territorial jurisdiction of the United States," *see* 46 U.S.C. § 1903(h), or contain no counterpart to Section 1702 limiting their reach to persons "subject to the jurisdiction of the United States."  It is also incorrect to treat extraterritoriality as a binary exercise in which a statute either is or is not extraterritorial. The government insists, for instance, that IEEPA must apply extraterritorially since it has "International" in its title.  Opp. 21.  Even putting aside that the caption of a statute "cannot undo or limit that which the [statute's] text makes plain," *Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 529 (1947)), the issue is not whether IEEPA applies "internationally"; it is whether it does so to criminalize conduct by a foreign citizen committed abroad.

*application*.  *See RJR Nabisco, Inc. v European Cmty.*, 136 S. Ct. 2090, 2112 (2016) (RICO Act applies extraterritorially, "but only" to the extent that Congress intended, *viz.*, "to the extent that the predicates alleged … apply extraterritorially").  Thus, while the government may be able to pursue charges extraterritorially against, for example, a foreign subsidiary of a U.S. company (because it is a "person[] subject to the jurisdiction of the United States"), it cannot pursue charges against a foreign individual for conduct abroad, because Congress did not extend IEEPA that far.  *See Yakou*, 428 F.3d at 252-54 ("[W]hile the Brokering Amendment and the ITAR have extraterritorial effect for 'U.S. persons,' they do not have such effect for 'foreign persons,' like Yakou, whose conduct occurs outside the United States.").  Congress chose instead to limit IEEPA to "persons subject to the jurisdiction of the United States"; there is no doctrine permitting the government to disregard that express limitation here.

## B.   The Indictment Fails To Allege Conspiracy To Commit Bank Fraud

The government's elaborate defense of its bank fraud count (Opp. 25-39) loses sight of the basic nature of that offense: a scheme to lie to a bank in order to obtain its money.  That is not the scheme the Indictment describes, which was an arrangement among co-conspirators to make payments, using funds from their own accounts, to foreign entities for the benefit of Iran.  Br. 6-8.  Given the disconnect between that conduct and any plot to defraud a bank, it is predictable that the Indictment fails to allege the elements of the crime.  There is no allegation that any U.S. bank was ever put at risk of losing its own money or parting with funds under its control, and there are no alleged misrepresentations directed to a U.S. bank.  Nowhere does the government dispute that this is the first time it has "ever attempted to charge alleged OFAC violations in the form of a bank fraud."  *Id.* 28-29.  The government's proposals to re-write bank fraud law solely to ensnare Zarrab demonstrate that such a charge simply does not fit.

To discourage scrutiny of its defective count, the government leads with the argument

that it should be the "end of the inquiry" that the Indictment "track[s] the language" of the bank fraud statute.  Opp. 4, 26.  But the Second Circuit rejected that shortcut when it held that parroting a statute's "generic terms" does not insulate an indictment from dismissal.  *Pirro*, 212 F.3d at 92-93; *see also Aleynikov*, 737 F. Supp. at 190-94 (dismissing count that tracked language of statute).  The government also accuses Zarrab of "look[ing] beyond the Indictment" to raise factual disputes.  Opp. 26, 28.  Actually, Zarrab is looking *within* the Indictment to observe that it includes no allegations—beyond the insufficient recitation of the statutory text— addressed to the most basic elements of the charged crime.  Count Three should be dismissed.

### 1.    The Indictment Fails To Allege A Scheme To Harm A U.S. Bank Or To Obtain Money Under Bank Custody

The government struggles unsuccessfully to identify an intended "loss" to any U.S. bank, as required under Section 1344(1), or to describe a conspiracy to obtain funds under bank custody, as required under Section 1344(2).  Bank fraud "is a specific intent crime requiring proof of an intent to victimize a bank by fraud," which entails subjecting "the institution to actual or potential loss."  *United States v. Nkansah*, 699 F.3d 743, 748 (2d Cir. 2012).  That loss, moreover, must be financial.  *United States v. Blackmon,* 839 F.2d 900, 906 (2d Cir. 1988) (bank fraud "threaten[s] the financial integrity of a … bank").  But there is no suggestion in the Indictment or Opposition that Zarrab or any co-conspirator had that intent.

The government therefore theorizes that Zarrab committed bank fraud, not by seeking to cause financial loss, but by "rob[bing] the banks of critical information that they needed to make economic decisions."  Opp. 4.  None of the government's cited cases support this novel theory.  In each, the defendant misled a victim in order to get that victim *to part with its money*.[4]  As

---

[4]    *United States v. Rossomando*, 144 F.3d 197, 198 (2d Cir. 1998), was a mail fraud case in which the defendant's lie to his pension fund about his outside income could have affected the amount to which he was due in disability payments. *United States v. Binday*, 804 F.3d 558, 567-68 (2d Cir. 2015), was a mail and wire fraud case in which the defendant insurance brokers' lies

such, none relieves the government of its obligation to allege that Zarrab, beyond depriving banks of "information," intended for them to part *with their money.*

The government ultimately tries to claim that the banks were at risk of a financial loss, but the "tremendous" risks it identifies (*id.* 32) contradict its own core theory. After arguing that Zarrab participated in a "scheme to cause [U.S.] banks unwittingly to conduct financial transfers," (*id.* 1, 2, 13, 34) and to "rob" innocent banks of critical information (*id.* 4, 31, 32), the government reverses course to maintain that the banks could be fined for "knowingly" effecting transfers to Iran. *Id.* 32-33. In other words, to concoct an argument that Zarrab exposed the banks to risk of financial loss, the government discards its central claim that "inducing U.S. banks to unwittingly process the transactions … was the very purpose of the scheme." *Id.* 2.

The other scenarios the government imagines only underscore that any "potential consequence" of financial loss (*id.* 32) would be, at best, "remote," and thus insufficient to support a bank fraud charge. *Nkansah*, 699 F.3d at 750. For instance, the government theorizes that U.S. banks could be penalized even for "unwitting" transactions (Opp. 33), but fails to identify *any* time that has ever happened, citing instead cases where banks had "reason to know" that they were facilitating sanctions violations. *Id.* 33-34.[5] The government also offers that if a U.S. bank unwittingly aids a foreign bank engaged in sanctions avoidance, the foreign bank's U.S. account could be seized. *Id.* 34. This is the wrong victim, because the seized account would hold only money that belongs to the *foreign* bank, not the U.S. bank. Lastly, the government muses—again, without any example—that a U.S. bank could be harmed if it

---

exposed the victim insurance companies to loss. *United States v. DiNome*, 86 F.3d 277, 278 (2d Cir. 1996), involved a false application to obtain a mortgage.

[5]   It is OFAC policy not to pursue an enforcement action if a U.S. bank "(1) is operating solely as an intermediary, (2) does not have any direct relationship with the [blocked] entity …, and (3) does not know or have reason to know the entity's ownership or other information demonstrating the blocked status of the entity's property." *OFAC FAQ 116: Sanctions Compliance* (Jan. 15, 2015), https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_compliance.aspx#116.

"transmit[s] the funds that they were requested to send without receiving a corresponding reimbursement" from a recipient bank.  *Id.*  But there is no allegation that any bank was called upon to advance funds, and it is the government's own premise that clearing entails no physical funds transfer, only a chain of "communications" and accounting entries.  *Id.* 16 n.6.

The government fares no better in arguing that the purported conspiracy was directed at obtaining money or property held by a U.S. bank.  *Id.* 35-37.  The government calls it "well-settled law" that processing a funds transfer "based on false and fraudulent pretenses" is bank fraud, "even if the funds belong to someone other than the banks."  *Id.* 36.  But this ignores that, *in all of the cases it cites*, the banks were exposed to a risk of loss because funds were being drawn from an innocent account holder who would thus have a cause of action against the bank.[6]  *See, e.g.*, *United States v. Morgenstern*, 933 F.2d 1108, 1114 (2d Cir. 1991) ("By falling prey to this scheme the bank lost custody over its accountholder's money, exposing the bank to the real threat of civil liability ….").  The claim here, that Zarrab and his co-conspirators transferred money from their own accounts, leaves no comparable risk that an innocent account holder could successfully sue for losses on his or her account.  The Opposition, and its misuse of case law, only makes concrete that there is no plausible basis for maintaining the bank fraud charge.

## 2.     The Indictment Fails To Allege Misrepresentations To A Bank

In an effort to depict the dispute here as factual, the government misstates Zarrab's argument as "claim[ing] that the representations made to the U.S. banks were neither false nor material."  Opp. 26.  The Indictment defect is much more basic.  It never describes any representation, or any communication whatsoever, by any purported co-conspirator to a U.S.

---

[6] *United States v. Crisci*, 273 F.3d 235 (2d Cir. 2001) (defendant requisitioned and then cashed checks drawn on his innocent employer's bank accounts, totaling  $95,000); *United States v. Miller*, 70 F.3d 1353 (D.C. Cir. 1995) (defendant used his innocent former employer's ATM card and withdrew her funds for his personal use); *United States v. Young*, 952 F.2d 1252, 1254 (10th Cir. 1991) (employee schemed to open an account in the name of her innocent employer and then diverted thousands of dollars to the account for her personal use).

bank.  *See* L. Sand, *et al.*, Modern Federal Jury Instructions—Criminal § 44-4 (2016) (requiring

a false or deceitful "statement, representation, claim, or document" to prove bank fraud).  In the

five pages devoted to this issue (Opp. 27-31), the government never identifies any part of its

Indictment that describes a false representation.  It instead observes that there "is no blanket rule

that instructions to transfer funds cannot carry with them misrepresentations."  *Id.* 28.  But the

theoretical possibility of a false statement in a transfer instruction does not cure the absence of an

allegation of an actual misrepresentation.

      Unable to point to any false statement, the government contends that the "transactions …

are themselves misrepresentations" because Zarrab failed to advise the banks that the money

transfers were ultimately destined to benefit Iranian entities.  *Id.* 27.  It is elementary, however,

that omitting information is not actionable absent a "legal duty" to provide that information.

*United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("The fraud statutes are violated by

affirmative misrepresentations or by omissions of material information that the defendant has a

duty to disclose."); *United States v. Perlmutter*, 636 F. Supp. 219, 224 (S.D.N.Y. 1986) (a person

cannot be accused of concealing something she has no duty to disclose).  The Indictment fails to

identify the source of any duty here.  This exact deficiency was dispositive in *Pirro*; the Second

Circuit held that the alleged omission on Pirro's tax return could not "amount to a false statement

… without the crucial background fact that gives rise to the duty to disclose the fact that was

omitted."  *Pirro*, 212 F.3d at 93.

      The government's heavy reliance on *United States v. Morgenstern*, 933 F.2d 1108 (2d

Cir. 1991), confirms the fatal defect in its theory.  Morgenstern was an accountant who stole

from his clients by inducing them to sign checks by telling them falsely that they were needed to

pay taxes.  *Id.* at 1110.  He then deposited the checks—which were not made out to him—into a

bank account under his own control.  *Id.*  The Second Circuit affirmed the bank fraud conviction because, by depositing checks not made out to him into his own account, Morgenstern was making a "false representation that he was properly authorized" by his clients to do so.[7]  *Id.* at 1113-14.   There is no equivalent here:   no allegation that Zarrab or his co-conspirators misrepresented their authority over an account or that they were transferring funds not their own.

### 3.    The Government Impermissibly Applies The Bank Fraud Statute Extraterritorially

The government's reliance on *Pasquantino v. United States*, 544 U.S. 349 (2005), to justify its extraterritorial application of the bank fraud statute to a foreign scheme, is also misplaced.   That case held that the wire fraud statute had been applied domestically because, while the victim was foreign, defendants "executed the scheme inside the United States."   *Id.* at 371.[8]   This case is the mirror image of *Pasquantino*, as the alleged scheme was executed abroad.   Moreover, the focus of any bank fraud charge is the knowing execution of a scheme to defraud a bank.   18 U.S.C. § 1344.   Here, because the conspirators' alleged "conduct relevant to the [statute's] focus occurred in a foreign country, … the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."   *RJR*, 136 S. Ct. at 2101.   The government fails to "convert this foreign scheme into a domestic one."   *United States v. Prevezon Holdings LTD.*, 122 F. Supp. 3d 57, 72 (S.D.N.Y. 2015).

---

[7]  The other authorities the government cites also involve conduct in which defendants misrepresented their authority over funds or accounts.  *See United States v. Burnett*, 10 F.3d 74, 78 (2d Cir. 1993) (defendant's check-kiting scheme was more than "bare" as he concealed his control over an account by using checks signed by someone else, and made several other misrepresentations to the bank); *United States* v. *Dayan*, No. 03 Cr. 1471, 2005 WL 757250, at *3 (S.D.N.Y. Apr. 4, 2005) (same); *United States v. Miller*, 70 F.3d 1353, 1355-56 (D.C. Cir. 1995) (defendant's use of stolen ATM card and pin number constituted "affirmative misrepresentations" about his "supposed authority" to make withdrawals); *United States v. Young*, 952 F.2d 1252, 1257 (10th Cir. 1991) (defendant "misrepresented to the bank she had authority to deposit" checks belonging to a third party); *United States v. Briggs*, 965 F.2d 10, 12 (5th Cir. 1992) ("Briggs falsely held herself out to have authority").

[8]  Further, the wire fraud statute expressly criminalizes the use of the wire in interstate or foreign commerce in furtherance of a scheme to defraud.  18 U.S.C. § 1343.

### C.     The Money Laundering And IEEPA Charges Impermissibly Merge.

The money laundering charge fails, most fundamentally, because the predicate offenses of IEEPA conspiracy and bank fraud fail.  But it is also doomed by the government's concessions that the money laundering statute's prohibition on conducting transactions with the proceeds of specified unlawful activity (SUA) to promote that activity "can present a 'merger' problem, if a 'violation of the [underlying] statute would also be a violation of the money-laundering statute.'"  Opp. 39-40 (discussing 18 U.S.C. § 1956(a)(1)).  The same problem is present here under Section 1956(a)(2)(A), because the Indictment treats the alleged IEEPA violation also as a violation of the money laundering statute's prohibition on "transmit[ting] … funds from a place in the United States to or through a place outside the United States" to promote "specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A); *see* Br. 33-34.

Without explaining why the same principles of statutory construction that apply to "proceeds" money laundering should not apply here, the government suggests that the Second Circuit is indifferent to whether an underlying violation and the international transaction promoting that violation are "analytically distinct."  Opp. 40 (quoting *United States v. Piervanzi*, 23 F.3d 670, 677 (2d Cir. 1994)).  Not so.  *Piervanzi* held that merger did not apply in that case precisely because the SUA "*was analytically distinct* from the attempted transmission of those funds overseas, and was itself independently illegal."  *Id*. at 679 (emphasis added).  Here, in contrast, the Indictment charges exactly what the doctrine of merger prohibits.

### D.     The Indictment Does Not Describe A Conspiracy To Defraud The U.S.

The conspiracy count fails because the Indictment does not describe an underlying scheme to violate U.S. sanctions laws (*see* Section I.A, *supra*), and there can thus be no conspiracy to frustrate enforcing those laws.  Separately, the text of Section 371 does not support the government's contention that a mere violation of an agency's regulation somehow constitutes

18

a conspiracy to "defraud" that agency.  *See* Br. 34-35.  And while the statute applies to persons who "commit *any* offense against the United States," 18 U.S.C. § 371, such a "generic term []" does not overcome the presumption against extraterritorial effect.  *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1665 (2013).

## II.   THE COURT SHOULD GRANT THE MOTION TO SUPPRESS, OR CONVENE A HEARING

Should the Court reach the issue, the Opposition fails to refute Zarrab's motion to suppress the contents of his iPhone and his answers to questioning after he requested counsel.

### A.   The Search Of A Traveler's iPhone Is Not Routine

The government adopts a novel view of what is a routine border search and of how a passcode-protected personal device, such as an iPhone, can be accessed as part of one.  In the process, it glosses over the in-depth analysis of nearly identical facts in *United States v. Djibo*, 151 F. Supp. 3d 297 (E.D.N.Y. 2015) (Johnson, J.).

There is no dispute that the search of one's hand-luggage, suitcases, personal effects and the like are reasonably to be expected when entering the U.S.  The government now informs us, however, that the public should also reasonably expect to have its personal electronic devices reviewed as part of a routine search at an airport.  What is more, travelers should expect to be compelled to provide passwords to those devices and thus allow central aspects of their private lives—including text messages, family photos and medical prescriptions, and calendars with personal appointments—to be perused at will and without limits by government officials.  The government is wrong.  Travelers do not reasonably expect a search of this type as part of a routine customs inquiry, and no case suggests otherwise.  The government quickly dismisses the *only* case directly on point, *Djibo*.

19

### B.     All Phone Data Should Be Suppressed

The government claims that because it procured a search warrant after obtaining the passcode, the search of the phone is valid.  The government is confusing two issues:  the search warrant authorization to access the phone, and the technical ability to gain access.  Zarrab's motion to suppress relates to the latter.[9]  The government does not deny that it had the technical ability to access the phone data *only* because it obtained the passcode from Zarrab.  That the government thereafter got a search warrant does not change the fact that it would not have been able to gain access to the phone without unlawfully obtaining the passcode.

### C.     The Government's Continued Questioning Of Zarrab After He Requested Counsel Cannot Be Justified As Arrest Processing

The government does not dispute that *after* Zarrab requested counsel, and *after* the agents assured him that his request would be honored, the agents turned off the video recorder and continued to question him.  It instead attempts to justify these actions by claiming that the agents merely sought pedigree information routinely obtained during arrest processing.  Opp. 53-54.  In a case such as this, where the defendant's bank accounts and businesses are at the heart of the government's charges, questioning about the accounts or businesses should be seen for what it is: continued interrogation in the absence of counsel.  Accordingly, the Fifth Amendment requires suppression of Zarrab's statements after he clearly invoked counsel on videotape.

### CONCLUSION

This Court should dismiss the Indictment.  If it reaches the issue, it should suppress the contents of the iPhone and Zarrab's responses to the agents' questions after he requested counsel.

---

[9]  The government's contention that *Miranda* violations cannot trigger suppression of evidence under the *Wong Sun* rationale is also wrong.  With respect to electronic device passwords, deterrence of police misconduct is well-served by suppression; otherwise, agents could, as here, take advantage of a defendant's ignorance of his right not to answer their questions when their real object is access to his private devices.  *See Riley v California*, 134 S. Ct. 2473, 2489-91 (2014) (cell phones can contain more sensitive records and private information than a home).

20

Dated:  New York, New York
        August 22, 2016

BANCROFT PLLC

/s/ *Viet D. Dinh*
Viet D. Dinh
Paul D. Clement
Jeffrey M. Harris
Edmund G. LaCour Jr.
500 New Jersey Avenue, NW
7th Floor
Washington, DC 20001
Tel:  (202) 234-0900
Fax:  (202) 234-2806

BRAFMAN & ASSOCIATES, P.C.

/s/ *Benjamin Brafman*
Benjamin Brafman
Marc Agnifilo
Joshua D. Kirshner
767 3rd Avenue, 26th Fl.
New York, NY 10017
Tel:  (212) 750-7800
Fax:  (212) 750-3906


Jonathan C. Poling
AKIN GUMP STRAUSS HAUER &
FELD LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

/s/ *Christine H. Chung*
Christine H. Chung
Adam M. Abensohn
William A. Burck
Daniel R. Koffmann
51 Madison Avenue
22nd Floor
New York, NY 10010
Tel:  (212) 849-7000
Fax:  (212) 849-7100


George D. Kleinfeld
CLIFFORD CHANCE US LLP
2001 K Street, N.W.
Washington, DC 20006


Aaron T. Wolfson
Tara J. Plochocki
LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC
405 Lexington Avenue
62nd Floor
New York, NY 10174

*Attorneys for Defendant Reza Zarrab*

# APPENDIX A

Cases identified in legal database searches in which violation of 31 C.F.R. §§ 560.203–560.204 were charged criminally or alleged in connection with a civil forfeiture action.[*]

| | Case Name | Charged Provision(s) | Goods/Services at issue | Cases Involving Section 204 | | | | Conduct Alleged |
|---|---|---|---|---|---|---|---|---|
| | | | | U.S. Citizen or Resident | Any Person Within the United States | Entity Organized Under U.S. Law | Property Subject to the Jurisdiction of the United States[**] | |
| 1. | United States v. Ehsan, 97-cr-45 (WMN) (D. Md. 1997) | 31 C.F.R. §§ 560.203–560.204 | Transformer Oil Gas Analysis Systems | | | | X | Non-U.S. person contacted a U.S.-based entity seeking to purchase U.S.-origin Transformer Oil Gas Analysis Systems (TOGAS) and asked the manufacturer to ship the merchandise to the defendant's agent in New Jersey, from which he would ship it to Dubai and then on to Iran. |
| 2. | United States v. Reyes, 98-cr-189 (CNC) (E.D. Wis. 1998) | 31 C.F.R. §§ 560.203–560.204 | Military Aircraft Parts | X | X | X | X | Wisconsin-based broker of commercial and military aviation component parts and its employee sold U.S.-origin military components to a Switzerland-based customer whom the defendant knew intended to ship the parts to Iran. |

---

[*]   Because this chart relies on reported decisions available in Westlaw and Lexis, it does not include information about unreported cases or settlements.

[**]   In any criminal prosecution in which an "X" is marked only for "property subject to the jurisdiction of the United States," the defendant or defendants also contacted the U.S. or conducted activity there, as was indicated in Appendix A to Zarrab's opening brief.

1

| | Cases Involving Section 204 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Case Name** | **Charged Provision(s)** | **Goods/Services at issue** | **U.S. Citizen or Resident** | **Any Person Within the United States** | **Entity Organized Under U.S. Law** | **Property Subject to the Jurisdiction of the United States**" | **Conduct Alleged** |
| 3. | United States v. All Funds on Deposit in United Bank of Switz., 01-cv-2091 (JSR) (S.D.N.Y. 2001) | 31 C.F.R. § 560.204 | Money Transfers | Civil Asset Forfeiture Case | | | X | Money remitters based in the United States facilitated funds transfers to Iran by collecting their customers' payments and making group deposits of U.S. dollars into a New York-based bank account and sent faxes from the U.S. to Dubai with instructions designating the bank accounts in Iran that the New York-based deposits should benefit. |
| 4. | United States v. Homa International Trading Corp., 01-cr-417 (TPG) (S.D.N.Y. 2001) | 31 C.F.R. §§ 560.203–560.204 | Money Transfers | X | X | X | | Manhattan-based money services business and its principal facilitated money transfers to bank accounts in Iran via Dubai, which amounted to a "service" from the U.S. in violation of the regulations. |
| 5. | United States v. Sevilla, 04-cr-171 (N.D. Ill. 2004) | 31 C.F.R. §§ 560.203–560.204 | Hydraulic Testing Machine with nuclear applications | X | X | | X | Sales director of California-based company attempted to export from the U.S. to Iran U.S.–origin machinery and software used to measure the tensile strength of steel, a component on the Nuclear Suppliers' Group "Watch List" because of its potential use in nuclear applications. |

2

| | | | | Cases Involving Section 204 | | | |
|---|---|---|---|---|---|---|---|
| Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Citizen or Resident | Any Person Within the United States | Entity Organized Under U.S. Law | Property Subject to the Jurisdiction of the United States" | Conduct Alleged |
| 6. United States v. Gholikhan, 05-cr-60238 (JIC) (S.D. Fla. 2005) | 31 C.F.R. § 560.204 | Military Night Vision Goggles to Iranian Military | | | | X | Iranian nationals solicited and arranged purchases of U.S.-origin military night vision goggles from the United States for shipment to Iran's military and police forces through Austria.  Defendants personally directed communications and money transfers to the U.S. in furtherance of the scheme. |
| 7. United States v. Quinn, 05-cr-18 (JDB) (D.D.C. 2005) | 31 C.F.R. §§ 560.203–560.204 | Forklift Parts | X | X | | X | Vice president and sales representative of Kentucky-based company shipped U.S.-origin forklift parts from the U.S. to Iran via the UAE. |
| 8. United States v. Groos, 06-cr-420 (N.D. Ill. 2006) | 31 C.F.R. §§ 560.203–560.204 | Firefighting Equipment | X | | | X | U.S. citizen and director of Luxembourg-based subsidiary of U.S. corporation transshipped U.S.-origin firefighting equipment to Iran. |
| 9. United States v. Mousavi, 07-cr-513 (C.D. Cal. 2008) | 31 C.F.R. § 560.204 | Consulting services for wireless company | X | X | | | Naturalized U.S. citizen of Iranian origin and U.S. resident entered into consulting contracts to support a Kuwaiti company's efforts to bid for a mobile communication license and to establish a bank and leasing company in Iran. |

3

| | Cases Involving Section 204 | | | | | | |
|---|---|---|---|---|---|---|---|
| Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Citizen or Resident | Any Person Within the United States | Entity Organized Under U.S. Law | Property Subject to the Jurisdiction of the United States* | Conduct Alleged |
| 10. United States v. Amirnazmi, 08-cr-429 (CMR) (E.D. Pa. 2008) | 31 C.F.R. § 560.204 | Software for Pricing Chemicals | X | X | | X | A dual U.S. and Iranian citizen and owner of Pennsylvania-based company developed and provided to Iranian government officials a proprietary database and software system that helped buyers locate the best prices in the world for various chemicals. |
| 11. In re 650 Fifth Ave., 08-cv-10934 (KBF) (S.D.N.Y. 2008) | 31 C.F.R. §§ 560.203– 560.204 | Rental income from tenants | Civil Asset Forfeiture Case | | | X | 36-story office building located at 650 Fifth Avenue was jointly owned by a U.S.-based Iranian charitable foundation and an entity indirectly by an Iranian bank identified with the Government of Iran. The Iranian bank gave instructions on the financing and management of the property and received rental income generated from tenants. |
| 12. United States v. Sairafi, 09-cr-01344 (VBF) (C.D. Cal. 2009) | 31 C.F.R. §§ 560.203– 560.204 | Vacuum Pumps with nuclear applications | X | X | | X | Iranian-born U.S. citizen and owner and operator of a California company arranged with an Iran-based co-conspirator to export high-dollar U.S.-origin vacuum pumps and pump-related equipment to Iran via the UAE. The U.S.-based defendant arranged for the shipment from the U.S. to the UAE, including by falsifying air waybills, where the Iran-based defendant then arranged for shipment to Iran. |

4

| | Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Citizen or Resident | Any Person Within the United States | Entity Organized Under U.S. Law | Property Subject to the Jurisdiction of the United States** | Conduct Alleged |
|---|---|---|---|---|---|---|---|---|
| | **Cases Involving Section 204** | | | | | | | |
| 13. | United States v. Seifi, et al., 10-cr-58 (M.D. Ga. 2010) United States v. Tabibi, et al., 11-cr-33 (M.D. Ga. 2011) | 31 C.F.R. §§ 560.203–560.204 | Military Aircraft Parts | X*** | | | X | Three defendants—an Iranian national, an Iranian-born U.S. citizen, and a U.S. citizen— contacted U.S.-based suppliers and arranged to export U.S.-origin parts for F-4 and F- 5 fighter jets and AH-1 and UH-1 Huey attack helicopters from the U.S. to Iran via the UAE. |
| 14. | United States v. Banki, 10-cr-8 (PAE) (S.D.N.Y. 2010) | 31 C.F.R. § 560.204 | $3.4 million in money transfers to the U.S. from Iran | X | X | | | Naturalized U.S. citizen of Iranian origin who received $3.4 million in funds from his family in Iran convicted of aiding and abetting sending by other U.S. residents of corresponding amount of funds from the U.S. to Iran through money transmitting system called a hawala, in violation of the Iran sanctions. |
| 15. | United States v. Nazemzadeh, 11-cr-5726 (S.D. Cal. 2011) | 31 C.F.R. §§ 560.203–560.204 | Medical Equipment | X | X | | X | Iranian national living in Michigan on an H1B employment visa sought to purchase U.S.-origin medical equipment from U.S.-based suppliers for subsequent shipment to Iran. When one shipper refused to ship to Iran, the defendant suggested making the shipment to a Dutch company as an intermediary. |

5

*** Two of the defendants were U.S. citizens, and one was an Iranian citizen. All three allegedly conspired to export property from the United States to Iran.

| | Cases Involving Section 204 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Citizen or Resident | Any Person Within the United States | Entity Organized Under U.S. Law | Property Subject to the Jurisdiction of the United States* | Conduct Alleged |
| 16. | United States v. Alexander, 11-cr-36 (N.D. Ga. 2011) | 31 C.F.R. §§ 560.203–560.204 | Industrial Metal Cutting Machines | X | X | | X | U.S. resident and owner-manager of U.S.-based manufacturer of water-jet cutting systems negotiated the sale of two U.S.-origin cutting systems to Iran-based companies and arranged for them to be shipped to Iran via the UAE. |
| 17. | United States v. Aydin, 12-cr-221 (ODE) (N.D. Ga. 2012) | 31 C.F.R. §§ 560.203–560.204 | F-14 Fighter Jet parts | | | | X | Iranian and Turkish nationals sent emails and wired money to the U.S. in order to export U.S.-origin military aircraft parts from the United States to Iran via Turkey. |
| 18. | United States v. Saboonchi, 13-cr-100 (PWG) (D. Md. 2013) | 31 C.F.R. §§ 560.203–560.204 | Industrial parts and components | X | X | | X | U.S. citizen and Maryland resident placed orders for U.S.-origin industrial parts and components such as cyclone separators, thermocouples, and stainless steel filter elements on behalf of Iranian-based co-conspirator and then shipped goods from the U.S. to co-conspirator in Iran via the UAE and China. |
| 19. | United States v. Ghorashi Sarvestani, 13-cr-214 (PGG) (S.D.N.Y. 2013) | 31 C.F.R. §§ 560.203–560.204 | Satellite Technology | | | | X | Iranian national solicited and negotiated purchases of U.S.-origin satellite technology and hardware from U.S.-based suppliers for shipment to Iran via Dubai, Malaysia, and Hong Kong and directed payments to the suppliers in the U.S. |

**Cases Involving Section 204**

| Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Citizen or Resident | Any Person Within the United States | Entity Organized Under U.S. Law | Property Subject to the Jurisdiction of the United States** | Conduct Alleged |
|---|---|---|---|---|---|---|---|
| 20. United States v. Hassanshahi, 13-cr-274 (RC) (D.D.C. 2013) | 31 C.F.R. §§ 560.203– 560.204 | Power Plant Components | X | X | | X | California resident purchased U.S.-origin power plant components in the United States and shipped them ultimately to Iran, often with intermediate stops in non-embargoed countries. |

| Cases Involving Section 203 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Citizen or Resident | Any Person Within the United States | Entity Organized Under U.S. Law | Property Subject to the Jurisdiction of the United States[****] | Conduct Alleged |
| 1. | United States v. Ehsan, 97-cr-45 (WMN) (D. Md. 1997) | 31 C.F.R. §§ 560.203–560.204 | Transformer Oil Gas Analysis Systems | | | | X | Non-U.S. person contacted a U.S.-based entity seeking to purchase U.S.-origin Transformer Oil Gas Analysis Systems (TOGAS) and asked the manufacturer to ship the merchandise to the defendant's agent in New Jersey, from which he would ship it to Dubai and then on to Iran. |
| 2. | United States v. Reyes, 98-cr-189 (CNC) (E.D. Wis. 1998) | 31 C.F.R. §§ 560.203–560.204 | Military Aircraft Parts | X | X | X | X | Wisconsin-based broker of commercial and military aviation component parts and its employee sold U.S.-origin military components to a Switzerland-based customer whom the defendant knew intended to ship the parts to Iran. |
| 3. | United States v. Homa International Trading Corp., 01-cr-417 (TPG) (S.D.N.Y. 2001) | 31 C.F.R. §§ 560.203–560.204 | Money Transfers | X | X | X | | Manhattan-based money services business and its principal facilitated money transfers to bank accounts in Iran via Dubai, which amounted to a "service" from the U.S. in violation of the regulations. |

8

---

[****]   In any criminal prosecution in which an "X" is marked only for "property subject to the jurisdiction of the United States," the defendant or defendants also contacted the U.S. or conducted activity there, as was indicated in Appendix A to Zarrab's opening brief.

| | Cases Involving Section 203 | | | | | | |
|---|---|---|---|---|---|---|---|
| Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Citizen or Resident | Any Person Within the United States | Entity Organized Under U.S. Law | Property Subject to the Jurisdiction of the United States**** | Conduct Alleged |
| 4. United States v. Sevilla, 04-cr-171 (N.D. Ill. 2004) | 31 C.F.R. §§ 560.203– 560.204 | Hydraulic Testing Machine with nuclear applications | X | X | | X | Sales director of California-based company attempted to export from the U.S. to Iran U.S.-origin machinery and software used to measure the tensile strength of steel, a component on the Nuclear Suppliers' Group "Watch List" because of its potential use in nuclear applications. |
| 5. United States v. Quinn, 05-cr-18 (JDB) (D.D.C. 2005) | 31 C.F.R. §§ 560.203– 560.204 | Forklift Parts | X | X | | X | Vice president and sales representative of Kentucky-based company shipped U.S.-origin forklift parts from the U.S. to Iran via the UAE. |
| 6. United States v. Groos, 06-cr-420 (N.D. Ill. 2006) | 31 C.F.R. §§ 560.203– 560.204 | Firefighting Equipment | X | | | X | U.S. citizen and director of Luxembourg-based subsidiary of U.S. corporation transshipped U.S.-origin firefighting equipment to Iran. |
| 7. In re 650 Fifth Ave., 08-cv-10934 (KBF) (S.D.N.Y. 2008) | 31 C.F.R. §§ 560.203– 560.204 | Rental income from tenants | Civil Asset Forfeiture Case | | | X | 36-story office building located at 650 Fifth Avenue was jointly owned by a U.S.-based Iranian charitable foundation and an entity indirectly by an Iranian bank identified with the Government of Iran. The Iranian bank gave instructions on the financing and management of the property and received rental income generated from tenants. |

| | Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Citizen or Resident | Any Person Within the United States | Entity Organized Under U.S. Law | Property Subject to the Jurisdiction of the United States[****] | Conduct Alleged |
|---|---|---|---|---|---|---|---|---|
| | | | Cases Involving Section 203 | | | | | |
| 8. | United States v. Sairafi, 09-cr-01344 (VBF) (C.D. Cal. 2009) | 31 C.F.R. §§ 560.203– 560.204 | Vacuum Pumps with nuclear applications | X | X | | X | Iranian-born U.S. citizen and owner and operator of a California company arranged with an Iran-based co-conspirator to export high-dollar U.S.-origin vacuum pumps and pump-related equipment to Iran via the UAE. The U.S.-based defendant arranged for the shipment from the U.S. to the UAE, including by falsifying air waybills, where the Iran-based defendant then arranged for shipment to Iran. |
| 9. | United States v. Seifi, et al., 10-cr-58 (M.D. Ga. 2010) United States v. Tabibi, et al., 11-cr-33 (M.D. Ga. 2011) | 31 C.F.R. §§ 560.203– 560.204 | Military Aircraft Parts | X[*****] | | | X | Three defendants—an Iranian national, an Iranian-born U.S. citizen, and a U.S. citizen— contacted U.S.-based suppliers and arranged to export U.S.-origin parts for F-4 and F-5 fighter jets and AH-1 and UH-I Huey attack helicopters from the U.S. to Iran via the UAE. |

[*****] *See supra* n.***.

10

| | | Cases Involving Section 203 | | | | | |
|---|---|---|---|---|---|---|---|
| | Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Citizen or Resident | Any Person Within the United States | Entity Organized Under U.S. Law | Property Subject to the Jurisdiction of the United States**** | Conduct Alleged |
| 10. | United States v. Nazemzadeh, 11-cr-5726 (S.D. Cal. 2011) | 31 C.F.R. §§ 560.203–560.204 | Medical Equipment | X | X | | X | Iranian national living in Michigan on an H1B employment visa sought to purchase U.S.-origin medical equipment from U.S.-based suppliers for subsequent shipment to Iran. When one shipper refused to ship to Iran, the defendant suggested making the shipment to a Dutch company as an intermediary. |
| 11. | United States v. Alexander, 11-cr-36 (N.D. Ga. 2011) | 31 C.F.R. §§ 560.203–560.204 | Industrial Metal Cutting Machines | X | X | | X | U.S. resident and owner-manager of U.S.-based manufacturer of water-jet cutting systems negotiated the sale of two U.S.-origin cutting systems to Iran-based companies and arranged for them to be shipped to Iran via the UAE. |
| 12. | United States v. Aydin, 12-cr-221 (ODE) (N.D. Ga. 2012) | 31 C.F.R. §§ 560.203–560.204 | F-14 Fighter Jet parts | | | | X | Iranian and Turkish nationals sent emails and wired money to the U.S. in order to export U.S.-origin military aircraft parts from the United States to Iran via Turkey. |
| 13. | United States v. Saboonchi, 13-cr-100 (PWG) (D. Md. 2013) | 31 C.F.R. §§ 560.203–560.204 | Industrial parts and components | X | X | | X | U.S. citizen and Maryland resident placed orders for U.S.-origin industrial parts and components such as cyclone separators, thermocouples, and stainless steel filter elements on behalf of Iranian-based co-conspirator and then shipped goods from the U.S. to co-conspirator in Iran via the UAE and China. |

11

| | | Cases Involving Section 203 | | | | | |
|---|---|---|---|---|---|---|---|
| | Case Name | Charged Provision(s) | Goods/Services at issue | U.S. Citizen or Resident | Any Person Within the United States | Entity Organized Under U.S. Law | Property Subject to the Jurisdiction of the United States**** | Conduct Alleged |
| 14. | United States v. Ghorashi Sarvestani, 13-cr-214 (PGG) (S.D.N.Y. 2013) | 31 C.F.R. §§ 560.203–560.204 | Satellite Technology | | | | X | Iranian national solicited and negotiated purchases of U.S.-origin satellite technology and hardware from U.S.-based suppliers for shipment to Iran via Dubai, Malaysia, and Hong Kong and directed payments to the suppliers in the U.S. |
| 15. | United States v. Hassanshahi, 13-cr-274 (RC) (D.D.C. 2013) | 31 C.F.R. §§ 560.203–560.204 | Power Plant Components | X | X | | X | California resident purchased U.S.-origin power plant components in the United States and shipped them ultimately to Iran, often with intermediate stops in non-embargoed countries. |
| 16. | United States v. Fokker Serv. B.V., 14-cr-121 (RJL) (D.D.C. 2014) | 31 C.F.R. § 560.203 | Aircraft Components and Services | | | | X | Dutch company charged with procuring U.S.-origin parts for transshipment to Iran and providing repair services in the United States and involving U.S.-origin parts. |

12

# APPENDIX B

**Relevant Statutes and Regulations**

**50 U.S.C. § 1702.  Presidential authorities**

(a)     In General

    (1)     At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

        (A)     investigate, regulate, or prohibit—

            (i)     any transactions in foreign exchange,

            (ii)     transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

            (iii)     the importing or exporting of currency or securities,

    by any person, or with respect to any property, subject to the jurisdiction of the United States; and

        (B)     investigate, block during the pendency of an investigation, ….

**50 U.S.C. § 1705.  Penalties**

(a)     Unlawful Acts.  It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter.

(b)     Civil Penalty.  A civil penalty may be imposed on any person who commits an unlawful act described in subsection (a) in an amount not to exceed the greater of—

    (1)     $250,000; or

    (2)     an amount that is twice the amount of the transaction that is the basis of the violation with respect to which the penalty is imposed.

(c)     Criminal Penalty.  A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) shall, upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both.

**31 C.F.R. § 560.314.  United States person; U.S. person.**

The term United States person or U.S. person means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States.

**31 C.F.R. § 560.203.  Evasions; attempts.  (Effective until October 21, 2012)**

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

**31 C.F.R. § 560.203.  Evasions; attempts; causing violations; conspiracies.  (Effective from October 22, 2012)**

(a)     Any transaction on or after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited.

(b)     Any conspiracy formed to violate any of the prohibitions set forth in this part is prohibited.

**31 C.F.R. § 560.204.  Prohibited exportation, reexportation, sale, or supply of goods, technology, or services to Iran.**

Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a)     Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

(b)     Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

**31 C.F.R. § 560.410.  Provision of services.**

(a)     The prohibition on the exportation, reexportation, sale or supply of services contained in § 560.204 applies to services performed on behalf of a person in Iran or the Government

of Iran or where the benefit of such services is otherwise received in Iran, if such services are performed:

    (1)    In the United States, or

    (2)    Outside the United States by a United States person, including by an overseas branch of an entity located in the United States.

(b)    The benefit of services performed anywhere in the world on behalf of the Government of Iran is presumed to be received in Iran.

(c)    The prohibitions on transactions involving blocked property contained in § 560.211 apply to services performed in the United States or by U.S. persons, wherever located, including by an overseas branch of an entity located in the United States:

    (1)    On behalf of or for the benefit of the Government of Iran, an Iranian financial institution, or any other person whose property and interests in property are blocked pursuant to § 560.211; or

    (2)    With respect to property interests of the Government of Iran, an Iranian financial institution, or any other person whose property and interests in property are blocked pursuant to § 560.211.

(d)    Example. A United States person is engaged in a prohibited exportation of services to Iran when it extends credit to a third-country firm specifically to enable that firm to manufacture goods for sale to Iran or for an entity of the Government of Iran. See also § 560.416.

3