# EXHIBIT D



# Department of Justice

STATEMENT

OF

DANIEL MERON
PRINCIPAL DEPUTY ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

AND

BARRY SABIN
CHIEF, COUNTERTERRORISM SECTION
CRIMINAL DIVISION

BEFORE THE

SUBCOMMITTEE ON TERRORISM, TECHNOLOGY
AND HOMELAND SECURITY

COMMITTEE ON THE JUDICIARY

UNITED STATES SENATE

CONCERNING

THE FEDERAL MATERIAL SUPPORT STATUTES

PRESENTED ON

APRIL 20, 2005

Department of Justice Joint Statement by

Daniel Meron, Principal Deputy Assistant Attorney General, Civil Division

and

Barry Sabin, Chief, Counterterrorism Section, Criminal Division

Hearing Before the United States Senate Judiciary Committee

April 20, 2005

Mr. Chairman, members of the Committee, thank you for the opportunity to testify at this important hearing. We are pleased to discuss with you the Justice Department's efforts in investigating and prosecuting terrorists and in protecting the American people from future terrorist attacks, owing to the important tools Congress has provided us over the years. Specifically, we will focus on our use of the material support statutes, 18 U.S.C. Sections 2339A and 2339B, which are at the heart of the Department's prosecutive efforts.

As President Bush recently said, "Our country is still the target of terrorists who want to kill many, and intimidate us all. We will stay on the offensive against them, until the fight is won." We, at the Department of Justice, continue that fight, always cognizant of the vital importance of the liberties guaranteed by our Constitution. Working together with the Intelligence community and our international allies, law enforcement agents and prosecutors have made significant progress in the war on terror through use of the criminal justice system, one of the many tools in the American counterterrorism arsenal.

The material support statutes, as enhanced and clarified by the USA PATRIOT Act in 2001, and the Intelligence Reform and Terrorism Prevention Act just a few months ago, are critical features of the law enforcement approach to counterterrorism. Rather than criminalizing the violent acts used by terrorists, these statutes recognize that there are important components of the terrorist infrastructure that stop short of actual attacks. We know from experience that terrorists need funding and logistical support to operate. They need to raise funds, open and use bank accounts to transfer money, and to communicate by phone and the Internet. They need travel documents. They need to train and recruit new operatives, and procure equipment for their attacks. People who occupy this position in the terrorism division of responsibility might not themselves be bomb-throwers. The front-line terrorists cannot operate without specialists. The material support statutes are designed to reach the non-violent specialists and the logistical support networks.

Even before the most recent amendment, which we will address shortly, these provisions criminalized the act of knowingly providing "material support or resources" to terrorist acts and to foreign terrorist organizations, or FTOs, designated by the Secretary of State. "Material support or resources" is a term of art specifically defined to include a broad range of conduct – all along the terrorist chain. It includes providing financial services, lodging, safe houses, false

documentation or identification, weapons, communications equipment, and explosives. Section 2339A, passed in 1994, criminalizes knowingly providing material support or resources to a particular crime of terrorism, such as a bombing plot, while Section 2339B, which became operational in October 1997, criminalizes the knowing provision of material support or resources to a foreign terrorist organization such as al Qaeda or Hamas, irrespective of the providors' violent intent.

Section 2339B provides a criminal sanction for anyone who supports a foreign terrorist organization designated by the Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury. One of the consequences of such a designation is that providing support to such an organization is illegal. There are presently 40 designated FTOs ranging from Al Qaeda to Abu Musab al-Zarqawi's Jama'at al-Tawhid wa'al-Jihad to the Palestinian rejectionist groups, such as the Palestinian Islamic Jihad, to narco-terrorist groups, such as the Revolutionary Armed Forces of Columbia (FARC).

Thanks to Congress, the material support laws contain the inchoate offenses of attempt and conspiracy, which allow law enforcement the legal basis to intervene at the very early stages of terrorist planning, several steps removed from the execution of particular attacks. This capability is crucial to the prosecution of terrorist supporters who may not themselves be prone to violence. By allowing for the prosecution of someone who intends to provide support to terrorists and takes an affirmative step in that direction, we can successfully interdict the support before it reaches the terrorist, let alone waiting until it culminates in a terrorist attack.

Over the past several years, our concerted efforts have led to the identification, disruption or demise of terrorist support conspiracies throughout the country. Some of these cases have involved individuals who are operational. Many have not. The terrorists and their supporters in these cases were brought down by the material support statutes you have provided us criminalizing such conduct.

## Convictions

A number of victories in recent months illustrate these powerful law enforcement tools and how they operate in practice.

On March 10, 2005, after a five-week trial, a jury in Brooklyn, New York, convicted two Yemeni citizens, Mohammed Ali Hasan Al-Moayad and Mohsen Yahya Zayed, of conspiring to provide material support to al Qaeda and Hamas, pursuant to 18 U.S.C. 2339B. They were both found guilty of attempting to provide material support to Hamas. Al-Moayad was also convicted of providing material support to Hamas and attempting to provide material support to al Qaeda. Al-Moayad, the imam of a large Yemeni mosque and an influential political leader, was caught on undercover tape recordings discussing the collection of monies from the al Farook mosque in Brooklyn and his desire to distribute the monies to al Qaeda and Hamas to finance violent *jihad*. Additional proof collected by the German authorities against Zayed - who accompanied Al Moayad to Franfurt, Germany in 2003, where they thought they would receive a large donation – allowed us to charge both of them.

This case also clearly demonstrates two important principles:

First, that United States prosecutors and investigators, like our colleagues in the intelligence community and the military, must rely upon our international partners to be successful. Al Moayad and Ziyad could not have been brought to justice without the assistance of our German colleagues, who worked alongside the FBI in the sting operation, and made the arrests that ultimately culminated in the extradition of the defendants to the United States from Germany. German officials testified about their actions in federal court in Brooklyn.

Second, that successful indictments and prosecutions often lead to further successes in combating terror. We are able to leverage the intelligence collected from cooperators in our criminal cases to discover and track down new leads and evidence. This investigation uncovered Al-Moayad's contacts in Brooklyn, including a Brooklyn associate who had transferred over $20 million overseas through the bank account of his tiny ice cream store. Those Brooklyn associates have been charged with various federal crimes ranging from unlicensed money remitting to making false statements as part of the Department's disruption approach. In the *Al-Moayad* trial, prosecutors presented the testimony of Yaya Goba, one of the convicted defendants in the Lackawanna case. Successful prosecutions beget more prosecutions.

On February 10, 2005, a Manhattan jury in United States v. Sattar found all defendants guilty on all counts, which also involved material support charges. This case sent a clear message that the Department will prosecute professionals who cross the line to assist terrorists with their murderous goals. Ahmed Abdel Sattar, an Islamic Group (AGAI) leader and associate of Sheik Omar Abdel Rahman, was convicted of plotting to kill and kidnap persons in a foreign country which included evidence highlighting his crucial participation in drafting and disseminating a legal fatwah in Abdel Rahman's name urging the murder of Jews wherever found. Lynne Stewart, a criminal defense attorney who has represented the Sheik, and Mohammed Yousry, an Arabic interpreter for the Sheik, were convicted on both substantive and conspiracy counts of providing, and concealing the provision of, material support or resources, knowing that such support was to be used in carrying out a conspiracy to kill persons in a foreign country, in violation of 18 U.S.C. 2339A.

Stewart and Yousry smuggled messages concerning Islamic Group activities between Sheik Abdel Rahman and his co-conspirators, including Sattar, and actively concealed the fact that they had done so in violation of the administrative prison rules to which Stewart agreed to be bound. Sheik Abdel Rahman is serving a life sentence for participating in a failed plot to bomb a series of New York City landmarks and soliciting the murder of Egyptian President Hosni Mubarak.

In February of this year, prosecutors in Detroit obtained a guilty plea from a Hizballah financier. The defendant, whose brother is the organization's Chief of Military Security in Southern Lebanon, admitted that he helped others raise money for Hizballah. Last year, we obtained a guilty plea to violations of both Sections 2339A and 2339B, among other charges, from a Pakistani-American involved in al Qaeda procurement, training and recruitment, who had appeared on British television stating "I do not feel any remorse for the Americans [who died] . . . I am willing to kill Americans. I will kill every American that I see in Afghanistan. And every

American soldier that I see in Pakistan." The defendant, Mohammed Junaid Babar, arranged for a month-long jihadi training camp, at which attendees received training in basic military skills, explosives and weapons. Among the attendees were individuals who were plotting to bomb targets abroad.

## Indictments

The operation of the material support statutes is also illustrated by a number of pending prosecutions. Last week, the Department announced the unsealing of an indictment that made important use of Section 2339A to charge three individuals for their alleged participation in terrorist plots to attack the financial sectors in New York, New Jersey and the District of Columbia. Dhiren Barot, Nadeem Tarmohamed and Qaisar Shaffi, all British nationals, are charged with assisting in a plot to attack the New York Stock Exchange and the Citigroup building in New York, the Prudential Building in New Jersey, and the International Monetary Fund and World Bank buildings in Washington, D.C.

Meanwhile, prosecutors in Miami superseded another indictment charging a Section 2339A violation, adding Kihah Jayyoussi as a defendant. A U.S. citizen, Jayyoussi was arrested on March 27, 2005 at the airport in Detroit upon his return from a trip to Qatar. According to the superseding indictment, Jayyousi, Adham Hassoun and Mohammed Youssef conspired to fund and support violent *jihad* in Bosnia, Chechnya, Kosovo, and Somalia. Jayyousi and his co-conspirators allegedly raised money and recruited fighters for *jihadi* groups. Hassoun, Youssef, Jayyousi and several other unindicted co-conspirators allegedly conducted dozens of semi-coded conversations between 1994 and 2000 about acts of violent *jihad*. Jayyousi and Hassoun are in federal custody in Miami and Youssef is in custody in Egypt. These two cases demonstrate how § 2339A can be used in the absence of evidence that the particular support was provided to a group that had been designated.

Another § 2339A case involves Babar Ahmad and Azzam Publications, charged in Connecticut in October of 2004. Ahmad, a resident of the United Kingdom, allegedly operated and directed Azzam Publications and its family of Internet websites to recruit and assist the Chechen mujahideen and the Taliban and to raise funds for violent *jihad* in Afghanistan, Chechnya and other locations. These websites existed and operated throughout the world, including in the United States. Along with other Internet media allegedly created and operated by Ahmad, these sites gave instructions for travel to Pakistan and Afghanistan to fight with these groups and for surreptitious transfer of funds to the Taliban; they also solicited military items for these groups, including gas masks and night vision goggles. The websites also advertised videotapes – allegedly produced by Ahmad and others – depicting violent jihad in Chechnya, Bosnia, and Afghanistan, and the torture and killing of captured Russian troops.

Ahmad has been charged with crimes that include providing material support to terrorists under 18 U.S.C. 2339A. We describe this indictment to you -- in part -- to highlight the use of the Internet by those who support their violent goals through communications, recruiting and propaganda. This is criminal conduct, not rights protected by the First Amendment. The government must meet the challenges posed by the technology of the twenty-first century through the use of all our tools, including criminal investigation and prosecution.

Meanwhile, we have a couple of important pending § 2339B cases. In Florida, the trial of four of the defendants in the *Sami al Arian* case is scheduled to begin on May 16, 2005. In a 53-count indictment, Sami Al-Arian and eight other defendants, including Ramadan Shallah, the acknowledged worldwide leader of the Palestinian Islamic Jihad (PIJ), have been charged with using facilities in the United States, including the University of South Florida, as the North American base for PIJ, providing material support to PIJ, and conspiring to murder individuals abroad, among other offenses. PIJ was designated as a foreign terrorist organization in 1997, and has claimed responsibility for suicide bombings in the Middle East that have killed U.S. citizens.

In August 2004, a Chicago grand jury indicted Mousa Marzook, Abdelhaleem Ashqar, and Mohammad Salah for participating in a 15-year racketeering conspiracy in the United States and abroad to illegally finance Hamas's terrorist activities in Israel, the West Bank, and Gaza Strip, including providing money for the purchase of weapons. The indictment, which for the first time identifies Hamas as a criminal enterprise, also charges Salah under 18 U.S.C. § 2339B for providing material support to Hamas. All three defendants allegedly used bank accounts in the United States to launder millions of dollars for Hamas, which has publicly claimed credit for engaging in suicide bombings that resulted in the deaths of Americans and other foreign nationals in Israel and the West Bank, as well as Israeli military personnel and civilians.

These cases, plus the other matters that have already resulted in convictions, demonstrate the manner in which we have come to rely upon the material support statutes.

## Legal Victories

We have also obtained important, favorable appellate court rulings in recent months that are vital to the enforcement of Section 2339B. In *United States v. Afshari* and *United States v. Hammoud,* a panel of the Ninth Circuit and the *en banc* Fourth Circuit, respectively, held that a criminal defendant charged with providing material support to a designated FTO under Section 2339B may not challenge the validity of the underlying FTO designation in the course of the criminal prosecution. The *Afshari* district court opinion, which was overturned by the appellate court, had raised the untenable specter of multi-district challenges to an FTO designation and the resulting criminalization of terrorist conduct in one district but not another. The appellate courts agreed with the government in both cases that the validity of an FTO designation is not an element of the offense under 18 U.S.C. 2339B, consistent with language explicit in the FTO statute to that effect.

Furthermore, in *Humanitarian Law Project v. Ashcroft*, the Ninth Circuit held *en banc* that there is no First Amendment right to provide material support to the ostensibly humanitarian or political activities of a designated FTO. Similarly, in *United States v. Hammoud*, the Fourth Circuit *en banc* rejected claims that the material support prohibition contained in Section 2339B impermissibly encroached on First Amendment rights of free association and expression. In the words of the Ninth Circuit, "giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts."

## The Future and the Intelligence Reform Act

Looking to the future, we are confident that the amendments to the material support statutes and foreign terrorist organization provisions of the Immigration and Nationality Act, passed by Congress and signed by the President in December, will significantly enhance the capabilities of prosecutors to eradicate terrorist activity at every stage. These amendments—contained in the Intelligence Reform and Terrorism Prevention Act—give prosecutors important new and enhanced tools in the fight against terrorism here and abroad.

Significantly, the definition of "material support or resources" was expanded to encompass all property—whether tangible or intangible—and all services, except for medicine and religious materials. The definition formerly was limited to specified types of material support and "other physical assets." Congress's action to clarify this definition assures that no form of terrorist assistance or activity will escape the reach of the statute.

The amendments also clarify the meaning of the terms "personnel," "training," and "expert advice or assistance," as used in the definition of "material support or resources." These changes should eliminate some of the uncertainty generated by a few adverse court decisions rejecting the government's interpretation of those terms. For example, it is now clear that the provision of "personnel" to a terrorist act or organization includes providing *oneself*. Congress also clarified that no one could be prosecuted for providing "personnel" under section 2339B unless the individual(s) were provided to manage, supervise or otherwise direct the terrorist organization or, conversely, to work under its direction or control. These changes respond to a few court decisions which opined that the term "personnel" could be vague. The amendments also defined the terms "training," and "expert advice or assistance," in response to perceived constitutional problems identified by the Ninth Circuit or the district court in *Humanitarian Law Project*. We are hopeful that these amendments will achieve their desired effect, especially in light of the Ninth Circuit's recent orders in *HLP* vacating the district courts' injunctions against enforcement of the terms "training," "personnel," and "expert advice or assistance" and remanding to the district court in light of changes made by the IRTPA.

Two other changes to the material support statutes are also significant. First, the recent amendments expand the jurisdictional basis for material support charges. Under the old jurisdictional provisions, Section 2339B was limited to activity occurring within the United States, and to overseas activity committed by persons "subject to the jurisdiction of the United States." Now, among other things, Section 2339B also reaches conduct by any lawful permanent resident alien anywhere in the world, as well as stateless persons who habitually reside in the United States. Jurisdiction also extends to conduct by an alien offender *outside* the United States who is later brought to the country or found here, regardless of whether the alien is a permanent resident alien. The rationale for the latter expansion is that those aliens outside the United States who furnish material support or resources to an FTO endanger the national security of the United Sates and should be subject to prosecution if they are present here.

The amendments also clarify the knowledge requirement of Section 2339B. That section now expressly says that the defendant must either know that the organization is a designated FTO or that it engages in certain terrorist conduct. The government is not required to show that

the material support was provided for the express purpose of furthering the FTO's terrorist activities, a standard at odds with the purposes of Section 2339B.

The Intelligence Reform Act also created a new "material support" offense, 18 U.S.C. 2339D, that explicitly criminalizes the receipt of military-type training from a foreign terrorist organization. Under the statute, "military-type training" includes "training in means or methods that can cause death or serious bodily injury, destroy or damage property, or disrupt services to critical infrastructure, or training on [sic] the use, storage, production, or assembly of any explosive, firearm or other weapon, including any weapon of mass destruction[.]" 18 U.S.C. § 2339D(c)(1).

Section 2339D fills an arguable gap in 18 U.S.C. § 2339B, which criminalizes *providing* material support, including training, *to* a foreign terrorist organization, but does not explicitly prohibit *receiving* training *from* a foreign terrorist organization, as Section 2339D now does. Thus, for post-enactment conduct, the prosecutor has a charging option that is a narrowly tailored fit and improves our ability to apprehend those who threaten our homeland.

Section 2339D is also a potent remedy for the serious problems created by the steady flow of recruits to terrorist training camps. Various investigations have uncovered individuals who have traveled overseas to training camps to receive military-style training. These individuals, who in many cases have received firearms and explosives training, appear to be preparing to conduct terrorist activity or violence and pose a clear threat here and abroad. Investigations have also disclosed that attendees sometimes maintain longstanding relationships with other training camp "alumni," who may later seek to recruit and utilize them in their plots. In an even more basic way, a trainee's participation in a terrorist organization's training camp, without more, benefits the organization as a whole. By attending a camp, an individual lends critical moral support to other trainees and the entire organization, a support that is essential to the health and vitality of the organization. Consequently, an attendee at a military-style training camp provides value to the organization, and his activities are appropriately within the reach of United States law.

## Material Support to Terrorism Prohibition Improvements Act

The amendments to the material support statutes contained in Intelligence Reform and Prevention Act of 2004 are currently scheduled to sunset at the end of 2006. As described above, these amendments are critical to maintaining the efficacy of the material support statutes as a potent prosecutorial tool in combating terrorism. The Department therefore supports making these revisions to the material support statutes permanent, and we commend Senator Kyl for introducing the Material Support to Terrorism Prohibition Improvements Act (MSTPIA), which would do just that.

Although the Department has not yet had a chance to evaluate thoroughly all of the provisions in the proposed legislation, repealing the sunset on those amendments to the material support statutes contained in the Intelligence Reform Act would represent a significant step forward, ending uncertainty in this area of the law and ensuring that prosecutors will not lose a critical tool.

The proposed legislation also contains another important provision, which the Department strongly supports. Under current law, those aliens who have received military-type training from or on behalf of a terrorist organization may be deported from the country. Such aliens, however, are not inadmissible. This anomaly in the law does not make any sense, and the proposed legislation would fix this problem by rendering inadmissible those aliens who have received military-type training from or on behalf of a terrorist organization. To put it simply, such aliens represent a clear and present danger to the safety of the American people and should not be allowed to enter nor remain present in the United States.

The MSTPIA also contains other worthwhile provisions, and the Department looks forward to working with Senator Kyl and other Committee members on this important piece of legislation.

## Conclusion

The changes recently enacted in the Intelligence Reform Act have built upon, and enhanced, the work of prior Congresses in the USA PATRIOT Act, the Anti-Terrorism and Effective Death Penalty Act of 1996 and the Violent Crime Control and Law Enforcement Act of 1994. Together, this legislation has provided law enforcement and prosecutors with a solid framework within which to pursue the goal of prevention, disruption and eventual eradication of terrorism within our borders and beyond. We, as prosecutors in the Justice Department, have more work to do to eliminate this deadly threat, and we urge you in Congress to continue to build upon and enhance the legal tools needed to accomplish our mutual goals.

Mr. Chairman, thank you again for inviting us here and giving us the opportunity to discuss how the material support statutes are being used in the field to fight terrorism. We would also like to thank this Committee for its continued leadership and support. Together, we will continue our efforts to defeat those who would harm this country.