

# EXHIBIT E



# House of Representatives

The House was not in session today. Its next meeting will be held on Monday, October 4, 2004, at 12:30 p.m.

---

# Senate

### FRIDAY, OCTOBER 1, 2004

The Senate met at 9:30 a.m. and was called to order by the President pro tempore (Mr. STEVENS.)

### PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

O, God, who sends showers to soften the soil and cause plants to sprout, You are the source of all life. You have challenged us to number our days, not our weeks, months, or years. Give us wisdom to comprehend the brevity and uncertainty of our life's journey. Forgive us when we boast about tomorrow, forgetting that our times are in Your hands.

Today, bless our lawmakers and their staffs. Remind them that they belong to You and that You will order their steps. As they wrestle with complex issues, help them seek Your wisdom and guidance. Empower them as stewards of Your bounty, as You make them faithful in the vocation to which You have called them.

We pray in Your Holy Name. Amen.

### PLEDGE OF ALLEGIANCE

The PRESIDENT pro tempore led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

### RECOGNITION OF THE MAJORITY LEADER

The PRESIDENT pro tempore. The majority leader is recognized.

### SCHEDULE

Mr. FRIST. Mr. President, good morning to everyone.

Today, we once again will return to the intelligence reform legislation sponsored by Senators COLLINS and LIEBERMAN. This week, we have made steady progress. As we set out, we will be completing this bill in the near future, but we have a number of amendments. I thank both of the managers for their patience and willingness to work through a maze of amendments.

We had all amendments submitted 2 days ago and all the language for the amendments as of yesterday. The managers and staff and Senators have been working hard over the course of the night to look at the amendments, to address them, and to establish an order to which they can be addressed over today and Monday.

As announced last night, there will be no rollcall votes today. We will have a full day of debate with a number of people speaking on their individual amendments. We will continue to move forward. A number of Senators have committed to being present today to offer their amendments. I thank them in advance for their participation. I encourage them to talk to the managers as to roughly when we will be discussing each of those amendments.

Monday, the plans are to stack the votes. We will have a series of votes, probably beginning around 3 o'clock Monday. There will be a series of rollcall votes beginning midafternoon. The specific time we will announce a little bit later today.

The Democratic leader and I have come to the Senate floor regularly over the course of the last week to comment on the progress being made on the bill. We will continue to monitor the progress. The bill itself is being discussed after full hearings in August and months and months of work, so the objective of completing this bill in the near future, both the internal organization, reorganization, and external by the time we depart, is the goal we hope to accomplish. We need to continue with the deliberative process, but we do need to bring the bill to a conclusion; therefore, there is a sense of urgency to have Members come to the Chamber and discuss their amendments.

We had, as of 4 o'clock yesterday, 233 filed amendments. The Senate has considered 34 amendments thus far, and 15 have been adopted, 5 tabled, and 14 are still pending.

Having said that, cloture may be a necessary tool. Again, the Democrat leader and I have been in consultation. We first mentioned cloture a couple days ago. It is a tool we might use. I point out that amendments that have been filed that are ready to be considered right now and even after cloture will remain, and we have 30 hours and could consider, of course, at that point all germane amendments.

I will be in consultation with the Democratic leader over the course of the day. We will have a full day today. I appreciate everyone's consideration.

We are also—not on the Senate floor but in a task force—considering the Senate's oversight of intelligence and homeland security. A number of people are asking: What is the appropriate vehicle? We are concentrating through

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.



crimes or the death or injury of a U.S. soldier during war—if such misinformation is conveyed under circumstances where it may reasonably be believed.

Professor Turley, at the Terrorism Subcommittee hearing on TFTA, commented that:

This new provision would create a serious deterrent to a type of misconduct that routinely places the lives of emergency personnel at risk and costs millions of dollars in unrecouped costs for the federal and state governments. Since a terrorist seeks first and foremost to terrorize, there is precious [little] difference between a hoaxster and a terrorist when the former seeks to shut down a business or a community with a fake threat. . . . This provision responds to the increase in this form of insidious misconduct and correctly defines it as criminal conduct.

Process: A bill that is substantially identical to section 416 first was introduced almost three years ago by Representative LAMAR SMITH on November 11, 2001. That proposal was the subject of a hearing before the House Crime Subcommittee on November 7, 2001. The bill was reported by the House Judiciary Committee on November 29, 2001, which issued Report No. 107–306 for the bill. The Smith bill was then unanimously approved by the House of Representatives on December 12, 2001. Representative SMITH reintroduced the bill in this Congress. The House Crime Subcommittee held another hearing on the proposal on July 10, 2003, and the Judiciary Committee issued Report No. 108–505 for the new Smith bill. Also, Senator HATCH has introduced a version of this proposal in the Senate.

Section 416 of my amendment is nearly identical to section 2022 of the House of Representatives' 9/11 Commission bill.

Financial and Material Support to Terrorists: The 9/11 Commission Report states in its recommendations that "vigorous efforts to track terrorist financing must remain front and center in U.S. counterterrorism efforts."

Subtitle E of my amendment, the "Combating Money Laundering and Terrorist Financing Act," expands the list of predicate offenses for money laundering to include burglary and embezzlement, operation of an illegal money-transmitting business, and offenses related to alien smuggling, child exploitation, and obscenity that were enacted or amended by the Protect Act. It also amends current law to prohibit concealing having provided financing while knowing that it has been or will be provided to terrorists.

Section 424 of my amendment expands existing prohibitions on providing material support to terrorist groups. This provision makes it a crime to provide material support to any crime of international or domestic terrorism, and expands federal jurisdiction over such offenses.

The Justice Department emphasized the importance of the material-support statute in its joint statement on the TFTA before the Terrorism Subcommittee:

The TFTA . . . improves current law by clarifying several aspects of the material support statutes. This is another key tool in preventing terrorism. As the Department of Justice has previously indicated, "a key element of the Department's strategy for winning the war against terrorism has been to use the material support statutes to prosecute aggressively those individuals who supply terrorists with the support and resources they need to survive . . . . The Department seeks to identify and apprehend terrorists before they can carry out their plans, and the material support statutes are a valuable tool for prosecutors seeking to bring charges against and incapacitate terrorists before they are able to cause death and destruction."

The 9/11 Commission Report also emphasizes the need "to ensure protection of civil liberties" during the war on terrorism. In order to address concerns raised by some courts and litigants about the chilling effect of the current material-support statute, section 424 of the amendment clarifies what it means to provide "training," "personnel," and "expert advice or assistance" to a terrorist group.

Professor Turley, in his Terrorism Subcommittee testimony on TFTA, said of section 424 that "[t]his proposal would actually improve the current federal law by correcting gaps and ambiguities that have led to recent judicial reversals. In that sense, the proposal can be viewed as a slight benefit to civil liberties by removing a dangerous level of ambiguity in the law."

A provision identical to section 424 of my amendment appears in the House of Representatives 9/11 Commission bill as section 2043.

Presumption of No Bail for Terrorists: Section 413 of my amendment would add terrorists to the category of criminal defendants for whom there is a presumption of no bail. Under current law, a criminal suspect will be denied bail in federal court if the government shows that there is a serious risk that the suspect will flee, obstruct justice, or injure or threaten a witness or juror. The judge must presume this showing is present if the suspect is charged with a crime of violence, a drug crime carrying a potential sentence of ten years or more, any crime that carries a potential sentence of life or the death penalty, or the suspect previously has been convicted of two or more such offenses. Section 413 would add terrorist offenses to this list—judges would be required to presume that facts requiring a denial of bail are present. This is only a presumption—the terror suspect still could attempt to show that he is not a flight risk or potential threat to jurors or witnesses.

The Justice Department testified as to the importance of this provision at the Terrorism Subcommittee hearing on TFTA:

Current law provides that federal defendants who are accused of serious crimes, including many drug offenses and violent crimes, are presumptively denied pretrial release under 18 U.S.C. § 3142(e). But the law does not apply this presumption to those charged with many terrorism offenses. To presumptively detain suspected drug traffickers and violent criminals before trial, but not suspected terrorists, defies common sense.

* * * *

This omission has presented authorities real obstacles to prosecuting the war on terrorism, as Michael Battle, U.S. Attorney for the Western District of New York, testified before this subcommittee on June 22. In the recent "Lackawanna Six" terrorism case in his district, prosecutors moved for pre-trial detention of the defendants, most of whom were charged with (and ultimately pled guilty to) providing material support to al Qaeda. It was expected that the defendants would oppose the motion. What followed was not expected, however. Because the law does not allow presumptive pre-trial detention in terrorism cases, prosecutors had to participate and prevail in a nearly three-week hearing on the issue of detention, and were forced to disclose a substantial amount of their evidence against the defendants prematurely, at a time when the investigation was still ongoing. Moreover, the presiding magistrate judge did in fact authorize the release of one defendant, who, it was later learned, had lied to the FBI about the fact that he had met with Osama bin Laden in Afghanistan.

The Lackawanna Six case illustrates the real-life problems the absence of presumptive pre-trial detention has posed to law enforcement. But this shortcoming in the law has also enabled terrorists to flee from justice altogether. For example, a Hezbollah supporter was charged long ago with providing material support to that terrorist organization. Following his release on bail, he fled the country.

The suspect described above eventually was recaptured by the United States 6 years after his escape. During that time, he was not a participant in a terrorist attack against the United States—but he could have been.

Jonathan Turley also commented on section 413 in his testimony at the Terrorism Subcommittee hearing on TFTA. He stated:

[Section 413] would create a presumption against bail for accused terrorists. Under this amendment, such a presumption could be rebutted by the accused, but the court would begin with a presumption that the accused represents a risk of flight or danger to society. This has been opposed by various groups, who point to the various terrorist cases where charges were dismissed or rejected, including the recent Detroit scandal where prosecutorial abuse was strongly condemned by the Court. I do not share the opposition to this provision because I believe that, while there have been abuses in the investigation and prosecution of terrorism cases, the proposed change sought by the Justice Department is neither unconstitutional nor unreasonable.

* * * *

This proposal would not impose a categorical denial of bail but a presumption against bail in terrorism cases. Congress has a clearly reasonable basis for distinguishing terrorism from other crimes in such a presumption. In my view, this would be clearly constitutional.

While I have been critical of the policies of Attorney General John Ashcroft, I do not share the view of some of my colleagues in the civil liberties community in opposition to this change. There is currently a presumption against pretrial release for a variety of crimes in 18 U.S.C. § 3142(e), including major drug crimes. It seems quite bizarre to have such a presumption in drug cases but not terrorism cases.

Use of FISA in immigration proceedings: The 9/11 Commission Report