# EXHIBIT F



# Congressional Record

United States of America  PROCEEDINGS AND DEBATES OF THE 108th CONGRESS, SECOND SESSION

*Vol. 150*   WASHINGTON, WEDNESDAY, DECEMBER 8, 2004   *No. 139*

## House of Representatives

The House was not in session today. Its next meeting will be held on Tuesday, January 4, 2005, at 12 noon.

## Senate

WEDNESDAY, DECEMBER 8, 2004

The Senate met at 9:30 a.m. and was called to order by the President pro tempore (Mr. STEVENS).

### PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Faithful God, who stretches out the Earth above the waters, Your Name is great and Your goodness extends to all generations. Thank You for Your protection. You make wars to cease, destroying the weapons of those who fight against Your purposes. Today, guide our lawmakers with Your justice and keep them as the apple of Your eye. Instruct them in Your wisdom and hide them under the shadow of Your wings. Help them to find light in Your laws and knowledge in Your instructions. Give them patience as they grapple with issues and wisdom to seek Your guidance.

Bless and strengthen the many staffers who provide the wind beneath the wings of our leaders. Bring to them a bountiful harvest for their many months of faithful toil.

Bless all who mourn the loss of Stan Kimmitt. He will be greatly missed.

We pray this in Your holy Name. Amen.

---

**NOTICE**

If the 108th Congress, 2d Session, adjourns sine die on or before December 10, 2004, a final issue of the Congressional Record for the 108th Congress, 2d Session, will be published on Monday, December 20, 2004, in order to permit Members to revise and extend their remarks.

All material for insertion must be signed by the Member and delivered to the respective offices of the Official Reporters of Debates (Room HT–60 or S–123 of the Capitol), Monday through Friday, between the hours of 10:00 a.m. and 3:00 p.m. through Monday, December 20. The final issue will be dated Monday, December 20, 2004, and will be delivered on Tuesday, December 21, 2004.

None of the material printed in the final issue of the Congressional Record may contain subject matter, or relate to any event that occurred after the sine die date.

Senators' statements should also be submitted electronically, either on a disk to accompany the signed statement, or by e-mail to the Official Reporters of Debates at "Record@Sec.Senate.gov".

Members of the House of Representatives' statements may also be submitted electronically by e-mail, to accompany the signed statement, and formatted according to the instructions for the Extensions of Remarks template at http://clerk.house.gov/forms. The Official Reporters will transmit to GPO the template formatted electronic file only after receipt of, and authentication with, the hard copy, and signed manuscript. Deliver statements to the Official Reporters in Room HT–60.

Members of Congress desiring to purchase reprints of material submitted for inclusion in the Congressional Record may do so by contacting the Office of Congressional Publishing Services, at the Government Printing Office, on 512–0224, between the hours of 8:00 a.m. and 4:00 p.m. daily.

By order of the Joint Committee on Printing.

ROBERT W. NEY, *Chairman.*

---

∙ This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.


Printed on recycled paper.

The Department of Justice's letter provides a detailed analysis of the relevant Fourth Amendment jurisprudence, concluding that the bill's authorization of lone-wolf surveillance would ''satisfy constitutional requirements.'' The Department emphasizes that anyone monitored pursuant to the lone-wolf authority would be someone who, at the very least, is involved in terrorist acts that ''transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to coerce or intimidate, or the locale in which their perpetrators operate or seek asylum.'' (Quoting 50 U.S.C. Sec. 1801(c)(3).) Therefore, a FISA warrant obtained pursuant to this authority necessarily would ''be limited to collecting foreign intelligence for the international responsibilities of the United States, and the duties of the Federal Government to the States in matters involving foreign terrorism.'' (Quoting *United States* v. *Dugan*, 743 F.2d 59, 73 (2d Cir. 1984).) The Department concludes ''the same interests and considerations that support the constitutionality of FISA as it now stands would provide the constitutional justification for S. 2568.'' The Department additionally notes that when FISA was enacted it was understood to allow surveillance of groups as small as two or three persons. The Department concludes that ''[t]he interests that the courts have found to justify the procedures of FISA are not likely to differ appreciably as between a case involving such a group . . . and a case involving a single terrorist.'']

A provision substantially the same as section 6001 first was introduced as a bill, S. 2586, by Senators SCHUMER and me on June 5, 2002. The Senate Intelligence Committee held a hearing on S. 2586 on July 31, 2002. Witnesses included James Baker, Counsel for Intelligence Policy with the Office of Intelligence and Policy Review, Department of State; Marion ''Spike'' Bowman, Deputy General Counsel, National Security Law Unit, Office of the General Counsel, FBI; and Fred Manget, Deputy General Counsel, CIA.

The same provision was reintroduced in the 108th Congress by me and Senator SCHUMER as S. 113 on January 9, 2003. S. 113 was unanimously reported by the Judiciary Committee on March 11, 2003. The Committee issued Report No. 108–40 for S. 113 on April 29, 2003. S. 113 was approved by the Senate by 90–4 on May 8, 2003. The same provision also was included in H.R. 3179, which was introduced by House Judiciary Chairman SENSENBRENNER and House Intelligence Chairman Goss on September 25, 2003. The House Subcommittee on Crime, Terrorism, and Homeland Security held a hearing on H.R. 3179 on May 18, 2004. Witnesses at the hearing included Dan Bryant, Assistant Attorney General, Office of Legal Policy, Department of Justice; Thomas Harrington, Deputy Assistant Director, FBI; and Bob Barr, former Congressman. The same provision also was introduced as H.R. 3552 by Representative KING on November 20, 2003.

Subtitle F, section 6501, Sharing Grand-Jury Information With State and Local Governments, this section amends current law to authorize the sharing of grand-jury information with appropriate state and local authorities.

I do not think that one can overstate the importance of information sharing, of tearing down the walls that prevent different parts of the Government from exchanging intelligence and working together in the war on terror. A graphic illustration of the importance of streamlined information sharing is provided by another pre-September 11 investigation. Like the Moussaoui case, this investigation also came tantalizing close to substantially disrupting or even stopping the 9/11 plot, and also ultimately was blocked by a flaw in our antiterror laws. The investigation to which I refer involved Khalid Al Midhar, one of the suicide hijackers of American Airlines Flight 77, which was crashed into the Pentagon, killing 58 passengers and crew and 125 people on the ground.

An account of the investigation of Midhar is provided in the 9/11 Commission's staff Statement No. 10. That statement notes as follows:

During the summer of 2001 [an FBI official] . . . found [a] cable reporting that Khalid Al Mihdhar had a visa to the United States. A week later she found the cable reporting that Mihdhar's visa application—what was later discovered to be his first application—listed New York as his destination. . . . The FBI official grasped the significance of this information.

The FBI official and an FBI analyst working the case promptly met with an INS representative at FBI Headquarters. On August 22 INS told them that Mihdhar had entered the United States on January 15, 2000, and again on July 4, 2001. . . . The FBI agents decided that if Mihdhar was in the United States, he should be found.

These alert agents immediately grasped the danger that Khalid Al Midhar posed to the United States, and immediately initiated an effort to track him down. Unfortunately, at the time, the law was not on their side. The Joint Inquiry Report of the House and Senate Intelligence Committees describes what happened next:

Even in late August 2001, when the CIA told the FBI, State, INS, and Customs that Khalid al-Mihdhar, Nawaf al-Hazmi, and two other ''Bin Laden-related individuals'' were in the United States, FBI Headquarters refused to accede to the New York field office recommendation that a criminal investigation be opened, which might allow greater resources to be dedicated to the search for the future hijackers. . . . FBI attorneys took the position that criminal investigators ''CAN NOT'' (emphasis original) be involved and that criminal information discovered in the intelligence case would be ''passed over the wall'' according to proper procedures. An agent in the FBI's New York field office responded by e-mail, saying: ''Whatever has happened to this, someday someone will die and, wall or not, the public will not understand why we were not more effective in throwing every resource we had at certain problems.''

The 9/11 Commission staff report assesses the ultimate impact of these legal barriers:

Many witnesses have suggested that even if Mihdhar had been found, there was nothing the agents could have done except follow him onto the planes. We believe this is incorrect. Both Hazmi and Mihdhar could have been held for immigration violations or as material witnesses in the Cole bombing case. Investigation or interrogation of these individuals, and their travel and financial activities, also may have yielded evidence of connections to other participants in the 9/11 plot. In any case, the opportunity did not arise.

Congress must do what it can now to make sure that something like this does not happen again—that arbitrary, seemingly minor bureaucratic barriers are not allowed to undermine our best leads toward uncovering an attack on the United States. Section 6501 is a substantial step in that direction.

The change made be section 6501 previously was enacted by the Homeland Security Act, but that change never went into effect because the Federal Rule of Criminal Procedure amended by the HSA was revised by the Supreme Court shortly after the enactment of the HSA, and the amendment made by HSA presupposed the earlier text of the Federal rule. The same provisions were introduced as part of S. 2599 by Senators CHAMBLISS and me on June 24, 2004.

Subtitle G, sections 6602 and 6603, and section 5402, Receiving Military-Type Training from and Providing Material Support to Terrorists, section 6602 makes it a crime to receive military-type training from a foreign terrorist group, and section 5402 makes aliens who have received such training deportable from the United States. Section 6603 broadens the jurisdictional bases of the material-support statute. It also clarifies the definitions of the terms ''personnel,'' ''training,'' and ''expert advice or assistance'' in response to concerns expressed in recent court decisions. Furthermore, this section clarifies the knowledge required to violate the statute, and specifies that nothing contained in the statute shall be construed to abridge free-speech rights. All of these sections apply extraterritorially to U.S. nationals, permanent residents, stateless persons whose habitual residence is the United States, and persons who are brought into or found in the United States.

In the final version of this legislation, all immigration- and border-related provisions were placed in a new title V, and thus the part of the military-type-training provision making terror trainees deportable ended up in that title as well, as section 5402. The new 5402, rather than referencing the definition of military-type training in 6602, simply duplicates the key part of that definition, a precaution against the event that the now-distant 6602 be repealed or never enacted.

Nevertheless, despite their now far-flung nature, these sections still should be read together. Thus 2339D(c)'s definitions of ''serious bodily injury'' and ''critical infrastructure'' should guide the use of those terms in 5402, even though, unlike the definition of ''military type training,'' those definitions are not copied in the deportation section. The extraterritorial scope of 6602, as articulated in 2339D(b), also should