UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                                                  :

UNITED STATES OF AMERICA

                                                  :

          - v. -                                        S1 15 Cr. 867 (RMB)

                                                  :

REZA ZARRAB,
  a/k/a "Riza Sarraf,"                        :

                   Defendant.                  :

                                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT REZA ZARRAB'S MOTION TO SUPPRESS EMAILS**

PREET BHARARA
United States Attorney for the
Southern District of New York

Michael D. Lockard
Sidhardha Kamaraju
David W. Denton, Jr.
  Assistant United States Attorneys
Dean Sovolos
  Special Assistant United States Attorney
       *Of Counsel*

# TABLE OF CONTENTS

Page

Background ................................................................................................................... 2

    A.    The Indictment ........................................................................................ 2

    B.    The September 2014 Search of the Defendant's Email Account ........................... 3

Discussion ................................................................................................................... 10

I.    The Warrant Application Did Not Intentionally or Recklessly Omit
Information Material to a Finding of Probable Cause, And
No Hearing Is Permitted .................................................................................. 10

    A.    Applicable Law ...................................................................................... 10

    B.    Discussion ............................................................................................. 12

II.    The Defendant's Emails Cannot Be Suppressed Pursuant to Rule 41 ............................ 19

    A.    The Stored Communications Act Expressly Forecloses the
Suppression Remedy the Defendant Seeks ........................................................ 19

    B.    The Warrant Does Not Violate the SCA or Rule 41 ........................................... 21

    C.    The Good Faith Exception Precludes Suppression ............................................. 23

Conclusion ................................................................................................................... 25

## **TABLE OF AUTHORITIES**

### **Cases**

*Corona* v. *Lunn,* No. 00 Civ. 7330 (GEL), 2002 WL 550963 (S.D.N.Y. Apr. 11, 2002) .............11

*Davis* v. *United States*, 564 U.S. 229 (2011) ................................................................................23

*Franks* v. *Delaware*, 438 U.S. 154 (1978) ..............................................................................10, 12

*Huon* v. *Mudge*, 597 F. App'x 868 (7th Cir. 2015) ......................................................................21

*In re Marc Rich & Co., A.G.*, 707 F.2d 663 (2d Cir. 1983) ..........................................................24

*Kiobel* v. *Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ...................................................20

*Microsoft* v. *United States*, 829 F.3d 197 (2d Cir. 2016) ..................................................... *passim*

*Rakas* v. *Illinois*, 439 U.S. 128 (1978) ........................................................................................22

*United States* v. *Anzalone*, CR 15-10347-PBS, 2016 WL 5339723 (D. Mass. Sept. 22, 2016) ....25

*United States* v. *Awadallah*, 349 F.3d 42 (2d Cir. 2003) .......................................................10, 11

*United States* v. *Canfield*, 212 F.3d 713 (2d Cir. 2000) ...............................................................10

*United States* v. *Carpenter*, 819 F.3d 880 (6th Cir. 2016) ...........................................................21

*United States* v. *Clark*, 638 F.3d 89 (2d Cir. 2011) .....................................................................10

*United States* v. *Colkley,* 899 F.2d 297 (4th Cir.1990) ................................................................11

*United States* v. *Croghan*, No. 1:15-CR-48, 2016 WL 4992105 (S.D. Iowa Sept. 19, 2016) .......21

*United States* v. *Falso*, 544 F.3d 110 (2d Cir. 2008) .............................................................12, 18

*United States* v. *Grubbs*, 547 U.S. 90 (2006) ..............................................................................22

*United States* v. *Guerrero,* 768 F.3d 351 (5th Cir. 2014) .............................................................21

*United States* v. *Jones*, 908 F. Supp. 2d 203 (D.D.C. 2012) ........................................................21

*United States* v. *Keith*, No. 15 Cr. 827 (AJN), 2016 WL 1644370 (S.D.N.Y. Apr. 22, 2016) ......12

*United States* v. *Klump*, 536 F.3d 113 (2d Cir. 2008) ..................................................................10

*United States* v. *Lahey*, 967 F. Supp. 2d 698 (S.D.N.Y. 2013) ....................................................10

*United States* v. *Leon*, 468 U.S. 897 (1984) ...................................................................23, 24

*United States* v. *Levin*, CR 15-10271-WGY, 2016 WL 2596010 (D. Mass. May 5, 2016) ....21, 25

*United States* v. *Melendez*, No. 16 Cr. 33 (LTS), 2016 WL 4098556 (S.D.N.Y. July 28, 2016)..12

*United States* v. *Navas*, 640 F. Supp. 2d 256 (S.D.N.Y. 2009) ...................................................21

*United States* v. *Powell*, 444 F. App'x 517 (3d Cir. 2011)..........................................................21

*United States* v. *Rajaratnam*, 719 F.3d 139 (2d Cir. 2013).................................................11, 18

*United States* v. *Raymonda*, 780 F.3d 105 (2d Cir. 2015)..........................................................24

*United States* v. *Scully*, 108 F. Supp. 3d 59 (E.D.N.Y. 2015) .....................................................21

*United States* v. *Singh*, 390 F.3d 168 (2d Cir. 2004) ..................................................................23

*United States* v. *Smith*, 155 F.3d 1051 (9th Cir. 1998) ...............................................................21

*United States* v. *Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) 10, 11

*United States* v. *Vilar*, 729 F.3d 62 (2d Cir. 2013).....................................................................23

*United States* v. *Wilson*, 633 F. App'x 750 (11th Cir. 2015).......................................................21

*Wearing* v. *Lavalley*, No. 10 Civ. 8307 (PO), 2015 WL 6738327 (S.D.N.Y. Nov. 4, 2015)........21

## **Statutes**

18 U.S.C. § 371...............................................................................................................................2

18 U.S.C. § 1349.............................................................................................................................2

18 U.S.C. § 1956.............................................................................................................................2

18 U.S.C. § 2701...........................................................................................................................20

18 U.S.C. § 2702...........................................................................................................................20

18 U.S.C. § 2703.................................................................................................................... *passim*

18 U.S.C. § 2707...........................................................................................................................20

18 U.S.C. § 2708...........................................................................................................................20

18 U.S.C. § 2711....................................................................................................................22, 25

50 U.S.C. § 1705 .................................................................................................................2

**Regulations**

31 C.F.R. 544 .....................................................................................................................4

31 C.F.R. 560.203 ..............................................................................................................2

31 C.F.R. 560.204 ..............................................................................................................2

31 C.F.R. 561 .....................................................................................................................4

**Rules**

Fed. R. Crim. P. 41 ..................................................................................................... *passim*

**Other Sources**

Tim Arango, *Corruption Scandal Is Edging Nearer Turkish Premier*, N.Y. TIMES (Dec. 26, 2013) (*available at* http://www.nytimes.com/2013/12/26/world/europe/turkish-cabinet-members-resign.html) ........................................................................................................................4

Committee to Protect Journalists, International Press Freedom Awards (*available at* https://www.cpj.org/awards/2016/can-dundar-turkey.php) ............................................................7

Thomas Erdbrink, *To This Tycoon, Iran Sanctions Were Like Gold*, N.Y. TIMES (Oct. 4, 2013) (*available at* http://www.nytimes.com/2013/10/05/world/middleeast/to-this-tycoon-iran-sanctions-are-like-gold.html) .....................................................................................................5

Glen Johnson & Richard Spencer, *Turkey's politicians, gold dealer and the pop star*, THE TELEGRAPH (Dec. 29, 2013) ...............................................................................................6

Golnar Motavelli, *Iranian Billionaire Can Avoid Death Penalty by Repaying Cash*, BLOOMBERG NEWS (Mar. 8, 2016) (*available at* http://www.bloomberg.com/news/articles/2016-03-08/iran-says-billionaire-can-evade-death-sentence-by-returning-cash) ......................................................5

Mehul Srivastava, *Turkey Crisis Puts Jailed Millionaire at Heart of Gold-Smuggling Ring*, BLOOMBERG NEWS (Jan. 29, 2014) (*available at* http://www.bloomberg.com/news/2014-01-29/turkey-scandal-places-jailed-millionaire-at-center-of-gold-trail.html) ....................................4

*Ethiopian Press Agency Ties Media Deal with Turkish Anadolu Agency*, ETHIOPIA ONLINE (Sep. 26, 2016) (available at http://onlineethiopia.net/2016/09/ethiopian-press-agency-ties-media-deal-turkish-anadolu-agency/) ...............................................................................................15

*Gulen links are everywhere in the Zarrab case*, DAILY SABAH (May 19, 2016) (*available at* http://www.dailysabah.com/columns/ragip-soylu/2016/05/19/gulen-links-are-everywhere-in-zarrab-case) ....................................................................................................................14

*Iranian businessman Zarrab's 'chief' saved by the bell, report claims*, TODAY'S ZAMAN (Dec. 22, 2013). (Ex. 1 ¶ 27(b)).................................................................................................................6

*Turkey – world leader in imprisoned journalists*, REPORTERS WITHOUT BORDERS (Aug. 10, 2016) (*available at* https://rsf.org/en/news/turkey-world-leader-imprisoned-journalists) .............7

*Turkey and US-led coalition pound IS group in Syria*, ASSOCIATED PRESS (May 2, 2016) (available at http://bigstory.ap.org/article/49b7499dbafb409799cc27cd21b9cb28/turkey-strikes-islamic-state-group-positions-syria) ............................................................................................15

*Turkish police detained over alleged plot to topple Erdogan government*, THE GUARDIAN (Sep. 1, 2014) (*available at* https://www.theguardian.com/world/2014/sep/01/turkey-police-detained).7

*Zaman newspaper: Seized Turkish daily 'now pro-government,'* BBC NEWS (Mar. 6, 2016) (*available at* http://www.bbc.com/news/world-europe-35739547)...............................................6

The Government respectfully submits this memorandum of law in opposition to defendant Reza Zarrab's motion to suppress the results of a search of an email account controlled by him and maintained by Microsoft Corp. (the "Motion" or "Mot.").

The Motion is premised entirely on speculation, supposition, and political rumor rather than material, verifiable information. The search of the defendant's email account, pursuant to a warrant issued by a United States Magistrate Judge in this District on September 23, 2014, yielded significant incriminating evidence, including evidence of Zarrab's knowing efforts to assist the Government of Iran in evading U.S. and international sanctions against Iran, as well as Zarrab's participation in multi-million-dollar bribery schemes to protect and promote his illicit financial schemes. In an effort to suppress this damning evidence, the defendant contends that the application in support of the warrant "knowingly or recklessly" omitted information, but (1) relies almost entirely on press reports and political developments in Turkey that occurred *after* the warrant was issued, and (2) either overstates or flatly mischaracterizes the nature of reports and political developments. The defendant's latest effort to inject Turkish politics into this prosecution fails, because the prosecution of the defendant in the United States for violating U.S. national security controls, bank fraud statutes, and anti-money laundering statutes has no connection with Turkish politics but only the defendant's own criminal conduct.

Moreover, the defendant's challenge to the search warrant based on the Second Circuit's decision in *Microsoft* v. *United States*, 829 F.3d 197 (2d Cir. 2016) – a decision that *also* occurred after the warrant was issued – fails for at least two reasons. First, the Stored Communications Act itself prohibits suppression. Second, agents were entitled to rely in good faith on the warrant, which was consistent with a written opinion by Magistrate Judge James C. Francis, IV, affirmed by then-Chief Judge Preska, at the time the Warrant issued.

Moreover, the hearing requested by the defendant is not permitted because the only issue for the Court is a strictly legal one: whether the information that the defendant contends was omitted from the application would have vitiated probable cause for the warrant. As described below, the "omitted" information either post-dates the warrant, is not material to the probable cause determination, or both, and the motion should be denied.

## BACKGROUND

### A.      The Indictment

On or about November 7, 2016, a superseding indictment was returned in this District, S2 15 Cr. 867 (RMB) (the "Indictment" or "Ind."), charging Zarrab, along with co-defendants Mohammad Zarrab, Camelia Jamshidy, and Hossein Najafzadeh with: (i) conspiring to defraud the United States, in violation of Title 18, United States Code, Section 371; (ii) conspiring to violate the International Emergency Economic Powers Act ("IEEPA") and the Iranian Transactions and Sanctions Regulations ("ITSR"), in violation of Title 50, United States Code, Section 1705 and Title 31, Code of Federal Regulations, Sections 560.203 and 560.204; (iii) conspiring to commit bank fraud, in violation of Title 18, United States Code, Section 1349; and (iv) conspiring to commit money laundering, in violation of title 18, United States Code, Section 1956.

As alleged in the Indictment, Zarrab owned and operated a network of companies located in Turkey and in the United Arab Emirates, including a group of companies under Royal Holding A.S. ("Royal Holding"), a holding company in Turkey; Durak Doviz Exchange, a money services business in Turkey; and Al Nafees Exchange LLC ("Al Nafees Exchange"), a money services business in the United Arab Emirates. (Ind. ¶ 10). Zarrab used this network of companies along with other entities and banks located in Turkey and the United Arab Emirates – including Royal Emerald Investments, Asi Kiymetli Madenler Turizm Otomitiv A.S., ECB

Kuyumculuk Ic Ve Dis Sanayi Ticaret Ltd. Sirketi, and others – to conduct international

financial transactions, including U.S.-dollar denominated transactions, on behalf of or for the

benefit of Iranian entities, including entities owned or controlled by the Government of Iran and

entities affiliated with the Islamic Revolutionary Guard Corps ("IRGC"), such as Bank Mellat (a

Government-owned Iranian bank), the National Iranian Oil Company ("NIOC") – identified at

the time by OFAC as an affiliate of the IRGC – and various entities owned or controlled by

NIOC, and Mahan Air – identified by OFAC as an entity providing support for the IRGC and

foreign terrorist organizations such as Hizballah and Hamas. (Ind. ¶¶ 6-9, 16).

### B.   The September 2014 Search of the Defendant's Email Account

On September 23, 2014, the Honorable Kevin Nathaniel Fox, United States Magistrate

Judge, issued a warrant (the "Warrant") to search the account "riza_sf@hotmail.com," an

account controlled by the defendant and maintained by Microsoft Corp. (the "Zarrab Account"),

pursuant to the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) and (c)(1)(A).

The application for the Warrant[1] noted that the Warrant was sought in connection with an

investigation of individuals and entities, including money exchange businesses and other

international financial institutions, that have used the United States financial system to conduct

transactions for the benefit of Iranian individuals and entities, including the Government of Iran

and entities designated by the U.S. Department of the Treasury, Office of Foreign Assets Control

("OFAC") as Specially Designated Nationals ("SDNs"), without a required license from OFAC.

(Ex. 1 ¶ 17). The application further noted that Reza Zarrab, as well as others, was a target of this

investigation (*id.*) and described Zarrab, the Al Nafees Exchange, and other companies under the

---

[1] A copy of the affidavit in support of the Warrant is annexed to this memorandum as Exhibit 1.
A copy of a subsequent affidavit is annexed as Exhibit 2. Certain additional materials described
herein are also annexed as Exhibits.

ownership or control of Zarrab and his family members, (¶¶ 17-20). The application noted, among other things, that Zarrab had been arrested in Turkey on December 19, 2013 by Turkish law enforcement on charges of paying multi-million-dollar bribes to cabinet-level Turkish government officials and bank officers to facilitate sales of Iranian oil for gold and exporting massive quantities of gold to Iran through Dubai. (*Id.* ¶¶ 20 & 27). Shortly after these arrests, three Turkish cabinet members implicated in the corruption investigation resigned, with one also calling on the Turkish Prime Minister to resign. *See* Tim Arango, *Corruption Scandal Is Edging Nearer Turkish Premier*, N.Y. TIMES (Dec. 26, 2013) (*available at* http://www.nytimes.com/2013/12/26/world/europe/turkish-cabinet-members-resign.html).

Zarrab's arrest and the resulting corruption scandal received international media attention, including descriptions of evidence that appeared to have been leaked to the media. On January 29, 2014, Bloomberg News published an article that purported to be based on court records relating to Zarrab's arrest, a transcript of Zarrab's post-arrest interview, and Turkish law enforcement records of physical surveillance and telephone intercepts. *See* Mehul Srivastava, *Turkey Crisis Puts Jailed Millionaire at Heart of Gold-Smuggling Ring*, BLOOMBERG NEWS (Jan. 29, 2014) (*available at* http://www.bloomberg/com/news/2014-01-29/turkey-scandal-places-jailed-millionaire-at-center-of-gold-trail.html). (Ex. 1 ¶ 27(a)). A person familiar with Zarrab's finances reportedly stated that Zarrab moved almost one metric ton of gold to Iran every day for a period of approximately one-and-a-half years, and in approximately January 2012 an airplane-load of 1.5 metric tons of gold flew from Ghana *en route* to Dubai with a refueling stop in Turkey. A transcript of Zarrab's post-arrest interview reportedly revealed that Zarrab admitted that the true owner of the gold was Babak Zanjani (*id.*), a self-described Iranian sanctions buster who, along with a network of companies owned or controlled by Zanjani, was sanctioned by the

4

European Union in December 2012 because of links to Iran's nuclear program and designated an

SDN by OFAC in April 2013 under the Weapons of Mass Destruction Non-Proliferation

Sanctions ("WMD Sanctions"), Title 31, Code of Federal Regulations, Part 544 and Executive

Order 13382, and the Iranian Financial Sanctions Regulations ("IFSR"), Title 31, Code of

Federal Regulations, Part 561.[2] The bank used by the seller of the gold reportedly was the First

Islamic Investment Bank (*id.*), a Zanjani-controlled bank that would also later designed as SDN.

A December 22, 2013, article by the Turkish publication, Today's Zaman, reported that

Zarrab identified his boss as "B.Z.," apparently a reference to Zanjani. According to the article,

an email from Zanjani to Zarrab instructed Zarrab to immediately secure, by any means

necessary, the release of the 1.5 tons of gold detained in Turkey while *en route* from Ghana to

Dubai. After Zarrab reportedly paid bribes to an unnamed official, the cargo was released to

Dubai with fabricated documents describing the cargo as "minerals." "B.Z." reportedly told

Zarrab, "Bravo, my brother. You have now grown up. I am no longer worried [about my

---

[2] According to an October 3, 2013, article published by the New York Times, in an interview with an Iranian magazine, Zanjani described "a spider web of 64 companies in Dubai, Turkey, and Malaysia" that Zanjani used "to sell millions of barrels of oil, earning $17.5 billion in desperately needed foreign exchange for Iran's Oil Ministry, Revolutionary Guards and central bank." Zanjani described himself as involved in "antisanctions operations" to sell Iranian oil in the international markets. Zanjani reportedly stated that: "[t]he central bank was running out of money" and "they asked me to bring their oil money into Iran so the system could use it." The Iranian government in turn reportedly accused Zanjani of still owing approximately $1.9 billion in oil revenues. *See* Thomas Erdbrink, *To This Tycoon, Iran Sanctions Were Like Gold*, N.Y. TIMES (Oct. 4, 2013) (*available at* http://www.nytimes.com/2013/10/05/world/middleeast/to-this-tycoon-iran-sanctions-are-like-gold.html) (*see also* Ex. 1 ¶ 23(b)). Zanjani reportedly has been convicted in Iran of embezzling $2.7 billion from NIOC and sentenced to death unless he repatriates the allegedly owed oil funds. *See* Golnar Motavelli, *Iranian Billionaire Can Avoid Death Penalty by Repaying Cash*, BLOOMBERG NEWS (Mar. 8, 2016) (*available at* http://www.bloomberg.com/news/articles/2016-03-08/iran-says-billionaire-can-evade-death-sentence-by-returning-cash). Zanjani was removed from the E.U. sanctions list and the SDN list in January 2016 as part of the Joint Comprehensive Plan of Action between the United States, European Union, and five other nations and Iran ("JCPOA").

business] there." *See Iranian businessman Zarrab's 'chief' saved by the bell, report claims*, TODAY'S ZAMAN (Dec. 22, 2013). (Ex. 1 ¶ 27(b)).[3]

A December 29, 2013, article from The Telegraph reported that Zarrab provided bribes to three Turkish ministers, including then-Minister of the Interior, then-Minister of the Economy, and then-minister of urban development in the form of tens of millions of dollars' worth of cash and jewelry. *See* Glen Johnson & Richard Spencer, *Turkey's politicians, gold dealer and the pop star*, THE TELEGRAPH (Dec. 29, 2013). (*See also* Ex. 1 ¶ 27(c)). The Telegraph reported shoeboxes full of cash seized from the home of the then-CEO of Turkey's Halk Bankasi ("Halkbank") and cash from rows of safes in the home of the son of the Minister of the Interior. The Telegraph also reported that "in the wake of the arrests, [Erdogan] lashed out at investigators, journalists, and America and Israel, who he said were involved in a plot against him. . . . Scores of police officers were removed from their posts, including some of those directly involved in the inquiry, and he has attempted to order that in future all such investigations are notified up the line of command, including political command, to prevent such a 'surprise' happening again. . . . One of the three main prosecutors was also taken off the case, accused of being behind the leaks to newspapers." (*Id.*). In the weeks following the December 17, 2013 arrests and another corruption investigation, the international press reported the reassignment, firing, and even criminal prosecutions of thousands of police officers, judges, and prosecutors as part of the Turkish administration's efforts to derail the investigations and

---

[3] The Turkish government reportedly seized control of Today's Zaman on March 4, 2016, part of a series of crackdowns on independent media in Turkey. *See, e.g.*, *Zaman newspaper: Seized Turkish daily 'now pro-government,'* BBC NEWS (Mar. 6, 2016) (*available at* http://www.bbc.com/news/world-europe-35739547). The paper is no longer available online. The cited article is attached as Exhibit 3.

prosecutions.[4] This political backlash, including firings and reassignments of police and prosecutors involved in the investigation of Zarrab and others, was disclosed in the Warrant application. (Ex. 1 ¶ 27 n.7).

In the wake of the political backlash, a 299-page report (the "Report")[5] that appeared to be a law enforcement report of evidence from the investigation of Zarrab and others was posted on the website of a Turkish journalist, Can Dundar.[6] (Ex. 1 ¶ 28). The application in support of the Warrant did not assert that the validity of the Report was confirmed, but instead described where the Report was found as well as the format and contents of the Report. The Report was dated December 18, 2013, the day after Zarrab's and others' arrests in Turkey. The Report bore what appeared to be a case number and references to investigative actions by what appear to be genuine Turkish law enforcement agencies: the Chief Public Prosecutor Office of Istanbul, the

---

[4] *See, e.g.*, *Turkey Crisis*, *supra* ("Since the first wave of arrests in the 15-month investigation occurred last month, Erdogan's government has fired or reassigned almost 4,000 police officers as well as prosecutors and regulatory officials. The prime minister portrays the case as an attempted coup directed at his government and his family."); *Turkish police detained over alleged plot to topple Erdogan government*, THE GUARDIAN (Sep. 1, 2014) (*available at* https://www.theguardian.com/world/2014/sep/01/turkey-police-detained) (describing arrests of "dozens of police officers . . . on suspicion of forming a criminal organisation and wire-tapping hundreds of people including Erdogan," as well as criticism from the then-head of Turkey's supreme court that "[a] judicial authority that is under the influence of the executive cannot correctly fulfil its role which is to prevent arbitrariness and illegality").

[5] A draft English translation of the Report is attached as Exhibit 4.

[6] Dundar was Editor-in-Chief of the Turkish publication, Cumhurriyet. The Committee to Protect Journalists reports that Dundar was arrested in 2015 as part of a political crackdown against Dundar and Cumhurriyet. Committee to Protect Journalists, International Press Freedom Awards (*available at* https://www.cpj.org/awards/2016/can-dundar-turkey.php). Turkey's sustained media crackdown has pushed it to the basement of international freedom of press rankings: Reporters Without Borders ranks Turkey 151 out of 180 countries in the 2016 World Press Freedom Index, worse than countries like South Sudan, Pakistan, and Russia; and Turkey leads the world in imprisoned journalists – more than China and Iran. *Turkey – world leader in imprisoned journalists*, REPORTERS WITHOUT BORDERS (Aug. 10, 2016) (*available at* https://rsf.org/en/news/turkey-world-leader-imprisoned-journalists).

Department of Anti-Smuggling and Organized Crime, and the Communications and Electronic Branch Office. (*Id.*). The Report describes investigative steps and evidence obtained in the course of the investigation of Zarrab and others, including financial records, physical surveillance (including photographs), telephone wiretaps, and an email search. (*Id.*). An FBI agent stationed in Istanbul reviewed the Report and confirmed that the Report appeared consistent in format and content with genuine Turkish law enforcement reports. (*Id.*).

Not only did the content and specificity of the information contained in the Report tend to indicate that it was genuine, but certain information contained in the Report was corroborated by U.S. law enforcement's investigation. For example, the Report describes a search of the Zarrab Account pursuant to a Turkish court order. (*Id.* ¶ 28(c), (e); *see also* Report at 91-93, 118-19). The U.S. investigation up to that date confirmed that this was Zarrab's account (as Zarrab admits in his Motion). The U.S. investigation confirmed that the Zarrab Account communicated with email accounts associated with the Al Nafees Exchange and with email accounts associated with Royal Holding. (Ex. 1 ¶ 25). The Report further described emails exchanged between Zarrab and Abdullah Happani, a Turkish business partner of Zarrab, tallying bribes paid to government and bank officials. (*Id.* ¶ 28(e); *see also* Report at 91-93, 118-19). This information was also corroborated by historical email header information provided to U.S. law enforcement by Microsoft showing email contact between Zarrab's account and an account controlled by Happani. (Ex. 1 ¶ 28(f)).

The information in the Report was further corroborated by U.S. financial data. Records from several U.S. financial institutions showed that between at least March 2007 and October 2012, Al Nafees Exchange was involved in at least approximately 119 international financial transfers, totaling approximately $64.95 million where the purpose of the transaction was

described as relating to gold. (*Id.* ¶ 29(a)). Royal Emerald Investments, a Royal Holding company, was involved in at least an additional 64 international financial transfers, totaling approximately $53.85 million, where the purpose of the transaction was described as relating to gold. (*Id.* ¶ 29(b)). Al Nafees Exchange was further involved as originator or beneficiary in over approximately 60 additional international wire transfers, totaling over approximately $162 million, between January 2007 and January 2011 through a U.S. correspondent bank, which (1) exceeded $1 million each and (2) did not identify the purpose of the transfer. Many of these involved counterparties with names indicative of dealing in gold or precious metals. Royal Deniczilik, a Royal Holding company, originated a transfer in March 2012 for approximately $3,916,500 to a company whose name indicated it was in the jewelry and securities or precious metals business. (*Id.* ¶ 29(c)).

As a result of the search of the Zarrab Account, significant evidence of his participation in the charged offenses was recovered. This evidence includes, but is not limited to:

- Zarrab's receipt of two versions of a letter drafted for his signature and addressed to the Central Bank of Iran offering his family's assistance in "economic jihad" by providing sanctions-evading financial services (*see, e.g.*, Ind. ¶ 16(a));

- Zarrab's receipt of emails from Happani attaching spreadsheets apparently tabulating bribes paid to government and bank officials, as described in the Report (*see* Report at 91-93, 118-19);

- Zarrab's receipt of numerous emails from Mellat Exchange concerning international financial transfers conducted by Zarrab's companies, Al Nafees Exchange and Durak Doviz, on behalf of Mellat Exchange and its customers, including transfers that were blocked by U.S. banks when the transfers' Iranian nexus was discovered (*see, e.g.*, Ind. ¶¶ 16(g), (i)); and

- Zarrab's sending and receipt of emails relating to establishing front companies in order to provide financial services for NIOC and NIOC-owned petrochemical companies and front companies, like Marun Petrochemical and HKICO (*see, e.g.*, Ind. ¶¶ 16(j)-(m)). (*See generally* Ex. 2 at 23-33, 36-37, 45-51).

<u>**DISCUSSION**</u>

**I.     The Warrant Application Did Not Intentionally or Recklessly Omit Information Material to a Finding of Probable Cause, And No Hearing Is Permitted**

> **A.     Applicable Law**

A search warrant affidavit is presumed reliable. *See Franks* v. *Delaware*, 438 U.S. 154, 171 (1978); *United States* v. *Klump*, 536 F.3d 113, 119 (2d Cir. 2008). "The task of a reviewing court is simply to ensure that the totality of the circumstances afforded the [issuing judge] a substantial basis for making the requisite probable cause determination." *United States* v. *Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (internal quotation marks omitted).

In order to successfully challenge the truthfulness of the factual statements in an affidavit, the defendant must demonstrate both that (1) there were intentional misstatements or omissions in the search warrant affidavit; and (2) those misstatements or omissions were material. *See United States* v. *Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003). The defendant must establish both elements by a preponderance of the evidence. *See Klump*, 536 F.3d at 119. "To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves *de novo* whether the hypothetical corrected affidavit still establishes probable cause." *United States* v. *Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *United States* v. *Canfield*, 212 F.3d 713, 718 (2d Cir. 2000). The Court must determine "whether the omitted information was 'necessary to the finding of probable cause,' and not just what might have been relevant to that finding, let alone of interest to a magistrate judge." *United States* v. *Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007) (quoting *Franks*, 438 U.S. at 156).

To justify a finding of intentional misstatements or omissions, "the reviewing court must be presented with credible and probative evidence that the omission of information . . . was designed to mislead or was made in reckless disregard of whether [it] would mislead." *United States* v. *Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (internal quotation marks omitted). An affiant "does not necessarily act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical'" and "an inference [of reckless disregard for the truth] is not to be automatically drawn simply because a reasonable person would have included the omitted information." *Id.* (citation and brackets omitted). Instead, "[t]o prove reckless disregard for the truth, the defendant[ ] must prove that the affiant in fact entertained serious doubts as to the truth of his allegations." *Id.*

Because "[a]ll storytelling involves an element of selectivity," *Wilson* v. *Russo*, 212 F.3d 781, 787 (3d Cir. 2000), "an affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Awadallah*, 349 F.3d at 67-68 (quoting *United States* v. *Colkley,* 899 F.2d 297, 300-01 (4th Cir.1990)). Thus, "*Franks* claims based on omissions are less likely to justify suppression than claims of intentionally or recklessly false assertions." *Vilar*, 2007 WL 1075041, at *27. This is particularly true where the purportedly omitted information concerns the credibility of sources of information. *See Corona* v. *Lunn,* No. 00 Civ. 7330 (GEL), 2002 WL 550963, at *6 (S.D.N.Y. Apr. 11, 2002), *aff'd*, 56 F. App'x 20 (2d Cir. 2003) ("In reviewing warrants obtained despite the non-disclosure of impeaching facts about an informant, the Second Circuit has frequently found probable cause to exist.") (collecting cases).

Finally, a defendant is not entitled to a hearing on the truthfulness of an affidavit. The defendant must first make a "'substantial preliminary showing' that a deliberate falsehood or

statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause." *United States* v. *Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Franks*, 438 U.S. at 155-56, 170-71). "The burden to obtain such a hearing is a heavy one, and such hearings are exceedingly rare." *United States* v. *Melendez*, No. 16 Cr. 33 (LTS), 2016 WL 4098556, at *7 (S.D.N.Y. July 28, 2016); *see also Franks*, 438 U.S. at 171-72 ("To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth . . accompanied by an offer of proof."); *United States* v. *Keith*, No. 15 Cr. 827 (AJN), 2016 WL 1644370, at *2 (S.D.N.Y. Apr. 22, 2016) ("Because materiality, which turns on the existence of probable cause, is a legal question, resolving whether information allegedly omitted from a search warrant application was material does not require an evidentiary hearing.").

## B.    Discussion

### 1.    The Motion Does Not Identify Any Material Facts That Were Omitted From the Warrant Application

Zarrab's principal contention in his Motion is that the Report has been "discredited" and the criminal investigation that led to charges against Zarrab and others shown to be "politically motivated." (Mot. at 1). If the Report had in fact been discredited at the time the application for the Warrant was sought, this might be a compelling argument. But the defense can point to nothing showing that the Report has in fact been discredited, much less anything in the public record at the time the Warrant issued.

As described in the application for the Warrant and reiterated above, the provenance of the Report could not be confirmed, and the law enforcement officers apparently involved in the investigation that led to the Report were fired or reassigned when the charges were made public.

The Report itself, however, bears numerous internal indications of its authenticity and reliability, including a date, reference to a case number, and references to predicate investigations by other Turkish law enforcement bodies. An agent stationed in Istanbul confirmed that the Report appeared consistent in format and content with genuine Turkish law enforcement reports. The very contents of the Report also tend to establish their own reliability: the Report consists of hundreds of pages detailing typical law enforcement investigative steps such as physical surveillance, telephone intercepts, financial analysis, and electronic searches. The evidence is described in great detail, usually accompanied by purported verbatim transcripts or excerpts of intercepted telephone conversations (verbatim excerpts that number in the dozens or hundreds), photographic images of financial records, screen prints of electronic evidence, and photographs of physical surveillance. Descriptions and quotations from purported wiretaps are accompanied by what appear to by unique identifiers, as would be expected for telephone intercept recordings, as well as date and time stamps and an identification of the participants to the calls. Surveillance photographs appear to be genuine photographs of the individuals claimed to be depicted, including photographs of Zarrab. Images of financial documents are consistent in format and content with genuine financial documents.

Moreover, the contents of the Report were corroborated in part by U.S. law enforcement's independent investigation. First, individuals described in the Report are individuals that are, in fact, associated with Zarrab and were involved in business relationships with him, including Babak Zanjani, Abdullah Happani, Camelia Jamshidy, and other employees of Al Nafees Exchange and Royal Holding companies. Second, companies described in the Report are, in fact, involved in Zarrab's illicit finance schemes, including Al Nafees Exchange, Royal Emerald, Kapital Kiymetli, Pirlanta Kiymetli, and Volgam Kuyumculuk. Third, the types

of transactions that the Report describes Zarrab being involved in, including multi-billion-dollar gold transactions for Iran, are the types of transactions that that Zarrab and his companies in fact conducted. Fourth, descriptions in the Report of evidence obtained from a search of the Zarrab Account are consistent with information obtained in the U.S. investigation that Zarrab in fact owned the Zarrab Account and used it to communicate with individuals described in the Report. (*See also* Ex. 2 at 23-33).

Though the application candidly made clear to the reviewing Magistrate Judge that the ultimate provenance of the Report was unconfirmed, and further disclosed that prosecutors and investigators involved in the Turkish corruption investigation were reassigned or fired, Zarrab nonetheless contends that press reports describing vague, unverifiable political motivations by an undefined universe of law enforcement officers or prosecutors constitute material information that destroys probable cause to believe that the Zarrab Account contains evidence, fruits, or instrumentalities of criminal offenses. This contention is wrong for several reasons.

First, most of the articles cited by the defense post-date the Warrant and thus are entirely irrelevant to the Motion. (*See, e.g.*, Mot. Exs. 10 (Jan. 16, 2015 article from Sabah), 12 (Oct. 18, 2014 article from Financial Times), 13 (Oct. 17, 2014 article from Reuters), 16 (Jan. 20, 2015 article from Wall Street Journal), 17 (Aug. 11, 2016 article from Anadolu Agency), 18 (Jan. 6, 2016 article from Daily Sabah).[7] Similarly, the documents that the defense describes as a Turkish

---

[7] Sabah, a Turkish-language newspaper, and its foreign-language counterpart Daily Sabah, have a history of unsupported speculation. A May 19, 2016, article from Daily Sabah, for example, asserted the existence of ties between the Gulen movement and both the U.S. Attorney's Office and this Court. *Gulen links are everywhere in the Zarrab case*, DAILY SABAH (May 19, 2016) (*available at* http://www.dailysabah.com/columns/ragip-soylu/2016/05/19/gulen-links-are-everywhere-in-zarrab-case). The January 2015 Sabah article claiming that the contents of the Report were pre-written is difficult to understand, unsourced, and contradicted by the contents of the Report itself, which describes events, financial transactions, and emails that were corroborated by the U.S. investigation and could not have been pre-written or fabricated. The

court order and a Parliamentary investigation commission report post-date the Warrant. (Mot. Exs. 14 (dated Dec. 15, 2014) and 15 (dated Jan. 5, 2015)). The Warrant affiant obviously cannot be faulted for omitting materials that did not yet exist.  Second, neither the articles existing at the time of the Warrant nor the articles or Turkish government documents published after the Warrant contain concrete, verifiable information discrediting the evidence described in the Report or the evidence obtained in the course of the U.S. law enforcement investigation. Rather, these articles paint with broad brush, rarely cite sources, rarely identify particular individuals, and never discuss any particular evidence described in the Report. Political punditry, such as discussions of what commentators infer about the political implications of an investigation, as in a New York Times article Zarrab relies on, (*see, e.g.*, Mot. at 14), or comments from a former Ambassador to Turkey who had not served in that post since 2010, (*id.* at 14-15), with no indication that those commentators have any first-hand information about the investigation or the resulting evidence, is not material to probable cause.

The defendant also attempts to draw categorical conclusions from the media that are not supported by the sources he cites. For example, the Motion selectively quotes from a New York Times article that "many commentators [in Turkey] saw the influence of the Gulen movement behind the investigation," but omits that the article goes on to state that "a senior member of a Gulen-affiliated organization denied any link between the group and the investigation." (Mot. Exh. 3).  The defendant similarly fails to cite portions of a Reuters article (Mot. at 4) criticizing

---

Anadolu Agency is often described as state-owned or state-run.  *See, e.g.*, *Turkey and US-led coalition pound IS group in Syria*, ASSOCIATED PRESS (May 2, 2016) (available at http://bigstory.ap.org/article/49b7499dbafb409799cc27cd21b9cb28/turkey-strikes-islamic-state-group-positions-syria); *Ethiopian Press Agency Ties Media Deal with Turkish Anadolu Agency*, ETHIOPIA ONLINE (Sep. 26, 2016) (available at http://onlineethiopia.net/2016/09/ethiopian-press-agency-ties-media-deal-turkish-anadolu-agency/).

the Turkish government's purge of law enforcement in response to the investigation, including "sharp criticism from the European Union" and concern from a leader of an association of judges and prosecutors of "political intervention" and "closing off the corruption investigations" causing "a great deal of harm." Zarrab claims that a former Ambassador to Turkey had called the corruption charges "wrong" (Mot. at 14-15), but selectively quotes the speaker: the former Ambassador in fact stated that it is wrong for charges to be politically motivated, even if they are true. The former Ambassador expressed no view about the validity of the charges or reliability of the evidence. Similarly, the defendant relies on another New York Times article (an article that never mentions Zarrab by name) that contains general assertions, not identifying particular individuals, that "the same prosecutors" involved in a previous case are also "going after him [Erdogan]," that "many of the prosecutors and investigators in both cases – corruption inquiry and the old military trials – are followers of Fetullah Gulen," and that certain evidence used in the prior trials appeared to be falsified. The article does not say whether "the same prosecutors" means particular individual prosecutors, a particular prosecutor's office, or the entire Justice Ministry. The defendant further omits that the article describes the Turkish President as complicit in the alleged prior wrongdoing and infers that his motivation for discrediting the prior trials is to discredit politically damaging corruption evidence. The article also notes that the publicly disclosed evidence from the corruption investigation "appears incriminating"—in other words, the same article describing specific aspects of evidence from a prior case indicating the evidence was unreliable also found the publicly available evidence from the corruption investigation to be incriminating. The article provides little basis to draw any conclusions about the authenticity or reliability of the information in the Report, which is not discussed at all.

Sources post-dating the Warrant do little to "discredit" the authenticity or reliability of the evidence in the Report. The purported Turkish court order dated December 15, 2014, for example, relates to complaints by former TNP officers against Zarrab and others claiming that they were unlawfully transferred and fired. The court order denied most of the claims on procedural grounds, finding that most of the complaining officers lacked standing. (*See* Mot. Ex. 14). The document has no discussion of the Report or the evidence described in the Report whatsoever. Similarly, the purported report of a Parliamentary investigative commission dated January 5, 2015 concludes principally that wiretaps relating to four former Turkish ministers (including three implicated in the Zarrab investigation) were unlawful under Turkish law and any resulting evidence would not be considered; the report contains no further discussion of that evidence. (*See* Mot. Ex. 25). The commission purported to carry out a new investigation, but largely fails to describe the investigative steps or resulting evidence except for exculpatory statements given by the former ministers themselves and by Zarrab. The Report, and the evidence described in the Report, is not discussed at all. Neither document "discredits" the Report or supports any of the conclusions Zarrab attempts to draw from them. Indeed, from the summary nature of the purported commission report and apparently cursory nature of any new investigation, little weight or confidence can be placed on it.

In short, the Motion attempts to create through rhetoric and conclusory assertion facts that are completely lacking from the sources it cites. The defense identifies no reliable information that would be helpful to a magistrate judge in evaluating the authenticity and reliability of the Report. The application in support of the Warrant, in contrast, contains extensive, detailed descriptions of the source of the Report, including the extent to which the source was unverified; internal indications that the Report likely was in fact what it purported to

be; the types and nature of evidence described in the Report; and independent corroboration of aspects of the Report. If the defendant's contention were correct, then any search warrant affidavit would need to include a canvass of contemporary politics and media coverage, the religious and political party affiliations of the agents and prosecutors involved in the investigation, allegations of possible historical misconduct by law enforcement that are not tied to the particular affiants or sources of information, and similar unhelpful information. But this kind of "omitted" information upon which the defense relies is not material and the motion to suppress should be denied.

### 2.    The Motion Does Not Make any Showing of Intentional or Reckless Omission

Precisely because the press cited by the defense sheds no material light on the reliability and authenticity of the Report or the evidence described in the Report, and material facts relating to the authenticity and reliability of the Report already are disclosed in the application, the defense fails to make any showing that the "omission" of information from then-existing articles cited in the Motion was either intentional or reckless. *Rajaratnam*, 719 F.3d at 154 ("the reviewing court must be presented with credible and probative evidence that the omission of information . . . was designed to mislead or was made in reckless disregard of whether [it] would mislead"). The defense advances no facts or evidence showing intentional or reckless conduct other than the mere fact of the omission and the defense's wrong contention that the information is material. This does not amount to a "substantial preliminary showing." *Falso*, 544 F.3d at 125.

Similarly, the defendant is not entitled to a hearing. Before ordering a hearing on the motion, the Court would first have to determine that the information that the defense claims to have been intentionally or recklessly omitted was, in fact material to determining probable cause,

and that the Warrant was not supported by probable cause if that information had been disclosed. As discussed above, the Motion does neither and a hearing is not permitted.[8]

### 3. The Application Supports Probable Cause Even if the Report Were Given No Weight

Finally, even if, *arguendo*, the Court were to entirely disregard the Report and evaluate the application in support of the Warrant without relying on any information obtained from the Report, the application would still contain probable cause to support the Warrant. The application includes a discussion of public reports of Zarrab's involvement in billions of dollars' worth of gold trade with Iran and ton-quantity gold transactions with Babak Zanjani, evidence of Zanjani's massive sanctions evasion for the Iranian Oil Ministry, evidence of international financial transactions totaling hundreds of millions of dollars of through U.S. banks by Al Nafees Exchange and other Zarrab-related companies related to gold transactions or having unidentified purpose, evidence of international financial transactions through U.S. banks by Al Nafees Exchange and other Zarrab-related companies for Iranian individuals, and evidence of email communications by Zarrab and others showing that their accounts likely contained communications related to these transactions. Thus, even completely excising the Report from the application, the Warrant still would be supported by probable cause.

## II. The Defendant's Emails Cannot Be Suppressed Pursuant to Rule 41

### A. The Stored Communications Act Expressly Forecloses the Suppression Remedy the Defendant Seeks

The defendant contends that emails from his account should be suppressed because the Warrant violates Federal Rule of Criminal Procedure 41(b), relying on the Second Circuit's

---

[8] If there were a hearing, the Government would also expect to demonstrate that the contents of Zarrab's account would inevitably have been discovered during the investigation.

recent decision in *Microsoft*.[9] The Warrant, however, was issued pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701 *et seq.*, which precludes the suppression remedy the defendant seeks, *see* 18 U.S.C. § 2708, as the courts unanimously have recognized. The Motion, however, entirely ignores this dispositive statute and case law.

Instead, the defendant misleadingly cites decisions suppressing evidence under Rule 41. Rule 41 is relevant only to the extent it is incorporated by reference into the SCA. In *Microsoft*, the panel held that the incorporation in part of Rule 41 into the SCA indicated that Congress did not intend the SCA to apply extraterritorially. *See* 829 F.3d 197 at 218-19. But the SCA incorporates Rule 41 solely with respect to procedure, not with respect to remedies. 18 U.S.C. § 2703(a) (providing for obtaining contents of wire or electronic communications "pursuant to a warrant issued using *the procedures* described in the Federal Rules of Criminal Procedure.") (emphasis supplied). In a section entitled "Exclusivity of Remedies," 18 U.S.C. § 2708, the SCA commands that "[t]he *remedies and sanctions* described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter" (emphasis supplied).[10] The "remedies and sanctions" described in the SCA do not include suppressing evidence as a remedy. *See* 18 U.S.C. §§ 2701, 2702, 2707.

Though the defense does not acknowledge this exclusive scheme of remedies, courts— including courts in this District—have consistently held that Congress precluded suppression of

---

[9] Although *Microsoft* was issued on July 14, 2016, no mandate has issued. *See* Appellate Docket No. 14-2985. The Government maintains that the opinion in *Microsoft* is flawed and has filed a petition for rehearing. *See* Pet'n for Rehr'g or Rehr'g En Banc, Dkt. 316, *Microsoft*, 14-2985.

[10] The defendant does not contend that the alleged violation of Rule 41 was a constitutional error, nor could he. The presumption against extraterritoriality that the Second Circuit found applicable in *Microsoft* and allegedly violated here is a "canon of statutory interpretation," *Kiobel* v. *Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013), not a constitutional rule.

evidence based on alleged statutory violations of the SCA. *Wearing* v. *Lavalley*, No. 10 Civ. 8307 (PO), 2015 WL 6738327, at *3 (S.D.N.Y. Nov. 4, 2015) (Because "[t]he [SCA] provides for civil damages and criminal punishment but excludes other potential remedies," "the statutory violations alleged by Petitioner do not afford a suppression remedy."); *United States* v. *Navas*, 640 F. Supp. 2d 256, 263 (S.D.N.Y. 2009) ("[T]he SCA provides for civil damages and criminal punishment, but specifically excludes other potential remedies.") (citations omitted), *rev'd in other part,* 597 F.3d 492 (2d Cir. 2010); *see also United States* v. *Carpenter*, 819 F.3d 880, 890 (6th Cir. 2016) (same); *United States* v. *Wilson*, 633 F. App'x 750, 753 (11th Cir. 2015) (same); *Huon* v. *Mudge*, 597 F. App'x 868, 875 (7th Cir. 2015) (same); *United States* v. *Guerrero,* 768 F.3d 351, 358 (5th Cir. 2014) (same); *United States* v. *Powell*, 444 F. App'x 517, 520 (3d Cir. 2011) (same); *United States* v. *Scully*, 108 F. Supp. 3d 59, 88 (E.D.N.Y. 2015) (same) (quoting *United States* v. *Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998)); *United States* v. *Jones*, 908 F. Supp. 2d 203, 209 (D.D.C. 2012) ("all courts that have addressed the issue have held that the SCA does not provide for a suppression remedy").[11] The defendant cannot obtain a suppression remedy that Congress has expressly foreclosed.

### B.   The Warrant Does Not Violate the SCA or Rule 41

Even if suppression were available as a remedy, the Warrant does not violate the SCA or Rule 41. The defense contends that the Warrant violated the extraterritorial restrictions set out in the *Microsoft* opinion, speculating that it is "a virtual certainty that the contents of the [Zarrab

---

[11] The two cases relied upon by the defendant, *United States* v. *Levin*, CR 15-10271-WGY, 2016 WL 2596010 (D. Mass. May 5, 2016) and *United States* v. *Croghan*, No. 1:15-CR-48, 2016 WL 4992105 (S.D. Iowa Sept. 19, 2016), concerned Rule 41 warrants to search computers, and not SCA warrants to email providers.

Account] were stored outside the United States." (Mot. at 20).[12] But even if that were true, before the data was produced to the Government, Microsoft repatriated the data to the United States, thus bringing it within the territorial scope of an SCA warrant.

The Magistrate had the jurisdiction to issue the Warrant regardless of where the data was stored at the time. The SCA confers jurisdiction to issue a warrant on any district court with "jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Jurisdiction over the offenses charged in the Indictment plainly lies in this District, and the Magistrate Judge accordingly had jurisdiction to issue the Warrant regardless of the location of the data. *See United States* v. *Grubbs*, 547 U.S. 90, 96 (2006) ("the fact that the [item to be seized] is not presently located at the place described in the warrant is immaterial" to the validity of a warrant).

And even if, under *Microsoft*, the Warrant could not be *enforced* against data located overseas (and even if the data at issue were in fact overseas), it was properly enforced to the extent Microsoft transferred any overseas data to the United States. *Microsoft* held that "the SCA does not authorize a U.S. court to issue and enforce an SCA warrant against a United States-based service provider for the contents of a customer's electronic communications stored on servers located outside the United States." 829 F.3d at 222. But as Judge Lynch observed in

---

[12] The defendant's conjecture is based on Microsoft's description of its general practices as repeated in the *Microsoft* opinion. This speculation demonstrates that Zarrab does not have standing to assert a violation of Rule 41 based on the location of the data, because he has no control over or interest in that location. Black-letter law requires a defendant to demonstrate that "the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect," *Rakas* v. *Illinois*, 439 U.S. 128, 140 (1978). A touchstone of that inquiry is whether the defendant has the ability to control the location that the police have searched. *See id.* at 155 (rejecting standing to challenge search of vehicle because "[n]one of the passengers is said to have had control of the vehicle"). Whatever interest the defendant may be able to assert in the *content* of the data, he has no Fourth Amendment interest in the *location* of that data, over which, by his own account, he had no control and about which he had no knowledge, and which is entirely the product of "the business decisions of a private corporation." *Microsoft*, 829 F.3d at 224 (Lynch, J., concurring).

concurrence, "[t]he contract between Microsoft and its customers does not limit the company's freedom to store its customers' emails wherever it chooses," and overseas data can be brought into the United States: "if Microsoft chooses . . . to repatriate the emails at issue here to a server in United States, there will be no obstacle to the government's obtaining them." 829 F.3d at 224 (Lynch, J., concurring). In this case, Microsoft could have objected to the Warrant or simply produced only responsive data located in the United States, as it chose to do in the *Microsoft* litigation. But Microsoft neither refused nor objected to bringing any overseas data to the United States, instead electing to repatriate the material described in the Warrant and to produce it to the Government, thereby making the data subject to the Warrant.

### C.       The Good Faith Exception Precludes Suppression

Finally, even if the SCA did not expressly foreclose suppression, and even if Rule 41 were in fact violated, the officers relied in good faith on the validity of the warrant.

#### 1.       Applicable Law

Under the good-faith exception, the exclusionary rule and its remedy of suppression should not apply where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *See United States* v. *Leon*, 468 U.S. 897, 922 (1984). In analyzing the applicability of the good-faith exception, the question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n. 23. If the reviewing court finds that reliance on the warrant was objectively reasonable, suppression is not warranted. *See, e.g., United States* v. *Vilar*, 729 F.3d 62, 82 n.17 (2d Cir. 2013); *United States* v. *Singh*, 390 F.3d 168, 183 (2d Cir. 2004). "Reasonable minds frequently may differ on the question whether a particular affidavit established probable cause, and we have thus concluded that the preference for warrants is most

appropriately effectuated by according 'great deference' to a magistrate's determination." *Leon*, 468 U.S. at 914.

The good faith exception applies both to the magistrate's probable cause determination and the magistrate's assessment of the technical sufficiency of the warrant. The Supreme Court has recognized that law enforcement "cannot be expected to question the magistrate's . . . judgment that the form of the warrant is technically sufficient." *Id*. at 921. A defendant faces a particularly high burden to show that officers did not act in good faith when prior legal rulings support the warrant or where a purported legal deficiency was not established in precedent. *Davis* v. *United States*, 564 U.S. 229, 241 (2011) ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule."); *United States* v. *Raymonda*, 780 F.3d 105, 119 (2d Cir. 2015) ("[W]here a relevant legal deficiency was not previously established in precedent, the agent's failure to recognize that deficiency cannot vitiate good faith.") (internal quotation marks omitted).

### 2. Discussion

At the time that the warrant was issued, no precedent restricted the territorial scope of the SCA. To the contrary, Magistrate Judge Francis had issued a well-reasoned opinion dated Apr. 25, 2014, adopted in full by Chief Judge Preska, *see* Order, 13 Mag. 2814, Dkt. 80 (Aug. 11, 2014), squarely holding that "[e]ven when applied to information that is stored in servers abroad, an SCA Warrant does not violate the presumption against extraterritorial application of American law." 15 F. Supp. 3d at 477. These holdings were supported by Second Circuit precedent that a party served with valid legal process may not "resist the production of documents on the ground that the documents are located abroad." *In re Marc Rich & Co., A.G.*, 707 F.2d 663, 667 (2d Cir. 1983). Reliance on the Warrant was therefore clearly in good faith. *Raymonda*, 780 F.3d at 119.

The defendant also asserts that the good faith exception is inapplicable to a warrant "the magistrate judge never had authority to issue." (Mot. at 23) (citing *Levin*, 2016 WL 2596010). But, as discussed above, Judge Fox had the authority to issue the Warrant under the plain terms of the SCA. *See* 18 U.S.C. § 2711(3)(A)(i).[13] The *Levin* opinion is both distinguishable and contrary to the vast majority of case law. *Levin* considered Rule 41 search warrants issued in the Eastern District of Virginia authorizing agents to install a network investigative technique (computer code) on visitors to a website hosted in that district, regardless of where the visitors' computers were located. The overwhelming majority of courts have found that the good faith exception applied or that Rule 41 was not violated at all. *See United States* v. *Anzalone*, CR 15-10347-PBS, 2016 WL 5339723, at *9-11 (D. Mass. Sept. 22, 2016) (collecting cases). Accordingly, the officers in this case acted in good faith.

## CONCLUSION

Accordingly, the Government respectfully requests that the Court deny the defendant's motions to suppress, without a hearing.

Dated: New York, New York
       November 14, 2016

                                    Respectfully submitted,

                                    PREET BHARARA
                                    United States Attorney

                            by:   _____/s/_____
                                    Michael D. Lockard/Sidhardha Kamaraju/David W.
                                    Denton, Jr., Assistant U.S. Attorneys
                                    Dean Sovolos, Special Assistant U.S. Attorney
                                    (212) 637-2193/6523/2744/2213

---

[13] The panel in *Microsoft* did not hold that SCA warrants for data hosted abroad are invalid; rather, the holding is limited solely to the scope of Microsoft's "lawful obligation to produce materials to the government," 829 F.3d at 222, recognizing that the warrant at issue there had valid "domestic directives." *Id.* at 201.