UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                          :

UNITED STATES OF AMERICA

                          :

   - v. -                             S2 15 Cr. 867 (RMB)

                          :

REZA ZARRAB,
  a/k/a "Riza Sarraf,"             :

        Defendant.            :

                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**THE GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO THE CONFLICTS OF INTEREST BY KIRKLAND AND ELLIS LLP**

PREET BHARARA
United States Attorney for the
Southern District of New York
*Attorney for the United States*
*Of America*

Michael D. Lockard
Sidhardha Kamaraju
David W. Denton, Jr.
  Assistant United States Attorneys
Dean Sovolos
  Special Assistant United States Attorney
     *Of Counsel*

Pursuant to the Court's Order, dated December 8, 2016, the Government respectfully submits the following proposed findings of fact and conclusions of law. The Government's sole interest in pressing this *Curcio* issue – and indeed its obligation – is to protect the integrity of these proceedings and ensure a defendant's right to conflict-free counsel. To be sure, a defendant has a right to counsel of his own choosing, but that right is not absolute. Here, the conflict issues that have already arisen strongly indicate that the defendant's Sixth Amendment right to conflict-free counsel is at odds with the defendant's right to his choice of counsel. The Government believes that Kirkland & Ellis' participation in Zarrab's defense will or likely could lead to complications that the parties and the Court are not even in a position to foresee at the current time, and that could disrupt a lengthy, complicated trial or lead to mistrial or reversal of any conviction obtained. *See, e.g.*, *United States* v. *Bright*, No. 06 CR. 242 (WHP), 2008 WL 11288148, at *1-*2 (S.D.N.Y. Nov. 24, 2008) (mistrial declared when conflict regarding counsel arose during trial that defendant refused to waive), *aff'd*, 356 F. App'x 474 (2d Cir. 2009); *see also United States* v. *Fulton*, 5 F.3d 605, 614 (2d Cir. 1993) (failure to disqualify an attorney who had a conflict of interest required reversal of conviction).

## PROPOSED FINDINGS OF FACT

### A.    The Indictment and the Defendant's Arrest

1.      On December 15, 2015, a federal grand jury sitting in the Southern District of New York ("SDNY") returned a sealed indictment, 15 Cr. 867 (the "Original Indictment"), charging Reza Zarrab (the "defendant") as well as Hossein Najafzadeh and Camelia Jamshidy, each of whom remains at large, with conspiring: (i) to defraud the United States, and in particular, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"), in violation of Title 18, United States Code, Section 371; (ii) to violate the International Emergency Economic Powers Act ("IEEPA") and the Iranian Transactions and Sanctions Regulations

("ITSR"), in violation of Title 50, United States Code, Section 1705 and Title 31, Code of Federal Regulations, Sections 560.202, 560.203, 560.204, 560.205, and 561.205; (iii) to commit bank fraud, in violation of Title 18, United States Code, Section 1349; and (iv) to commit money laundering, in violation of Title 18, United States Code, Section 1956, from approximately 2010 up to and including approximately 2015.

2.      The Original Indictment alleges that the defendant and his co-conspirators used a network of Turkish and Emirati companies to conduct financial transactions on behalf of Iranian entities that were processed by U.S. financial institutions, in violation of U.S. sanctions law. *See* Original Indictment ¶¶ 9-12.

3.      On March 19, 2016, the defendant was arrested in Miami, Florida, after arriving on an inbound flight from Turkey. He was presented in the United States District Court for the Southern District of Florida, and ordered to be removed to this District.

4.      On March 30, 2016, a grand jury sitting in this District returned a superseding indictment, docketed as S1 15 Cr. 867 (RMB) (the "First Superseding Indictment"). The First Superseding Indictment asserted the same charges against the defendant as were contained in the Original Indictment, but asserted that original venue existed in the SDNY.[1]

**B.      The Defendant's Initial Appearance and Representation before the Court**

5.      On April 14, 2016, Benjamin Brafman, Esq., Marc A. Agnifilo, Esq., and Joshua D. Kirshner, Esq., three attorneys from the law firm Brafman & Associates, P.C. ("Brafman &

---

[1] On November 7, 2016, a grand jury in this District returned a second superseding Indictment, S2 15 Cr. 867 (RMB) (the "Second Superseding Indictment"). The Second Superseding Indictment charged the defendant and his co-defendants with the same crimes as were contained in the Original Indictment and the First Superseding Indictment, but added an additional co-conspirator as a named defendant as well as additional overt acts.

Associates"), filed notices of appearance on behalf of the defendant.  *See United States* v. *Reza Zarrab et al.*, S2 15 Cr. 867 (RMB), Dkt. Nos. 10, 11, 12.

6.      On April 27, 2016, the defendant was arraigned on the First Superseding Indictment.  At the arraignment, the defendant was represented by Mr. Brafman, Mr. Agnifilo, and Mr. Kirshner.

7.      On June 29, 2016, Aaron T. Wolfson, Esq., from the law firm Lewis Baach PLLC ("Lewis Baach"), filed a notice of appearance on behalf of the defendant.  *See Zarrab*, 15 Cr. 867, Dkt. No. 44.  On July 18, 2016, Tara J. Plochocki, Esq. of Lewis Baach filed a motion to appear *pro hac vice* on behalf of the defendant, which was granted by the Court on July 20, 2016.  *See Zarrab*, S2 15 Cr. 867, Dkt. Nos. 60 & 68.

8.      In June and July 2016, William A. Burke, Esq., Christine H. Chung, Esq., Adam Abensohn, Esq., and Daniel R. Koffman, Esq., four attorneys from the law firm Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel"), filed notices of appearance on behalf of the defendant.  *See Zarrab*, S2 15 Cr. 867, Dkt. Nos. 46, 53, 54, 61.

9.      In June and July 2016, Viet Dinh, Esq., Paul D. Clement, Esq., Jeffrey M. Harris, Esq., and Edmund G. LaCour, Jr., Esq., four attorneys who were at the time with the law firm Bancroft PLLC ("Bancroft"), filed motions for admission *pro hac vice* to represent the defendant.  *See Zarrab*, S2 15 Cr. 867, Dkt. Nos. 45, 50, 51, and 52.  With the exception of the application of Mr. Dinh, the Court granted these motions on July 20, 2016.  *See id.*, Dkt. Nos. 69, 70, and 71.[2]

10.     On July 5, 2016, Edward O'Callaghan, Esq., from the law firm Clifford Chance US, LLP ("Clifford Chance"), filed a notice of appearance on behalf of the defendant.  *See*

---

[2] No order granting Mr. Dinh's pro hac vice motion appears on the docket in this case.

*Zarrab*, S2 15 Cr. 867, Dkt. No. 48. That same day, another Clifford Chance attorney, George

Kleinfeld, Esq., filed a motion to appear *pro hac vice* on behalf of the defendant, which was

granted by the Court on July 6, 2016. *See id.*, Dkt. Nos. 47, 49.

**C.     Bancroft Attorneys Join Kirkland & Ellis LLP**

11.     On September 12, 2016, the law firm Kirkland & Ellis LLP ("Kirkland")

announced that all of the attorneys working at Bancroft were joining Kirkland. *See* Exh. 1, Sept.

12, 2016 Kirkland Press Release

12.     On October 22, 2016, all of Bancroft's attorneys, including Messrs. Clement,

Dinh, Harris, and LaCour joined Kirkland. *See* Exhibit 2, Nov. 30, 2016 Tr. at 6.

**D.     Messrs. Dinh, Clement, and Harris's Simultaneous Representation in the HSBC
         Prosecution and Appeal**

13.     On December 11, 2012, a criminal action was initiated against HSBC USA Bank,

N.A. ("HSBC") and HSBC Holdings PLC ("HSBC Holdings," and together with HSBC, the

"HSBC Defendants") in the United States District Court for the Eastern District of New York

(the "HSBC Prosecution"). *See United States* v. *HSBC Bank USA, N.A.*, No. 12 Cr. 763 (AMD)

(E.D.N.Y.). HSBC and HSBC Holdings were charged by criminal Information (the "HSBC

Information") with: (a) failure to maintain an effective anti-money laundering program; (b)

failure to conduct due diligence on correspondent bank accounts involving foreign persons; (c)

violations of the IEEPA; and (d) violations of the Trading With the Enemy Act ("TWEA"). *See*

Exhibit 3, HSBC Information at ¶¶ 18-27. According to the HSBC Information, these charges

stemmed from HSBC's willful facilitation of financial transactions that violated several different

sanctions regimes imposed by the United States, including sanctions imposed under the IEEPA

and the precursor to the ITSR. *See id.* ¶¶ 9-11, 25.

14.     In the HSBC Prosecution, the HSBC Defendants were represented by attorneys with the law firms Sullivan & Cromwell LLP and Cahill Gordon & Reindel LLP.

15.     On December 11, 2012, the United States Attorney's Office for the Eastern District of New York ("USAO-EDNY") filed a deferred prosecution agreement between the Government and the HSBC Defendants (the "HSBC DPA," attached hereto as Exhibit 4) in the HSBC Prosecution. Pursuant to the HSBC DPA, the United States Department of Justice, Criminal Division, Asset Forfeiture and Money Laundering Section, USAO-EDNY, and the United States Attorney's Office for the Northern District of Virginia agreed not to prosecute the HSBC Defendants for the charges in the HSBC Information if they agreed to comply with certain conditions for a period of five years. *See* HSBC DPA at 3-4. These conditions included, among others, that the HSBC Defendants: (a) accept responsibility for the conduct alleged in the HSBC Information and set forth in a "Statement of Facts" attached to the HSBC DPA; (b) had to agree to retain an "independent compliance monitor" (the "Monitor"); and (c) had to forfeit more than $1.2 billion. *See id.* at 3, 12-13, 15-16.

16.     On July 1, 2013, the Honorable John Gleeson, United States District Judge for the Eastern District of New York, approved the HSBC DPA. *See HSBC Bank USA, N.A.*, No. 12 Cr. 763, Dkt. Entry No. 23 (the "July 1, 2013 HSBC Order," attached hereto as Exhibit 5). In the July 1, 2013 HSBC Order, Judge Gleeson directed the parties "to file quarterly reports with the Court to keep it apprised of all significant developments in the implementation of the [HSBC DPA]." *See id.* at 20.

17.     On April 28, 2015, Judge Gleeson ordered the USAO-EDNY file a report prepared by the Monitor (the "Monitor's Report") with the court. *See HSBC Bank USA, N.A.*, No. 12 Cr. 763, ("April 28, 2015 Order").

18.     On June 1, 2015, the USAO-EDNY applied to file the Monitor's Report under seal.  *See HSBC Bank USA, N.A.*, No. 12 Cr. 763, Dkt. Entry No. 35.

19.     On November 3, 2015, an individual who had filed a complaint against HSBC with the Consumer Financial Protection Bureau applied to Judge Gleeson to unseal the Monitor's Report.  *See HSBC Bank USA, N.A.*, No. 12 Cr. 763, Dkt. Entry No. 42 (Nov. 3, 2015 Letter from Hubert Dean Moore, Jr.).

20.     On January 28, 2016, Judge Gleeson ordered that a redacted version of the Monitor's Report should be filed publicly.  *See HSBC Bank USA, N.A.*, No. 12 Cr. 763, Dkt. Entry No. 52 (the "January 28, 2016 HSBC Order," attached hereto as Exhibit 6) at 14.

21.     On February 1, 2016, the HSBC Defendants filed a notice of appeal of the January 28, 2016 HSBC Order directing the unsealing of the Monitor's Report in redacted form. *See HSBC Bank USA, N.A.*, No. 12 Cr. 763, Dkt. Entry No. 55 ("Feb. 1, 2016 Notice of Appeal").

22.     On July 21, 2016, Messrs. Clement, Dinh, and Harris, who at the time were still with Bancroft, filed a brief in the United States Court of Appeals for the Second Circuit on behalf of the HSBC Defendants.  *See United States* v. *HSBC Bank USA, N.A.*, No. 16-308 (2d Cir.), Dkt. Entry No. 118 ("HSBC 2d Circuit Brief," attached hereto as Exhibit 7).  The brief was submitted in support of the HSBC Defendants' appeal of Judge Gleeson's January 28, 2016 HSBC Order directing, *inter alia*, that the Monitor's Reports be unsealed.  *See id*. at 6.

23.     The HSBC 2d Circuit Brief describes the First Annual Monitor's Report as a more than 1,000-page report reflecting a two-year investigation by the Monitor and "an abundance of sensitive and proprietary banking information."  *See id.* at 2; *see also id.* at 16 ("The Report, which runs more than 1,000 pages, documents the Monitor's extensive

investigation into HSBC's compliance with the DPA and relevant financial laws around the world. JA202. Among other things, the Report contains the Monitor's analysis of 'confidential client information, including … names, nationality, source of wealth, transaction history and suspicious activity alerts.'") (alteration in original), 18 (stating that "the Justice Department, Monitor, and financial regulators all cautioned that disclosing the Report's assessment of deficiencies in HSBC's anti-money-laundering and sanctions control efforts could create a road map for criminals to exploit"), & 43 (describing "vast disclosures of highly sensitive banking and customer information by HSBC and its global affiliates to the Monitor").

24.     On December 2, 2016, Messrs. Clement and Dinh, by that point at Kirkland, filed a reply brief in further support of the HSBC Defendants' appeal. *See HSBC Bank USA, N.A.*, No. 16-2545 (2d Cir.), Dkt. Entry No. 120.

**E.     Messrs. Clement and Harris's Simultaneous Representation of JPMorgan Chase Bank**

25.     On March 28, 2014, several individual and corporate plaintiffs (the "Dusek Plaintiffs") filed a civil lawsuit against JPMorgan Chase Bank N.A. ("JPMC"), JPMorgan Chase & Co., J.P. Morgan Securities LLC, and J.P. Morgan Securities Ltd. (collectively, the "J.P. Morgan Defendants") in the United States District Court for the Middle District of Florida. *See Dusek* v. *J.P. Morgan Chase & Co. et al.*, No. 14 Civ. 184 (M.D. Fla.), Dkt. No. 1 ("Dusek Compl."). The complaint alleged, in substance and in part, that the J.P Morgan Defendants were liable to the Dusek Plaintiffs for losses arising out of the Ponzi scheme operated by Bernie Madoff. *See* Dusek Compl. ¶¶ 1-11.

26.     On October 3, 2014, the Dusek Plaintiffs filed a second amended complaint against the J.P. Morgan Defendants. *See Dusek*, No. 14 Civ. 184, Dkt. No. 52.

27.     On September 17, 2015, the Honorable John E. Steele, United States District Judge for the Middle District of Florida, granted the J.P. Morgan Defendants' motion to dismiss the Dusek Plaintiffs' second amended complaint.  *See Dusek*, No. 14 Civ. 184, Dkt. No. 82.

28.     On September 30, 2015, the Dusek Plaintiffs filed a notice of appeal, appealing the dismissal of the second amended complaint.  *See Dusek*, No. 14 Civ. 184, Dkt. No. 84.

29.     On August 10, 2016, the United States Court of Appeals for the Eleventh Circuit affirmed Judge Steele's dismissal of the second amended complaint.  *See Dusek*, No. 14 Civ. 184, Dkt. Nos. 89, 90, 91.

30.     On September 26, 2016, the Dusek Plaintiffs petitioned for certiorari from the United States Supreme Court.  *See Dusek* v. *J.P. Morgan Chase & Co. et al.*, No. 16-389 (2016).

31.     On November 7, 2016, Messrs. Clement and Harris, along with another attorney from Kirkland, filed an opposition to the Dusek Plaintiffs' petition for certiorari.  *See Dusek*, No. 16-389, Brief in Opposition to Pet. for Cert. (attached hereto as Exhibit 8).  According the opposition, the question presented by the petition for certiorari is "Whether the tolling rule articulated in [*American Pipe & Construction Co.* v. *Utah*, 414 U.S. 538 (1974)] should be extended to the statute of repose governing fraud claims under the Securities Exchange Act of 1934 despite this Court's holding in [*CTS Corp.* v. *Waldburger*, 134 S.Ct. 2175 (2014)] that statutes of repose serve as an 'absolute … bar' to a defendant's liability?"  *See id.* at i.

**F.     Discovery and Motion Practice in the Instant Prosecution**

32.     On May 27, 2016, the Government produced discovery to the defendant pursuant to Rule 16 of the Federal Rules of Criminal Procedure which included, among other things, redacted versions of search warrants and affidavits in support of applications for the search warrants.  One of the search warrant affidavits produced to the defendant described records showing that the Al Nafees Exchange, Royal Emerald Investments LLC, and Royal Emerald I

8

used correspondent bank accounts at JPMC, Standard Chartered Bank, and Deutsche Bank to conduct more than $118 million in transactions purportedly related to the purchase of gold between at least 2007 and 2012, that the Al Nafees Exchange used correspondent bank accounts at Citibank, N.A., to conduct more than $190 million in large transactions purportedly related to gold or having no identified purpose between at least 2007 and 2011, and that the Al Nafees Exchange used correspondent bank accounts at JPMC, HSBC, Standard Chartered Bank and Deutsche Bank to transfer millions of dollars to beneficiaries in the United States between 2007 and 2010. *See* Exhibit 9, Sept. 23, 2014 Affidavit at ¶¶ 29, 33-34. A second search warrant affidavit described records showing that the defendant used correspondent bank accounts at HSBC to transfer $1.8 million in 2012. *See* Exhibit 10, July 24, 2015 Affidavit at ¶ 53(d).

33. On June 1, 2016, the Government produced information obtained from the alleged victim financial institutions to the defendant. *See* Exhibit 11, June 1, 2016 Govt. Discovery Letter. The data produced included financial information provided by Bank of America, N.A. ("Bank of America"), Citibank, N.A. ("Citibank"), Deutsche Bank Trust Company of the Americas ("Deutsche Bank"), HSBC, JPMC, Standard Chartered Bank, PLC ("SCB"), UBS Bank USA ("UBS"), and Wells Fargo Bank, N.A. ("Wells Fargo"). *See* Exhibit 12, Bank Data Spreadsheet.

34. On July 19, 2016, the defendant's attorneys, including Messrs. Clement, Dinh, Harris, and LaCour, filed a motion to dismiss the First Superseding Indictment. *See Zarrab*, S2 15 Cr. 867, Dkt. No. 64.

35. In their memorandum of law in support of the motion to dismiss the First Superseding Indictment, the defense argued that all four counts should be dismissed. With respect to the bank fraud count, the defense argued, among other things, that "[t]here was no

bank fraud for the added reason that there was no bank victim" because "[t]here is simply no indication in the Indictment, or in any relevant case law, that a bank would face a real threat of loss on account of processing a transaction that, unbeknownst to the bank, was meant to evade OFAC sanctions." Exhibit 13, Mem. in Support of Motion to Dismiss at 27-28.

36.     On August 30, 2016, Messrs. Dinh, Harris, LaCour, Brafman, Agnifilo, Kirshner, and Abensohn and Ms. Chung submitted a motion on behalf of the defendant in which they argued that the Court should recuse itself based on its participation in a conference in Istanbul, Turkey in May 2014. *See Zarrab*, S2 15 Cr. 867, Dkt. No. 80.

37.     On September 29, 2016, the Court denied Zarrab's motion for the Court's recusal. *See Zarrab*, S2 15 Cr. 867, Dkt. No. 87.

38.     On October 5, 2016, the Court held oral argument on the defendant's remaining motions. Mr. Clement argued in support of the defendant's motion to dismiss.

39.     During the oral argument, Mr. Clement contended that the bank fraud count should be dismissed because the U.S. financial institutions that conducted the transactions at issue were not victims of fraud because, among other things:

a.     "[W]ith respect to these wire transfers, there is nothing alleged in the indictment that rises to the level of misrepresentation in the wire transfer requests." Exhibit 14, Oct. 5, 2016 Tr. at 17.

b.     "I think it is worth understanding that there is a little bit of an oddity of this whole regime, because you would think, in a regime where it was really problematic for a U.S. bank to process a wire transfer to the ultimate benefit of an Iranian entity, that in order to do any wire transfer internationally, there would be some box you would have to check or some information that would tip the U.S. bank off to that, that there is a problem. But there isn't." *Id.*

c.       "I think what makes this bank [sic] different from every other case of bank fraud of which I am aware is that, if this scheme were to succeed here, the U.S. bank is better off. They process to [sic] wire transfer. They have gotten some compensation for that. If the scheme works, the bank is better off. Every other bank fraud case I have ever seen, if the scheme works, the bank is worse off. And that is kind of the *sine qua non* of bank fraud. I do think that is a fundamental defect in their bank fraud theory." *Id*. at 20.

d.       "I think what they say in their brief is, well, there could be regulatory costs that the bank incurs. There could be some threat. There are a lot of these transactions that go through a bank. Maybe some bank regulator is going to take a closer look at them. That, your Honor, is a theory that, I think, they have absolutely no support for." *Id*.

40.       On October 17, 2016, the Court denied the defendant's motion to dismiss the First Superseding Indictment.  In denying the motion to dismiss the bank fraud count, the Court determined both that the First Superseding Indictment alleged material misrepresentations and "that Zarrab and his co-conspirators intended to and did victimize the U.S. banks and exposed them to actual and potential loss."  *See Zarrab*, S2 15 Cr. 867, Dkt. No. 90 (attached hereto as Exhibit 15).

41.       On October 28, 2016, in a letter from Mr. Dinh to the Court, Kirkland requested permission to file a motion to suppress the results of a search of Zarrab's email account based on the September 23, 2014 search warrant affidavit.  *See Zarrab*, S2 15 Cr. 867, Dkt. No. 97.

42.       On November 3, 2016, the Court granted Kirkland's application to file the additional motion to suppress.  The motion was filed on November 9, 2016, and briefing was completed on November 17, 2016.  That motion remains pending.

## G.     The *Curcio* Proceeding

43.     On November 16, 2016, the Government called Mr. Dinh to inform him that the Government was aware that Kirkland simultaneously represented of the defendant, Bank of America, and Deutsche Bank and that the Government believe this presented a potential or actual conflict requiring a hearing pursuant to *United States* v. *Curcio*, 680 F.2d 881, 888-90 (2d Cir. 1982).  Mr. Dinh requested that the Government provide a list of any other banks that the Government believed to be similarly affected.  That same day, the Government emailed Mr. Dinh a list of nine additional similarly situated banks. *See* Exhibit 16, Nov. 16, 2016 Govt. Email.

44.     On November 18, 2016, the Government submitted a letter to the Court advising of potential conflicts of interest presented by the representation of the defendant by Kirkland. *See* Exhibit 17, Nov. 18, 2016 Govt. Letter.  The Government requested that the Court hold a *Curcio* hearing, and enclosed a set of proposed questions to be put to the defendant as part of the *Curcio* inquiry.  *See id*.

45.     On November 21, 2016, the Court directed the defense to respond to the Government's November 18, 2016 letter.  *See Zarrab*, S2 15 Cr. 867, Dkt. No. 121.

46.     On November 21, 2016, Kirkland submitted a response letter to the Government's November 18, 2016 letter requesting a *Curcio* hearing.  *See* Exhibit 18, Nov. 21, 2016 Kirkland Letter.  Kirkland contended that "it is not representing Deutsche Bank or Bank of America in any matter related to the defendant or his alleged conduct," and asserted that it does not believe that there is any actual or potential conflict between the defendant's interests and the interests of any of its current clients.  *Id.*  Kirkland advised that the firm had instituted an "ethical wall that prohibits access to any materials related to Kirkland's representation" of the defendant, and would deny access to materials related to the defendant's case to (1) any Kirkland lawyer,

12

contractor, or staff member who has worked for Deutsche Bank or Bank of America as well as (2) any other lawyer, contractor, or staff member who has not been precleared by Kirkland's conflicts department. *Id.* Kirkland further advised that it would not object to the Court holding a *Curcio* hearing, and attached proposed *Curcio* questions with the submission to the Court. *See id.*

47.     On November 22, 2016, the Court ordered a *Curcio* hearing, and further instructed that the hearing must be conducted before any further proceedings in this case. *See Zarrab*, S2 15 Cr. 867, Dkt. No. 131 (attached as Exhibit 19). The Court specified that the following be provided in advance of any *Curcio* hearing: "1- Assurances that defense counsel thoroughly have discussed all aspects of the proposed *Curcio* hearing with the defendant, and with Deutsche Bank and Bank of America, including written position statements from Deutsche Bank and Bank of America (who may, if they wish, testify at the *Curcio* hearing.) 2- Appointment of independent counsel carefully to review the *Curcio* issues with the defendant, including without limitation, the proposed 'ethical wall' mentioned in Mr. Dinh's and Mr. Brafman's letter, and to report to the Court in writing." *Id.* Additionally, the Court asked for a brief supplement to Mr. Dinh's and Mr. Brafman's letter indicating when defense counsel became aware of the conflict of interest issues in this case. *See id.* On that same day, the Court also appointed Harry Rimm, Esq., as independent counsel to advise the defendant regarding any waiver of his Sixth Amendment rights, and further scheduled a *Curcio* hearing in this matter. *See Zarrab*, S2 15 Cr. 867, Dkt. 135.

48.     On November 23, 2016, Kirkland submitted a letter to the Court to advise that the firm "became aware of the potential conflict of interest issues raised by the government when counsel for the government called Viet Dinh on November 16, 2016, to inform him that the

government planned to file its November 18 letter motion requesting a *Curcio* hearing." *See* Exhibit 20, Nov. 23, 2016 Kirkland Letter.

49. On November 29, 2016 the Court issued an Order requiring additional submissions from the parties. *See Zarrab*, S2 15 Cr. 867, Dkt. No. 144 (attached as Exhibit 21). The Court directed the Government to provide: "1- Paragraph citations to the S2 Superseding Indictment in which Deutsche Bank and Bank of America are specifically referenced; 2- Brief proffer of bank testimony which may be adduced by the Government at trial." *Id.* The Court directed the defense to provide: "3- Waiver statements addressed to the Court and on each bank's corporate letterhead; 4- With respect to Deutsche Bank, what is the significance of the apparent limitation to the Bank's 'New York Branch'; 5- Clearly shown name of Bank signatory and title of the signatory, and a description of their duties and responsibilities." *Id.*

50. On November 29, 2016, the Government submitted a letter to the Court with the information requested in the November 29, 2016 Order. *See* Exhibit 22, Nov. 29, 2016 Govt. Letter. The Government's letter noted that Deutsche Bank had conducted over $1 billion in transactions for entities alleged to be involved in the charged offenses, and that Bank of America had conducted over $27 million in transactions for those entities. *See id.* The Government also identified ten categories of information that the Government expects will be the subject of testimony from bank witnesses at trial in this case, including:

a. The banks' processes for conducting correspondent banking transactions in U.S. dollars, including the nature, content, and sources of the payment instructions for those transactions;

b. The nature, purpose, and function of the banks' anti-money laundering and sanctions compliance programs;

c. The nature, purpose, and function of anti-money laundering and sanctions laws, regulations, and official guidance;

d. The nature of the risks posed to the banks by transactions, practices, or courses of conduct that would violate the banks' policies and programs or applicable laws, regulations, and guidance, and policies, practices, or procedures in place to manage or mitigate such risks;

e. The authenticity and interpretation of records of transactions conducted by the banks in furtherance of transfers ordered by various entities controlled by the defendant;

f. Whether the payment instructions transmitted by entities controlled by the defendant resulted in each bank "processing a transaction that it wouldn't process if it were fully informed," Exh. 14 at 65;

g. Whether the banks faced a risk of financial loss in the event that "one bank or another in the chain of these payments realizes the Iranian nexus, and in accordance with OFAC regulations, blocks that payment," *id.* at 44;

h. Whether the payment instructions transmitted by entities controlled by the defendant put the banks at "risk of civil liability from the [OFAC]" *id.*;

i. Whether, from the perspective of the banks, they would "want to know if there is an ultimate Iranian beneficiary because those are particularly risky transactions from a financial standpoint," *id.* at 66-67; and

j. Whether "if the [defendant's] conspiracy or the scheme is effectuated, [the banks would be] better off, not worse off," *id.* at 65.

*See* Exh. 22 at 2-3.

51.     On November 29, 2016, Kirkland filed a waiver provided by Bank of America. This waiver consented to Kirkland's representation of the defendant, subject to several conditions and limitations. *See* Exhibit 23, Nov. 29, 2016 Bank of America Waiver. Bank of America provided consent on the condition that: (a) attorneys who perform or have performed services on behalf of the bank or its affiliates will not assist the defense of the defendant; (b) during the pendency of the defense, the attorneys representing the defendant will not have any involvement in matters related to the bank; and (c) an "information wall" be established between attorneys representing the defendant and the attorneys who perform services for the bank. *See id.* Bank of America further limited the consent from extending to any other litigation or proceeding, and specified additional requirements as listed in the submitted letter. *See id.*

52.     On November 29, 2016, Kirkland filed a waiver provided by Deutsche Bank's New York branch. *See* Exhibit 24, Nov. 29, 2016 Deutsche Bank Waiver. This waiver consented to Kirkland's representation of the defendant, subject to the following conditions and limitations: (a) attorneys who perform or have performed services on behalf of the bank or its affiliates will not assist the defense of the defendant; (b) during the pendency of the defense, the attorneys representing the defendant will not have any involvement in matters related to the bank; and (c) an "information wall" be established between attorneys representing [the defendant] and the attorneys who perform services for the bank. *See id.* Deutsche Bank further limited the consent from extending to any other litigation or proceeding, and specified additional requirements as listed in the submitted letter. *See id.*

53.     On November 30, 2016, a *Curcio* hearing was held. At the hearing, the Government advised counsel and the Court that: (1) the bank personnel with whom Kirkland had spoken concerning the conflict of interest appeared not to have spoken with the bank personnel

with whom the Government had communicated concerning the investigation and trial preparation; and (2) the Government would take steps to encourage these internal bank communications concerning the conflict to take place, so that any bank's waiver of the conflict would be based on full information and, accordingly, fully knowing and intelligent. *See* Exh. 2 at 19-20.

54. The Court indicated that such internal bank communications were necessary; otherwise, any conflict waivers from the banks would be "illusory, unless the person who wrote the waiver really speaks for the bank, and what we don't want to hear is that the general counsel or somebody else was unaware of that." *Id.* at 20. The Court then directed that this "has to be addressed in a formal way." *Id.*

55. At the same November 30, 2016 hearing, Kirkland also informed the Court for the first time that Kirkland also represented six other banks that had been identified by the Government in its email of November 16, 2016. *Id.* at 16-17. At the conclusion of the hearing, Kirkland advised the Government that, in addition to Bank of America and Deutsche Bank, Kirkland also represents Citibank, HSBC, JPMC, SCB, UBS, and Wells Fargo.

56. The Court emphasized that "we do need to hear from the other six banks, and we need to hear from everybody that the left hand and the right hand are communicating internally." *Id.* at 21.

57. Also at the November 30, 2016 hearing, Mr. Brafman advised the Court that with respect to the bank fraud charge, the defendant is "certainly not waiving his right to argue that the banks are not victims here, either because they suffered no loss or because they clearly knew that these transactions involved, Iran, for example." *Id.* at 23. Mr. Dinh indicated that he did not believe this to be a problem because Kirkland's role was "as appellate and strategic counsel. We

are responsible for the motions as well as any potential appeals. We were not retained nor do we anticipate to be examining witnesses, in preparation of the witnesses, and certainly not on cross examination of any bank witnesses, and so in large part that takes care of the directly adverse issue under the professional rules." *Id.* at 21.

58. On December 2, 2016, the Government submitted a letter pursuant to the Court's request at the *Curcio* hearing held on November 30, 2016, for further information regarding the additional six banks which are represented by Kirkland that are alleged to be victims in this case and that will likely be witnesses at trial. *See* Exhibit 25, Dec. 2, 2016 Govt. Letter.

59. On December 7, 2016, Kirkland filed a letter with the Court enclosing waivers from HSBC, SCB, and UBS. Kirkland also informed the Court that Citibank "does not consent to waive any potential conflict arising out of Kirkland's representation of Mr. Zarrab." Exhibit 26, Dec. 7, 2016 Kirkland Letter at 2.

60. HSBC provided consent on the conditions that: "(a) Kirkland attorneys will not be involved in the examination or cross-examination of any Bank personnel who may be called to participate in the Zarrab proceedings, and (b) in representing Zarrab, Kirkland attorneys will not use any confidential information obtained in the course of their representation of the Bank." Exh. 27, Dec. 7, 2016 HSBC Waiver at 1. HSBC further noted that its "consent does not extend to the representation by the firm of Zarrab in any other litigation, arbitration or other adversarial proceeding or claim that might arise between the Bank (or any subsidiary or affiliate of the Bank) and Zarrab in connection with the charges the government has filed against him, or otherwise." *See id.* at 1-2. HSBC instructed that "[i]n the event of any such litigation, arbitration, other adverse proceeding or claim, [Kirkland] will not represent Zarrab unless the

Bank gives [Kirkland] a new written consent at that time to represent such person or persons." *Id.* at 2.

61.    In addition to the conditions expressed in the waiver submitted by HSBC, the letter submitted by Kirkland also represented in its letter to the Court that "Kirkland has further agreed with HSBC that, to the extent consistent with its obligations to Mr. Zarrab, Kirkland will allow HSBC to review any Kirkland pleading that references HSBC to satisfy the bank that no information Kirkland obtained representing the bank is used in Mr. Zarrab's defense." Exh. 26 at 2.

62.    On December 7, 2016, Kirkland submitted a waiver from SCB consenting to Kirkland's representing the defendant in this matter. *See* Exhibit 28, Dec. 6, 2016 SCB Waiver. The consent is subject to the conditions and limitations that: (1) attorneys who performed services on behalf of SCB or its affiliates will not assist in the defense of the defendant; (2) during the pendency of the defense, the attorneys representing the defendant will not have any involvement in any other matter relating to SCB; and (3) an "information wall" will be established between the attorneys representing the defendant and the attorneys who perform services for the SCB. *See id.* The consent provided by SCB does not extend to any "other litigation, arbitration, adversarial proceeding or claim" that might arise between the bank and the defendant. *Id.*

63.    On December 7, 2016, Kirkland submitted a waiver from UBS consenting to Kirkland representing the defendant in the captioned matter. *See* Exhibit 29, Dec. 2, 2016 UBS Waiver. The consent is subject to the conditions and limitations that: (1) attorneys who performed services on behalf of UBS or its affiliates will not assist in the defense of the defendant; (2) during the pendency of the defense, the attorneys representing the defendant will

not have any involvement in any other matter relating to the bank; and (3) an "information wall" will be established between the attorneys representing the defendant and the attorneys who perform services for the Bank. *See id.* The consent provided by UBS does not extend to any "other litigation, arbitration, adversarial proceeding or claim" that might arise between the bank and the defendant. *Id.*

64. On December 8, 2016, Kirkland submitted a letter from JPMC consenting to Kirkland's representation of the defendant in this matter. *See* Exhibit 30, Dec. 8, 2016 JPMC Waiver. The consent was subject to the conditions and limitations that: (1) "[Kirkland's] attorneys will not be involved in the examination or cross-examination of any JPMC personnel who may be called to participate in [the defendant's] proceedings or respond to a claim to restitution by JPMC"; (2) in representing the defendant, the Kirkland attorneys "will not use any confidential information obtained in the course of the representation of" JPMC; and (3) "the consent extends only to [Kirkland's] representation of [the defendant] in connection with" Kirkland's defense of the captioned case. *Id.* at 1. The consent provided by JPMC does not extend to any "other litigation, arbitration, or adversarial proceeding or claim that might arise between JPMC and [the defendant]." *Id.*

65. On December 8, 2016, the Court ordered an additional *Curcio* hearing to be held on December 14, 2016. The Court communicated an expectation that a final ruling could not be made on that date, and advised that the Court will require the filing of post-hearing findings of fact and conclusions of law. *See Zarrab*, S2 15 Cr. 867, Dkt. No. 159 (attached as Exhibit 31). The Court also referenced the prospect of opinion(s) of independent ethics counsel, to be discussed by all parties at the scheduled *Curcio* Hearing. *See id.*

66.     On December 12, 2016, Ms. Chung of Quinn Emmanuel and Mr. Kleinfled of Clifford Chance filed a joint letter with the Court requesting that their firms be permitted to withdraw from this case.  *Zarrab.*, S2 15 Cr. 867, Dkt. No. 164.  These applications were granted by the Court on December 14, 2016.

67.     In the late afternoon of December 13, 2016, Kirkland submitted an "Independent Ethics Opinion" to the Court.  *See* Exhibit 32, Dec. 13, 2016 Ethics Opinion of Stephen Gillers. Professor Gillers was retained by Kirkland to offer an opinion on two questions: (1) whether Kirkland's continued concurrent representation of the defendant and the banks is consistent with Kirkland's obligations under the New York Rules of Professional Conduct; and (2) whether the proposed *Curcio* questions submitted by the defense were adequate to ensure that the defendant's choice of counsel is made knowingly and intelligently.  *See id.* at 2.  Professor Gillers opined that Kirkland's continued representation of the defendant was consistent with the Rules of Professional Conduct, because Kirkland had limited its representation of the defendant in a way that avoided any conflict of interest.  Specifically, Kirkland could not: "(1) use or disclose the banks' confidential information; (2) cross-examine or assist in the cross examination of witnesses from the banks; (3) use or advise on the use of court process to secure testimony or documents from the banks; and (4) through proof or argument accuse the banks of wrongdoing or assist other lawyers in connection with any proof or arguments that may do so."  *Id.*  Professor Gillers suggested the addition of two additional *Curcio* questions: first regarding Kirkland's involvement in the use of process to compel the attendance of bank witnesses, and second "to make it clear that not only may the Kirkland lawyers not personally do certain things (e.g., accuse the banks of wrongdoing), they may not participate in any decision whether or not to do

those things." *Id.* at 5-6. Additionally, two Exhibits were provided—a memorandum describing this case that had been provided by Kirkland to Professor Gillers and Professor Gillers's resume.

68. On December 14, 2016, a continuation of the *Curcio* hearing was held. Mr. Dinh argued, among other things, that the limitations on Kirkland's representation of the defendant precluded any adversity to Kirkland's bank clients. Mr. Dinh alternately posited the broad limitation that "our representation of Mr. Zarrab is of limited scope; that is, everything except that is dealing with the bank and may be potentially adverse to the bank," Exhibit 33, Dec. 14, 2016 Tr. at 17; *see also id.* at 18 ("[W]e have limited the scope of our representation of Mr. Zarrab to those issues not dealing with the banks."), and the narrower limitation that "our representation of Mr. Zarrab will be limited to matters other than the bank fraud issues," *id. at* 20.

69. The Government raised a concern that if parts of banks "have material information about the investigation or about the case that are not being communicated to the decision makers, it undermines the Court's confidence in those waivers." *Id.* at 38. The Government also pointed out that "waivers are revocable. If banks become aware of information they wish they had known later on, this issue could come back up again later in the proceedings." *Id.* at 38. With regard to the defense proposal of an "ethical wall" to alleviate a possible conflict, the Government questioned the adequacy of such an arrangement. *Id.* at 25. On this date, the Government did not take a position with regard to the disqualification of any defense counsel.

70. The Government also argued that the defendant has already taken the position that the banks in this matter are not victims, which is a position that is adverse to the banks' rights as victims. *Id.* at 22. The Government identified the likelihood that, with respect to either the bank fraud charge or the IEEPA charge, the defendant can make a contention at trial that the banks

were either indifferent to the conduct in which the defendant was engaging, the banks were somehow complicit, or the banks did not view the nexus to Iran as material. *Id.* at 23.

71.  With respect to Kirkland's representation of HSBC, the Government further stated that "the representation of HSBC undoubtedly puts the Kirkland firm in possession of material confidential information that relates to [the defense that HSBC was somehow complicit in the defendant's actions]. It is not a possibility, it is not a hypothetical, it is a certainty that Kirkland possesses confidential information about HSBC that is relevant to a potential defense that we've already discussed on the record at the prior conference." *Id.* at 23.

72.  At the conclusion of the proceeding on December 14, 2016, the Court continued the *Curcio* hearing to December 20, 2016. *Id.* at 42. The Court noted that the Wells Fargo position on a waiver is outstanding, and the continuance was subject to the position of Wells Fargo being known. *See id.* at 42. The Court also ordered the parties to submit proposed findings of fact and conclusions of law on December 21, 2016. *See id.* at 42.

73.  On December 19, 2016, Mr. Wolfson of Lewis Baach filed a letter with the Court requesting to withdraw as counsel for the defendant. *See Zarrab*, S2 15 Cr. 867, Dkt. No. 182 (attached hereto as Exhibit 34). Lewis Baach noted that its withdrawal was part of the defendant's decision to streamline his defense team in preparation for trial and that the defendant would continue to be represented by Brafman & Associates and Kirkland. *Id.* The Court granted this application on December 19, 2016. *See United States* v. *Reza Zarrab et al.*, S2 15 Cr. 867 (RMB), Dkt. No. 185.

74.  On December 21, 2016, Kirkland provided the Government with emails exchanged between Kirkland attorneys and Wells Fargo, in which Wells Fargo consents to Kirkland's representation of the defendant in this matter. *See* Exhibit 35, Request for Wells

Fargo Waiver; Exhibit 36, Dec. 20, 2016 Wells Fargo Consent E-mail.  The consent was subject

to the conditions and limitations that: (1) "the Firm acknowledges and agrees that its

representation of Zarrab (whether through trial or appellate work) will not pertain to developing

or advancing any argument that Wells Fargo knew of, was complicit with or otherwise was not a

victim of the alleged illegal transactions;" (2) "disclose to Zarrab any confidential information

concerning Wells Fargo or its businesses (including, without limitation, trade secrets, matters

covered by the attorney-client privilege and matters covered by the attorney work product

privilege)," (3) "use such information in any matter or proceeding without Wells Fargo's

consent," or (4) "represent Zarrab in any subsequent Dispute with Wells Fargo." Exh. 35 at 1.

## PROPOSED CONCLUSIONS OF LAW

### A.      Defendant's Right to Conflict-Free Counsel

1.      While the Sixth Amendment encompasses a defendant's right to be represented

by the attorney of his choice, the essential aim of the Sixth Amendment's right to counsel is to

ensure an effective advocate for all criminal defendants.  *Wheat* v. *United States*, 486 U.S. 153,

159 (1988).  A defendant has a right under the Sixth Amendment to conflict-free legal

representation.  *See Wood* v. *Georgia*, 450 U.S. 261, 271 (1981); *United States* v. *Cain*, 671 F.3d

271, 293 (2d Cir. 2012); *United States* v. *Schwarz*, 283 F.3d 76, 90-91 (2d Cir. 2002); *United

States* v. *Levy*, 25 F.3d 146, 152 (2d Cir. 1994).

2.      When the Court has been informed of the possibility of a defense counsel's

conflict of interest, it has a threshold obligation "to investigate the facts and details of the

attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a

potential conflict, or no genuine conflict at all."  *Cain*, 671 F.3d at 293; *Levy*, 25 F.3d at 153; *see

also United States* v. *Kliti*, 156 F.3d 150, 153 (2d Cir. 1998).  "It is hard to conceive of a conflict

of interest between clients that would not be serious." *United States ex rel. Stewart* v. *Tineo*, 870 F.2d 854, 857 (2d Cir. 1989) (citing *Camera* v. *Fogg*, 658 F.2d 80, 86 (2d Cir. 1981)).

3.       If the Court determines that defense counsel has an actual or potential conflict, the Court has a "disqualification/waiver obligation" to determine whether the conflict is so severe as to obligate the Court to disqualify the attorney or whether it is a lesser conflict that can be waived in a hearing pursuant to *United States* v. *Curcio*, 680 F.2d 881 (2d Cir. 1982). *See Levy*, 25 F.3d at 153; *Kliti*, 156 F.3d at 153; *see also Cain*, 671 F.2d at 293-94. The need to investigate potential conflicts arises in part from the legitimate wish of district courts that their judgments remain intact on appeal. *Wheat*, 486 U.S. at 161.

4.       An unwaivable conflict is one that is so "severe" that "no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation . . . ." *Levy*, 25 F.3d at 153 (citing *United States* v. *Fulton*, 5 F.3d 605, 612-14 (2d Cir. 1993)). An actual conflict exists "when the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action, or when the attorney's representation of the defendant is impaired by loyalty owed to a prior client." *United States* v. *Jones*, 381 F.3d 114, 119 (2d Cir. 2004) (internal quotation marks and citations omitted). Multiple conflicts should be considered together, rather than in isolation. *Levy*, 25 F.3d at 157; *United States* v. *Rivera*, No. 08 Cr. 1327 (HB), 2009 WL 1059641, at *2 (S.D.N.Y. Apr. 13, 2009), *aff'd*, *United States* v. *Rivera*, 571 Fed. Appx. 55 (2014); *United States* v. *Rahman*, 861 F. Supp. 266, 278 (S.D.N.Y. 1994).

5.       Where a conflict of interest is unwaivable, a court is "obliged" to disqualify the attorney, and no *Curcio* hearing is required. *Cain*, 671 F.3d at 293-94; *Levy*, 25 F.3d at 153. A waivable conflict of interest, by contrast, is a "lesser" conflict such that "a rational defendant

could knowingly and intelligently desire the conflicted lawyer's representation . . . ." *Levy*, 25 F.3d at 153.

6.       "A district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly.  The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.  It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand.  A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants.  These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics.  Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them." *Wheat*, 486 U.S. at 162-163.

## B.       Courts' Independent Interest in Supervising Legal Proceedings

7.       Regardless of the severity of the conflict, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160.  "The question of [attorney] disqualification therefore implicates not only the Sixth Amendment right to the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial." *United States* v. *Locascio*, 6 F.3d 924, 931 (2d Cir. 1993).  Accordingly, "a district court should decline

to permit a defendant to be represented by the counsel of his choice if that representation would undermine the integrity of the judicial process." *United States* v. *DiPietro*, No. 02 Cr. 1237 (SWK), 2004 WL 613073, at \*4-\*5 (S.D.N.Y. Mar. 29, 2004) (citing *Wheat*, 486 U.S. at 163).

**C.    Courts' Discretion in Resolving Conflicts of Interest of Defendant's Counsel**

8.    A district court's decision to disqualify an attorney is accorded "substantial latitude" and is reviewed only for abuse of discretion. *Locascio*, 6 F.3d at 931. "Given the difficulties of the decision, the uncertainties involved where the conflict has yet to fully materialize, and the need for the district court to rely on its 'instinct and judgment based on experience in making the [disqualification] decision,'" *Cain*, 671 F.3d at 294 (quoting *Wheat*, 486 U.S. at 163) (alteration in original), "the evaluation of whether 'the facts and circumstances' of a particular case evince a conflict so serious as to be unwaivable is a discretionary one that is best left 'primarily to the informed judgment of the trial court,'" *id.* (quoting *Wheat*, 486 U.S. at 164).

**D.    Interests of Crime Victims**

9.    "The victim of a crime is not a detached observer of the trial of the accused." *Castillo* v. *Estelle*, 504 F.2d 1243, 1245 (5th Cir. 1974). Crime victims have statutory rights under federal law. *See*, *e.g.*, 18 U.S.C. §§ 3663, 3663A, 3771. These rights include the obligation of the court to impose, as part of sentencing, a requirement for the defendant to make monetary restitution where the crime causes identifiable victims pecuniary loss. *See* 18 U.S.C. § 3663A(c)(1)(B).

10.    In criminal cases, courts routinely hold that the interests of an alleged crime victim are adverse to those of the alleged perpetrator. *See*, *e.g.*, *United States* v. *Gordon*, 334 F. Supp. 2d 581, 591 (D. Del. 2004) ("As to the assertion that the County is no victim but simply a neutral third-party with, at most, a rooting interest, I again hold that the United States has the

more persuasive argument, indeed, the vastly more persuasive one."); *United States* v. *Fawell*, No. 02 Cr. 310, 2002 WL 1284388, at *7 (N.D. Ill. June 10, 2002) ("'[T]he former clients and alleged victims have an interest in seeing that [defendants] are convicted. Conversely, [the attorney's new client] has a great interest in being acquitted of all charges. These interests are diametrically opposed and may not be reconciled.'" (quoting *United States* v. *Alex*, 788 F. Supp. 359, 362 (N.D. Ill. 1992))); *see also United States* v. *DiTommaso*, 817 F.2d 201, 219 (2d Cir. 1987); *United States* v. *Armedo-Sarmiento*, 524 F.2d 591, 592-93 (2d Cir. 1975); *Davis* v. *Stamler*, 494 F. Supp. 339, 343-44 (D.N.J. 1980).

11.     "[C]ourts will disqualify lawyers who switch sides from representing a crime victim to representing the perpetrator." *United States* v. *Prevezon*, 839 F.3d 227, 242 (2d Cir. 2016) (citing *Gordon*, 334 F. Supp.2d at; *Fawell*, 2002 WL 1284388, at *7-*8, *11; *Alex*, 788 F. Supp. at 365.

### E.     The Defendant's Counsel Suffer from Actual Conflicts of Interest

12.     Three of the defendant's attorneys, Messrs. Clement, Dinh, and Harris, suffer from actual conflicts of interest in this matter. Mr. Clement, Mr. Dinh, and Mr. Harris also represent HSBC, in HSBC's appeal currently pending before the Second Circuit from an order requiring public disclosure of a monitor's report evaluating HSBC's controls, policies, and procedures related to its compliance with anti-money laundering and sanctions laws and remedial measures identified in HSBC's deferred prosecution agreement with the U.S. Attorney's Office for the Eastern District of New York. HSBC is also alleged by the Government to be a victim of the offenses with which the defendant is charged. Messrs. Clement, Dinh, and Harris thus have conflicting duties of loyalty to an adverse party in this matter. Messrs. Clement, Dinh, and Harris also have possession of confidential information of HSBC that potentially could be

helpful to the defendant, but which they are precluded from using for the defendant's benefit in this matter.

13.     Messrs. Clement and Harris also represent JPMC, in *Dusek* v. *J.P. Morgan Chase & Co. et al.*, No. 16-389 (2016).  JPMC is also alleged by the Government to be a victim of the offenses with which the defendant is charged.  Messrs. Clement and Harris thus have conflicting duties of loyalty to an adverse party in this matter.

14.     Kirkland also represents Bank of America, Citibank, Deutsche Bank, SCB, UBS, and Wells Fargo in various matters.  Each of these banks is also alleged by the Government to be a victim of the offenses with which the defendant is charged.  Kirkland thus has conflicting duties of loyalty to adverse parties in this matter.

15.     In the defendant's motion to dismiss the first superseding indictment, S1 15 Cr. 867 (RMB), Messrs. Clement, Dinh, Harris, and LaCour, at the time with the law firm Bancroft PLLC, advanced the position on behalf of the defendant that no U.S. banks were victims of the charged offenses.  This position is adverse to the legal interests of Bank of America, Citibank, Deutsche Bank, HSBC, JPMC, SCB, UBS, and Wells Fargo.

16.     At oral argument on the defendant's motion to dismiss, Mr. Clement argued, among other things, that the U.S. banks benefitted financially from conducting transactions that the Government alleges were unlawful.  This argument suggests that the banks had a motive either to fail to prevent unlawful transactions or to encourage unlawful transactions, and is adverse to the interests of Bank of America, Citibank, Deutsche Bank, HSBC, JPMC, SCB, UBS, and Wells Fargo.

17.     The defendant's trial strategies also appear likely to be adverse to the interests of Bank of America, Citibank, Deutsche Bank, HSBC, JPMC, SCB, UBS, and Wells Fargo.

Defense counsel, for example, has refused to forego the contention that the banks encouraged the alleged unlawful conduct, a contention that would be adverse to the interests of the banks.

18.     Because the Government has advised that several of the banks are likely to supply trial testimony, the interest of the defendant in cross-examining the bank witnesses, in questioning their credibility, in questioning their expertise, and in questioning the reliability and efficacy of the banks' sanctions and anti-money-laundering compliance programs, among other matters, will be adverse to the interests of the bank witnesses and their bank employers.

19.     In addition to suffering divided loyalties between the interests of the defendant and the interests of the bank clients, the defendant's counsel from Kirkland will also have confidential information or access to confidential information of the banks that could be helpful to the defendant's cross-examination of witnesses, trial strategies, or appeal strategies, which Kirkland will be precluded from using, from sharing with or revealing to the defendant, and from sharing with or revealing to co-counsel.

**F.      The Proposed Limitations on Kirkland's Representation of the Defendant Do Not Cure the Conflicts of Interest**

20.     Kirkland proposes to cure this conflict by now adopting limitations on its representation of the defendant that it claims will prevent any future conflict with Bank of America, Citibank, Deutsche Bank, HSBC, JPMC, SCB, UBS, and Wells Fargo.  In support of this position, Kirkland relies principally on the Gillers Opinion.  *See* Exh. 33 at 17.

21.     It is inappropriate for the Court to rely on the Gillers Opinion.  As the Second Circuit has made clear, courts should "not consider arguments" based "on the conclusions of [a] legal-ethics expert made in a declaration."  *Bernstein* v. *Bernstein Litowitz Berger & Grossman LLP,* 814 F.3d 132, 144 (2d Cir. 2016).  As the Second Circuit explained in *Bernstein*, consideration of such arguments would violate the "longstanding rule that expert testimony on

30

issues of domestic law is not to be considered.  *See Amnesty Int'l USA* v. *Clapper,* 638 F.3d 118, 128 n. 12 (2d Cir.2011) (holding that the court was 'not compelled to accept' a legal-ethics expert's declaration regarding whether an ethical duty had been triggered, because the question was for the court to decide), *rev'd on other grounds,* —— U.S. ——, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013); *see also Hygh* v. *Jacobs,* 961 F.2d 359, 363 (2d Cir.1992); *Marx & Co.* v. *The Diners' Club, Inc.,* 550 F.2d 505, 509–11 (2d Cir.1977)." *Id.*

22.     "To the extent that expert interpretations of the ethical rules are useful, they are better presented in an amicus brief or the parties' citations to treatises, rather than a declaration or affidavit." *Id.*

23.     In addition to being inappropriate for this Court to rely upon, the Gillers Opinion does not address the pertinent question before the Court of whether the defendant's representation by Kirkland is permissible under the Sixth Amendment.  The question addressed by Professor Gillers concerns whether Kirkland may appropriately limit its representation of the defendant consistent with Rule 1.2(c) of the New York Rules of Professional Conduct, and whether such limitation is sufficient to vitiate a conflict of interest under Rule 1.7(a).  *See generally* Exh. 32.

24.     The Court's obligations to ensure that the defendant's representation meets the guarantees of the Sixth Amendment are not defined by the New York Rules of Professional Conduct.  While those rules may be informative, the Court's obligation is not just to prevent "a breach of professional ethics," but also to vindicate "the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court."  *Wheat*, 486 U.S. at 162.

25.     Thus, in *Curcio* and other disqualification litigation, the courts do not generally sit in review of an attorney's compliance with the rules of professional conduct.  Instead, the court will look to see whether the attorney's conduct "tends to taint the underlying trial, because federal and state disciplinary mechanisms suffice for other ethical violations."  *United States* v. *Prevezon Holdings Ltd.*, 839 F.3d 227, 241 (2d Cir. 2016) (internal quotation marks omitted).[3] Furthermore, "the ethical standards of the profession" are not limited to the black letter rules of professional responsibility of the particular jurisdiction: while an attorney may be charged with knowledge of and compliance with state codes of conduct, the federal court imposes standards as a matter of inherent discretion under federal law.  *See In re Snyder*, 472 U.S. 634, 643 (1985).

26.     Recognizing the Supreme Court's admonition in *Wheat* that "[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials," 486 U.S. at 162, courts, including several in this Circuit, have routinely rejected the sort of "limited representation" that Kirkland now proposes.

27.     In *United States* v. *Rahman*, 861 F. Supp. 266 (S.D.N.Y. 1994), Judge Mukasey considered whether a conflict caused by a defendant's attorney's prior representation of an anticipated Government witness at trial could be avoided by having independent co-counsel cross-examine the former client.  Judge Mukasey rejected this proposal and disqualified the defendant's counsel, finding that:

> [The proposed limited representation] provides no assured solution
> to the problem.  Even if substitute counsel could cross-examine
> former clients of the Kunstler firm, there is no assurance that
> information potentially damaging to one of those clients would not
> appear during the examination of other witnesses.  The court and
> counsel would have to remain constantly alert to detect such
> potential damage.  When it was detected, the Kunstler firm would

---

[3] Accordingly, the Government does not opine on whether there was any breach of ethical rules in this case—that question is not dispositive of the issue before the Court.

have to abandon cross-examination relating to such information, and let standby counsel take over. The same problem would afflict openings and summations, with the Kunstler firm barred ethically from making any argument or previewing any proof that could adversely affect any of its former clients at risk in this case. Thus, cross-examination for El–Gabrowny's benefit, and indeed his entire representation, would be conducted in the manner of a fugue, with the Kunstler firm developing only themes that could not damage its former clients, and standby counsel developing the themes that could. Even if such a bizarre scenario were workable—and it is not—any miscalculation of the potential effect of any argument or item of evidence would enable El–Gabrowny to argue on appeal that his representation had been adversely affected by a conflict of interest.

*Id.* at 277.

28. In *United States* v. *Massino*, 303 F. Supp. 2d 258 (E.D.N.Y. 2003), the court

similarly rejected a proposal to limit the subject matter of a conflicted attorney's representation:

> Massino's response to this concern is to limit Savitt's role in his defense, thus protecting CW's confidences from disclosure. Massino claims that Savitt's role is as death counsel, and that CW would testify only as to counts in the indictment that are not related to the charges implicating the death penalty. Savitt would not then have to cross-examine or impeach CW as his testimony would not affect the aspect of the case in which Savitt primarily is involved. The court, however, does not believe that Savitt effectively can isolate his knowledge about CW from the defense team, and thus avoid his responsibility to obtain a waiver from CW. As death counsel, Savitt will be involved not only with the death charge itself, but also with preparing the defense strategy in general. His privileged information may provide insights that result in part from his representation of CW. This creates a severe and actual conflict that puts at risk CW's protected communications. . . . Given the nature and complexity of the trial, the parties and the court are unable to predict all of the strategies that might become necessary in order to mount a vigorous and successful defense. Because of this unpredictability, the court believes that the best way to protect the integrity of this trial and to secure a just result is to eliminate this conflict while it remains only potential.

*Id.* at 264–65.

29.     In *United States* v. *Locascio*, 357 F. Supp. 2d 536 (E.D.N.Y. 2004), the court

rejected a proposal to have independent counsel cross-examine a witness employed by the law

firm of the defendant's counsel:

> [T]he Court is not convinced that the use of an independent
> counsel would suffice to eliminate the conflicts in their entirety.
> The specter of Ms. Jaffe as a potential witness and the impact of
> her testimony will extend beyond her mere cross-examination; it
> will permeate the entire trial, including the opening statement,
> summation, and advice to [the defendant] as to whether or not he
> should testify.  On reflection, this Court concludes that, despite its
> fervent hope that this alternative would resolve this extremely
> difficult and troubling problem, retaining separate counsel to cross-
> examine Ms. Jaffe will not suffice.  The conflict cannot be so
> neatly compartmentalized.

*Id.* at 557.

30.     Numerous other cases similarly have rejected the sort of compartmentalization

that Kirkland proposes here.  *See*, *e.g.*, *United States* v. *Yannotti*, 358 F. Supp. 2d 289, 295 n.50

(S.D.N.Y. 2004) ("Corozzo proposes that in order to mitigate the conflict Yannotti will obtain

independent co-counsel to conduct the cross-examination of Mangiavillano. . . .  Corozzo might

have added that his co-counsel would also take responsibility for any argument to the jury

attacking Mangiavillano's credibility. I see no need to endorse such an arrangement, in view of

the multiple conflicts from which Corozzo suffers. *Cf. Rahman*, 861 F. Supp. at 277 (rejecting

'standby counsel alternative' where defendant's attorney had represented multiple co-defendants

and potential witnesses)."); *United States* v. *Cordoba*, No. 12-20157-CR, 2013 WL 5741834, at

*12 (S.D. Fla. Oct. 17, 2013) (finding "use of second counsel to handle Mr. Cambara's cross-

examination is an imperfect and ineffective solution"); *United States* v. *Lock*, No. 07-CR-204,

2008 WL 1777221, at *3-4 (E.D. Wis. Apr. 15, 2008) (rejecting proposal that "other counsel be

brought in for the limited purpose of cross-examining" Government witness, finding "[m]ost

significant is the fact that in the Government's view Clay is a critical witness" and that "[g]iven

the serious nature of the charges together with the government's theory of the case, it is apparent that Clay's testimony may ultimately prove pivotal to the prosecution" and "may reach well beyond the isolation of his direct and cross examination at trial").

31.     Here, the Government has alleged that the defendant violated four different criminal statutes by inducing Bank of America, Citibank, Deutsche Bank, HSBC, JPMC, Standard Chartered, UBS, and Wells Fargo, among other banks, to process transactions for the benefit of sanctioned entities in Iran.  *See* Exhibit 37, Government Opposition to Mot. to Dismiss at 12, 18 (discussing theory of the IEEPA charge that the defendant is "alleged to have conspired to cause U.S. persons—the banks—to supply and export these services directly and indirectly to Iran" and "is criminally liable under Section 1705(b) for willfully causing the banks to supply or export those services"); *id.* at 25-39 (discussing charge that the defendant defrauded U.S. banks); *id.* at 39-42 (discussing money laundering charge involving transactions through U.S. banks for which the IEEPA and bank fraud charges serve as predicate specified unlawful activity); *id.* at 43 (discussing theory of conspiracy to defraud the United States by "preventing both U.S. banks and the United States government from identifying the fact that he was transmitting prohibited payments on behalf of Iran through U.S. banks.  As the Indictment makes plain, the defendant willfully concealed information knowing that screening functions implemented by banks seeking to comply with OFAC regulations would block the transactions in which he was engaging.").

32.     This case is thus materially different from one in which a single witness of limited significance can be cross-examined by standby counsel.  Every single aspect of this case involves the defendant's alleged efforts to influence the actions of among others, Bank of America, Citibank, Deutsche Bank, HSBC, JPMC, SCB, UBS, and Wells Fargo by (1) causing them to process transactions in violation of U.S. sanctions laws, (2) making material

misrepresentations to them or scheming to obtain property from their custody and control, (3) causing them to undertake transactions in order to promote specified unlawful activity, and (4) preventing them from complying with OFAC regulations. As in *Locascio*, the conduct involving the alleged victim banks permeates every aspect of this prosecution and will permeate every aspect of the trial, and thus Kirkland's "conflict cannot be so neatly compartmentalized." 357 F. Supp. 2d at 557. Kirkland's numerous clients are going to play a substantial role in this entire trial, and it is not possible to craft a limitation on Kirkland's role that would be sufficient to guarantee that the firm could not end up adverse to any of the many clients whose conduct is implicated in this case.

33.     Professor Gillers's proposal that Kirkland could limit its representation of the defendant consistent with Rule 1.2(c) of the New York Rules of Professional Conduct does not suffice to mitigate the severe Sixth Amendment concerns that the Court must consider. In the context of New York law, state law is also of only limited relevance to the inquiry before the Court, given that New York has rejected the inquiry that the Second Circuit has required. *People v. Cortez*, 22 N.Y.3d 1061, 1075 (2014) (Abdus-Salaam, J., concurring) ("While we share the Second Circuit's concern for protecting a defendant's right to conflict-free counsel, we have taken a decidedly different approach to providing what we consider adequate constitutional safeguards of that right, and it is not clear whether the *Curcio* approach appropriately accounts for our concern that a trial court avoid delving too deeply into the attorney-client relationship for fear of upsetting the defendant's right to retain counsel of choice.").

34.     Even if a limitation consonant with Rule 1.2 could potentially be sufficient to mitigate the conflict present in this case, the sort of limitations proposed in this case are materially different than those contemplated by the Rule and by the authorities cited by Professor

Gillers. Rule 1.2(c) provides that "[a] lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances, the client gives informed consent and where necessary notice is provided to the tribunal and/or opposing counsel." Professor Gillers's opinion relies entirely on a single Formal Opinion issued by the Association of the Bar of the City of New York Committee on Professional and Judicial Ethics. Specifically, Formal Opinion 2001-3, "Limiting the Scope of an Attorney's Representation to Avoid Client Conflicts," concludes that "a representation may be limited to eliminate adversity and avoid a conflict of interest, as long as the lawyer's continuing representation of the client is not so restricted that it renders her counsel inadequate and the client for whom the lawyer will provide the limited representation consents to the limitation." NYC Eth. Op. 2001-3 (N.Y.C. Assn. B. Comm. Prof. Jud. Eth.), 2001 WL 1870201.

35.     But that opinion specifically provides that "there predictably are circumstances where a lawyer's attempt to limit the scope of her engagement will be doomed. For example, the limitation may be inadequate to protect the client, or once limited so as to address the conflict, the lawyer's engagement may no longer provide meaningful value to the client whose engagement is limited, or in order to advance one client's interests, the lawyer must harm the interests of the other client." *Id*.

36.     Even where a limited representation is approved, that limitation must be complete, and the opinion does not purport to condone the sort of partial participation in a defense team that is proposed here. The opinion specifically requires that "[i]n this context, however, it is important that the lawyer refrain from actions that would effectively undermine the limitation by placing the lawyer in a position adverse to the other client. Although there is no prohibition against the lawyer's recommending or otherwise assisting her client in retaining other

counsel for purposes of litigating the cross-claims, there are constraints on the lawyer's interaction with the new counsel. The lawyer *may not assist, or otherwise participate with, new counsel in litigating against her own client*. This means that the lawyer may not instruct the other lawyer or strategize on the best way to proceed or indicate which evidence already developed pertains to the case against the other client." NYC Eth. Op. 2001-3 (July 6, 2001) (emphasis added).

37.     Finally, even if it would be appropriate for Kirkland to limit its representation of the defendant in order to avoid its many conflicts of interest, it has not adopted such effective limitations here. The opinion cited by Professor Gillers requires that "[a]s a threshold matter, the 'terms of the limited engagement' should be memorialized in writing as soon as possible, and in detail. These rules should be communicated both to separate counsel (if any) and to the client to ensure they both fully understand the limitations on the scope of the original firm's representation." *Id.*

38.     No such memorialization has been offered here. Indeed, it is unclear what precisely the limitations on Kirkland's representation are, or when they were adopted. In its letter dated November 21, 2016, Kirkland did not articulate any limitations on its representation of the defendant, stating instead that the firm "does not believe that there is an actual or potential conflict." Exh. 18 at 2.

39.     At the conference before the Court on November 30, 2016, Mr. Dinh offered for the first time that Kirkland's role was "as appellate and strategic counsel. We are responsible for the motions as well as any potential appeals. We were not retained nor do we anticipate to be examining witnesses, in preparation of the witnesses, and certainly not on cross examination of any bank witnesses, and so in large part that takes care of the directly adverse issue under the

professional rules." Exh. 2 at 21. Similarly, in its letter dated December 7, 2016, Kirkland

stated that the firm had been "hired instead to assist primarily in motions practice and appellate

issues," and that Kirkland attorneys would not "handle any cross-examination of witnesses."

Exh. 26 at 4.

40.     Such a narrow prohibition on the cross-examination of bank witnesses, however,

is clearly insufficient.  This does not cure the divided loyalties that attorneys from Kirkland will

have with respect to pretrial motions, motions *in limine*, requested jury instructions, the

formulation of trial strategies, and appellate proceedings—all of which will require Kirkland to

make arguments adverse to the interests of its bank clients.

41.     Second, if this limitation is interpreted to suggest that attorneys from Kirkland

will not participate in trial more broadly, this too does not cure the divided loyalties that

attorneys from Kirkland will have with respect to pretrial motions, motions *in limine*, requested

jury instructions, the formulation of trial strategies, and appellate proceedings.  Moreover, the

suggestion is inconsistent with indications that Kirkland in fact will play a significant, though

undefined, role in the trial; for example, in filing its motion to withdraw as counsel for the

defendant, the law firm Lewis Baach noted that its withdrawal was part of the defendant's

decision to streamline his defense team in preparation for trial and that the defendant would

continue to be represented by Brafman & Associates and Kirkland.  *See* Exh, 34.

42.     At the conference before the Court on December 14, 2016, Mr. Dinh offered a

different set of limitations on Kirkland's representation.  He alternately posited the broad

limitation that "our representation of Mr. Zarrab is of limited scope; that is, everything except

that is dealing with the bank and may be potentially adverse to the bank," Exh. 33 at 17; *see also*

*id*. at 18 ("[W]e have limited the scope of our representation of Mr. Zarrab to those issues not

dealing with the banks."), and the narrower limitation that "our representation of Mr. Zarrab will be limited to matters other than the bank fraud issues," *id.* at 20.

43. Even under the opinion on which the Gillers Opinion is based, such shifting, ill-defined limitations are insufficient to eliminate a conflict of interest under the Rules of Professional Responsibility. Assuming that Kirkland's representation is in fact limited in one of the two ways articulated at the December 14, 2016 hearing, however, the limitations are still insufficient. If, for example, the limitation only prevents Kirkland from working on "matters other than . . . bank fraud"—*i.e.*, matters other than Count Three of the Indictment, which charges bank fraud—that is insufficient to prevent adversity against Kirkland's client banks, whose conduct (and therefore whose testimony) is critical to the charges in all four counts of the Indictment. *See* Formal Op. 2001-3 (limited representation will be "doomed" in cases where "the limitation may be inadequate to protect the client").

44. If, on the other hand, Kirkland is prohibited from participating in any "issues . . . dealing with the banks" whatsoever, then Kirkland has effectively disqualified itself from this matter, because every aspect of this case turns on the defendant's conduct with respect to the victim banks, eight of which are represented by Kirkland. *See* Formal Op. 2001-3 (limited representation similarly "doomed" when limitation requires that a "lawyer's engagement may no longer provide meaningful value to the client whose engagement is limited."). Accordingly, this vague suggestion provides no practical guidance to the Court, the defendant, or the bank clients about what issues attorneys from Kirkland *will* be participating in and what the boundaries of that representation are. This ambiguity creates a high risk that attorneys from Kirkland may operate under a conflict of interest that the defendant does not understand at this time, or may plausibly be able to claim after trial that he did not understand.

## G. A Rational Defendant Would Not Waive the Conflicts

45. Finally, a rational defendant in the defendant's position would not waive the conflicts of interest, for multiple independent reasons.

46. First, a rational defendant would not agree to waive the divided loyalties of his counsel when that counsel has duties of loyalty to eight large, sophisticated financial institutions that are likely to be significant clients of the attorneys.

47. Second, a rational defendant would not agree to waive the divided loyalties of his counsel when that counsel has duties of loyalty to eight victims of the crimes with which the defendant is charged.

48. Third, a rational defendant would not agree to provide copies of draft filings to a victim of the offense for the victim's review.

49. Fourth, a rational defendant would not be able to fully appreciate and anticipate they ways in which the multiple conflicts of interest suffered by the attorneys with Kirkland could manifest themselves over the course of the pretrial, trial, and appellate proceedings in this matter.

50. Courts have declined to accept waivers of counsel's conflicts of interest in similar situations involving a defendant's attorney who currently represents or previously represented a witness in a case, even if the defendant wishes to waive the conflict and even where the attorney proposes measure to attempt to ameliorate the conflict. In *United States* v. *Daugerdas*, 735 F. Supp. 2d 113 (S.D.N.Y. 2010), a law firm represented a cooperating witness who was expected to testify against the defendant at trial. The defendant hired another attorney at the same firm to represent him for a limited purpose of challenging the Government's purported interference with the defendant's employer's payment of the defendant's legal fees. 735 F. Supp. 2d at 114-115. The law firm proposed to impose an ethical wall between the two offices where the attorneys

representing the defendant and the cooperating witness were located and proposed to limit counsel's involvement in the matter to investigating the attorneys' fees issue. *Id.* at 115. The cooperating witness did not agree to waive the firm's conflict. *Id*. at 115. The *Daugerdas* court held that the law firm suffered from a "clear conflict of interest." *Id*. at 116. Even with respect to the firm's proposal to limit the scope of the representation of the defendant, the court found both potential conflicts of interest—because of potential scenarios in which the defendant's attorney would take positions adverse to the cooperating witness—but also an actual conflict of interest with respect to the firm advising both clients about whether or not to waive the conflict. *Id*. at 116-17. Having found a "serious conflict of interest," the *Daugerdas* court proceeded to "balance the competing interests of those involved." *Id*. at 117. The court found that the cooperating witness's refusal to waive the conflict suggested "a level of discomfort with [the firm's] dual representation," that the court should consider the witness's interests in conflict-free counsel, and that disqualification would not unduly burden the defendant in light of the discrete issue with respect to which the attorney was retained and the presence of other counsel to represent the defendant in that matter. *Id.* The *Daugerdas* court also considered that "the simultaneous representation of a defendant and a cooperating witness undermines the integrity of these proceedings." *Id*. at 118.

51. In *United States ex rel. Stewart* v. *Tineo*, 870 F.2d 854 (2d Cir. 1989), the Second Circuit considered an appeal from an order pursuant to Title 28, United States Code, Section 2254, vacating a state-court conviction based on the purported denial of the petitioner's Sixth Amendment right to counsel of his choice when the trial court disqualified his attorney. The defendant's retained counsel previously represented a confidential informant who was expected to be a trial witness. 870 F.2d at 855. To avoid disqualification, the attorney proposed to limit

the scope of his cross-examination of his former client, the confidential informant, to the information in the informant's rap sheet. *Id*. Standby, court-appointed counsel was also available, and ultimately acted as standby counsel when the defendant elected to proceed to trial *pro se* following disqualification of his retained attorney. *Id*. at 855-56. The district court hearing the § 2254 petition vacated the conviction and the Second Circuit reversed. The Second Circuit noted that there is "a presumption in favor of a defendant's choice of counsel, but this may be overcome 'by a showing of a serious potential for conflict.'" *Id*. at 856 (quoting *Wheat*, 486 U.S. at 164; citing *United States* v. *Arrington*, 867 F.2d 122, 128 (2d Cir. 1989)). "The solution to this clash between a defendant's Sixth Amendment right to counsel and the same defendant's right to a fair trial"—that is, to conflict-free counsel—"is a balancing of interests that is committed to the discretion of the trial judge, who has 'broad latitude' in this matter." *Id*. (quoting *Wheat*, 486 U.S. at 163). The Second Circuit observed that "[i]t is hard to conceive of a conflict of interest between clients that would not be serious." *Id*. at 857. The court held that "there can be no doubt that [the attorney's] potential conflict was serious, that his loyalty was divided between a client and a former client, and that representing [the defendant] would have created a strong appearance of impropriety. This is no less true simply because [the attorney's] representation of the clients did not concern the same matter . . . . Two clients' interests in separate matters may be just as opposed, and the potential for conflict just as serious." *Id*. The Second Circuit also held that "although there is no record of the informant ever having been asked his views on [the attorney's] representation of [the defendant], such consent would not have been dispositive. Even if the informant had consented to the representation, *Wheat* holds that the trial court's independent duty to assure a fair trial may override such a waiver." *Id*. at 857-58.

52.     In *United States* v. *Rivera*, No. 08 Cr. 1327 (HB) (S.D.N.Y.), the lawyer for the defendant previously represented two co-defendants and shared an office with a second attorney (and family member) who represented a third defendant in the proceedings.  2009 WL 1059641, at *1.  The *Rivera* court acknowledged that it had "no reason to doubt the professionalism of [the attorney] or [the attorney's relative] or to believe that they have acted or are likely to act in any way other than in strict conformance with their ethical duties.  It is, however, precisely those ethical duties that create the conflict-of-interest problem we confront today.  Upon due consideration, I find that it is a problem of such magnitude that [the attorney] must be relieved as counsel to [the defendant], notwithstanding the waiver of conflicts that he has offered here."  *Id.* The court described "the complex and difficult task of trying to predict how conflicts that are today mere possibilities will affect [the defendant's] right to effective counsel at trial if, several weeks hence, one or more of these possibilities becomes a reality."  *Id.* at *2.  One such possibility was if one of the attorney's former clients elected to testify in their own defense or as a government witness.  *Id.*  The court was also concerned that the attorney would have access, even inadvertent access, to confidential information of the defendant represented by her office partner.  *Id.*  The court ultimately concluded that:

> Both the number of potential conflicts posed by [the attorney's] representation, and their severity should they evolve into actual conflicts at trial, that place this case within the narrow category of conflicts that cannot be waived.  In short, the likelihood that one or more of [the attorney's] several potential conflicts of interest that will burgeon into the type of severe and actual conflict that leaves [the defendant] in the untenable position of being represented by counsel who must choose between providing effective assistance to her client or adhering to her ethical obligations creates a risk that I cannot allow [the defendant] to take in this case.

*Id.* (citing *United States* v. *Perez*, 325 F.3d 115, 126 (2d Cir. 2003)).  The Second Circuit affirmed the disqualification order, holding that "[t]he District Court properly exercised its

judgment in concluding that the potential conflicts . . . were sufficiently likely to materialize and, combined with the apparent conflict arising from her sharing an office with her father, necessitated disqualifying [the attorney]." *United States* v. *Rivera*, 571 Fed. Appx. 55, 60 (2d Cir. July 2, 2014).

53.     In *United States* v. *Rahman*, 861 F. Supp. 266 (S.D.N.Y. 1994), also discussed above, a law firm had previously represented four co-defendants. The *Rahman* court first evaluated the nature and scope of the conflicts arising from these prior representations, including the potential benefit to the defendant of advancing arguments distancing himself from his co-defendants or adducing evidence helpful to the defendant but harmful to the co-defendants, which "would give rise to arguments by [the defendant] on appeal that his lawyer's performance had been adversely affected by a conflict of interest and his conviction therefore should be reversed." 861 F. Supp. at 276. The court also noted the conflicts that would arise if any of the former clients testified at trial. *Id*. at 276-77. The *Rahman* court then considered the proposal that conflict-free counsel would handle aspects of the representation that would involve conflicts by the law firm and found that this proposal was inadequate. *Id*. at 277.

54.     The circumstances faced by the defendant in this case are similar to those in *Daugerdas*, *Stewart*, *Rivera*, and *Rahman*. The Kirkland attorneys suffer from "clear conflicts of interest" that have the likelihood of developing into conflicts that are "severe and actual." *See Rivera*, 2009 WL 1059641, at *2; *Massino*, 303 F. Supp. 2d at 264. The number of conflicts adds to the degree to which the defendant's right to effective representation is undermined as well as to the "complex and difficult task of trying to predict" how these conflicts will manifest themselves at a trial scheduled to take place eight months in the future. *See Rivera*, 2009 WL 1059641, at *2. Indeed, in this case, the Kirkland attorneys already have taken positions adverse

to their current clients, and the ways in which their ability effectively to represent the defendant

may be impaired by their strong duties of loyalty and confidentiality to eight victims and

potential trial witnesses as these proceedings develop are difficult to predict and but virtually

certain to manifest.

55.     For the reasons discussed above, and the reasons discussed in *Daugerdas*,

*Stewart*, *Rivera*, *Locascio*, *Yannotti*, *Massino*, and *Rahman*, the proposed measures to ameliorate

the effects of these conflicts by Kirkland are inadequate to ensure the defendant's right to the

effective assistance of counsel or to ensure that these proceedings are free from the appearance

of impropriety.

56.     Accordingly, a rational defendant in the defendant's position would not waive the

conflicts at issue.

57.     In conclusion, Kirkland must be disqualified from this representation.  The Court

has "no reason to doubt the professionalism" of Kirkland or its attorneys, "or to believe that they

have acted or are likely to act in any way other than in strict conformance with their ethical

duties."  *See Rivera*, 2009 WL 1059641, at *1.  However, the Court shares the Government's

concern that Kirkland's continued participation of Zarrab's defense will or likely could lead to

further complications down the road that the parties and the Court are not even in a position to

foresee at the current time – but that could disrupt a lengthy, complicated trial or lead to mistrial

or reversal of any conviction obtained.  *See*, *e.g.*, *United States* v. *Bright*, No. 06 CR. 242

(WHP), 2008 WL 11288148, at *1 (S.D.N.Y. Nov. 24, 2008) (granting retrial after mistrial

declared when new conflict arose during trial that defendant refused to waive), *aff'd*, 356 F.

App'x 474 (2d Cir. 2009); s*ee also United States* v. *Fulton*, 5 F.3d 605, 614 (2d Cir. 1993)

(failure to disqualify an attorney who had a debilitating conflict was basis for fatal error on appeal, requiring reversal of conviction).

58.     Indeed, it is already possible to envision scenarios – particularly given HSBC's insistence that it be allowed to review the defendant's submission before they are filed, and further given Citibank's refusal to waive – in which, as defense and prosecution theories develop and sharpen in the lead-up to trial, or as the case unfolds before a jury during trial, one or more banks or the defendant could express more discomfort with Kirkland's dual representation of the defendant and the various banks. *See Daugerdas*, 735 F. Supp. 2d at 117 (noting that cooperating witness's refusal to waive a conflict suggested "a level of discomfort with [the firm's] dual representation"); *United States* v. *Schwartz*, 283 F.3d 76, 96 (2d Cir. 2002) ("[W]e conclude that the conflict between Worth's representation of Schwarz, on the one hand, and his ethical obligation to the PBA as his client and his self interest in the PBA retainer, on the other, was so severe that no rational defendant in Schwarz's position would have knowingly and intelligently desired Worth's representation."); *United States* v. *Parse*, 789 F.3d 83, 120 (2d Cir. 2015) (ordering new trial because, despite a waiver by the defendant of certain of his constitutional rights, it was later determined that waiver was made with insufficient information)

59.     In light of the complexity and difficulty in managing the conflicts raised by Kirkland's simultaneous representation of the defendant and eight of the banks that he allegedly victimized, who also are likely trial witnesses, the potential for serious consequences for the defendant and this proceeding should the proposed solutions not mitigate the conflicts, and the fact that the defendant has many other able attorneys and firms representing him, including the trial counsel of his choice, the Court concludes that the risk from allowing Kirkland to proceed is

too great.  Accordingly, the Court finds that Kirkland should be disqualified from further

representation of the defendant.

Dated:  New York, New York
        December 21, 2016

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

            by:  _____/s/_____
                 Michael D. Lockard
                 Sidhardha Kamaraju
                 David W. Denton, Jr.
                   Assistant U.S. Attorneys
                 Dean C. Sovolos
                   Special Assistant U.S. Attorney
                 (212) 637-2193/6523/2744/2213