**EXHIBIT 7**

# 16-308(L)

## 16-353, 16-1068, 16-1094

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

HSBC BANK USA, N.A., HSBC HOLDINGS PLC,

*Defendants-Appellants,*

HUBERT DEAN MOORE, JR.,

*Appellee.*

———————————

On Appeal from the United States District Court for the
Eastern District of New York, No. 12-cr-763 (JG)

———————————

**BRIEF FOR DEFENDANTS-APPELLANTS**

———————————

SAMUEL W. SEYMOUR
ALEXANDER J. WILLSCHER
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

JEFFREY B. WALL
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW
Washington, DC 20006
(202) 956-7500

PAUL D. CLEMENT
 *Counsel of Record*
VIET D. DINH
JEFFREY M. HARRIS
MEGAN M. WOLD
CHRISTOPHER G. MICHEL
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Defendants-Appellants*

July 21, 2016

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), HSBC Bank USA, N.A. certifies that its parent corporation is HSBC Holdings plc and that no other publicly held corporation owns more than ten percent of its stock.  HSBC Holdings plc certifies that it has no parent corporation and that no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES.................................................................... iv

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION .......................................................... 4

STATEMENT OF ISSUES ................................................................... 6

STATEMENT OF THE CASE................................................................. 6

    A.    Deferred Prosecution Agreements........................................... 6

    B.    The Speedy Trial Act...................................................... 8

    C.    The HSBC DPA............................................................ 10

    D.    The District Court's "Approval" of the DPA ................................. 13

    E.    The Monitor's First Annual Report ......................................... 16

    F.    The Challenged Orders..................................................... 19

        1.    The Release Order (January 28, 2016) ................................. 19

        2.    The Redaction Order (March 9, 2016).................................. 21

SUMMARY OF ARGUMENT................................................................ 22

STANDARD OF REVIEW .................................................................. 25

ARGUMENT .............................................................................. 26

I.    The Report Is Not A "Judicial Document" For Purposes Of The First Amendment Public Access Doctrine. ........................................ 26

    A.    The Report Is a Confidential Executive Document. ......................... 26

        1.    The Report's origins and function demonstrate its confidential executive character............................................. 26

　　　　　2.　　Neither the filing of the DPA nor the filing of the Report under seal pursuant to court order deprived the Report of its confidential executive character. .................................... 30

　　B.　　The Report Is Not Relevant to the Performance of any Judicial Function Within the District Court's Authority. ................................. 34

　　C.　　At the Very Least, a Court Has No Power to Retroactively Alter the Terms of a DPA It Has Already Approved. ......................... 41

II.　　Even If The Report Were A Judicial Document, History, Public Policy, And Higher Values Counsel In Favor Of Maintaining It Under Seal. ............................................................................................... 45

　　A.　　Documents Regarding the Executive's Exercise of Prosecutorial Discretion and Supervision of the Banking Sector Have Not Historically Been Open to the Public. .................... 46

　　B.　　Logic, Public Policy, and Higher Values Counsel Against Publicizing the Report. ...................................................................... 51

III.　　In The Alternative, Mandamus Is Warranted. ................................................ 55

CONCLUSION ................................................................................................... 59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*100Reporters LLC v. Dep't of Justice*,
  307 F.R.D. 269 (D.D.C. 2014)...........................................................33

*Arthur Andersen LLP v. United States*,
  544 U.S. 696 (2005)........................................................................7

*Bank of America Nat'l Trust & Sav. Ass'n v. Douglas*,
  105 F.2d 100 (D.C. Cir. 1939) ..........................................................50

*Bank of Nova Scotia v. United States*,
  487 U.S. 250 (1988)........................................................................36

*Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*,
  814 F.3d 132 (2d Cir. 2016) .................................................. 25, 26, 31

*Can v. United States*,
  14 F.3d 160 (2d Cir. 1994)...............................................................29

*Carlisle v. United States*,
  517 U.S. 416 (1996)........................................................................36

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991).........................................................................36

*Cheney v. U.S. Dist. Court for D.C.*,
  542 U.S. 367 (2004).................................................................. 56, 57

*City of Hartford v. Chase*,
  942 F.2d 130 (2d Cir. 1991) .................................................. 41, 42, 43

*Ctr. for Nat'l Sec. Studies v. Dep't of Justice*,
  331 F.3d 918 (D.C. Cir. 2003) ..........................................................32

*Dig. Equip. Corp. v. Desktop Direct, Inc.*,
  511 U.S. 863 (1994).........................................................................4

*Gambale v. Deutsche Bank AG*,
  377 F.3d 133 (2d Cir. 2004) .................................................... 31, 32

iv

*Geller v. Branic Int'l Realty Corp.*,
    212 F.3d 734 (2d Cir. 2000) .................................................................43

*Holley v. Lavine*,
    553 F.2d 845 (2d Cir. 1977) .................................................................27

*IMS Health Inc. v. Sorrell*,
    630 F.3d 263 (2d Cir. 2010) .................................................................26

*In re City of New York*,
    607 F.3d 923 (2d Cir. 2010) ........................................................ 56, 57

*In re N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials*,
    577 F.3d 401 (2d Cir. 2009) .................................................. 45, 51, 54

*In re Sims*,
    534 F.3d 117 (2d Cir. 2008) .................................................................57

*In re Subpoena Served Upon Comptroller of Currency*,
    967 F.2d 630 (D.C. Cir. 1992) .............................................................50

*In re United States*,
    398 F.3d 615 (7th Cir. 2005) ....................................................... 28, 32

*In re United States*,
    503 F.3d 638 (7th Cir. 2007) ........................................................ *passim*

*In re von Bulow*,
    828 F.2d 94 (2d Cir. 1987) ..................................................................57

*Inmates of Attica Corr. Facility v. Rockefeller*,
    477 F.2d 375 (2d Cir. 1973) ...................................................... 28, 31, 47

*Lugosch v. Pyramid Co. of Onondaga*,
    435 F.3d 110 (2d Cir. 2006) .................................................................20

*N.Y. Times v. Dep't of Justice*,
    806 F.3d 682 (2d Cir. 2015) ........................................................ 29, 31

*Newsday LLC v. Cty. of Nassau*,
    730 F.3d 156 (2d Cir. 2013) ....................................... 24, 31, 45, 51

*Rockwell Int'l Corp. v. Dep't of Justice*,
  235 F.3d 598 (D.C. Cir. 2001) ............................................................................33

*SEC v. AIG*,
  712 F.3d 1 (D.C. Cir. 2013) ........................................................................ 30, 36

*SEC v. Citigroup Glob. Mkts. Inc.*,
  827 F. Supp. 2d 328 (S.D.N.Y. 2011) ..................................................................38

*SEC v. Citigroup Glob. Mkts., Inc.*,
  752 F.3d 285 (2d Cir. 2014) ...................................................................... *passim*

*SEC v. Rajaratnam*,
  622 F.3d 159 (2d Cir. 2010) ........................................................................ 5, 57

*SEC v. TheStreet.com*,
  273 F.3d 222 (2d Cir. 2001) ................................................................... 4, 5, 32

*Standard Inv. Chartered, Inc. v. Fin. Indus. Regulatory Auth.*,
  347 F. App'x 615 (2d Cir. 2009) ........................................................................51

*Stein v. KPMG, LLP*,
  486 F.3d 753 (2d Cir. 2007) ...............................................................................5

*United States v. Alameh*,
  341 F.3d 167 (2d Cir. 2003) ..............................................................................48

*United States v. Amodeo*,
  44 F.3d 141 (2d Cir. 1995) ................................................................. 20, 39, 44

*United States v. Amodeo*,
  71 F.3d 1044 (2d Cir. 1995) ........................................................................ 30, 31

*United States v. Aref*,
  533 F.3d 72 (2d Cir. 2008) ........................................................... 31, 46, 54, 55

*United States v. Armstrong*,
  517 U.S. 456 (1996) .......................................................................... 27, 47, 48

*United States v. Bonnet-Grullon*,
  212 F.3d 692 (2d Cir. 2000) ......................................................................... 28, 29

*United States v. El-Sayegh*,
    131 F.3d 158 (D.C. Cir. 1997) ............................................................. 33, 38, 49

*United States v. Erie Cty.*,
    763 F.3d 235 (2d Cir. 2014) ........................................................ 34, 39, 40, 45

*United States v. Feliciano*,
    998 F. Supp. 166 (D. Conn. 1998) .................................................................47

*United States v. Fokker Servs. B.V.*,
    79 F. Supp. 3d 160 (D.D.C. 2015) .................................................................37

*United States v. Fokker Servs. B.V.*,
    818 F.3d 733 (D.C. Cir. 2016) ............................................................ *passim*

*United States v. Garcia*,
    519 F.2d 1343 (9th Cir. 1975) .......................................................................41

*United States v. Gogarty*,
    533 F.2d 93 (2d Cir. 1976) ...........................................................................41

*United States v. Haller*,
    837 F.2d 84 (2d Cir. 1988) ...........................................................................47

*United States v. Hicks*,
    693 F.2d 32 (5th Cir. 1982) ...................................................................... 6, 41

*United States v. Huerta*,
    878 F.2d 89 (2d Cir. 1989) ...........................................................................27

*United States v. Kravetz*,
    706 F.3d 47 (1st Cir. 2013) ...........................................................................31

*United States v. Lau Tung Lam*,
    714 F.2d 209 (2d Cir. 1983) .........................................................................37

*United States v. Saena Tech Corp.*,
    140 F. Supp. 3d 11 (D.D.C. 2015) .................................................................7

*United States v. Zingsheim*,
    384 F.3d 867 (7th Cir. 2004) .........................................................................28

**Constitutional Provision**

U.S. Const. art. II, §3 ...........................................................................27

**Statutes**

5 U.S.C. §552(b) ..................................................................................32

5 U.S.C. §552(b)(5)..............................................................................32

5 U.S.C. §552(b)(7)..............................................................................32

5 U.S.C. §552(b)(8)..............................................................................33

18 U.S.C. §3161 .....................................................................................8

18 U.S.C. §3161(c)(1) ............................................................................8

18 U.S.C. §3161(h)(2)................................................................... 8, 9, 35

31 U.S.C. §5318(g) ..............................................................................50

**Regulations**

12 C.F.R. §4.32(b)................................................................................50

12 C.F.R. §21.11(k)..............................................................................50

12 C.F.R. §261.2(c)(1)(iii) ...................................................................50

**Rules**

Fed. R. Crim. P. 6(e)(2).......................................................................47

Fed. R. Crim. P. 16(a)(2)......................................................................49

Fed. R. Crim. P. 16(b)(2)(A)................................................................49

**Other Authorities**

Accountability in Deferred Prosecution Act of 2009, H.R. 1947,
    111th Cong. (2009) ........................................................................10

Elizabeth K. Ainslie, *Indicting Corporations Revisited:*
  *Lessons of the Arthur Andersen Prosecution*,
  43 Am. Crim. L. Rev. 107 (2006) ........................................................7

Assistant Attorney General Leslie Caldwell,
  Remarks at the ACAMS Anti-Money Laundering & Financial
  Crimes Conference (Mar. 16, 2015) ........................................... 8, 58

Brandon L. Garrett, *Structural Reform Prosecution*,
  93 Va. L. Rev. 853, 926 (2007) ........................................................41

Gibson, Dunn & Crutcher, *2015 Year-End Update on Corporate Non-*
  *Prosecution Agreements (NPAs) and Deferred Prosecution*
  *Agreements (DPAs)* (2016)................................................................8

Gov't Accountability Office, GAO-10-110,
  *Corporate Crime: DOJ Has Taken Steps to Better Track Its Use of*
  *Deferred and Non-Prosecution Agreements, but Should Evaluate*
  *Effectiveness* (2009) .......................................................................10

S. Rep. No. 93-1021................................................................................9

U.S.A.M. §9-28.1100.B ..........................................................................7

**INTRODUCTION**

After a criminal investigation that lasted over four years and spanned the globe, HSBC and the United States entered into a deferred prosecution agreement ("DPA") resolving charges that HSBC had failed to maintain adequate anti-money laundering and sanctions controls. The Justice Department agreed to dismiss the charges after five years if HSBC forfeited more than $1.25 billion and undertook sweeping remedial measures. The DPA vested the Department with "sole discretion" to determine whether HSBC had satisfied its obligations. To inform that determination, the DPA required the appointment of an independent Monitor to send the Department annual reports evaluating HSBC's controls, policies, and procedures related to its compliance with anti-money laundering and sanctions laws and the specific remedial measures identified in the DPA. Because these reports would include extensive confidential information about HSBC's internal activities, as well as highly sensitive information protected by the laws of foreign jurisdictions whose regulators supervise HSBC affiliates, the DPA expressly required that the Monitor's reports remain "non-public."

The government filed the DPA in district court and moved to toll the speedy trial clock under 18 U.S.C. §3161(h)(2), which provides for an exclusion of time during a deferred prosecution. The district court (Gleeson, J.) granted that motion but also asserted an admittedly "novel" theory of supervisory power that allowed it

to "approve" the DPA and monitor its ongoing implementation. The court then "approved" the DPA, but required the government to submit quarterly status reports on the DPA's implementation. The court did not suggest that it would seek to review the Monitor's reports, much less that it would disclose the reports despite the DPA's express requirement that they remain "non-public."

Two years later, after HSBC and its affiliates had provided the Monitor with an abundance of sensitive and proprietary banking information—including highly confidential customer data—the district court *sua sponte* ordered the government to submit the Monitor's thousand-page First Annual Follow-Up Review Report ("the Report") to the court. Although the court initially accepted the Report under seal, it later construed an unsolicited letter from a private citizen as a motion to unseal the document under the First Amendment right of public access to "judicial documents." HSBC, the Justice Department, the Monitor, the Federal Reserve, and three foreign regulatory agencies all urged the court to keep the Report confidential, as required by the DPA's express terms. But the court nonetheless perfected the expansion of its authority by ordering the Report unsealed subject only to redactions made at the court's discretion. The court subsequently indicated that it would "not ma[k]e many of the redactions" proposed by HSBC. HSBC and the United States appealed both the unsealing and redaction orders.

*   *   *

Through a series of usurpations, the district court converted an expressly "non-public" executive branch document created to inform the Justice Department's "sole discretion" over a criminal prosecution into what the court deemed a presumptively-public judicial document. This act of purported alchemy cannot be allowed to succeed. The district court's remarkable assertion of authority is incompatible with settled principles of prosecutorial discretion and separation of powers. As the D.C. Circuit recently held, "the court plays no role in monitoring the defendant's compliance with the DPA's conditions. … Rather, the prosecution—and the prosecution alone—monitors a defendant's compliance with the agreement's conditions." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 744 (D.C. Cir. 2016).

The decision below is especially egregious—a bait-and-switch on top of a usurpation—because the district court ordered the release of a confidential executive document after having *approved* the DPA expressly designating the document "non-public," thereby contravening not only the separation of powers but also basic principles of contract law and fairness. Ordering the release of highly confidential banking information that the parties agreed to keep secret would inflict unjustified harm on HSBC and its customers, and on broader efforts to enforce compliance with global banking laws through monitorships and DPAs. Whether by appeal or mandamus, the district court's unprecedented orders should be vacated.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this criminal prosecution pursuant to 18 U.S.C. §3231.  The orders on appeal were entered on January 28, 2016, and March 9, 2016.  SPA1-18.  HSBC filed timely notices of appeal from those orders on February 1, 2016, and April 8, 2016, respectively.  JA250, 273.

This Court has jurisdiction pursuant to 28 U.S.C. §1291 because the district court's orders are appealable under the collateral order doctrine.  Appealable collateral orders are "those district court decisions that are conclusive, that resolve important questions completely separate from the merits, and that would render such important questions effectively unreviewable on appeal from final judgment in the underlying action."  *Dig. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994).  All three criteria are satisfied here.

*First*, the orders conclusively determine whether the Report will remain confidential because they direct the Report's public release.  *See SEC v. TheStreet.com*, 273 F.3d 222, 228 (2d Cir. 2001) (order was conclusive for collateral-order purposes because it "'conclusively determined' … whether or not the Confidential Testimony would be disclosed").

*Second*, the challenged orders resolve a discrete and important question completely separate from the merits.  The underlying case turns on the criminal charges against HSBC, but the orders at issue here address only whether to unseal

4

the Report, which is an important issue wholly unrelated to the criminal charges. *See id*. (issue of disclosure was "wholly separate from the underlying merits of the action, which involved alleged violations of the securities law").

*Third*, the orders will be effectively unreviewable on appeal from any final judgment. If the DPA succeeds, the case will end in an unappealable dismissal rather than a final judgment. And even in the unlikely event that a final judgment is entered in the future, an appeal about the Report's disclosure would be futile because the Report would have already been released. *See id*. ("because the alleged harm caused by disclosure … will be immediate and irreparable, the order is unreviewable on appeal from a final judgment").

In the alternative, this Court has jurisdiction under 28 U.S.C. §1651 to consider the mandamus petition that HSBC has filed concurrently with this brief. This Court has considered jointly an interlocutory appeal and alternative mandamus petition in a number of other cases arising in comparable postures. *See SEC v. Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 291-98 (2d Cir. 2014); *SEC v. Rajaratnam*, 622 F.3d 159, 167 (2d Cir. 2010); *Stein v. KPMG, LLP*, 486 F.3d 753, 758 (2d Cir. 2007); *accord Fokker*, 818 F.3d at 747.

## STATEMENT OF ISSUES

**I.** Whether the Monitor's Report, which was created as a "non-public" document to inform the executive branch in exercising its prosecutorial discretion, is a "judicial document" for purposes of the First Amendment public access doctrine.

**II.** Whether the Report should remain confidential even if it is a judicial document given that records of its kind have not historically been open to the public, and given that higher values—including protecting confidential banking information and facilitating international cooperation essential to this and other DPAs—outweigh any interest in public access.

**III.** In the alternative, whether the district court's clear errors and usurpation of authority warrant mandamus.

## STATEMENT OF THE CASE

### A.    Deferred Prosecution Agreements

At its core, a DPA "is a contract" between the prosecutor and a criminal defendant. *United States v. Hicks*, 693 F.2d 32, 33 (5th Cir. 1982). The defendant admits wrongdoing, while "the government formally initiates prosecution but agrees to dismiss all charges if the defendant abides by negotiated conditions over a prescribed period of time." *Fokker*, 818 F.3d at 737. If the defendant fails to satisfy the conditions, the government can "pursue the charges based on facts admitted in the agreement." *Id.* DPAs thus offer "a middle-ground option" that the government can employ when it "believes that a criminal conviction may be difficult to obtain or

may result in unwanted collateral consequences for a defendant or third parties, but also believes that the defendant should not evade accountability altogether." *Id.* at 738.

Historically, prosecutors used DPAs primarily to allow "individual defendants to demonstrate their rehabilitation without triggering the devastating collateral consequences of a criminal conviction." *United States v. Saena Tech Corp.*, 140 F. Supp. 3d 11, 42 (D.D.C. 2015). In recent years, the government has recognized that those same considerations support the use of DPAs with corporate defendants. A DPA with a corporate defendant "can help restore the integrity of a company's operations," "preserve the financial viability of a corporation," and avoid "a result that seriously harms innocent third parties who played no role in the criminal conduct," while "preserving the government's ability to prosecute a recalcitrant corporation that materially breaches the agreement." U.S.A.M. §9-28.1100.B.

The advantages of DPAs with corporate criminal defendants became especially clear after the prosecution of Arthur Andersen, which was debarred from auditing public companies and went out of business—costing some 28,000 jobs—based on a conviction that was ultimately reversed. *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005); *see* Elizabeth K. Ainslie, *Indicting Corporations Revisited: Lessons of the Arthur Andersen Prosecution*, 43 Am. Crim. L. Rev. 107, 108 (2006). In the ensuing decade, the government has entered more than 300 DPAs

or non-prosecution agreements[1] with corporations, yielding significant corporate reforms and more than $45 billion in fines and forfeitures. *See* Gibson, Dunn & Crutcher, *2015 Year-End Update on Corporate Non-Prosecution Agreements (NPAs) and Deferred Prosecution Agreements (DPAs)* 3-4 (2016). In short, DPAs are "useful enforcement tools" that allow the government to "accomplish as much as, and sometimes even more than, [it] could from a criminal conviction," without inflicting ruinous collateral consequences on innocent employees and shareholders. Assistant Attorney General Leslie Caldwell, Remarks at the ACAMS Anti-Money Laundering & Financial Crimes Conference (Mar. 16, 2015).

**B.     The Speedy Trial Act**

Congress has expressly approved the use of DPAs through the Speedy Trial Act. 18 U.S.C. §3161. The Act generally requires a trial to begin within 70 days of the filing of an information or indictment. *Id.* §3161(c)(1). To accommodate DPAs, Congress excluded from the speedy trial calculation "[a]ny period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct." *Id.* §3161(h)(2). By tolling the speedy trial clock during a DPA, §3161(h)(2) preserves the government's

---

[1] A non-prosecution agreement operates in essentially the same way as a DPA, but "formal charges are not filed and the agreement is maintained by the parties rather than being filed with a court." *Fokker*, 818 F.3d at 738.

leverage to prosecute a defendant who fails to comply. This provision is thus "essential to the … effective operation" of DPAs. *Fokker*, 818 F.3d at 739.

Because §3161(h)(2) requires "approval of the court," the government generally submits simultaneously to the court a DPA, a criminal information, and a motion to exclude time. The review contemplated by §3161(h)(2) is narrow; the court need only confirm that the DPA is "for the purpose of allowing the defendant to demonstrate his good conduct." §3161(h)(2). Congress included the court-approval provision to ensure that DPAs "will not be used by prosecutors and defense counsel to avoid the speedy trial time limits." S. Rep. No. 93-1021 at 37; *see* JA150 (provision is "grounded in a concern, to put it bluntly, that parties will collude to circumvent the speedy trial clock").

In the first four decades after Congress enacted §3161(h)(2), no court denied a joint request by the parties to exclude time to allow a defendant to comply with a DPA. *See Fokker*, 818 F.3d at 740. When one court did so in 2015, the D.C. Circuit unanimously granted mandamus on the ground that §3161(h)(2) permits only "circumscribed" judicial review to "assure that the DPA in fact is geared to enabling the defendant to demonstrate compliance with the law, and is not instead a pretext intended merely to evade the Speedy Trial Act's time constraints." *Id.* at 744-45. A broader reading of §3161(h)(2) would not only "contradict[] the provision's apparent overarching object," but would also amount to "a substantial and unwarranted

intrusion on the Executive Branch's fundamental prerogative[]" of prosecutorial discretion.  *Id.*

Section 3161(h)(2) is the only provision in the U.S. Code that contemplates judicial review related to DPAs, and "the law does not otherwise specify judicial involvement in the DPA process."  Gov't Accountability Office, GAO-10-110, *Corporate Crime: DOJ Has Taken Steps to Better Track Its Use of Deferred and Non-Prosecution Agreements, but Should Evaluate Effectiveness* 25 (2009). Congress has considered legislation that would provide for broader judicial involvement.  For example, one bill would require courts to determine whether DPAs serve "the interests of justice" and to receive "quarterly reports" from monitors appointed pursuant to DPAs.  Accountability in Deferred Prosecution Act of 2009, H.R. 1947, 111th Cong. §7 (2009).  To date, however, no such bill has been enacted.

### C.    The HSBC DPA

Founded in 1865 as the Hongkong and Shanghai Banking Corporation, HSBC has long maintained a global presence in the financial markets.  The company today has more than 6,900 offices and 250,000 employees in 80 countries.  JA64.

In the years preceding the criminal information filed in 2012, HSBC failed to maintain an effective system of anti-money-laundering controls.  As a result, HSBC was unable to detect substantial amounts of drug trafficking proceeds laundered through the bank in the United States.  JA66.  HSBC's international affiliates also

participated in transactions with foreign banks and individuals that violated Treasury Department sanctions.  JA81.

When notified of the government's investigation into this conduct, HSBC fully and promptly cooperated.  The bank conducted multiple internal investigations, produced more than 9 million pages of documents, and made available past and present employees throughout the world.  JA90.  HSBC also installed a new leadership team; "clawed back" bonuses from former senior officials; undertook to implement the highest or most effective anti-money laundering standards globally (requiring HSBC affiliates to adhere to standards often extending beyond the requirements of local laws); overhauled its due diligence and compliance processes; and exited customer relationships, lines of business, and jurisdictions that presented excessive risk.  JA34-38.  HSBC also admitted wrongdoing and pledged to continue cooperating with the government to uncover any further violations.  JA32, 38-41.

After investigating HSBC for more than four years, the Justice Department drafted a criminal information charging the bank with violating the Bank Secrecy Act, the International Emergency Economic Powers Act, and the Trading with the Enemy Act.  JA25-29.  In light of HSBC's acceptance of responsibility, "extensive remedial actions," and "exceptional[]" cooperation—as well as its willingness to accept "unprecedented" conditions for five years—the government agreed to resolve the prosecution through a DPA.  JA33-34, 125, 132.  Among other conditions, the

DPA requires HSBC to forfeit more than $1.25 billion (the largest ever forfeiture in a bank prosecution); to give the Justice Department access to a massive amount of highly sensitive banking information; and to apply stringent U.S. anti-money laundering standards at affiliates around the world, even though such standards are not required by governing foreign law.  JA36, 39, 41-42, 126, 131.

To evaluate its compliance with the DPA, HSBC agreed to retain for five years at its own expense an independent corporate compliance monitor approved by the government ("the Monitor").  JA44-46.  HSBC pledged to "provide the Monitor with access to all information, documents, records, facilities and/or employees, as reasonably requested by the Monitor."  JA95.  The DPA directs the Monitor to use this information, in combination with his own investigation, to prepare an annual report.  JA101-02.  The Monitor's reports are to be sent to HSBC's Board of Directors, the Justice Department, and two financial regulators for whom the Monitor is also conducting reviews of HSBC pursuant to settlements reached in 2012 —the U.S. Federal Reserve and the United Kingdom's Financial Conduct Authority ("FCA").  JA99.[2]

Nothing in the DPA contemplates that the Monitor's reports would be provided to a court or made public.  To the contrary, because the Monitor's reports

_____

[2] The DPA refers to the Financial Services Authority, which was the predecessor entity to the Financial Conduct Authority.  JA207.

"will likely include proprietary, financial, confidential, and competitive business information," and because "public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the Monitorship," the DPA expressly provides that "the reports and the contents thereof are intended to remain and shall remain non-public." JA103-04.

The DPA vests the Justice Department with "sole discretion" to determine whether HSBC has complied with the agreement. JA32, 47. If the Department determines that HSBC has violated the agreement, the Department may either extend the DPA for an additional year or move forward with a criminal prosecution of HSBC. JA32-33, 47. In contrast, if HSBC has "fully compl[ied]" with the terms of the DPA, the Department "shall seek dismissal with prejudice of the criminal information." JA47.

## D. The District Court's "Approval" of the DPA

On December 11, 2012, the government submitted to the district court the criminal information, the DPA, and a letter joined by HSBC requesting exclusion of time under the Speedy Trial Act. JA15. The district court held an arraignment hearing at which it accepted a plea of not guilty, took notice of the DPA, and asked the parties what they "contemplated of the Court's participation, if any, in the proceedings as they go forward." JA109. The government explained that the parties

"had not asked the Court to actively take part in overseeing the" DPA but had "simply asked the Court to accept the information for filing and exclude time during the period of the deferred prosecution." JA109.

The court ordered the parties to prepare submissions explaining why it should approve the "plea agreement" between HSBC and the government under Federal Rule of Criminal Procedure 11(c)(1)(A). JA109-10. HSBC and the Justice Department noted that judicial approval of a plea agreement is necessary only when the defendant "pleads guilty or nolo contendere," which HSBC had not done. JA117-118, 137. The parties also explained that the only relevant rule or statute is the Speedy Trial Act, §3161(h)(2), which allows for exclusion of time so long as the DPA is "for the purpose of allowing the defendant to demonstrate his good conduct"—a standard readily satisfied here. *See* JA 117-133, 137-40.

In an unpublished opinion issued on July 1, 2013, the district court agreed with the parties that Rule 11 is inapplicable because HSBC has not pled guilty or nolo contendere. JA147. The court also agreed with the parties that time should be excluded under the Speedy Trial Act because the DPA "is, without a doubt, about diverting HSBC from criminal prosecution." JA150. The court nevertheless adopted the concededly "novel" position that it had authority both "to approve or reject the DPA pursuant to its supervisory power" and to make its approval "subject to a continued monitoring of [the DPA's] execution and implementation." JA150,

14

154, 157. The court reasoned that "[b]y placing a criminal matter on the docket of a federal court, the parties have subjected their DPA to the legitimate exercise of that court's authority." JA154.

In reviewing the DPA, the court detected "no impropriety that implicates the integrity of the Court and therefore warrants the rejection of the agreement." JA157. The court observed that "the DPA imposes upon HSBC significant, and in some respect extraordinary, measures," including a $1.25 billion forfeiture and extensive remedial measures overseen by a monitor who "will report regularly to the DOJ regarding HSBC's compliance with and/or violation of the DPA." JA163-64. Indeed, the district court explained, "taking into account the fact that a company cannot be imprisoned, it appears … that much of what might have been accomplished by a criminal conviction has been agreed to in the DPA." JA164.

The district court accordingly "approve[d] without hesitation both the DPA and the manner in which it has been implemented thus far," but "retain[ed] the authority to ensure that the implementation of the DPA remains within the bounds of lawfulness and respects the integrity of this Court." *Id.* To that end, the court directed the parties "to file quarterly reports with the Court to keep it apprised of all significant developments in the implementation of the DPA." *Id.* The court gave no indication that the Monitor's reports—in contrast to the "quarterly reports" the court requested from the parties—would be filed in court or made public in any way.

### E.    The Monitor's First Annual Report

HSBC proposed and the government approved Michael G. Cherkasky to serve as the independent Monitor.  JA143-44.  Mr. Cherkasky was also selected to conduct annual reviews in connection with a cease-and-desist order from the Federal Reserve and a Direction from the United Kingdom's FCA.  JA200.  The Monitor completed an Initial Review Report in January 2014 and his First Annual Follow-Up Review Report ("the Report") in January 2015.  JA200-01.

The Report, which runs more than 1,000 pages, documents the Monitor's extensive investigation into HSBC's compliance with the DPA and relevant financial laws around the world.  JA202.  Among other things, the Report contains the Monitor's analysis of "confidential client information, including … names, nationality, source of wealth, transaction history and suspicious activity alerts." JA201.  The Monitor obtained this sensitive information from HSBC employees and foreign regulators based on a "presumption of confidentiality."  JA201-02.  The Report also includes the Monitor's recommendations for HSBC to further improve its anti-money-laundering and sanctions-compliance programs.  JA202.  As mandated by the DPA, the Monitor sent the Report only to HSBC, the Justice Department, and regulators at the Federal Reserve and FCA.  JA99.

Separate from the Monitor's work, the government sent quarterly status reports to the district court as directed by the order approving the DPA.  JA164.  In

its seventh quarterly status report, submitted on April 1, 2015, the government noted that the Monitor had recently completed the Report. JA180. Although the district court had not taken any action in response to the six previous quarterly status reports, the court *sua sponte* ordered the government to submit the Report to the court. JA7.

The government complied with that order but asked the court to accept the Report under seal. HSBC and the Justice Department filed letters—supported by submissions from the Monitor, the Federal Reserve, and three foreign regulators— advising the court that publicly disclosing the Report would be inconsistent with the terms of the DPA, undermine the monitorship, and harm HSBC and its customers. JA186-223. The letters explained that HSBC and its foreign regulators had shared enormous quantities of sensitive banking information with the Monitor on the express assurance that this information would remain confidential. *See* JA219 (HSBC produced "over two million pages of documents" and made employees available for more than 3,500 meetings with the Monitor's team). Breaching that promise of confidentiality would imperil future cooperation with the Monitor and jeopardize efforts to remedy the deficiencies in HSBC's anti-money-laundering and sanctions controls. *See* JA193-95, 201-02, 204-05, 211-12, 215-17, 219-22.

The parties' submissions further explained that public release of the Report would harm HSBC and its clients by exposing "highly sensitive information regarding HSBC's … customers, employees, operations, and business," all of which

HSBC had promised to keep "strictly confidential." JA218-19. Public release would also impair regulatory supervision of HSBC by exposing information traditionally protected by the "bank examination privilege" and related federal regulations, which the Federal Reserve has described as "critical" safeguards that facilitate "[o]pen and candid communications between examiners and regulated organizations" about potential weaknesses and vulnerabilities. JA205; *see also* JA210 (describing UK regulators' protection of confidential banking information). Moreover, the Justice Department, Monitor, and financial regulators all cautioned that disclosing the Report's assessment of deficiencies in HSBC's anti-money-laundering and sanctions control efforts could create a road map for criminals to exploit, thereby harming HSBC and worsening the very problems the DPA was designed to solve. JA196, 201, 205, 212, 215.

Finally, both HSBC and the United States explained to the court that releasing a redacted version of the Report would not be an adequate solution because foreign regulators and others who provided access to sensitive financial data would have no assurance that similar information provided to the Monitor in the future will remain private. *See* JA204, 215, 220. The Monitor himself (supported by the FCA) also noted that a redacted Report would be of little value to the public because the necessary redactions would be so extensive as to render the Report unintelligible in key parts. JA202, 212. The court ultimately agreed to accept the Report under seal.

### F. The Challenged Orders

#### 1. The Release Order (January 28, 2016)

In November 2015, the district court received a letter from Hubert Moore, a homeowner who had filed a *pro se* complaint against HSBC before the Consumer Financial Protection Bureau in response to difficulties in obtaining a residential mortgage modification. JA228. Moore suggested (incorrectly) that the Report might contain information pertinent to his dispute with HSBC. *Id.*

The district court *sua sponte* construed Moore's letter as a motion to unseal the Report. JA8. HSBC and the government argued that Moore had no right to view the Report, which had been compiled solely to inform the Justice Department's exercise of prosecutorial discretion. HSBC and the government also reiterated that breaking the DPA's explicit promise of confidentiality—even by releasing a redacted report—would undermine the monitorship, impair regulatory supervision, damage HSBC's business by exposing highly sensitive information, and create a road map for criminal exploitation of HSBC and the global banking system. JA231-247.

Notwithstanding those arguments by *both* parties to the DPA, the district court ordered the public release of the Report subject to redactions entered in the district court's discretion. *See* SPA1 ("Release Order"). The court held that the Report was a "judicial document" subject to a First Amendment right of public access because it was "relevant to the performance of the judicial function and useful in the judicial

process."  SPA4 (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) (*Amodeo I*)).  In the court's view, the Report was "directly relevant" to the "continued monitoring" that the court had undertaken as part of its concededly novel exercise of supervisory power over the DPA.  SPA7.

The district court held that the First Amendment requires public access to the Report because documents purportedly like the Report have "historically been open to the press and general public" and "public access plays a significant positive role in the functioning of the particular process in question."  SPA7 (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006)).  The court conceded that "there is scant historical evidence of public access to documents in the precise posture of the Monitor's Report at issue here."  SPA8.  But it reiterated that the Report is "integral to the fulfilment of [the court's] continuing obligation to monitor the execution and implementation of the DPA."  SPA8.  The court further held that "logic" supports public access because the public has an interest in staying informed about the "progress" of the DPA and "whether [the court is] doing [its] job of monitoring the execution and implementation of that arrangement."  SPA9-10.

Finally, the district court determined that "targeted redactions" entered in the court's sole discretion would "easily alleviate" the concerns raised by the government, HSBC, the Monitor, the Federal Reserve, and the foreign regulators.  SPA11.  The court announced that it would redact information that identifies HSBC

employees or that, in the court's judgment, reveals "processes by which criminals could exploit HSBC." SPA11-12. The court also stated that it would redact five appendices to the Report that relate primarily to HSBC's foreign affiliates. SPA13. The court directed the parties to propose redactions for its consideration, but made clear that it would ultimately decide what content should be redacted. SPA14.

Both HSBC and the government filed notices of appeal of the Release Order. JA250-51. The district court indicated that it would likely stay its order pending appeal because the "issues in this case are important and of first impression in some respects" and "could benefit from appellate review." JA257.

## 2. The Redaction Order (March 9, 2016)

Although HSBC and the government strenuously objected to the public release of *any* of the Report's contents, both parties submitted proposed redactions as directed by the district court. On March 9, 2016 (Judge Gleeson's final day on the bench[3]), the court issued a redacted version of the Report under seal and an order explaining its redactions. SPA15-17 ("Redaction Order"). The court noted that it had made "all of the redactions requested by the government" but had "not made many of the redactions" proposed by HSBC. SPA16. In the court's view, much of the information that HSBC designated as "commercially sensitive or proprietary" could not "fairly be characterized in that way." SPA17. The court proceeded to

_____

[3] The case was subsequently reassigned to Judge Donnelly. JA13.

quote in its public order one of the passages from the Report that HSBC had marked for redaction as an "example" of the kind of redaction it had declined to accept. SPA17. HSBC and the government appealed the Redaction Order, JA272-73, and the district court stayed both the Release Order and the Redaction Order pending appeal, SPA17. Because the government and HSBC both sought vacatur of the orders, this Court granted Moore leave to intervene as appellee. DE58.[4]

## SUMMARY OF ARGUMENT

The district court unilaterally converted a confidential executive document into a public judicial document based on a concededly "novel" concept of its supervisory power. The decisions below are irreconcilable not only with first principles of separation of powers and prosecutorial discretion, but also with basic notions of fairness and contract law. By appeal or mandamus, the orders should be vacated.

**I.** The decisions below contain multiple flaws, but the most straightforward ground for vacatur is that the Report is not a "judicial document" for purposes of the public access doctrine. To the contrary, the Report is a "non-public"

---

[4] HSBC moved to certify both orders for interlocutory appeal under 28 U.S.C. §1292(b). The district court denied that motion but emphasized that it did "not mean to suggest that this case would not benefit from appellate review" because "the issues presented are 'of first impression in some respects.'" JA278. For all the reasons noted above, this Court has jurisdiction over this appeal notwithstanding the denial of the §1292(b) motion. *See supra* pp. 4-5.

executive document created solely to inform the Justice Department's exercise of its prosecutorial discretion. Neither the filing of the DPA nor the filing of the Report under seal in response to a court order deprived the Report of its fundamental character as a confidential executive document. A district court cannot convert a confidential executive branch document into a presumptively-public judicial document by simply demanding the document from the executive and then labeling it "judicial"; that is precisely the kind of bootstrapping that this Court has repeatedly refused to countenance in the past.

Nor is the Report "relevant to the performance of" any "judicial function" within the court's authority. The Report could not have been relevant to the only germane and valid "judicial function"—the decision to exclude time under the Speedy Trial Act—because the Report did not even exist when the district court made that decision. And the district court erred in arrogating to itself a broader judicial function of supervising HSBC's compliance with the DPA. As the D.C. Circuit recently held, "the court plays no role in monitoring the defendant's compliance with the DPA's conditions." *Fokker*, 818 F.3d at 744.

Finally, as yet another basis for vacatur, even if there were some proper judicial role in supervising compliance with DPAs, it surely would not include the authority to retroactively rewrite the express terms of a DPA. Here, the district court purported to convert the Report into a public judicial document *after* it had approved

the DPA expressly treating the Report as a confidential executive document, *after* regulators all over the world had acted in reliance on that promise of confidentiality, and *after* the court had accepted the Report under seal.  For the court to change the terms of engagement so drastically after all that amounts to an astonishing bait-and-switch that is fundamentally unfair to the parties, vastly exceeds the court's authority, and would inflict unjustified harm on HSBC and its customers.

II.    Even if the Report were considered a judicial document, it would not be subject to a First Amendment right of access.  The First Amendment provides a rebuttable presumption of public access only to documents that "have historically been open to the press and general public" where "public access plays a significant positive role in the functioning of the particular process in question."  *Newsday LLC v. Cty. of Nassau*, 730 F.3d 156, 164 (2d Cir. 2013).  But documents related solely to the exercise of prosecutorial discretion have historically been *shielded* from public disclosure, not subject to it, and the same is true of documents provided to regulators for purposes of bank examination and supervision.

Even if there were a *presumption* of public access to the Report, powerful public policy concerns and "higher values" would require maintaining the confidentiality of the Report consistent with the express terms of the DPA.  *Id.* at 165.  Breaking the DPA's promise of confidentiality would undermine cooperation with the Monitor, disrupt HSBC's continued progress toward improving its anti-

money-laundering and sanctions controls, and damage HSBC's business by exposing highly sensitive customer and financial information. Releasing the Report would also provide a road map for criminals by revealing HSBC's enforcement protocols (and ways to evade them), thereby harming HSBC and exacerbating the very problems the DPA was intended to solve.

**III.**    In the alternative, this Court should grant mandamus. HSBC's right to relief is clear and indisputable for the same reasons that support vacatur on appeal. And the other conditions for mandamus are readily satisfied. If this Court does not exercise appellate jurisdiction, HSBC will have no other adequate means to attain relief because the damage done by releasing confidential information cannot be undone through a future appeal. And mandamus is appropriate under the circumstances given the novelty of the district court's ruling, its threat to the separation of powers, and the far-reaching consequences of releasing sensitive information that all interested parties had expressly agreed to keep confidential.

## STANDARD OF REVIEW

The district court's determination that the Report is a judicial document is a legal determination this Court reviews *de novo. See Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016). "In reviewing a district court's order to seal or unseal," this Court "examine[s] the [district] court's factual findings for clear error, its legal determinations de novo, and its ultimate decision to

seal or unseal for abuse of discretion." *Id.* To the extent the case "turns on constitutional issues," this Court's "review is *de novo*." *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 271 (2d Cir. 2010).

## ARGUMENT

**I.** **The Report Is Not A "Judicial Document" For Purposes Of The First Amendment Public Access Doctrine.**

The district court's order releasing the Report depends on a threshold determination that the Report is a "judicial document" for purposes of the public access doctrine. SPA4; *Bernstein*, 814 F.3d at 139. It is not. To the contrary, the Report is an expressly "non-public" executive document that is not relevant to the performance of any judicial function within the district court's authority.

### A. The Report Is a Confidential Executive Document.

#### 1. The Report's origins and function demonstrate its confidential executive character.

By its terms and function, the Report is manifestly a confidential executive document, not a judicial document. The DPA expressly designates the Monitor's reports as "non-public," and for good reason: the Report contains an abundance of "proprietary, financial, confidential, and competitive business information" that has traditionally been, and is intended to be, kept secret for the benefit of banks, customers, and regulators alike. JA103. Indeed, the confidentiality provision was a necessary "condition of HSBC's agreement to the DPA." JA220.

26

The Report is also an inherently *executive* document. It was created by a Monitor selected in the "sole discretion" of the Justice Department with no involvement from the court. JA45. And the Report's express function—indeed, its *only* function—is to inform the executive branch's exercise of its "sole discretion" to determine whether HSBC has complied with the DPA and, accordingly, whether to continue deferring the prosecution and ultimately dismiss the charges or instead seek a criminal conviction of HSBC. JA47.

The Report thus owes its existence to and informs the executive's "exclusive authority to decide whether to prosecute." *United States v. Huerta*, 878 F.2d 89, 92 (2d Cir. 1989). That exclusive authority flows from the executive's Article II power and duty to "take Care that the Laws be faithfully executed," and includes both the "exclusive right to choose which charges to levy against a defendant" and the decision "not to prosecute." *Citigroup*, 752 F.3d at 297; *see United States v. Armstrong*, 517 U.S. 456, 464 (1996). Of particular importance here, the executive's exclusive prosecutorial discretion encompasses authority to decide "whether to dismiss charges once brought." *Fokker*, 818 F.3d at 737.

As an exclusive executive power, the decision whether to initiate or maintain a prosecution is "virtually unreviewable by a court." *Holley v. Lavine*, 553 F.2d 845, 850 (2d Cir. 1977). Apart from a challenge under a constitutional provision such as the Equal Protection Clause, the decision to press or dismiss charges "rests squarely

with the" prosecutor. *Citigroup*, 752 F.3d at 296. And rightly so. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *United States v. Bonnet-Grullon*, 212 F.3d 692, 701 (2d Cir. 2000). Requiring courts to review such decisions would place judges in the "undesirable and injudicious posture of becoming 'superprosecutors.'" *Inmates of Attica Corr. Facility v. Rockefeller*, 477 F.2d 375, 380 (2d Cir. 1973).

The executive's exclusive prosecutorial discretion necessarily includes control over documents that inform that discretion. As this Court has explained, neither a court nor the public has the right or authority to probe "the prosecutor's file" to assess the government's decision to start or stop a prosecution. *Inmates of Attica*, 477 F.2d at 380. "How the United States reaches its litigating positions, who said what to whom within the prosecutor's office, and so on, are for the Attorney General and the President to evaluate." *In re United States*, 398 F.3d 615, 618 (7th Cir. 2005). Hence, "memoranda and discussions within the Executive Branch leading up to the formulation of an official position," such as whether to press or drop charges, are executive documents shielded from public disclosure. *United States v. Zingsheim*, 384 F.3d 867, 872 (7th Cir. 2004); *see In re United States*, 503 F.3d 638, 641 (7th Cir. 2007); *In re United States*, 398 F.3d at 618.

The Report falls comfortably within that category of confidential executive documents. The monitorship of HSBC and, in turn, the Monitor's Report, exist only because the *Justice Department* decided to make them necessary conditions of the DPA. This was a paradigmatic exercise of the executive's "discretionary authority" to defer prosecution "on a particular set of terms." *Citigroup*, 752 F.3d at 295. Moreover, the Report's express function is to inform the Department's ongoing exercise of its "sole discretion" whether to pursue or dismiss the criminal charges against HSBC. JA47. The DPA makes the Report "non-public" precisely because public access would impede core executive functions; "public disclosure … could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the Monitorship." JA103-04. Designation of the Report as "non-public" also reflects an executive determination about the United States' relations with foreign sovereigns and foreign regulators, a quintessentially executive function. *See Can v. United States*, 14 F.3d 160, 163 (2d Cir. 1994).

Those executive determinations are simply not "susceptible to the kind of analysis the courts are competent to undertake." *Bonnet-Grullon*, 212 F.3d at 701. The Report is no more a "judicial document" presumptively subject to public release than an internal Justice Department memorandum about whether to prosecute HSBC or any other "traditionally nonpublic government information." *N.Y. Times v. Dep't of Justice*, 806 F.3d 682, 688 (2d Cir. 2015).

2. **Neither the filing of the DPA nor the filing of the Report under seal pursuant to court order deprived the Report of its confidential executive character.**

In deeming the Report a judicial document, the district court relied heavily on the government's decision to file the DPA in court. SPA4-6, 10, 12; *see* JA154 ("By placing a criminal matter on the docket of a federal court, the parties have subjected their DPA to the legitimate exercise of that court's authority."). But neither the filing of the DPA, nor the filing of the Report under seal in response to a court order, transformed the Report from a confidential executive document into a public judicial document.

a. As an initial matter, the government's decision to file *the DPA* in support of its motion to exclude time under the Speedy Trial Act cannot implicate the status of *the Report*, which did not even exist at the time the DPA was filed. *See SEC v. AIG*, 712 F.3d 1, 4 (D.C. Cir. 2013). Every lawsuit begins with the filing of a complaint and related documents, but that does not mean that every document "generated in federal litigation" after the filing of the complaint becomes a public judicial document. *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) (*Amodeo II*). "Unlimited access to every item turned up in the course of litigation would be unthinkable." *Id.*

Indeed, the district court's logic would transform every internal executive branch document prepared after the filing of the indictment or criminal complaint

into a public judicial document.  But "there is no tradition of access to criminal discovery," *United States v. Kravetz*, 706 F.3d 47, 54 (1st Cir. 2013), and courts have repeatedly rejected requests for public access to "the prosecutor's file" out of respect for prosecutorial discretion and separation of powers, *Inmates of Attica*, 477 F.2d at 380; *see In re United States*, 503 F.3d at 641.  Similarly, this Court has recognized that documents "passed between the parties in discovery" are presumptively not judicial documents. *Bernstein*, 814 F.3d at 142 (quoting *Amodeo II*, 71 F.3d at 1050).

The government's filing of the Report in response to a court order does not change the equation.  It is well-settled that "the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access." *Bernstein*, 814 F.3d at 140 n.3.  For example, a privileged or classified document filed for a court's *in camera* review does not automatically become a "judicial document" once it passes through the chambers door.  *See N.Y. Times*, 806 F.3d at 688; *United States v. Aref*, 533 F.3d 72, 81-82 (2d Cir. 2008).

Nor does a court's "request for confidential information" transform a non-judicial document into a judicial document—even if the parties comply with the request (as parties facing a court order understandably tend to do).  *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 143 n.8 (2d Cir. 2004).  Allowing a court to create a judicial document simply by demanding it from a party would have a "troubling element of bootstrapping." *Id.*; *see Newsday*, 730 F.3d at 167.  And that is doubly

true when the parties file the document in court *under seal*, as the government did and the district court initially permitted here. *See Gambale*, 377 F.3d at 143 n.8 ("strong presumption" against public access to documents filed under seal); *TheStreet.com*, 273 F.3d at 231 (same). The concern about judicial bootstrapping reaches its apex when, as here, the court demands a document that rightly belongs to the executive branch. Such an overreach is not only an abuse of discretion, but a separation of powers violation and grounds for mandamus. *In re United States*, 503 F.3d at 641, 643; *In re United States*, 398 F.3d at 618, 620.

**b.** A judicial order granting public access to an executive document is not only an invasion of the executive's prerogative, but also of the legislature's. Congress has enacted a highly reticulated statutory scheme that regulates access to executive documents, the Freedom of Information Act (FOIA), which generally requires federal agencies to disclose records, subject to exemptions established by Congress. 5 U.S.C. §552(b). As a means for the public to access executive documents, "FOIA has displaced the common law right" of public access. *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 936 (D.C. Cir. 2003).

Given the Report's confidential nature and underlying law-enforcement and deliberative purposes, its disclosure would be protected by multiple FOIA exemptions. *See* 5 U.S.C. §552(b)(5) (inter- or intra-agency letters or memoranda), §552(b)(7) (certain records or information "compiled for law enforcement

purposes"), §552(b)(8) (certain "reports prepared … for the use of an agency responsible for the regulation or supervision of financial institutions"); *see also Rockwell Int'l Corp. v. Dep't of Justice*, 235 F.3d 598, 604-07 (D.C. Cir. 2001) (withholding intra-Justice Department memoranda evaluating plea negotiation strategies); *100Reporters LLC v. Dep't of Justice*, 307 F.R.D. 269, 277 (D.D.C. 2014) (discussing FOIA exemptions that may apply to report compiled by corporate compliance monitor). A district court may not supplant or circumvent that statutory regime by demanding a confidential and FOIA-exempt executive branch document and then re-branding it a presumptively-public judicial document.

For example, in *United States v. El-Sayegh*, 131 F.3d 158 (D.C. Cir. 1997), the government and a criminal defendant submitted a proposed plea agreement to the district court under seal. Before the court issued any decision on the agreement, the plea bargain negotiations broke down and the agreement was withdrawn. The district court nevertheless deemed the agreement a judicial document and granted a third party's motion to unseal it. The D.C. Circuit reversed. Noting that "[t]he only judicial act related to this document is the district court's determination to release it," the court concluded that the agreement did not constitute a "judicial document" subject to a First Amendment right of access. *Id.* at 162. Instead, the "appropriate device" to pursue public access to the agreement was "a Freedom of Information Act request addressed to the relevant agency." *Id.* at 163.

Just so here.  The Monitor's Report is a confidential executive document that exists solely to inform the Justice Department's exclusive exercise of prosecutorial discretion.  *See supra* pp. 26-29.  That document did not—and could not—become a judicial document simply because the district court insisted upon seeing it and the parties complied with the court's order.

## B. The Report Is Not Relevant to the Performance of any Judicial Function Within the District Court's Authority.

For all the reasons set forth above, the Report is a confidential executive document that cannot be transformed into a presumptively-public judicial document merely because the district court demanded that it be filed with the court.  This Court can and should vacate the district court's orders on that basis alone.  But even if this Court evaluates the Report under the test for documents filed by the parties in the ordinary course of litigation, the Report plainly does not constitute a "judicial document" for purposes of the First Amendment public access doctrine.

A document filed in court is a "judicial document" presumptively subject to public access only if it is "relevant to the performance of the judicial function and useful in the judicial process."  SPA4; *United States v. Erie Cty.*, 763 F.3d 235, 239 (2d Cir. 2014).  The Report, however, was not "relevant to the performance" of any judicial function that the district court had authority to perform.  Indeed, the only relevant judicial function—consideration of the motion to exclude time under the Speedy Trial Act—was discharged long before the Report came into existence.

34

**1.** The district court first concluded that the Report was "relevant to the performance" of the court's "continued monitoring of [the DPA's] execution and implementation," a judicial function that in the court's view arose from the government's decision to place "a pending criminal case" on the court's docket. SPA5, 6. But a unanimous panel of the D.C. Circuit recently rejected an identical argument. As that court explained, "although charges remain pending on the court's docket under a DPA, the court *plays no role in monitoring the defendant's compliance with the DPA's conditions*." *Fokker*, 818 F.3d at 744 (emphasis added). "Rather, the prosecution—and the prosecution alone—monitors a defendant's compliance with the agreement's conditions and determines whether the defendant's conduct warrants dismissal of the pending charges." *Id*.

*Fokker* makes clear that the district court fundamentally misperceived its role in the proceedings below. Congress approved the use of DPAs via the Speedy Trial Act and gave district courts the narrow charge of ensuring that a DPA is "for the purpose of allowing the defendant to demonstrate his good conduct" before suspending the speedy trial clock. 18 U.S.C. §3161(h)(2). The district court correctly recognized that this provision requires courts to consider "whether a [DPA] is truly about diversion and not simply a vehicle for fending off a looming trial date." JA150; *accord Fokker*, 818 F.3d at 744. Because it found that "[t]he DPA … here is, without a doubt, about diverting HSBC from criminal prosecution," the district

35

court properly did not attempt to invoke §3161(h)(2) as authority for its continued monitoring of the DPA.  JA150.[5]

**2.**    With the Speedy Trial Act off the table, the district court's sole remaining basis for treating the Report as a judicial document was its concededly "novel" conception of supervisory power, JA154, but that rationale fails for several reasons.

Supervisory power, because of its "very potency," "must be exercised with restraint and discretion."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).  More specifically, a court's supervisory power "does not include the power to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure" or applicable statutes.  *Carlisle v. United States*, 517 U.S. 416, 426 (1996); *see Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).  But that is just what the district court did here.  By the court's own admission, the Speedy Trial Act—the only statutory provision that specifically addresses DPAs—provides for limited

---

[5] The only other federal statute or rule that even arguably provides a district court with authority over DPAs is Rule 48(a) of the Federal Rules of Criminal Procedure, which requires the prosecutor to obtain "leave of court" before dismissing charges, as may (or may not) occur at the end of a DPA's prescribed period.  But any assertion of judicial authority based on a *hypothetical* future Rule 48 motion is plainly premature at this stage of the proceedings.  Indeed, the district court acknowledged that Rule 48 might only be relevant to the "*future* resolution of the case…. *if* the government chooses to dismiss this case."  SPA6-7 (emphases added).  The "concept of a judicial [document] 'assumes a judicial decision,' and with no such decision, there is 'nothing judicial to record'" and thus no judicial document subject to public access.  *AIG*, 712 F.3d at 3.

judicial review and no continued monitoring.  Tellingly, the D.C. Circuit in *Fokker* did not even consider the supervisory power as a basis for judicial authority over DPAs once it concluded that the Speedy Trial Act does not permit a court to play any "role in monitoring the defendant's compliance with the DPA's conditions." *Fokker*, 818 F.3d at 744.  The court reached that holding even though the *Fokker* district court relied heavily on "supervisory power" and, indeed, cited the district court's approach in this case as its model.  *See United States v. Fokker Servs. B.V.*, 79 F. Supp. 3d 160, 165-66 (D.D.C. 2015) (citing and quoting JA150).

The district court's assertion of supervisory power over the executive's exercise of prosecutorial discretion is also irreconcilable with this Court's admonition that "the federal judiciary's supervisory power[] over prosecutorial activities that take place outside the courthouse is extremely limited, if it exists at all." *United States v. Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir. 1983); *see In re United States*, 503 F.3d at 641 ("a judicial effort to supervise the process of reaching a decision [in a criminal prosecution] intrudes impermissibly into the activities of the Executive Branch of government").  The decision below is reminiscent not only of the decision unanimously vacated by the D.C. Circuit in *Fokker*, but also of the decision unanimously vacated by this Court in *Citigroup*.  Just as the district court here asserted broad supervisory power to avoid being an "instrument[] of law enforcement," JA152, 154, the district court in *Citigroup* insisted upon broad review

of an SEC settlement to avoid serving as "a tool to enforce an agreement that is unfair, unreasonable, inadequate, or in contravention of the public interest." *SEC v. Citigroup Glob. Mkts. Inc.*, 827 F. Supp. 2d 328, 332 (S.D.N.Y. 2011). This Court held that the district court had abused its discretion by "infring[ing] on the S.E.C.'s discretionary authority to settle on a particular set of terms" and improperly inserting itself into "assessments [that] are uniquely for the litigants to make." *Citigroup*, 752 F.3d at 295.

This case follows *a fortiori* from *Citigroup*. There, the district court was considering a motion to enter a consent decree pursuant to its well-established equitable power to ensure that the agreement was "fair and reasonable." *Id.* at 294. Here, by contrast, the district court relied on a concededly "novel" exercise of supervisory power to engage in an unprecedented form of judicial monitoring of DPAs. The district court's holding that the Report is a judicial document because it is "relevant to the performance of the judicial function" of "continued monitoring of [the DPA's] execution and implementation," SPA4-5, is thus even less defensible than the decision reversed in *Citigroup*. Simply put, what the district court identified as the judicial function "is not the judicial function," and so the Report is not a judicial document. *El-Sayegh*, 131 F.3d at 163.

**3.** Finally, the district court purported to rely on this Court's First Amendment public access cases, but those cases provide no support for its approach.

None of those decisions addressed documents prepared to assist the executive branch in exercising its "sole discretion" over whether to prosecute a criminal case. JA32, 47. Nor did they involve documents filed only at the behest of the court itself. In *Amodeo I*, for example, the document in question was a report prepared by a *court officer* appointed pursuant to a consent decree who was "vested with the powers of a Receiver" and thus subject to discharge at the court's discretion. 44 F.3d at 146. The "Consent Decree itself [made] the reports and exhibits filed by the Court Officer relevant to the performance of the judicial function" because the decree permitted the officer "to apply [to the court] for necessary and appropriate assistance to execute her powers." *Id.*

Similarly, in *Erie County*, the contested document was a compliance report prepared pursuant to a consent decree in a civil case between two public institutions. The district court had express statutory authority to review and approve the decree under the Prison Litigation Reform Act, 18 U.S.C. §3626(a)(1)(A). Moreover, the decree itself explicitly provided that the compliance reports "were … to be filed with the District Court," and allowed "either party to move to reopen the case at any time 'should issues requiring the Court's intervention arise.'" *Erie Cty.*, 763 F.3d at 237. Accordingly, the "compliance reports would form the record for any appropriate enforcement action before the District Court." *Id.* The district court also retained

the power to "reinstat[e] the civil proceedings *sua sponte*" if it believed the substance of the dismissal order was not being fulfilled. *Id.* at 240.

Here, in contrast, the DPA contemplates no judicial supervisory role in implementing the agreement, does not empower the Monitor to seek assistance from the court, does not permit the parties to solicit the court's intervention, and certainly does not allow the court to reinstate criminal charges *sua sponte* if it concludes that HSBC has not complied with the agreement. To the contrary, the DPA expressly vests the Justice Department with "sole discretion" to make prosecutorial decisions based on confidential reports from the Monitor.

* * *

To be sure, reasonable minds can differ over whether courts should play a more active role in supervising the implementation of DPAs—just as reasonable minds can differ over whether courts should play a greater role in reviewing SEC consent decrees. As noted, Congress has considered (and, to date, rejected) legislation that would grant courts broader supervisory powers over DPAs generally and authority to receive monitor reports prepared pursuant to DPAs specifically. *See supra* p. 10. But this only underscores that district courts lack such authority under the law as it currently stands. Indeed, even supporters of greater judicial oversight have recognized that "[i]f Congress intended to provide for supervision over" DPAs "it could pass a statute to that effect." Brandon L. Garrett, *Structural Reform*

*Prosecution*, 93 Va. L. Rev. 853, 926 (2007).  Unless and until Congress directs

otherwise, district courts "play[] no role in monitoring the defendant's compliance

with the DPA's conditions," *Fokker*, 818 F.3d at 744, and the district court here was

plainly wrong to invoke a purported oversight role in deeming the Report to be a

judicial document.

### C.     At the Very Least, a Court Has No Power to Retroactively Alter the Terms of a DPA It Has Already Approved.

Even if a district court could properly exercise some degree of supervisory

authority over the implementation of a DPA, and even if that authority could include

the power to insist on the disclosure of an otherwise-confidential executive

document, the power asserted here—the power to retroactively alter fundamental

terms of the DPA in a manner that frustrates the expectations of the parties and

foreign authorities after the district court had already *approved* those terms—would

be a bridge too far.

At its core, the DPA "is a contract" between the government and HSBC.

*Hicks*, 693 F.2d at 33.  It must accordingly be enforced consistent with basic

principles of contract law.  *See United States v. Gogarty*, 533 F.2d 93, 95 (2d Cir.

1976); *United States v. Garcia*, 519 F.2d 1343, 1345 (9th Cir. 1975); *cf. City of

Hartford v. Chase*, 942 F.2d 130, 134 (2d Cir. 1991) (enforcing confidentiality order

in court-approved settlement "according to general principles of contract law").  The

DPA expressly states in no uncertain terms that the Monitor's "reports and the

contents thereof *are intended to remain and shall remain non-public*." JA104 (emphasis added). This confidentiality provision was not just an afterthought but was a necessary condition of HSBC's agreement to the DPA. JA220. The DPA also specifies where the Monitor's reports are to be sent—to HSBC, the Justice Department, and two financial regulators—and neither the court nor the general public is on that list. JA99.

The district court's order that the Report be made public manifestly contradicts both of those provisions. Needless to say, public release of the Report (even with redactions) is inconsistent with the DPA's provisions making the Report "non-public" and confining its distribution to HSBC and certain government agencies. Even assuming the district court had some degree of authority to supervise the implementation of the DPA, the *agreement itself* must still "be construed as … written." *Citigroup*, 752 F.3d at 295; *see Chase*, 942 F.2d at 135.

The district court's abrogation of the clear terms of the DPA is even more egregious given that the court had previously reviewed *and approved* the agreement as written. In doing so, the court never suggested that it took issue with the DPA's confidentiality provisions, nor did it suggest that the court or the public would have access to the Monitor's reports. Indeed, the district court prescribed a *different* mechanism to exercise oversight of the DPA, directing the parties "to file quarterly reports with the Court to keep it apprised of all significant developments in the

implementation of the DPA." JA164. Having approved the agreement without altering its confidentiality provisions, the court was bound to enforce them. As this Court has explained, a district court has "[t]he clearest obligation … to enforce" a confidentiality provision in an agreement "that it has approved." *Geller v. Branic Int'l Realty Corp.*, 212 F.3d 734, 737 (2d Cir. 2000) (reversing district court for unsealing document that approved agreement designated as confidential); *see Chase*, 942 F.2d at 134-35 (same).

The district court's obligation to enforce the DPA's confidentiality provisions as written is especially clear in light of the substantial reliance interests generated by those provisions. *See Geller*, 212 F.3d at 738; *Chase*, 942 F.2d at 138 (Pratt, C.J., concurring). The court's approval of the DPA set into motion vast disclosures of highly sensitive banking and customer information by HSBC and its global affiliates to the Monitor, all predicated on a promise of strict confidentiality. *See supra* pp. 16-18.

The district court's only response to the DPA's express confidentiality provision and the worldwide reliance interests it generated was a footnote stating that it was "not swayed by the fact that the parties did not contemplate that the Report would be filed with the Court." SPA5 n.5. The court cited *Amodeo I*, in which the court officer who prepared a report regarding compliance with a consent decree "averred that she never intended that the public have access to the confidential status

reports." 44 F.3d at 144. But the express upfront assurances of confidentiality here have no parallel in *Amodeo I*, which is wholly inapposite. The parties there had no agreement that the reports would be confidential, let alone a confidentiality agreement expressly "approved" by the district court. Indeed, the consent decree at issue in *Amodeo I* did not even mention reports. *See id.* at 143. Moreover, the report was prepared by a *court officer*, not a monitor selected by a prosecutor, so the powerful separation of powers concerns implicated by this case were wholly absent there.

In sum, even if a court were to have some authority to "supervise" a DPA, it would not include the power to induce the Justice Department, a private defendant, and multiple foreign regulatory agencies to engage in a course of conduct predicated on confidentiality, only to retroactively change the rules and convert confidential executive records into presumptively-public judicial documents. "The deal … actually struck leaves matters to the prosecutor's discretion," and "judges must respect the agreement that the parties have reached." *In re United States*, 503 F.3d at 643. The district court's orders abrogating the DPA's confidentiality requirements were a fundamentally unfair bait-and-switch that would upset significant reliance interests, inflict unjustified harms on HSBC and its customers, and far exceed any proper supervisory power of the court.

## II. Even If The Report Were A Judicial Document, History, Public Policy, And Higher Values Counsel In Favor Of Maintaining It Under Seal.

Even if the Report were a judicial document, it should nonetheless be maintained under seal. The First Amendment's rebuttable presumption of public access applies only where "experience" and "logic" support making the document public. *Erie Cty.*, 763 F.3d at 239. That is, the presumption applies to documents that have "historically been open to the press and general public" (experience) and for which "public access plays a significant positive role in the functioning of the particular process in question" (logic). *In re N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials*, 577 F.3d 401, 409 (2d Cir. 2009); *see id.* at 410 (both "experience" and "logic" prongs must be satisfied to support First Amendment right of access).[6] And, even then, a judicial document must remain confidential if "sealing is necessary to preserve higher values." *Newsday*, 730 F.3d at 165.

All of those considerations counsel strongly in favor of maintaining the confidentiality of the Report. Documents like the Report, designed to inform the exercise of prosecutorial discretion, have historically been *shielded* from public disclosure, not subject to it. So too have documents prepared to facilitate bank

---

[6] The district court addressed only the First Amendment presumption of public access, and did not address the common law presumption of public access. SPA7. But the First Amendment presumption is "stronger and can only be overcome under more stringent circumstances than the common law presumption." *Erie Cty.*, 763 F.3d at 241. Thus, if this Court holds that there is no First Amendment right of access to the Report, then *a fortiori* there would be no common law right of access.

examination and supervision. Moreover, strong public policy reasons support

maintaining the Report under seal. Disclosure of its contents (even in redacted form)

would jeopardize the implementation of this DPA and future DPAs by, among other

things, chilling cooperation with foreign financial regulators and employees of

HSBC's foreign affiliates. Disclosing the Report would also harm HSBC's business

by exposing confidential information and giving criminals and terrorist financiers a

road map to exploit weaknesses in HSBC's compliance programs—precisely the

kind of "higher values" that this Court has found sufficient to justify maintaining a

document under seal, *see Aref*, 533 F.3d at 82.

A. **Documents Regarding the Executive's Exercise of Prosecutorial Discretion and Supervision of the Banking Sector Have Not Historically Been Open to the Public.**

**1.** The district court conceded, with considerable understatement, that

"there is scant historical evidence of public access to documents in the precise

posture of the Monitor's Report at issue here." SPA8. In fact, there is no precedent

whatsoever for treating compliance reports arising out of a DPA—let alone a DPA

that expressly designates such reports as "non-public"—as presumptively-public

documents. To the extent any historical practice is relevant here, it counsels in favor

of *maintaining* the confidentiality of the Monitor's Report. The Report was prepared

as part of negotiations between the Justice Department and HSBC over a resolution

of criminal charges, and is designed to inform the Department's continued exercise

of prosecutorial discretion. Such documents have historically been shielded from public view, and there is no persuasive reason for treating the Report any differently.

Courts have long rejected requests for public access to "the prosecutor's file" out of respect for prosecutorial discretion and the separation of powers. *See Inmates of Attica*, 477 F.2d at 380; *In re United States*, 503 F.3d at 641. The decision "whether or not to prosecute" generally rests "entirely in [the prosecutor's] discretion," and documents concerning that decision are not presumptively public or discoverable. *Armstrong*, 517 U.S. at 464; *see*, *e.g.*, *United States v. Feliciano*, 998 F. Supp. 166, 175-76 (D. Conn. 1998) (refusing discovery request for "[a]ll information and factors on which the government based its decision" to pursue "federal, as opposed to state, prosecution" because that was "entirely a matter of prosecutorial discretion"). Indeed, even *court proceedings* related to charging decisions are routinely kept secret. For example, "the proper functioning of our grand jury system depends upon [] secrecy" because if grand jury proceedings became public, "prospective witnesses may be deterred from testifying, those who do testify may be less likely to do so truthfully, targets of investigations may flee, and persons who are the subject of an ultimately meritless investigation may face public embarrassment." *United States v. Haller*, 837 F.2d 84, 87-88 (2d Cir. 1988); *see* Fed. R. Crim. P. 6(e)(2).

Far from there being a demonstrable history of public access to information about a prosecutor's exercise of discretion, a party seeking such information must overcome a demanding burden of proof. For example, to prevail on a claim of selective prosecution, a defendant must offer clear evidence of both discriminatory effect (that similarly situated individuals were not prosecuted) and discriminatory purpose (that the prosecutor took action "at least in part because of, not merely in spite of, its adverse effects upon an identifiable group"). *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003). That is a "deliberately rigorous standard," and the standard for seeking discovery on a selective prosecution claim is "correspondingly rigorous." *Id.* Courts impose that demanding standard to avoid "unnecessarily impair[ing] the performance of a core executive constitutional function" by "[e]xamining the basis of a prosecution." *Armstrong*, 517 U.S. at 465.

Federal Rule of Criminal Procedure 16 similarly undermines any suggestion that documents like the Report have been subject to a presumption of public access. Rule 16 lists documents that both the government and the defendant must disclose upon a request from the other side. The defendant, however, is not entitled to "the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in

connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2).[7]
Those protections would be meaningless if any interested citizen could presumptively obtain such documents under the First Amendment public access doctrine.

The district court asserted that "history" supports release of the Report because the DPA was analogous to "a plea agreement or a trial," two things to which the public has historically been granted a right of access. SPA8. But the court ignored significant and dispositive differences between the Report and a plea agreement or trial. Unlike a plea agreement or jury verdict, the Report does not embody any *final* agreement between the government and HSBC regarding the resolution of the criminal charges. Instead, the Report is a purely interim document, designed to move the parties toward a final resolution *if* HSBC complies with the DPA's terms to the government's satisfaction. At most, the Report is akin to an *unconsummated* plea agreement, which is not a presumptively-public judicial document. *See El-Sayegh*, 131 F.3d at 162. In all events, the far better analogies are internal memoranda informing an exercise of prosecutorial discretion, which have long been shielded from public view.

---

[7] That protection runs both ways. The government is also not entitled to "reports, memoranda, or other documents made by the defendant, or the defendant's attorney or agent, during the case's investigation or defense." Fed. R. Crim. P. 16(b)(2)(A).

**2.**     Historical practice also cuts in favor of maintaining the confidentiality of the Report because it is analogous to bank supervisory and examination reports prepared by regulators to supervise compliance and assess potential weaknesses. Courts "have long recognized that the report of a bank examiner is protected by a qualified privilege." *In re Subpoena Served Upon Comptroller of Currency*, 967 F.2d 630, 633 (D.C. Cir. 1992); *see Bank of America Nat'l Trust & Sav. Ass'n v. Douglas*, 105 F.2d 100, 103 (D.C. Cir. 1939) ("by unbroken custom reports of bank examiners have been regarded as privileged"). That privilege is rooted in "practical necessity," because the "success of the [regulatory] supervision … depends vitally upon the quality of communication between the regulated banking firm and the bank regulatory agency." *In re Subpoena*, 967 F.2d at 633.

The Report closely resembles bank supervisory documents that have historically been protected from disclosure by the bank examination privilege as well as a number of federal statutes and regulations. *See*, *e.g.*, 31 U.S.C. §5318(g) and 12 C.F.R. §21.11(k) (requiring non-disclosure of suspicious transaction reports); 12 C.F.R. §261.2(c)(1)(iii) (defining "[c]onfidential supervisory information" to include documents prepared for Federal Reserve Board's use); 12 C.F.R. §4.32(b) (Comptroller of Currency may not release "[n]on-public" information, including records compiled for enforcement purposes). That historical practice is particularly noteworthy here given that the Monitor's Reports are used not only to ensure

compliance with the DPA but also to oversee HSBC's compliance with a Direction issued by the United Kingdom's FCA and to inform the Federal Reserve's supervision of HSBC.  JA201.

> **B.** **Logic, Public Policy, and Higher Values Counsel Against Publicizing the Report.**

**1.** In addition to the total absence of historical precedent for treating documents like the Report as public, public access would not "play[] a significant positive role in the functioning of the particular process in question."  *In re N.Y. Times*, 577 F.3d at 409.  To the contrary, logic, public policy, and "higher values" counsel strongly in favor of maintaining the confidentiality of the Report consistent with the express terms of the DPA.  *See Newsday*, 730 F.3d at 165 (presumption of public access can be overcome if "sealing is necessary to preserve higher values").

Disclosure of the Report would harm HSBC's business and financial interests by exposing "highly sensitive information" regarding HSBC's "customers, employees, operations, and business," all of which HSBC has treated as "strictly confidential."  JA218-19.  Where disclosure would subject a business to "financial harm," the interest in "protecting confidential business information outweighs the qualified First Amendment presumption of public access."  *Standard Inv. Chartered, Inc. v. Fin. Indus. Regulatory Auth.*, 347 F. App'x 615, 617 (2d Cir. 2009).  Indeed, the need for strict confidentiality of banks' customer and financial information is underscored by the well-established common law and statutory protections for bank

examination and supervisory documents, which have long been protected from disclosure.  *See supra* p. 50.

Publicizing the Report would also hinder the implementation of the DPA by making HSBC employees less willing to share confidential business and customer information with the Monitor.  JA205-06.  Open communication between the Monitor and HSBC employees is critical to the success of the DPA because it supplies the Monitor with the information needed to identify any ongoing shortcomings in HSBC's anti-money-laundering and sanctions compliance programs.  *Id*.  Any chilling of those communications could affect not only HSBC's compliance with the DPA, but also the FCA Direction and the separate, but related, review conducted annually by the Monitor for the Federal Reserve.  Both of those regulators rely on the Monitor's reports to evaluate the integrity of HSBC's anti-money laundering and sanctions compliance programs.  JA202, 208.

Indeed, publicizing the Report would give criminals a road map to exploit any deficiencies in HSBC's compliance programs, and potentially those of other financial institutions as well.  *See* JA205.  Information about *weaknesses* in HSBC's compliance programs may be useful in the hands of HSBC, the Justice Department, and financial regulators, but it is downright dangerous in the hands of criminals.  Disclosing that information "may enable money launderers and those attempting to evade sanctions controls to target and further exploit HSBC in order to facilitate

increased levels of illegal activity," thereby undermining the very public interests that the DPA was designed to protect. JA212.

Finally, granting public access to the Report would severely undermine the confidentiality interests of foreign regulators who cooperated with the Monitor based on an understanding that the Report would remain confidential. The Monitor himself has emphasized that the "presumption of confidentiality" attached to the Report was "a critical component in obtaining foreign regulators' agreement to access confidential client information and to rely on it in preparing [the] reports." JA201. Because of that promise of confidentiality, publicizing the Report "could trigger action by regulators that would negatively impact [the Monitor's] work." JA202. Both the Federal Reserve and the UK's Financial Conduct Authority have echoed those same concerns. *See* JA205, 211-12. And one foreign regulator that has cooperated with the Monitor, the Central Bank of Malaysia, has specifically stated that it "granted approval for the Monitor's access to confidential information" based on the assurance "that the information obtained and the findings made by the [ ] Monitor would be treated with utmost confidentiality." JA216.

**2.** The district court provided only a single justification for why "logic" supports disclosure: that it was "appropriate and desirable for the public to be interested and informed" about the DPA's progress and about "whether [the court is] doing [its] job of monitoring the execution and implementation of that arrangement."

SPA10. But that is just another version of the district court's impermissible bootstrapping, and does not remotely support a First Amendment presumption of access. As explained above, the district court *had no proper ongoing role* in "monitoring the execution and implementation" of the DPA. *See supra* pp. 34-41; *Fokker*, 818 F.3d at 744.

Moreover, the public *always* has a generalized interest in being "informed" about the status of criminal investigations, yet that hardly justifies access to information about the exercise of prosecutorial discretion. The amorphous justifications proffered by the district court cannot outweigh the powerful policy interests that support maintaining the Report under seal. *See In re N.Y. Times*, 577 F.3d at 410 (public's interest in monitoring government use of wiretaps not more compelling than Congress' preferred policy of "favoring confidentiality and privacy").

The district court purported to address concerns about unsealing the Report by promising to redact "identifying information about HSBC employees" and information that criminals could use to "exploit HSBC" (with the court retaining unilateral discretion to decide what information to redact). SPA11-12. But that is plainly insufficient to protect the weighty confidentiality interests at stake. *See Aref*, 533 F.3d at 82 (Court was "satisfie[d]" that complete "closure" was "narrowly tailored to protect national security"). The Federal Reserve, for example, has warned

that "public disclosure of *all or any portion of* the Monitor Report would seriously impair" the Monitor's "ability to efficiently and effectively carry out his various responsibilities." JA204 (emphasis added). And the Monitor himself (supported by the FCA) has emphasized that a redacted Report would be of little value to the public because the necessary redactions would be so extensive as to render the Report unintelligible in key parts. JA202, 212. Financial institutions simply cannot turn over highly sensitive information with complete uncertainty as to whether it may ultimately be placed in the public domain, based on the mere hope that a court might strike the right balance in its unilateral redaction decisions.

In sum, whether considered through the framework of "logic" and public policy or "higher values," the powerful confidentiality interests articulated by HSBC and government officials at home and abroad plainly justify maintaining the Report in its entirety under seal. "[D]isclosure of the information sought [in the Report] would impair identified national interests in substantial ways," *Aref*, 533 F.3d at 82, which is more than sufficient to rebut the First Amendment's presumption of public access.

## III. In The Alternative, Mandamus Is Warranted.

As explained in the Statement of Jurisdiction, this Court has appellate jurisdiction under the collateral order doctrine. If the Court declines to exercise jurisdiction on that basis, it should grant the mandamus petition that HSBC has filed

concurrently with this brief. This Court has often jointly considered appeals and mandamus petitions arising out of the same district court orders, *see supra* p. 5, and mandamus is warranted here for many of the same reasons supporting vacatur on appeal.

To grant a writ of mandamus, (1) "the party seeking issuance of the writ must have no other adequate means to attain the relief it desires"; (2) "the petitioner must demonstrate that the 'right to issuance of the writ is clear and indisputable'"; and (3) "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *In re City of New York*, 607 F.3d 923, 932-33 (2d Cir. 2010); *see Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004). All three conditions are satisfied here.

First, absent an exercise of appellate jurisdiction, HSBC would be left with "no other adequate means to attain the relief" it seeks. *Id.* at 380. The usual approach of appeal after final judgment is inadequate here for multiple reasons. As an initial matter, there is unlikely to *ever* be an appealable final judgment in this case. If the DPA runs its course as intended, the case will end in an unappealable dismissal of the criminal charges against HSBC. And even in the unlikely event that a final judgment materialized at some future point in time, an appeal following release of the Report would be meaningless because the damage from disclosure of the Report would have already been done. No future appellate victory could "unsay the

confidential information that has been revealed." *In re Sims*, 534 F.3d 117, 129 (2d Cir. 2008). This Court has thus long recognized that the first prong of the mandamus standard is readily satisfied in information-disclosure disputes. *See id.* at 129; *City of New York*, 607 F.3d at 934; *Rajaratnam*, 622 F.3d at 169-70; *In re von Bulow*, 828 F.2d 94, 99 (2d Cir. 1987).

Second, HSBC's right to relief is "clear and indisputable." *Cheney*, 542 U.S. at 381. As explained above, the district court's orders unilaterally converting a confidential executive document into a public judicial document—after approving the provisions of the DPA making the Report "non-public"—contradict settled principles of prosecutorial discretion and this Court's precedents interpreting the public access doctrine. The need for mandamus is especially compelling given that the district court's overreach "would threaten the separation of powers." *Id.*; *cf. City of New York*, 607 F.3d at 947-48 (granting mandamus where disclosure order constituted "an intrusion into the executive branch's historic control over criminal investigations").

Finally, mandamus is "appropriate under the circumstances." *Id.* at 932. Mandamus is warranted when a disclosure order presents a "novel and significant question of law … whose resolution will aid in the administration of justice." *Id.* at 939. The district court's assertion of supervisory power over the DPA is concededly "novel," JA154, and is "significant" by any measure. As explained in the numerous

submissions to the district court, breaking the DPA's express assurance of confidentiality would undermine the DPA and the monitorship, damage HSBC's business and customer relationships, create a road map for criminals to exploit weaknesses in HSBC's systems, and make foreign regulators less likely to cooperate with monitors in future cases. The end result may be not only to undermine the DPA in this case, but also to take DPAs off the table in many future cases, thereby depriving the public of "useful enforcement tools in criminal cases" that benefit the government, criminal defendants, and innocent employees and shareholders alike. Caldwell Remarks, *supra* p. 8.

# CONCLUSION

For the reasons set forth above, this Court should vacate the orders of the district court.

Respectfully submitted,

SAMUEL W. SEYMOUR
ALEXANDER J. WILLSCHER
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

JEFFREY B. WALL
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW
Washington, DC 20006
(202) 956-7500

s/Paul D. Clement
PAUL D. CLEMENT
  *Counsel of Record*
VIET D. DINH
JEFFREY M. HARRIS
MEGAN M. WOLD
CHRISTOPHER G. MICHEL
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Defendants-Appellants*

July 21, 2016

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION**

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 13,643 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font.

July 21, 2016

<u>s/Christopher G. Michel</u>
Christopher G. Michel

## CERTIFICATE OF SERVICE

I hereby certify that, on July 21, 2016, an electronic copy of the foregoing Brief for Appellant was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

<u>s/Paul D. Clement</u>
Paul D. Clement