**EXHIBIT 33**

Gcedzarh

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          15 Cr. 867 (RMB)

5  REZA ZARRAB,

6            Defendant.

7  ------------------------------x

8                                        New York, N.Y.
                                         December 14, 2016
9                                        9:39 a.m.

10 Before:

11              HON. RICHARD M. BERMAN,

12                                       District Judge

13                 APPEARANCES

14 PREET BHARARA
        United States Attorney for the
15      Southern District of New York
   BY:  MICHAEL LOCKARD
16      SID KAMARAJU
        DAVID W. DENTON, JR.
17      DEAN SOVOLOS
            Assistant United States Attorneys
18
   BRAFMAN & ASSOCIATES, P.C.
19      Attorneys for Defendant
   BY:  BENJAMIN BRAFMAN
20      JOSHUA KIRSHNER

21 KIRKLAND & ELLIS
        Attorneys for Defendant
22 BY:  VIET D. DINH

23 BANCROFT PLLC
        Attorneys for Defendant
24 BY:  EDMUND G. LACOUR, JR.

25

Gcedzarh

APPEARANCES CONTINUED

2

QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Attorneys for Defendant
BY:  CHRISTINE CHUNG

FERRARI & ASSOCIATES, P.C.
     Attorneys for Defendant
BY:  ERICH FERRARI

HARRY RIMM
     CJA counsel for the Defendant

          – also present –

Special Agent Jennifer McReynolds, FBI

Asiye Kay, Turkish Language Interpreter

George Esayan, Turkish Language Interpreter

Gcedzarh

1          THE COURT:  So this is a continuation of the <u>Curcio</u>

2     hearing which we started I believe it was on or about

3     November 30.  Let me just see if I understand where things are

4     and talk about the possible agenda for today.

5          First, let me just ask Mr. Zarrab if he is able to

6     understand these proceedings with the help of the Turkish

7     language interpreter?

8          THE DEFENDANT:  Yes.

9          THE COURT:  So a couple of items of business.  We have

10    applications from two of Mr. Zarrab's New York counsel to step

11    out of the case, and I just want to hear briefly about that.

12    Ms. Chung, among you, and also --

13          MS. CHUNG:  Your Honor, Mr. Kleinfeld isn't here

14    today.

15          THE COURT:  Mr. Kleinfeld is not here today.

16          MS. CHUNG:  He has never attended any court

17    conferences, but I am prepared to speak on our application.

18          THE COURT:  So, yes, would you just explain what's

19    going on from your perspective, and in particular I would like

20    you to address the issue about whether anything as a result of

21    your representation that is impacted by this <u>Curcio</u> hearing or

22    impacts the <u>Curcio</u> hearing, any conflicts from your firm or

23    yourself that we ought to know about.

24          MS. CHUNG:  No, your Honor.  There is no conflict

25    issue with either of the firms that are seeking to withdraw.

Gcedzarh

1    It's been a decision by Mr. Zarrab in preparing for trial and

2    for deciding on the composition of his trial team that he will

3    no longer retain the Quinn Emanuel or Clifford Chance firms,

4    and for that reason we have made our application to withdraw.

5        And the Curcio -- maybe the connection is that as your

6    Honor is considering retention issues and counsel issues, we

7    wanted your Honor to be aware of what Mr. Zarrab's plans were.

8        THE COURT:  What Mr.?

9        MS. CHUNG:  Zarrab's plans were, obviously subject to

10   the approval of the Court, but we thought it important to let

11   the Court know what Mr. Zarrab's intentions would be, subject

12   to the Court's approval.

13       THE COURT:  And, Mr. Zarrab, is that right, that you

14   wish Mr. Kleinfeld's firm and Ms. Chung's firm to step out of

15   the case at this point?

16       THE DEFENDANT:  Yes, your Honor.

17       THE COURT:  OK.  And at the same time, though, we have

18   new counsel, Mr. Ferrari, I believe, who has filed a pro hac

19   motion to be admitted.

20       Mr. Ferrari, tell us a little bit about yourself.  You

21   have a distinguished background and you work mostly I think

22   from out of Washington; is that correct?

23       MR. FERRARI:  That's correct, your Honor.  And as

24   Ms. Chung alluded to, as part of the streamlining for the

25   trial, I have handled a number of IEEPA-related prosecutions on

Gcedzarh

1   the defense side, and I would be assisting the defense team as

2   we move towards trial.

3           THE COURT:  I guess streamlining means two leave, one

4   comes in, so net one leave.  Is that the streamlining that we

5   are talking about?

6           MR. FERRARI:  I believe so, your Honor.  Yes.

7           THE COURT:  You are very welcome --

8           MR. FERRARI:  Thank you, your Honor.

9           THE COURT:  -- to be here.

10          So let's also just talk for a moment about the --

11  Mr. Dinh, probably this is your issue, or the waivers that I

12  had requested from the various banks, could you just bring us

13  up to speed as to how many banks?  Is it eight, or whatever the

14  number is, that your firm represents who are also alleged to be

15  participant banks in the transactions involved in this case?

16          MR. DINH:  Yes, your Honor.  It is a total of eight.

17  Your Honor is correct in that regard.

18          And with respect to the progress of those eight, six

19  we have obtained waivers for.  One, Citibank, has indicated

20  they will not sign a consent of waiver, and we are still

21  working with the eighth bank, Wells Fargo.

22          After the Court's order last Friday, we sought from

23  the three banks that have not addressed their letter directly

24  to the Court, we gave the Court's instruction and requested

25  that they further advise the Court that it may rely on the

Gcedzarh

1    waiver and representations therein.  We have heard back, as you

2    saw, overnight, we filed this morning, from one of those banks,

3    Standard Chartered.  The other two banks, JPMorgan Chase and

4    UBS, are still considering the request.  They have acknowledged

5    our request and very respectfully acknowledge the Court's

6    request.  It is just that this is not a standard matter for

7    them in terms of doing something of that type of representation

8    so they are working through their processes.

9             THE COURT:  OK.  I appreciate that.  And I did see and

10   review all of those waivers.

11            And I'll turn in a moment to Mr. Gillers' opinion,

12   which has been forwarded to me.  Among other things, he is of

13   the opinion that the waivers are not even necessary from the

14   banks' point of view.  If I understand his argument correctly,

15   it's that the banks presumably are not disadvantaged by the

16   representation of them and Mr. Zarrab, it's Mr. Zarrab who is

17   potentially disadvantaged, and so the waiver more properly

18   comes from him.

19            MR. DINH:  That is exactly right, your Honor.

20            And I point your Honor's attention to the middle of

21   page 3 of Professor Giller's opinion where he says that the --

22   while I appreciate the Court's care in seeking consent from the

23   banks, there is nothing for which Kirkland requires their

24   consent.  They are waiving no duties Kirkland owes them.

25            I think your Honor has correctly stated that the focus

Gcedzarh

1   of the Curcio proceeding before your Honor is to apprise

2   Mr. Zarrab of the limitations on our ability to represent

3   Mr. Zarrab given our obligations not to be adverse to the bank.

4   And I think the Curcio questions that the government has

5   presented, we have agreed to and we have added to, at the

6   recommendation of Professor Gillers, correctly states those

7   points.

8          May I add, your Honor, that the only really contrary

9   authority that the government has cited with respect to the

10  professional obligation occurred in Footnote 1 of the original

11  Curcio letter that the government submitted on November 18th,

12  and that Footnote 1 states that New York Disciplinary Rule

13  5-105 requires that all clients that are subject to conflicts

14  waive the conflict in writing.  I would like to advise the

15  Court that that rule has been superseded in New York by Rule

16  1.7 since April 1, 2009, and so, therefore, Professor Gillers'

17  analysis of the relevant law, the Rule 1.7, is the controlling

18  analysis.

19         THE COURT:  Great.  I appreciate the point, and I just

20  make one observation.  So sometimes judges and lawyers and even

21  law professors have somewhat different fish to fry, as they

22  say.  So I am eager to follow up, maybe it is belt and

23  suspenders, but to make sure we have those waivers on behalf of

24  the banks as well.

25         MR. DINH:  Yes, your Honor.  We will submit any

Gcedzarh

1    communications to the bank as we are able to obtain.

2         But I think the issues, all the issues are fully

3    joined before the Court because Citibank has indicated to us

4    that it will not consent to waive, so I do not think that they

5    will reconsider their position in that regard.

6         THE COURT:  OK.  So then let's turn to Mr. Gillers' --

7    Professor Gillers, oh, by the way, who is regarded as clearly

8    expert in these matters, so you couldn't have a better person

9    to write an opinion.  There is nevertheless one issue that I

10   would like to explore further.  It relates to his opinion and

11   it also relates to the conflicts issue.

12        Oh, let me just ask for a moment.  The government

13   obviously saw Mr. Gillers and read Mr. Gillers' opinion, right?

14        MR. LOCKARD:  We did.  We received it last night when

15   it was filed on ECF.

16        THE COURT:  Right.  And have you formed an opinion

17   about that opinion, so to speak?  Do you agree with it, or do

18   you have questions related to it, or are you seeking your own

19   counsel with respect to these issues?

20        MR. LOCKARD:  So we are not currently seeking outside

21   opinions about this issue.  I think we do have certainly some

22   thoughts about --

23        THE COURT:  Hold on a second.  If you could use the

24   podium, Mr. Lockard.

25        MR. LOCKARD:  I think we do have certainly some

Gcedzarh

1    thoughts about even on the quick review we have been able to

2    accomplish since the opinion was filed last night.  And I am

3    happy to sort of speak to all of the issues that the government

4    has been considering in connection with these Curcio

5    proceedings, or if the Court would rather sort of take them

6    issue --

7              THE COURT:  I will come back to that.

8              I just wondered if you were in a hundred percent

9    agreement with it, it would be one thing, but if you are less

10   than that, I think we'll come back to other issues.

11             MR. LOCKARD:  Yes, your Honor.

12             THE COURT:  How would you characterize where you are?

13             MR. LOCKARD:  I think, significantly, there are two

14   issues that I think the government disagrees with respect to

15   Mr. Gillers' opinion, or at least the characterization of that

16   opinion.  The first is, you know, again, the government does

17   believe that in the context of this prosecution there is

18   adversity between Mr. Zarrab and between the victim banks.

19             THE COURT:  OK.  That is one.  We'll come back to

20   that.  Was there another one?

21             MR. LOCKARD:  We do believe that under -- you know,

22   granted, the New York rules have shifted from the previous

23   version to the current rules, but the current rules still do

24   require, under Rule 1.7(b)(4), that each affected client give

25   informed consent, confirmed in writing.

Gcedzarh

1        THE COURT:  OK.  So you support the waiver process, as

2   it were?

3        MR. LOCKARD:  It appears to be required by the rule.

4        THE COURT:  OK.  All right.  We'll come back and hear

5   from you and from Mr. Dinh in a minute.  But here's the one

6   issue -- thank you.  Oh, and we have Mr. Rimm.

7        Again, I should mention, Mr. Rimm, you were appointed

8   by me as outside independent counsel for purposes of this

9   Curcio proceeding of Mr. Zarrab, and I think you indicated to

10  me in a letter recently that you have had I believe an updated

11  meeting with Mr. Zarrab with respect to the issues here?

12       MR. RIMM:  Mr. Zarrab and I met yesterday morning.

13  The focus of yesterday's meeting was on the six additional

14  banks, and my letter from yesterday early afternoon addresses

15  each of those six banks.

16       I should just note for the record that I spent some

17  time with Mr. Zarrab this morning discussing with him the three

18  additional filings, of which I am aware, that were filed after

19  my meeting with him from yesterday morning.  That would be,

20  number one, the Kirkland and Ellis letter from yesterday

21  attached to which was the Gillers opinion.  Mr. Zarrab and I

22  focused on the two additional questions that were proposed to

23  be included in the Curcio colloquy.

24       THE COURT:  Proposed by Professor Gillers?

25       MR. RIMM:  Right.

Gcedzarh

1     We also discussed the December 13th letter from

2     Kirkland & Ellis updating the Court as to the status with

3     respect to the Court's request for the letters to be either

4     readdressed or for supplemental letters to be submitted.  And

5     we also spoke about Kirkland & Ellis' December 14th letter from

6     this morning attached to which was a supplemental submission

7     from Standard Chartered Bank.

8          THE COURT:  OK.  So here's the issue that I want to

9     delve into in a little bit more detail, and it may turn out

10    that it is a nonissue in relation to this Curcio and it is just

11    a question of my own interest and fascination or maybe there is

12    some more to it than that.  So that has to do with the bank,

13    the HSBC Bank situation, and here is the following.  So at the

14    current moment both you and Mr. Clement and one of your other

15    partners, all of whom have argued in this court on behalf of

16    Mr. Zarrab -- Right? -- are actually at the very moment arguing

17    what turns out to be a very similar sanctions case in the

18    Second Circuit Court of Appeals on behalf of HSBC.  So the

19    issues have been narrowed substantially in terms of the appeal

20    and what is being argued.  But that underlying case,

21    interesting, stems from an information that was a criminal

22    information that was filed in the Eastern District of New York

23    in 2012 by the government against HSBC Bank U.S., U.S.A. and

24    Holdings.  And, in fact, I must say I was intrigued and I don't

25    know what the implications there are necessarily for us here,

Gcedzarh

1  but when I say it is a similar sanctions case, HSBC Bank was

2  actually accused by the government of, just for a summary, of

3  not having the structures in place as a bank -- the safeguards,

4  the methods, the process, the oversight -- and even more than

5  that, actually, they were accused of willfully violating, among

6  other things, the very same sanctions law that Mr. Zarrab is

7  accused of violating in this case going back to 2012.

8           So the questions that I have -- and, again, maybe they

9  are just questions that are just because it is so interesting,

10  but -- well, let me just, before I get to that:  So what

11  happened in that case is that there was no prosecution

12  ultimately in the sense that the government agreed to enter

13  into what's called a deferred prosecution agreement with the

14  banks in that case, but along with that the banks, if I

15  remember correctly, forfeited over a billion dollars.  That was

16  number one.  Number two, they set up a five-year monitorship,

17  or whatever, during which time they agreed -- and that period

18  is ongoing, they are still in the monitorship.  And the monitor

19  is a respected attorney, Michael Cherkasky, who many of us are

20  familiar with, and they agreed to implement a whole series of

21  measures to make sure that those violations of the sanctions

22  law could not, would not recur.

23          So this regime is a dramatic, for want of a better

24  phrase, know-your-customer series of requirements and

25  responsibilities, which the banks agreed to implement and,

Gcedzarh

1    hence, they got the deferred prosecution agreement.

2            So here's some of the questions that I have about

3    that, and I don't know if it impacts this legally, the Curcio.

4    It certainly does -- it certainly is interesting, or ironic, or

5    whatever.

6            So probably the implications are that the wall -- the

7    ethical wall that Kirkland was proposing, you all were

8    proposing, between the lawyers who work on the bank cases and

9    the lawyers who work on Mr. Zarrab's case doesn't exist with

10   regard to HSBC because in fact there you are representing that

11   very bank and Mr. Zarrab, now do and will.

12           So here are some of the questions I have.  So this one

13   is for the government or for you.  So are some or more of the

14   transactions that Mr. Zarrab is accused of entering into which

15   the government says are illegal, did some or more of those

16   involve HSBC?  We know "yes" is the answer to that, but part B

17   is did some of them involve HSBC even after this monitorship

18   was set up and entered into?  If the government knows?

19           MR. LOCKARD:  It's hard to say for certain because the

20   investigation relating to HSBC was conducted by a different

21   U.S. Attorney's Office and a different investigating agency or

22   agencies, but it does appear that that is certainly a

23   possibility given the overlap in the timeframe of the

24   monitorship and the timeframe of the charges in the Indictment

25   and the fact that HSBC is such a major player in U.S. dollar

Gcedzarh

1    corresponding account business.  There is certainly a likely

2    possibility.

3         THE COURT:  It struck me as that also, also as a

4    possibility, as someone who is even further removed from the

5    nitty-gritty details and facts of the case, just looking at the

6    dates and looking at the players.  So that's one question I

7    had.  All right.  And if that would matter in any way.

8         MR. BRAFMAN:  Your Honor -- excuse me, sir.  Benjamin

9    Brafman for Mr. Zarrab.

10        Just so it's clear, the defense maintains that if

11   there were any such transactions by HSBC, they were with

12   companies which, although charged in the Indictment, they

13   maintain they are completely unrelated to Mr. Zarrab

14   personally.  So I don't know whether that alters the issue at

15   all but that's --

16        THE COURT:  So say that again.  Explain that.  There

17   could be other defendants or --

18        MR. BRAFMAN:  There are a number of entities charged

19   in the Indictment which the government suggests are related to

20   Reza Zarrab that we maintain or had maintained that he does not

21   own or have any ownership interest in those companies.  And I

22   believe if there is a transaction involving HSBC and some of

23   the companies charged in the Indictment, I just want the record

24   to reflect that we maintain that Reza Zarrab is not the owner

25   of those companies.  I don't know if that alters your Honor's

Gcedzarh

1    inquiry but I just want to make certain --

2                THE COURT:  No, that is very helpful.

3                MR. BRAFMAN:  That we are not conceding anything.

4                THE COURT:  No.  I get that.  Thanks.

5          So one obvious question is does the fleshing out of

6    this -- well, did you feel or do you feel that there was any

7    need or did you talk to Mr. Cherkasky or anybody about that,

8    the monitorship, in connection -- only as it relates to this

9    Curcio proceeding?

10               MR. DINH:  Yes, your Honor, thank you very much for

11   that inquiry because it is one that we take very seriously.

12         Your Honor is entirely correct in your recitation of

13   the case in the Eastern District.  I would only start by

14   providing the context that we, the Kirkland & Ellis lawyers,

15   were not representing HSBC with respect to the underlying

16   information, with respect to the deferred prosecution

17   agreement, or even with respect to the interactions with the

18   monitor as part of that compliance.  We were retained for the

19   limited purpose of reviewing and then ultimately prosecuting an

20   appeal, alongside with the government, of a District Court

21   order unsealing and making public Mr. Cherkasky's report to the

22   government.  So it was that narrow of a representation, not

23   what is underlying the entire matter.

24               THE COURT:  Got you.  So, this question:  Is that the

25   what the Gillers' opinion -- well, I don't know what he knows

Gcedzarh

1    or looked into or if he was aware of the monitorship and all of

2    that, but is the thrust of his opinion that let's assume those

3    facts are the facts that for purposes of a <u>Curcio</u> proceeding

4    you can separate the issues out so that if the appeal issues --

5    and this appeal relates to the publication of some documents,

6    or not -- if that's unrelated to the Information, etc., then

7    that means that there is no conflict?  Can lawyers splice or

8    dice the issues of one case, one transaction, and

9    notwithstanding the underlying case, here the information

10   charging the bank, but say it's OK to represent somebody for

11   the narrow issue on appeal as long as that issue is -- well, I

12   don't know about "as long as" -- even though there is a set of

13   facts underlying that case that might pose some question?

14          MR. DINH:  Yes, I think your Honor posed exactly the

15   question that we were concerned with and asked Professor

16   Gillers to focus on specifically.  He addressed that at page 4,

17   specifically Footnote 3 of the Information, that we had wholly

18   apprised him of.  And the basic inquiry is fairly

19   straightforward, as one should divide the duty to the duty of

20   loyalty and the duty of confidentiality.  We owe both to both

21   clients, HSBC, as well as to Mr. Zarrab.

22          With respect to the duty of loyalty, there is no

23   direct adversity because we do not represent HSBC in this

24   proceeding.  It is a separate proceeding.  And we owe HSBC that

25   duty of loyalty notwithstanding our representation of

Gcedzarh

1   Mr. Zarrab in this case.

2          The _Curcio_ hearing that your Honor is conducting

3   ensures that the defendant is fully apprised of the limitation

4   on our ability to represent him fully because of our

5   preexisting obligation to HSBC.  And so that's why under

6   Professor Gillers learned opinion and our position, our

7   representation of Mr. Zarrab is of limited scope; that is,

8   everything except that is dealing with the bank and may be

9   potentially adverse to the bank.  And that's why the questions

10  in the _Curcio_ proceeding, after it was done and originally

11  proposed and as we originally acceded to, ask Mr. Zarrab

12  whether he understands that and whether he knowingly and

13  intelligently waived that right of Kirkland to represent him

14  entirely, not just for the limited purpose of the issue of not

15  dealing with the case.

16          THE COURT:  I get it.

17          MR. DINH:  With respect to the duty of

18  confidentiality, as your Honor indicated, our prophylaxis, the

19  wall, does not work as a prophylaxis because Mr. Clement,

20  myself and another lawyer are on both sides of the wall.  It is

21  conceivable that some information from Mr. Zarrab's case may be

22  relevant to the HSBC case, and it is conceivable, and although

23  these are all within the realm of conceivability rather than a

24  possibility, but highly conceivable that some information on

25  the HSBC case may be relevant to Mr. Zarrab's case.  We owe

Gcedzarh

1    that duty of confidentiality both under Rule 1.6(b) and 1.8(b),

2    independent of any wall that we would have dealt with and

3    worked through as a prophylaxis.  That is why we have advised

4    Mr. Zarrab that we will not use any information that HSBC may

5    have in aid of -- or what we may learn in the course of

6    representing HSBC in aid of his representation, and, indeed, we

7    can't because we are limited in our representation of

8    Mr. Zarrab.  So, therefore, there is no adversity in that

9    regard.

10           Likewise, our agreement with HSBC fully ensures that

11   we protect any information that conceivably could be used here

12   in order to represent Mr. Zarrab.  Again, it is a mere

13   impossibility because we have limited the scope of our

14   representation of Mr. Zarrab to those issues not dealing with

15   the banks, and so therefore we have eliminated the possibility

16   that such information would be used and our confidentiality

17   would be violated.

18           We have further established procedures that is in the

19   now nearly impossible and highly unlikely, I would say well not

20   impossible but conceivably, that a Kirkland and Ellis pleading

21   would mention HSBC, consistent with our duties to Mr. Zarrab,

22   we would give HSBC an opportunity to review that so that they

23   could make their own judgment that there is no confidential

24   information that has been improperly used.  So I think that we

25   have established procedures both structural, by limiting the

Gcedzarh

1    scope of our representation of Mr. Zarrab, and also procedural

2    in order to ensure that there is no breaching of the duty of

3    confidentiality, either way.

4        Your Honor mentioned the question of adversity as well

5    as the viability of waiver with respect to the banks.  The key

6    part here that -- I think the key part of the analysis that

7    Professor Gillers presents, as well as in our opposition, is

8    that there is no adversity because we do not represent HSBC in

9    this proceeding, and so -- and we have indeed walled off,

10   limited, if you will, our representation of Mr. Zarrab so that

11   we would not be taking a position adverse to the banks.

12   Indeed, we would not be dealing with any of the -- effectively,

13   we would not be dealing with any of the bank propositions

14   because the banks potentially are affected by that case.  And

15   so in that sense we are not adverse and cannot be adverse.

16       So the only question is the Curcio proceeding for

17   Mr. Zarrab, whether he understands the limitation on Kirkland &

18   Ellis' ability to represent him fully, and then whether or not

19   that limitation is reasonable to give him an effective defense.

20   With respect to the first, the Curcio questions aptly

21   addresses.  And with respect to the second, the fact that we

22   have able counsel representing Mr. Zarrab in all aspects of the

23   proceeding more than amply provides the Court with the comfort

24   that he would be adequately represented notwithstanding the

25   limitation on Kirkland & Ellis' ability to fully represent him.

Gcedzarh

1      And so, therefore -- and this is where the difference

2 between the former rule, 505-105, and Rule 1.7(b)(4) is

3 relevant, because the prior rule requires written consent by

4 both clients when there is a concurrent representation.  The

5 new rule, the formulation is "affected" clients.  So the

6 insertion of the word "affected," I submit, permits and

7 validates and codifies the position that we and Professor

8 Gillers have articulated here, which is the banks are not

9 affected because of the sufficient, adequate and complete

10 limitation on our ability to represent Mr. Zarrab to the extent

11 that it potentially affects the banks' interests.

12      THE COURT:  So here is a hypothetical question.  Is

13 the analysis different if, for example, the appeal that you are

14 arguing, or will be arguing, in the Second Circuit went to the

15 merits of the deferred prosecution arrangement, as opposed to

16 this issue of whether a particular document ought to be public

17 or not?

18      MR. DINH:  No, your Honor, it would not be, simply

19 because, again, our representation of Mr. Zarrab will be

20 limited to matters other than the bank fraud issues, and so,

21 therefore, there is no adversity --

22      THE COURT:  Say that again.  Your representation of

23 Mr. Zarrab would be --

24      MR. DINH:  Limited to issues other than the bank fraud

25 charges.

Gcedzarh

1        THE COURT:  Which bank fraud charges?  In this case?

2        MR. DINH:  In this case, your Honor, yes.

3        THE COURT:  Didn't Mr. Clement already argue the bank

4   fraud charges in this case on the motion to dismiss?

5        MR. DINH:  He did, your Honor, at a time when the

6   potential conflict was not identified because HSBC was not

7   named in this case, and we were notified that there would be a

8   potential conflict in that regard.  And so as soon as we

9   learned of the conflict and as part of the Curcio proceeding

10  here, we advised Mr. Zarrab of the potential issues and advised

11  him that he has the right not to consent as part of the Curcio

12  processes.

13        THE COURT:  OK.

14        THE CLERK:  Mr. Lockard, if you could use the podium,

15  please.

16        MR. LOCKARD:  Your Honor, I think the HSBC issue

17  highlights how fully and complex of an issue is presented with

18  respect to the Curcio issues in this particular case.

19        Just to take a step back, as a background principle,

20  the Court has a couple of obligations and a couple of

21  responsibilities here.  The first is to ensure --

22        THE COURT:  Wait.  Before you leave -- so I don't mean

23  to cut you off, but are you heading in the direction of

24  contending that Kirkland & Ellis cannot participate in this

25  case?

Gcedzarh

1          MR. LOCKARD:  What we're contending for now --

2          THE COURT:  Or is it so leaning?

3          MR. LOCKARD:  No, we are not taking that position at

4     this point.  We are taking the position that in order for the

5     Court to effectively exercise the broad discretion that it does

6     have in addressing and resolving issues presented by conflicts

7     of interest, that judgment has to be informed judgment.  So the

8     facts matter, and it's important to the government to ensure

9     that the Court has as robust of a factual record in front of it

10    in order to be able to exercise its discretion appropriately.

11         The factual issues relating to the HSBC issue we think

12    are particularly thorny.  I disagree with Mr. Dinh when he says

13    that there is not adversity here between Mr. Zarrab and the

14    banks, as the government has repeatedly said.  The government

15    contends that the banks are victims of a bank fraud.  So while

16    the banks are not technically parties, because they can't be in

17    a criminal prosecution, they are nonetheless involved in this

18    matter as witnesses and as victims.  If they are victims, they

19    have certain rights under the Criminal Code, including rights

20    to notice, rights to participate in certain aspects of the

21    proceedings, and potentially rights to restitution for any

22    losses that they may have suffered.

23         The defendant in this case has already taken the

24    position that the banks are not victims, which is a position

25    that is adverse to the banks' rights as victims.  So we think

Gcedzarh

1    there already has been adversity between Mr. Zarrab and the

2    banks in this matter.

3         When it comes to the HSBC matter, we had an extensive

4    discussion between the Court and the government and defense

5    counsel about potential trial arguments or trial defenses

6    relating to the banks.  And Mr. Zarrab made it clear that one

7    potential argument that he was not going to waive and that may

8    very well come --

9         THE COURT:  Not going to waive?

10        MR. LOCKARD:  And could very well come up at the trial

11   would be a contention with respect to either the bank fraud

12   charge or the IEEPA charge or who knows which charge, that the

13   banks either were indifferent to the conduct that he was

14   engaging in and did not view the nexus to Iran as material or

15   were somehow complicit, and that is an argument that he has

16   maintained in his quiver of available arguments.

17        The representation of HSBC undoubtedly puts the

18   Kirkland firm in possession of material confidential

19   information that relates to that issue.  It is not a

20   possibility, it is not a hypothetical, it is a certainty that

21   Kirkland possesses confidential information about HSBC that is

22   relevant to a potential defense that we've already discussed on

23   the record at the prior conference.

24        So when Mr. Dinh proposes that the firm is not

25   actually going to be adverse to HSBC, what we're pointing to

1    are a bunch of conditions that have been placed on HSBC's

2    waiver of the conflict.  And I take it that the idea is that

3    these conditions effectively handcuff the firm from doing

4    anything that could be adverse to HSBC's interests and,

5    therefore, there is no longer any conflict with respect to

6    HSBC.  If that is in fact the contention that the Court is

7    being asked to rely on, then we think it is important for the

8    Court to be able to assess whether that contention is in fact

9    true and to be able to assess whether those conditions create

10   circumstances that might make it unreasonable for a defendant

11   to agree to those conditions.  That is the Court's function

12   that it has to be able to exercise based on an appropriate

13   factual record.

14           The conditions that have been placed on the HSBC

15   waiver include a pretty unusual condition that could give HSBC

16   advance access to pleadings in this case before they are filed,

17   to review those pleadings before they are made to the Court or

18   to the government.  So what's being proposed is that the

19   defendant is going to agree that the alleged victim of his

20   crimes could have an opportunity to review the arguments his

21   lawyers are going to make on his behalf before they're filed.

22   We think that is a pretty complicated issue to address from a

23   conflicts perspective and from a Curcio perspective.

24           It's also been proposed that the firm's role in this

25   case is going to be so limited that it is no longer going to

1   deal with the banks.  It's not clear exactly where that is

2   memorialized or how that is formalized, but it is also not

3   clear to the government at this point what the scope of that

4   limitation is.  Given the fact that the bank involvement is so

5   central to the charges in this case, it's hard to see what is

6   left if you take the banks out of it, because the banks are not

7   just involved with respect to the bank fraud charges, they are

8   also involved in the sanctions charges because the gravamen of

9   the sanctions charge is bank transactions.

10         They are also involved in the money laundering

11   charges, because the specified unlawful activities that are

12   alleged to have been promoted are the IEEPA violations and the

13   bank fraud violations.  So if we are carving out anything

14   having to do with the banks, it is not clear what exactly is

15   left over.

16         And one final complication that we can see from

17   Mr. Gillers' letter is he appears to propose an additional

18   condition.  It is not really explicit, but it appears that he

19   is also suggesting sort of an ethical wall within Mr. Zarrab's

20   defense team so that not only would Kirkland & Ellis attorneys

21   not be able to take certain overtly adverse steps, such as

22   cross-examining bank witnesses or advancing arguments about

23   bank wrongdoing, but they would also not be able to participate

24   in those discussions or decisions within the defense team.  I

25   think that is a new condition, sort of an internal defense team

Gcedzarh

1    wall, that has not previously been put before the Court, and I

2    think that that is another issue that I think the Court has to

3    be confident of in determining what are the factual parameters

4    of the proposed waivers and in what ways could those impact the

5    firm's ability to represent the defendant effectively and to

6    what extent do they reflect valid waivers by the banks.

7         So as I said earlier, we have some additional thoughts

8    sort of generally about this matter, but I think those are the

9    issues that jump out at us particularly with respect to the

10   HSBC representation.

11        THE COURT:  As a practical matter, is one thing that

12   you are suggesting that the Curcio questions be revised that

13   are posed to Mr. Zarrab?  Would that either illuminate and/or

14   resolve any issues that remain?

15        MR. LOCKARD:  There are a couple of ways that these

16   issues play out in the decision that the Court ultimately is

17   going to have to resolve here.  One is that, you know, it is

18   the government's view that the nature and scope of the banks'

19   waivers are relevant information for both Mr. Zarrab to

20   consider and for the Court to consider in determining whether

21   Mr. Zarrab's waiver is a knowing and intelligent one.  A

22   voluntary waiver is no good if it is not also knowing and

23   intelligent.

24        I think Mr. Zarrab and the Court also have to be

25   confident in the validity of those banks' waivers or to the

Gcedzarh

1    extent to which they are subject to uncertainty or revocation

2    later down the line, because if conflict issues are reraised

3    later on in this proceeding it's going to affect the

4    administration of the proceedings from the Court's perspective,

5    it could potentially affect the defendant's trial rights

6    depending on the timing and the nature of those things, so it

7    is in everyone's interest to make sure that we have a lot of

8    transparency here all around.

9         The second way that the bank waivers are relevant to

10   what the Court has to decide is there is this concept in

11   determining whether a conflict is waivable about whether the

12   attorney, if permitted to stay on the in the representation,

13   would be so diminished in their ability to zealously represent

14   their client that it's not really a reasonable thing to waive.

15   I think the Court has to be able to assess, given whatever

16   conditions are being proposed on the representation, would it

17   under those conditions be reasonable for the defendant to waive

18   the conflict and would those conditions have a material impact

19   on the firm's ability to represent the defendant.  So those are

20   the two ways that we think that this is relevant to the issue

21   the Court is going to have to decide.

22        THE COURT:  And how are those two issues fleshed out

23   further?  Is the record adequate?  I am going to raise the

24   question again of whether the Curcio questions need revision to

25   illuminate either of these two issues?

Gcedzarh

1    MR. LOCKARD:  I think the record probably needs more

2  clarity on what really are the scope of the conditions that

3  have been placed on the banks' waivers, what is the scope of

4  the limitations that Mr. Gillers is proposing.  You know, for

5  example, one of the things Mr. Gillers says is that Kirkland

6  would be prohibit from taking certain actions that could be

7  harmful to the banks, and one of those says, for example,

8  accusing the banks of wrongdoing.  That is an example.  What is

9  the full scope of what it is that the firm is not going to be

10  doing and not going to be participating in decisions about and

11  not willing to be sharing information with the other firms and

12  lawyers on the team?  What really is the scope of the

13  limitations that the Court is being asked to rely upon in order

14  to determine that the waivers are effective and that Mr. Zarrab

15  has knowingly waived his conflict.

16    MR. BRAFMAN:  Your Honor, can I be briefly heard?

17    THE COURT:  Yes.  I was just going to turn to you,

18  actually, and ask you, as a general matter, since you represent

19  Mr. Zarrab, you know -- this is too simplicit but what do you

20  think of all of this, so to speak, is really what I am asking?

21    MR. BRAFMAN:  Judge, I am, you know, pleased that the

22  Court has engaged in this discussion, and clearly the Court has

23  spent a substantial amount of time and effort in trying to

24  resolve this issue.  And I also commend Mr. Dinh and his firm

25  for trying their best to accommodate the Court's requests and

Gcedzarh

furnishing your Honor with as many waivers as is humanly

possible.

        At the end of the day, I think what the Court needs to

I think recognize, hopefully, is that this boils down to a

question of trust, because regardless of the questions you put

to Mr. Zarrab and Mr. Dinh and myself, we in the well of this

courtroom on both sides rely on each other's professionalism

and integrity.  We work with protective orders on both sides,

and we assume the parties will act responsibly.

        This case really has two parts.  There was a motions

part which has been resolved.  After careful review, your Honor

has issued its rulings, and right now we are abiding by those

rulings in preparing for trial.

        The issue with respect to the banks, to me, at least,

is fairly simple.  We want Mr. Dinh and his firm to remain in

the case.  I think they have demonstrated their scholarship

over and over again in very, very complicated and novel issues

dealing with IEEPA sanctions.  But with respect to the trial

itself, they were never contemplated as being part of the trial

team that would cross-examine any witnesses but certainly will

not be cross-examining bank witnesses.  And we do not need

their confidential information, should they have any, in order

to prepare for the cross-examination of bank witnesses.  Much

of what is in the HSB case, for example, is a matter of public

record.  The briefs have been filed.  The arguments will be a

Gcedzarh

part of the public record.  And I would never ask or expect

Mr. Dinh or his colleagues to divulge any confidential

information, nor would we try to obtain it.

Whether the banks are victims or not in this case is a

question of fact, not really something that we need to address

any longer because your Honor has ruled on the bank fraud

issue.  We reserve the right after the trial is over in the

charging conference to revisit those issues depending on the

information that we obtain from bank witnesses.  But it is

either I or Mr. Kirshner or Mr. Ferrari, who has no conflict,

who will be questioning bank witnesses.

So I think this is a very intelligent, smart, academic

exercise that the Court must engage in.  I think with the

recommendation of Professor Gillers, we have independent

counsel as well who has discussed these issues with Mr. Zarrab,

as have I, and I think he is prepared to make an intelligent,

knowing waiver of today and can respond to all of the Court's

questions, and I think that should suffice, most respectfully.

THE COURT:  Do we have to modify those questions at

all further to reflect any of your concerns or comments or

Professor Gillers', for that matter?

MR. DINH:  Your Honor, we asked Professor Gillers to

review the questions, and the relevant question is question

number 10.

THE COURT:  In your --

1          MR. DINH:  In both the original and the revised.

2          THE COURT:  Hold on a second.

3          (Pause)

4          MR. BRAFMAN:  I agree, your Honor.

5          MR. DINH:  This is exactly -- the operative question

6     is obviously question number 9, which presents the

7     probabilities of the limitation on our representation.

8          Question number 10 provides elucidation of those

9     specific factual scenarios.  And as our submission last night

10    indicated, Professor Gillers recommended, and we propose to the

11    Court, the addition of questions 10(e) and 10(f), and I think

12    that if the Court accepts that, that encapsulates and

13    operationalizes the limitations that Professor Gillers had

14    reviewed and we would accept.

15         THE COURT:  E and F?

16         MR. DINH:  E and F as an addition, yes, your Honor,

17    because A, B, C and D already takes care of all of the

18    possibilities that Mr. Lockard deals with, and then E and F

19    goes one step further in terms of us not even participating

20    outwardly but --

21         THE COURT:  Do you agree?

22         MR. BRAFMAN:  I agree that those are the pertinent

23    questions.

24         THE COURT:  And Mr. Lockard?

25         MR. LOCKARD:  Your Honor, I don't think we get to

Gcedzarh

1    question 10 because we still have two of the bank victims who

2    have not waived the conflict.  So I understand that it is

3    Mr. Dinh's position that the firm has voluntarily cabined its

4    representation to the point where it is no longer adverse to

5    those two particular victims, but I don't know the answer.  I

6    don't know if that is allowable under the rules or if the broad

7    outlines of the representation creating those issues puts the

8    clients in a position where even in the face of the proposed

9    voluntary conditions their waiver is still required.

10              THE COURT:  And what is your view with respect to

11   Citibank, which has said that it will not sign a waiver?

12              MR. LOCKARD:  If the Court determines that Citibank's

13   waiver is required, then it seems to us that is the end of the

14   inquiry at that point.  Then that sort of feeds back into the

15   question of --

16              THE COURT:  But didn't you take the position before

17   that there do need to be waivers on both sides, and does that

18   mean all or none?  In the case of Citibank, no waiver, no

19   waiver of conflict is possible?

20              MR. LOCKARD:  Without having had an opportunity to

21   really research this question, it certainly appears from the

22   face of the rule that Citibank is an affected client.  It could

23   be the law that the firm can make them unaffected by imposing,

24   you know, self-imposed conditions on its representation of the

25   other client.  It's not obvious to me that that's true.

Gcedzarh

1    MR. DINH:  Your Honor, may I make a suggestion in the

2    interest of administration, your Honor?

3         THE COURT:  OK.  Yes.

4         MR. DINH:  We have the issues all joined because

5    Citibank has advised that they will not waive.

6         THE COURT:  Right.

7         MR. DINH:  We have what I believe, and I don't hear

8    any difference, a complete set of <u>Curcio</u> questions.  I think

9    that the government --

10         THE COURT:  And we are -- you are still pursuing the

11   two waivers that are out?

12         MR. DINH:  We are.

13         THE COURT:  And they haven't rejected --

14         MR. DINH:  Exactly.  We are still -- the city has

15   rejected but the Wells Fargo has not.  We are still talking

16   with them.

17         The question that Mr. Lockard reserves as an anterior

18   question is really whether or not the sentence that I read to

19   the Court at the beginning in Professor Gillers' opinion is

20   indeed the law and whether or not --

21         THE COURT:  That's what I was just going to ask.

22         MR. DINH:  Exactly.  Whether or not the bank waivers

23   are relevant.  Professor Gillers' opinion, our position is they

24   are not because there is nothing to waive.

25         What I suggest, what I propose, that we proceed with

Gcedzarh

1    the Curcio portion of this and reserve for your Honor's

2    decision -- and perhaps Mr. Lockard would suggest additional

3    briefing is required -- that legal question whether or not it

4    is adequate.  At least then we could have a full record as to

5    Mr. Zarrab's waiver in light -- but still reserve in light of

6    the Citibank nonwaiver and then reserve the question of law

7    that Mr. Lockard wants further research on that seems to divide

8    the parties.

9         MR. LOCKARD:  I think there are still two at least

10   open factual issues.  One is the Wells Fargo, who has been

11   requested to waive, we understand, but has not yet.  It could

12   be that Wells Fargo also declines to waive.  It could be that

13   they agree to waive but impose additional conditions that would

14   be new facts the Court would have to consider and new facts for

15   Mr. Zarrab to have to consider.  So we think that that is an

16   issue that in the interest of efficiency probably should be

17   resolved first.

18        We think there is also an open factual question --

19        THE COURT:  You think that Mr. Zarrab ought to know

20   whether or not there is going to be a Wells Fargo waiver and,

21   if there is, what it says before he can respond to these

22   questions?

23        MR. LOCKARD:  I think so.  You can imagine -- it seems

24   unlikely, but Wells Fargo could say that we waive -- we want to

25   sit in on defense strategy meetings.  I don't think they would

Gcedzarh

1 do that but we don't know until we have the waiver.

2           THE COURT:  I understand.

3           Was there something else?

4           MR. LOCKARD:  There was another one and this loops

5 back to an issue that was raised at the prior conference.  So

6 there had been a discussion about the process by which the

7 waivers had been obtained.  We alerted the Court to the fact

8 that with respect to these banks the government has been in

9 contact with certain portions of the bank for purposes of

10 obtaining documents relating to the investigation and trial

11 preparation, identifying trial witnesses, and beginning to

12 prepare topics of trial testimony and trial testimony.  Those

13 individuals as of November 30th appear not to have had any

14 substantive discussions with the portions of the bank counsel

15 who had been considering the requests to waive the conflict.

16           So since then, the same two waivers that had already

17 been issued before that discussion on the record on

18 November 30th had been resubmitted to the Court.  I don't know,

19 maybe Mr. Dinh can answer the question, whether the bank

20 internal conversations have now taken place and the banks'

21 counsel reaffirms the waivers after having had that substantive

22 discussion.  I think the Court's concern had been that if the

23 people considering the waiver were not in touch with the people

24 actually affected by participating in the investigation and

25 preparing for trial testimony, if they weren't talking to each

Gcedzarh

1    other the waivers could be illusory because the banks may not

2    be fully informed about the scope of the factual or legal

3    issues presented.

4              MR. DINH:  I appreciate Mr. Lockard's--

5              MR. LOCKARD:  I am not quite finished.  I have just a

6    little bit more to lay out so that Mr. Dinh can maybe address

7    all of these issues at once.

8              Following the conference, we provided contact

9    information to defense counsel for the individuals with whom we

10   had been in touch.  We provided those individuals with copies

11   of the public filings relating to the Curcio issue and the

12   transcript of the November 30th conference in an effort to try

13   and fulfill the Court's desire that the banks have internal

14   discussions to make the waivers effective and valid.  We do not

15   know if those people spoke to the individuals who considered

16   the waivers and signed the waivers.

17             We asked defense counsel to provide us with the names

18   of the individuals with whom they were speaking so that we

19   could provide that contact information to the individuals at

20   the bank that we had been in touch with, but we were not

21   provided that information until after the waivers were signed

22   and filed.  We did see that the waivers were then provided to

23   the individuals we had identified but it did not appear --

24             THE COURT:  Say that again.

25             MR. LOCKARD:  Defense counsel then provided the

Gcedzarh

individuals at the banks with whom the government had been

communicating with copies of the executed waivers, but it

wasn't apparent that the discussions between the two groups of

people at the banks had occurred before the waivers were

signed.  And maybe Mr. Dinh is in a position to represent to

the Court whether those discussions did or did not happen, but

we think that that is an open factual issue that the Court

already has expressed a deep interest in and should be

resolved.

MR. DINH:  I think the operative question here is

whether or not those waivers are illusory, and we have taken

steps and procedures in order to ensure that every part of the

left hand knows what the right hand is doing.  We copied

Mr. Lockard on those transmittal emails.  No bank has expressed

anything other than thank you to us for providing that

information.

THE COURT:  So you are representing to the Court that

the waivers speak for the bank?

MR. DINH:  Yes, your Honor.

THE COURT:  For the entire bank?

MR. DINH:  Because we have provided those executed

waivers to the parts of the bank that Mr. Lockard has been in

communication with, and we have received no contrary indication

that there was want of authority or that there were further

revisions to be had.  Yes, your Honor.

Gcedzarh

1          THE COURT:  So the waivers are as if they were issued

2     by the chairman of the bank, as it were, and binds the whole

3     bank?

4          MR. DINH:  That is correct.

5          THE COURT:  Whether somebody had spoken to somebody

6     else as a factual matter, the entire bank is bound by those

7     waivers?

8          MR. DINH:  That is our understanding, especially given

9     your Honor's instruction to ensure the identified individuals

10    and the lines of authority within the bank, and we have taken

11    all the steps necessary to inform the other parts of the bank

12    that Mr. Lockard refers to, and there has been no contrary

13    indication.  Yes, your Honor.

14         MR. LOCKARD:  Your Honor, I don't think that answers

15    the question.  I don't think there has ever been any dispute

16    that the bank counsel executing the waivers had the authority

17    to do so.

18         I think the concern that the Court expressed quite

19    pointedly was that if parts of the bank have material

20    information about the investigation or about the case that are

21    not being communicated to the decision makers, it undermines

22    the Court's confidence in those waivers.  Waivers are

23    revocable.  If banks become aware of information that they wish

24    they had known later on, this issue could come back up again

25    later on in the proceedings.  And so saying that the signed

Gcedzarh

1   waivers were presented to the knowledgeable part of the bank

2   after they had been executed I don't think addresses the

3   Court's concern at all.

4           MR. DINH:  I think the concession that the question is

5   not one of legal authority to bind the bank answers your

6   Honor's question.  There was additional concern that they are

7   somehow illusory, but those concerns are adequately addressed

8   by the full and frank apprisal of those waivers and decisions

9   to the relevant parts of the bank.  And I think that no further

10  intrusion into the bank's deliberative processes or our

11  attorney-client relationship with the bank is necessary in

12  order to ensure the defendant's rights in this case.

13          THE COURT:  And when did you anticipate that you will

14  hear from -- Wells Fargo then is the only outstanding --

15          MR. DINH:  Yes, your Honor, Wells Fargo is the only

16  outstanding waiver that is out there.

17          THE COURT:  And one way or another, you would know

18  when, whether it is forthcoming or --

19          MR. DINH:  Yeah.  We were hoping to get it done before

20  today, but we anticipate probably within the next 48 hours is

21  my guess, probably.  Again, I am not in charge of the timing

22  and I can't push a string, but we are working as diligently as

23  possible to provide the Court with the information.

24          THE COURT:  OK.  All right.

25          Anybody else?

Gcedzarh

1              (Pause)

2              So we will take a short break of about five or ten

3       minutes.

4              (Recess)

5              THE COURT:  Please be seated.

6              So here's what I'd like to do.  In the interest of

7       perhaps consistency, I do want to hold off asking the Curcio

8       questions until we get the Wells Fargo response.  I am happy to

9       call you back whenever that comes in.  If it comes in in a day

10      or so, I can do it Tuesday morning at 10, if that is agreeable

11      to all of you, or if it doesn't come by then, I will do it as

12      soon as it comes in.  It seems to me that if we're developing a

13      record, we might as well have the full record, even though

14      there is this just one item outstanding.

15             And even though we can assume, I suppose, or you are

16      assuming that the answers to the questions that have been

17      presented to the Court probably would not change one way or

18      another if that bank decided not to waive or it had some

19      different conditions, but, nevertheless, it doesn't make sense

20      to not have a full record.  Let's have a full record.

21             But in the meantime, I would like you to prepare, both

22      the government and the defense, for simultaneous submission of

23      findings of fact and conclusions of law with respect to -- with

24      authorities -- with respect to this Curcio issue.  And as to

25      that, I'm going to go off the record and you can talk among

Gcedzarh

1    yourselves as to what's a reasonable period of time that you

2    would like to have to make those submissions.  I will be at

3    your disposal.

4           I think that they can be simultaneous submissions.  I

5    think each side knows everything that everybody else knows.

6    And so you tell me what are good dates for you for that so we

7    don't hold up the process.

8           And with those findings of fact and conclusions of

9    law, if you would submit a proposed form of judgment also, a

10   short form, that you propose that the Court sign that covers

11   your position.

12          MR. DINH:  Your Honor, we would propose one week from

13   today.

14          THE COURT:  That is fine.

15          Is that OK with you?

16          MR. LOCKARD:  I think that's fine.  One potential

17   wrinkle is if we don't get the last waiver of the bank's

18   position until --

19          THE COURT:  Well, that is understood.  I think that is

20   understood.  I say that's fine.  Let me just take a look.

21          (Pause)

22          All right.  So let's tentatively set 12/20 at 10.

23   That presumes that the Wells Fargo issue is in hand for the Q&A

24   part of Curcio.

25          Is that all right with -- Mr. Brafman, is that OK with

1  you?  The 20th at 10 works?

2          MR. BRAFMAN:  I'm sorry?

3          THE COURT:  The 20th at 10 works for you?

4          MR. BRAFMAN:  Give me one second, sir.

5          THE COURT:  OK.

6          (Pause)

7          MR. BRAFMAN:  Yes, your Honor.

8          MR. DINH:  Yes, your Honor.

9          THE COURT:  OK.  And so could the government -- then

10 we'll say 12/21 for the submission of the findings of fact,

11 conclusions of law.  I'm interested in all of the issues that

12 we have been discussing, but in your findings of fact,

13 conclusions of law, I am most interested in the question that's

14 discussed in Professor Gillers' opinion, that no waivers are

15 needed on the bank side at all, and I'm also interested in what

16 you all believe is the impact of the HSBC matter to this Curcio

17 proceeding.

18          MR. BRAFMAN:  Your Honor, is the 20th at 10 subject to

19 us having the information from the bank?

20          THE COURT:  Yes.  And if you don't, you will let me

21 know and I will make it at another time.

22          MR. BRAFMAN:  Yes.  Thank you, your Honor.  We will be

23 in touch with the Court.

24          THE COURT:  So I will grant the applications of

25 Ms. Chung and Mr. Kleinfeld to exit the case, with our thanks

Gcedzarh

1    for your participation, and Mr. Ferrari of entering into the

2    case.  Thanks to you as well.

3              MR. FERRARI:  Thank you, your Honor.

4              THE COURT:  Any other issues that we need to address?

5              MR. RIMM:  Would your Honor like me here next Tuesday?

6              THE COURT:  Yes.  Absolutely.  For whenever we do the

7    Q&A, I think having you here would be very desirable.

8              OK?  Anything else?

9              MR. LOCKARD:  Not from the government.

10             THE COURT:  Nope?  Thanks very much.

11

12                                  -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25