UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| - v - | **S3 15 Cr. 867 (RMB)** |
| MEHMET HAKAN ATILLA, | |
| *Defendant*. | |

# GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT MEHMET HAKAN ATILLA'S MOTION FOR BAIL

JOON H. KIM
Acting United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007
*Attorney for the United States of America*

Michael Lockard
Sidhardha Kamaraju
David W. Denton Jr.
Assistant United States Attorneys
Dean C. Sovolos
Special Assistant United States Attorney
    *Of Counsel*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .................................................................................................... 2

    *A. The Indictment* ............................................................................................ 2

    *B. Statutory Background* ................................................................................. 3

    *C. Offense Conduct* ......................................................................................... 7

    *D. The Defendant's Arrest in New York, Pretrial Services Interview, and this Action* ......... 8

DISCUSSION .................................................................................................... 9

    I. Applicable Law ............................................................................................ 9

    II. The Defendant Presents an Incurable Risk of Flight .................................... 10

    *A. Nature and Seriousness of the Charges Against the Defendant* ...................... 11

    *B. Weight of the Evidence Against the Defendant* ............................................ 13

    *C. History and Characteristics of the Defendant* .............................................. 15

    *D. The Defendant's Proposed Bail Package Is Insufficient to
Address Any of These Concerns* ...................................................................... 18

    CONCLUSION ............................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*United States* v. *Townsend*,
897 F.2d 989, 994-95 (9th Cir. 1990)……………….................…………………………….....10

*United States* v. *Briggs*, 697 F.3d 98, 102 (2d. Cir. 2012)………………………...……………...13

*United States* v. *Salameh*, 152 F.3d 88, 115 (2d Cir. 1998)……………………………………14

*United States* v. *Nikolas Epskamp*, 15 - 2028 (2d. Cir. 2016)……………….………………….14

*United States* v. *El Hage*, 213 F.3d 74, 80 (2d Cir. 2000)…………………………………….15

*United States* v. *John Ashe*, et. al. 15 Cr. 706 (VSB) (S.D.N.Y.) …………………….15, 16, 18

*United States* v. *Alfred Hawit*, 15 Cr. 252 (RJD) (E.D.N.Y.) ………………………….....15, 19

*United States* v. *Eduardo Li*, 15 Cr. 252 (RJD) (E.D.N.Y.) ………………………………16, 18

*United States* v. *Hanson*, 613 F. Supp. 2d 85, 89-91 (D.D.C. 2009)……………………………16

*United States* v. *Paul Ceglia*,
12 Cr. 876 (VSB) (S.D.N.Y. 2015) .................................................................................17

*United States v. Reza Zarrab*, Bail Order S1 15 Cr. 867 (RMB) …………………………..*Passim*

## STATUTES AND RULES

Exec. Order 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979)………………………………………3

Exec. Order 12613, 52 Fed. Reg. 41940 (Oct. 30, 1987)………………………………………3

Exec. Order No. 12957, 60 Fed. Reg. 14615 (Mar. 17, 1995)…………………………………3

Exec. Orders 12959 (May 6, 1995)…………………………………………………………..3

Exec. Order 13059 (Aug. 19, 1997)………………………………………………………3

Exec. Order 13,622, 77 Fed. Reg. 149 (July 30, 2012)……………………………………....5, 6

Exec. Order 13645, 78 Fed. Reg. 33945 (June 3, 2013)…………………………………………6

Exec. Order 13716, (Jan. 16, 2016)   ……………………………………………………6

82 Fed. Reg. 6187 (Jan. 13, 2017)……………………………………………………………4

31 C.F.R. § 560.203……………………………………………………………………………4

31 C.F.R. § 561.204        ……………………………………..………………………………4

22 U.S.C. § 8804(a)(1)(A)……………………………………………………………………6

50 U.S.C. § 1701…………………………………………………………………………..3

50 U.S.C § 1702…………………………………………………………………... 3, 7

50 U.S.C. § 1705………………………………………………………………..…3, 7

18 U.S.C. § 3142………………………………………………………………9, 13, 17

**SECONDARY SOURCES**

Dept. of State, 2013 Country Reports on Terrorism, *available at*
http://www.state.gov/j/ct/rls/crt/2013/224826.htm (May 3, 2016) ................................................3


Testimony of Robert J. Einhorn to House Comm. on
Oversight and Govt. Reform (July 29,
2010)…………………………………………………………………………………..11

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the defendant's application for bail. There are no conditions that can reasonably assure the defendant's appearance. Accordingly, the defendant's application for bail should be denied, and the defendant should remain detained pending trial.

Mehmet Hakan Atilla is a sophisticated international banker, who is alleged to have used his position at Türkiye Halk Bankasi A.Ş. ("Halk Bank"), a Turkish government-owned bank, to aid the government of Iran's evasion of national security controls imposed by the United States and deception of the U.S. and international banking system for years. The charges against Atilla involve massive fraud against U.S. banks and regulators and the corruption of Turkish bank and government officials to further that fraud. While Atilla tries to minimize the charges against him in his bail application, they are serious national security and financial offenses which carry a potential of decades in prison as punishment. That potential sentence – together with the Government's substantial evidence of the scheme at large and Atilla's involvement in it – create a powerful incentive for Atilla to flee if released. Moreover, that incentive is only heightened by the fact that Atilla has deep roots in another country, Turkey, where Atilla is a citizen and from where he cannot be extradited if he were to return. On the other hand, Atilla has no connections to the United States to counterbalance this incentive to flee. He has no family, property, employment, or other connections to the United States at all. The only thing that ties him to this District are the criminal charges that threaten to send him to prison for years. Finally, Atilla has more than enough resources to flee: he claims that his net monthly income in Turkey was approximately $10,000, and that he has more than $100,000 in liquid assets and almost a million dollars in total assets.

1

In the face of this significant flight risk, there is no combination of conditions that would reasonably secure the defendant's appearance in court, including the bail package proposed by Atilla. Atilla's proposed bail conditions are essentially a bond secured by a pledge of property that is in Turkey and thus beyond the reach of the Government and the Court, home detention in an apartment of his choosing, and electronic monitoring which, as the Court knows, is subject to lapses. This proposal – which, given the lack of any meaningful security, is basically nothing more than a promise by Atilla to comply – falls far short even of the conditions proposed by Atilla's co-defendant Reza Zarrab. Zarrab, like Atilla, has no domestic ties and substantial overseas connections, faces a similar potential sentence, and, also has significant means to flee. The Court rejected Zarrab's proposed package, and it should similarly reject Atilla's proposed conditions. Indeed, the inadequacy of Atilla's proposed conditions is further underscored by comparison to the cases cited in his application, all of which involve defendants who had significantly more ties to the United States and still were only released on more substantial bail packages. For these reasons, and those set forth more fully below, the defendant's application for bail should be denied.

## BACKGROUND

*A. The Indictment*

Atilla is charged in two counts of a four-count superseding indictment, S3 15 Cr. 867 (RMB) (the "Indictment"), attached hereto as Exhibit A. In particular, Atilla is charged with conspiring from at least in or about 2010, up to and including in or about 2015 to violate : (1) the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, and the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560 (Count Two, hereinafter referred to as the "IEEPA Count"); and (2) to commit bank fraud, in violation of Title

18, United States Code, Section 1349 (Count Three, hereinafter referred to as the "Bank Fraud Count").

    *B.   Statutory Background*

        The IEEPA authorizes the President to deal with "unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats, 50 U.S.C. § 1701(a), and to take steps to address such threats, 50 U.S.C. § 1702. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

        The President has repeatedly declared such a national emergency with respect to the government of Iran: beginning with Executive Order No. 12170, issued on November 14, 1979, President Carter found in response to the Islamic Revolution in Iran and the takeover of the American Embassy in Tehran, that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."  Exec. Order 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979).   A few years later, in 1987, President Reagan issued an Executive Order finding "that Government of Iran is actively supporting terrorism as an instrument of state policy" and "has conducted aggressive and unlawful military action against U.S.-flag vessels and merchant vessels of other non-belligerent nations engaged in lawful and peaceful commerce in international waters of the Persian Gulf and territorial waters of non-belligerent nations of that region."  Exec. Order 12613, 52 Fed. Reg. 41940 (Oct. 30, 1987)

        On March 15, 1995, President Clinton again found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States[.]"  Exec. Order No. 12957, 60 Fed. Reg. 14615

(Mar. 17, 1995).  On two other occasions in 1995 and 1997, President Clinton again found that the actions and policies of the Government of Iran constituted a threat to the national security, foreign policy, and economy of the United States.  *See* Exec. Orders 12959 (May 6, 1995) and 13059 (Aug. 19, 1997).  These orders, among other things, prohibited the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person and authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.

Presidents have continued the national emergency with respect to Iran and Executive Orders 13059, 12959, and 12957, given that the actions and policies of Iran continue to threaten the national security, foreign policy, and economy of the United States.  The most recent continuation of this national emergency was on January 13, 2017.  *See* 82 Fed. Reg. 6187 (Jan. 13, 2017).  In this most recent continuation, President Obama noted that, despite the Joint Comprehensive Plan of Action ("JCPOA") entered into among the United States and others, and Iran concerning Iran's nuclear program, "certain actions and policies of the Government of Iran continue to pose an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."  *Id.*

Pursuant to these authorities, the Secretary of the Treasury promulgated the ITSR, implementing the national security measures imposed by the Executive Orders.  Section 560.204 prohibits, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. Person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from

4

OFAC.  The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR.  31 C.F.R. § 560.203.

Appendix A to the ITSR contains a list of persons determined to be the Government of Iran.  At all times relevant to the charged conduct, Bank Mellat, an Iranian state-owned bank; the National Iranian Oil Company ("NIOC"), an Iranian oil company; Naftiran Intertrade Company Ltd. ("NICO"), an Iranian company located in the United Kingdom; and Naftiran Intertrade Company Sarl ("NICO Sarl"), an Iranian company located in Switzerland, were on the list in Appendix A.  At all times relevant to the charges in the Indictment, NIOC was also identified by OFAC as an agent or affiliate of Iran's Islamic Revolutionary Guard Corps ("IRGC") pursuant to Executive Order 13599.  In addition, at all times relevant to the charges in the Indictment, Bank Mellat, and all of its branches and subsidiaries, including Mellat Exchange, were designated as Specially Designated Nationals ("SDNs") pursuant to the ITSR, the Iranian Financial Sanctions Regulations ("IFSR"), 31 C.F.R. Part 561, and the Weapons of Mass Destruction Proliferators Sanctions Regulations ("WMD Sanctions"), 31 C.F.R. Part 544.

In addition to these primary sanctions against the Government of Iran, the President and Congress adopted additional restrictions against foreign financial institutions from maintaining correspondent banking relationships with U.S. banks if they provided certain services to the Government of Iran.  On June 30, 2012, President Obama issued Executive Order 13622, which imposed additional sanctions.  Executive Order 13622 and the regulations promulgated pursuant to the order authorized the Secretary of Treasury to sanction any foreign financial institution that conducted any financial transaction for (a) NIOC or NICO, with exceptions for certain sales of refined petroleum products to Iran; (b) the purchase or acquisition of petroleum or petroleum products from Iran; or (c) the purchase or acquisition of petrochemical products from

Iran. *See* 31 C.F.R. § 561.204(b).  The order and regulations permitted the Secretary of Treasury to block U.S. financial institutions from maintaining correspondent banking relationships with a foreign financial institution sanctioned pursuant to Executive Order 13622 or to place strict limitations on any such correspondent banking relationship.  *See* 31 C.F.R. § 561.204(a). Executive Order 13622 also authorized the blocking of property in the United States belonging to anyone who provided "financial, material, or technological support, or goods or services in support of, NIOC, NICO, or the Central Bank of Iran . . . or the purchase of precious metals by the Government of Iran."  *See* Exec. Order 13,622, 77 Fed. Reg. 149 (July 30, 2012).  Certain categories of transactions were exempted from these prohibitions, including transactions involving the sale of agricultural commodities, food, medicine, or medical devices to Iran.  *See* 31 C.F.R. §561.204(d)(1).

On January 2, 2013, the Iranian Freedom and Counter-proliferation Act (the "IFCA") required the imposition of sanctions on any person who knowingly "sells, supplies, or transfers, directly or indirectly, to or from Iran, precious metals."  *See* 22 U.S.C. § 8804(a)(1)(A). One of the effects of the IFCA was to broaden the ban on shipments of precious metals to Iran – while previously, only precious metal shipments in behalf of the Government of Iran were banned, after IFCA, *all* such shipments to Iran were banned, regardless of whether they were on behalf of the Government of Iran.  On June 3, 2013, President Obama implemented, among other things, the IFCA's prohibitions on dealings in precious metals on behalf of Iran.  *See* Exec. Order 13645, 78 Fed. Reg. 33945 (June 3, 2013).

On January 16, 2016, the International Atomic Energy Administration certified that Iran had met its obligations under the JCPOA to dismantle its nuclear program.  On that date, known as "Implementation Day," the JCPOA formally went into effect.  As part of the United

States' obligations under the JCPOA, OFAC removed NIOC, Nico Sarl, and Bank Mellat from the SDN List.  The practical effect of their removal was that non-U.S. persons and companies no longer risked U.S. sanctions for doing business with these entities that did not involve U.S. goods or services.  In addition, Executive Order 13716, also dated January 16, 2016, revoked the prohibitions of Executive Orders 13622 and 13645, pursuant to the JCPOA.  However, it remains unlawful for U.S. persons to engage in transactions with any of these entities, and they remain barred from engaging in U.S. dollar transactions.

### C.  Offense Conduct

The Indictment alleges a scheme by the defendants to help evade U.S. sanctions on behalf of a wide array of designated Iranian government and government-owned entities.  That scheme involved, among other things, the use of front companies, false documents, bulk cash shipments, and stripping of wire information.  Through that scheme, the defendants helped the Government of Iran and Iranian entities process millions of dollars-worth of financial transactions through the U.S. financial system that the American financial institutions would not have otherwise processed.  Atilla's co-defendant, Reza Zarrab, owned and operated with his family a network of businesses in Turkey and the United Arab Emirates, including the Royal family of companies, Al Nafees Exchange, and Durak Doviz.  (*See* Ind. ¶ 10).  Using this network, Zarrab facilitated transactions through several U.S. financial institutions on behalf of several designated entities, including Bank Mellat, Mellat Exchange, NIOC, NICO, and Mahan Airlines.  (*See id*. ¶ 18).

At all relevant times alleged in the Indictment, Atilla was the Deputy General Manager of Halk Bank.  (*See* Ind. ¶ 11).  As described in the Indictment and the Complaint filed against Atilla (which is attached hereto as Exhibit B), Atilla's role in the scheme to evade U.S. sanctions was primarily to use Halk Bank, along with others, to conceal Zarrab's shipments of gold and currency to Iran that violated U.S. sanctions.  (*See* Compl. ¶ 10).  The defendants'

7

efforts to conceal these shipments included, among other things, creating and using false documentation to make it appear that Zarrab's transactions were for humanitarian purposes that would exempt the transactions and Halk Bank from the sanctions regime.  (*See id*.).  As acknowledged even by then-Turkish deputy prime minister Ali Babacan, the shipping of gold from Turkey in exchange for Iranian oil was an integral way that Iran could recoup the proceeds of its sales of oil, s*ee* http://www.cnn.com/2012/11/29/world/meast/turkey-iran-gold-for-oil/, which was subject to U.S. and international sanctions.

       Zarrab and Atilla discussed the gold and purported food transactions and how the scheme would work.  For example, in one call, Zarrab explained how the purported food transactions would be conducted in the same manner as the previous gold transactions, including a description of how U.S. dollars could be used as part of the scheme.  *See id*. ¶ 18(b)).  In other calls, Atilla and Zarrab discussed the kinds of records that Zarrab would provide to Halk Bank to document these transactions, including the fact that Zarrab's documents were, on their face, not credible, and needed to be revised.  For instance, in one call, Atilla noted that the amount of food stuffs reflected on Zarrab's documents could not possibly be shipped on the vessels of the size that Zarrab claimed to be using, and Atilla instructed Zarrab in the future to double-check the purported transaction amounts and the purported ship capacities.  (*See id*. ¶ 18(e)).  And in another call, Atilla and Zarrab discussed the fact that Zarrab's documents claimed that wheat Zarrab was purportedly to ship originated in Dubai, which, Atilla pointed out was "impossible."  (*See id*. ¶ 18(f)).

  D.  *The Defendant's Arrest in New York, Pretrial Services Interview, and this Action*

       On March 27, 2017, Atilla was arrested at John F. Kennedy Airport by FBI agents. Atilla was scheduled to fly back to Istanbul that day.  He was presented before the Honorable James C. Francis IV on March 28, 2017.  In anticipation of his presentment, Atilla was interviewed by a Pre-Trial Services Officer, who prepared a report recommending that Atilla be detained

pending trial.  During his initial interview with the Pre-Trial Services Officer, Atilla indicated that for his work, he engaged in extensive international travel.  He also reported earning 300,000 Turkish lira a year, and having savings of 400,000 Turkish lira.  At the presentment, Atilla consented to detention without prejudice to a later bail application.

On April 7, 2017, the Indictment was filed.  Atilla was arraigned on the charges in the Indictment on April 13, 2017.  He filed the instant application initially on July 20, 2017, and then filed a supplemental submission on July 28, 2017, in response to the Court's July 24, 2017 Order.

## DISCUSSION

The Government respectfully submits that, in light of the foregoing, the defendant presents a significant flight risk, and that, as a result, there are no combination of bail conditions that could reasonably assure his appearance in Court.

## I.  Applicable Law

The question of bail is governed by the factors set forth in Title 18, United States Code, Section 3142.  Those factors include: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including, among other things, the defendant's ties to the community, past conduct, and financial resources; and (4) whether the defendant poses a danger to the community if released.  *See* 18 U.S.C. § 3142(g)(1)-(4).  If, after weighing these factors, the Court concludes that "no condition or combination of conditions will reasonably assure the appearance of the person as required . . . ." then bail should be denied.  *See* 18 U.S.C. § 3142(e).

9

## II.   The Defendant Presents an Incurable Risk of Flight

In denying Zarrab's bail application, the Court found particular persuasive: the "Defendant's lack of ties to the United States, his significant wealth and his substantial resources, his extensive international travel, and his strong ties to foreign countries, including countries without extradition.  These factors, among others stated, provide Mr. Zarrab with the incentive and the wherewithal to flee and render him a flight risk."  *See* June 6, 2016 Zarrab Bail Decision and Order ("Zarrab Bail Order"), at 17, attached hereto as Exhibit C.  Those same considerations apply equally to Atilla and show that he is a significant flight risk.  Atilla has acknowledged that: (a) he has no ties to the United States, having only traveled here on a few occasions for business; (b) he has deep roots in Turkey, including having lived and worked there his entire life, and having a wife, son, and parents who continue to live there; (c) he has traveled extensively; and (d) according to information provided by Atilla, he has assets of approximately $800,000, including, apparently approximately 400,000 Turkish lira, or more than $100,000 in his savings account.  Furthermore, just like Zarrab, Atilla faces the possibility of spending decades incarcerated in the United States.  By his own admissions, Atilla certainly has sufficient assets to secure the means of flight (*i.e.*, a passport and an airplane ticket), and he has a place to which flee (Turkey) that would not extradite him back to the United States to face charges because he is a Turkish citizen.  Regardless of how much Atilla attempts to minimize the charges against him as mere "export violations," criticize the Government's evidence against him, or assure the Court of his trustworthy nature, common sense and case law dictate that the serious nature of the charged conduct, the weight of the evidence, and his personal characteristics, including his wealth, foreign ties, and lack of any connection to the United States, make Atilla a substantial flight risk who should not be released on bail.  *See id.* at 30 (finding that because of Zarrab's lack of ties to the United States, his foreign connections, financial wherewithal, and the potential of a long sentence, Zarrab was a flight risk who should be

detained); *see also United States* v. *Townsend*, 897 F.2d 989, 994-95 (9th Cir. 1990) (denying bail to defendants charged with export violations where defendants faced substantial sentences, had no domestic ties, extensive foreign ties, and had access to large quantities of cash).

   A.   *Nature and Seriousness of the Charges Against the Defendant*

        The Court has already concluded that the charges in this case, which are all grounded in violations of the U.S. national security controls against Iran, are serious because "[t]he United States has imposed economic sanctions and regulations to help ensure that the Government of Iran and Iranian companies [do not harm the] United States." *See* Zarrab Bail Order at 7, & 18-19 (concluding that "undermining U.S. sanctions by Iran may well pose a threat to the United States" that could be exacerbated by Zarrab's release. The offenses with which Atilla is charged carry the potential for decades in prison, as described in more detail below. The fact that Atilla refuses to acknowledge the gravity and duration of a potential sentence significantly undercuts his pledge to return to Court to face these charges if bailed.

        At the time of the charged conduct, one of the purposes of the sanctions regime was to place pressure on various industries in Iran, thus limiting Iran's ability to engage in the type of conduct that threatens U.S. interests. As Robert J. Einhorn, Special Advisor for Arms Control and International Security, testified to the House Committee on Oversight and Government Reform, sanctions on the Iranian financial sector, among other efforts, were causing Iran to have "great difficulty in obtaining access to financial services that are the lifeblood of international commerce and Iranian proliferation," and had "raised the cost of doing business for Iranian procurement agents as they are forced to find alternative financial arrangements and engage in more complex deceptive practices, sacrificing time and resources to do so." *See* Testimony of Robert J. Einhorn to House Comm. on Oversight and Govt. Reform (July 29, 2010). Sanctions on Iran's shipping and petroleum industries similarly limited Iranian entities operating in those sectors from accessing

international markets, including U.S. markets, thus encouraging Iran to cease its nuclear program and hostility against the United States. *See id.*

Thus, a key part of the strategy behind the U.S. sanctions regime was limiting Iran's ability to profit from its petroleum industry, thus limiting the resources it could use for its illicit activities, including pursuing a nuclear program and sponsoring terrorism. Atilla, however, played a critical role in allowing Iran to leverage its oil resources in an unfettered manner. By helping Zarrab complete illegal shipments that were purchased with Iranian oil proceeds to Iran, Atilla, Zarrab, and their co-conspirators helped Iran ease the pressure imposed by U.S. sanctions. In particular, Atilla used his considerable influence at Halk Bank as one of its top executives to use the bank to conceal Zarrab's sanctions-busting transactions, while at the same time attempting to shield Halk Bank from secondary sanctions that could have been levied by OFAC. Atilla is hardly, as he describes himself in his bail application, "at best, a minor figure." *See* Atilla Bail App. at 11.

The seriousness of the Atilla's criminal conduct is further demonstrated by the potential sentence that he faces should he be convicted. The statutory maximum term of imprisonment for the IEEPA Count and the Bank Fraud Count is 50 years. Moreover, while the Government's investigation is ongoing, even a preliminary Guidelines analysis shows that, contrary to his assertion in his bail application, Atilla faces decades in prison. Specifically, after accounting for the volume of illegal transactions involved the conspiracy, offense-level enhancements that are likely to apply, such as the 2-point increase for use of sophisticated means, and the grouping of the offenses, the applicable offense level would be at least a 38. Even at a Criminal History Category I, this offense level results in a Guidelines range of 235 months to 293 months' imprisonment. *See* Zarrab Bail Order at 7 (noting that the potential of a "substantial term

of imprisonment" favored detention).

Atilla argues, in essence, that the potential jail sentence he faces is not that significant because of statistics suggesting that the average sentence imposed for evasion of sanctions between 2008 and 2012 is 22 months. *See id.* at 11. Initially, Atilla simply ignores that he is also charged in the Bank Fraud Count, which carries a 30-year statutory maximum term of imprisonment and is the principle force behind the potential Guidelines range of more than 20 years' imprisonment. And, while Atilla may hope that he receives a lesser sentence than what is prescribed by the Guidelines, the fact is that the Guidelines range, and indeed, the statutory maximum, is the sentence that he is currently facing. That is particularly true given the fact that the scope of the conspiracy that Atilla is alleged to have participated in far exceeds the run-of-the-mill "export violations" case.

Accordingly, the Government respectfully submits that this factor weighs in favor of detention.

B.  *Weight of the Evidence Against the Defendant*

A potential decades-long sentence is certainly sufficient to motivate Atilla to flee. As the Court noted in the Zarrab Bail Order, the merits of the Government's case are not ultimately a matter to be determined on a bail application. *See* Zarrab Bail Order at 10. But even when viewing the Government's evidence through the lens of a bail determination pursuant to Section 3142, and despite Atilla's attempt to mischaracterize and minimize the evidence against him, the weight of the evidence against the defendant favors detention.

The evidence against Atilla includes, among other things, emails and other electronic communications, intercepted telephone calls, and bank records. This evidence establishes conclusively the existence of the sanctions-evasion network dedicated to furthering the "Economic Jihad" referred to in the draft letter to Ayatollah Khamenei found in Zarrab's email.

13

(Ind. ¶ 18(a)).  Moreover, the evidence shows clearly that this network moved millions of dollars illegally for Iranian entities, including Bank Mellat, NIOC, NICO, and Mahan Air.  (*See id*. ¶ 18).

Furthermore, the evidence linking Atilla to the Halk Bank portion of the scheme is substantial.   Through, among other things, intercepted communications and emails, the Government will establish at trial that Atilla knew that Zarrab was processing fraudulent transactions through Halk Bank, gave instructions on how to make the fraudulent documents more believable, helped facilitate those transactions, and did so knowing such transactions violated U.S. sanctions.

While Atilla feigns ignores in his bail application, the fact is that gas-for-gold activity at Halk Bank was a matter of considerable notoriety, which led to scrutiny of the bank by U.S. regulators.   That scrutiny included direct communications between U.S. officials and employees of Halk Bank, including Atilla.  And intercepted communications between Zarrab and Atilla *and* between Zarrab and other co-conspirators shows that Atilla was helping to facilitate transactions for Zarrab that were contradictory to assurances given to U.S. regulators.   The Government's case against Atilla is strong, and accordingly, this factor also weighs in favor of detention.  *See*, *e.g.*, *United States* v. *Briggs*, 697 F.3d 98, 102 (2d. Cir. 2012) (noting that fact that defendant was captured in intercepted communications demonstrated strength of Government's case).

Atilla's response to this evidence is to ignore whole categories of it, question the admissibility of the evidence without any basis, and raise disputes with the Government's evidence that can only be resolved at trial.  First, Atilla's argument focuses only on the evidence that he claims directly involves him.  *See* Atilla Bail App. at 12-13.  But that ignores the well-established case law that evidence of the conspiracy at large and of acts taken by Atilla's co-

14

conspirators is admissible against him, including, for example, all of the evidence that the Court considered and found to be strong in connection with its denial of Zarrab's bail motion.  *See generally*, *United States* v. *Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (per curiam) ("Where a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant."). That also includes communications between Atilla's co-conspirators in which they discuss aspects of the scheme, including Atilla's role.  *See* Fed. R. Evid. 802(d)(2)(E).

Second, although Atilla makes reference to vague "fifth and sixth amendment" concerns concerning the intercepted communications, he does not articulate those concerns in his bail application and, in any event, has no basis to challenge on constitutional grounds the admission of foreign wiretaps, a routine practice in this District.  *See, e.g.*, *United States* v. *Nikolas Epskamp*, 12 Cr. 120 (RJS).  And Atilla's explanations of the calls in which he participated – even if they were properly considered on a pre-trial motion – are of little significance when he simply ignores all the other evidence.  *See* Zarrab Bail Order at 10 (noting that jurisdictional and evidentiary matters should be the subjects of pretrial motions).  In short, each of Atilla's challenges to the weight of the evidence are without merit, and this factor therefore also weighs in favor of detention.

C.  *History and Characteristics of the Defendant*

Finally, the defendant's personal characteristics, including his lack of any ties to the United States, his extensive and life-long connections to Turkey, and his personal resources only magnify the risk of flight he presents.  Aside from downplaying his own personal wealth, Atilla does not – because he cannot – dispute the core facts that render him a flight risk.  He concedes that he has no family, no assets, and no business in the United States.  Indeed, other than a few work trips to the United States, Atilla has only rarely been in this country.  Absent this

15

prosecution, there is nothing mooring him to the United States, and that is a considerable factor favoring detention. *See* Zarrab Bail Order at 17.

In stark contrast to his lack of connections to the United States, Atilla is deeply rooted in Turkey. He has lived there his entire life and has a wife and son there. He has spent more than 20 years working at Halk Bank, which has afforded him opportunities to travel around the world. He and his wife own outright at least three properties and invest in a fourth in Turkey. He has, according to his Pre-Trial Services interview, more than $100,000 in a bank account in Turkey. This too cuts strongly in favor of detention. *See United States* v. *El Hage*, 213 F.3d 74, 80 (2d Cir. 2000) (noting that extensive foreign travel and residency abroad are factors in favor of detention).

Atilla's attempts to surmount the obstacles presented by his foreign citizenship and residency are unavailing. First, Atilla contends that foreign citizens are bailed despite their ties abroad. But the case law cited by Atilla harms, rather than helps, his position. Initially, the overwhelming majority of the cases upon which he relies involve either U.S. citizens, U.S. legal permanent residents, or defendants with U.S. family members who are willing to sign a bond. *See United States* v. *John Ashe*, 15 Cr. 706 (VSB) (S.D.N.Y.) (setting bail for a U.S. legal permanent resident, who had a wife and children who are U.S. citizens); *United States* v. *Francisco Lorenzo*, 15 Cr. 706 (VSB) (S.D.N.Y.) (setting bail for a U.S. citizen with a bond to be signed by the defendant's mother, brother, and two sisters, all of whom reside in the United States); *United States* v. *Alfred Hawit*, 15 Cr. 252 (RJD) (E.D.N.Y.) (setting bail for a foreign defendant who lived with his daughter in the United States with a bond to be signed by multiple family members and friends who also lived in the United States); *United States* v. *Eduardo Li*, 15 Cr. 252 (RJD) (E.D.N.Y.) (setting bail for a foreign defendant with a bond secured by property in the United States and bail

package signed by six U.S. persons); *United States* v. *Hanson*, 613 F. Supp. 2d 85, 89-91 (D.D.C. 2009) (setting bail for U.S. citizen who had a home in the United States that was posted as security for the bond).  In all of these cases, the defendants who were granted bail, unlike Atilla, had significant ties to the United States that provided reason why they would return to court.  And in the one case Atilla cites in which the defendant arguably was lacking those ties, the defendant was released on a bail package that involved, among other things, private armed security guards with the authority to use reasonable force and a bond secured by $20 million in cash and a residence. *United States* v. *Ng Lap Seng*, 15 Cr. 706 (VSB) (S.D.N.Y.).  As the Court already found in rejecting Zarrab's bail application, which was patterned on the package offered in *Seng*, even private security guards and a bond secured by tens of millions of dollars is not sufficient to abate the flight risk presented by a defendant – like Zarrab and Atilla – who have no ties to the United States, extensive ties to Turkey, and the means to flee.

Second, Atilla argues that because, as he describes it, the case against him is weak, it is to advantage to say and face the charges rather than live life as a fugitive in Turkey.  In particular, Atilla claims that he would never be able to work at Halk Bank or as a banker again. Initially, it is unclear whether Atilla would in fact be barred from working at Halk Bank again, given the position taken by Halk Bank that Atilla and the bank have not done anything wrong.  But even if true, it defies reason to believe that Atilla would not take an opportunity to return to Turkey and thereby avoid prosecution and a potentially significant term of incarceration.  And that is particularly true when – contrary to Atilla's claim in his application – Turkey would not extradite him back to the United States because he is a Turkish citizen (even with a purported extradition waiver) and because the Turkish government is unlikely to return him to face these charges by virtue of his Turkish citizenship.  Simply put, whatever potential consequences Atilla claims may

result if he flees, he still has numerous powerful reasons to want to return to Turkey, and, if he does, will almost assuredly never return to this country to face the charges pending before the Court.

Third, while the defendant paints himself as a man of modest means, his description of his assets suggests anything but.  Atilla has enough financial ability to flee the United States, particularly when coupled with his own acumen as a successful international banker with an intimate knowledge of the global financial market.  As one of the most senior executives at Halk Bank, Atilla was paid a net monthly salary of approximately $10,000.  His wife also earns income from Halk Bank, though he did not specify the amount of her salary in his submission.  Atilla also has more than $100,000 in a Turkish bank account, more than enough cash to flee.  Moreover, in addition to his liquid assets, Atilla also owns a house, farmland, and a vacation home, and invests in a fourth property, all of which are in Turkey.  Atilla may not be a millionaire, but he certainly has the financial means to flee if given the chance.

The Government respectfully submits that the defendant's history and characteristics also support detention.  *See* Zarrab Bail Order at 17 (Zarrab's lack of U.S. ties, foreign connections, and wealth, among other factors, supported detention).

D.   *The Defendant's Proposed Bail Package Is Insufficient to Address Any of These Concerns*

The seriousness of the offense charged against Atilla, the weight of the evidence in support of those charges, the potential sentence that could result from a conviction, Atilla's lack of ties to the United States and his substantial connections to Turkey, and his financial wherewithal render Atilla a flight risk that is incurable by any combination of conditions, let alone the package he proposes.  That package, which is largely predicated on a bond secured by foreign assets beyond the reach of the Court and the Government, and electronic monitoring provides no meaningful assurance that Atilla would return to Court to face the very serious charges with which he is

18

charged.

First, Atilla suggests a bond of $2 million, which would be signed by him and his wife, and secured by his property interests and cash in Turkey.  Property located in Turkey, however, is no real collateral for a bond before a U.S. court, however, because neither the Court nor the Government has to ability to forfeit the property.  Thus, what Atilla has proposed, for all intents and purposes, is an unsecured $2 million bond.  And even that bond is of little value because, if Atilla flees, at most the bond would be turned into a judgment in the United States. Atilla's bond and security condition do not mitigate the substantial flight risk he presents.

Second, the defendant's proposal that he be subject to electronic monitoring does not reduce the risk of flight.  The inadequacies of electronic monitoring are well-documented: as of 2012, more than 140 federal and state defendants on electronic monitoring have absconded. Indeed, in 2015, the defendant in *United States* v. *Paul Ceglia*, (VSB) 12 Cr. 876 (S.D.N.Y.) fled while on electronic monitoring, and remains at large.  And these concerns are magnified by the fact that should the defendant flee, he is very likely to travel abroad, beyond the reach of the Government and the Court.  Thus, Atilla's proposed electronic monitoring condition adds little by way of assurances that he will appear in court.

Third, Atilla proposes that he be placed in home detention with reporting requirements to Pretrial Services and limited ability to depart.  But home detention is only as reliable as the defendant's representations to Pretrial Services as to where he is going and the monitoring services ability to ensure that he actually goes there.  Here, given the nature of the crimes charged – which involve acts of deception – and the incentive to flee presented by the potential sentence and his established life in Turkey with no significant ties to the United States, the defendant's pledge that he will abide by his bail conditions should be taken with a substantial

grain of salt.  And that is particularly true when, as noted above, defendants have been able to evade electronic monitoring in the past.  *See supra* p. 18.  Atilla's home detention condition has the effect of putting him in a high-flight-risk environment with only minimal checks on his ability to flee.

The inadequacy of Atilla's proposed package is further highlighted by a comparison to the bail packages accepted in the cases to which he cites, almost all of which involve defendants with substantially stronger ties to the United States than Atilla.  *See supra* p. 16.  For example, in *Ashe*, the defendant (a U.S. legal permanent resident with a home in Dobbs Ferry, New York) was released with a bail package that included, among other things, a $1,000,000 bond secured by $500,000 in cash and signed by five co-signers.  *See Ashe*, 15 Cr. 706 (VSB) Dkt. # 13.  Lorenzo, another defendant in the same case, is a U.S. citizen and was released upon, among other conditions, a $2,000,000 bond secured by $500,000 in cash and two properties, one of which was the defendant's mother's home.  *See id*. Dkt. # 30.  In *Li*, the defendant was released upon, among other things, $5,000,000 bond secured by $300,000 in cash, real estate in the US, and corporate assets, and signed by several U.S. citizens.  *See Li*, 15 Cr. 252 (RJD) (E.D.N.Y.) Dkt. # 253.  Even in *Hawit*, which appears to involve the least restrictive package imposed in the cases Atilla cites, the defendant was released on a $1,000,000 bond that was signed by multiple members of his family who resided in the United States.  *See id*. Dkt. # 209.  Despite having no connections to the United States, Atilla has offered a bail proposal than is substantially weaker than that which was accepted in all of these cases, which involved defendants with at least some tie to the United States.

Atilla's proposed package is also a far cry from the bail package accepted by the court in *Seng* and the package offered by Zarrab and rejected by the Court.  In both cases, the defendants essentially attempted to create a personal jail through their wealth, offering to hire

private security guards who were even empowered to shoot the defendants if they attempted to flee.  While such arrangements "hel[p] to foster inequality and unequal treatment in favor of a very small cohort of criminal defendants who are extremely wealthy," and are thus improper, *see* Zarrab Bail Order at 29, it is telling that the flight risk that Zarrab presented could not be abated through such extreme conditions of detention.  Atilla poses a considerable flight risk, and his proposed bail package offers nothing close to the security of the package of his co-conspirator, Zarrab, which this Court already rejected.  Under these circumstances, the Government respectfully submits that Atilla's motion for bail should be denied.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that the defendant's motion for bail should be denied.

Dated: New York, New York
      August 7, 2017

                                      Respectfully submitted,

                                      JOON H. KIM
                                      Acting United States Attorney for the
                                      Southern District of New York

By:                 /s/
                                        Michael Lockard
                                        Sidhardha Kamaraju
                                        David W. Denton Jr.
                                        Assistant United States Attorneys
                                        Dean C. Sovolos
                                        Special Assistant United States Attorney