UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                                      :

UNITED STATES OF AMERICA         :

                                  :      S5 15 Cr. 867 (RMB)

     - v. -                         :

                                  :

REZA ZARRAB,                    :
  a/k/a "Riza Sarraf,"         :

                                  :

                  Defendant.     :

                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 

## GOVERNMENT'S SENTENCING MEMORANDUM
## AND MOTION PURSUANT TO U.S.S.G. § 5K1.1

 

                                     JAY CLAYTON
                                       United States Attorney for the
                                       Southern District of New York

Michael D. Lockard
Assistant United States Attorney
   - *Of Counsel* -

The Government respectfully submits the following to advise the Court of pertinent facts concerning the assistance that the defendant, Reza Zarrab (the "defendant" or "Zarrab"), has rendered to the Government. In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5).

Zarrab was one of the principal architects of a prolific Iranian sanctions-evasion and money-laundering machine that funneled billions of dollars' worth of the Government of Iran's oil money from sanctions-restricted accounts held at Turkiye Halk Bankasi, A.S. ("Halkbank"), a Turkish government-owned bank, to money launderers in Turkiye and the United Arab Emirates, so that the Government of Iran would have effectively unrestricted access to those funds. Zarrab worked with Halkbank's senior leadership and high-level Turkish and Iranian government officials to design, implement, and protect this money-laundering system, and paid out millions of dollars' worth of bribes to corrupt bank and government officials.

From the inception of this scheme in March 2012 until Zarrab's arrest in March 2016, the sanctions-evasion system at Halkbank laundered approximately $20 billion-worth of oil proceeds for the Central Bank of Iran and the National Iranian Oil Company ("NIOC")—a state-owned and -run oil company that the U.S. Department of the Treasury ("Treasury") has identified as an affiliate of Iran's Islamic Revolutionary Guard Corps ("IRGC"). At least approximately $3 billion of this Iranian oil money was directed through the U.S. financial system as part of the laundering and disbursement of the Government of Iran's money.

The system operated at a particularly crucial time for the Government of Iran: throughout the 2000s and early 2010s, U.S. and international sanctions against the Government of Iran and its petroleum and petrochemicals industries grew increasingly restrictive in an attempt to curb the Government of Iran's funding for its nuclear and ballistic missiles programs and its funding of terror proxies, and as an economic incentive for the Government of Iran to engage in a diplomatic process to address its nuclear program. The money laundering system at Halkbank gave the Government of Iran a $20 billion lifeline during the multilateral diplomatic negotiations that ultimately led to the 2015 Joint Comprehensive Plan of Action ("JCPOA"), from which the United States later withdrew after determining that Iran had escalated its destabilizing activities in the surrounding region following the JCPOA, that Iran had violated the JCPOA's limits on heavy water stockpiles and requirements for inspections of nuclear and nuclear-related sites, and that continued participation in the JCPOA was not in the national interest of the United States.

Following Zarrab's March 2016 arrest, however, Zarrab began cooperating with the Government and the FBI, including by testifying at the trial of his co-defendant, former Halkbank Deputy General Manager in charge of International Banking, Mehmet Hakan Atilla. While the charges against Atilla and other co-defendants were filed based solely on evidence entirely independent of Zarrab's testimony and cooperation, Zarrab's first-hand account of the design and execution of the complex, multi-year money-laundering system was helpful to the jury, corroborated by a wealth of evidence, and fully truthful and credible. Zarrab also paid a high price for his honesty: he suffered significant threats and retaliation because of his cooperation.

In sum, Zarrab's information and testimony has been "truthful[], complete[], and reliab[le];" his assistance has been "significan[t] and useful[]" and "timel[y];" and he has suffered "danger or risk . . . resulting from his assistance." U.S.S.C. § 5K1.1(a)(1), (2), (4), & (5).

**BACKGROUND**

## I.      The Defendant's Background

Zarrab was born in Iran, moved to Turkiye at a young age, and attended school in Dubai. Zarrab was married to Ebru Gundes Sarraf, a Turkish performer, until approximately 2021, and they have a child together.

Zarrab worked in his father's Dubai-based currency exchange business, Al Nafees Exchange, when he was younger. Zarrab later established and operated Turkish and Emirati companies involved in, among other things, currency exchange and money remittance, precious metal exports, shipping, furniture manufacture, and construction.

## II.     The Defendant's Criminal Conduct

Agents and prosecutors have held numerous proffers and meetings with Zarrab since he first began meeting with the Government. During these sessions, Zarrab admitted to the full extent of his prior criminal history, as was required by his cooperation agreement with the Government. The description below is based on the Government's independent investigation and Zarrab's proffer admissions.

### A.      Money Laundering and Sanctions Evasion for Iranian Customers

In approximately 2010, Zarrab began conducting sanctions-evading and money-laundering transactions for Iranian clients through his currency exchange businesses. (PSR ¶ 29; Tr. 272-78.) Zarrab opened accounts at a Turkish bank, Aktif Bank for this business. Zarrab's relationship with Aktif Bank was facilitated by Egemen Bagis, who at the time was Turkiye's European Union ("EU") Minister. (Tr. 277.) Zarrab used these accounts, opened in the name of a straw owner, to operate a *hawala* system whereby Iranian customers could pay Zarrab in Iran and Zarrab would make funds available to the Iranian customer in Turkiye, thereby concealing that the funds

3

originated from Iran and were controlled by an Iranian customer. Zarrab laundered Iranian customer funds into various currencies, including U.S. dollars.

Zarrab expanded his business so that clients included Iranian banks, typically operating through wholly owned currency exchange businesses, such as Bank Mellat's Mellat Exchange.[1] Zarrab also executed international payment instructions on behalf of Bank Mellat and other Iranian clients, using a network of Turkish corporate entities that he owned and controlled or otherwise had access to through business associates. (Tr. 286-90.) These international payments included U.S. dollar-denominated transfers that were processed through the U.S. financial system. The method of *hawala* transfers and front companies concealed from international banks the fact that the money transfers were of Iranian origin and were on behalf of OFAC-sanctioned entities.

Zarrab sought to further expand his business by offering his services to the Central Bank of Iran ("CBI"). Zarrab executed currency exchange transactions in Iranian toman for CBI, including transactions to help CBI manipulate the value of the toman to meet certain currency exchange rate targets. CBI ended their business relationship after a period of time. Zarrab attempted to revive his business with CBI by sending letters to the head of the central bank and to Mahmoud Ahmedinejad, the president of Iran at the time, pledging his commitment to Iran's policy of "Economic Jihad," or the "Resistance Economy"—essentially, the Government of Iran's institutional policies of economic sanctions evasion. Zarrab's effort was unsuccessful, however. (Tr. 278-85.)

---

[1] Bank Mellat is an Iranian state-owned bank that was designated as a Specially Designated National ("SDN") pursuant to the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560; the Iranian Financial Sanctions Regulations ("IFSR"), 31 C.F.R. Part 561, and the Weapons of Mass Destruction Proliferators Sanctions Regulations ("WMD Sanctions"), 31 C.F.R. Part 544.

### B.    Money Laundering and Sanctions Evasion With Halkbank

Zarrab learned that Halkbank was involved in the handling of Iranian oil proceeds and sought to expand his business to these funds. Zarrab found an existing Halkbank client who was buying, exporting, and selling gold for Iranian customers using Halkbank accounts in order to launder the Iranian customers' money and evade sanctions, and arranged for a test transaction through this Halkbank client's system to ensure that the system worked. (Tr. 295-97.) Zarrab also learned from Reza Rajaeieh, who at the time was a senior officer at the Iranian Bank Sarmayeh,[2] that Bank Sarmayeh had approximately one billion Euro in an account at Halkbank, and Rajaeieh sought Zarrab's help to withdraw those funds as well. (Tr. 316-17.)

Zarrab then secured a meeting with Suleyman Aslan, at the time Halkbank's General Manager (equivalent to the CEO). Zarrab described his plan to use Iranian oil proceeds held at Halkbank to buy and export gold for the Government of Iran, earning fees for Zarrab and the bank and giving the Government of Iran free use of its funds outside of its accounts at Halkbank. Aslan demurred, however, explaining that Zarrab's public profile—a result of his marriage to a popular performer—would draw unwanted attention to the bank and the Iran business. (Tr. 298-99.)

In the spring of 2012, Zarrab made the acquaintance of Mehmet Zafer Caglayan, at the time the Turkish Minister of Economic Affairs. Zarrab explained his plan to launder Iranian oil proceeds out of accounts at Halkbank and Aslan's reluctance to greenlight the scheme. Caglayan offered to become Zarrab's "partner," meaning that Zarrab would bribe Caglayan by sharing half of Zarrab's earnings from the scheme. Zarrab further developed his plans in meetings with Caglayan and Rajaeieh. (PSR ¶ 29; Tr. 300-10, 317-29.)

---

[2] In July 2012, OFAC identified Bank Sarmayeh as an Iranian financial institution pursuant to Executive Order 13599, whose interests in property in the United States or the custody of any U.S. person were blocked.

### 1.    Laundering Restricted Iranian Oil Proceed Using the Gold Method

Armed with Caglayan's support, Zarrab met again with Aslan, Atilla, and other Halkbank officers to work through the details of this gold laundering scheme, including how to manipulate the compliance documentation to make the transactions appear to be for legitimate business purposes and compliant with the relevant sanctions on Iranian oil proceeds and gold purchases.

In the first step of the money-laundering scheme, Halkbank transferred Iranian oil proceeds from accounts held by CBI and NIOC to accounts at Halkbank held by Iranian non-governmental banks, like Bank Sarmayeh. The Iranian banks then transferred funds to accounts held by Zarrab's companies at Halkbank, which Zarrab used to buy gold from Turkish gold trading companies. Zarrab then exported the gold from Turkiye to Dubai,[3] where it was sold. Zarrab used the proceeds from the gold sales to execute payment orders he received from his Iranian bank customers, sending international transfers using Emirati banks and money services businesses to the payees identified by Iran. Zarrab often outsourced these international transfers to third-party money laundering partners to avoid the administrative expense of creating and managing a portfolio of Emirati front companies and executing the international bank wires. (PSR ¶ 32; Tr. 323-35; GX9501, 9502.)

Zarrab modified the gold scheme at times based on instructions from Halkbank, particularly Atilla, about changes in the applicable sanctions being evaded. For example, at the beginning of the scheme, Zarrab created documents indicating that the gold was being exported from Turkiye to Iran, which was false—the gold was exported to Dubai and sold. In July 2012, a new Executive Order authorized the imposition of sanctions against foreign banks facilitating the

---

[3] On occasion, Zarrab did not actually buy and export gold, but instructed his employees to create documents to make it appear that he had. (Tr. 369-70.)

Government of Iran's acquisition of precious metals. On Atilla's instructions, Zarrab changed the gold documents to show the gold being exported from Turkiye to Dubai, instead of Iran. This change was to conceal that the gold purchases were for the benefit of the Government of Iran. Later, sanctions tightened again with the introduction of the "bilateral trade" requirement, *see* § 504, Iran Threat Reduction and Syria Human Rights Act of 2012 ("TRA"), Pub. L. 112-158, 126 Stat. 1214, 1261 (Aug. 10, 2012) (codified at 22 U.S.C. § 8513a), limiting the use of Iranian oil funds at foreign banks to buying goods from the country where the bank was located for export to Iran. On Atilla's instructions, Zarrab again changed the documentation to indicate that the gold was being exported to Iran to make it appear to comply with this requirement. (PSR ¶ 33-35; Tr. 360-63.)

The gold scheme was enormously successful. In 2011, before the gold laundering system for Iran's oil proceeds, Turkiye exported approximately $55 million worth of gold to Iran and $280 million to the U.A.E. In 2012, Turkiye's reported gold exports skyrocketed to approximately $6.5 billion to Iran and $4.6 billion to the U.A.E. (PSR ¶ 39.) Zarrab's business with NIOC was the vast majority of the increased gold exports. (*Id*.) At one point in the scheme, so much gold was being exported from Turkiye to Dubai to fuel the money-laundering and sanctions-evasion scheme that Zarrab found it cheaper to buy gold in Dubai (the same market where he was selling the exported gold from Turkiye) and have it re-imported to Turkiye in order to recycle it into the gold laundering scheme. In 2012 and 2013, Zarrab paid nearly $1 billion in U.S. dollars to buy gold in Dubai so it could be reimported to Turkiye and injected back into the scheme.

Indeed, the scheme was so successful that NIOC and the Ministry of Petroleum attempted to transfer Iranian oil proceeds held in other countries to Halkbank, so that it could be laundered through the gold system. A delegation from Iran travelled to Turkiye in October 2012, including

Bank Sarmaye's Rajaeieh and senior officers from NIOC and from NIOC's European subsidiary, Naftiran Intertrade Company ("NICO"), to meet with Halkbank and Turkish government officials. During this visit, the Iranian bank and petroleum officials negotiated with Halkbank to transfer NIOC funds held in restricted accounts in India. (PSR ¶ 26; Tr. 384-88, 394-96, 403-04.) The Iranian Ministry of Petroleum also later sought to transfer Iranian oil proceeds held in Japan to Halkbank. (Tr. 601-02.)

Zarrab charged his customers approximately 1.5% commission for the money laundering services, which he split evenly with Caglayan. Halkbank charged approximately 0.8%-1% in commissions for the transfers involving Halkbank customer accounts, including CBI and NIOC. During the Iranian delegation's October 2012 visit to Turkiye, the Iranians sought to reduce their expenses by cutting Zarrab out: the Iranians asked Halkbank to transfer the funds directly from Halkbank. As then-General Manager Aslan reported to Zarrab in a wiretapped call, Aslan and Atilla rejected the request and told the Iranians that there was already a system for making international payments—referring to Zarrab. (PSR ¶ 37; Tr. 396-97.)

### 2.    Bribes Paid to Halkbank's Aslan

In early October 2012, Halkbank's Aslan solicited bribes from Zarrab. During a meeting at Aslan's Halkbank office, Aslan complained that he had been instructed by Caglayan to have Halkbank carry out the money-laundering scheme, but that he (Aslan) was taking a lot of risk and was drawing a lot of attention from the U.S. Treasury and OFAC authorities. Aslan told Zarrab that he wanted to ensure his future, in other words, he wanted to be paid. Zarrab obtained Caglayan's blessing for adding another bribe recipient to the scheme, and then had an initial bribe payment of €2 million in cash delivered to Aslan's home. (PSR ¶ 38; Tr. 408-14.) It was shortly after the meeting in Aslan's office where Aslan asked for a bribe that Aslan and Atilla rejected the Iranian delegation's request to cut Zarrab out of the scheme.

8

From October 2012 until December 2013, Zarrab paid Aslan cash bribes totaling at least approximately $8.5 million in U.S. dollars, Euro, and Turkish lira. Throughout 2012 and 2013, Zarrab also paid Caglayan bribes totaling at least approximately $70 million in U.S. dollars, Euro, and Turkish lira, as well as luxury watches and other items. (PSR ¶ 38.)

### 3.    Laundering Restricted Iranian Oil Proceeds Using the Fake Food Method

In later 2012 and early 2013, the gold laundering system became more difficult. There was heightened U.S. Treasury attention on Halkbank's involvement in facilitating Iranian gold purchases, widespread public reports about Turkiye paying for Iranian oil with gold, and increasingly restrictive sanctions against Iranian precious metals trade. Throughout February and March 2013, Treasury officials continued to pressure Halkbank about the Iranian gold trade and about the Government of Iran's frequent use of fake trade and falsified documents to launder oil proceeds. (PSR ¶¶ 55-61.)

In January 2013, Congress enacted the Iran Freedom and Counter-Proliferation Act ("IFCA"), Subtitle D of Title XII of the National Defense Authorization Act of 2013. Pub. L. 112-239, §1245, 126 Stat. 1632, 2009 (Jan. 2, 2013), which required the imposition of sanctions against any foreign financial institution determined to have conducted or facilitated a significant financial transaction for the sale, supply, or transfer of precious metals to or from Iran. Thus, earlier sanctions against the Government of Iran's acquisition of gold were expanded to include the acquisition of gold by non-government actors—including the private Iranian banks acting as intermediaries for the laundering of NIOC's oil money. Accordingly, in February 2013, Aslan told Zarrab to switch from the gold method to using fake food trade to launder Iranian oil proceeds by taking advantage of the "humanitarian trade" exception to sanctions against Iran's access to oil

9

proceeds.[4] (PSR ¶¶ 41-42; Tr. 493-502.) Under this exception, the Government of Iran's oil proceeds could be used to buy food and agricultural products for importation to Iran, without needing to comply with the bilateral trade requirement (*i.e.*, the humanitarian goods could be bought from other countries).

In February, March, and April, Zarrab—who had never been involved in any kind of food or agricultural trade—worked with his employees and with Halkbank to devise a method to use the humanitarian trade exception to launder Iran's oil money. Halkbank officials, including Atilla, devised a new, special-purpose payment and documentation protocol for Zarrab's companies based on the documents he was able to obtain or fabricate. The protocol for Zarrab was different from Halkbank's protocol for other customers, required fewer documents and less verification, and provided faster approvals for payments. Atilla also provided regular feedback on documents Zarrab provided to ensure they were at least facially plausible—such as advising when the documents purporting to show that tons more food had been loaded on a vessel than the vessel's maximum capacity; or when documents showed the purported use of a large vessel that, in a real transaction, would generate a bill of lading—a shipping document Zarrab was not required to provide because he could not effectively forge them. (PSR¶¶ 42-44, 46-47; Tr. 557-73, 613-16, 621-22, 649-68; GX9503.) Notwithstanding these corrections from Halkbank, Zarrab often used the same Iranian bank counterparties from the gold transactions as his counterparties for food transactions, so that, for example, an Iranian bank previously documented as purchasing tons of gold was now documented as purchasing tons of frozen chicken. (Tr. 768-70.)

---

[4] The gold laundering method did not stop after the fake-food laundering method started. The Prime Minister of Turkiye told Halkbank that the gold method should continue in order to artificially support Turkiye's reported trade statistics. (PSR ¶ 48; GX268-T.) At least approximately 9 to 10 metric tons of gold were exported from Turkey to Dubai between July and December 2013 through the gold laundering method. (PSR ¶ 62.)

The fake-food laundering method was equally as successful as the gold laundering method. Between approximately April and December 2013, Zarrab laundered at least approximately $1.5 billion-worth of NIOC funds out of Halkbank using the fake-food method. (PSR ¶ 47.) The system was so effective that, in the fall of 2013, Halkbank began to worry that the NIOC account balance was getting too low. Halkbank imposed restricted access to the NIOC funds by companies that were actually engaged in humanitarian trade so the money could be used in the fake-food laundering system instead. (PSR ¶ 51.)

**4.    The December 2013 Turkish Arrests, Bribery to Quash the Case, and Resumption of the Oil Proceeds Laundering Scheme**

On December 17, 2013, Zarrab, Aslan, Caglayan's son, and others were arrested in connection with an investigation of gold smuggling, money laundering, and bribery by the Financial Crimes Unit of the Turkish National Police ("TNP"). (PSR ¶ 49.) The investigation, which began in approximately September 2012, included the use of court-authorized wiretaps, court-authorized physical and electronic surveillance, financial analysis, and other investigative techniques. On the day of Zarrab and Aslan's arrests, TNP officers also executed search warrants at Zarrab's home and business offices and Aslan's home and Halkbank office, resulting in the seizure of computers, phones, hardcopy documents, and several shoeboxes of cash from Aslan's home. (*E.g.*, Tr. 1392-98, 1565-81, 1585-91.)

All of the officers and supervisors involved in investigation were removed from their positions and reassigned, often to posts outside Istanbul. There were also large-scale personnel changes throughout the TNP, reportedly resulting in the dismissal or reassignments of thousands of officers. In 2014 and 2015, arrest warrants were issued for the investigators and prosecutors involved in the corruption investigations, and most were either arrested on false charges or fled the country. (*E.g.*, Tr. 1373-84, 1561-64.)

11

Zarrab was imprisoned for a short period of time, but after paying bribes he was released and the charges later dismissed. (PSR ¶ 49; Tr. 696.)

By approximately July 2014, Zarrab was in talks with Halkbank and its new General Manager, Ali Fuat Taskensenlioglu, about restarting the Iranian oil money laundering system. Taskensenlioglu was reluctant because of the attention Zarrab could bring the bank, but was instructed by the son-in-law of the Turkish Prime Minister, who would later serve as Minister of Energy, to continue the scheme. Zarrab worked with Halkbank officers, including Atilla and others, to refine the documentation Zarrab would provide the bank in order to create compliance records for the continued money laundering scheme. (PSR ¶ 50; Tr. 697-704, 1036-38.)

The system continued until Zarrab's arrest in the United States in approximately March 2016. In total, between 2012 and 2016, the gold and fake-food scheme laundered approximately $20 billion-worth of the Government of Iran's oil proceeds, including several billion dollars that were transferred through U.S. banks for repurchasing gold, internal transfers among front companies used in the system, and U.S. dollar-denominated payments for the Government of Iran.

## C.    Additional Bribes

In addition to the bribes paid to Caglayan and Aslan, Zarrab bribed other Turkish government officials, including then-Minister for European Union Affairs Egemen Bagis and then-Minister of the Interior (the Ministry responsible for the Turkish police forces) Muammer Guler. Zarrab paid various bribes to Turkish police officers, immigration officials, and municipal officials to get out of traffic tickets, secure or expedite immigration benefits for employees or family members, and secure or expedite permitting. He also paid bribes to customs officials and officials at other banks to facilitate his business.

### D. Additional Offenses

During the time Zarrab was engaged in the scheme to launder the Government of Iran's oil proceeds held at Halkbank, he also established companies in China in order to launder the Government of Iran's oil money held in Chinese banks. Zarrab used similar means and methods as in the Halkbank scheme in order to move the oil proceeds to Dubai, or to Turkiye and then to Dubai. The scheme was smaller in scale than the laundering at Halkbank.

In an interview with FBI agents following his March 2016 arrest, Zarrab falsely denied his knowledge of and involvement in laundering money and evading sanctions for Iranian customers and the Government of Iran. When Zarrab was interviewed by Pretrial Services in connection with his presentment in the Southern District of Florida, he similarly made false statements to the Pretrial Services officer.

After his arrest in the United States, Zararb was ordered detained without bail. While detained at the Metropolitan Detention Center ("MDC") in Brooklyn, he paid a prison guard to give him access to an illegal cellphone and alcohol.

## III.    The Information and Guilty Plea

On October 26, 2017, in a sealed proceeding, Zarrab waived indictment and consented to the filing of an information, S5 15 Cr. 867 (RMB) (the "Information"). Zarrab pleaded guilty to the charges in the Information before this Court pursuant to a cooperation plea agreement.

Count One of the Information charges Zarrab with conspiring to impair, impede, and obstruct the lawful and legitimate governmental functions and operations of the U.S. Department of the Treasury in the enforcement of economic sanctions laws and regulations administered by that agency between in or about 2010 and in or about March 2016, in violation of Title 18, United States Code, Section 371.

Count Two of the Information charges Zarrab with conspiring to violate the International Emergency Economic Powers Act (the "IEEPA") between in or about 2010 and in or about March 2016, in violation of Title 50, United States Code, Section 1705.

Count Three of the Information charges Zarrab with committing bank fraud between in or about 2010 and in or about March 2016, in violation of Title 18, United States Code, Section 1344.

Count Four of the Information charges Zarrab with conspiring to commit bank fraud between in or about 2010 and in or about March 2016, in violation of Title 18, United States Code, Section 1349.

Count Five of the Information charges Zarrab with committing money laundering between in or about 2010 and in or about March 2016, in violation of Title 18, United States Code, Section 1956.

Count Six of the Information charges Zarrab with conspiring to commit money laundering between in or about 2010 and in or about March 2016, in violation of Title 18, United States Code, Section 1956.

Counts One through Six of the Information relate to Zarrab's participation in schemes to launder funds and evade sanctions for Iranians and the Government of Iran with money held at Aktif Bank, Halkbank, and Chinese banks; including by using money laundering methods that concealed from U.S. correspondent banks that were involved in some of those transactions that the transfers were on behalf of and for the ultimate benefit of Iranian customers and the Government of Iran.

Count Seven of the Information charges Zarrab with conspiring to bribe a U.S. public official and possessing contraband in a federal detention center between in or about 2016 and in or about June 2017, in violation of Title 18, United States Code, Section 371. Count Seven relates

14

to Zarrab's payment of bribes to a Bureau of Prisons correctional officer in order to obtain contraband at the MDC, including an unlawful cellphone and alcohol.

## IV.    The Defendant's Substantial Assistance

Following his arrest, Zarrab initially contested the charges in the original indictment and in superseding indictments returned on March 30, 2016, and November 7, 2016. Atilla was arrested in the United States on a Complaint in March 2017, and a third superseding indictment including charges against Atilla was filed on April 7, 2017. The Government of Turkiye, including its Ministry of Foreign Affairs and Ministry of Justice, sought to have the charges against Zarrab and Atilla dismissed.

Zarrab began participating in proffers in furtherance of cooperation in approximately August 2017. Shortly afterwards, on September 7, 2017, a fourth superseding indictment was filed expanding the factual allegations relating to the Halkbank sanctions-evasion and money-laundering scheme, and adding Caglayan, Aslan, and Levent Balkan (a former Halkbank officer) as co-defendants. The fourth superseding indictment was not based on Zarrab's cooperation, however, but was based solely on the Government's investigation and evidence gathered independently of Zarrab's proffers.

However, Zarrab's pursuit of cooperation made him available as a trial witness. The Government was prepared to proceed to trial without Zarrab as a witness, and the evidence independent of Zarrab's testimony was sufficient to convict beyond a reasonable doubt—including recorded phone calls involving Zarrab, Aslan, Atilla, Caglayan, and others; emails recovered from accounts used by Zarrab and his employees; text messages recovered from Zarrab and Aslan's phones; documents obtained from searches of Zarrab's home and offices and Aslan's home and office; and other evidence. Zarrab's testimony was nonetheless invaluable in assisting the jury and the Court in understanding a complex scheme that repeatedly evolved and adapted to pressures

15

from Treasury officials and tightening sanctions. The scheme revealed itself across hundreds of emails, text messages, intercepted phone calls, and financial records, and Zarrab's ability to provide an insider's view of how the scheme worked, and why it was designed the way that it was, made it much easier to understand and much easier to put the other evidence into context.

Zarrab also authenticated and corroborated the wiretap, text message, and email evidence, and was able to explain to the jury the issues that were discussed in those communications. Over the course of several days of testimony, including nearly three days on cross-examination alone, Zarrab walked through numerous emails, text messages, and intercepted telephone calls to identify the other participants and their roles in the scheme, explain the context of the communications, and explain how each communication related to the broader discussions among the coconspirators about the scheme to evade sanctions and launder the Government of Iran's oil money.

On January 6, 2018, the jury returned a verdict of guilty against Atilla for conspiring to obstruct Treasury, conspiring to violate the IEEPA, bank fraud and bank fraud conspiracy, and money laundering conspiracy.

In early November 2017, after Zarrab had pleaded guilty in a sealed proceeding and before his cooperation had been publicly revealed,[5] another inmate at the MDC approached Zarrab and advised that he had been paid to kill Zarrab for being a cooperator. The MDC inmate said he expected Zarrab's cooperation to be confirmed in the near future and Zarrab would be killed because he was cooperating against "big people in Turkey." The MDC inmate showed Zarrab a homemade knife to confirm his threat. After this threat, Zarrab was taken out of the MDC and held in FBI custody until trial was complete.

---

[5] Although Zarrab's cooperation was not public, there had been speculation that Zarrab might be cooperating and Zarrab did not file motions *in limine* on the October 30, 2017, filing deadline.

16

Trial commenced on November 27, 2017, and Zarrab was called as a witness on November 29. During his first day of testimony, Zarrab (i) described the initiation of the scheme to launder the Government of Iran's money at Halkbank; (ii) described Zarrab's profit-sharing bribery agreement with Caglayan, including Zarrab's explanation of internal accounting records that one of his employees maintained to keep track of the bribe payments; (iii) provided a detailed explanation of the gold laundering and fake-food laundering systems, including by making diagrams of how the systems operated; and (iv) authenticated recordings of wiretapped telephone calls that Zarrab participated in.[6]  As has been publicly reported, the Government of Turkiye retaliated against Zarrab immediately by, among other things, imposing broad freezes and seizures against Zarrab's assets.

## V.    Forfeiture and Restitution

The Court entered a Consent Preliminary Order of Forfeiture at the time of Zarrab's guilty plea, forfeiting all of his right, title, and interest in any proceeds obtained from the charged offenses and any property involved in the money laundering offenses.

The Government does not seek restitution. The principal victim of the offenses is the public and the effect of the offense conduct on the national security of the United States. The Government is aware that certain plaintiffs in a civil action captioned *Owens et al. v. Turkiye Halk Bankasi A.S.*, 20 Civ. 2648 (DLC) (S.D.N.Y.), filed a letter asserting crime victim rights under 18 U.S.C. § 3771 with respect to Halkbank. The Government has conferred with *Owens* counsel and has been advised that the Owens plaintiffs do not intend to assert crime victim rights with respect to Zarrab.

---

[6] The Government of Turkiye and Halkbank had previously claimed that these wiretaps were fabricated or altered in some way.

17

## CONCLUSION

For the reasons stated above, the Government intends to request at sentencing that the Court sentence the defendant, Reza Zarrab, in light of the factors set forth in Section 5K1.1(a) of the Sentencing Guidelines.

Dated:  New York, New York
        July 6, 2026

                               Respectfully submitted,

                               JAY CLAYTON
                               United States Attorney

                        By:  _____*/s/*_____

                               Michael D. Lockard
                               Assistant United States Attorney
                               (212) 637-2193

cc:     Counsel of record (by ECF)
        Michelle Millan, U.S. Probation Officer (by email)

18